<DOCUMENT>
<TYPE>424B5
<SEQUENCE>1
<FILENAME>y15539e424b5.txt
<DESCRIPTION>424B5
<TEXT>
<PAGE>

INVESTING IN THESE CERTIFICATES INVOLVES RISKS. YOU SHOULD NOT PURCHASE THESE
CERTIFICATES UNLESS YOU FULLY UNDERSTAND THEIR RISKS AND STRUCTURE. SEE "RISK
FACTORS" BEGINNING ON PAGE S-16 OF THIS PROSPECTUS SUPPLEMENT AND PAGE 1 OF
THE ATTACHED PROSPECTUS.


These certificates will be beneficial interests in a trust fund, and will be
backed only by the assets of the trust fund. Neither these certificates nor
the assets of the trust fund will be obligations of Merrill Lynch, Pierce,
Fenner & Smith Incorporated, LaSalle Bank National Association, Citibank,
N.A., National City Home Loan Services, Inc., Wilshire Credit Corporation or
any of their affiliates. These certificates will not be insured or guaranteed
by any governmental agency or any other entity.

Filed Pursuant to Rule 424(B)5

Registration No: 333-127233

PROSPECTUS SUPPLEMENT
 (TO PROSPECTUS DATED AUGUST 26, 2005)

$1,874,757,100 (APPROXIMATE)

FIRST FRANKLIN MORTGAGE LOAN TRUST

MORTGAGE LOAN ASSET-BACKED CERTIFICATES,

SERIES 2005-FF12

MERRILL LYNCH MORTGAGE INVESTORS, INC.
DEPOSITOR

First Franklin Mortgage Loan Trust, Series
2005-FF12 will issue sixteen classes of
certificates, fourteen of which are offered by
this prospectus supplement and the attached
prospectus. The table on page S-4 identifies the

various classes of offered certificates and
specifies certain characteristics of each such

class, including the class's initial certificate

principal balance, interest rate and rating.

The trust fund will consist primarily of sub-prime mortgage loans secured by first liens

on real properties that were acquired by Merrill

Lynch Mortgage Lending, Inc. from First Franklin

Financial Corp.

<Table>
<Caption>

| PRICE TO PUBLIC | UNDERWRITING DISCOUNT | PROCEEDS TO DEPOSITOR |
|---|---|---|
| ----------------- | ------------ | ----------------- |
| <S> | <C> | <C> |
| $1,873,357,303.96 | $4,686,715.31 | $1,868,670,588.65 |
| 99.9253% | 0.2500% | 99.6753% |

</Table>

The price to public and underwriting discount shown are for certain classes of offered certificates in the aggregate. This information

is shown for each individual class on page S-102.

See "Method of Distribution."

The proceeds to the depositor will be $1,868,670,588.65 before deducting expenses, which are estimated at $900,000.00. See "Method

of Distribution."

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED ON THE ADEQUACY OR ACCURACY OF THIS PROSPECTUS SUPPLEMENT AND THE ATTACHED PROSPECTUS.
ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

MERRILL LYNCH & CO.

The date of this prospectus supplement is December 22, 2005.
<PAGE>

WHERE TO FIND INFORMATION IN THIS PROSPECTUS SUPPLEMENT
AND THE ATTACHED PROSPECTUS

Information about the offered certificates is contained in (a) the attached prospectus, which provides general information, some of which may not apply to the certificates; and (b) this prospectus supplement, which describes the specific terms of the certificates.

This prospectus supplement and the attached prospectus include cross references to sections in these materials where you can find further related discussions. The tables of contents in this prospectus supplement and the attached prospectus identify the pages where those sections are located.

After the initial distribution of the certificates offered by this prospectus supplement, the prospectus and this prospectus supplement may be used by Merrill Lynch, Pierce, Fenner & Smith Incorporated, an affiliate of the seller, the depositor and the servicer, in connection with market making transactions in those certificates. Merrill Lynch, Pierce, Fenner & Smith Incorporated may act as principal or agent in these transactions. These transactions will be at market prices at the time of sale and not at the prices of the initial offering.

In this prospectus supplement, the terms "Depositor," "we," "us" and "our" refer to Merrill Lynch Mortgage Investors, Inc.

FOR EUROPEAN INVESTORS ONLY

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), the underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time:

(a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized, or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than (E) 43,000,000 and (3) an annual net turnover of more than (E) 50,000,000, as shown in its last annual or

consolidated accounts; or

(c) in any other circumstances which do not require the publication by the

issuer of a prospectus pursuant to Article 3 of the Prospectus
Directive.

For the purposes of this provision, the expression an "offer of
certificates to the public" in relation to any certificates in any Relevant
Member State means the communication in any form and by any means of
sufficient
information on the terms of the offer and the certificates to be offered so
as
to enable an investor to decide to purchase or subscribe the certificates, as
the same may be varied in that Member State by any measure implementing the
Prospectus Directive in that Member State and the expression "Prospectus
Directive" means Directive 2003/71/EC and includes any relevant implementing
measure in each Relevant Member State.

<center>S-2</center>

<PAGE>

TO UNDERSTAND THE STRUCTURE OF THESE CERTIFICATES, YOU MUST READ CAREFULLY
BOTH
THE ATTACHED PROSPECTUS AND THIS PROSPECTUS SUPPLEMENT IN THEIR ENTIRETY.

<center>TABLE OF CONTENTS</center>

<Table>
<S>                                          <C>
The Series 2005-FF12 Certificates.............  S-4
Summary Information...........................  S-5
  Principal Parties...........................  S-5
  Cut-off Date................................  S-5
  Closing Date................................  S-5
  Distribution Date...........................  S-5
  The Trust Fund..............................  S-5
  The Series 2005-FF12 Certificates...........  S-5
  Interest Distributions......................  S-6
  Principal Distributions.....................  S-7
  Cap Contracts...............................  S-7
  Denominations...............................  S-7
  Book-Entry Registration.....................  S-7
  Credit Enhancement..........................  S-7
  NIMs Insurer................................  S-9
  Optional Termination........................  S-9
  Legal Investment............................  S-9
  Federal Income Tax Consequences.............  S-9
  ERISA Considerations........................  S-10
  Ratings.....................................  S-10
  The Mortgage Loans..........................  S-10
Risk Factors..................................  S-16
Forward-Looking Statements....................  S-24
Glossary......................................  S-24
The Mortgage Pool.............................  S-24
  General.....................................  S-24
  Mortgage Loans..............................  S-27

Underwriting Guidelines........................ S-51
The Master Servicer............................ S-54
The Servicer................................... S-54
  General...................................... S-54
  NCHLS's Delinquency and Foreclosure
    Statistics................................. S-54
Servicing of The Mortgage Loans................ S-56
  General...................................... S-56
  Servicing Compensation and Payment of
    Expenses................................... S-56
Adjustment to Servicing Fee in Connection with
  Certain Prepaid Mortgage Loans............... S-57
  Advances..................................... S-57
  Loss Mitigation Procedures................... S-58
  The Special Servicer......................... S-58
  Pledge of Servicing Rights................... S-58
Description of the Certificates................ S-59
  General...................................... S-59
  Book-Entry Certificates...................... S-59
  Payments on Mortgage Loans; Collection
    Account; Certificate Account; Cap Contract
    Account.................................... S-63
  Distributions................................ S-64
  Overcollateralization Provisions............. S-66
  Subordination of the Payment of the
    Subordinated Certificates.................. S-67
  Cap Contracts................................ S-67
  Calculation of One-Month LIBOR............... S-71
  Reports to Certificateholders................ S-71
  Additional Rights of the Class R
    Certificateholder.......................... S-73
  Restrictions on Transfer of the Class R
    Certificate................................ S-73
The Pooling and Servicing Agreement............ S-74
  General...................................... S-74
  Assignment of Mortgage Loans................. S-74
  Amendment.................................... S-75
  Optional Termination......................... S-75
  Events of Default............................ S-76
  Rights upon Event of Default................. S-76
  The Trustee.................................. S-77
  The Securities Administrator................. S-77
Yield, Prepayment and Maturity
  Considerations............................... S-77
  General...................................... S-77
  Prepayments and Yields for the
    Certificates............................... S-78
  Hypothetical Available Funds Cap Table....... S-92
  Additional Information....................... S-94
Federal Income Tax Consequences................ S-94
  Taxation of the Basis Risk Arrangements...... S-95
  Original Issue Discount and Amortizable Bond
    Premium.................................... S-96
  Special Tax Attributes of the Offered
    Certificates............................... S-96
  Prohibited Transactions Tax and Other
    Taxes...................................... S-97

  Class R Certificate......................... S-98
Tax Return Disclosure Requirements............ S-99
State Taxes................................... S-99
ERISA Considerations.......................... S-99
Legal Investment.............................. S-102
Use of Proceeds............................... S-102
Method of Distribution........................ S-102
Legal Matters................................. S-103
Ratings....................................... S-104
Glossary of Defined Terms..................... S-105
Annex 1....................................... A-1
</Table>

<PAGE>

## THE SERIES 2005-FF12 CERTIFICATES

<Table>
<Caption>

| | CLASS A-1 | CLASS A-2A | CLASS A-2B | CLASS A-2C | CLASS M-1 | CLASS M-2 |
|---|---|---|---|---|---|---|
| Initial Certificate Principal Balance(1):... | $663,543,000 | $440,895,000 | $406,266,000 | $21,136,000 | $71,728,000 | $64,850,000 |
| Pass-Through Rate:........................... | LIBOR plus 0.24%(2)(3) | LIBOR plus 0.09%(2)(3) | LIBOR plus 0.26%(2)(3) | LIBOR plus 0.33%(2)(3) | LIBOR plus 0.45%(2)(4) | LIBOR plus 0.47%(2)(4) |
| ERISA Eligible:.............................. | Yes | Yes | Yes | Yes | Yes | Yes |
| First Principal Payment Date(5):............ | 1/2006 | 1/2006 | 9/2007 | 1/2012 | 11/2009 | 8/2009 |
| Weighted Avg. Life At Issuance: | | | | | | |
|  to call (yrs.)(5):...................... | 2.18 | 1.00 | 3.00 | 6.08 | 4.68 | 4.52 |
|  to maturity (yrs.)(5):.................. | 2.44 | 1.00 | 3.07 | 9.65 | 5.15 | 4.97 |
| Expected Maturity (to call)(5):............. | 1/2012 | 9/2007 | 1/2012 | 1/2012 | 1/2012 | 1/2012 |
| Expected Maturity (to maturity)(5):......... | 5/2020 | 9/2007 | 1/2014 | 3/2018 | 12/2017 | 6/2017 |
| Last Scheduled Distribution Date(6):........ | 11/2036 | 11/2036 | 11/2036 | 11/2036 | 11/2036 | 11/2036 |
| Interest Accrual Method(7):.................. | actual/360 | actual/360 | actual/360 | actual/360 | actual/360 | actual/360 |
| Payment Delay:.............................. | 0 days | 0 days | 0 days | 0 days | 0 days | 0 days |
| Anticipated Ratings(8):..................... | Aaa/ | Aaa/ | Aaa/ | Aaa/ | Aa1/AA+ | Aa2/AA+ |
| (Moody's/S&P):.............................. | AAA | AAA | AAA | AAA | AAA | AAA |

<Caption>

```
                                                         CLASS M-3    CLASS M-4
CLASS M-5     CLASS M-6     CLASS B-1     CLASS B-2
                                                         -----------  ----------- -----
------  -----------  -----------  -----------
<S>                                                      <C>          <C>          <C>
<C>          <C>          <C>
Initial Certificate Principal Balance(1):...  $43,233,000 $32,425,000
$32,425,000 $27,512,000 $29,477,000 $21,616,000
Pass-Through Rate:..........................  LIBOR plus   LIBOR plus   LIBOR
plus   LIBOR plus   LIBOR plus   LIBOR plus
                                                         0.50%(2)(4)  0.63%(2)(4)
0.67%(2)(4)  0.74%(2)(4)  1.65%(2)(4)  1.75%(2)(4)
ERISA Eligible:.............................  Yes          Yes
Yes          Yes          Yes          Yes
First Principal Payment Date(5):............  6/2009       5/2009
4/2009       4/2009       3/2009       2/2009
Weighted Avg. Life At Issuance:
 to call (yrs.)(5):.........................  4.43         4.38
4.35         4.32         4.29         4.28
 to maturity (yrs.)(5):.....................  4.87         4.80
4.75         4.70         4.64         4.60
Expected Maturity (to call)(5):.............  1/2012       1/2012
1/2012       1/2012       1/2012       1/2012
Expected Maturity (to maturity)(5):.........  11/2016      6/2016
1/2016       8/2015       3/2015       8/2014
Last Scheduled Distribution Date(6):........  11/2036      11/2036
11/2036      11/2036      11/2036      11/2036
Interest Accrual Method(7):.................  actual/360   actual/360
actual/360   actual/360   actual/360   actual/360
Payment Delay:..............................  0 days       0 days       0
days       0 days       0 days       0 days
Anticipated Ratings(8):.....................  Aa3/AA       A1/AA-
A2/A+        A3/A         Baa1/A-      Baa2/BBB+
(Moody's/S&P):..............................

<Caption>
                                                         CLASS B-3    CLASS R
                                                         -----------  -----------
<S>                                                      <C>          <C>
Initial Certificate Principal Balance(1):...  $19,651,000  $100
Pass-Through Rate:..........................  LIBOR plus   LIBOR plus
                                                         1.75%(2)(4)  0.24%(2)(3)
ERISA Eligible:.............................  Yes          No
First Principal Payment Date(5):............  2/2009       N/A
Weighted Avg. Life At Issuance:
 to call (yrs.)(5):.........................  4.26         N/A
 to maturity (yrs.)(5):.....................  4.53         N/A
Expected Maturity (to call)(5):.............  1/2012       N/A
Expected Maturity (to maturity)(5):.........  3/2014       N/A
Last Scheduled Distribution Date(6):........  11/2036      N/A
Interest Accrual Method(7):.................  actual/360   actual/360
Payment Delay:..............................  0 days       0 days
Anticipated Ratings(8):.....................  Baa3/BBB     NR/AAA
(Moody's/S&P):..............................
</Table>

---------------
```

OTHER INFORMATION:

(1) The initial certificate principal balances shown above are subject to a
    permitted variance of plus or minus 10%.
(2) Subject to the related available funds cap. The pass-through rates for
the
    offered certificates are one-month LIBOR plus the applicable pass-through
    margin. These pass-through rates are subject to adjustment and your
    pass-through rate may be lower. See "Description of the
    Certificates -- Distributions -- Distributions of Interest."
(3) If the 10% optional termination does not occur by the first distribution
    date on which it may occur, the margin on each of the class A-1, class A-
2A,
    class A-2B, class A-2C and class R certificates will increase to 2 times
its
    respective margin shown above.
(4) If the 10% optional termination does not occur by the first distribution
    date on which it may occur, the margin on each of the class M-1, class M-
2,
    class M-3, class M-4, class M-5, class M-6, class B-1, class B-2 and
class
    B-3 certificates will increase to 1.5 times its respective margin shown
    above.
(5) The information set forth above regarding first principle payment date,
    weighted average life at issuance and expected maturity is based on the
    modeling assumptions defined beginning on page S-121 and 20% HEP for the
    fixed rate mortgage loans or 100% PPC (a constant prepayment rate of 2%
per
    annum in month 1, increasing linearly (rounded to the nearest hundredth)
to
    a constant prepayment rate of 30% per annum in month 12, remaining
constant
    at a constant prepayment rate of 30% per annum until month 22, 50% CPR
from
    month 23 to month 27, and 35% CPR in month 28 and thereafter) for the
    adjustable rate mortgage loans, as applicable.
(6) Latest maturity date for any mortgage loan plus one year.
(7) The interest rate index reset date for the offered certificates is two
    business days prior to the start of each interest accrual period.
(8) The designation "NR" means that the applicable rating agency will not
rate
    the certificates of that class.

CREDIT ENHANCEMENT:

Excess Interest
Overcollateralization
Subordination

OVERCOLLATERALIZATION REQUIREMENTS:

Initial Overcollateralization Amount: 4.60% of the aggregate stated principal
balance of the mortgage loans as of the cut-off date
Targeted Overcollateralization Amount: 4.60% of the aggregate stated
principal
balance of the mortgage loans as of the cut-off date
Stepdown Overcollateralization Amount: 9.20% of current mortgage loan balance

Minimum Required Overcollateralization Amount: 0.50% of the aggregate stated
principal balance of the mortgage loans as of the cut-off date
Earliest Possible Stepdown Date: January 2009

<PAGE>

## SUMMARY INFORMATION

THIS SECTION BRIEFLY SUMMARIZES MAJOR CHARACTERISTICS OF THE
CERTIFICATES
AND THE MORTGAGE LOANS. IT DOES NOT CONTAIN ALL OF THE INFORMATION THAT YOU
NEED
TO CONSIDER IN MAKING YOUR INVESTMENT DECISION. TO FULLY UNDERSTAND THE TERMS
OF
THE CERTIFICATES, YOU SHOULD READ BOTH THIS PROSPECTUS SUPPLEMENT AND THE
ATTACHED PROSPECTUS IN THEIR ENTIRETY.

## PRINCIPAL PARTIES

Issuer:  First Franklin Mortgage Loan Trust, Series 2005-FF12.

Depositor:  Merrill Lynch Mortgage Investors, Inc., a Delaware corporation
whose
address is 250 Vesey Street, 4 World Financial Center, 10th Floor, New York,
New
York 10080 and whose telephone number is (212) 449-0357. See "The Depositor"
in
the prospectus.

Seller:  Merrill Lynch Mortgage Lending, Inc., a Delaware corporation whose
address is 250 Vesey Street, 4 World Financial Center, 10th Floor, New York,
New
York 10080 and whose telephone number is (212) 449-0357.

Servicer:  National City Home Loan Services, Inc., a Delaware corporation
whose
address is 150 Allegheny Center, LOC23-541, Pittsburgh, Pennsylvania 15212
and
whose telephone number is (412) 442-3950. See "The Servicer."

Special Servicer:  Wilshire Credit Corporation,
a Nevada corporation whose address is 14523 SW Millikan Way, Suite 200,
Beaverton, Oregon 97005 and whose telephone number is (503) 223-5600. See
"Servicing of the Mortgage Loans--The Special Servicer."

Master Servicer and Securities Administrator: LaSalle Bank National
Association,
a national banking association whose address is 135 South LaSalle Street,
Suite
1625, Chicago, Illinois 60603 and whose telephone number is (312) 904-6299.
See
"The Master Servicer." and "The Pooling and Servicing Agreement--The
Securities
Administrator."

Originator:  First Franklin, a division of National City Bank of Indiana, or its
affiliate First Franklin Financial Corporation, originated the mortgage loans to
be included in the trust fund.

Trustee:  Citibank, N.A. whose address is 388 Greenwich Street, 14th Floor, New
York, New York 10013 and whose telephone number is (800) 422-2066. See "The
Trustee."

                            CUT-OFF DATE

The cut-off date will be December 1, 2005.

                            CLOSING DATE

The closing date will be on or about December 28, 2005.

                          DISTRIBUTION DATE

The 25th day of each month, beginning in January 2006. If the 25th day is not a
business day, then the distribution date will be the next business day.

                           THE TRUST FUND

The name of the trust fund is First Franklin Mortgage Loan Trust, Series
2005-FF12. We are forming the trust fund to own a pool of sub-prime mortgage
loans secured by first liens on real properties. The trust fund will contain
both fixed rate mortgage loans and adjustable rate mortgage loans. Each class of
certificates represents an interest in the trust fund.

                    THE SERIES 2005-FF12 CERTIFICATES

The certificates represent beneficial ownership interests in the underlying
trust fund assets. The offered certificates will have the original certificate
principal balance, pass-through rate and other features set forth in the table
on page S-4. The trust fund will issue the certificates under a pooling and
servicing agreement dated as of December 1, 2005, among Merrill Lynch Mortgage
Investors, Inc., as depositor, LaSalle Bank National Association, as master
servicer and securities administrator, Citibank, N.A., as trustee, Wilshire
Credit Corporation, as special servicer and National City Home Loan Services,
Inc., as servicer. Any collections on the mortgage loans will be used to pay
fees to the servicer and the securities administrator (which includes fees paid
to the master servicer and the trustee) and to make interest or principal
payments on the certifi

                                S-5
<PAGE>

cates. All principal collections will be paid to one or more classes of the

certificates offered through this prospectus supplement or to other classes of
certificates that we are not offering by this prospectus supplement, based on the outstanding certificate principal balances and the remaining principal amount of the mortgage loans. Any interest collections in excess of the amount
paid to holders of the offered certificates (either as interest or principal), the servicer, the special servicer, the master servicer, the securities administrator and the trustee will be paid to the owners of the other classes of
certificates that we are not offering by this prospectus supplement, which are
entitled to receive those excess amounts. See "Description of the Certificates--Distributions."

INTEREST DISTRIBUTIONS

Interest will accrue on each class of certificates at the pass-through rate for
that class. Interest will accrue on each class of certificates from the prior distribution date (or the closing date, in the case of the first distribution date) to the day prior to the current distribution date.

The pass-through rates on the offered certificates will be subject to one of three available funds caps, as described in more detail herein. These caps limit
the pass-through rates on the offered certificates.

The pass-through rates on the class A-1 and class R certificates will be limited
by reference to a rate determined by multiplying (a) 12, (b) an amount obtained
by dividing the amount of interest due on the group one mortgage loans, less certain amounts, by the aggregate stated principal balance of the group one mortgage loans as of the first day of the related accrual period and (c) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related accrual period.

The pass-through rates on the class A-2A, class A-2B and class A-2C certificates
will be limited by reference to a rate determined by multiplying (a) 12, (b) an
amount obtained by dividing the amount of interest due on the group two mortgage
loans, less certain amounts, by the aggregate stated principal balance of the group two mortgage loans as of the first day of the related accrual period and
(c) a fraction, the numerator of which is 30 and the denominator of which is the
actual number of days in the related accrual period.

The pass-through rates on the class M-1, class M-2, class M-3, class M-4, class
M-5, class M-6, class B-1, class B-2 and class B-3 certificates will be limited
by reference to a rate determined by the weighted average of the available funds

cap for the class A-1 and class R certificates and the available funds cap for
the class A-2A, class A-2B and class A-2C certificates (weighted in proportion
to the results of subtracting from the aggregate stated principal balance of
each mortgage group, the current certificate principal balance of the related
class A certificates and, in the case of group one, the class R certificate).

Shortfalls arising from the application of an available funds cap, subject to
certain limitations based upon one-month LIBOR and the upper collar on the
related cap contract, will be carried over on a subordinated basis with accrued
interest at the then applicable pass-through rate and paid from excess cash flow
in a later distribution, if available.

As described below, the trust fund will own three one-month LIBOR cap contracts.
Amounts received on the class A-1 cap contract will only be available to make
payments on the class A-1 and class R certificates, amounts received on the
class A-2 cap contract will only be available to make payments on the class
A-2A, class A-2B, and class A-2C certificates, and amounts received on the
subordinated certificate cap contract will only be available to make payments on
the class M-1, class M-2, class M-3, class M-4, class M-5, class M-6, class B-1,
class B-2 and class B-3 certificates, in each case to the extent of the interest
shortfall on such certificates attributable to the related available funds cap
subject to certain limitations based upon one-month LIBOR and the upper collar
on the related cap contract (other than any such shortfalls attributable to the
fact that losses are not allocated to the class A certificates after the class M
and class B certificates have been written down to zero).

See "Description of the Certificates--Distributions--Distributions of
Interest."

<PAGE>

PRINCIPAL DISTRIBUTIONS

Principal payments to the certificates will generally reflect principal
collections on the mortgage loans in the trust fund. The class A-1 and class R
certificates will generally receive principal collected on the group one
mortgage loans. The class A-2A, class A-2B and class A-2C certificates will
generally receive principal collected on the group two mortgage loans. The class
M-1, class M-2, class M-3, class M-4, class M-5, class M-6, class B-1, class B-2
and class B-3 certificates will generally receive principal collected on both
groups of mortgage loans. Principal payments will also include a portion of

interest collections to the extent necessary to restore overcollateralization to
the required level, as described below. See "Description of the
Certificates--Distributions--Distributions of Principal."

## CAP CONTRACTS

The trust fund will own three one-month LIBOR cap contracts purchased for the
benefit of the offered certificates. Each of the cap contracts will terminate
following the last listed distribution date shown in the tables beginning on
page S-68 with respect to the related cap contract. Each cap contract will have
a notional balance that will be reduced on each distribution date according to
the schedules described in this prospectus supplement under the heading
"Description of the Certificates--Cap Contracts" until it is terminated. The
trust fund will receive a payment under each cap contract with respect to any
distribution date on which one-month LIBOR exceeds the related lower collar with
respect to such distribution date shown in the tables beginning on page S-68.
Payments received on the cap contracts will be available to make payments to the
holders of the related offered certificates only in respect of interest
shortfalls on such certificates attributable to the related available funds cap
(other than any such shortfalls attributable to the fact that losses are not
allocated to the class A certificates after the class M and class B certificates
have been written down to zero).

## DENOMINATIONS

The trust fund will issue the offered certificates (other than the class R
certificate) in minimum denominations of $25,000 in original principal amount
and integral multiples of $1 in excess of $25,000. A single class R certificate
will be issued in definitive form in a $100 denomination.

## BOOK-ENTRY REGISTRATION

The trust fund will initially issue the offered certificates (other than the
class R certificate) in book-entry form. You may elect to hold your interest in
the certificates through The Depository Trust Company in the United States, or
Clearstream Banking, societe anonyme or the Euroclear Bank, S.A./N.V. in Europe,
or indirectly through participants in these systems.

You will not be entitled to receive a definitive certificate representing your
interest except under limited circumstances. See "Description of the
Certificates--Book-Entry Certificates" in this prospectus supplement and
"Description of the Securities" in the prospectus.

## CREDIT ENHANCEMENT

Credit enhancement is intended to reduce the harm caused to holders of the certificates as a result of shortfalls in payments received and losses realized
on the mortgage loans. The credit enhancement for the certificates will consist
of excess interest, overcollateralization and subordination features described
in this prospectus supplement.

Excess Interest and Overcollateralization.  The overcollateralization amount is
the excess of the aggregate outstanding principal balance of the mortgage loans
over the aggregate principal balance of the certificates. On the closing date, the overcollateralization amount will equal approximately 4.60% of the aggregate
outstanding principal balance of the mortgage loans as of the cut-off date. Generally, because more interest is required to be paid by the mortgagors than
is necessary to pay the interest accrued on the certificates and the expenses of
the trust fund, there is expected to be excess interest each month. If the overcollateralization amount is reduced below the overcollateralization target
amount as a result of losses on the mortgage loans, the trust fund will apply some or all of this excess interest as principal payments on the classes of certificates then entitled to principal until the overcollateralization target
is restored, resulting in a limited acceleration of amortization of the certificates relative to the mortgage loans.

<PAGE>

This acceleration feature is intended to restore overcollateralization. Once the
required level of overcollateralization is restored, the acceleration feature will again cease, unless it becomes necessary again to maintain the required level of overcollateralization. The actual level of overcollateralization may increase or decrease over time. This could result in a temporarily faster or slower amortization of the certificates. See "Description of the Certificates--Overcollateralization Provisions."

Subordination.  The rights of the holders of the more junior classes of certificates to receive distributions will be subordinated to the rights of the
holders of the more senior classes of certificates to receive distributions. See
"Description of the Certificates--Distributions."

Priority of Distributions and Allocation of Losses. In general, the protection
afforded the holders of more senior classes of certificates by means of this subordination will be effected in two ways:

        - by the preferential right of the holders of the more senior classes to

receive, prior to any distribution being made on any distribution
date
to the holders of the more junior classes of certificates, the
amount
of interest and principal due on the more senior classes of
certificates and, if necessary, by the right of the more senior
holders to receive future distributions on the mortgage loans that
would otherwise have been allocated to the holders of the more
junior
classes of certificates; and

- by the allocation to the more junior classes of certificates (in
  inverse order of seniority) of losses resulting from the
liquidation
  of defaulted mortgage loans or the bankruptcy of mortgagors prior
to
  the allocation of these losses to the more senior classes of
  certificates, until their respective certificate principal balances
  have been reduced to zero.

The chart below summarizes the relative seniority of the various classes of
certificates and indicates the approximate initial level of credit support
provided to the various classes of certificates. The initial level of credit
support includes the initial overcollateralization level of approximately
4.60%.

<Table>
<Caption>

|            |                | INITIAL CREDIT |
| CLASS(ES)  | CREDIT SUPPORT | SUPPORT        |
| ---------  | -------------- | -------        |
| <S>        | <C>            | <C>            |
| A and R..  | Class M-1,     | 22.05%         |
|            | Class M-2,     |                |
|            | Class M-3,     |                |
|            | Class M-4,     |                |
|            | Class M-5,     |                |
|            | Class M-6,     |                |
|            | Class B-1,     |                |
|            | Class B-2,     |                |
|            | Class B-3      |                |
| M-1.....   | Class M-2,     | 18.40%         |
|            | Class M-3,     |                |
|            | Class M-4,     |                |
|            | Class M-5,     |                |
|            | Class M-6,     |                |
|            | Class B-1,     |                |
|            | Class B-2,     |                |
|            | Class B-3      |                |
| M-2.....   | Class M-3,     | 15.10%         |
|            | Class M-4,     |                |
|            | Class M-5,     |                |
|            | Class M-6,     |                |
|            | Class B-1,     |                |
|            | Class B-2,     |                |
|            | Class B-3      |                |

```
M-3.....        Class M-4,         12.90%
                Class M-5,
                Class M-6,
                Class B-1,
                Class B-2,
                Class B-3
M-4.....        Class M-5,         11.25%
                Class M-6,
                Class B-1,
                Class B-2,
                Class B-3
</Table>
```

```
<PAGE>

<Table>
<Caption>

                                   INITIAL
                                   CREDIT
CLASS(ES)      CREDIT SUPPORT      SUPPORT
---------      --------------      -------
<S>            <C>                 <C>
  M-5            Class M-6,           9.60%
                 Class B-1,
                 Class B-2,
                 Class B-3
  M-6            Class B-1,           8.20%
                 Class B-2,
                 Class B-3
  B-1            Class B-2,           6.70%
                 Class B-3
  B-2            Class B-3            5.60%
  B-3      Over-collateralization    4.60%
</Table>
```

                              NIMS INSURER

The NIMS Insurer, if any, may issue a financial guaranty insurance policy
covering certain payments to be made on net interest margin securities to be
issued by a separate trust and secured by all or a portion of two classes of
certificates, the class C certificates and the class P certificates, that we
are
not offering pursuant to this prospectus supplement. In such event, the NIMS
Insurer will be able to exercise rights which could adversely impact the
certificateholders. See "Risk Factors--Rights of the NIMS Insurer, if any,
may
negatively impact the offered certificates."

                          OPTIONAL TERMINATION

Subject to restrictions described in this prospectus supplement, before the
first distribution date after the distribution date on which the aggregate
unpaid principal balance of the mortgage loans is reduced to less than or
equal
to 10% of the aggregate stated principal balance of the mortgage loans as of
the

cut-off date, the securities administrator will be directed, pursuant to the
pooling and servicing agreement, to attempt to terminate the trust fund
through
a one-time auction process mutually acceptable to the securities
administrator
and the depositor.

If the trust fund is not terminated because a sufficient bid price at least
equal to the sum of (i) the aggregate outstanding principal balance of the
mortgage loans (or if such mortgage loan is an REO property, the fair market
value of such REO property), plus accrued interest thereon through the due
date
preceding distribution of the proceeds, (ii) any unreimbursed amounts owed to
the trustee, the securities administrator, master servicer, the special
servicer
or the servicer, whether incurred or otherwise, and all unreimbursed advances
and servicing advances, (iii) any unreimbursed costs, penalties and/or
damages
incurred by the trust fund in connection with any violation relating to any
of
the mortgage loans of any predatory or abusive lending law and (iv) all
reasonable fees and expenses incurred by the securities administrator in
connection with such auction is not received at such auction, the NIMS
Insurer,
if any, may purchase all of the mortgage loans, which would result in the
termination of the trust fund. If the auction fails to achieve the sufficient
purchase price and the NIMS Insurer, if any, fails to exercise its option to
purchase all of the mortgage loans, under certain circumstances the servicer
may
purchase all of the mortgage loans, which similarly would result in the
termination of the trust fund. See "The Pooling and Servicing
Agreement--Optional Termination."

LEGAL INVESTMENT

The certificates will not constitute "mortgage related securities" under the
Secondary Mortgage Market Enhancement Act of 1984, as amended. We make no
representation as to the appropriate characterization of the certificates
under
any laws relating to investment restrictions. You should consult your own
counsel as to whether you have the legal authority to invest in these
securities. See "Risk Factors--The certificates lack SMMEA eligibility and
may
lack liquidity, which may limit your ability to sell" and "Legal Investment"
in
this prospectus supplement and the prospectus.

FEDERAL INCOME TAX CONSEQUENCES

For federal income tax purposes, the trust fund, other than the cap contract
account, rights to receive payments on the cap contracts and rights to
receive
prepayment charges, will elect to be treated as multiple real estate mortgage
investment conduits ("REMICs"). For federal income tax purposes, the offered
certificates (other than the class R certificate) will represent ownership of
regular interests in a REMIC and the right to receive payments under certain
non-REMIC contracts. To the extent that the offered certificates represent

regular interests in a REMIC, they will generally be treated as debt
instruments
for

<PAGE>

federal income tax purposes. Holders of offered certificates will be required
to
include in income all interest and original issue discount on the portion of
their offered certificates that represents a regular interest in a REMIC, in
accordance with the accrual method of accounting. See "Federal Income Tax
Consequences" in this prospectus supplement and "Material Federal Income Tax
Consequences" in the prospectus for a discussion of the federal income tax
treatment of a holder of a regular interest in a REMIC and for a discussion
of
the federal income tax consequences associated with the deemed rights to
receive
payments under the non-REMIC contracts. See "Federal Income Tax Consequences"
in
this prospectus supplement and "Material Federal Income Tax Consequences" in
the
prospectus.

For federal income tax purposes, the class R certificate will represent the
residual interest in each of the REMICs included in the trust fund and the
right
to receive payments under certain non-REMIC contracts. The class R
certificate
will not be treated as a debt instrument for federal income tax purposes. The
beneficial owner of the class R certificate will be required to include the
taxable income or loss of the REMICs in determining its taxable income. All
or
most of the taxable income of the REMICs includable by the beneficial owner
of
the class R certificate will be treated as "excess inclusion" income which is
subject to special limitations for federal income tax purposes. As a result
of
this tax treatment, the after-tax return on the class R certificate may be
significantly lower than would be the case if the class R certificate were
taxed
as a debt instrument, or may be negative. See "Federal Income Tax
Consequences--Class R Certificate" in this prospectus supplement.

Additionally, the class R certificate will be treated as a "noneconomic
residual
interest" for tax purposes and, as a result, certain transfers of the class R
certificate may be disregarded for federal income tax purposes, with the
transferor continuing to have tax liabilities for the transferred
certificates.
See "Description of the Certificates--Restrictions on Transfer of the Class R
Certificate" and "Federal Income Tax Consequences--Class R Certificate" in
this
prospectus supplement and "Material Federal Income Tax Consequences--Tax-
Related
Restrictions on Transfers of REMIC Residual Certificates" in the prospectus.

## ERISA CONSIDERATIONS

Under current law, in general, the offered certificates (other than the class R
certificate) will be eligible for acquisition by retirement or other employee
benefit plans subject to Title I of the Employee Retirement Income Security Act
of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986, as
amended. Prospective investors should consult with legal counsel regarding the
consequences of the acquisition and holding of these certificates by such a
retirement plan. See "ERISA Considerations" in this prospectus supplement and in
the prospectus

## RATINGS

The offered certificates are required to receive the ratings indicated under the
heading "Anticipated Ratings" in the chart shown on page S-4 of this prospectus
supplement.

A security rating is not a recommendation to buy, sell or hold securities and
may be subject to revision or withdrawal at any time by any rating agency. The
ratings on the certificates address the likelihood of the receipt by holders of
the certificates of all distributions on the underlying mortgage loans to which
they are entitled. They do not represent any assessment of the likelihood or
rate of principal prepayments or the likelihood that any interest carry forward
amount will be paid. See "Ratings."

## THE MORTGAGE LOANS

We will divide the mortgage loans into two separate groups referred to as group
one and group two. Group one will consist of first lien fixed rate and
adjustable rate mortgage loans that had a principal balance at origination of no
more than $359,650 if a single-unit property (or $539,475 if the property is
located in Hawaii or Alaska), $460,400 if a two-unit property (or $690,600 if
the property is located in Hawaii or Alaska), $556,500 if a three-unit property
(or $834,750 if the property is located in Hawaii or Alaska), or $691,600 if a
four-unit property (or $1,037,400 if the property is located in Hawaii or
Alaska). Group two will consist of first lien fixed rate and adjustable rate
mortgage loans that had a principal balance at origination that may or may not
conform to the criteria specified above for mortgage loans included in group
one.

<PAGE>

The following tables summarize approximate characteristics of the entire
mortgage pool as of December 1, 2005. When we refer to percentages of
mortgage
loans in the following tables, we are describing the percentage of the
aggregate
principal balance of the mortgage loans in the trust fund as of December 1,
2005, which we refer to as the cut-off date. The sum of the percentages may
not
equal 100.00% due to rounding. For additional information on the mortgage
loans,
see "The Mortgage Pool--Mortgage Loans."

<PAGE>

THE MORTGAGE POOL

MORTGAGE LOAN CHARACTERISTICS

<Table>
<S>                                                        <C>
Number of loans.............................................  9,194
Aggregate outstanding principal balance.....................  $1,965,157,627
Number of loans with prepayment charges at origination......  7,121
Weighted average prepayment term at origination for loans
   with prepayment charges (in months)......................  26
</Table>

<Table>
<Caption>

| | AVERAGE OR WEIGHTED AVERAGE |
|---|---|
| RANGE | ---------------- |
| --------------------- | |
| <S> | <C> |
| <C> | |
| Outstanding principal balance(1)........................ | $213,743 |
| $20,000 to $1,500,000 | |
| Original principal balance(1)........................... | $213,894 |
| $20,000 to $1,500,000 | |
| Current mortgage rates(2)............................... | 6.838% |
| 4.750% to 10.250% | |
| Original loan-to-value ratio(2)......................... | 80.13% |
| 10.98% to 100.00% | |
| Stated remaining term to maturity (in months)(2)........ | 357 |
| 177 to 359 | |
| Credit Score(2)......................................... | 656 |
| 540 to 817 | |
| Maximum mortgage rates(2)(3)............................ | 12.797% |
| 10.750% to 16.250% | |
| Minimum mortgage rates(2)(3)............................ | 6.797% |
| 4.750% to 10.250% | |
| Gross Margin(2)(3)...................................... | 5.437% |
| 3.500% to 7.875% | |
| Initial Rate Cap(2)(3).................................. | 2.993% |
| 1.000% to 3.000% | |

```
Periodic Rate Cap(2)(3)................................    1.000%
1.000% to 1.000%
Months to Roll(2)(3)...................................      26
3 to 59
</Table>
```

---------------

(1) Indicates average.

(2) Indicates weighted average.

(3) Adjustable Rate Mortgage Loans only.

<div align="center">

MORTGAGE RATES FOR THE MORTGAGE POOL

(MORTGAGE RATES GRAPH)

S-12
</div>

<PAGE>

<div align="center">

ORIGINAL PRINCIPAL BALANCES FOR THE MORTGAGE POOL

(ORIGINAL PRINCIPAL BALANCES GRAPH)

PRODUCT TYPES FOR THE MORTGAGE POOL

(PRODUCT TYPES PIE CHART)

S-13
</div>

<PAGE>

<div align="center">

ORIGINAL LOAN-TO-VALUE RATIOS FOR THE MORTGAGE POOL

(LOAN VALUE GRAPH)

CREDIT SCORE SUMMARY FOR THE MORTGAGE POOL

(CREDIT SCORE SUMMARY GRAPH)

S-14
</div>

<PAGE>

<div align="center">

ORIGINAL PREPAYMENT PENALTY TERMS FOR THE MORTGAGE POOL

(PREPAYMENT CHARGE GRAPH)

S-15
</div>

<PAGE>

<div align="center">

RISK FACTORS
</div>

THE OVERCOLLATERALIZATION PROVISIONS OF YOUR CERTIFICATES WILL AFFECT THE YIELD
TO MATURITY OF THE CERTIFICATES

        The overcollateralization provisions of the trust fund will affect the

weighted average life of the certificates and consequently the yield to maturity
of these certificates. To the extent necessary to maintain the required amount
of overcollateralization, net excess cashflow will be applied as distributions
of principal to the classes of certificates then entitled to principal, thereby
reducing the weighted average lives of the certificates. The actual required
amount of overcollateralization may change from distribution date to
distribution date, producing uneven distributions of accelerated payments in
respect of principal under these circumstances. We cannot predict whether, or to
what degree, it will be necessary to apply net excess cashflow as distributions
of principal in order to maintain the required amount of
overcollateralization.

     Net excess cashflow generally is the excess of interest collected or
advanced on the mortgage loans over the interest required to pay interest on the
offered certificates and the trust fund expenses. Mortgage loans with higher
interest rates will contribute more interest to the net excess cashflow.
Mortgage loans with higher interest rates may prepay faster than mortgage loans
with relatively lower interest rates in response to a given change in market
interest rates. Any disproportionate prepayments of mortgage loans that have
higher interest rates may adversely affect the amount of net excess cashflow.

     As a result of the interaction of these factors, the effect of the
overcollateralization provisions on the weighted average life of the offered
certificates may vary significantly over time. See "Yield, Prepayment and
Maturity Considerations" in this prospectus supplement and "Yield
Considerations--Prepayments--Maturity and Weighted Average Life" in the
prospectus.

PREPAYMENTS ON THE MORTGAGE LOANS WILL AFFECT THE YIELD TO MATURITY OF THE
CERTIFICATES

     The yield to maturity and weighted average life of the certificates will
be affected primarily by the rate and timing of principal payments (including
prepayments, liquidations, repurchases and defaults) of, and losses on, the
mortgage loans. Prepayment experience may be affected by many factors, including
general economic conditions, interest rates and the availability of alternative
financing, homeowner mobility and the solicitation of mortgagors to refinance
their mortgage loans.

     To the extent permitted by applicable law, any assumption will not release
the original borrower from its obligation under the mortgage loan. See "Yield,
Prepayment and Maturity Considerations" in this prospectus supplement and
"Material Legal Aspects of the Mortgage Loans--Enforceability of Due-on-Sale
Clauses" in the prospectus for a description of the provisions of the mortgage

loans that may affect their prepayment experience.

    The securities administrator will be directed in the pooling and servicing
agreement to conduct a one-time auction of the assets remaining in the trust
fund in an attempt to terminate the trust fund after the aggregate unpaid
principal balance of the mortgage loans is reduced to less than or equal to 10%
of the aggregate stated principal balance of the mortgage loans as of the
cut-off date. If the auction fails to realize a sufficient purchase price, the
NIMS Insurer, if any, may purchase all of the mortgage loans. If the auction
fails to realize a sufficient purchase price and the NIMS Insurer, if any, fails
to exercise its purchase option, under certain circumstances the servicer may
purchase all of the mortgage loans.

    The yield on the certificates will also be sensitive to the level of
one-month LIBOR and the level of the mortgage index. In addition, the yield to
maturity of any offered certificates that you purchase at a discount or premium
will be more sensitive to the rate and timing of payments thereon. You should
consider, in the case of any offered certificates that you purchase at a
discount, the risk that a slower than anticipated rate of principal payments
could result in an actual yield that is lower than the anticipated yield and, in
the case of any offered certificates that you purchase at a premium, the risk
that a faster than anticipated rate of principal payments could result in an
actual yield that is lower than the anticipated yield. Because approximately
78.07% of the mortgage loans contain prepayment charges, the rate of principal
prepayments during the term of such prepayment charges may be less than the rate
of principal

<PAGE>

prepayments for mortgage loans which do not contain prepayment charges; however,
principal prepayments on the mortgage loans could be expected to increase,
perhaps materially, at or near the time of the expiration of such prepayment
charges. We cannot make any representation as to the anticipated rate of
prepayments on the mortgage loans, the amount and timing of losses on the
mortgage loans, the level of one-month LIBOR or the mortgage index or the
resulting yield to maturity of any offered certificates. Any reinvestment risks
resulting from a faster or slower incidence of prepayments on the mortgage loans
will be borne entirely by the offered certificateholders as described in this
prospectus supplement. See "Yield, Prepayment and Maturity Considerations" in
this prospectus supplement and "Yield Considerations--Prepayments--Maturity and
Weighted Average Life" in the prospectus.

MORTGAGE LOANS ORIGINATED UNDER THE UNDERWRITING GUIDELINES DESCRIBED IN THIS

The underwriting guidelines used in connection with the origination of the
mortgage loans in the trust fund consider the credit quality of a mortgagor and
the value of the mortgaged property. The mortgagors generally do not qualify for
loans conforming to Fannie Mae or Freddie Mac guidelines. Furthermore, the
underwriting guidelines used in connection with the origination of the mortgage
loans in the trust fund do not prohibit a borrower from obtaining additional
financing on the mortgaged property. Secondary financing would reduce the
borrower's equity in the related mortgaged property.

As a result of the underwriting guidelines used in connection with the
origination of the mortgage loans in the trust fund, these mortgage loans are
likely to experience rates of delinquency, foreclosure and bankruptcy that are
higher, and that may be substantially higher, than those experienced by mortgage
loans underwritten to Fannie Mae and Freddie Mac conforming guidelines.
Furthermore, changes in the values of mortgaged properties may have a greater
effect on the delinquency, foreclosure, bankruptcy and loss experience of the
mortgage loans than on mortgage loans originated in a more traditional manner.
Similarly, an overall general decline in residential real estate values could
cause a particularly severe decline in the value of the mortgaged properties
relating to mortgage loans in the trust fund. We can provide any assurance
that the mortgaged properties will not experience an overall decline in value.

THE INTEREST RATE ON THE CERTIFICATES MAY BE CAPPED DEPENDING ON FLUCTUATIONS IN
ONE-MONTH LIBOR AND SIX-MONTH LIBOR

The pass-through rates on the offered certificates are calculated based
upon the value of an index (one-month LIBOR) that is different from the value of
the index applicable to substantially all of the adjustable rate mortgage loans
(six-month LIBOR) in the mortgage pool as described under "The Mortgage
Pool--General" and are subject to available funds caps. In addition, the fixed
rate mortgage loans have mortgage rates that remain constant and are not
dependent on any index.

The class A-1 available funds cap effectively limits the amount of
interest accrued on the class A-1 and class R certificates to a per annum rate
equal to the product of (a) 12, (b) an amount obtained by dividing the amount of
interest due on the group one mortgage loans, less certain amounts, by the
aggregate stated principal balance of the group one mortgage loans as of the
first day of the related accrual period and (c) a fraction, the numerator of
which is 30 and the denominator of which is the actual number of days in the
related accrual period. The class A-2 available funds cap effectively limits the
amount of interest accrued on the class A-2A, class A-2B, and class A-2C

certificates to a per annum rate equal to the product of (a) 12, (b) an amount
obtained by dividing the amount of interest due on the group two mortgage loans,
less certain amounts, by the aggregate stated principal balance of the group two
mortgage loans as of the first day of the related accrual period and (c) a
fraction, the numerator of which is 30 and the denominator of which is the
actual number of days in the related accrual period. The pass-through rates on
the class M-1, class M-2, class M-3, class M-4, class M-5, class M-6, class B-1,
class B-2 and class B-3 will be limited by reference to a rate equal to the
weighted average (weighted in proportion to the results of subtracting from the
aggregate principal balance of each mortgage group the current principal balance
of the related class A certificates) of the class A-1 available funds cap and
the class A-2 available funds cap.

<PAGE>

        Various factors may cause an available funds cap described above to limit
the interest rate on the offered certificates. First, this can result if
one-month LIBOR increases more rapidly than six-month LIBOR . In addition, the
pass-through rates on the offered certificates adjust monthly, while the
interest rates on the adjustable rate mortgage loans adjust less frequently and
the interest rates on the fixed rate mortgage loans remain constant, with the
result that the operation of an available funds cap described above may limit
increases in the pass-through rates for extended periods in a rising interest
rate environment. The adjustable rate mortgage loans are also subject to
periodic (i.e., semi-annual) adjustment caps and maximum rate caps, and the
weighted average margin is subject to change based upon prepayment experience,
which also may result in an available funds cap described above limiting
increases in the pass-through rates for the offered certificates. Consequently,
the interest that becomes due on the adjustable rate mortgage loans (net of the
servicing fee rate) with respect to any distribution date may not equal the
amount of interest that would accrue at one-month LIBOR plus the applicable
margin on the offered certificates during the related period. Furthermore, if an
available funds cap described above determines the pass-through rates for a
class of offered certificates for a distribution date, the market value of those
certificates may be temporarily or permanently reduced.

THE PROTECTION AFFORDED TO YOUR CERTIFICATES BY SUBORDINATION IS LIMITED

        The rights of the class M-1 certificates to receive distributions with
respect to the mortgage loans will be subordinate to the rights of the class A
certificates to receive those distributions; the rights of the class M-2

certificates to receive distributions with respect to the mortgage loans will be
subordinate to the rights of the class A and the class M-1 certificates to receive those distributions; the rights of the class M-3 certificates to receive
distributions with respect to the mortgage loans will be subordinate to the rights of the class A, class M-1 and class M-2 certificates to receive those distributions; the rights of the class M-4 certificates to receive distributions
with respect to the mortgage loans will be subordinate to the rights of the class A, class M-1, class M-2 and class M-3 certificates to receive those distributions; the rights of the class M-5 certificates to receive distributions
with respect to the mortgage loans will be subordinate to the rights of the class A, class M-1, class M-2, class M-3 and class M-4 certificates to receive
those distributions; the rights of the class M-6 certificates to receive distributions with respect to the mortgage loans will be subordinate to the rights of the class A, class M-1, class M-2, class M-3, class M-4 and class M-5
certificates to receive those distributions; the rights of the class B-1 certificates to receive distributions with respect to mortgage loans will be subordinate to the rights of the class A and class M certificates to receive those distributions; the rights of the class B-2 certificates to receive distributions with respect to mortgage loans will be subordinate to the rights
of the class A, class M and class B-1 certificates to those distributions; and
the rights of the class B-3 certificates to receive distributions with respect
to mortgage loans will be subordinate to the rights of the class A, class M, class B-1 and class B-2 certificates to those distributions. This subordination
is intended to enhance the likelihood of regular receipt by higher-ranking classes of certificates of the full amount of the monthly distributions allocable to them, and to afford protection against losses.

ALLOCATION OF LOSSES TO THE CLASS M AND CLASS B CERTIFICATES MAKES THE YIELD TO
MATURITY ON THOSE CLASSES OF CERTIFICATES SENSITIVE TO DEFAULTS ON THE MORTGAGE
LOANS

        If realized losses are incurred with respect to the mortgage loans to the
extent that the aggregate principal balance of the offered certificates exceeds
the stated principal balances of the mortgage loans, the principal balance of
the class M and class B certificates will be reduced in reverse order of seniority (first to the class B-3 certificates, second to the class B-2 certificates, third to the class B-1 certificates, fourth to the class M-6 certificates, fifth to the class M-5 certificates, sixth to the class M-4 certificates, seventh to the class M-3 certificates, eighth to the class M-2 certificates and ninth to the class M-1 certificates) by the amount of the excess. Consequently, the yields to maturity on the class M and class B certificates will be sensitive, in varying degrees, to defaults on the mortgage

loans and the timing of these defaults. Investors should fully consider the
risks associated with an investment in the class M and class B certificates,
including the possibility that investors may not fully recover their initial
investments as a result of realized losses.

S-18

<PAGE>

SEQUENTIAL RIGHT TO RECEIVE PRINCIPAL PAYMENTS MAY INCREASE RISK OF LOSS TO
CLASS A-2B AND CLASS A-2C CERTIFICATES

        If you purchase the class A-2B or class A-2C certificates, you should
consider that holders of the class A-2B certificates will not receive any
payments of principal until the principal balance of the class A-2A
certificates
has been reduced to zero and holders of class A-2C certificates will not
receive
any payments of principal until the principal balance of each of the class A-
2A
and class A-2B certificates has been reduced to zero (provided that in the
event
that the principal balance of each class of the class M, class B and class C
certificates has been reduced to zero, principal distributions to the class
A-2A, class A-2B and class A-2C certificates will be allocated pro rata among
such certificates). See "Description of the Certificates
--Distributions--Distributions of Principal."

DELAYS AND EXPENSES CONNECTED WITH THE LIQUIDATION OF MORTGAGED PROPERTIES
MAY
RESULT IN LOSSES TO YOU

        Even assuming that the mortgaged properties provide adequate security
for
the mortgage loans, there could be substantial delays in connection with the
liquidation of mortgage loans that are delinquent and resulting shortfalls in
distributions to you could occur. Further, liquidation expenses, such as
legal
fees, real estate taxes and maintenance and preservation expenses, will
reduce
the security for the mortgage loans and thereby reduce the proceeds payable
to
you. If any of the mortgaged properties fail to provide adequate security for
the related mortgage loans, you could experience a loss, particularly if you
are
a holder of one of the most subordinate classes.

RATINGS ON THE CERTIFICATES DO NOT ADDRESS ALL OF THE FACTORS YOU SHOULD
CONSIDER WHEN PURCHASING CERTIFICATES

        The rating of each class of certificates will depend primarily on an
assessment by the rating agencies of the mortgage loans as well as the
structure
of the transaction. The rating by the rating agencies of any class of
certificates is not a recommendation to purchase, hold or sell any rated
certificates, inasmuch as the rating does not comment as to the market price
or
suitability for a particular investor. There is no assurance that the ratings

will remain in place for any given period of time or that the ratings will not
be qualified, lowered or withdrawn by the rating agencies. In general, the
ratings address credit risk and do not address the likelihood of prepayments or
the likelihood that any floating rate certificate carryover amounts will be
paid. See "Ratings" in this prospectus supplement.

COLLECTIONS ON THE MORTGAGE LOANS MAY BE DELAYED OR REDUCED IF THE SELLER OR THE
SERVICER BECOMES INSOLVENT

        The sale of the mortgage loans from Merrill Lynch Mortgage Lending, Inc.
to Merrill Lynch Mortgage Investors, Inc. will be treated as a sale of the
mortgage loans. However, in the event of an insolvency of Merrill Lynch Mortgage
Lending, Inc., the conservator, receiver or trustee in bankruptcy of such entity
may attempt to recharacterize the mortgage loan sales as a borrowing, secured by
a pledge of the applicable mortgage loans. If these transfers were to be
challenged, delays in payments of the certificates and reductions in the amounts
of these payments could occur.

        In the event of a bankruptcy or insolvency of National City Home Loan
Services, Inc., as servicer, the bankruptcy trustee or receiver may have the
power to prevent LaSalle Bank National Association, as master servicer, the
trustee or the certificateholders from appointing a successor servicer.
Regardless of whether a successor servicer is appointed, any termination of
National City Home Loan Services, Inc., as servicer (whether due to bankruptcy
or insolvency or otherwise), could adversely affect the servicing of the
mortgage loans, including the delinquency experience of the mortgage loans.

                                      S-19
<PAGE>

THE CERTIFICATES MAY BE INAPPROPRIATE FOR INDIVIDUAL INVESTORS

        The certificates may not be an appropriate investment for you if you do
not have sufficient resources or expertise to evaluate the particular
characteristics of the applicable class of certificates. This may be the case
because, among other things:

        - The yield to maturity of offered certificates purchased at a price
other
          than par will be sensitive to the uncertain rate and timing of
principal
          prepayments on the mortgage loans;

        - The rate of principal distributions on, and the weighted average life
          of, the certificates will be sensitive to the uncertain rate and
timing
          of principal prepayments on the mortgage loans and the priority of
          principal distributions among the classes of certificates, and for
that

reason, the certificates may be inappropriate investments for you if you
require a distribution of a particular amount of principal on a specific
date or an otherwise predictable stream of distributions;

- You may not be able to reinvest amounts distributed in respect of
  principal on an offered certificate (which, in general, are expected to
  be greater during periods of relatively low interest rates) at a rate at
  least as high as the pass-through rates on the certificates; or

- It is possible that a secondary market for the certificates will not
  develop or that your investment may not be liquid. Lack of liquidity
  could result in a substantial decrease in the market value of your
  certificates.

You should also carefully consider the further risks and other special
considerations discussed above and under the heading "Yield, Prepayment and
Maturity Considerations" in this prospectus supplement, and in the prospectus
under the heading "Risk Factors."

THE GEOGRAPHIC CONCENTRATION OF MORTGAGE LOANS MEANS YOUR INVESTMENT MAY BE
ESPECIALLY SENSITIVE TO ECONOMIC CONDITIONS IN PARTICULAR STATES

As of the cut-off date, approximately 38.38%, 7.18%, 5.37%, 3.43% and
2.89% of the mortgaged properties were located in California, Florida,
Illinois,
New York and Texas, respectively. An overall decline in the residential real
estate markets in these states could adversely affect the values of the
mortgaged properties securing the related mortgage loans. As the residential
real estate market is influenced by many factors, including the general
condition of the economy and interest rates, we cannot assure you that the
residential real estate markets in these states will not weaken. If the
residential real estate markets in these states should experience an overall
decline in property values, the rates of losses on the related mortgage loans
would be expected to increase, and could increase substantially. Natural
disasters affect regions of the United States from time to time, and may
result
in increased losses on mortgage loans in those regions, or in insurance
payments
that will constitute prepayments of principal of those mortgage loans.
Properties in these states, particularly California, may be more susceptible
than homes located in other parts of the country to certain types of
uninsurable
hazards, such as earthquakes and hurricanes, as well as floods, wildfires,
mudslides and other natural disasters.

POTENTIAL DAMAGE TO MORTGAGED PROPERTIES

Hurricane Katrina, which struck Louisiana, Alabama, Mississippi and
surrounding areas on August 29, 2005, Hurricane Rita, which struck Texas,
Louisiana and surrounding areas on September 24, 2005, and Hurricane Wilma,
which struck Florida on October 24, 2005, may have adversely affected
mortgage

properties located in those areas. As of the cut-off date, approximately 0.28%
of the mortgaged properties were located in Hurricane Katrina, Hurricane Rita
and Hurricane Wilma disaster areas designated by the Federal Emergency
Management Agency.

Merrill Lynch Mortgage Lending, Inc. will make a representation and
warranty that no mortgaged property is subject to any material damage by
waste,
fire, earthquake, windstorm, flood or other casualty as of the closing date.
We
do not know how many mortgaged properties have been or may be affected by
Hurricane Katrina, Hurricane Rita or Hurricane Wilma. Damages to mortgaged
properties as a result of

S-20

<PAGE>

Hurricane Katrina, Hurricane Rita or Hurricane Wilma may or may not be
covered
by the related hazard insurance policies. No assurance can be given as to the
effect of this event on the rate of delinquencies and losses on the mortgage
loans secured by mortgaged properties that were or may be affected by
Hurricane
Katrina, Hurricane Rita or Hurricane Wilma. Any adverse impact as a result of
Hurricane Katrina, Hurricane Rita or Hurricane Wilma may be borne by the
holders
of the certificates, particularly if Merrill Lynch Mortgage Lending, Inc.
fails
to repurchase any mortgage loan that breaches this representation and
warranty.
In addition, property values in these states may be adversely affected by
Hurricane Katrina, Hurricane Rita or Hurricane Wilma. Mortgagors in areas
affected by the hurricanes may also be affected by a decline in the economic
environment in these areas.

MORTGAGE LOANS WITH INTEREST-ONLY PAYMENTS MAY EXPERIENCE HIGHER DEFAULT
RATES

Approximately 65.65% of the mortgage loans as of the cut-off date
provide
for payment of interest at the related mortgage rate, but no payment of
principal, for a period of five years following the origination of the
mortgage
loan. Following the applicable period, the monthly payment with respect to
each
of these mortgage loans will be increased to an amount sufficient to amortize
the principal balance of the mortgage loan over the remaining term and to pay
interest at the related mortgage rate.

The presence of these mortgage loans will, absent other considerations,
result in longer weighted average lives of the offered certificates than
would
have been the case had these mortgage loans not been included in the trust
fund.
If you purchase a certificate at a discount, you should consider that the

extension of weighted average lives could result in a lower yield than would be
the case if these mortgage loans provided for payment of principal and interest
on every payment date. In addition, a borrower may view the absence of any
obligation to make a payment of principal during the first two to five years of
the term of a mortgage loan as a disincentive to prepayment.

If a recalculated monthly payment as described above is substantially
higher than a borrower's previous interest-only monthly payment, that mortgage
loan may be subject to an increased risk of delinquency and loss.

MORTGAGE LOANS WITH BALLOON PAYMENTS MAY EXPERIENCE HIGHER DEFAULT RATES

Approximately 0.03% of the mortgage loans as of the cut-off date are
"balloon loans" that provide for the payment of the unamortized principal
balance of the mortgage loan in a single payment at maturity. The balloon loans
generally provide for equal monthly payments, consisting of principal and
interest, generally based on a 30 year amortization schedule, and a single
payment of the remaining balance of the balloon loan generally up to 15 years
after origination. Amortization of a balloon loan based on a scheduled period
that is longer than the term of the mortgage loan results in a remaining
principal balance at maturity that is substantially larger than the regular
scheduled payments. We do not have any information regarding the default history
or prepayment history of payments on balloon loans. Because borrowers of balloon
loans are required to make substantial single payments upon maturity, it is
possible that the default risk associated with the balloon loans is greater than
that associated with fully-amortizing loans.

THE MORTGAGE POOL MAY CONTAIN DELINQUENT MORTGAGE LOANS, WHICH MAY DECREASE THE
AMOUNT OF PRINCIPAL DISTRIBUTED TO YOU

The trust fund may include mortgage loans which are delinquent as of the
cut-off date. It is expected that as of the cut-off date not more than
approximately 1.50% of the mortgage loans (by the cut-off date principal
balance) will be between 31 and 60 days delinquent, and it is expected that none
of the mortgage loans will be 61 days or more delinquent. If there are not
sufficient funds from amounts collected on the mortgage loans, the aggregate
amount of principal returned to any class of offered certificateholders may be
less than the certificate principal balance of a class on the day that class was
issued. Delinquency information presented in this prospectus supplement as of
the cut-off date is determined and prepared as of the close of business on the
last business day immediately prior to the cut-off date.

<PAGE>

THE CERTIFICATES LACK SMMEA ELIGIBILITY AND MAY LACK LIQUIDITY, WHICH MAY LIMIT
YOUR ABILITY TO SELL

    The underwriter intends to make a secondary market in the offered
certificates, but will have no obligation to do so. We cannot assure you that a
secondary market for any class of offered certificates will develop, or if one
does develop, that it will continue or provide sufficient liquidity of
investment or that it will remain for the term of the related class of offered
certificates. The offered certificates will not constitute "mortgage related
securities" for purposes of the Secondary Mortgage Market Enhancement Act of
1984, as amended. Accordingly, many institutions with legal authority to invest
in SMMEA securities will not be able to invest in the offered certificates,
thereby limiting the market for the offered certificates. In light of those
risks, you should consult your own counsel as to whether you have the legal
authority to invest in non-SMMEA securities such as the offered certificates.
See "Legal Investment" in this prospectus supplement and in the prospectus.

PAYMENTS DUE UNDER THE TERMS OF THE CAP CONTRACTS MAY BE DELAYED, REDUCED OR
ELIMINATED IF THE CAP CONTRACT COUNTERPARTY, THE ROYAL BANK OF SCOTLAND PLC,
BECOMES INSOLVENT

    The trust fund will include three one-month LIBOR cap contracts for the
benefit of the offered certificates under which the cap contract counterparty,
The Royal Bank of Scotland plc, is obligated on any distribution date to make
certain payments to the trust fund in the event that one-month LIBOR exceeds the
related lower collar shown in the tables beginning on page S-68 with respect to
that distribution date. Each of the cap contracts will terminate following the
last listed distribution date shown in the tables beginning on page S-68 with
respect to the related cap contract. However, in the event of the insolvency or
bankruptcy of the cap contract counterparty, payments due under the cap
contracts may be delayed, reduced or eliminated. Moreover, any of the cap
contracts may be subject to early termination if either party thereto fails to
perform or the cap contract becomes illegal or subject to certain kinds of
taxation. In the event of early termination of any cap contract, there will not
be a replacement cap contract.

VIOLATIONS OF FEDERAL, STATE AND LOCAL LAWS

    Federal, state and local laws regulate the underwriting, origination,
servicing and collection of the mortgage loans. These laws have changed over
time and have become more restrictive or stringent with respect to specific
activities of servicers and originators. Actual or alleged violations of these
federal, state and local laws may, among other things:

- limit the ability of the servicer to collect principal or interest on the mortgage loans,

- provide the borrowers with a right to rescind the mortgage loans,

- entitle the borrowers to refunds of amounts previously paid or to set-off those amounts against their loan obligations,

- result in a litigation proceeding (including class action litigation) being brought against the trust fund, and

- subject the trust fund to liability for expenses, penalties and damages
  resulting from the violations.

As a result, these violations or alleged violations could result in shortfalls in the distributions due on your certificates. See "Certain Legal Aspects of Mortgage Loans" in the prospectus.

RECENT DEVELOPMENTS MAY INCREASE RISK OF LOSS ON THE MORTGAGE LOANS

The Servicemembers Civil Relief Act and comparable state legislation provide relief to mortgagors who enter active military service and to mortgagors
in reserve status who are called to active duty after the origination of their
mortgage loans. Certain state laws provide relief similar to that of the Servicemembers Civil Relief Act and may permit the mortgagor to delay or forgo
certain interest and principal payments. The response of the United States to the terrorist attacks on September 11, 2001 and to the current

<PAGE>

situation in Iraq and Afghanistan has involved military operations that have placed a substantial number of citizens on active duty status, including persons
in reserve status or in the National Guard who have been called or will be called to active duty. It is possible that the number of reservists and members
of the National Guard placed on active duty status in the near future may increase. The Servicemembers Civil Relief Act provides generally that a mortgagor who is covered by the Servicemembers Civil Relief Act may not be charged interest on a mortgage loan in excess of 6% per annum during the period
of the mortgagor's active duty. These shortfalls are not required to be paid by
the mortgagor at any future time. The servicer will not advance these shortfalls
as delinquent payments and such shortfalls are not covered by any form of credit
enhancement on the certificates. Shortfalls on the mortgage loans due to the application of the Servicemembers Civil Relief Act or similar state legislation
or regulations will reduce the amount of collections available for distribution

on the certificates.

     The Servicemembers Civil Relief Act also limits the ability of the
servicer to foreclose on a mortgage loan during the mortgagor's period of
active
duty and, in some cases, during an additional three-month period thereafter.
As
a result, there may be delays in payment and increased losses on the mortgage
loans. Those delays and increased losses will be borne primarily by the
outstanding class of certificates with the lowest payment priority.

     We do not know how many mortgage loans have been or may be affected by
the
application of the Servicemembers Civil Relief Act or any similar state
legislation. See "Certain Legal Aspects of Mortgage Loans--Servicemembers
Civil
Relief Act" in the prospectus.

HIGH COST LOANS

     None of the mortgage loans are covered by the Home Ownership and Equity
Protection Act of 1994. In addition to the Home Ownership and Equity
Protection
Act of 1994, however, a number of legislative proposals have been introduced
at
both the federal and state levels that are designed to discourage predatory
lending practices. Some states have enacted, or may enact, laws or
regulations
that prohibit inclusion of some provisions in mortgage loans that have
mortgage
rates or origination costs in excess of prescribed levels, and require that
borrowers be given certain disclosures prior to the consummation of such
mortgage loans. In some cases, state law may impose requirements and
restrictions greater than those in the Home Ownership and Equity Protection
Act
of 1994. The failure to comply with these laws could subject the trust fund,
and
other assignees of the mortgage loans, to monetary penalties and could result
in
the borrowers rescinding such mortgage loans against either the trust fund or
subsequent holders of the mortgage loans. Lawsuits have been brought in
various
states making claims against assignees of high cost loans for violations of
state law. Named defendants in these cases include numerous participants
within
the secondary mortgage market, including some securitization trusts. None of
the
mortgage loans are "high cost loans" under any applicable state or local laws.

RIGHTS OF THE NIMS INSURER, IF ANY, MAY NEGATIVELY IMPACT THE OFFERED
CERTIFICATES

     Net interest margin securities may be issued by a separate trust and
secured by all or a portion of the class C and class P certificates issued by
the trust fund on the closing date. The NIMS Insurer, if any, of such net
interest margin securities will be a third party beneficiary of the pooling
and

servicing agreement.

     Pursuant to the terms of the pooling and servicing agreement, unless there
exists a continuance of any failure by the NIMS Insurer to make a required
payment under the policy insuring the net interest margin securities (such
event, a "NIMS Insurer Default"), the NIMS Insurer will be entitled to exercise
extensive rights under the pooling and servicing agreement. Unless there exists
a NIMS Insurer Default, wherever in the pooling and servicing agreement there
shall be a requirement that any person or any communication, object or other
matter be acceptable or satisfactory to or otherwise receive the consent or
other approval of any other person (whether as a condition to the eligibility of
such person to act in any capacity, as a condition to any circumstance or state
of affairs related to such matter, or otherwise), there also shall be deemed to
be a requirement that such person or matter be approved in writing by the NIMS

<PAGE>

Insurer. For example, unless a NIMS Insurer Default exists, the NIMS Insurer's
consent will be required prior to any amendment to the pooling and servicing
agreement. Without limiting the foregoing, the NIMS Insurer also has the right
to provide notices of a servicer default, the right to direct the trustee to
terminate the rights and obligations of the servicer in the event of a default
by the servicer, the right to remove the trustee or any co-trustee and the right
to consent to the removal or replacement of the servicer or the trustee.

     Investors in the offered certificates should note that:

     - the insurance policy issued by the NIMS Insurer, if any, will not cover,
       and will not benefit in any manner whatsoever, the offered
certificates;

     - the rights granted to the NIMS Insurer, if any, are extensive;

     - the interests of the NIMS Insurer, if any, may be inconsistent with, and
       adverse to, the interests of the holders of the offered certificates,
       and the NIMS Insurer, if any, has no obligation or duty to consider the
       interests of the offered certificates in connection with the exercise or
       non-exercise of such NIMS Insurer's rights; and

     - such NIMS Insurer's exercise of the rights and consents set forth above

may negatively affect the offered certificates, and the existence of such NIMS Insurer's rights, whether or not exercised, may adversely affect the liquidity of the offered certificates, relative to other asset-backed certificates backed by comparable mortgage loans and with

comparable payment priorities and ratings.

FORWARD-LOOKING STATEMENTS

In this prospectus supplement and the attached prospectus, we use forward-looking statements. These forward-looking statements are found in the material, including each of the tables, set forth under "Risk Factors" and "Yield, Prepayment and Maturity Considerations." Forward-looking statements are also found elsewhere in this prospectus supplement and the prospectus and include words like "expects," "intends," "anticipates," "estimates" and other similar words. These statements are inherently subject to a variety of risks and uncertainties. Actual results may differ materially from those we anticipate due to changes in, among other things:

- economic conditions and industry competition;

- political, social and economic conditions;

- the law and government regulatory initiatives; and

- interest rate fluctuations.

We will not update or revise any forward-looking statements to reflect changes in our expectations or changes in the conditions or circumstances on which these statements were originally based.

GLOSSARY

A glossary of defined terms used in this prospectus supplement begins on page S-105.

THE MORTGAGE POOL

GENERAL

The mortgage pool with respect to the certificates consisted as of the Cut-off Date of approximately 9,194 conventional mortgage loans evidenced by promissory notes having an aggregate principal balance of approximately $1,965,157,627. The mortgage pool consists of first lien Fixed Rate Mortgage Loans and first lien Adjustable Rate Mortgage Loans.

S-24

<PAGE>

References herein to percentages of Mortgage Loans refer in each case to the percentage of the aggregate principal balance of all of the Mortgage Loans

in the mortgage pool as of the Cut-off Date, based on the outstanding principal
balances of such Mortgage Loans as of the Cut-off Date, after giving effect to
Scheduled Payments due on or prior to the Cut-off Date, whether or not received.
References to percentages of mortgaged properties refer, in each case, to the
percentages of aggregate principal balances of the related Mortgage Loans
(determined as described in the preceding sentence). The mortgage pool will be
divided into two groups, referred to as Group One and Group Two.

Group One, representing approximately 43.32% of the mortgage pool, will
consist of Fixed Rate Mortgage Loans and Adjustable Rate Mortgage Loans that had
a principal balance at origination of no more than $359,650 if a single-unit
property (or $539,475 if the property is located in Hawaii or Alaska), $460,400
if a two-unit property (or $690,600 if the property is located in Hawaii or
Alaska), $556,500 if a three-unit property (or $834,750 if the property is
located in Hawaii or Alaska), or $691,600 if a four-unit property (or $1,037,400
if the property is located in Hawaii or Alaska). Group Two, representing
approximately 56.68% of the mortgage pool, will consist of Fixed Rate Mortgage
Loans and Adjustable Rate Mortgage Loans that had a principal balance at
origination that may or may not conform to the criteria specified above for
mortgage loans included in Group One.

The Class A-1 and Class R Certificates will generally represent interests
in the Group One Mortgage Loans. On each Distribution Date, principal and
interest received with respect to the Group One Mortgage Loans generally will be
applied to pay principal and interest with respect to the Class A-1 and Class R
Certificates. The Class A-2A, Class A-2B and Class A-2C Certificates will
generally represent interests in the Group Two Mortgage Loans. On each
Distribution Date, principal and interest received with respect to the Group Two
Mortgage Loans generally will be applied to pay principal and interest with
respect to the Class A-2A, Class A-2B and Class A-2C Certificates. The Class M
and Class B Certificates will generally represent interests in both the Group
One and Group Two Mortgage Loans. On each Distribution Date, principal and
interest received with respect to both the Group One and Group Two Mortgage
Loans will be applied to pay principal and interest with respect to the Class M
and Class B Certificates.

The mortgage notes are secured by mortgages or deeds of trust or other
similar security instruments creating first liens on real properties including
single-family residences, two- to four-family dwelling units, condominiums,
planned unit developments and modular homes. The Trust Fund includes, in
addition to the mortgage pool, the following:

- certain amounts held from time to time in Accounts maintained in the name of the Trustee under the Pooling and Servicing Agreement;

- any property which initially secured a Mortgage Loan and which is acquired by foreclosure or deed-in-lieu of foreclosure; and

- rights to require repurchase of the Mortgage Loans by the Originator for
  breach of representation or warranty.

The Mortgage Loans to be included in the Trust Fund have been purchased by the Seller and have been originated substantially in accordance with the various underwriting criteria described herein under "Underwriting Guidelines." Sub-prime mortgage loans are generally mortgage loans made to borrowers who do not qualify for financing under conventional underwriting criteria due to prior credit difficulties, the inability to satisfy conventional documentation standards and/or conventional debt-to-income ratios.

All of the Mortgage Loans were originated or acquired by the Originator and subsequently purchased by the Seller. All of the Mortgage Loans were underwritten in accordance with the underwriting guidelines of the Originator. Substantially all of the Mortgage Loans were originated since March 2005.

Scheduled Payments either earlier or later than the scheduled Due Dates on the Mortgage Loans will not affect the amortization schedule or the relative application of these payments to principal and

<PAGE>

interest. Any Mortgage Loan may be prepaid in full or in part at any time; however, approximately 78.07% of the Mortgage Loans provided at origination for the payment by the borrower of a prepayment charge in limited circumstances on full or partial prepayments made during the prepayment charge term. The weighted average prepayment charge term at origination is approximately 26 months with respect to the Mortgage Loans which have prepayment charges. In general, the related mortgage note will provide that a prepayment charge will apply if, during the prepayment charge term, the borrower prepays the mortgage loan in full or in part. The enforceability of prepayment charges is unclear under the laws of many states. Prepayment charges will not be available for distribution to holders of the offered certificates. See "Certain Legal Aspects of Mortgage Loans" in the prospectus.

Approximately 10.37% of the Mortgage Loans in the mortgage pool are Fixed Rate Mortgage Loans.

Approximately 0.23% of the Mortgage Loans as of the Cut-off Date are Six-Month LIBOR Loans. The Six-Month LIBOR Loans are subject to a weighted average Periodic Rate Cap of approximately 1.000% with respect to the first Adjustment Date and a weighted average Periodic Rate Cap of approximately 1.000% with respect to each Adjustment Date thereafter. The Six-Month LIBOR Loans have a weighted average Maximum Mortgage Rate equal to the initial Mortgage Rate plus approximately 6.000%.

Approximately 0.13% of the Mortgage Loans as of the Cut-off Date are 1/29 LIBOR Loans. The 1/29 LIBOR Loans are subject to a weighted average Periodic Rate Cap of approximately 2.000% with respect to the first Adjustment Date and a weighted average Periodic Rate Cap of approximately 1.000% with respect to each Adjustment Date thereafter. The 1/29 LIBOR Loans have a weighted average Maximum Mortgage Rate equal to the initial Mortgage Rate plus approximately 6.000%.

Approximately 68.25% of the Mortgage Loans as of the Cut-off Date are 2/28 LIBOR Loans. The 2/28 LIBOR Loans are subject to a weighted average Periodic Rate Cap of approximately 3.000% with respect to the first Adjustment Date and a weighted average Periodic Rate Cap of approximately 1.000% with respect to each Adjustment Date thereafter. The 2/28 LIBOR Loans have a weighted average Maximum Mortgage Rate equal to the initial Mortgage Rate plus approximately 6.000%.

Approximately 17.53% of the Mortgage Loans as of the Cut-off Date are 3/27 LIBOR Loans. The 3/27 LIBOR Loans are subject to a weighted average Periodic Rate Cap of approximately 3.000% with respect to the first Adjustment Date and a weighted average Periodic Rate Cap of approximately 1.000% with respect to each Adjustment Date thereafter. The 3/27 LIBOR Loans have a weighted average Maximum Mortgage Rate equal to the initial Mortgage Rate plus approximately 6.000%.

Approximately 3.50% of the Mortgage Loans as of the Cut-off Date are 5/25 LIBOR Loans. The 5/25 LIBOR Loans are subject to a weighted average Periodic Rate Cap of approximately 3.000% with respect to the first Adjustment Date and a weighted average Periodic Rate Cap of approximately 1.000% with respect to each Adjustment Date thereafter. The 5/25 LIBOR Loans have a weighted average Maximum Mortgage Rate equal to the initial Mortgage Rate plus approximately 6.000%.

As of the Cut-off Date, the aggregate original principal balance of the

Mortgage Loans was approximately $1,966,540,555. As of the Cut-off Date, the aggregate outstanding principal balance of the Mortgage Loans was approximately
$1,965,157,627, the minimum outstanding principal balance was approximately $20,000, the maximum outstanding principal balance was approximately $1,500,000,
the lowest current Mortgage Rate and the highest current Mortgage Rate were 4.750% and 10.250% per annum, respectively, and the weighted average Mortgage Rate was approximately 6.838% per annum.

Approximately 65.65% of the Mortgage Loans as of the Cut-off Date are Interest-Only Mortgage Loans.

Approximately 0.03% of the Mortgage Loans as of the Cut-off Date are Balloon Loans.

The weighted average Original Loan-to-Value Ratio as of the Cut-off Date
was approximately 80.13%.

<PAGE>

The weighted average Credit Score as of the Cut-off Date of the Mortgage
Loans was approximately 656. The Credit Scores are generated by models developed
by a third party and are made available to lenders through three national credit
bureaus. The models were derived by analyzing data on consumers in order to establish patterns which are believed to be indicative of the borrower's probability of default. The Credit Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of
credit, and bankruptcy experience. Credit Scores range from approximately 350 to
approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. However,
a Credit Score purports only to be a measurement of the relative degree of risk
a borrower represents to a lender, i.e., that a borrower with a higher score is
statistically expected to be less likely to default in payment than a borrower
with a lower score. In addition, it should be noted that Credit Scores were developed to indicate a level of default probability over a two-year period which does not correspond to the life of a mortgage loan. Furthermore, Credit Scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general. Therefore, a Credit Score does not take into consideration the effect of mortgage loan characteristics on the probability of prepayment by the borrower. None of the Depositor, the Seller or
the Servicer makes any representations or warranties as to the actual performance of any Mortgage Loan or that a particular Credit Score should be relied upon as a basis for an expectation that the borrower will repay the Mortgage Loan according to its terms.

As used herein, the Credit Score of a Mortgage Loan is generally equal to
the lower of two credit scores or the middle of three scores for two-file and
three-file credit reports, respectively.

MORTGAGE LOANS

The following tables describe the Mortgage Loans and the related mortgaged
properties as of the close of business on the Cut-off Date. The sum of the
columns below may not equal the total indicated due to rounding.

THE MORTGAGE POOL

MORTGAGE RATES

<Table>
<Caption>

| RANGE OF MORTGAGE RATES | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | NUMBER OF MORTGAGE LOANS | WEIGHTED AVERAGE ORIGINAL LTV | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | MORTGAGE PERCENT FULL DOC | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 5.000% or less......... | 696 | $195,447 | 19 | 76.01% | $ 3,713,487 | 97.12% | 0.19% | 4.933% |
| 5.001% to 5.500%....... | 693 | 239,747 | 150 | 75.50 | 35,962,093 | 84.07 | 1.83 | 5.392 |
| 5.501% to 6.000%....... | 684 | 281,971 | 846 | 78.06 | 238,547,743 | 82.07 | 12.14 | 5.868 |
| 6.001% to 6.500%....... | 674 | 266,136 | 1,907 | 78.85 | 507,521,571 | 65.80 | 25.83 | 6.336 |
| 6.501% to 7.000%....... | 657 | 221,696 | 2,362 | 79.38 | 523,645,336 | 54.88 | 26.65 | 6.817 |
| 7.001% to 7.500%....... | 641 | 183,955 | 1,769 | 81.12 | 325,416,220 | 54.49 | 16.56 | 7.306 |
| 7.501% to 8.000%....... | 624 | 165,400 | 1,235 | 83.07 | 204,268,485 | 59.45 | 10.39 | 7.797 |
| 8.001% to 8.500%....... | 612 | 143,329 | 567 | 86.24 | 81,267,604 | 62.78 | 4.14 | 8.289 |
| 8.501% to 9.000%....... | 595 | 139,622 | 270 | 86.66 | 37,697,908 | 64.60 | 1.92 | 8.773 |
| 9.001% to 9.500%....... | 581 | 110,626 | 58 | 87.47 | 6,416,319 | 71.53 | 0.33 | 9.241 |
| 9.501% to 10.000%...... | 572 | 65,844 | 10 | 87.04 | 658,442 | 78.11 | 0.03 | 9.665 |
| 10.001% to 10.500%..... | 563 | 42,417 | 1 | 90.00 | 42,417 | 100.00 | 0.00 | 10.250 |
| | --- | -------- | ----- | ----- | -------------- | ------ | ------ | ------ |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Total............... | 9,194 | $1,965,157,627 | 100.00% | 6.838% |
| 656 | $213,743 | 80.13% | 62.60% |
|  |  | ===== | ============== | ====== | ====== |
| === | ======== | ===== | ====== |

<Caption>

| RANGE OF MORTGAGE RATES | PERCENT IO |
|---|---|
| ----------------------- | ---------- |
| <S> | <C> |
| 5.000% or less......... | 77.14% |
| 5.001% to 5.500%....... | 66.47 |
| 5.501% to 6.000%....... | 78.93 |
| 6.001% to 6.500%....... | 75.48 |
| 6.501% to 7.000%....... | 70.41 |
| 7.001% to 7.500%....... | 57.18 |
| 7.501% to 8.000%....... | 45.41 |
| 8.001% to 8.500%....... | 35.46 |
| 8.501% to 9.000%....... | 34.44 |
| 9.001% to 9.500%....... | 39.47 |
| 9.501% to 10.000%...... | 27.34 |
| 10.001% to 10.500%..... | 0.00 |
|  | ----- |
| Total............... | 65.65% |
|  | ===== |

</Table>

        As of the Cut-off Date, the Mortgage Rates of the Mortgage Loans ranged
from 4.750% per annum to 10.250% per annum and the weighted average Mortgage
Rate of the Mortgage Loans was approximately 6.838% per annum.

<PAGE>

REMAINING MONTHS TO STATED MATURITY

<Table>
<Caption>

| RANGE OF REMAINING TERMS (MONTHS) | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | NUMBER OF MORTGAGE LOANS | PERCENT FULL DOC | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|---|---|
| ----------------------- | -------- | ----------- | -------- | --------- | -------- | -------------- | ---------- | -------- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 169 to 180............. | 647 | $102,697 | 71.23% | 118 | 60.22% | $ 12,118,222 | 0.62% | 7.017% |
| 229 to 240............. | 624 | 130,473 | 94.54 | 2 | 0.00 | 260,945 | 0.01 | 7.895 |
| 337 to 348............. | 705 | 116,249 | 79.97 | 1 | 100.00 | 116,249 | 0.01 | 6.000 |
| 349 to 360............. | 656 | 215,217 | 80.18 | 9,073 | 62.62 | 1,952,662,210 | 99.36 | 6.837 |

```
                               -----    --------------    ------    -----
---      --------    -----    ------
   Total................    9,194    $1,965,157,627    100.00%    6.838%
656      $213,743    80.13%    62.60%
                               =====    ==============    ======    =====
===      ========    =====    ======
```

<Caption>

```
RANGE OF REMAINING TERMS
(MONTHS)                    PERCENT IO
------------------------    ----------
<S>                         <C>
169 to 180.............       13.63%
229 to 240.............        0.00
337 to 348.............      100.00
349 to 360.............       65.98
                            ------
   Total................      65.65%
                            ======
```

</Table>

        As of the Cut-off Date, the remaining terms to stated maturity of the
Mortgage Loans ranged from 177 months to 359 months and the weighted average
remaining term to stated maturity of the Mortgage Loans was approximately 357
months.

                    ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES

<Table>
<Caption>

| | | | | AGGREGATE | |
| WEIGHTED | AVERAGE | WEIGHTED | | | |
| | | | NUMBER OF | PRINCIPAL | PERCENT OF |
| WEIGHTED | AVERAGE | PRINCIPAL | AVERAGE | | |
| RANGE OF ORIGINAL | MORTGAGE LOAN | MORTGAGE | | BALANCE | MORTGAGE |
| AVERAGE | CREDIT | BALANCE | ORIGINAL | PERCENT | |
| PRINCIPAL BALANCES | | | LOANS | OUTSTANDING | POOL |
| COUPON | SCORE | OUTSTANDING | LTV | FULL DOC | |
| -------------------------------- | -------- | ----------- | -------- | -------- | ---------- -------- |
| <S> | | | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> | <C> | |
| $50,000 or less............... | | | 254 | $   10,605,165 | 0.54% |
| 7.901% | 620 | $  41,753 | 77.12% | 81.95% | |
| $50,001 to $100,000........... | | | 1,597 | 125,656,030 | 6.39 |
| 7.324 | 629 | 78,683 | 79.62 | 79.45 | |
| $100,001 to $150,000.......... | | | 2,091 | 261,003,957 | 13.28 |
| 7.065 | 639 | 124,823 | 80.13 | 73.71 | |
| $150,001 to $200,000.......... | | | 1,641 | 286,293,718 | 14.57 |
| 6.970 | 645 | 174,463 | 80.35 | 67.65 | |
| $200,001 to $250,000.......... | | | 1,019 | 228,733,537 | 11.64 |
| 6.853 | 651 | 224,469 | 80.38 | 63.16 | |
| $250,001 to $300,000.......... | | | 759 | 208,008,136 | 10.58 |
| 6.782 | 656 | 274,056 | 80.09 | 56.02 | |
| $300,001 to $350,000.......... | | | 499 | 162,208,206 | 8.25 |
| 6.763 | 663 | 325,067 | 80.37 | 52.21 | |

| Range | # | Aggregate | % | Rate | Score | Avg Bal | LTV | % |
|---|---|---|---|---|---|---|---|---|
| $350,001 to $400,000......... | 377 | 141,671,382 | 7.21 | 6.664 | 669 | 375,786 | 80.52 | 48.70 |
| $400,001 to $450,000......... | 247 | 104,822,167 | 5.33 | 6.666 | 669 | 424,381 | 80.68 | 52.48 |
| $450,001 to $500,000......... | 222 | 105,680,406 | 5.38 | 6.618 | 668 | 476,038 | 80.60 | 51.94 |
| $500,001 to $550,000......... | 119 | 62,385,322 | 3.17 | 6.723 | 675 | 524,246 | 80.38 | 44.50 |
| $550,001 to $600,000......... | 103 | 59,449,820 | 3.03 | 6.635 | 665 | 577,183 | 80.79 | 63.05 |
| $600,001 to $650,000......... | 55 | 34,442,307 | 1.75 | 6.701 | 660 | 626,224 | 79.80 | 59.89 |
| $650,001 to $700,000......... | 54 | 36,456,902 | 1.86 | 6.639 | 672 | 675,128 | 79.88 | 53.82 |
| $700,001 to $750,000......... | 35 | 25,466,187 | 1.30 | 6.497 | 680 | 727,605 | 78.55 | 65.66 |
| $750,001 to $800,000......... | 28 | 21,868,557 | 1.11 | 6.492 | 673 | 781,020 | 77.91 | 74.91 |
| $800,001 to $850,000......... | 18 | 14,914,224 | 0.76 | 6.521 | 684 | 828,568 | 80.91 | 72.14 |
| $850,001 to $900,000......... | 19 | 16,714,458 | 0.85 | 6.423 | 689 | 879,708 | 78.84 | 78.79 |
| $900,001 to $950,000......... | 12 | 11,137,793 | 0.57 | 6.534 | 669 | 928,149 | 75.47 | 66.55 |
| $950,001 to $1,000,000........ | 24 | 23,627,857 | 1.20 | 6.453 | 689 | 984,494 | 77.67 | 87.35 |
| $1,000,001 or greater........ | 21 | 24,011,493 | 1.22 | 6.363 | 717 | 1,143,404 | 78.30 | 85.26 |
| | ----- | -------------- | ------ | ---- | --- | ---------- | ----- | ------ |
| Total....................... | 9,194 | $1,965,157,627 | 100.00% | 6.838% | 656 | $ 213,743 | 80.13% | 62.60% |
| | ===== | ============== | ====== | ===== | === | ========== | ===== | ====== |

<Caption>

| RANGE OF ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES | PERCENT IO |
|---|---|
| <S> | <C> |
| $50,000 or less............... | 6.26% |
| $50,001 to $100,000........... | 24.65 |
| $100,001 to $150,000.......... | 41.91 |
| $150,001 to $200,000.......... | 54.63 |
| $200,001 to $250,000.......... | 65.09 |
| $250,001 to $300,000.......... | 73.82 |
| $300,001 to $350,000.......... | 78.33 |
| $350,001 to $400,000.......... | 80.65 |
| $400,001 to $450,000.......... | 76.98 |
| $450,001 to $500,000.......... | 79.69 |
| $500,001 to $550,000.......... | 82.32 |
| $550,001 to $600,000.......... | 90.30 |
| $600,001 to $650,000.......... | 88.99 |
| $650,001 to $700,000.......... | 83.45 |
| $700,001 to $750,000.......... | 91.37 |
| $750,001 to $800,000.......... | 85.55 |

```
$800,001 to $850,000.......... 66.76
$850,001 to $900,000.......... 89.39
$900,001 to $950,000.......... 75.32
$950,001 to $1,000,000........ 83.31
$1,000,001 or greater......... 95.83
                              ------
  Total....................... 65.65%
                              ======
```

</Table>

        As of the Cut-off Date, the outstanding principal balances of the
Mortgage
Loans ranged from approximately $20,000 to approximately $1,500,000 and the
average outstanding principal balance of the Mortgage Loans was approximately
$213,743.

<PAGE>

                        PRODUCT TYPES

<Table>
<Caption>

| PRODUCT TYPE WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | WEIGHTED AVERAGE PRINCIPAL BALANCE OUTSTANDING | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | ORIGINAL LTV | PERCENT FULL DOC | PERCENT OF MORTGAGE POOL |
|---|---|---|---|---|---|---|---|
| <S> | | | <C> | <C> | | | <C> |
| <C> | <C> | <C> | <C> | | | | |
| 15 Year Fixed Loans........... | | | 114 | $   11,507,516 | | | 0.59% |
| 6.976% | 648 | $100,943 | 70.49% | 58.10% | | | |
| 20 Year Fixed Loans........... | | | 2 | 260,945 | | | 0.01 |
| 7.895 | 624 | 130,473 | 94.54 | 0.00 | | | |
| 30 Year Fixed Loans........... | | | 1,274 | 191,402,693 | | | 9.74 |
| 7.201 | 647 | 150,238 | 78.44 | 73.15 | | | |
| 6 Month LIBOR Loans........... | | | 14 | 4,497,664 | | | 0.23 |
| 6.255 | 667 | 321,262 | 79.08 | 46.67 | | | |
| 1/29 LIBOR Loans.............. | | | 8 | 2,491,598 | | | 0.13 |
| 6.652 | 692 | 311,450 | 82.38 | 46.98 | | | |
| 2/28 LIBOR Loans.............. | | | 5,865 | 1,341,274,029 | | | 68.25 |
| 6.828 | 655 | 228,691 | 80.47 | 59.13 | | | |
| 3/27 LIBOR Loans.............. | | | 1,642 | 344,417,663 | | | 17.53 |
| 6.744 | 658 | 209,755 | 80.52 | 68.48 | | | |
| 5/25 LIBOR Loans.............. | | | 271 | 68,694,814 | | | 3.50 |
| 6.496 | 687 | 253,486 | 77.83 | 73.68 | | | |
| Balloon Loans................. | | | 4 | 610,706 | | | 0.03 |
| 7.790 | 619 | 152,677 | 85.16 | 100.00 | | | |
| | | | ----- | -------------- | | | ------ |
| Total....................... | | | 9,194 | $1,965,157,627 | | | 100.00% |
| 6.838% | 656 | $213,743 | 80.13% | 62.60% | | | |

```
                                    =====      ==============      ======
=====        ===       ========     =====      ======
```

&lt;Caption&gt;

| PRODUCT TYPE | PERCENT IO |
| ------------ | ---------- |
| &lt;S&gt; | &lt;C&gt; |
| 15 Year Fixed Loans........... | 12.07% |
| 20 Year Fixed Loans........... | 0.00 |
| 30 Year Fixed Loans........... | 14.70 |
| 6 Month LIBOR Loans........... | 100.00 |
| 1/29 LIBOR Loans.............. | 0.00 |
| 2/28 LIBOR Loans.............. | 72.24 |
| 3/27 LIBOR Loans.............. | 67.92 |
| 5/25 LIBOR Loans.............. | 77.09 |
| Balloon Loans................. | 43.18 |
| Total........................ | 65.65% |

&lt;/Table&gt;

AMORTIZATION TYPE

&lt;Table&gt;
&lt;Caption&gt;

| AMORTIZATION TYPE | WEIGHTED AVERAGE COUPON | AVERAGE CREDIT SCORE | WEIGHTED AVERAGE PRINCIPAL BALANCE OUTSTANDING | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC | PERCENT OF MORTGAGE POOL |
| ----------------- | ----- | -------- | ----------- | -------- | -------------- | -------- | -------- | --- |
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| Fully Amortizing.............. | 7.099% | 641 | $155,450 | 4,340 | $ 674,651,978 | 80.31% | 61.94% | 34.33% |
| Balloon...................... | 7.790 | 619 | 152,677 | 4 | 610,706 | 85.16 | 100.00 | 0.03 |
| 60 Month Interest-Only........ | 6.701 | 664 | 265,958 | 4,850 | 1,289,894,943 | 80.03 | 62.93 | 65.64 |
| Total........................ | 6.838% | 656 | $213,743 | 9,194 | $1,965,157,627 | 80.13% | 62.60% | 100.00% |

```
=====        ===       ========     =====      ======
```

&lt;Caption&gt;

| AMORTIZATION TYPE | PERCENT IO |
| ----------------- | ---------- |
| &lt;S&gt; | &lt;C&gt; |
| Fully Amortizing.............. | 0.00% |
| Balloon...................... | 43.18 |

```
60 Month Interest-Only........    100.00
                                  ------
 Total........................     65.65%
                                  ======
</Table>
```

## ADJUSTMENT TYPE

```
<Table>
<Caption>
```

| | | | | AGGREGATE | | |
| WEIGHTED | AVERAGE | WEIGHTED | | | | |
| | | | NUMBER OF | PRINCIPAL | PERCENT OF | |
| WEIGHTED | AVERAGE | PRINCIPAL | AVERAGE | | | |
| | | | MORTGAGE | BALANCE | MORTGAGE | |
| AVERAGE | CREDIT | BALANCE | ORIGINAL | PERCENT | | |
| ADJUSTMENT TYPE | | | LOANS | OUTSTANDING | POOL | |
| COUPON | SCORE | OUTSTANDING | LTV | FULL DOC | | |
| --------------- | -------- | ----------- | -------- | -------- | ---------- | --- |
| ----- | -------- | ----------- | -------- | -------- | | |
| <S> | | | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> | | | |
| ARM.......................... | | | 7,800 | $1,761,375,766 | 89.63% | |
| 6.797% | 657 | $225,817 | 80.37% | 61.48% | | |
| Fixed Rate................... | | | 1,394 | 203,781,861 | 10.37 | |
| 7.191 | 647 | 146,185 | 78.03 | 72.29 | | |
| | | | ----- | -------------- | ------ | -- |
| --- | --- | -------- | ----- | ----- | | |
| Total....................... | | | 9,194 | $1,965,157,627 | 100.00% | |
| 6.838% | 656 | $213,743 | 80.13% | 62.60% | | |
| | | | ===== | ============== | ====== | |
| ===== | === | ======== | ===== | ===== | | |

```
<Caption>
```

| ADJUSTMENT TYPE | PERCENT IO |
| --------------- | ----------- |
| <S> | <C> |
| ARM.......................... | 71.56% |
| Fixed Rate................... | 14.62 |
| | ----- |
| Total....................... | 65.65% |
| | ===== |

```
</Table>
```

S-29
```
<PAGE>
```

## GEOGRAPHIC DISTRIBUTIONS OF MORTGAGED PROPERTIES

```
<Table>
<Caption>
```

| | | | | AGGREGATE | |
| WEIGHTED | AVERAGE | WEIGHTED | | | |
| | | | NUMBER OF | PRINCIPAL | PERCENT OF |
| WEIGHTED | AVERAGE | PRINCIPAL | AVERAGE | | |
| | | | MORTGAGE | BALANCE | MORTGAGE |
| AVERAGE | CREDIT | BALANCE | ORIGINAL | PERCENT | |

```
GEOGRAPHIC DISTRIBUTION          LOANS      OUTSTANDING        POOL
COUPON      SCORE     OUTSTANDING   LTV      FULL DOC        
----------------------          ---------  --------------   ----------   ---
-----       --------   -----------   --------  --------
<S>                              <C>        <C>                <C>         <C>
<C>         <C>        <C>           <C>
Alabama.....................      67      $    7,038,264       0.36%
7.425%      628        $105,049     82.34%     86.01%
Arizona.....................     220         43,188,292       2.20
6.783       646        196,310      79.33      77.11
Arkansas....................      33          3,419,279       0.17
7.100       660        103,615      81.67      75.55
California..................    2055        754,168,543      38.38
6.538       670        366,992      78.80      56.58
Colorado....................     198         35,329,377       1.80
6.803       648        178,431      80.30      67.74
Connecticut.................      54         12,988,067       0.66
7.022       650        240,520      79.30      66.47
Delaware....................      11          2,079,750       0.11
7.635       627        189,068      81.32      50.90
District of Columbia........       9          2,939,979       0.15
7.054       671        326,664      81.94      49.22
Florida.....................     698        141,127,709       7.18
7.075       653        202,189      80.57      61.90
Georgia.....................     318         50,433,906       2.57
7.144       641        158,597      81.72      82.89
Idaho.......................      57          7,046,729       0.36
6.802       636        123,627      79.73      80.00
Illinois....................     581        105,537,908       5.37
7.236       644        181,649      82.43      46.15
Indiana.....................      88          9,198,994       0.47
7.090       643        104,534      83.38      76.19
Iowa........................      42          3,391,283       0.17
7.656       609         80,745      83.87      78.07
Kansas......................      32          3,217,770       0.16
7.326       634        100,555      82.26      96.77
Kentucky....................      95          9,634,981       0.49
7.210       625        101,421      82.47      78.38
Maine.......................      20          2,706,110       0.14
7.334       643        135,305      80.87      72.34
Maryland....................     213         54,163,077       2.76
6.994       640        254,287      80.31      73.23
Massachusetts...............     127         31,206,269       1.59
7.020       665        245,719      80.89      65.25
Michigan....................     371         51,822,580       2.64
7.180       634        139,684      83.71      58.79
Minnesota...................     286         51,077,272       2.60
6.886       656        178,592      81.02      59.83
Mississippi.................       9          1,187,368       0.06
7.445       627        131,930      81.82     100.00
Missouri....................     143         17,024,434       0.87
7.301       630        119,052      82.11      69.31
Montana.....................       3            299,160       0.02
7.507       577         99,720      79.86     100.00
Nebraska....................      12          1,076,237       0.05
7.243       635         89,686      81.68      93.40
```

| State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nevada........................ | 203 | 49,077,600 | 2.50 | 6.761 | 656 | 241,762 | 79.97 | 63.30 |
| New Hampshire................. | 21 | 4,126,649 | 0.21 | 7.227 | 636 | 196,507 | 79.85 | 65.92 |
| New Jersey.................... | 140 | 36,155,024 | 1.84 | 7.024 | 650 | 258,250 | 79.21 | 51.38 |
| New Mexico.................... | 29 | 4,021,169 | 0.20 | 7.270 | 623 | 138,661 | 81.03 | 80.41 |
| New York...................... | 269 | 67,453,365 | 3.43 | 6.951 | 672 | 250,756 | 80.09 | 48.62 |
| North Carolina............... | 214 | 31,776,771 | 1.62 | 7.154 | 642 | 148,490 | 81.83 | 83.02 |
| North Dakota.................. | 8 | 735,307 | 0.04 | 7.181 | 649 | 91,913 | 82.75 | 43.40 |
| Ohio.......................... | 411 | 45,649,295 | 2.32 | 7.230 | 629 | 111,069 | 82.37 | 74.70 |
| Oklahoma...................... | 54 | 5,017,692 | 0.26 | 7.520 | 621 | 92,920 | 82.51 | 68.61 |
| Oregon........................ | 282 | 47,783,071 | 2.43 | 6.693 | 656 | 169,444 | 80.25 | 79.94 |
| Pennsylvania.................. | 143 | 19,008,866 | 0.97 | 7.194 | 642 | 132,929 | 82.63 | 69.24 |
| Rhode Island.................. | 40 | 8,274,691 | 0.42 | 6.749 | 679 | 206,867 | 80.73 | 62.23 |
| South Carolina............... | 73 | 11,816,556 | 0.60 | 7.012 | 648 | 161,871 | 82.80 | 71.37 |
| South Dakota.................. | 9 | 893,079 | 0.05 | 7.076 | 651 | 99,231 | 81.16 | 77.54 |
| Tennessee..................... | 219 | 22,653,873 | 1.15 | 7.338 | 628 | 103,442 | 81.11 | 80.02 |
| Texas......................... | 454 | 56,880,507 | 2.89 | 7.110 | 642 | 125,287 | 79.23 | 62.58 |
| Utah.......................... | 336 | 49,455,773 | 2.52 | 6.837 | 648 | 147,190 | 80.49 | 71.71 |
| Vermont....................... | 4 | 700,809 | 0.04 | 7.208 | 653 | 175,202 | 85.95 | 60.10 |
| Virginia...................... | 115 | 30,890,601 | 1.57 | 6.848 | 648 | 268,614 | 79.06 | 72.36 |
| Washington.................... | 258 | 48,960,850 | 2.49 | 6.711 | 649 | 189,771 | 80.91 | 78.54 |
| West Virginia................. | 18 | 2,506,128 | 0.13 | 6.468 | 661 | 139,229 | 79.27 | 90.22 |
| Wisconsin..................... | 147 | 19,301,334 | 0.98 | 7.207 | 635 | 131,302 | 82.11 | 71.41 |
| Wyoming....................... | 5 | 715,279 | 0.04 | 7.370 | 605 | 143,056 | 82.31 | 85.53 |
| | ----- | -------------- | ------ | -- | --- | --- | -------- | ----- | ------ |
| Total........................ | 9,194 | $1,965,157,627 | 100.00% | 6.838% | 656 | $213,743 | 80.13% | 62.60% |
| | ===== | ============== | ====== | ===== | === | ======== | ===== | ====== |

&lt;Caption&gt;

GEOGRAPHIC DISTRIBUTION      PERCENT IO
-----------------------      ----------

| `<S>` | `<C>` |
|---|---|
| Alabama......................... | 40.31% |
| Arizona......................... | 69.96 |
| Arkansas........................ | 18.91 |
| California...................... | 87.14 |
| Colorado........................ | 82.35 |
| Connecticut..................... | 40.90 |
| Delaware........................ | 49.30 |
| District of Columbia............ | 82.90 |
| Florida......................... | 59.26 |
| Georgia......................... | 68.52 |
| Idaho........................... | 31.14 |
| Illinois........................ | 37.33 |
| Indiana......................... | 25.78 |
| Iowa............................ | 9.60 |
| Kansas.......................... | 24.78 |
| Kentucky........................ | 20.26 |
| Maine........................... | 46.68 |
| Maryland........................ | 76.28 |
| Massachusetts................... | 55.46 |
| Michigan........................ | 39.52 |
| Minnesota....................... | 65.70 |
| Mississippi..................... | 58.58 |
| Missouri........................ | 27.05 |
| Montana......................... | 79.97 |
| Nebraska........................ | 0.00 |
| Nevada.......................... | 82.21 |
| New Hampshire................... | 45.39 |
| New Jersey...................... | 43.63 |
| New Mexico...................... | 42.76 |
| New York........................ | 50.63 |
| North Carolina.................. | 50.32 |
| North Dakota.................... | 26.66 |
| Ohio............................ | 40.15 |
| Oklahoma........................ | 21.73 |
| Oregon.......................... | 64.42 |
| Pennsylvania.................... | 25.16 |
| Rhode Island.................... | 51.22 |
| South Carolina.................. | 64.99 |
| South Dakota.................... | 20.96 |
| Tennessee....................... | 36.93 |
| Texas........................... | 14.30 |
| Utah............................ | 52.98 |
| Vermont......................... | 22.83 |
| Virginia........................ | 61.28 |
| Washington...................... | 63.86 |
| West Virginia................... | 61.96 |
| Wisconsin....................... | 23.95 |
| Wyoming......................... | 52.50 |
|  | ----- |
| Total........................ | 65.65% |
|  | ===== |

</Table>


No more than approximately 0.33% of the Mortgage Loans will be secured by
mortgaged properties located in any one zip code area.

<PAGE>

ORIGINAL LOAN-TO-VALUE RATIOS

<Table>
<Caption>

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS / WEIGHTED AVERAGE CREDIT SCORE | PRINCIPAL BALANCE OUTSTANDING / WEIGHTED AVERAGE PRINCIPAL BALANCE OUTSTANDING | NUMBER OF MORTGAGE LOANS / WEIGHTED AVERAGE ORIGINAL LTV | AGGREGATE PRINCIPAL BALANCE OUTSTANDING / PERCENT FULL DOC | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> | | |
| 10.01% to 20.00%....... | | 8 | $ 565,989 | 0.03% | 6.510% |
| 710 | $ 70,749 | 16.86% | 57.91% | | |
| 20.01% to 30.00%....... | | 21 | 2,008,239 | 0.10 | 6.863 |
| 638 | 95,630 | 24.70 | 50.12 | | |
| 30.01% to 40.00%....... | | 35 | 4,612,433 | 0.23 | 6.497 |
| 641 | 131,784 | 35.56 | 68.03 | | |
| 40.01% to 50.00%....... | | 84 | 13,340,916 | 0.68 | 6.735 |
| 636 | 158,820 | 46.18 | 70.66 | | |
| 50.01% to 60.00%....... | | 141 | 28,036,505 | 1.43 | 6.744 |
| 629 | 198,840 | 55.95 | 54.97 | | |
| 60.01% to 70.00%....... | | 390 | 74,464,910 | 3.79 | 6.750 |
| 636 | 190,936 | 66.16 | 55.41 | | |
| 70.01% to 75.00%....... | | 296 | 70,815,398 | 3.60 | 6.802 |
| 643 | 239,241 | 73.66 | 56.35 | | |
| 75.01% to 80.00%....... | | 6365 | 1,424,739,220 | 72.50 | 6.645 |
| 663 | 223,840 | 79.88 | 65.26 | | |
| 80.01% to 85.00%....... | | 437 | 81,627,421 | 4.15 | 7.564 |
| 617 | 186,790 | 84.51 | 57.78 | | |
| 85.01% to 90.00%....... | | 921 | 173,076,160 | 8.81 | 7.755 |
| 634 | 187,922 | 89.64 | 57.06 | | |
| 90.01% to 95.00%....... | | 493 | 91,320,793 | 4.65 | 7.625 |
| 662 | 185,235 | 94.61 | 47.58 | | |
| 95.01% to 100.00%...... | | 3 | 549,641 | 0.03 | 8.447 |
| 669 | 183,214 | 99.99 | 100.00 | | |
| | | ----- | -------------- | ------ | ----- |
| Total............... | | 9,194 | $1,965,157,627 | 100.00% | 6.838% |
| 656 | $213,743 | 80.13% | 62.60% | | |
| | | ===== | ============== | ====== | ===== |

<Caption>

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS | PERCENT IO |
|---|---|
| <S> | <C> |

```
10.01% to 20.00%.......    22.09%
20.01% to 30.00%.......    31.27
30.01% to 40.00%.......    35.76
40.01% to 50.00%.......    47.99
50.01% to 60.00%.......    40.22
60.01% to 70.00%.......    43.96
70.01% to 75.00%.......    51.29
75.01% to 80.00%.......    74.01
80.01% to 85.00%.......    39.60
85.01% to 90.00%.......    48.37
90.01% to 95.00%.......    32.98
95.01% to 100.00%......    72.77
                           -----
   Total................   65.65%
                           =====

</Table>
```

As of the Cut-off Date, the Original Loan-to-Value Ratios of the Mortgage
Loans ranged from 10.98% to 100.00% and the weighted average Original
Loan-to-Value Ratio was approximately 80.13%.

LOAN PURPOSE

<Table>
<Caption>

| LOAN PURPOSE | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Purchase............... | 665 | $219,371 | 80.60% | 6,158 | $1,350,886,691 | 68.74% | 6.745% | 65.14% |
| Refinance--Cashout..... | 635 | 204,794 | 79.14 | 2,736 | 560,315,245 | 28.51 | 7.044 | 55.47 |
| Refinance--Rate Term... | 638 | 179,852 | 78.61 | 300 | 53,955,691 | 2.75 | 7.041 | 73.08 |
|  |  |  |  | ----- | -------------- | ------ | ----- | ----- |
| Total................ | 656 | $213,743 | 80.13% | 9,194 | $1,965,157,627 | 100.00% | 6.838% | 62.60% |
|  |  |  |  | ===== | ============== | ====== | ===== | ===== |

<Caption>

| LOAN PURPOSE | PERCENT IO |
|---|---|
| ------------ | ---------- |
| <S> | <C> |
| Purchase............... | 74.59% |
| Refinance--Cashout..... | 46.58 |

```
Refinance--Rate Term...    39.89
                           -----
  Total................    65.65%
                           =====

</Table>
```

TYPES OF MORTGAGED PROPERTIES

<Table>
<Caption>

| PROPERTY TYPE | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE NUMBER OF MORTGAGE ORIGINAL LOANS LTV | AGGREGATE PRINCIPAL BALANCE PERCENT OUTSTANDING FULL DOC | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|
| <S> | | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> |
| Single Family Residence............ | 652 | 6,606 $200,833 | $1,326,703,650 80.12% | 67.51% 61.31% | 6.865% |
| Planned Unit Development.......... | 658 | 1491 259,626 | 387,102,625 80.14 | 19.70 69.71 | 6.789 |
| Condominium............ | 667 | 768 215,607 | 165,586,456 80.19 | 8.43 61.75 | 6.717 |
| Two-to-Four-Family..... | 680 | 328 260,870 | 85,565,266 80.24 | 4.35 52.21 | 6.872 |
| Modular Home........... | 793 | 1 199,629 | 199,629 60.42 | 0.01 0.00 | 6.375 |
| | | ----- -------- | ----- ----- | -------------- | ------ | ----- |
| | --- | -------- | ----- ----- | | | |
| Total............... | 656 | 9,194 $213,743 | $1,965,157,627 80.13% | 100.00% 62.60% | 6.838% |
| | | ===== ======== | ===== ===== | ============== | ====== | ===== |
| | === | ======== | ===== ===== | | | |

<Caption>

| PROPERTY TYPE | PERCENT IO |
|---|---|
| ------------- | ---------- |
| <S> | <C> |
| Single Family Residence............ | 62.49% |
| Planned Unit Development.......... | 73.31 |
| Condominium............ | 76.79 |
| Two-to-Four-Family..... | 58.60 |
| Modular Home........... | 0.00 |
| | ----- |
| Total............... | 65.65% |
| | ===== |

</Table>

<PAGE>

DOCUMENTATION SUMMARY

<Table>
<Caption>

| DOCUMENTATION SCORE | WEIGHTED AVERAGE CREDIT BALANCE OUTSTANDING | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
| AVERAGE PRINCIPAL | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC | | | |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> | | |
| Full Documentation..... | 6,204 | $1,230,216,167 | 62.60% | 6.765% | |
| 647 | $198,294 | 80.00% | 100.00% | | |
| No Income Verification......... | 2,891 | 704,654,216 | 35.86 | 6.954 | |
| 671 | 243,741 | 80.23 | 0.00 | | |
| Stated Plus............ | 48 | 20,059,337 | 1.02 | 7.084 | |
| 677 | 417,903 | 83.54 | 0.00 | | |
| Limited Income Verification......... | 51 | 10,227,907 | 0.52 | 7.128 | |
| 648 | 200,547 | 82.00 | 0.00 | | |
| Total............... | 9,194 | $1,965,157,627 | 100.00% | 6.838% | |
| 656 | $213,743 | 80.13% | 62.60% | | |

<Caption>

| DOCUMENTATION | PERCENT IO |
|---|---|
| <S> | <C> |
| Full Documentation..... | 66.01% |
| No Income Verification......... | 64.64 |
| Stated Plus............ | 86.63 |
| Limited Income Verification......... | 51.46 |
| Total............... | 65.65% |

</Table>

OCCUPANCY TYPES

<Table>
<Caption>

AGGREGATE
WEIGHTED       AVERAGE      WEIGHTED

| OCCUPANCY | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | ORIGINAL LTV | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| Primary................. | 8,812 | $1,903,172,564 | 96.85% | 6.816% | 655 | $215,975 | 80.02% | 61.85% |
| Investment.............. | 326 | 52,024,861 | 2.65 | 7.517 | 685 | 159,585 | 83.22 | 88.64 |
| Second Home............. | 56 | 9,960,202 | 0.51 | 7.463 | 674 | 177,861 | 84.19 | 70.65 |
| Total................. | 9,194 | $1,965,157,627 | 100.00% | 6.838% | 656 | $213,743 | 80.13% | 62.60% |

| OCCUPANCY | PERCENT IO |
|---|---|
| Primary................. | 65.91% |
| Investment.............. | 57.20 |
| Second Home............. | 61.30 |
| Total................. | 65.65% |

        The information set forth above with respect to occupancy is based upon representations of the related mortgagors at the time of origination.

MORTGAGE LOAN AGE SUMMARY

| MORTGAGE LOAN AGE (MONTHS) | AGGREGATE NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | ORIGINAL LTV | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| 1...................... | 44 | $ 8,269,069 | 0.42% | 6.913% | 650 | $187,933 | 78.97% | 72.48% |

| Mortgage Loan Age | Number | Aggregate Principal Balance | Percent | WAC | FICO | Avg Principal | LTV | Percent |
|---|---|---|---|---|---|---|---|---|
| 2...................... | 8,325 | 1,768,079,556 | 89.97 | 6.847 | 656 | 212,382 | 80.10 | 62.91 |
| 3...................... | 621 | 134,730,135 | 6.86 | 6.870 | 657 | 216,957 | 80.52 | 60.33 |
| 4...................... | 161 | 43,063,941 | 2.19 | 6.457 | 665 | 267,478 | 79.98 | 55.68 |
| 5...................... | 27 | 7,702,385 | 0.39 | 6.226 | 646 | 285,274 | 80.27 | 46.70 |
| 6...................... | 9 | 2,122,809 | 0.11 | 6.908 | 630 | 235,868 | 84.20 | 93.48 |
| 7...................... | 5 | 878,483 | 0.04 | 7.394 | 635 | 175,697 | 87.98 | 78.09 |
| 8...................... | 1 | 195,000 | 0.01 | 7.125 | 564 | 195,000 | 67.24 | 100.00 |
| 15...................... | 1 | 116,249 | 0.01 | 6.000 | 705 | 116,249 | 79.97 | 100.00 |
|  | ----- | -------------- | ------ | ----- | --- | -------- | ----- | ------ |
| Total............... | 9,194 | $1,965,157,627 | 100.00% | 6.838% | 656 | $213,743 | 80.13% | 62.60% |
|  | ===== | ============== | ====== | ===== | === | ======== | ===== | ====== |

<Caption>

| MORTGAGE LOAN AGE (MONTHS) | PERCENT IO |
|---|---|
| ------------------ | ---------- |
| <S> | <C> |
| 1...................... | 56.27% |
| 2...................... | 65.06 |
| 3...................... | 68.93 |
| 4...................... | 78.55 |
| 5...................... | 77.90 |
| 6...................... | 80.89 |
| 7...................... | 49.48 |
| 8...................... | 100.00 |
| 15...................... | 100.00 |
|  | ------ |
| Total............... | 65.65% |
|  | ====== |

</Table>

     As of the Cut-off Date, the weighted average age of the Mortgage Loans
was
approximately 2 months.

<PAGE>

                       PREPAYMENT CHARGES
<Table>
<Caption>
                                     AGGREGATE
WEIGHTED      AVERAGE      WEIGHTED
                           NUMBER OF    PRINCIPAL      PERCENT OF    WEIGHTED
AVERAGE       PRINCIPAL    AVERAGE

```
PREPAYMENT CHARGE TERM   MORTGAGE       BALANCE       MORTGAGE    AVERAGE
CREDIT        BALANCE    ORIGINAL    PERCENT
(MONTHS)                 LOANS       OUTSTANDING      POOL        COUPON
SCORE     OUTSTANDING    LTV         FULL DOC
-----------------------  ---------   --------------  ----------  --------
--------   -----------    --------    --------
<S>                      <C>          <C>             <C>         <C>
<C>          <C>           <C>          <C>
None...................  2,073     $  431,002,376     21.93%      7.104%
657      $207,912       80.80%      59.36%
12 Months..............    469        145,214,098      7.39       7.040
663      309,625        80.66       55.39
24 Months..............   4399        952,654,576     48.48       6.762
656      216,562        79.90       61.29
36 Months..............   2253        436,286,576     22.20       6.674
653      193,647        79.80       71.08
                          -----      --------------   ------      -----
---      --------       -----       -----
  Total................  9,194      $1,965,157,627   100.00%      6.838%
656      $213,743       80.13%      62.60%
                          =====      ==============   ======      =====
===      ========       =====       =====
```

<Caption>

```
PREPAYMENT CHARGE TERM
(MONTHS)                  PERCENT IO
-----------------------   ----------
<S>                       <C>
None...................   56.32%
12 Months..............   79.43
24 Months..............   69.27
36 Months..............   62.39
                          -----
  Total................   65.65%
                          =====
```

</Table>

     The weighted average prepayment charge term at origination with respect to
the Mortgage Loans having prepayment charges is approximately 26 months.

                          CREDIT SCORES
<Table>
<Caption>

```
                                    AGGREGATE
WEIGHTED      AVERAGE      WEIGHTED
                          NUMBER OF    PRINCIPAL    PERCENT OF   WEIGHTED
AVERAGE      PRINCIPAL     AVERAGE
RANGE OF CREDIT          MORTGAGE      BALANCE       MORTGAGE    AVERAGE
CREDIT        BALANCE     ORIGINAL    PERCENT
SCORES                   LOANS        OUTSTANDING     POOL       COUPON
SCORE     OUTSTANDING    LTV         FULL DOC
---------------          ---------   --------------  ----------  --------
--------   -----------    --------    --------
<S>                      <C>          <C>             <C>         <C>
<C>          <C>           <C>          <C>
```

| RANGE OF CREDIT SCORES | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE | PERCENT | WEIGHTED AVERAGE RATE | WEIGHTED AVERAGE FICO | AVERAGE PRINCIPAL BALANCE | WEIGHTED AVERAGE LTV | WEIGHTED AVERAGE |
|---|---|---|---|---|---|---|---|---|
| 540 to 550............. | 165 | $ 21,804,011 | 1.11% | 8.132% | 545 | $132,146 | 75.99% | 84.13% |
| 551 to 575............. | 536 | 78,834,661 | 4.01 | 7.824 | 565 | 147,080 | 78.32 | 77.14 |
| 576 to 600............. | 1063 | 161,638,059 | 8.23 | 7.510 | 589 | 152,058 | 80.06 | 80.82 |
| 601 to 625............. | 1710 | 311,075,804 | 15.83 | 7.045 | 613 | 181,916 | 80.26 | 80.73 |
| 626 to 650............. | 1670 | 365,125,386 | 18.58 | 6.829 | 639 | 218,638 | 80.49 | 66.14 |
| 651 to 675............. | 1606 | 390,341,207 | 19.86 | 6.651 | 663 | 243,052 | 80.23 | 53.01 |
| 676 to 700............. | 1041 | 262,885,953 | 13.38 | 6.586 | 687 | 252,532 | 80.14 | 51.78 |
| 701 to 725............. | 657 | 177,666,152 | 9.04 | 6.492 | 712 | 270,420 | 80.67 | 46.30 |
| 726 to 750............. | 402 | 107,225,379 | 5.46 | 6.476 | 737 | 266,730 | 80.15 | 47.66 |
| 751 to 775............. | 204 | 54,200,283 | 2.76 | 6.427 | 763 | 265,688 | 80.10 | 57.56 |
| 776 to 800............. | 115 | 28,614,143 | 1.46 | 6.454 | 786 | 248,819 | 78.58 | 53.31 |
| 801 to 817............. | 25 | 5,746,589 | 0.29 | 6.319 | 805 | 229,864 | 76.30 | 86.45 |
| Total............... | 9,194 | $1,965,157,627 | 100.00% | 6.838% | 656 | $213,743 | 80.13% | 62.60% |

<Caption>

| RANGE OF CREDIT SCORES | PERCENT IO |
|---|---|
| <S> | <C> |
| 540 to 550............. | 26.20% |
| 551 to 575............. | 28.00 |
| 576 to 600............. | 41.05 |
| 601 to 625............. | 61.25 |
| 626 to 650............. | 68.95 |
| 651 to 675............. | 72.24 |
| 676 to 700............. | 72.78 |
| 701 to 725............. | 74.46 |
| 726 to 750............. | 76.09 |
| 751 to 775............. | 75.32 |
| 776 to 800............. | 76.23 |
| 801 to 817............. | 68.07 |
| Total............... | 65.65% |

</Table>

        The Credit Scores of the Mortgage Loans as of the Cut-off Date ranged
from

540 to 817 and the weighted average Credit Score of the Mortgage Loans as of the
Cut-off Date was approximately 656.

GROSS MARGINS
(EXCLUDES FIXED RATE MORTGAGE LOANS)

| RANGE OF GROSS MARGINS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| 3.001% to 3.500%....... | 1 | $ 116,249 | 0.01% | 6.000% | 705 | $116,249 | 79.97% | 100.00% |
| 4.001% to 4.500%....... | 4 | 778,950 | 0.04 | 5.234 | 650 | 194,737 | 78.20 | 59.57 |
| 4.501% to 5.000%....... | 1917 | 563,131,928 | 31.97 | 6.242 | 667 | 293,757 | 78.67 | 61.81 |
| 5.001% to 5.500%....... | 2746 | 647,453,781 | 36.76 | 6.719 | 661 | 235,781 | 79.49 | 61.29 |
| 5.501% to 6.000%....... | 1870 | 350,024,943 | 19.87 | 7.244 | 645 | 187,179 | 81.61 | 63.93 |
| 6.001% to 6.500%....... | 954 | 153,401,955 | 8.71 | 7.737 | 638 | 160,799 | 84.53 | 56.94 |
| 6.501% to 7.000%....... | 249 | 39,133,935 | 2.22 | 8.102 | 637 | 157,164 | 89.85 | 55.84 |
| 7.001% to 7.500%....... | 53 | 6,857,391 | 0.39 | 8.547 | 644 | 129,385 | 92.92 | 59.12 |
| 7.501% to 8.000%....... | 6 | 476,633 | 0.03 | 8.846 | 642 | 79,439 | 92.16 | 84.07 |
| Total.................. | 7,800 | $1,761,375,766 | 100.00% | 6.797% | 657 | $225,817 | 80.37% | 61.48% |

| RANGE OF GROSS MARGINS | PERCENT IO |
|---|---|
| 3.001% to 3.500%....... | 100.00% |
| 4.001% to 4.500%....... | 100.00 |
| 4.501% to 5.000%....... | 91.07 |
| 5.001% to 5.500%....... | 76.44 |
| 5.501% to 6.000%....... | 54.90 |
| 6.001% to 6.500%....... | 32.26 |
| 6.501% to 7.000%....... | 19.90 |

```
7.001% to 7.500%.......    32.93
7.501% to 8.000%.......     0.00
                          ------
Total..................    71.56%
                          ======
```

</Table>

<PAGE>

As of the Cut-off Date, the gross margins for the Adjustable Rate Mortgage
Loans ranged from 3.500% per annum to 7.875% per annum and the weighted average
gross margin for the Adjustable Rate Mortgage Loans was approximately 5.437% per
annum.

## MAXIMUM MORTGAGE RATES
### (EXCLUDES FIXED RATE MORTGAGE LOANS)

<Table>
<Caption>

| RANGE OF MAXIMUM MORTGAGE RATES | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 11.000% or less........ | 15 | $ 3,375,934 | 0.19% | 4.926% | 693 | $225,062 | 78.98% | 96.83% |
| 11.001% to 11.500%..... | 119 | 30,164,024 | 1.71 | 5.396 | 691 | 253,479 | 77.10 | 82.08 |
| 11.501% to 12.000%..... | 782 | 224,987,670 | 12.77 | 5.870 | 683 | 287,708 | 78.41 | 81.59 |
| 12.001% to 12.500%..... | 1760 | 480,425,748 | 27.28 | 6.337 | 673 | 272,969 | 78.99 | 65.12 |
| 12.501% to 13.000%..... | 2114 | 479,496,442 | 27.22 | 6.814 | 656 | 226,820 | 79.62 | 53.56 |
| 13.001% to 13.500%..... | 1456 | 279,356,469 | 15.86 | 7.304 | 642 | 191,866 | 81.77 | 51.89 |
| 13.501% to 14.000%..... | 948 | 168,849,159 | 9.59 | 7.797 | 625 | 178,111 | 83.70 | 57.59 |
| 14.001% to 14.500%..... | 387 | 61,836,267 | 3.51 | 8.289 | 612 | 159,784 | 86.63 | 62.38 |
| 14.501% to 15.000%..... | 179 | 27,826,872 | 1.58 | 8.775 | 592 | 155,457 | 87.04 | 62.04 |
| 15.001% to 15.500%..... | 34 | 4,658,288 | 0.26 | 9.244 | 584 | 137,008 | 89.44 | 71.40 |
| 15.501% to 16.000%..... | 5 | 356,477 | 0.02 | 9.625 | 575 | 71,295 | 88.69 | 70.40 |

```
16.001% to 16.500%.....        1            42,417      0.00      10.250
563       42,417       90.00      100.00
                            -----    --------------    ------    ------
---       --------      -----    ------
Total.................   7,800    $1,761,375,766   100.00%     6.797%
657      $225,817      80.37%      61.48%
                            =====    ==============    ======    ======
===       ========     =====    ======
```

&lt;Caption&gt;

```
RANGE OF MAXIMUM
MORTGAGE RATES          PERCENT IO
----------------        ----------
<S>                     <C>
11.000% or less........  84.85%
11.001% to 11.500%.....  79.25
11.501% to 12.000%.....  83.22
12.001% to 12.500%.....  79.24
12.501% to 13.000%.....  75.20
13.001% to 13.500%.....  63.62
13.501% to 14.000%.....  51.49
14.001% to 14.500%.....  43.44
14.501% to 15.000%.....  39.54
15.001% to 15.500%.....  51.54
15.501% to 16.000%.....  50.49
16.001% to 16.500%.....   0.00
                         -----
Total..................  71.56%
                         =====
```

&lt;/Table&gt;

    As of the Cut-off Date, the Maximum Mortgage Rates for the Adjustable
Rate
Mortgage Loans ranged from 10.750% per annum to 16.250% per annum and the
weighted average Maximum Mortgage Rate for the Adjustable Rate Mortgage Loans
was 12.797% per annum.

&lt;PAGE&gt;

                    NEXT RATE ADJUSTMENT DATE
                (EXCLUDES FIXED RATE MORTGAGE LOANS)
&lt;Table&gt;
&lt;Caption&gt;

```
                                     AGGREGATE
WEIGHTED      AVERAGE      WEIGHTED
                            NUMBER OF    PRINCIPAL      PERCENT OF   WEIGHTED
AVERAGE      PRINCIPAL     AVERAGE
                            MORTGAGE     BALANCE        MORTGAGE     AVERAGE
CREDIT       BALANCE       ORIGINAL     PERCENT
NEXT RATE ADJUSTMENT DATE   LOANS     OUTSTANDING        POOL       COUPON
SCORE        OUTSTANDING   LTV          FULL DOC
------------------------   ---------  --------------   ----------   --------
--------     -----------   --------     --------
<S>                        <C>        <C>              <C>          <C>
<C>          <C>           <C>          <C>
```

| Month | Number | Aggregate Amount | % | Rate | Score | Avg Amount | % | % |
|---|---|---|---|---|---|---|---|---|
| March 2006.............. | 1 | $ 188,983 | 0.01% | 6.875% | 705 | $188,983 | 90.00% | 100.00% |
| April 2006.............. | 13 | 4,308,681 | 0.24 | 6.228 | 666 | 331,437 | 78.61 | 44.33 |
| October 2006........... | 8 | 2,491,598 | 0.14 | 6.652 | 692 | 311,450 | 82.38 | 46.98 |
| April 2007.............. | 1 | 195,000 | 0.01 | 7.125 | 564 | 195,000 | 67.24 | 100.00 |
| May 2007................ | 2 | 276,755 | 0.02 | 7.919 | 586 | 138,378 | 85.00 | 100.00 |
| June 2007............... | 7 | 1,732,066 | 0.10 | 6.708 | 634 | 247,438 | 84.20 | 92.01 |
| July 2007............... | 20 | 5,954,337 | 0.34 | 6.243 | 644 | 297,717 | 79.82 | 45.48 |
| August 2007............. | 102 | 29,141,120 | 1.65 | 6.481 | 660 | 285,697 | 80.36 | 52.74 |
| September 2007.......... | 401 | 95,592,688 | 5.43 | 6.850 | 657 | 238,386 | 80.67 | 56.32 |
| October 2007........... | 5311 | 1,204,127,267 | 68.36 | 6.839 | 655 | 226,723 | 80.46 | 59.46 |
| November 2007.......... | 21 | 4,254,795 | 0.24 | 6.562 | 653 | 202,609 | 77.42 | 75.91 |
| May 2008................ | 2 | 409,252 | 0.02 | 6.989 | 663 | 204,626 | 89.05 | 100.00 |
| July 2008............... | 5 | 1,356,457 | 0.08 | 6.191 | 640 | 271,291 | 82.33 | 61.13 |
| August 2008............. | 30 | 8,552,257 | 0.49 | 6.306 | 682 | 285,075 | 80.27 | 56.00 |
| September 2008.......... | 114 | 22,032,774 | 1.25 | 6.727 | 655 | 193,270 | 81.46 | 73.12 |
| October 2008........... | 1481 | 309,944,089 | 17.60 | 6.756 | 657 | 209,280 | 80.41 | 68.58 |
| November 2008.......... | 10 | 2,122,834 | 0.12 | 7.181 | 677 | 212,283 | 85.44 | 55.54 |
| September 2009.......... | 1 | 116,249 | 0.01 | 6.000 | 705 | 116,249 | 79.97 | 100.00 |
| June 2010............... | 1 | 226,943 | 0.01 | 7.375 | 563 | 226,943 | 80.00 | 100.00 |
| July 2010............... | 1 | 332,000 | 0.02 | 5.750 | 695 | 332,000 | 80.00 | 0.00 |
| August 2010............. | 12 | 2,498,494 | 0.14 | 6.343 | 678 | 208,208 | 79.33 | 78.48 |
| September 2010.......... | 19 | 5,301,917 | 0.30 | 6.427 | 708 | 279,048 | 76.42 | 62.24 |
| October 2010........... | 235 | 59,868,142 | 3.40 | 6.508 | 686 | 254,758 | 77.86 | 74.88 |
| November 2010.......... | 2 | 351,069 | 0.02 | 6.928 | 678 | 175,535 | 80.00 | 51.04 |
| | ----- | -------------- | ------ | ----- | --- | -------- | ----- | ------ |
| Total................. | 7,800 | $1,761,375,766 | 100.00% | 6.797% | 657 | $225,817 | 80.37% | 61.48% |
| | ===== | ============== | ====== | ===== | === | ======== | ===== | ====== |

<Caption>

```
NEXT RATE ADJUSTMENT DATE   PERCENT IO
-------------------------   ----------
<S>                         <C>
March 2006...............    100.00%
April 2006...............    100.00
October 2006.............      0.00
April 2007...............    100.00
May 2007.................     70.64
June 2007................     89.68
July 2007................     81.27
August 2007..............     80.51
September 2007...........     73.32
October 2007.............     71.88
November 2007............     74.17
May 2008.................     58.45
July 2008................     61.13
August 2008..............     86.73
September 2008...........     77.70
October 2008.............     66.88
November 2008............     47.90
September 2009...........    100.00
June 2010................      0.00
July 2010................    100.00
August 2010..............     95.21
September 2010...........     80.33
October 2010.............     76.32
November 2010............     51.04
                             ------
   Total.................     71.56%
                             ======

</Table>
```

## THE GROUP ONE MORTGAGE LOANS
### MORTGAGE RATES FOR THE GROUP ONE MORTGAGE LOANS

```
<Table>
<Caption>
                                      AGGREGATE
WEIGHTED      AVERAGE      WEIGHTED
                          NUMBER OF   PRINCIPAL      PERCENT OF    WEIGHTED
AVERAGE       PRINCIPAL   AVERAGE
RANGE OF                  MORTGAGE    BALANCE        MORTGAGE      AVERAGE
CREDIT        BALANCE     ORIGINAL    PERCENT
MORTGAGE RATES            LOANS       OUTSTANDING    POOL          COUPON
SCORE    OUTSTANDING      LTV         FULL DOC
--------------            ---------   ------------   ----------    --------
--------  -----------     --------    --------
<S>                       <C>         <C>            <C>           <C>
<C>          <C>          <C>         <C>
5.000% or less..........      12      $  1,588,051       0.19%       4.884%
690          $132,338     70.68%      93.27%
5.001% to 5.500%........      83        14,121,121       1.66        5.388
694          170,134      71.44       76.53
5.501% to 6.000%........     401        67,760,366       7.96        5.879
680          168,978      75.25       77.12
6.001% to 6.500%........     927       149,810,452      17.60        6.341
661          161,608      77.61       73.99
```

| Range | No. | Aggregate | % | Rate | | | | |
|---|---|---|---|---|---|---|---|---|
| 6.501% to 7.000%........ | 1,395 | 213,004,635 | 25.02 | 6.820 | | | | |
| 645 | 152,691 | 78.96 | 65.67 | | | | | |
| 7.001% to 7.500%........ | 1,248 | 175,908,362 | 20.66 | 7.322 | | | | |
| 630 | 140,952 | 80.90 | 64.99 | | | | | |
| 7.501% to 8.000%........ | 1,012 | 137,825,296 | 16.19 | 7.794 | | | | |
| 618 | 136,191 | 82.82 | 64.10 | | | | | |
| 8.001% to 8.500%........ | 491 | 61,158,059 | 7.18 | 8.290 | | | | |
| 609 | 124,558 | 85.87 | 65.88 | | | | | |
| 8.501% to 9.000%........ | 230 | 25,072,638 | 2.95 | 8.760 | | | | |
| 593 | 109,011 | 85.93 | 75.53 | | | | | |
| 9.001% to 9.500%........ | 50 | 4,291,918 | 0.50 | 9.243 | | | | |
| 574 | 85,838 | 85.78 | 73.65 | | | | | |
| 9.501% to 10.000%....... | 10 | 658,442 | 0.08 | 9.665 | | | | |
| 572 | 65,844 | 87.04 | 78.11 | | | | | |
| 10.001% to 10.500%...... | 1 | 42,417 | 0.00 | 10.250 | | | | |
| 563 | 42,417 | 90.00 | 100.00 | | | | | |

```
                          -----      ------------    ------    ------
---       --------   -----    ------
  Total................   5,860     $851,241,759   100.00%    7.072%
639      $145,263    80.06%   68.24%
                          =====    =============   ======    ======
===       ========   =====    ======
```

<Caption>

| RANGE OF MORTGAGE RATES | PERCENT IO |
|---|---|
| \<S> | \<C> |
| 5.000% or less.......... | 63.78% |
| 5.001% to 5.500%........ | 52.67 |
| 5.501% to 6.000%........ | 62.81 |
| 6.001% to 6.500%........ | 59.35 |
| 6.501% to 7.000%........ | 55.10 |
| 7.001% to 7.500%........ | 43.39 |
| 7.501% to 8.000%........ | 33.63 |
| 8.001% to 8.500%........ | 31.41 |
| 8.501% to 9.000%........ | 25.26 |
| 9.001% to 9.500%........ | 14.95 |
| 9.501% to 10.000%....... | 27.34 |
| 10.001% to 10.500%...... | 0.00 |
| | ----- |
| Total................ | 47.73% |
| | ===== |

</Table>

        As of the Cut-off Date, the Mortgage Rates of the Group One Mortgage Loans
ranged from 4.750% per annum to 10.250% per annum and the weighted average
Mortgage Rate of the Group One Mortgage Loans was approximately 7.072% per
annum.

<PAGE>

        REMAINING MONTHS TO STATED MATURITY FOR THE GROUP ONE MORTGAGE LOANS
<Table>

<Caption>

| RANGE OF REMAINING TERMS (MONTHS) | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE PRINCIPAL PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 169 to 180.............. | 112 | $ 10,489,123 | 1.23% | 7.059% | 640 | $ 93,653 | 70.44% | 59.03% |
| 229 to 240.............. | 2 | 260,945 | 0.03 | 7.895 | 624 | 130,473 | 94.54 | 0.00 |
| 337 to 348.............. | 1 | 116,249 | 0.01 | 6.000 | 705 | 116,249 | 79.97 | 100.00 |
| 349 to 360.............. | 5,745 | 840,375,441 | 98.72 | 7.072 | 639 | 146,279 | 80.17 | 68.37 |
| Total................. | 5,860 | $851,241,759 | 100.00% | 7.072% | 639 | $145,263 | 80.06% | 68.24% |

<Caption>

| RANGE OF REMAINING TERMS (MONTHS) | PERCENT IO |
|---|---|
| <S> | <C> |
| 169 to 180.............. | 6.03% |
| 229 to 240.............. | 0.00 |
| 337 to 348.............. | 100.00 |
| 349 to 360.............. | 48.26 |
| Total................. | 47.73% |

</Table>

        As of the Cut-off Date, the remaining terms to stated maturity of the
Group One Mortgage Loans ranged from 177 months to 359 months and the
weighted
average remaining term to stated maturity of the Group One Mortgage Loans was
approximately 356 months.

    ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES FOR THE GROUP ONE MORTGAGE LOANS
<Table>
<Caption>

|  | | AGGREGATE | | | |
| WEIGHTED | AVERAGE | WEIGHTED | | | |
|  |  | NUMBER OF | PRINCIPAL | PERCENT OF | WEIGHTED |
| AVERAGE | PRINCIPAL | AVERAGE | | | |

| RANGE OF ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES | MORTGAGE LOANS | BALANCE OUTSTANDING | MORTGAGE POOL PERCENT | AVERAGE COUPON | CREDIT SCORE | BALANCE OUTSTANDING | ORIGINAL LTV | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| $50,000 or less.......... | 252 | $ 10,520,523 | 1.24% | 7.913% | 619 | $ 41,748 | 77.10% | 81.80% |
| $50,001 to $100,000...... | 1,506 | 117,990,497 | 13.86 | 7.341 | 628 | 78,347 | 79.59 | 79.29 |
| $100,001 to $150,000..... | 1,772 | 220,014,913 | 25.85 | 7.085 | 638 | 124,162 | 80.04 | 72.99 |
| $150,001 to $200,000..... | 1,189 | 206,501,943 | 24.26 | 7.019 | 642 | 173,677 | 80.36 | 68.21 |
| $200,001 to $250,000..... | 582 | 130,003,267 | 15.27 | 6.948 | 643 | 223,373 | 80.39 | 64.73 |
| $250,001 to $300,000..... | 342 | 93,402,672 | 10.97 | 6.913 | 644 | 273,107 | 79.67 | 57.61 |
| $300,001 to $350,000..... | 178 | 57,821,662 | 6.79 | 7.051 | 645 | 324,841 | 80.32 | 52.85 |
| $350,001 to $400,000..... | 30 | 10,980,005 | 1.29 | 7.001 | 649 | 366,000 | 80.94 | 63.42 |
| $400,001 to $450,000..... | 6 | 2,543,033 | 0.30 | 7.206 | 649 | 423,839 | 77.91 | 49.67 |
| $450,001 to $500,000..... | 2 | 915,244 | 0.11 | 6.689 | 638 | 457,622 | 82.21 | 0.00 |
| $500,001 to $550,000..... | 1 | 548,000 | 0.06 | 8.250 | 656 | 548,000 | 74.76 | 100.00 |
| Total................... | 5,860 | $851,241,759 | 100.00% | 7.072% | 639 | $145,263 | 80.06% | 68.24% |

`<Caption>`

| RANGE OF ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES | PERCENT IO |
|---|---|
| `<S>` | `<C>` |
| $50,000 or less.......... | 6.31% |
| $50,001 to $100,000...... | 24.59 |
| $100,001 to $150,000..... | 42.02 |
| $150,001 to $200,000..... | 53.32 |
| $200,001 to $250,000..... | 57.34 |
| $250,001 to $300,000..... | 59.53 |
| $300,001 to $350,000..... | 62.10 |
| $350,001 to $400,000..... | 52.78 |
| $400,001 to $450,000..... | 49.67 |
| $450,001 to $500,000..... | 49.82 |
| $500,001 to $550,000..... | 100.00 |
| Total................... | 47.73% |

</Table>

As of the Cut-off Date, the outstanding principal balances of the Group One Mortgage Loans ranged from approximately $20,000 to approximately $548,000 and the average outstanding principal balance of the Group One Mortgage Loans was approximately $145,263.

PRODUCT TYPES FOR THE GROUP ONE MORTGAGE LOANS

<Table>
<Caption>

| PRODUCT TYPE | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|
| WEIGHTED AVERAGE CREDIT SCORE | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC | | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | | | |
| 15 Year Fixed Loans..... | 109 | $ 10,142,110 | 1.19% | 7.033% | |
| 641 | $ 93,047 | 70.06% | 57.63% | | |
| 20 Year Fixed Loans..... | 2 | 260,945 | 0.03 | 7.895 | |
| 624 | 130,473 | 94.54 | 0.00 | | |
| 30 Year Fixed Loans..... | 1,057 | 131,843,021 | 15.49 | 7.332 | |
| 638 | 124,733 | 78.22 | 68.22 | | |
| 6 Month LIBOR ARM....... | 3 | 439,832 | 0.05 | 6.389 | |
| 681 | 146,611 | 81.10 | 42.97 | | |
| 1/29 LIBOR ARM.......... | 5 | 840,640 | 0.10 | 7.099 | |
| 638 | 168,128 | 82.00 | 60.40 | | |
| 2/28 LIBOR ARM.......... | 3,449 | 524,097,399 | 61.57 | 7.063 | |
| 637 | 151,956 | 80.68 | 66.45 | | |
| 3/27 LIBOR ARM.......... | 1,070 | 155,215,912 | 18.23 | 6.958 | |
| 643 | 145,062 | 80.71 | 74.08 | | |
| 5/25 LIBOR ARM.......... | 162 | 28,054,886 | 3.30 | 6.659 | |
| 676 | 173,178 | 76.87 | 74.11 | | |
| Balloon Loans........... | 3 | 347,013 | 0.04 | 7.821 | |
| 595 | 115,671 | 81.49 | 100.00 | | |
| Total................. | 5,860 | $851,241,759 | 100.00% | 7.072% | |
| 639 | $145,263 | 80.06% | 68.24% | | |

<Caption>

| PRODUCT TYPE | PERCENT IO |
|---|---|
| <S> | <C> |
| 15 Year Fixed Loans..... | 6.24% |
| 20 Year Fixed Loans..... | 0.00 |
| 30 Year Fixed Loans..... | 10.22 |
| 6 Month LIBOR ARM....... | 100.00 |

```
1/29 LIBOR ARM..........     0.00
2/28 LIBOR ARM..........    53.94
3/27 LIBOR ARM..........    57.51
5/25 LIBOR ARM..........    70.73
Balloon Loans...........     0.00
                            ------
  Total.................    47.73%
                            ======
```

</Table>

<PAGE>

AMORTIZATION TYPE FOR THE GROUP ONE MORTGAGE LOANS

<Table>
<Caption>

| AMORTIZATION TYPE | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Fully Amortizing........ | 632 | $128,745 | 80.39% | 3,453 | $444,557,723 | 52.22% | 7.238% | 63.29% |
| Balloon................. 60 Month | 595 | 115,671 | 81.49 | 3 | 347,013 | 0.04 | 7.821 | 100.00 |
| Interest-Only......... | 647 | 169,025 | 79.69 | 2,404 | 406,337,023 | 47.73 | 6.891 | 73.63 |
| Total................. | 639 | $145,263 | 80.06% | 5,860 | $851,241,759 | 100.00% | 7.072% | 68.24% |

<Caption>

| AMORTIZATION TYPE | PERCENT IO |
|---|---|
| <S> | <C> |
| Fully Amortizing........ | 0.00% |
| Balloon................. 60 Month | 0.00 |
| Interest-Only......... | 100.00 |
| Total................. | 47.73% |

</Table>

ADJUSTMENT TYPE FOR THE GROUP ONE MORTGAGE LOANS

<Table>
<Caption>

| ADJUSTMENT TYPE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| ARM..................... | 4,689 | $708,648,669 | 83.25% | 7.024% | 640 | $151,130 | 80.53% | 68.41% |
| Fixed Rate.............. | 1,171 | 142,593,090 | 16.75 | 7.313 | 638 | 121,770 | 77.67 | 67.42 |
| Total................. | 5,860 | $851,241,759 | 100.00% | 7.072% | 639 | $145,263 | 80.06% | 68.24% |

<Caption>

| ADJUSTMENT TYPE | PERCENT IO |
|---|---|
| <S> | <C> |
| ARM..................... | 55.35% |
| Fixed Rate.............. | 9.90 |
| Total................. | 47.73% |

</Table>

<PAGE>

GEOGRAPHIC DISTRIBUTIONS OF MORTGAGED PROPERTIES FOR THE GROUP ONE MORTGAGE LOANS

<Table>
<Caption>

| GEOGRAPHIC DISTRIBUTION | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |

| State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Alabama................. | 53 | $ 4,889,984 | 0.57% | 7.557% | 620 | $ 92,264 | 83.04% | 86.96% |
| Arizona................. | 162 | 28,335,581 | 3.33 | 6.836 | 641 | 174,911 | 78.54 | 78.10 |
| Arkansas................ | 24 | 1,938,079 | 0.23 | 7.253 | 652 | 80,753 | 81.15 | 91.23 |
| California.............. | 528 | 121,860,518 | 14.32 | 6.660 | 649 | 230,796 | 73.63 | 58.60 |
| Colorado................ | 147 | 22,334,108 | 2.62 | 6.820 | 641 | 151,933 | 80.84 | 76.51 |
| Connecticut............. | 36 | 6,016,781 | 0.71 | 7.236 | 629 | 167,133 | 81.17 | 81.72 |
| Delaware................ | 7 | 1,249,364 | 0.15 | 7.738 | 638 | 178,481 | 82.20 | 33.63 |
| District of Columbia.... | 4 | 841,180 | 0.10 | 7.001 | 604 | 210,295 | 74.38 | 76.32 |
| Florida................. | 394 | 61,316,605 | 7.20 | 7.259 | 640 | 155,626 | 79.94 | 68.39 |
| Georgia................. | 248 | 31,839,688 | 3.74 | 7.336 | 632 | 128,386 | 82.31 | 83.19 |
| Idaho................... | 49 | 5,630,920 | 0.66 | 6.886 | 636 | 114,917 | 79.69 | 74.97 |
| Illinois................ | 474 | 73,725,661 | 8.66 | 7.305 | 636 | 155,539 | 82.40 | 47.51 |
| Indiana................. | 73 | 6,537,976 | 0.77 | 7.399 | 635 | 89,561 | 84.44 | 76.80 |
| Iowa.................... | 41 | 3,284,273 | 0.39 | 7.661 | 610 | 80,104 | 83.99 | 77.36 |
| Kansas.................. | 27 | 2,367,804 | 0.28 | 7.362 | 641 | 87,696 | 83.07 | 95.61 |
| Kentucky................ | 84 | 8,116,534 | 0.95 | 7.257 | 622 | 96,625 | 82.25 | 78.50 |
| Maine................... | 14 | 1,641,966 | 0.19 | 7.370 | 650 | 117,283 | 81.44 | 65.67 |
| Maryland................ | 155 | 31,048,652 | 3.65 | 7.095 | 633 | 200,314 | 80.03 | 73.89 |
| Massachusetts........... | 68 | 13,023,072 | 1.53 | 6.969 | 651 | 191,516 | 80.95 | 87.85 |
| Michigan................ | 326 | 40,580,087 | 4.77 | 7.223 | 634 | 124,479 | 83.82 | 57.33 |
| Minnesota............... | 241 | 39,384,265 | 4.63 | 6.956 | 649 | 163,420 | 81.54 | 60.52 |
| Mississippi............. | 6 | 597,268 | 0.07 | 7.624 | 615 | 99,545 | 78.12 | 100.00 |
| Missouri................ | 130 | 14,308,959 | 1.68 | 7.332 | 627 | 110,069 | 82.70 | 70.99 |
| Montana................. | 3 | 299,160 | 0.04 | 7.507 | 577 | 99,720 | 79.86 | 100.00 |
| Nebraska................ | 12 | 1,076,237 | 0.13 | 7.243 | 635 | 89,686 | 81.68 | 93.40 |
| Nevada.................. | 114 | 21,676,351 | 2.55 | 6.743 | 644 | 190,143 | 79.12 | 76.36 |
| New Hampshire........... | 18 | 3,301,149 | 0.39 | 7.230 | 642 | 183,397 | 79.81 | 57.40 |
| New Jersey.............. | 79 | 15,462,927 | 1.82 | 7.134 | 637 | 195,733 | 78.77 | 53.82 |

```
New Mexico.............     21      2,174,628      0.26      7.412
621      103,554    81.00      82.60
New York...............    160     21,294,874      2.50      7.360
643      133,093    79.11      72.96
North Carolina.........    165     19,211,447      2.26      7.336
634      116,433    82.22      82.74
North Dakota...........      8        735,307      0.09      7.181
649       91,913    82.75      43.40
Ohio...................    354     36,282,299      4.26      7.302
625      102,492    82.66      75.19
Oklahoma...............     45      4,110,457      0.48      7.482
624       91,343    82.52      66.12
Oregon.................    216     32,812,129      3.85      6.774
651      151,908    80.39      82.66
Pennsylvania...........    109     12,697,563      1.49      7.308
629      116,491    81.92      64.30
Rhode Island...........     18      3,512,185      0.41      6.848
665      195,121    81.72      66.67
South Carolina.........     53      5,891,362      0.69      7.300
634      111,158    83.31      78.62
South Dakota...........      8        701,452      0.08      6.994
659       87,682    81.47      71.41
Tennessee..............    177     15,882,073      1.87      7.414
625       89,729    81.42      85.81
Texas..................    331     34,861,176      4.10      7.301
633      105,321    79.31      57.54
Utah...................    262     33,815,095      3.97      6.891
645      129,065    81.15      77.10
Vermont................      4        700,809      0.08      7.208
653      175,202    85.95      60.10
Virginia...............     76     15,181,102      1.78      7.029
637      199,751    78.10      66.26
Washington.............    189     31,071,774      3.65      6.759
651      164,401    81.10      76.45
West Virginia..........     11      1,131,528      0.13      6.736
664      102,866    77.46     100.00
Wisconsin..............    132     16,046,071      1.89      7.269
632      121,561    82.17      70.04
Wyoming................      4        443,279      0.05      7.598
612      110,820    83.72      76.65
                         -----   ------------    ------     -----
---     --------     -----    ------
  Total................  5,860   $851,241,759    100.00%    7.072%
639     $145,263    80.06%     68.24%
                         =====   ============    ======     =====
===     ========     =====    ======
```

<Caption>

| GEOGRAPHIC DISTRIBUTION | PERCENT IO |
| --- | --- |
| <S> | <C> |
| Alabama................. | 32.41% |
| Arizona................. | 62.77 |
| Arkansas............... | 24.44 |
| California............. | 71.35 |
| Colorado............... | 76.49 |

<table>

| | |
|---|---|
| Connecticut............. | 34.82 |
| Delaware................ | 27.10 |
| District of Columbia.... | 40.24 |
| Florida................. | 42.58 |
| Georgia................. | 61.55 |
| Idaho................... | 31.29 |
| Illinois................ | 29.70 |
| Indiana................. | 24.17 |
| Iowa.................... | 9.91 |
| Kansas.................. | 17.25 |
| Kentucky................ | 22.10 |
| Maine................... | 32.03 |
| Maryland................ | 70.51 |
| Massachusetts........... | 64.57 |
| Michigan................ | 36.41 |
| Minnesota............... | 59.89 |
| Mississippi............. | 17.65 |
| Missouri................ | 23.19 |
| Montana................. | 79.97 |
| Nebraska................ | 0.00 |
| Nevada.................. | 77.89 |
| New Hampshire........... | 31.74 |
| New Jersey.............. | 25.90 |
| New Mexico.............. | 14.96 |
| New York................ | 25.34 |
| North Carolina.......... | 40.59 |
| North Dakota............ | 26.66 |
| Ohio.................... | 35.46 |
| Oklahoma................ | 18.81 |
| Oregon.................. | 59.08 |
| Pennsylvania............ | 25.48 |
| Rhode Island............ | 56.36 |
| South Carolina.......... | 47.94 |
| South Dakota............ | 26.69 |
| Tennessee............... | 32.43 |
| Texas................... | 11.30 |
| Utah.................... | 49.67 |
| Vermont................. | 22.83 |
| Virginia................ | 54.97 |
| Washington.............. | 58.13 |
| West Virginia........... | 56.01 |
| Wisconsin............... | 20.41 |
| Wyoming................. | 23.35 |
| | ----- |
| Total................ | 47.73% |
| | ===== |

</table>

        No more than approximately 0.30% of the Group One Mortgage Loans will
be
secured by mortgaged properties located in any one zip code area.

<PAGE>

        ORIGINAL LOAN-TO-VALUE RATIOS FOR THE GROUP ONE MORTGAGE LOANS
<Table>

<Caption>

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 10.01% to 20.00%........ | 8 | $ 565,989 | 0.07% | 6.510% | 710 | $ 70,749 | 16.86% | 57.91% |
| 20.01% to 30.00%........ | 21 | 2,008,239 | 0.24 | 6.863 | 638 | 95,630 | 24.70 | 50.12 |
| 30.01% to 40.00%........ | 32 | 4,064,848 | 0.48 | 6.499 | 639 | 127,026 | 35.41 | 69.86 |
| 40.01% to 50.00%........ | 78 | 10,317,093 | 1.21 | 6.756 | 632 | 132,270 | 45.95 | 75.42 |
| 50.01% to 60.00%........ | 124 | 19,238,465 | 2.26 | 6.856 | 620 | 155,149 | 55.61 | 48.06 |
| 60.01% to 70.00%........ | 344 | 52,456,734 | 6.16 | 6.760 | 629 | 152,491 | 66.23 | 59.71 |
| 70.01% to 75.00%........ | 241 | 41,296,008 | 4.85 | 6.932 | 628 | 171,353 | 73.54 | 54.16 |
| 75.01% to 80.00%........ | 3,463 | 486,181,818 | 57.11 | 6.836 | 646 | 140,393 | 79.82 | 75.53 |
| 80.01% to 85.00%........ | 372 | 58,078,778 | 6.82 | 7.647 | 609 | 156,126 | 84.53 | 62.66 |
| 85.01% to 90.00%........ | 769 | 115,403,820 | 13.56 | 7.768 | 629 | 150,070 | 89.62 | 63.01 |
| 90.01% to 95.00%........ | 406 | 61,480,278 | 7.22 | 7.621 | 660 | 151,429 | 94.59 | 48.07 |
| 95.01% to 100.00%....... | 2 | 149,691 | 0.02 | 8.640 | 625 | 74,845 | 100.00 | 100.00 |
| Total................. | 5,860 | $851,241,759 | 100.00% | 7.072% | 639 | $145,263 | 80.06% | 68.24% |

<Caption>

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS | PERCENT IO |
|---|---|
| <S> | <C> |
| 10.01% to 20.00%........ | 22.09% |
| 20.01% to 30.00%........ | 31.27 |
| 30.01% to 40.00%........ | 40.58 |
| 40.01% to 50.00%........ | 48.08 |
| 50.01% to 60.00%........ | 34.49 |
| 60.01% to 70.00%........ | 35.67 |
| 70.01% to 75.00%........ | 40.09 |

```
75.01% to 80.00%........    57.39
80.01% to 85.00%........    32.56
85.01% to 90.00%........    40.61
90.01% to 95.00%........    19.98
95.01% to 100.00%.......     0.00
                           -----
  Total.................    47.73%
                           =====
```

</Table>

As of the Cut-off Date, the Original Loan-to-Value Ratios of the Group One
Mortgage Loans ranged from 10.98% to 100.00% and the weighted average
Loan-to-Value Ratio for the Group One Mortgage Loans was approximately 80.06%.

LOAN PURPOSE FOR THE GROUP ONE MORTGAGE LOANS

<Table>
<Caption>

| LOAN PURPOSE | WEIGHTED AVERAGE PRINCIPAL BALANCE OUTSTANDING | NUMBER OF MORTGAGE LOANS | WEIGHTED AVERAGE ORIGINAL LTV | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|
| WEIGHTED AVERAGE CREDIT SCORE | PRINCIPAL BALANCE OUTSTANDING | | PERCENT FULL DOC | | | |
| ------------ | ----------- | --------- | -------- | ------------ | ---------- | -------- |
| -------- | ----------- | -------- | -------- | | | |
| <S> | | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> | | | |
| Purchase................ | | 3,170 | | $409,821,136 | 48.14% | 6.970% |
| 651 | $129,281 | 81.20% | 79.41% | | | |
| Refinance--Cashout...... | | 2,415 | | 399,637,228 | 46.95 | 7.164 |
| 627 | 165,481 | 78.97 | 56.27 | | | |
| Refinance--Rate Term.... | | 275 | | 41,783,395 | 4.91 | 7.196 |
| 634 | 151,940 | 79.20 | 73.20 | | | |
| | | ----- | | ------------ | ------ | ----- |
| --- | -------- | ----- | ----- | | | |
| Total................. | | 5,860 | | $851,241,759 | 100.00% | 7.072% |
| 639 | $145,263 | 80.06% | 68.24% | | | |
| | | ===== | | ============ | ====== | ===== |
| === | ======== | ===== | ===== | | | |

<Caption>

| LOAN PURPOSE | PERCENT IO |
|---|---|
| ------------ | ---------- |
| <S> | <C> |
| Purchase................ | 58.16% |
| Refinance--Cashout...... | 38.76 |
| Refinance--Rate Term.... | 31.30 |
| | ----- |
| Total................. | 47.73% |
| | ===== |

</Table>

TYPES OF MORTGAGED PROPERTIES FOR THE GROUP ONE MORTGAGE LOANS

<Table>
<Caption>

| PROPERTY TYPE | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | NUMBER OF MORTGAGE LOANS | WEIGHTED AVERAGE ORIGINAL LTV | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT FULL DOC | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|---|---|
| Single Family Residence............. | 636 | $139,778 | 4,487 | 80.09% | $627,182,544 | 66.66% | 73.68% | 7.106% |
| Planned Unit Development........... | 640 | 166,872 | 756 | 80.01 | 126,154,914 | 75.58 | 14.82 | 6.984 |
| Condominium............. | 660 | 150,190 | 425 | 80.15 | 63,830,945 | 67.76 | 7.50 | 6.918 |
| Two-to-Four Family...... | 662 | 177,349 | 191 | 79.44 | 33,873,728 | 71.51 | 3.98 | 7.065 |
| Modular Home............ | 793 | 199,629 | 1 | 60.42 | 199,629 | 0.00 | 0.02 | 6.375 |
| Total................. | 639 | $145,263 | 5,860 | 80.06% | $851,241,759 | 68.24% | 100.00% | 7.072% |

<Caption>

| PROPERTY TYPE | PERCENT IO |
|---|---|
| Single Family Residence............. | 43.75% |
| Planned Unit Development........... | 59.56 |
| Condominium............. | 64.24 |
| Two-to-Four Family...... | 46.57 |
| Modular Home............ | 0.00 |
| Total................. | 47.73% |

</Table>

<PAGE>

DOCUMENTATION SUMMARY FOR THE GROUP ONE MORTGAGE LOANS
<Table>
<Caption>

```
                                        AGGREGATE
WEIGHTED     AVERAGE      WEIGHTED
                          NUMBER OF   PRINCIPAL     PERCENT OF   WEIGHTED
AVERAGE      PRINCIPAL    AVERAGE
                          MORTGAGE     BALANCE      MORTGAGE     AVERAGE
CREDIT       BALANCE      ORIGINAL    PERCENT
DOCUMENTATION              LOANS     OUTSTANDING      POOL       COUPON
SCORE        OUTSTANDING  LTV         FULL DOC
-------------            ---------   ------------   ----------  --------
--------     ----------   --------    --------
<S>                       <C>          <C>           <C>         <C>
<C>          <C>          <C>         <C>
Full Documentation.......  4,209     $580,886,688    68.24%      7.037%
634          $138,011     80.00%      100.00%
No Income Verification...  1,600      261,917,034    30.77       7.141
652          163,698      80.18        0.00
Limited Income
  Verification...........    33        4,940,528     0.58        7.643
613          149,713      81.63        0.00
Stated Plus..............    18        3,497,509     0.41        6.982
695          194,306      77.45        0.00
                          -----      ------------   ------      -----
---          --------     -----      ------
   Total.................  5,860     $851,241,759   100.00%      7.072%
639          $145,263     80.06%      68.24%
                          =====      ============   ======      =====
===          ========     =====      ======


<Caption>

DOCUMENTATION            PERCENT IO
-------------            ----------
<S>                        <C>
Full Documentation.......  51.50%
No Income Verification...  39.95
Limited Income
  Verification...........  28.31
Stated Plus..............  32.66
                           -----
   Total.................  47.73%
                           =====

</Table>

        OCCUPANCY TYPES FOR THE GROUP ONE MORTGAGE LOANS
<Table>
<Caption>
                                        AGGREGATE
WEIGHTED     AVERAGE      WEIGHTED
                          NUMBER OF   PRINCIPAL     PERCENT OF   WEIGHTED
AVERAGE      PRINCIPAL    AVERAGE
                          MORTGAGE     BALANCE      MORTGAGE     AVERAGE
CREDIT       BALANCE      ORIGINAL    PERCENT
OCCUPANCY                  LOANS     OUTSTANDING      POOL       COUPON
SCORE        OUTSTANDING  LTV         FULL DOC
---------                ---------   ------------   ----------  --------
--------     ----------   --------    --------
```

<S>                        <C>           <C>            <C>          <C>
<C>          <C>           <C>           <C>
Primary.................     5,501      $799,702,087       93.95%       7.043%
636      $145,374    79.82%    67.19%
Investment..............       306        42,970,265        5.05        7.532
688        140,426    83.86    88.21
Second Home.............        53         8,569,407        1.01        7.490
668        161,687    83.34    65.88
                            -----      ------------      ------       -----
---      --------    -----    ------
  Total.................     5,860      $851,241,759      100.00%       7.072%
639      $145,263    80.06%    68.24%
                            =====      ============      ======       =====
===      ========    =====    ======


<Caption>

OCCUPANCY              PERCENT IO
---------              ----------
<S>                    <C>
Primary.................    47.37%
Investment..............    53.11
Second Home.............    55.02
                           -----
  Total.................    47.73%
                           =====

</Table>

     The information set forth above with respect to occupancy is based upon
representations of the related mortgagors at the time of origination.

          MORTGAGE LOAN AGE SUMMARY FOR THE GROUP ONE MORTGAGE LOANS
<Table>
<Caption>
                                       AGGREGATE
WEIGHTED        AVERAGE      WEIGHTED
                             NUMBER OF    PRINCIPAL      PERCENT OF   WEIGHTED
AVERAGE        PRINCIPAL     AVERAGE
MORTGAGE LOAN                MORTGAGE     BALANCE        MORTGAGE     AVERAGE
CREDIT         BALANCE       ORIGINAL   PERCENT
AGE (MONTHS)                 LOANS        OUTSTANDING    POOL         COUPON
SCORE          OUTSTANDING   LTV        FULL DOC
-------------                ---------    ------------   ----------   --------
--------       -----------   --------   --------
<S>                          <C>          <C>            <C>          <C>
<C>            <C>           <C>        <C>
1........................       27      $  3,520,449        0.41%        7.194%
628        $130,387    75.27%    79.69%
2........................    5,331        775,030,214       91.05        7.072
640        145,382    80.01    68.29
3........................      379         54,685,525        6.42        7.102
639        144,289    80.88    68.34
4........................       97         13,889,181        1.63        6.963
633        143,187    79.66    62.48
5........................       13          2,097,876        0.25        6.670
630        161,375    80.86    51.40

```
6.......................        6         828,782     0.10     7.580
645        138,130      88.39        83.30
7.......................        5         878,483     0.10     7.394
635        175,697      87.98        78.09
8.......................        1         195,000     0.02     7.125
564        195,000      67.24       100.00
15.......................       1         116,249     0.01     6.000
705        116,249      79.97       100.00
                              -----      ------------   ------   -----
---        --------     -----     ------
  Total.................      5,860      $851,241,759   100.00%   7.072%
639        $145,263     80.06%       68.24%
                              =====      ============   ======   =====
===        ========     =====     ======
```

<Caption>

```
MORTGAGE LOAN
AGE (MONTHS)              PERCENT IO
-------------            ----------
<S>                         <C>
1.......................     42.94%
2.......................     46.99
3.......................     52.27
4.......................     66.92
5.......................     64.77
6.......................     78.44
7.......................     49.48
8.......................    100.00
15.......................   100.00
                            -----
  Total.................     47.73%
                            =====
```

</Table>

     As of the Cut-off Date, the weighted average age of the Group One Mortgage
Loans was approximately 2 months.

S-40

<PAGE>

              PREPAYMENT CHARGES FOR THE GROUP ONE MORTGAGE LOANS
<Table>
<Caption>

```
                                        AGGREGATE
WEIGHTED      AVERAGE      WEIGHTED
                           NUMBER OF    PRINCIPAL      PERCENT OF   WEIGHTED
AVERAGE      PRINCIPAL     AVERAGE
PREPAYMENT CHARGE          MORTGAGE     BALANCE        MORTGAGE     AVERAGE
CREDIT       BALANCE       ORIGINAL     PERCENT
TERM (MONTHS)              LOANS        OUTSTANDING    POOL         COUPON
SCORE        OUTSTANDING   LTV          FULL DOC
-----------------          ---------    ------------   ----------   --------
--------     -----------   --------     --------
<S>                          <C>          <C>            <C>          <C>
<C>          <C>           <C>          <C>
```

| | Number | Aggregate Principal Balance | Percent | WAC | Credit Score | Average Balance | Original LTV | Percent Full Doc |
|---|---|---|---|---|---|---|---|---|
| None.................... | 1,416 | $198,182,405 | 23.28% | 7.314% | 640 | $139,959 | 80.86% | 67.70% |
| 12 Months............... | 214 | 37,074,564 | 4.36 | 7.342 | 643 | 173,246 | 81.05 | 56.88 |
| 24 Months............... | 2,625 | 386,376,685 | 45.39 | 7.037 | 637 | 147,191 | 79.88 | 67.52 |
| 36 Months............... | 1,605 | 229,608,105 | 26.97 | 6.879 | 642 | 143,058 | 79.50 | 71.74 |
| | ----- | ------------ | ------ | ----- | --- | -------- | ----- | ----- |
| Total................ | 5,860 | $851,241,759 | 100.00% | 7.072% | 639 | $145,263 | 80.06% | 68.24% |
| | ===== | ============ | ====== | ===== | === | ======== | ===== | ===== |

<Caption>

| PREPAYMENT CHARGE TERM (MONTHS) | PERCENT IO |
|---|---|
| <S> | <C> |
| None.................... | 37.23% |
| 12 Months............... | 55.51 |
| 24 Months............... | 50.32 |
| 36 Months............... | 51.20 |
| | ----- |
| Total................ | 47.73% |
| | ===== |

</Table>

The weighted average prepayment charge term at origination with respect to
the Group One Mortgage Loans having prepayment charges is approximately 28 months.

CREDIT SCORES FOR THE GROUP ONE MORTGAGE LOANS

<Table>
<Caption>

| RANGE OF CREDIT SCORE | WEIGHTED AVERAGE PRINCIPAL BALANCE OUTSTANDING | AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 540 to 550.............. | 544 | $120,003 | 74.40% | 145 | $ 17,400,374 | 2.04% | 8.067% |
| | | | 82.50% | | | | |
| 551 to 575.............. | 564 | 132,420 | 77.81 | 488 | 64,621,170 | 7.59 | 7.823 |
| | | | 77.26 | | | | |
| 576 to 600.............. | 589 | 128,550 | 80.00 | 860 | 110,553,203 | 12.99 | 7.555 |
| | | | 78.41 | | | | |

```
601 to 625..............    1,242      177,559,832      20.86      7.159
613       142,963       80.45      76.88
626 to 650..............    1,035      160,255,503      18.83      6.965
638       154,836       80.46      67.07
651 to 675..............      864      133,994,173      15.74      6.785
663       155,086       80.58      58.63
676 to 700..............      543       82,741,446       9.72      6.702
687       152,378       80.61      55.45
701 to 725..............      303       46,720,017       5.49      6.661
712       154,191       80.86      54.43
726 to 750..............      199       30,708,813       3.61      6.489
736       154,316       79.42      60.07
751 to 775..............      104       16,456,140       1.93      6.692
763       158,232       81.12      61.07
776 to 800..............       60        8,187,300       0.96      6.676
787       136,455       76.29      71.07
801 to 817..............       17        2,043,788       0.24      6.173
806       120,223       76.36      85.69
                            -----     ------------      ------      -----

---        --------       -----      -----
  Total.................    5,860     $851,241,759     100.00%     7.072%
639      $145,263       80.06%     68.24%
                            =====     ============      ======     =====

===        ========       =====      =====
```

<Caption>

```
RANGE OF CREDIT
SCORES                   PERCENT IO
---------------          ----------

<S>                      <C>
540 to 550..............  22.75%
551 to 575..............  26.02
576 to 600..............  34.93
601 to 625..............  50.12
626 to 650..............  53.74
651 to 675..............  52.11
676 to 700..............  53.00
701 to 725..............  53.63
726 to 750..............  55.62
751 to 775..............  66.32
776 to 800..............  52.42
801 to 817..............  39.15
                          -----
  Total.................  47.73%
                          =====
```

</Table>

        The Credit Scores of the Group One Mortgage Loans as of the Cut-off
Date
ranged from 540 to 817 and the weighted average Credit Score of the Group One
Mortgage Loans as of the Cut-off Date was approximately 639.

<PAGE>

                 GROSS MARGINS FOR THE GROUP ONE MORTGAGE LOANS

(EXCLUDES FIXED RATE MORTGAGE LOANS)

<Table>
<Caption>

| RANGE OF GROSS MARGINS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| 3.001% to 3.500%......... | 1 | $ 116,249 | 0.02% | 6.000% | 705 | $116,249 | 79.97% | 100.00% |
| 4.001% to 4.500%......... | 1 | 106,950 | 0.02 | 4.875 | 648 | 106,950 | 66.88 | 0.00 |
| 4.501% to 5.000%......... | 781 | 137,842,776 | 19.45 | 6.226 | 652 | 176,495 | 76.58 | 71.27 |
| 5.001% to 5.500%......... | 1,553 | 245,728,402 | 34.68 | 6.797 | 643 | 158,228 | 78.90 | 71.01 |
| 5.501% to 6.000%......... | 1,331 | 191,463,763 | 27.02 | 7.310 | 632 | 143,850 | 81.93 | 68.62 |
| 6.001% to 6.500%......... | 767 | 101,097,108 | 14.27 | 7.764 | 629 | 131,808 | 84.10 | 62.11 |
| 6.501% to 7.000%......... | 206 | 28,205,442 | 3.98 | 8.104 | 639 | 136,920 | 90.38 | 53.37 |
| 7.001% to 7.500%......... | 44 | 3,709,091 | 0.52 | 8.488 | 641 | 84,298 | 91.26 | 64.30 |
| 7.501% to 8.000%......... | 5 | 378,888 | 0.05 | 8.774 | 652 | 75,778 | 91.43 | 79.96 |
| Total.................... | 4,689 | $708,648,669 | 100.00% | 7.024% | 640 | $151,130 | 80.53% | 68.41% |

<Caption>

| RANGE OF GROSS MARGINS | PERCENT IO |
|---|---|
| 3.001% to 3.500%......... | 100.00% |
| 4.001% to 4.500%......... | 100.00 |
| 4.501% to 5.000%......... | 83.36 |
| 5.001% to 5.500%......... | 65.17 |
| 5.501% to 6.000%......... | 45.94 |
| 6.001% to 6.500%......... | 24.48 |
| 6.501% to 7.000%......... | 15.00 |
| 7.001% to 7.500%......... | 0.00 |
| 7.501% to 8.000%......... | 0.00 |
| Total.................... | 55.35% |

</Table>

        As of the Cut-off Date, the gross margins for the Adjustable Rate
Mortgage
Loans in Group One ranged from 3.500% per annum to 7.875% per annum and the
weighted average gross margin for the Adjustable Rate Mortgage Loans in Group
One was approximately 5.610% per annum.

            MAXIMUM MORTGAGE RATES FOR THE GROUP ONE MORTGAGE LOANS
                    (EXCLUDES FIXED RATE MORTGAGE LOANS)

<Table>
<Caption>

| RANGE OF MAXIMUM MORTGAGE RATES | NUMBER OF LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 11.000% or less.......... | 8 | $ 1,250,497 | 0.18% | 4.853% | 680 | $156,312 | 77.25% | 91.45% |
| 11.001% to 11.500%....... | 59 | 10,800,363 | 1.52 | 5.402 | 689 | 183,057 | 73.62 | 72.31 |
| 11.501% to 12.000%....... | 354 | 60,704,389 | 8.57 | 5.883 | 678 | 171,481 | 75.84 | 76.69 |
| 12.001% to 12.500%....... | 820 | 134,351,940 | 18.96 | 6.341 | 659 | 163,844 | 78.02 | 74.27 |
| 12.501% to 13.000%....... | 1,205 | 186,198,760 | 26.28 | 6.818 | 643 | 154,522 | 79.32 | 66.68 |
| 13.001% to 13.500%....... | 987 | 142,767,801 | 20.15 | 7.320 | 630 | 144,648 | 81.91 | 64.80 |
| 13.501% to 14.000%....... | 750 | 106,913,179 | 15.09 | 7.795 | 618 | 142,551 | 83.79 | 63.26 |
| 14.001% to 14.500%....... | 324 | 44,459,230 | 6.27 | 8.290 | 608 | 137,220 | 86.20 | 65.71 |
| 14.501% to 15.000%....... | 149 | 18,133,867 | 2.56 | 8.765 | 588 | 121,704 | 86.49 | 75.09 |
| 15.001% to 15.500%....... | 27 | 2,669,749 | 0.38 | 9.255 | 573 | 98,880 | 87.82 | 76.15 |
| 15.501% to 16.000%....... | 5 | 356,477 | 0.05 | 9.625 | 575 | 71,295 | 88.69 | 70.40 |
| 16.001% to 16.500%....... | 1 | 42,417 | 0.01 | 10.250 | 563 | 42,417 | 90.00 | 100.00 |
|  | ----- | ------------ | ------ | ------ | --- | -------- | ----- | ------ |
| Total................. | 4,689 | $708,648,669 | 100.00% | 7.024% | 640 | $151,130 | 80.53% | 68.41% |
|  | ===== | ============ | ====== | ====== | === | ======== | ===== | ====== |

<Caption>

```
RANGE OF MAXIMUM
MORTGAGE RATES                PERCENT IO
----------------             ----------
<S>                          <C>
11.000% or less..........     80.99%
11.001% to 11.500%.......     68.86
11.501% to 12.000%.......     70.11
12.001% to 12.500%.......     65.52
12.501% to 13.000%.......     62.00
13.001% to 13.500%.......     49.65
13.501% to 14.000%.......     40.22
14.001% to 14.500%.......     39.74
14.501% to 15.000%.......     30.36
15.001% to 15.500%.......     19.11
15.501% to 16.000%.......     50.49
16.001% to 16.500%.......      0.00
                             -----
   Total..................     55.35%
                             =====
```

</Table>


     As of the Cut-off Date, the Maximum Mortgage Rates for the Adjustable
Rate
Mortgage Loans in Group One ranged from 10.750% per annum to 16.250% per
annum
and the weighted average Maximum Mortgage Rate for the Adjustable Rate
Mortgage
Loans in Group One was 13.024% per annum.

S-42

<PAGE>

                NEXT RATE ADJUSTMENT DATE FOR THE GROUP ONE MORTGAGE LOANS
                       (EXCLUDES FIXED RATE MORTGAGE LOANS)
<Table>
<Caption>

| WEIGHTED AVERAGE CREDIT SCORE NEXT RATE ADJUSTMENT DATE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|---|
| <S> | | | | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> | | | | |
| March 2006............... | | | | 1 | $  188,983 | 0.03% | 6.875% |
| 705 | $188,983 | 90.00% | 100.00% | | | | |
| April 2006............... | | | | 2 | 250,849 | 0.04 | 6.022 |
| 663 | 125,425 | 74.40 | 0.00 | | | | |
| October 2006............. | | | | 5 | 840,640 | 0.12 | 7.099 |
| 638 | 168,128 | 82.00 | 60.40 | | | | |
| April 2007............... | | | | 1 | 195,000 | 0.03 | 7.125 |
| 564 | 195,000 | 67.24 | 100.00 | | | | |

| | Number | Amount | Percent | Rate | | | | |
|---|---|---|---|---|---|---|---|---|
| May 2007................. | 2 | 276,755 | 0.04 | 7.919 | 586 | 138,378 | 85.00 | 100.00 |
| June 2007................. | 5 | 664,982 | 0.09 | 7.384 | 636 | 132,996 | 88.00 | 79.19 |
| July 2007................. | 10 | 1,839,985 | 0.26 | 6.695 | 627 | 183,998 | 80.98 | 44.59 |
| August 2007.............. | 56 | 8,077,361 | 1.14 | 7.049 | 626 | 144,239 | 80.79 | 63.67 |
| September 2007........... | 223 | 34,040,435 | 4.80 | 7.094 | 635 | 152,648 | 81.36 | 66.55 |
| October 2007............. | 3,142 | 477,685,270 | 67.41 | 7.062 | 637 | 152,032 | 80.64 | 66.53 |
| November 2007........... | 10 | 1,317,610 | 0.19 | 6.797 | 648 | 131,761 | 71.66 | 65.85 |
| May 2008................. | 2 | 409,252 | 0.06 | 6.989 | 663 | 204,626 | 89.05 | 100.00 |
| July 2008................. | 2 | 198,300 | 0.03 | 6.042 | 651 | 99,150 | 80.00 | 100.00 |
| August 2008.............. | 17 | 2,453,556 | 0.35 | 6.711 | 638 | 144,327 | 80.42 | 53.39 |
| September 2008........... | 74 | 10,769,740 | 1.52 | 6.822 | 655 | 145,537 | 81.33 | 79.44 |
| October 2008............. | 968 | 140,589,727 | 19.84 | 6.973 | 642 | 145,237 | 80.62 | 73.86 |
| November 2008........... | 7 | 795,337 | 0.11 | 7.125 | 647 | 113,620 | 84.29 | 83.67 |
| September 2009........... | 1 | 116,249 | 0.02 | 6.000 | 705 | 116,249 | 79.97 | 100.00 |
| August 2010.............. | 9 | 1,493,144 | 0.21 | 6.545 | 673 | 165,905 | 80.00 | 91.99 |
| September 2010........... | 8 | 1,343,926 | 0.19 | 6.991 | 654 | 167,991 | 80.57 | 59.47 |
| October 2010............. | 143 | 24,922,366 | 3.52 | 6.652 | 677 | 174,282 | 76.45 | 73.53 |
| November 2010........... | 1 | 179,200 | 0.03 | 6.500 | 655 | 179,200 | 80.00 | 100.00 |
| | ----- | ------------ | ------ | ----- | --- | -------- | ----- | ------ |
| Total................. | 4,689 | $708,648,669 | 100.00% | 7.024% | 640 | $151,130 | 80.53% | 68.41% |
| | ===== | ============ | ====== | ===== | === | ======== | ===== | ====== |

<Caption>

| NEXT RATE ADJUSTMENT DATE | PERCENT IO |
|---|---|
| ------------------------- | ---------- |
| <S> | <C> |
| March 2006............... | 100.00% |
| April 2006............... | 100.00 |
| October 2006............. | 0.00 |
| April 2007............... | 100.00 |
| May 2007................. | 70.64 |
| June 2007................. | 73.13 |
| July 2007................. | 63.08 |
| August 2007.............. | 69.35 |
| September 2007........... | 55.35 |

| | |
|---|---|
| October 2007............. | 53.52 |
| November 2007............ | 40.06 |
| May 2008................. | 58.45 |
| July 2008................ | 100.00 |
| August 2008.............. | 94.57 |
| September 2008........... | 71.99 |
| October 2008............. | 55.66 |
| November 2008............ | 63.27 |
| September 2009........... | 100.00 |
| August 2010.............. | 91.99 |
| September 2010........... | 66.72 |
| October 2010............. | 69.33 |
| November 2010............ | 100.00 |
| | ------ |
| Total................. | 55.35% |
| | ====== |

</Table>

THE GROUP TWO MORTGAGE LOANS

MORTGAGE RATES FOR THE GROUP TWO MORTGAGE LOANS

<Table>
<Caption>

| RANGE OF MORTGAGE RATES CREDIT SCORE | WEIGHTED AVERAGE PRINCIPAL BALANCE OUTSTANDING | NUMBER OF ORIGINAL LOANS LTV | AGGREGATE PRINCIPAL BALANCE OUTSTANDING FULL DOC | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> | | |
| 5.000% or less......... | 7 | 7 | $ 2,125,436 | 0.19% | 4.969% |
| 701 | $303,634 | 79.99% | 100.00% | | |
| 5.001% to 5.500%....... | 67 | 67 | 21,840,972 | 1.96 | 5.394 |
| 693 | 325,985 | 78.14 | 88.95 | | |
| 5.501% to 6.000%....... | 445 | 445 | 170,787,377 | 15.33 | 5.863 |
| 686 | 383,792 | 79.17 | 84.04 | | |
| 6.001% to 6.500%....... | 980 | 980 | 357,711,119 | 32.11 | 6.334 |
| 680 | 365,011 | 79.36 | 62.36 | | |
| 6.501% to 7.000%....... | 967 | 967 | 310,640,701 | 27.89 | 6.814 |
| 665 | 321,242 | 79.67 | 47.48 | | |
| 7.001% to 7.500%....... | 521 | 521 | 149,507,858 | 13.42 | 7.288 |
| 654 | 286,963 | 81.39 | 42.14 | | |
| 7.501% to 8.000%....... | 223 | 223 | 66,443,189 | 5.96 | 7.804 |
| 636 | 297,952 | 83.58 | 49.81 | | |
| 8.001% to 8.500%....... | 76 | 76 | 20,109,545 | 1.81 | 8.287 |
| 621 | 264,599 | 87.35 | 53.36 | | |
| 8.501% to 9.000%....... | 40 | 40 | 12,625,270 | 1.13 | 8.799 |
| 601 | 315,632 | 88.12 | 42.91 | | |
| 9.001% to 9.500%....... | 8 | 8 | 2,124,401 | 0.19 | 9.239 |
| 595 | 265,550 | 90.88 | 67.25 | | |

```
   Total...............    3,334    $1,113,915,868    100.00%    6.659%
669      $334,108    80.19%    58.29%
                           =====    ==============    ======    =====
===        ========    =====    ======
```

<Caption>

```
RANGE OF
MORTGAGE RATES              PERCENT IO
--------------              ----------
<S>                         <C>
5.000% or less.........     87.12%
5.001% to 5.500%.......     75.39
5.501% to 6.000%.......     85.33
6.001% to 6.500%.......     82.23
6.501% to 7.000%.......     80.91
7.001% to 7.500%.......     73.41
7.501% to 8.000%.......     69.83
8.001% to 8.500%.......     47.78
8.501% to 9.000%.......     52.68
9.001% to 9.500%.......     89.00
                            -----
   Total...............     79.34%
                            =====
```

</Table>

        As of the Cut-off Date, the Mortgage Rates of the Group Two Mortgage
Loans
ranged from 4.750% per annum to 9.500% per annum and the weighted average
Mortgage Rate of the Group Two Mortgage Loans was approximately 6.659% per
annum.

S-43

<PAGE>

        REMAINING MONTHS TO STATED MATURITY FOR THE GROUP TWO MORTGAGE LOANS
<Table>
<Caption>

```
                                           AGGREGATE
WEIGHTED        AVERAGE     WEIGHTED
                            NUMBER OF    PRINCIPAL      PERCENT OF   WEIGHTED
AVERAGE       PRINCIPAL     AVERAGE
RANGE OF REMAINING          MORTGAGE      BALANCE        MORTGAGE    AVERAGE
CREDIT        BALANCE       ORIGINAL    PERCENT
TERMS (MONTHS)               LOANS      OUTSTANDING        POOL      COUPON
SCORE      OUTSTANDING       LTV       FULL DOC
------------------          ---------  --------------   ----------  --------
--------   -----------     --------    --------
<S>                         <C>         <C>             <C>         <C>
<C>         <C>            <C>         <C>
169 to 180.............        6       $   1,629,099      0.15%      6.744%
692       $271,516       76.32%      67.83%
349 to 360.............     3,328       1,112,286,769    99.85       6.659
669        334,221       80.19       58.28
                            -----      --------------   ------      -----
---        --------       -----       -----
```

```
   Total................    3,334    $1,113,915,868     100.00%     6.659%
669      $334,108    80.19%    58.29%
                               =====    ==============     ======     =====
===      ========    =====    =====
```

&lt;Caption&gt;

```
RANGE OF REMAINING
TERMS (MONTHS)            PERCENT IO
------------------        ----------
<S>                       <C>
169 to 180.............    62.59%
349 to 360.............    79.37
                           -----
   Total................    79.34%
                           =====
```

&lt;/Table&gt;

As of the Cut-off Date, the remaining terms to stated maturity of the Group Two Mortgage Loans ranged from 178 months to 359 months and the weighted
average remaining term to stated maturity of the Group Two Mortgage Loans was approximately 358 months.

ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES FOR THE GROUP TWO MORTGAGE LOANS
&lt;Table&gt;
&lt;Caption&gt;

| | | | AGGREGATE | | |
| WEIGHTED AVERAGE RANGE OF ORIGINAL AVERAGE PRINCIPAL MORTGAGE LOAN CREDIT BALANCE PRINCIPAL BALANCES SCORE OUTSTANDING | WEIGHTED AVERAGE NUMBER OF MORTGAGE ORIGINAL LOANS LTV | PRINCIPAL BALANCE OUTSTANDING PERCENT FULL DOC | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
| ------------------ -------- ---------- | --------- -------- | -------------- -------- | ---------- | -------- |
| &lt;S&gt; &lt;C&gt; &lt;C&gt; &lt;C&gt; | &lt;C&gt; &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| $50,000 or less........ 708 $ 42,321 | 2 80.00% | $ 84,642 100.00% | 0.01% | 6.368% |
| $50,001 to $100,000.... 646 84,237 | 91 80.15 | 7,665,532 81.88 | 0.69 | 7.055 |
| $100,001 to $150,000... 644 128,492 | 319 80.66 | 40,989,044 77.57 | 3.68 | 6.960 |
| $150,001 to $200,000... 653 176,530 | 452 80.31 | 79,791,775 66.21 | 7.16 | 6.845 |
| $200,001 to $250,000... 662 225,927 | 437 80.35 | 98,730,271 61.10 | 8.86 | 6.727 |
| $250,001 to $300,000... 666 274,833 | 417 80.44 | 114,605,464 54.73 | 10.29 | 6.676 |
| $300,001 to $350,000... 673 325,192 | 321 80.39 | 104,386,544 51.86 | 9.37 | 6.603 |
| $350,001 to $400,000... 671 376,632 | 347 80.48 | 130,691,377 47.46 | 11.73 | 6.635 |
| $400,001 to $450,000... 670 424,395 | 241 80.75 | 102,279,134 52.55 | 9.18 | 6.653 |

| RANGE OF ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES | | | | |
|---|---|---|---|---|
| $450,001 to $500,000... | 220 | 104,765,163 | 9.41 | 6.617 |
| 668 | 476,205 | 80.58 | 52.39 | |
| $500,001 to $550,000... | 118 | 61,837,322 | 5.55 | 6.710 |
| 675 | 524,045 | 80.43 | 44.01 | |
| $550,001 to $600,000... | 103 | 59,449,820 | 5.34 | 6.635 |
| 665 | 577,183 | 80.79 | 63.05 | |
| $600,001 to $650,000... | 55 | 34,442,307 | 3.09 | 6.701 |
| 660 | 626,224 | 79.80 | 59.89 | |
| $650,001 to $700,000... | 54 | 36,456,902 | 3.27 | 6.639 |
| 672 | 675,128 | 79.88 | 53.82 | |
| $700,001 to $750,000... | 35 | 25,466,187 | 2.29 | 6.497 |
| 680 | 727,605 | 78.55 | 65.66 | |
| $750,001 to $800,000... | 28 | 21,868,557 | 1.96 | 6.492 |
| 673 | 781,020 | 77.91 | 74.91 | |
| $800,001 to $850,000... | 18 | 14,914,224 | 1.34 | 6.521 |
| 684 | 828,568 | 80.91 | 72.14 | |
| $850,001 to $900,000... | 19 | 16,714,458 | 1.50 | 6.423 |
| 689 | 879,708 | 78.84 | 78.79 | |
| $900,001 to $950,000... | 12 | 11,137,793 | 1.00 | 6.534 |
| 669 | 928,149 | 75.47 | 66.55 | |
| $950,001 to $1,000,000.......... | 24 | 23,627,857 | 2.12 | 6.453 |
| 689 | 984,494 | 77.67 | 87.35 | |
| $1,000,001 or greater.............. | 21 | 24,011,493 | 2.16 | 6.363 |
| 717 | 1,143,404 | 78.30 | 85.26 | |
| | ----- | -------------- | ------ | ----- |
| --- | ---------- | ----- | ------ | |
| Total............... | 3,334 | $1,113,915,868 | 100.00% | 6.659% |
| 669 | $ 334,108 | 80.19% | 58.29% | |
| | ===== | ============== | ====== | ===== |
| === | ========== | ===== | ====== | |

<Caption>

| RANGE OF ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES | PERCENT IO |
|---|---|
| ------------------- | ---------- |
| <S> | <C> |
| $50,000 or less........ | 0.00% |
| $50,001 to $100,000.... | 25.62 |
| $100,001 to $150,000... | 41.33 |
| $150,001 to $200,000... | 58.04 |
| $200,001 to $250,000... | 75.30 |
| $250,001 to $300,000... | 85.46 |
| $300,001 to $350,000... | 87.31 |
| $350,001 to $400,000... | 82.99 |
| $400,001 to $450,000... | 77.66 |
| $450,001 to $500,000... | 79.95 |
| $500,001 to $550,000... | 82.16 |
| $550,001 to $600,000... | 90.30 |
| $600,001 to $650,000... | 88.99 |
| $650,001 to $700,000... | 83.45 |
| $700,001 to $750,000... | 91.37 |
| $750,001 to $800,000... | 85.55 |
| $800,001 to $850,000... | 66.76 |

```
$850,001 to $900,000...    89.39
$900,001 to $950,000...    75.32
$950,001 to
  $1,000,000...........    83.31
$1,000,001 or
  greater..............    95.83
                           -----
  Total................    79.34%
                           =====
```

</Table>

As of the Cut-off Date, the outstanding principal balances of the Group
Two Mortgage Loans ranged from approximately $39,927 to approximately
$1,500,000
and the average outstanding principal balance of the Group Two Mortgage Loans
was approximately $334,108.

<PAGE>

PRODUCT TYPES FOR THE GROUP TWO MORTGAGE LOANS

<Table>
<Caption>

| PRODUCT TYPE | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE NUMBER OF MORTGAGE ORIGINAL LOANS LTV | AGGREGATE PRINCIPAL BALANCE OUTSTANDING PERCENT FULL DOC | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| 15 Year Fixed Loans.... | 700 | $273,081 | 5 73.67% | $ 1,365,406 61.62% | 0.12% | 6.550% |
| 30 Year Fixed Loans.... | 668 | 274,469 | 217 78.94 | 59,559,672 84.07 | 5.35 | 6.911 |
| 6 Month LIBOR ARM...... | 666 | 368,894 | 11 78.87 | 4,057,831 47.07 | 0.36 | 6.241 |
| 1/29 LIBOR ARM......... | 719 | 550,319 | 3 82.57 | 1,650,957 40.15 | 0.15 | 6.425 |
| 2/28 LIBOR ARM......... | 667 | 338,235 | 2,416 80.33 | 817,176,630 54.44 | 73.36 | 6.678 |
| 3/27 LIBOR ARM......... | 669 | 330,772 | 572 80.36 | 189,201,750 63.89 | 16.99 | 6.568 |
| 5/25 LIBOR ARM......... | 695 | 372,843 | 109 78.50 | 40,639,928 73.38 | 3.65 | 6.384 |
| Balloon Loans.......... | 651 | 263,693 | 1 90.00 | 263,693 100.00 | 0.02 | 7.750 |
| Total................ | 669 | $334,108 | 3,334 80.19% | $1,113,915,868 58.29% | 100.00% | 6.659% |

&lt;Caption&gt;

| PRODUCT TYPE | PERCENT IO |
| ------------ | ---------- |
| &lt;S&gt; | &lt;C&gt; |
| 15 Year Fixed Loans.... | 55.37% |
| 30 Year Fixed Loans.... | 24.60 |
| 6 Month LIBOR ARM...... | 100.00 |
| 1/29 LIBOR ARM......... | 0.00 |
| 2/28 LIBOR ARM......... | 83.99 |
| 3/27 LIBOR ARM......... | 76.46 |
| 5/25 LIBOR ARM......... | 81.47 |
| Balloon Loans.......... | 100.00 |
| | ------ |
| Total............... | 79.34% |
| | ====== |

&lt;/Table&gt;

AMORTIZATION TYPE FOR THE GROUP TWO MORTGAGE LOANS

&lt;Table&gt;
&lt;Caption&gt;

| AMORTIZATION TYPE | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | NUMBER OF MORTGAGE LOANS PERCENT FULL DOC | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
| ----------------- | -------- | ----------- | -------- | -------- | -------------- | ---------- | -------- |
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| Fully Amortizing....... | 657 | $259,407 | 80.16% | 887 59.32% | $ 230,094,255 | 20.66% | 6.831% |
| Balloon................ 60 Month | 651 | 263,693 | 90.00 | 1 100.00 | 263,693 | 0.02 | 7.750 |
| Interest-Only........ | 672 | 361,226 | 80.19 | 2,446 58.01 | 883,557,920 | 79.32 | 6.614 |
| | --- | -------- | ----- | ----- ------ | -------------- | ------ | ----- |
| Total.............. | 669 | $334,108 | 80.19% | 3,334 58.29% | $1,113,915,868 | 100.00% | 6.659% |
| | === | ======== | ===== | ===== ====== | ============== | ====== | ===== |

&lt;Caption&gt;

| AMORTIZATION TYPE | PERCENT IO |
| ----------------- | ---------- |
| &lt;S&gt; | &lt;C&gt; |
| Fully Amortizing....... | 0.00% |
| Balloon................ 60 Month | 100.00 |
| Interest-Only........ | 100.00 |

```
                      ------
   Total................  79.34%
                      ======

</Table>

              ADJUSTMENT TYPE FOR THE GROUP TWO MORTGAGE LOANS
<Table>
<Caption>
                                     AGGREGATE

WEIGHTED      AVERAGE      WEIGHTED
                           NUMBER OF      PRINCIPAL       PERCENT OF    WEIGHTED
AVERAGE       PRINCIPAL    AVERAGE
                           MORTGAGE        BALANCE        MORTGAGE      AVERAGE
CREDIT        BALANCE      ORIGINAL    PERCENT
ADJUSTMENT TYPE             LOANS       OUTSTANDING        POOL         COUPON
SCORE         OUTSTANDING  LTV         FULL DOC
---------------  ----------  --------   --------------   ----------   --------
--------  -----------  --------   --------
<S>                         <C>          <C>               <C>          <C>
<C>           <C>          <C>        <C>
ARM...................      3,111     $1,052,727,097       94.51%       6.645%
669        $338,389      80.26%      56.82%
Fixed Rate............        223         61,188,771        5.49        6.907
669         274,389      78.87       83.64
                            -----     --------------      ------       -----
---        --------      -----       -----
   Total................    3,334     $1,113,915,868      100.00%       6.659%
669        $334,108      80.19%      58.29%
                            =====     ==============      ======       =====
===        ========      =====       =====

<Caption>

ADJUSTMENT TYPE           PERCENT IO
---------------           ----------
<S>                       <C>
ARM...................     82.47%
Fixed Rate............     25.61
                          -----
   Total................   79.34%
                          =====
</Table>

                                 S-45
<PAGE>

  GEOGRAPHIC DISTRIBUTIONS OF MORTGAGED PROPERTIES FOR THE GROUP TWO MORTGAGE
                                    LOANS
<Table>
<Caption>
                                     AGGREGATE

WEIGHTED      AVERAGE      WEIGHTED
                           NUMBER OF      PRINCIPAL       PERCENT OF    WEIGHTED
AVERAGE       PRINCIPAL    AVERAGE
                           MORTGAGE        BALANCE        MORTGAGE      AVERAGE
CREDIT        BALANCE      ORIGINAL    PERCENT
```

| GEOGRAPHIC DISTRIBUTION SCORE | OUTSTANDING | LOANS | LTV | OUTSTANDING FULL DOC | | POOL | COUPON |
|---|---|---|---|---|---|---|---|
| Alabama............... | | 14 | | $ 2,148,280 | | 0.19% | 7.124% |
| 646 | $153,449 | | 80.77% | 83.84% | | | |
| Arizona............... | | 58 | | 14,852,711 | | 1.33 | 6.684 |
| 654 | 256,081 | | 80.84 | 75.24 | | | |
| Arkansas.............. | | 9 | | 1,481,199 | | 0.13 | 6.900 |
| 672 | 164,578 | | 82.35 | 55.02 | | | |
| California............ | | 1,527 | | 632,308,026 | | 56.76 | 6.514 |
| 674 | 414,085 | | 79.80 | 56.19 | | | |
| Colorado.............. | | 51 | | 12,995,269 | | 1.17 | 6.772 |
| 661 | 254,809 | | 79.36 | 52.67 | | | |
| Connecticut........... | | 18 | | 6,971,287 | | 0.63 | 6.838 |
| 667 | 387,294 | | 77.69 | 53.30 | | | |
| Delaware.............. | | 4 | | 830,386 | | 0.07 | 7.479 |
| 610 | 207,596 | | 80.00 | 76.89 | | | |
| District of Columbia... | | 5 | | 2,098,799 | | 0.19 | 7.075 |
| 698 | 419,760 | | 84.97 | 38.35 | | | |
| Florida............... | | 304 | | 79,811,104 | | 7.16 | 6.934 |
| 663 | 262,537 | | 81.05 | 56.92 | | | |
| Georgia............... | | 70 | | 18,594,218 | | 1.67 | 6.816 |
| 657 | 265,632 | | 80.72 | 82.38 | | | |
| Idaho................. | | 8 | | 1,415,808 | | 0.13 | 6.468 |
| 639 | 176,976 | | 79.90 | 100.00 | | | |
| Illinois.............. | | 107 | | 31,812,246 | | 2.86 | 7.077 |
| 662 | 297,311 | | 82.50 | 43.01 | | | |
| Indiana............... | | 15 | | 2,661,018 | | 0.24 | 6.330 |
| 663 | 177,401 | | 80.77 | 74.69 | | | |
| Iowa.................. | | 1 | | 107,011 | | 0.01 | 7.500 |
| 588 | 107,011 | | 80.00 | 100.00 | | | |
| Kansas................ | | 5 | | 849,966 | | 0.08 | 7.227 |
| 613 | 169,993 | | 80.00 | 100.00 | | | |
| Kentucky.............. | | 11 | | 1,518,447 | | 0.14 | 6.963 |
| 638 | 138,041 | | 83.64 | 77.74 | | | |
| Maine................. | | 6 | | 1,064,143 | | 0.10 | 7.278 |
| 633 | 177,357 | | 80.00 | 82.63 | | | |
| Maryland.............. | | 58 | | 23,114,425 | | 2.08 | 6.858 |
| 651 | 398,525 | | 80.68 | 72.34 | | | |
| Massachusetts......... | | 59 | | 18,183,197 | | 1.63 | 7.056 |
| 675 | 308,190 | | 80.85 | 49.06 | | | |
| Michigan.............. | | 45 | | 11,242,493 | | 1.01 | 7.024 |
| 635 | 249,833 | | 83.30 | 64.06 | | | |
| Minnesota............. | | 45 | | 11,693,007 | | 1.05 | 6.650 |
| 679 | 259,845 | | 79.25 | 57.51 | | | |
| Mississippi........... | | 3 | | 590,100 | | 0.05 | 7.264 |
| 639 | 196,700 | | 85.56 | 100.00 | | | |
| Missouri.............. | | 13 | | 2,715,476 | | 0.24 | 7.136 |
| 647 | 208,883 | | 79.04 | 60.45 | | | |
| Nevada................ | | 89 | | 27,401,249 | | 2.46 | 6.776 |
| 665 | 307,879 | | 80.64 | 52.96 | | | |
| New Hampshire......... | | 3 | | 825,500 | | 0.07 | 7.214 |
| 612 | 275,167 | | 80.00 | 100.00 | | | |

| | | | |
|---|---|---|---|
| New Jersey............ | 61 | 20,692,096 | 1.86 | 6.942 |
| 660 | 339,215 | 79.53 | 49.55 |
| New Mexico............ | 8 | 1,846,542 | 0.17 | 7.103 |
| 625 | 230,818 | 81.06 | 77.83 |
| New York.............. | 109 | 46,158,491 | 4.14 | 6.762 |
| 686 | 423,472 | 80.54 | 37.39 |
| North Carolina........ | 49 | 12,565,325 | 1.13 | 6.875 |
| 655 | 256,435 | 81.24 | 83.46 |
| Ohio.................. | 57 | 9,366,997 | 0.84 | 6.952 |
| 645 | 164,333 | 81.22 | 72.82 |
| Oklahoma.............. | 9 | 907,235 | 0.08 | 7.696 |
| 604 | 100,804 | 82.48 | 79.88 |
| Oregon................ | 66 | 14,970,941 | 1.34 | 6.515 |
| 667 | 226,832 | 79.93 | 74.00 |
| Pennsylvania.......... | 34 | 6,311,303 | 0.57 | 6.966 |
| 668 | 185,627 | 84.06 | 79.18 |
| Rhode Island.......... | 22 | 4,762,507 | 0.43 | 6.676 |
| 690 | 216,478 | 80.00 | 58.96 |
| South Carolina........ | 20 | 5,925,195 | 0.53 | 6.726 |
| 663 | 296,260 | 82.29 | 64.16 |
| South Dakota.......... | 1 | 191,627 | 0.02 | 7.375 |
| 621 | 191,627 | 80.00 | 100.00 |
| Tennessee............. | 42 | 6,771,799 | 0.61 | 7.161 |
| 634 | 161,233 | 80.40 | 66.44 |
| Texas................. | 123 | 22,019,331 | 1.98 | 6.808 |
| 655 | 179,019 | 79.10 | 70.55 |
| Utah.................. | 74 | 15,640,678 | 1.40 | 6.720 |
| 654 | 211,361 | 79.07 | 60.07 |
| Virginia.............. | 39 | 15,709,499 | 1.41 | 6.674 |
| 660 | 402,808 | 79.98 | 78.25 |
| Washington............ | 69 | 17,889,076 | 1.61 | 6.627 |
| 645 | 259,262 | 80.60 | 82.17 |
| West Virginia......... | 7 | 1,374,600 | 0.12 | 6.248 |
| 659 | 196,371 | 80.76 | 82.16 |
| Wisconsin............. | 15 | 3,255,263 | 0.29 | 6.901 |
| 654 | 217,018 | 81.82 | 78.16 |
| Wyoming............... | 1 | 272,000 | 0.02 | 6.999 |
| 594 | 272,000 | 80.00 | 100.00 |
| | | ----- | -------------- | ------ | ----- |
| --- | -------- | ----- | ------ |
| Total............... | 3,334 | $1,113,915,868 | 100.00% | 6.659% |
| 669 | $334,108 | 80.19% | 58.29% |
| | | ===== | ============== | ====== | ===== |
| === | ======== | ===== | ====== |

<Caption>

| GEOGRAPHIC DISTRIBUTION | PERCENT IO |
|---|---|
| ----------------------- | ---------- |
| <S> | <C> |
| Alabama................ | 58.28% |
| Arizona................ | 83.66 |
| Arkansas............... | 11.67 |
| California............. | 90.18 |
| Colorado............... | 92.43 |
| Connecticut............ | 46.14 |
| Delaware............... | 82.70 |

```
District of Columbia...    100.00
Florida................     72.07
Georgia................     80.47
Idaho..................     30.53
Illinois...............     55.01
Indiana................     29.76
Iowa...................      0.00
Kansas.................     45.76
Kentucky...............     10.44
Maine..................     69.28
Maryland...............     84.03
Massachusetts..........     48.93
Michigan...............     50.76
Minnesota..............     85.29
Mississippi............    100.00
Missouri...............     47.41
Nevada.................     85.62
New Hampshire..........    100.00
New Jersey.............     56.88
New Mexico.............     75.50
New York...............     62.30
North Carolina.........     65.21
Ohio...................     58.31
Oklahoma...............     34.95
Oregon.................     76.12
Pennsylvania...........     24.52
Rhode Island...........     47.43
South Carolina.........     81.94
South Dakota...........      0.00
Tennessee..............     47.47
Texas..................     19.03
Utah...................     60.12
Virginia...............     67.39
Washington.............     73.80
West Virginia..........     66.86
Wisconsin..............     41.41
Wyoming................    100.00
                           ------
   Total...............     79.34%
                           ======
```

</Table>

        No more than approximately 0.53% of the Group Two Mortgage Loans will be
secured by mortgaged properties located in any one zip code area.

<PAGE>

        ORIGINAL LOAN-TO-VALUE RATIOS FOR THE GROUP TWO MORTGAGE LOANS
<Table>
<Caption>

                                             AGGREGATE
WEIGHTED        AVERAGE        WEIGHTED
                               NUMBER OF     PRINCIPAL      PERCENT OF    WEIGHTED
AVERAGE        PRINCIPAL       AVERAGE

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS | CREDIT SCORE | BALANCE OUTSTANDING | MORTGAGE ORIGINAL LOANS | ORIGINAL LTV | BALANCE OUTSTANDING | PERCENT FULL DOC | MORTGAGE POOL | AVERAGE COUPON |
|---|---|---|---|---|---|---|---|---|
| <S> | | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 30.01% to 40.00%....... | 654 | $182,529 | 3 | 36.67% | $ 547,586 | 54.42% | 0.05% | 6.480% |
| 40.01% to 50.00%....... | 649 | 503,971 | 6 | 46.97 | 3,023,823 | 54.40 | 0.27 | 6.662 |
| 50.01% to 60.00%....... | 648 | 517,532 | 17 | 56.71 | 8,798,040 | 70.07 | 0.79 | 6.499 |
| 60.01% to 70.00%....... | 654 | 478,439 | 46 | 66.00 | 22,008,177 | 45.18 | 1.98 | 6.725 |
| 70.01% to 75.00%....... | 665 | 536,716 | 55 | 73.84 | 29,519,391 | 59.41 | 2.65 | 6.619 |
| 75.01% to 80.00%....... | 672 | 323,417 | 2902 | 79.91 | 938,557,402 | 59.95 | 84.26 | 6.546 |
| 80.01% to 85.00%....... | 637 | 362,287 | 65 | 84.48 | 23,548,643 | 45.74 | 2.11 | 7.359 |
| 85.01% to 90.00%....... | 645 | 379,423 | 152 | 89.69 | 57,672,341 | 45.16 | 5.18 | 7.728 |
| 90.01% to 95.00%....... | 666 | 342,994 | 87 | 94.64 | 29,840,515 | 46.56 | 2.68 | 7.632 |
| 95.01% to 100.00%...... | 686 | 399,950 | 1 | 99.99 | 399,950 | 100.00 | 0.04 | 8.375 |
| Total | 669 | $334,108 | 3,334 | 80.19% | $1,113,915,868 | 58.29% | 100.00% | 6.659% |

<Caption>

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS | PERCENT IO |
|---|---|
| <S> | <C> |
| 30.01% to 40.00%....... | 0.00% |
| 40.01% to 50.00%....... | 47.68 |
| 50.01% to 60.00%....... | 52.73 |
| 60.01% to 70.00%....... | 63.73 |
| 70.01% to 75.00%....... | 66.96 |
| 75.01% to 80.00%....... | 82.62 |
| 80.01% to 85.00%....... | 56.97 |
| 85.01% to 90.00%....... | 63.90 |
| 90.01% to 95.00%....... | 59.74 |
| 95.01% to 100.00%...... | 100.00 |
| Total................ | 79.34% |

</Table>

As of the Cut-off Date, the Original Loan-to-Value Ratios of the Group Two
Mortgage Loans ranged from 34.99% to 99.99% and the weighted average
Loan-to-Value Ratio for the Group Two Mortgage Loans was approximately 80.19%.

LOAN PURPOSE FOR THE GROUP TWO MORTGAGE LOANS

<Table>
<Caption>

| LOAN PURPOSE | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Purchase............... | 671 | $314,948 | 80.34% | 58.93% | 2,988 | $ 941,065,555 | 84.48% | 6.646% |
| Refinance--Cashout..... | 655 | 500,555 | 79.57 | 53.47 | 321 | 160,678,016 | 14.42 | 6.745 |
| Refinance--Rate Term... | 650 | 486,892 | 76.60 | 72.68 | 25 | 12,172,296 | 1.09 | 6.511 |
| Total............... | 669 | $334,108 | 80.19% | 58.29% | 3,334 | $1,113,915,868 | 100.00% | 6.659% |

<Caption>

| LOAN PURPOSE | PERCENT IO |
|---|---|
| <S> | <C> |
| Purchase............... | 81.74% |
| Refinance--Cashout..... | 66.04 |
| Refinance--Rate Term... | 69.36 |
| Total............... | 79.34% |

</Table>

TYPES OF MORTGAGED PROPERTIES FOR THE GROUP TWO MORTGAGE LOANS

<Table>
<Caption>

| PROPERTY TYPE | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|---|---|

------------- --------- -------------- ---------- --------
-------- ----------- -------- --------
<S> <C> <C> <C> <C>
<C> <C> <C> <C>

| Single Family | | | | |
|---|---|---|---|---|
| Residence............ | 2,119 | $ 699,521,106 | 62.80% | 6.649% |
| 667 $330,119 80.14% 56.52% | | | | |
| Planned Unit | | | | |
| Development.......... | 735 | 260,947,711 | 23.43 | 6.695 |
| 667 355,031 80.19 66.88 | | | | |
| Condominium............ | 343 | 101,755,511 | 9.13 | 6.591 |
| 672 296,663 80.22 57.97 | | | | |
| Two-to-Four Family..... | 137 | 51,691,538 | 4.64 | 6.745 |
| 693 377,310 80.77 39.56 | | | | |
| | ----- | -------------- | ------ | ----- |
| --- -------- ----- ----- | | | | |
| Total............... | 3,334 | $1,113,915,868 | 100.00% | 6.659% |
| 669 $334,108 80.19% 58.29% | | | | |
| | ===== | ============== | ====== | ===== |
| === ======== ===== ===== | | | | |

<Caption>

| PROPERTY TYPE | PERCENT IO |
|---|---|
| ------------- | ----------- |
| <S> | <C> |
| Single Family | |
| Residence............ | 79.29% |
| Planned Unit | |
| Development.......... | 79.96 |
| Condominium............ | 84.66 |
| Two-to-Four Family..... | 66.48 |
| | ----- |
| Total............... | 79.34% |
| | ===== |

</Table>

<PAGE>

DOCUMENTATION SUMMARY FOR THE GROUP TWO MORTGAGE LOANS
<Table>
<Caption>

| DOCUMENTATION | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|
| WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT FULL DOC | |
| ------------- --------- -------------- ---------- -------- | | | | |
| -------- ----------- -------- -------- | | | | |
| <S> | <C> | <C> | <C> | <C> |
| <C> <C> <C> <C> | | | | |
| Full Documentation..... | 1,995 | $ 649,329,478 | 58.29% | 6.522% |
| 659 $325,478 80.00% 100.00% | | | | |

```
No Income
  Verification.........    1,291        442,737,182       39.75       6.843
682        342,941     80.25        0.00
Stated Plus...........       30         16,561,828        1.49       7.106
674        552,061     84.82        0.00
Limited Income
  Verification.........       18          5,287,379        0.47       6.647
681        293,743     82.35        0.00
                          -----     --------------      ------      -----
---      --------     -----      ------
  Total...............    3,334     $1,113,915,868      100.00%      6.659%
669      $334,108     80.19%       58.29%
                          =====     ==============      ======      =====
===      ========     =====      ======
```

<Caption>

```
DOCUMENTATION           PERCENT IO
-------------           ----------
<S>                     <C>
Full Documentation.....  78.98%
No Income
  Verification.........  79.25
Stated Plus............  98.02
Limited Income
  Verification.........  73.09
                         -----
  Total...............   79.34%
                         =====
```

</Table>

OCCUPANCY TYPES FOR THE GROUP TWO MORTGAGE LOANS

<Table>
<Caption>

| | | | AGGREGATE | | |
| WEIGHTED | AVERAGE | WEIGHTED | | | |
| | | NUMBER OF | PRINCIPAL | PERCENT OF | WEIGHTED |
| AVERAGE | PRINCIPAL | AVERAGE | | | |
| | | MORTGAGE | BALANCE | MORTGAGE | AVERAGE |
| CREDIT | BALANCE | ORIGINAL | PERCENT | | |
| OCCUPANCY | | LOANS | OUTSTANDING | POOL | COUPON |
| SCORE | OUTSTANDING | LTV | FULL DOC | | |
| --------- | ----------- | -------- | -------- | ---------- | -------- |
| -------- | ----------- | -------- | -------- | | |
| <S> | | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> | | |
| Primary................. | | 3,311 | $1,103,470,477 | 99.06% | 6.652% |
| 669 | $333,274 | 80.18% | 57.97% | | |
| Investment.............. | | 20 | 9,054,596 | 0.81 | 7.448 |
| 674 | 452,730 | 80.16 | 90.66 | | |
| Second Home............. | | 3 | 1,390,795 | 0.12 | 7.291 |
| 707 | 463,598 | 89.39 | 100.00 | | |
| | | ----- | ------ | | |
| --- | -------- | ----- | ------ | | |
| Total................. | | 3,334 | $1,113,915,868 | 100.00% | 6.659% |
| 669 | $334,108 | 80.19% | 58.29% | | |

```
                                =====  ===============  ======  =====
===     ========  =====  ======
```

<Caption>

```
OCCUPANCY                 PERCENT IO
---------                 ----------
<S>                       <C>
Primary.................   79.34%
Investment.............    76.65
Second Home............   100.00
                          ------
  Total.................   79.34%
                          ======
```

</Table>

        The information set forth above with respect to occupancy is based upon
representations of the related mortgagors at the time of origination.

        MORTGAGE LOAN AGE SUMMARY FOR THE GROUP TWO MORTGAGE LOANS
<Table>
<Caption>

| | | | AGGREGATE | | |
| WEIGHTED | AVERAGE | WEIGHTED NUMBER OF | PRINCIPAL | PERCENT OF | WEIGHTED |
| AVERAGE | PRINCIPAL | AVERAGE | | | |
| MORTGAGE LOAN AGE | MORTGAGE | BALANCE | MORTGAGE | AVERAGE | |
| CREDIT | BALANCE | ORIGINAL | PERCENT | | |
| (MONTHS) | | LOANS | OUTSTANDING | POOL | COUPON |
| SCORE | OUTSTANDING | LTV | FULL DOC | | |
| ------------------ | ----------- | -------- | -------- | ---------- | -------- |
| -------- | ----------- | -------- | -------- | | |
| <S> | | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> | | |
| 1..................... | 17 | $ 4,748,620 | 0.43% | 6.704% | |
| 667 | $279,331 | 81.71% | 67.13% | | |
| 2..................... | 2,994 | 993,049,342 | 89.15 | 6.671 | |
| 668 | 331,680 | 80.17 | 58.72 | | |
| 3..................... | 242 | 80,044,610 | 7.19 | 6.712 | |
| 669 | 330,763 | 80.27 | 54.86 | | |
| 4..................... | 64 | 29,174,760 | 2.62 | 6.216 | |
| 680 | 455,856 | 80.13 | 52.44 | | |
| 5..................... | 14 | 5,604,509 | 0.50 | 6.060 | |
| 652 | 400,322 | 80.05 | 44.93 | | |
| 6..................... | 3 | 1,294,027 | 0.12 | 6.477 | |
| 620 | 431,342 | 81.51 | 100.00 | | |
| | ----- | -------------- | ------ | ----- | |
| --- | -------- | ----- | ------ | | |
| Total............... | 3,334 | $1,113,915,868 | 100.00% | 6.659% | |
| 669 | $334,108 | 80.19% | 58.29% | | |
| | ===== | ============== | ====== | ===== | |
| === | ======== | ===== | ====== | | |

<Caption>

```
MORTGAGE LOAN AGE
(MONTHS)                  PERCENT IO
```

```
------------------      ----------
<S>                     <C>
1.......................  66.16%
2.......................  79.17
3.......................  80.31
4.......................  84.08
5.......................  82.82
6.......................  82.46
                          -----
   Total...............  79.34%
                          =====

</Table>
```

As of the Cut-off Date, the weighted average age of the Group Two Mortgage
Loans was approximately 2 months.

PREPAYMENT CHARGES FOR THE GROUP TWO MORTGAGE LOANS

<Table>
<Caption>

| PREPAYMENT CHARGE TERM (MONTHS) | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | NUMBER OF MORTGAGE LOANS | PERCENT FULL DOC | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| None................... | 671 | $354,368 | 80.74% | 657 | 52.26% | $ 232,819,972 | 20.90% | 6.926% |
| 12 Months.............. | 669 | 424,077 | 80.53 | 255 | 54.87 | 108,139,534 | 9.71 | 6.936 |
| 24 Months.............. | 668 | 319,210 | 79.91 | 1774 | 57.03 | 566,277,891 | 50.84 | 6.575 |
| 36 Months.............. | 666 | 318,948 | 80.13 | 648 | 70.34 | 206,678,472 | 18.55 | 6.445 |
|  |  |  |  | ----- |  | -------------- | ------ | ----- |
| Total................ | 669 | $334,108 | 80.19% | 3,334 | 58.29% | $1,113,915,868 | 100.00% | 6.659% |
|  | === | ======== | ===== | ===== | ===== | ============== | ====== | ===== |

<Caption>

| PREPAYMENT CHARGE TERM (MONTHS) | PERCENT IO |
|---|---|
| <S> | <C> |
| None................... | 72.57% |
| 12 Months.............. | 87.63 |
| 24 Months.............. | 82.20 |
| 36 Months.............. | 74.82 |

```
                                -----
      Total................     79.34%
                                =====

</Table>
```

        The weighted average prepayment charge term at origination with respect
to
the Group Two Mortgage Loans having prepayment charges is approximately 25
months.

```
<PAGE>
```

            CREDIT SCORES FOR THE GROUP TWO MORTGAGE LOANS
```
<Table>
<Caption>
```

| | | | AGGREGATE | | |
|---|---|---|---|---|---|
| WEIGHTED | AVERAGE | WEIGHTED | | | |
| | | NUMBER OF | PRINCIPAL | PERCENT OF | WEIGHTED |
| AVERAGE | PRINCIPAL | AVERAGE | | | |
| | | MORTGAGE | BALANCE | MORTGAGE | AVERAGE |
| CREDIT | BALANCE | ORIGINAL | PERCENT | | |
| RANGE OF CREDIT SCORES | LOANS | OUTSTANDING | POOL | COUPON | |
| SCORE | OUTSTANDING | LTV | FULL DOC | | |

```
----------------------  ---------  --------------  ----------  --------
--------    -----------  --------   --------
<S>                         <C>         <C>           <C>          <C>
<C>          <C>          <C>       <C>
540 to 550.............      20    $    4,403,637       0.40%       8.391%
546     $220,182        82.25%    90.59%
551 to 575.............      48        14,213,492       1.28        7.828
565      296,114        80.61     76.58
576 to 600.............     203        51,084,856       4.59        7.413
590      251,650        80.19     86.03
601 to 625.............     468       133,515,971      11.99        6.894
614      285,291        80.00     85.85
626 to 650.............     635       204,869,883      18.39        6.723
640      322,630        80.51     65.42
651 to 675.............     742       256,347,034      23.01        6.581
663      345,481        80.05     50.07
676 to 700.............     498       180,144,506      16.17        6.532
687      361,736        79.93     50.09
701 to 725.............     354       130,946,135      11.76        6.431
712      369,904        80.60     43.40
726 to 750.............     203        76,516,566       6.87        6.471
737      376,929        80.44     42.68
751 to 775.............     100        37,744,143       3.39        6.311
763      377,441        79.66     56.03
776 to 800.............      55        20,426,843       1.83        6.365
785      371,397        79.49     46.19
801 to 809.............       8         3,702,801       0.33        6.399
804      462,850        76.27     86.87
                          -----    --------------      ------      -----
---         --------     -----     -----
   Total................   3,334    $1,113,915,868     100.00%      6.659%
669     $334,108        80.19%    58.29%
```

```
         =====   ==============   ======   =====
===   ========   =====   =====
```

```
         =====   ==============   ======   =====
===   ========   =====   =====
```

<Caption>

| RANGE OF CREDIT SCORES | PERCENT IO |
|------------------------|------------|
| <S>                    | <C>        |
| 540 to 550............. | 39.82%    |
| 551 to 575............. | 36.99     |
| 576 to 600............. | 54.31     |
| 601 to 625............. | 76.04     |
| 626 to 650............. | 80.85     |
| 651 to 675............. | 82.75     |
| 676 to 700............. | 81.87     |
| 701 to 725............. | 81.90     |
| 726 to 750............. | 84.30     |
| 751 to 775............. | 79.25     |
| 776 to 800............. | 85.77     |
| 801 to 809............. | 84.03     |
|                        | -----     |
| Total................. | 79.34%    |
|                        | =====     |

</Table>

The Credit Scores of the Group Two Mortgage Loans as of the Cut-off Date
ranged from 540 to 809 and the weighted average Credit Score of the Group Two
Mortgage Loans as of the Cut-off Date was approximately 669.

                GROSS MARGINS FOR THE GROUP TWO MORTGAGE LOANS
                      (EXCLUDES FIXED RATE MORTGAGE LOANS)

<Table>
<Caption>

|                    |           |           | AGGREGATE     |            |          |
| WEIGHTED           | AVERAGE   | WEIGHTED  |               |            |          |
|                    |           | NUMBER OF | PRINCIPAL     | PERCENT OF | WEIGHTED |
| AVERAGE            | PRINCIPAL | AVERAGE   |               |            |          |
| RANGE OF GROSS     |           | MORTGAGE  | BALANCE       | MORTGAGE   | AVERAGE  |
| CREDIT             | BALANCE   | ORIGINAL  | PERCENT       |            |          |
| MARGINS            |           | LOANS     | OUTSTANDING   | POOL       | COUPON   |
| SCORE  OUTSTANDING |           | LTV       | FULL DOC      |            |          |
|------------------- |---------- |---------- |-------------- |----------- |--------- |
| -------- -------- |           |           |               |            |          |
| <S>                | <C>       | <C>       | <C>           | <C>        | <C>      |
| <C>     <C>        | <C>       | <C>       |               |            |          |
| 4.001% to 4.500%....... | 3  | $   672,000 | 0.06% | 5.292% |
| 650     $224,000  80.00%  69.05% |
| 4.501% to 5.000%....... | 1136 | 425,289,153 | 40.40 | 6.247 |
| 672     374,374   79.35   58.74 |
| 5.001% to 5.500%....... | 1193 | 401,725,379 | 38.16 | 6.671 |
| 671     336,735   79.85   55.35 |
| 5.501% to 6.000%....... | 539  | 158,561,180 | 15.06 | 7.165 |
| 661     294,177   81.21   58.26 |
| 6.001% to 6.500%....... | 187  |  52,304,847 | 4.97  | 7.686 |
| 655     279,705   85.35   46.97 |
```

| | | | | |
|---|---|---|---|---|
| 6.501% to 7.000%....... | 43 | 10,928,493 | 1.04 | 8.097 |
| 631 | 254,151 | 88.50 | 62.23 | |
| 7.001% to 7.500%....... | 9 | 3,148,300 | 0.30 | 8.618 |
| 647 | 349,811 | 94.89 | 53.01 | |
| 7.501% to 8.000%....... | 1 | 97,745 | 0.01 | 9.125 |
| 605 | 97,745 | 95.00 | 100.00 | |
| Total............... | 3,111 | $1,052,727,097 | 100.00% | 6.645% |
| 669 | $338,389 | 80.26% | 56.82% | |

<Caption>

| RANGE OF GROSS MARGINS | PERCENT IO |
|---|---|
| <S> | <C> |
| 4.001% to 4.500%....... | 100.00% |
| 4.501% to 5.000%....... | 93.57 |
| 5.001% to 5.500%....... | 83.34 |
| 5.501% to 6.000%....... | 65.72 |
| 6.001% to 6.500%....... | 47.30 |
| 6.501% to 7.000%....... | 32.55 |
| 7.001% to 7.500%....... | 71.72 |
| 7.501% to 8.000%....... | 0.00 |
| Total............... | 82.47% |

</Table>

As of the Cut-off Date, the gross margins for the Adjustable Rate Mortgage Loans in Group Two ranged from 4.500% per annum to 7.750% per annum and the weighted average gross margin for the Adjustable Rate Mortgage Loans in Group Two was approximately 5.321% per annum.

<PAGE>

MAXIMUM MORTGAGE RATES FOR THE GROUP TWO MORTGAGE LOANS
(EXCLUDES FIXED RATE MORTGAGE LOANS)

<Table>
<Caption>

| RANGE OF MAXIMUM MORTGAGE RATES | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | AGGREGATE NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | PERCENT FULL DOC |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |

| Range of Maximum Mortgage Rates | Number | Principal Balance | Percent | Rate | | | | |
|---|---|---|---|---|---|---|---|---|
| 11.000% or less........ | 7 | $ 2,125,436 | 0.20% | 4.969% | 701 | $303,634 | 79.99% | 100.00% |
| 11.001% to 11.500%..... | 60 | 19,363,660 | 1.84 | 5.393 | 693 | 322,728 | 79.05 | 87.53 |
| 11.501% to 12.000%..... | 428 | 164,283,281 | 15.61 | 5.865 | 685 | 383,839 | 79.35 | 83.40 |
| 12.001% to 12.500%..... | 940 | 346,073,809 | 32.87 | 6.335 | 679 | 368,164 | 79.37 | 61.56 |
| 12.501% to 13.000%..... | 909 | 293,297,682 | 27.86 | 6.812 | 664 | 322,660 | 79.81 | 45.23 |
| 13.001% to 13.500%..... | 469 | 136,588,668 | 12.97 | 7.288 | 654 | 291,234 | 81.61 | 38.39 |
| 13.501% to 14.000%..... | 198 | 61,935,980 | 5.88 | 7.801 | 637 | 312,808 | 83.54 | 47.80 |
| 14.001% to 14.500%..... | 63 | 17,377,037 | 1.65 | 8.287 | 625 | 275,826 | 87.74 | 53.85 |
| 14.501% to 15.000%..... | 30 | 9,693,005 | 0.92 | 8.795 | 601 | 323,100 | 88.07 | 37.62 |
| 15.001% to 15.500%..... | 7 | 1,988,539 | 0.19 | 9.229 | 598 | 284,077 | 91.62 | 65.01 |
| | ----- | -------------- | ------ | ----- | --- | -------- | ----- | ------ |
| Total................. | 3,111 | $1,052,727,097 | 100.00% | 6.645% | 669 | $338,389 | 80.26% | 56.82% |
| | ===== | ============== | ====== | ===== | === | ======== | ===== | ====== |

<Caption>

| RANGE OF MAXIMUM MORTGAGE RATES | PERCENT IO |
|---|---|
| ---------------- | ---------- |
| <S> | <C> |
| 11.000% or less........ | 87.12% |
| 11.001% to 11.500%..... | 85.04 |
| 11.501% to 12.000%..... | 88.06 |
| 12.001% to 12.500%..... | 84.56 |
| 12.501% to 13.000%..... | 83.58 |
| 13.001% to 13.500%..... | 78.22 |
| 13.501% to 14.000%..... | 70.96 |
| 14.001% to 14.500%..... | 52.90 |
| 14.501% to 15.000%..... | 56.72 |
| 15.001% to 15.500%..... | 95.08 |
| | ----- |
| Total................. | 82.47% |
| | ===== |

</Table>

As of the Cut-off Date, the Maximum Mortgage Rates for the Adjustable Rate
Mortgage Loans in Group Two ranged from 10.750% per annum to 15.500% per annum
and the weighted average Maximum Mortgage Rate for the Adjustable Rate Mortgage
Loans in Group Two was 12.645% per annum.

NEXT RATE ADJUSTMENT DATE FOR THE GROUP TWO MORTGAGE LOANS

(EXCLUDES FIXED RATE MORTGAGE LOANS)

<Table>
<Caption>

| WEIGHTED AVERAGE NEXT RATE ADJUSTMENT DATE | WEIGHTED AVERAGE CREDIT SCORE | NUMBER OF MORTGAGE LOANS | AVERAGE PRINCIPAL BALANCE OUTSTANDING | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | PERCENT OF MORTGAGE POOL | PERCENT FULL DOC | WEIGHTED AVERAGE COUPON |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| April 2006 | 666 | 11 | $368,894 | $ 4,057,831 | 78.87% | 0.39% | 47.07% | 6.241% |
| October 2006 | 719 | 3 | 550,319 | 1,650,957 | 82.57 | 0.16 | 40.15 | 6.425 |
| June 2007 | 633 | 2 | 533,542 | 1,067,084 | 81.83 | 0.10 | 100.00 | 6.286 |
| July 2007 | 652 | 10 | 411,435 | 4,114,352 | 79.30 | 0.39 | 45.87 | 6.041 |
| August 2007 | 673 | 46 | 457,908 | 21,063,759 | 80.19 | 2.00 | 48.55 | 6.264 |
| September 2007 | 668 | 178 | 345,799 | 61,552,253 | 80.28 | 5.85 | 50.66 | 6.715 |
| October 2007 | 667 | 2169 | 334,920 | 726,441,996 | 80.34 | 69.01 | 54.81 | 6.692 |
| November 2007 | 654 | 11 | 267,017 | 2,937,186 | 80.00 | 0.28 | 80.42 | 6.456 |
| July 2008 | 638 | 3 | 386,052 | 1,158,157 | 82.73 | 0.11 | 54.48 | 6.216 |
| August 2008 | 700 | 13 | 469,131 | 6,098,701 | 80.21 | 0.58 | 57.05 | 6.142 |
| September 2008 | 655 | 40 | 281,576 | 11,263,034 | 81.59 | 1.07 | 67.08 | 6.636 |
| October 2008 | 669 | 513 | 330,125 | 169,354,361 | 80.22 | 16.09 | 64.19 | 6.576 |
| November 2008 | 695 | 3 | 442,499 | 1,327,497 | 86.13 | 0.13 | 38.69 | 7.214 |
| June 2010 | 563 | 1 | 226,943 | 226,943 | 80.00 | 0.02 | 100.00 | 7.375 |
| July 2010 | 695 | 1 | 332,000 | 332,000 | 80.00 | 0.03 | 0.00 | 5.750 |
| August 2010 | 684 | 3 | 335,117 | 1,005,350 | 78.33 | 0.10 | 58.42 | 6.042 |
| September 2010 | 727 | 11 | 359,817 | 3,957,991 | 75.01 | 0.38 | 63.19 | 6.236 |
| October 2010 | 693 | 92 | 379,845 | 34,945,775 | 78.87 | 3.32 | 75.84 | 6.405 |
| November 2010 | 702 | 1 | 171,869 | 171,869 | 80.00 | 0.02 | 0.00 | 7.375 |
| Total | 669 | 3,111 | $338,389 | $1,052,727,097 | 80.26% | 100.00% | 56.82% | 6.645% |

```
=====    ===============    ======    =====
===       ========    =====      ======
```

<Caption>

```
<Table>

NEXT RATE
ADJUSTMENT DATE              PERCENT IO
---------------             ----------
<S>                         <C>
April 2006.............      100.00%
October 2006...........        0.00
June 2007..............      100.00
July 2007..............       89.41
August 2007............       84.79
September 2007.........       83.26
October 2007...........       83.95
November 2007..........       89.47
July 2008..............       54.48
August 2008............       83.57
September 2008.........       83.17
October 2008...........       76.20
November 2008..........       38.69
June 2010..............        0.00
July 2010..............      100.00
August 2010............      100.00
September 2010.........       84.94
October 2010...........       81.30
November 2010..........        0.00
                             ------
   Total................       82.47%
                             ======

</Table>
```

<PAGE>

UNDERWRITING GUIDELINES

All of the Mortgage Loans were originated or acquired by the Originator, generally in accordance with the underwriting criteria described in this Prospectus Supplement. The information set forth in the following paragraphs has been provided by the Originator.

The information set forth in the following paragraphs has been provided by the Originator.

The Originator is a Delaware corporation headquartered in San Jose, California. First Franklin is a division of National City Bank of Indiana. National City Bank is a wholly owned subsidiary of National City Corporation.

The Originator's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. All

of the Mortgage Loans were underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage market. The Originator considers, among
other things, a mortgagor's credit history, repayment ability and debt service
to income ratio ("Debt Ratio"), as well as the value, type and use of the mortgaged property. The Mortgage Loans generally bear higher rates of interest
than mortgage loans that are originated in accordance with Fannie Mae and Freddie Mac standards, and may experience rates of delinquencies and foreclosures that are higher, and that may be substantially higher, than those
experienced by portfolios of mortgage loans underwritten in a more traditional
manner. Unless prohibited by state law or otherwise waived by the Originator upon the payment by the related mortgagor of higher origination fees and a higher mortgage rate, a majority of the Mortgage Loans provide for the payment
by the mortgagor of a prepayment charge on certain full or partial prepayments
made within one to three years from the date of origination of the related Mortgage Loan as described under "The Mortgage Pool--Mortgage Loans" above.

Substantially all of the mortgage loans originated by the Originator are
based on loan application packages submitted through mortgage brokerage companies. These brokers must meet minimum standards set by the Originator based
on an analysis of the following information submitted with an application for approval: applicable state lending license (in good standing), satisfactory credit report only if no federal income tax identification number, signed broker
agreement, signed W-9 and signed broker authorization. Once approved, mortgage
brokerage companies are eligible to submit loan application packages in compliance with the terms of a signed broker agreement.

The Originator has one underwriting program called the Direct Access Program. Within the Direct Access Program, there are four documentation programs, the Full Documentation Program, the Limited Income Verification Program (the "LIV"), the Stated Plus Program and the No Income Verification Program (the "NIV"). All of the Mortgage Loans were originated in accordance with the Originator's Direct Access Program. While each underwriting program is
intended to assess the risk of default, the Direct Access Program makes use of
credit bureau risk scores (the "Credit Bureau Risk Score"). The Credit Bureau Risk Score is a statistical ranking of likely future credit performance developed by Fair, Isaac & Company ("Fair, Isaac") and the three national credit
repositories Equifax, Trans Union and First American (formerly Experian which was formerly TRW). The Credit Bureau Risk Scores available from the three national credit repositories are calculated by the assignment of weightings to
the most predictive data collected by the credit repositories and range from 300
to 850. Although the Credit Bureau Risk Scores are based solely on the

information at the particular credit repository, such Credit Bureau Risk Scores
have been calibrated to indicate the same level of credit risk regardless of
which credit repository is used. The Credit Bureau Risk Score is used as an aid
to, not a substitute for, the underwriter's judgment.

The Direct Access Program was developed to simplify the origination
process for the mortgage brokerage companies approved by the Originator. In
contrast to assignment of credit grades according to

<PAGE>

traditional non agency credit assessment methods, i.e., mortgage and other
credit delinquencies, Direct Access relies upon a borrower's Credit Bureau Risk
Score initially to determine a borrower's likely future credit performance.
Mortgage brokerage companies are able to access Credit Bureau Risk Scores at the
initial phases of the loan application process and use the score to determine a
borrower's interest rate based upon the Originator's Direct Access Program risk
based pricing matrix (subject to final loan approval by the Originator).

Under the Direct Access Program, the Originator requires that the Credit
Bureau Risk Score of the primary borrower (the borrower with at least 51.00% of
total income for all LTVs) be used to determine program eligibility. Credit
Bureau Risk Scores must be obtained from at least two national credit
repositories, with the lower of the two scores being utilized in program
eligibility determination. If Credit Bureau Risk Scores are obtained from three
credit repositories, the middle of the three scores can be utilized. In all
cases, a borrower's complete credit history must be detailed in the credit
report that produces a given Credit Bureau Risk Score or the borrower is not
eligible for the Direct Access Program. Generally, the minimum Credit Bureau
Risk Score allowed under the Direct Access Program is 540.

The Credit Bureau Risk Score, along with the loan-to-value ratio, is an
important tool in assessing the creditworthiness of a Direct Access borrower.
However, these two factors are not the only considerations in underwriting a
Direct Access loan. The Originator's underwriting staff fully reviews each
Direct Access loan to determine whether the Originator's guidelines for income,
assets, employment and collateral are met.

All of the Mortgage Loans were underwritten by the Originator's
underwriters having the appropriate signature authority. Each underwriter is
granted a level of authority commensurate with their proven judgment, maturity
and credit skills. On a case by case basis, the Originator may determine that,
based upon compensating factors, a prospective mortgagor not strictly qualifying
under the underwriting risk category guidelines described below warrants an

underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a substantial portion of the Mortgage Loans
may represent such underwriting exceptions.

The Originator's underwriters verify the income of each applicant under various documentation programs as follows: under the Full Documentation Program,
applicants are generally required to submit verification of stable income for the periods of six months to two years preceding the application dependent on credit score range; under the LIV Program, the borrower is qualified based on the income stated on the application and applicants are generally required to submit verification of adequate cash flow to meet credit obligations for the six
month period preceding the application; the Stated Plus Program allows income to
be stated, but requires borrowers to provide verification of liquid assets equaling three months of income stated on the mortgage application; under the NIV Program, applicants are qualified based on monthly income as stated on the
mortgage application and the underwriter will determine that the stated income
is reasonable and realistic when compared to borrower's employment type, assets
and credit history. For Direct Access first lien mortgage loans from self-employed or 1099 borrowers with a credit score greater than or equal to 540
and not originated in conjunction with a second lien mortgage, bank statements
(for 12 months) are acceptable as full documentation. For Direct Access first lien mortgage loans from self-employed or 1099 borrowers with credit scores greater than or equal to 600, regardless of being originated with a corresponding second lien mortgage, twelve months bank statements are acceptable
as full documentation. In all cases, the income stated must be reasonable and customary for the applicant's line of work. Although the income is not verified
under the LIV and NIV Programs, a preclosing audit generally will confirm that
the business exists. Verification may be made through phone contact to the place
of business, obtaining a valid business license, CPA/Enrolled Agent letter or through Dun and Bradstreet Information Services.

The applicant generally must have a sufficiently established credit history to qualify for the appropriate Credit Bureau Risk Score range under the
Direct Access Program. This credit history is substantiated by a two repository
merged report prepared by an independent credit report agency. The

<PAGE>

report typically summarizes the applicant's entire credit history, and generally
includes a seven year public record search for each address where the applicant
has lived during the two years prior to the issuance of the credit report and
contains information relating to such matters as credit history with local and
national merchants and lenders, installment debt payments and any record of
defaults, bankruptcy, repossession, suits or judgments. In some instances,
borrowers with a minimal credit history are eligible for financing under the
Direct Access Program.

The Originator originates loans secured by 1-4 unit residential properties
made to eligible borrowers with a vested fee simple (or in some cases a
leasehold) interest in the property. The Originator's guidelines are applied in
accordance with a procedure which complies with applicable federal and state
laws and regulations and generally require an appraisal of the mortgaged
property which conforms to Freddie Mac and/or Fannie Mae standards; and if
appropriate, a review appraisal. Generally, appraisals are provided by
appraisers approved by the Originator. Review appraisals may only be provided by
appraisers approved by the Originator. In some cases, the Originator relies on a
statistical appraisal methodology provided by a third party.

Qualified independent appraisers must meet minimum standards of licensing
and provide errors and omissions insurance in states where it is required to
become approved to do business with the Originator. Each Uniform Residential
Appraisal Report includes a market data analysis based on recent sales of
comparable homes in the area and, where deemed appropriate, replacement cost
analysis based on the current cost of constructing a similar home. The review
appraisal may be an enhanced desk, field review or an automated valuation report
that confirms or supports the original appraiser's value of the mortgaged
premises. The review appraisal may be waived by a Standard Plus Delegated
Underwriter.

The Originator requires title insurance on all mortgage loans secured by
liens on real property. The Originator also requires that fire and extended
coverage casualty insurance be maintained on the secured property in an amount
at least equal to the principal balance of the related residential loan or the
replacement cost of the property, whichever is less.

The Originator conducts a number of quality control procedures, including
a post funding compliance audit as well as a full re underwriting of a random
selection of loans to assure asset quality. Under the compliance audit, all
loans are reviewed to verify credit grading, documentation compliance and data
accuracy. Under the asset quality procedure, a random selection of each month's

originations is reviewed. The loan review confirms the existence and accuracy of
legal documents, credit documentation, appraisal analysis and underwriting
decision. A report detailing audit findings and level of error is sent monthly
to each branch for response. The audit findings and branch responses are then
reviewed by the Originator's senior management. Adverse findings are tracked
monthly and over a rolling six month period. This review procedure allows the
Originator to assess programs for potential guideline changes, program
enhancements, appraisal policies, areas of risk to be reduced or eliminated and
the need for additional staff training.

Under the mortgage loan programs, various risk categories are used to
grade the likelihood that the applicant will satisfy the repayment conditions of
the loan. These risk categories establish the maximum permitted loan-to-value
ratio and loan amount, given the occupancy status of the mortgaged property and
the applicant's credit history and Debt Ratio. In general, higher credit risk
mortgage loans are graded in categories which permit higher Debt Ratios and more
(or more recent) major derogatory credit items such as outstanding judgments or
prior bankruptcies; however these loan programs establish lower maximum
loan-to-value ratios and lower maximum loan amounts for loans graded in such
categories.

"Equity Refinance" transactions are defined as those instances where the
borrower receives the lesser of 2% of the new loan amount or $2,000 cash in
hand. Funds used for debt consolidation are not included in this amount.

The Originator's guidelines under the Direct Access Program generally have
the following criteria for borrower eligibility for the specified Credit Bureau
Risk Score range.

<PAGE>

The Debt Ratio generally may not exceed 50.49% for all credit scores on
full documentation and LIV loans. Loans meeting the residual income requirements
may have a maximum Debt Ratio of 55.49%. The Debt Ratio for NIV loans may not
exceed 50.49%.

Generally, all liens affecting title must be paid at closing. Collections,
charge-offs, judgments and liens not affecting title may remain open for
combined loan- to-value ratios less than or equal to 80%, provided certain
criteria are met. For instance, if the loan is a purchase or rate and term
refinance, a payoff of such amounts shall not be required if, the related loan
is not being originated together with a second lien loan, the balance of the
items added to the loan amount does not exceed the maximum allowed combined

loan-to-value ratio, the payment amounts are included in the debt calculation, and the Originator loan has first lien priority.

## THE MASTER SERVICER

LaSalle Bank National Association is a national banking association with
master servicing offices located at 135 S. LaSalle Street, Suite 1625, Chicago,
Illinois 60603.

The Servicer will directly service the Mortgage Loans and the Master Servicer will monitor and oversee the performance by the Servicer of its obligations under the Pooling and Servicing Agreement. The Master Servicer, however, will not be ultimately responsible for the servicing of the Mortgage Loans except to the extent described in under "Servicing of the Mortgage Loans"
below.

The Master Servicer is engaged in the business of master servicing single-family residential mortgage loans secured by properties throughout the country.

## THE SERVICER

GENERAL

National City Home Loan Services, Inc. ("NCHLS") will act as the Servicer
of the Mortgage Loans. NCHLS's obligations with respect to the Mortgage Loans are limited to its contractual servicing obligations.

The information set forth in the following paragraphs has been provided by
the Servicer.

NCHLS, a wholly owned subsidiary of National City Bank of Indiana, is a full-service, non-conforming mortgage servicing company headquartered in Pittsburgh, Pennsylvania. The Servicer will provide customary functions with respect to the mortgage loans. Among other things, the Servicer is obligated under some circumstances to advance delinquent payments of principal and interest with respect to the mortgage loans and to pay compensating interest with respect to mortgage loans serviced by it. In managing the liquidation of defaulted mortgage loans, the Servicer will have sole discretion to take such action in maximizing recoveries to the Certificateholders including, without limitation, selling defaulted mortgage loans and REO properties.

As of September 30, 2005, the servicer serviced a portfolio of approximately 249,378 mortgage loans totaling approximately $33,309,397,431.

NCHLS'S DELINQUENCY AND FORECLOSURE STATISTICS

The following table sets forth the delinquency and foreclosure experience
of the mortgage loans serviced by the Servicer at the end of the indicated periods. The indicated periods of delinquency are based on the number of days

past due on a contractual basis. No mortgage loan is considered delinquent for
these purposes until it has not been paid by the next scheduled due date. The
Servicer's portfolio may differ significantly from the Mortgage Loans in the
Mortgage Pool in terms of interest rates, principal balances, geographic
distribution, types of properties, lien priority, origination and underwriting
criteria,

<PAGE>

prior Servicer performance and other possibly relevant characteristics. There
can be no assurance, and no representation is made, that the delinquency and
foreclosure experience with respect to the Mortgage Loans will be similar to
that reflected in the table below, nor is any representation made as to the rate
at which losses may be experienced on liquidation of defaulted Mortgage Loans.
The actual delinquency experience on Mortgage Loans will depend, among other
things, upon the value of the real estate securing such Mortgage Loans and the
ability of the related borrower to make required payments. It should be noted
that if the residential real estate market should experience an overall decline
in property values, the actual rates of delinquencies and foreclosures could be
higher than those previously experienced by the Servicer. In addition, adverse
economic conditions may affect the timely payment by borrowers of scheduled
payments of principal and interest on the Mortgage Loans and, accordingly, the
actual rates of delinquencies and foreclosures with respect to the Mortgage
Pool. Finally, the statistics shown below represent the delinquency experience
for the Servicer's mortgage servicing portfolio only for the periods presented,
whereas the aggregate delinquency experience on the Mortgage Loans will depend
on the results obtained over the life of the Mortgage Pool.

NCHLS LOAN DELINQUENCY EXPERIENCE

<Table>
<Caption>

|  | AS OF DECEMBER 31, 2003 | AS OF DECEMBER 31, 2004 | AS OF SEPTEMBER 30, 2005 |
| --- | --- | --- | --- |
|  | TOTAL SERVICING PORTFOLIO | TOTAL SERVICING PORTFOLIO | TOTAL SERVICING PORTFOLIO |
|  | ($ IN THOUSANDS) | ($ IN THOUSANDS) | ($ IN THOUSANDS) |

<S>                         <C>              <C>          <C>

| | | | |
|---|---|---|---|
| Total Outstanding Balance:...... | $18,751,866 | $23,049,992 | $33,309,397 |
| **Delinquency at:** | | | |
| 30 Days* | | | |
|   Outstanding Principal Balance:................... | $ 530,613 | $ 595,677 | $ 906,711 |
|   Delinquency %.............. | 2.83% | 2.58% | 2.72% |
| 60 Days* | | | |
|   Outstanding Principal Balance................... | $ 182,027 | $ 205,202 | $ 273,870 |
|   Delinquency %.............. | 0.97% | 0.89% | 0.82% |
| 90+ Days* | | | |
|   Outstanding Principal Balance................... | $ 102,237 | $ 114,126 | $ 154,504 |
|   Delinquency %.............. | 0.55% | 0.50% | 0.46% |
| Bankruptcy(1): | | | |
|   Outstanding Principal Balance................... | $ 199,423 | $ 173,945 | $ 244,743 |
|   Delinquency %.............. | 1.06% | 0.75% | 0.73% |
| Foreclosure: | | | |
|   Outstanding Principal Balance................... | $ 185,962 | $ 168,194 | $ 185,879 |
|   Delinquency %.............. | 0.99% | 0.73% | 0.56% |
| Real Estate Owned: | | | |
|   Outstanding Principal Balance................... | $ 79,116 | $ 58,733 | $ 61,460 |
|   Delinquency %.............. | 0.42% | 0.25% | 0.18% |
| Total Seriously Delinquent including real estate owned(2):................... | $ 748,765 | $ 720,201 | $ 920,456 |
| Total Seriously Delinquent excluding real estate owned:................... | $ 669,649 | $ 661,467 | $ 858,996 |

</Table>

---------------

(1) Bankruptcies include both non-performing and performing loans in which
the

related borrower is in bankruptcy. Amounts included for contractually current bankruptcies for the total servicing portfolio for December, 31, 2003, December 31, 2004 and September 30, 2005 are $42,727, $50,831 and $84,553 respectively.

(2) Seriously delinquent is defined as loans that are 60 or more days delinquent, in foreclosure, in REO or held by a borrower who has declared bankruptcy.

 *  Bankruptcies and Foreclosures have been removed from these categories.

<PAGE>

        The statistics shown above represent the recent experience of the Servicer. There can be no assurance that the delinquency and foreclosure experience of the mortgage loans included in the trust fund will be comparable.
In addition, these statistics are based on all of the one-to-four family residential mortgage loans in the Servicer's servicing portfolio, including mortgage loans with a variety of payment and other characteristics, including geographic locations and underwriting standards. Not all the mortgage loans in
the Servicer's servicing portfolio constitute non-conforming credits. Accordingly, there can be no assurance that the delinquency and foreclosure experience of the trust fund's mortgage loans in the future will correspond to
the future delinquency and foreclosure experience of the Servicer's one-to-four
family conventional residential mortgage loan servicing portfolio. The actual delinquency and foreclosure experience of the mortgage loans will depend, among
other things, upon:

        the value of real estate securing the mortgage loans; and

        the ability of borrowers to make required payments.

                        SERVICING OF THE MORTGAGE LOANS

GENERAL

        The Servicer will service the Mortgage Loans in accordance with the terms
set forth in the Pooling and Servicing Agreement among the Trustee, the Depositor, the Master Servicer, the Securities Administrator, the Special Servicer and the Servicer. The Pooling and Servicing Agreement may be amended only with the consent of the NIMS Insurer, and the NIMS Insurer will be a third
party beneficiary of the Pooling and Servicing Agreement. Notwithstanding anything to the contrary in the prospectus, the Securities Administrator, the Trustee, the Special Servicer and, except to the extent described below, the Master Servicer will not be responsible for the performance of the servicing activities by the Servicer. If the Servicer fails to fulfill its obligations under the Pooling and Servicing Agreement, the Master Servicer (in its discretion or at the direction of the certificateholders) is obligated to terminate the Servicer and is obligated to appoint a successor servicer as

provided in the Pooling and Servicing Agreement.

    In accordance with the Pooling and Servicing Agreement, the Servicer may
perform any of its obligations under the Pooling and Servicing Agreement through
one or more subservicers, which may be affiliates of the Servicer.
Notwithstanding any subservicing arrangement, the Servicer will remain liable
for its servicing duties and obligations under the Pooling and Servicing
Agreement as if the Servicer alone were servicing the Mortgage Loans.

    The servicing rights with respect to the Mortgage Loans may be transferred
to one or more successor servicers at any time, subject to the conditions set
forth in the Pooling and Servicing Agreement, including the requirements that
any such successor servicer be qualified to service mortgage loans for Freddie
Mac or Fannie Mae, that the NIMS Insurer approve of such successor servicer and
that each Rating Agency confirm in writing that the transfer of servicing will
not result in a qualification, withdrawal or downgrade of the then current
ratings of any of the Offered Certificates.

SERVICING COMPENSATION AND PAYMENT OF EXPENSES

    The Servicer will be paid the Servicing Fee. The amount of the monthly
Servicing Fee is subject to adjustment with respect to prepaid Mortgage Loans,
as described below under "--Adjustment to Servicing Fee in Connection with
Certain Prepaid Mortgage Loans." The Servicer is also entitled to receive, as
additional servicing compensation, all Prepayment Interest Excesses, all late
payment charges, insufficient funds charges, assumption fees, modification fees,
extension fees and other similar charges (other than prepayment charges) and all
investment income earned on amounts on deposit in the Collection Account. The
Servicer is obligated to pay certain ongoing expenses associated with the
Mortgage Loans in connection with its responsibilities under the Pooling and
Servicing Agreement.

                                    S-56

<PAGE>

ADJUSTMENT TO SERVICING FEE IN CONNECTION WITH CERTAIN PREPAID MORTGAGE LOANS

    When a mortgagor prepays all or a portion of a Mortgage Loan between Due
Dates, the mortgagor pays interest on the amount prepaid only to the date of the
prepayment, instead of for a full month, with a resulting reduction in the
interest payable for the period in which the prepayment is made. Prepayments
received during the Prepayment Period are included in the distribution to
certificateholders on the related Distribution Date, thereby causing a shortfall
in interest for prepayments made from the 15th of the month to the end of the
month. In order to mitigate the effect of any such shortfall in interest

distributions to certificateholders on any Distribution Date, the Servicer shall
deposit Compensating Interest in the related Collection Account for distribution
to the certificateholders on such Distribution Date; provided, however, that
such amount shall not exceed the product of (a) one-twelfth of 0.25% per annum
and (b) the aggregate Stated Principal Balance of the Mortgage Loans for such
Distribution Date. Any such deposit by the Servicer will be reflected in the
distributions to the certificateholders made on the Distribution Date to which
such Prepayment Period relates. Any Prepayment Interest Shortfall will be
allocated on such Distribution Date pro rata among the outstanding classes of
certificates based upon the amount of interest each such class would otherwise
be paid on such Distribution Date.

ADVANCES

        Subject to the limitations described below, on each Servicer Remittance
Date, the Servicer will be required to make Advances from its funds or funds in
the Collection Account that are not included in the available funds for such
Distribution Date. Advances are intended to maintain a regular flow of scheduled
interest and principal payments on the Offered Certificates rather than to
guarantee or insure against losses.

        The Servicer is obligated to make Advances with respect to delinquent
payments of principal and interest on each Mortgage Loan (with such payments of
interest adjusted to the related Net Mortgage Rate) to the extent that such
Advances are, in its judgment, reasonably recoverable from future payments and
collections or insurance payments or proceeds of liquidation of the related
Mortgage Loan; provided, however, that the Servicer will not make Advances with
respect to the principal portion of any Balloon Amount but the Servicer will be
required to advance monthly interest on a Balloon Loan until the principal
balance thereof is reduced to zero subject to the Servicer's determination of
nonrecoverability and provided further that the Servicer need not make Advances
with respect to any Mortgage Loan that is 150 days or more delinquent. The
Master Servicer (in its capacity as successor Servicer) will be obligated to
make any required Advances if the Servicer fails in its obligation to do so. The
Servicer and the Master Servicer, as applicable, shall have the right to
reimburse itself for any such Advances from amounts held from time to time in
the Collection Account to the extent such amounts are not then required to be
distributed to certificateholders; provided, however, any funds so applied and
transferred shall be replaced by the Servicer or the Master Servicer, as
applicable, by deposit in the Collection Account no later than one Business Day
prior to the Distribution Date on which such funds are required to be
distributed. Notwithstanding the foregoing, in the event the Servicer or the

Master Servicer, as applicable, previously made Advances which later are determined to be nonrecoverable, the Servicer or the Master Servicer, as applicable, will be entitled to reimbursement of such Advances prior to distributions to certificateholders.

If the Servicer determines on any Servicer Remittance Date to make an Advance, such Advance will be included with the distribution to holders of the
Offered Certificates on the related Distribution Date. In addition, the Servicer
may withdraw from the Collection Account funds that were not included in the available funds for the preceding Distribution Date to reimburse itself for Advances previously made. Any failure by the Servicer to make an Advance as required by the Pooling and Servicing Agreement will constitute an event of default thereunder, in which case the Master Servicer, solely in its capacity as
successor servicer, or such other entity as may be appointed as successor servicer, will be obligated to make any such Advance in accordance with the terms of the Pooling and Servicing Agreement.

<PAGE>

LOSS MITIGATION PROCEDURES

The Servicer is authorized to engage in a wide variety of loss mitigation
practices. With respect to such of the Mortgage Loans as come into and continue
in default, the Servicer will decide whether to (i) foreclose upon the mortgaged
properties securing those Mortgage Loans, (ii) write off the unpaid principal balance of the Mortgage Loans as bad debt if no net recovery is possible through
foreclosure, (iii) take a deed in lieu of foreclosure, (iv) accept a short sale
(a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate a sale of the mortgaged property by the mortgagor) or permit a short refinancing (a payoff of the Mortgage Loan for
an amount less than the total amount contractually owed in order to facilitate
refinancing transactions by the mortgagor not involving a sale of the mortgaged
property), (v) arrange for a repayment plan, or (vi) agree to a modification in
accordance with the Pooling and Servicing Agreement. As to any Mortgage Loan that becomes 120 days delinquent, the Servicer will be required to obtain a broker's price opinion, the cost of which will be reimbursable as a servicing advance. After obtaining the broker's price opinion, the Servicer will determine
whether a net recovery is possible through foreclosure proceedings or other liquidation of the related mortgage property. If the Servicer determines that no
such recovery is possible, it may charge off the related Mortgage Loan at the time it becomes 180 days delinquent. Once a Mortgage Loan has been charged off,

the Servicer will discontinue making Advances, the Servicer will not be entitled
to Servicing Fees , and the loan will be treated as a liquidated Mortgage Loan
giving rise to a Realized Loss. If the Servicer determines that such net recovery is possible through foreclosure proceedings or other liquidation of the
related mortgaged property on a Mortgage Loan that becomes 180 days delinquent,
the Servicer may continue making Advances, and the Servicer will be required to
notify the Master Servicer and the Trustee of such decision.

THE SPECIAL SERVICER

        Wilshire Credit Corporation will act as the Special Servicer.

        Servicing of Mortgage Loans that are 90 days or more delinquent will be transferred to the Special Servicer upon the mutual consent of the holder of the
Class C Certificates and the Special Servicer, whereupon the Special Servicer will be entitled to receive the Servicing Fee plus an additional fee, if any, as
mutually agreed upon by the holder of the Class C Certificates and the Special
Servicer.

PLEDGE OF SERVICING RIGHTS

        On or after the Closing Date, the Servicer may pledge and assign all of its right, title and interest in, to and under the Pooling and Servicing Agreement to one or more lenders, or servicing rights pledgees, selected by the
Servicer, as the representative of certain lenders. The Trustee, the Master Servicer, the Securities Administrator, the Servicer and the Depositor have agreed that upon delivery to the Trustee by the servicing rights pledgee of a letter signed by the Servicer whereunder the Servicer shall resign as Servicer
under the Pooling and Servicing Agreement, the Trustee shall appoint the servicing rights pledgee or its designee as successor servicer, provided that at
the time of such appointment, the servicing rights pledgee or such designee meets the requirements of a successor servicer described in the Pooling and Servicing Agreement (including being acceptable to the Rating Agencies) and that
the servicing rights pledgee agrees to be subject to the terms of the Pooling and Servicing Agreement. Under no circumstances will the Trustee be required to
act as a backup servicer.

        The Pooling and Servicing Agreement will provide that (i) the Servicer or
the Master Servicer, on behalf of the Trust Fund, may enter into a facility with
any person which provides that such person may fund Advances and/or servicing advances, although no such facility will reduce or otherwise affect the

Servicer's obligation to fund such Advances and/or servicing advances and (ii)
the Pooling and Servicing Agreement may be amended by the parties thereto
without the consent of the certificateholders as necessary or appropriate to
effect the terms of such a facility.

<PAGE>

DESCRIPTION OF THE CERTIFICATES

GENERAL

     The certificates will represent the entire beneficial ownership
interest
in the Trust Fund to be created under the Pooling and Servicing Agreement. A
copy of the Pooling and Servicing Agreement will be attached as an exhibit to
the Current Report on Form 8-K of the Depositor that will be available to
purchasers of the certificates at, and will be filed with, the Securities and
Exchange Commission within 15 days of the initial delivery of the
certificates.
Reference is made to the attached prospectus for additional information
regarding the terms and conditions of the Pooling and Servicing Agreement.

     The following summaries do not purport to be complete and are subject
to,
and are qualified in their entirety by reference to, the provisions of the
Pooling and Servicing Agreement. When particular provisions or terms used in
the
Pooling and Servicing Agreement are referred to, the actual provisions
(including definitions of terms) are incorporated by reference.

     The certificates will consist of:

     1. the Class A Certificates, Class M Certificates, Class B-1
Certificates,
          Class B-2 Certificates and Class B-3 Certificates (all of which are
          being offered hereby); and

     2. the Class C Certificates and Class P Certificates (which are not
being
          offered hereby).

     The Class A-1 and Class R Certificates will generally represent
interests
in the Group One Mortgage Loans. On each Distribution Date, principal and
interest received with respect to the Group One Mortgage Loans generally will
be
applied to pay principal and interest with respect to the Class A-1 and Class
R
Certificates. The Class A-2 Certificates will generally represent interests
in
the Group Two Mortgage Loans. On each Distribution Date, principal and
interest
received with respect to the Group Two Mortgage Loans generally will be
applied
to pay principal and interest with respect to the Class A-2 Certificates. The

Class M and Class B Certificates will generally represent interests in both the
Group One and Group Two Mortgage Loans. On each Distribution Date, principal and
interest received with respect to both the Group One and Group Two Mortgage
Loans will be applied to pay principal and interest with respect to the Class M
and Class B Certificates.

The Offered Certificates (other than the Class R Certificate) will be
issued in book-entry form as described below. The Definitive Certificates will
be transferable and exchangeable through the Securities Administrator. The
Offered Certificates (other than the Class R Certificate) will be issued in
minimum dollar denominations of $25,000 and integral multiples of $1 in excess
thereof. A single Class R Certificate will be issued in definitive form in a
$100 denomination.

BOOK-ENTRY CERTIFICATES

The Offered Certificates (other than the Class R Certificate) will be
Book-Entry Certificates. Certificate Owners may elect to hold their Book-Entry
Certificates through DTC in the United States, or Clearstream Luxembourg or
Euroclear in Europe, if they are participants in such systems, or indirectly
through organizations which are participants in such systems. The Book-Entry
Certificates will be issued in one or more certificates which equal the
aggregate principal balance of the Offered Certificates (other than the Class R
Certificate) and will initially be registered in the name of Cede & Co., the
nominee of DTC. Clearstream Luxembourg and Euroclear will hold omnibus positions
on behalf of their participants through customers' securities accounts in
Clearstream Luxembourg's and Euroclear's names on the books of their respective
depositaries which in turn will hold such positions in customers' securities
accounts in the depositaries' names on the books of DTC. Citibank, N.A. will act
as depositary for Clearstream Luxembourg and JPMorgan Chase Bank will act as
depositary for Euroclear. Investors may hold such beneficial interests in the
Book-Entry Certificates in minimum Certificate Principal Balances of $25,000

<PAGE>

and integral multiples of $1 in excess of $25,000. Except as described below, no
person acquiring a Book-Entry Certificate will be entitled to receive a
Definitive Certificate. Unless and until Definitive Certificates are issued, it
is anticipated that the only certificateholder of the Book-Entry Certificates
will be Cede & Co., as nominee of DTC. Certificate Owners will not be
certificateholders as that term is used in the Pooling and Servicing Agreement.
Certificate Owners are only permitted to exercise their rights indirectly
through Participants and DTC.

The beneficial owner's ownership of a Book-Entry Certificate will be recorded on the records of the Financial Intermediary that maintains the beneficial owner's account for such purpose. In turn, the Financial Intermediary's ownership of such Book-Entry Certificate will be recorded on the records of DTC (or of a participating firm that acts as agent for the Financial Intermediary, whose interest will in turn be recorded on the records of DTC, if the beneficial owner's Financial Intermediary is not a DTC Participant, and on the records of Clearstream Luxembourg or Euroclear, as appropriate).

Certificate Owners will receive all distributions of principal of, and interest on, the Book-Entry Certificates from the Securities Administrator through DTC and DTC Participants. While the Book-Entry Certificates are outstanding (except under the circumstances described below), under the Rules, DTC is required to make book-entry transfers among Participants on whose behalf it acts with respect to the Book-Entry Certificates and is required to receive and transmit distributions of principal of, and interest on, the Book-Entry Certificates. Indirect Participants, with whom Certificate Owners have accounts with respect to Book-Entry Certificates, are similarly required to make book-entry transfers and receive and transmit such distributions on behalf of their respective Certificate Owners. Accordingly, although Certificate Owners will not possess certificates, the Rules provide a mechanism by which Certificate Owners will receive distributions and will be able to transfer their interests.

Certificate Owners will not receive or be entitled to receive certificates representing their respective interests in the Book-Entry Certificates, except under the limited circumstances described below. Unless and until Definitive Certificates are issued, Certificate Owners who are not Participants may transfer ownership of Book-Entry Certificates only through Participants and Indirect Participants by instructing such Participants and Indirect Participants to transfer Book-Entry Certificates, by book-entry transfer, through DTC for the account of the purchasers of such Book-Entry Certificates, which account is maintained with their respective Participants. Under the Rules and in accordance with DTC's normal procedures, transfers of ownership of Book-Entry Certificates will be executed through DTC and the accounts of the respective Participants at DTC will be debited and credited. Similarly, the Participants and Indirect Participants will make debits or credits, as the case may be, on their records on behalf of the selling and purchasing Certificate Owners.

Because of time zone differences, credits of securities received in

Clearstream Luxembourg or Euroclear as a result of a transaction with a
Participant will be made during subsequent securities settlement processing
and
dated the Business Day following the DTC settlement date. Such credits or any
transactions in such securities settled during such processing will be
reported
to the relevant Euroclear or Clearstream Luxembourg Participants on such
Business Day. Cash received in Clearstream Luxembourg or Euroclear, as a
result
of sales of securities by or through a Clearstream Luxembourg Participant or
Euroclear Participant to a DTC Participant, will be received with value on
the
DTC settlement date but will be available in the relevant Clearstream
Luxembourg
or Euroclear cash account only as of the Business Day following settlement in
DTC. For information with respect to tax documentation procedures relating to
the Book-Entry Certificates, see "Material Federal Income Tax
Consequences--Grantor Trust Funds--Non-U.S. Persons," "Material Federal
Income
Tax Consequences--REMICs--Taxation of Owners of REMIC Regular
Certificates--Non-U.S. Persons" and "Material Federal Income Tax
Consequences--Tax Treatment of Certificates as Debt for Tax Purposes--Foreign
Investors" in the prospectus and "Global Clearance, Settlement and Tax
Documentation Procedures--Certain U.S. Federal Income Tax Documentation
Requirements" in Annex 1 hereto.

<PAGE>

        Transfers between Participants will occur in accordance with the Rules.
Transfers between Clearstream Luxembourg Participants and Euroclear
Participants
will occur in accordance with their respective rules and operating procedures.

        Cross-market transfers between persons holding directly or indirectly
through DTC, on the one hand, and directly or indirectly through Clearstream
Luxembourg Participants or Euroclear Participants, on the other, will be
effected in DTC in accordance with the Rules on behalf of the relevant
European
international clearing system by the Relevant Depositary; however, such
cross-market transactions will require delivery of instructions to the
relevant
European international clearing system by the counterpart in such system in
accordance with its rules and procedures and within its established deadlines
(European time). The relevant European international clearing system will, if
the transaction meets its settlement requirements, deliver instructions to
the
Relevant Depositary to take action to effect final settlement on its behalf
by
delivering or receiving securities in DTC, and making or receiving payment in
accordance with normal procedures for same-day funds settlement applicable to
DTC. Clearstream Luxembourg Participants and Euroclear Participants may not
deliver instructions directly to the European Depositaries.

        DTC, which is a New York-chartered limited purpose trust company,
performs

services for its Participants, some of which (and/or their representatives) own
DTC. In accordance with its normal procedures, DTC is expected to record the
positions held by each DTC Participant in the Book-Entry Certificates, whether
held for its own account or as a nominee for another person. In general,
beneficial ownership of Book-Entry Certificates will be subject to the rules,
regulations and procedures governing DTC and DTC Participants as in effect from
time to time.

Clearstream Luxembourg is incorporated under the laws of Luxembourg as a
professional depository. Clearstream Luxembourg holds securities for Clearstream
Luxembourg Participants and facilitates the clearance and settlement of
securities transactions between Clearstream Luxembourg Participants through
electronic book-entry changes in accounts of Clearstream Luxembourg
Participants, thereby eliminating the need for physical movement of
certificates. Transactions may be settled in Clearstream Luxembourg in any of 28
currencies, including United States dollars. Clearstream Luxembourg provides to
its Clearstream Luxembourg Participants, among other things, services for
safekeeping, administration, clearance and settlement of internationally traded
securities and securities lending and borrowing. Clearstream Luxembourg
interfaces with domestic markets in several countries. As a professional
depository, Clearstream Luxembourg is subject to regulation by the Luxembourg
Monetary Institute. Clearstream Luxembourg Participants are recognized financial
institutions around the world, including underwriters, securities brokers and
dealers, banks, trust companies, clearing corporations and certain other
organizations. Indirect access to Clearstream Luxembourg is also available to
others, such as banks, brokers, dealers and trust companies that clear through
or maintain a custodial relationship with a Clearstream Luxembourg Participant,
either directly or indirectly.

Euroclear was created in 1968 to hold securities for its participants and
to clear and settle transactions between its participants through simultaneous
electronic book-entry delivery against payment, thereby eliminating the need for
physical movement of certificates and any risk from lack of simultaneous
transfers of securities and cash. Euroclear is owned by Euroclear plc and
operated through a license agreement by Euroclear Bank S.A./N.V., a bank
incorporated under the laws of the Kingdom of Belgium.

The Euroclear Operator holds securities and book-entry interests in
securities for participating organizations and facilitates the clearance and
settlement of securities transactions between Euroclear Participants, and
between Euroclear Participants and Participants of certain other securities
intermediaries through electronic book-entry changes in accounts of such

Participants or other securities intermediaries. The Euroclear Operator provides
Euroclear Participants with, among other things, safekeeping, administration, clearance and settlement, securities lending and borrowing and other related services.

Non-Participants of Euroclear may hold and transfer book-entry interests
in the Certificates through accounts with a direct Participant of Euroclear or
any other securities intermediary that holds a book-entry interest in the Certificates through one or more securities intermediaries standing between such
other securities intermediary and the Euroclear Operator.

<PAGE>

The Euroclear Operator is regulated and examined by the Belgian Banking and Finance Commission and the National Bank of Belgium.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions. The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions
only on behalf of Euroclear Participants, and has no record of or relationship
with persons holding through Euroclear Participants.

Distributions on the Book-Entry Certificates will be made on each Distribution Date by the Securities Administrator to DTC. DTC will be responsible for crediting the amount of such payments to the accounts of the applicable DTC Participants in accordance with DTC's normal procedures. Each DTC
Participant will be responsible for disbursing such payments to the beneficial
owners of the Book-Entry Certificates that it represents and to each Financial
Intermediary for which it acts as agent. Each such Financial Intermediary will
be responsible for disbursing funds to the beneficial owners of the Book-Entry
Certificates that it represents.

Under a book-entry format, beneficial owners of the Book-Entry Certificates may experience some delay in their receipt of payments, since such
payments will be forwarded by the Securities Administrator to Cede & Co. Distributions with respect to Book-Entry Certificates held through Clearstream
Luxembourg or Euroclear will be credited to the cash accounts of Clearstream Luxembourg Participants or Euroclear Participants in accordance with the relevant system's rules and procedures, to the extent received by the Relevant

Depositary. Such distributions will be subject to tax reporting and may be subject to tax withholding in accordance with relevant United States tax laws and regulations. See "Material Federal Income Tax Consequences -- Grantor Trust
Funds -- Non-U.S. Persons," "Material Federal Income Tax
Consequences -- REMICs -- Taxation of Owners of REMIC Regular Certificates -- Non-U.S. Persons" and "Material Federal Income Tax Consequences -- Tax Treatment
of Certificates as Debt for Tax Purposes -- Foreign Investors" in the prospectus. Because DTC can only act on behalf of Financial Intermediaries, the
ability of a beneficial owner to pledge Book-Entry Certificates to persons or entities that do not participate in the depository system, or otherwise take actions in respect of such Book-Entry Certificates, may be limited due to the lack of physical certificates for such Book-Entry Certificates. In addition, issuance of the Book-Entry Certificates in book-entry form may reduce the liquidity of those Offered Certificates in the secondary market since some potential investors may be unwilling to purchase Offered Certificates for which
they cannot obtain physical certificates.

     Monthly and annual reports on the Trust Fund provided by the Securities Administrator to Cede & Co., as nominee of DTC, may be made available to beneficial owners upon request, in accordance with the rules, regulations and procedures creating and affecting DTC or the Relevant Depositary, and to the Financial Intermediaries to whose DTC accounts the Book-Entry Certificates of such beneficial owners are credited.

     DTC has advised the Depositor, the Securities Administrator and the Trustee that, unless and until Definitive Certificates are issued, DTC will take
any action permitted to be taken by the holders of the Book-Entry Certificates
under the Pooling and Servicing Agreement only at the direction of one or more
Financial Intermediaries to whose DTC accounts the Book-Entry Certificates are
credited, to the extent that such actions are taken on behalf of Financial Intermediaries whose holdings include such Book-Entry Certificates. Clearstream
Luxembourg or the Euroclear Operator, as the case may be, will take any other action permitted to be taken by a holder of a Book-Entry Certificate under the
Pooling and Servicing Agreement on behalf of a Clearstream Luxembourg Participant or Euroclear Participant only in accordance with its relevant rules
and procedures and subject to the ability of the Relevant Depositary to effect
such actions on its behalf through DTC. DTC may take actions, at the direction
of the related Participants, with respect to some Book-Entry Certificates which
conflict with actions taken with respect to other Book-Entry Certificates.

<PAGE>

Definitive Certificates will be issued to beneficial owners of the Book-Entry Certificates, or their nominees, rather than to DTC, only if:

(1) DTC or the Depositor advises the Securities Administrator and the Trustee in writing that DTC is no longer willing, qualified or able to

discharge properly its responsibilities as nominee and depository with

respect to the Book-Entry Certificates and the Depositor is unable to

locate a qualified successor;

(2) the Depositor notifies the Securities Administrator and the Trustee and DTC of its intent to terminate the book entry system through DTC

and, upon receipt of notice of such intent from DTC, the beneficial owners of the Book-Entry Certificates agree to initiate such termination; or

(3) after the occurrence and continuation of an event of default, beneficial owners having not less than 51% of the voting rights evidenced by any class of Book-Entry Certificates advise the Securities Administrator, the Trustee and DTC through the Financial Intermediaries and the DTC Participants in writing that the continuation of a book-entry system through DTC (or a successor to DTC) is no longer in the best interests of beneficial owners of such

class.

Upon the occurrence of any of the events described in the immediately preceding paragraph, the Securities Administrator will be required to notify all beneficial owners of the occurrence of such event and the availability through DTC of Definitive Certificates. Upon surrender by DTC of the global certificate or certificates representing the Book-Entry Certificates and instructions for re-registration, the Securities Administrator will issue Definitive Certificates, and thereafter the Trustee and the Securities Administrator will recognize the holders of such Definitive Certificates as holders of the Offered Certificates under the Pooling and Servicing Agreement.

Although DTC, Clearstream Luxembourg and Euroclear have agreed to these procedures in order to facilitate transfers of certificates among Participants of DTC, Clearstream Luxembourg and Euroclear, they are under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

PAYMENTS ON MORTGAGE LOANS; COLLECTION ACCOUNT; CERTIFICATE ACCOUNT; CAP CONTRACT ACCOUNT

The Pooling and Servicing Agreement provides that the Servicer for the benefit of the certificateholders shall establish and maintain one or more

accounts, known collectively as the Collection Account, into which the Servicer
is generally required to deposit or cause to be deposited, promptly upon receipt
and in any event within two Business Days of receipt, the payments and
collections described in "Description of the Agreements -- Collection Account
and Related Accounts" in the prospectus, except that the Servicer may deduct its
Servicing Fee, and any expenses of liquidating defaulted Mortgage Loans or
property acquired in respect thereof. The Pooling and Servicing Agreement
permits the Servicer to direct any depository institution maintaining the
Collection Account to invest the funds in the related Collection Account in one
or more investments acceptable to Moody's and S&P as provided in the Pooling and
Servicing Agreement, that mature, unless payable on demand, no later than the
Servicer Remittance Date. The Servicer will be entitled to all income and gain
realized from the Collection Account investments, and the income and gain will
be subject to withdrawal by the Servicer from time to time. The Servicer will be
required to deposit the amount of any losses incurred in respect to the
Collection Account investments out of its own funds as the losses are realized.

        The Securities Administrator will be obligated to establish the
Certificate Account, into which the Servicer will deposit or cause to be
deposited not later than 3:00 p.m. New York City time on the Servicer Remittance
Date from amounts on deposit in the Collection Account, the Interest Funds and
the Principal Funds with respect to the related Distribution Date. Subject to
the restrictions set forth in the Pooling and Servicing Agreement, the
Securities Administrator is permitted to direct that the funds in the
Certificate Account be invested so long as the investments mature no later than
the Distribution Date. The Securities Administrator will be entitled to a
portion of interest or investment income earned on funds in the Certificate
Account. The Securities Administrator will be required to deposit in the
Certificate Account

                                    S-63

<PAGE>

out of its own funds the amount of any losses incurred in respect of any
Certificate Account investment, as the losses are realized.

        The Securities Administrator will be obligated to establish the Cap
Contract Account, into which the Securities Administrator shall promptly deposit
upon receipt any amounts paid pursuant to the Cap Contracts. The funds in the
Cap Contract Account shall not be invested.

DISTRIBUTIONS

General. Distributions on the certificates will be made by the Securities
Administrator, on each Distribution Date, commencing in January 2006, to the
persons in whose names the certificates are registered at the close of business
on the Record Date.

Distributions on each Distribution Date will be made by check mailed to
the address of the person entitled to distributions as it appears on the
certificate register or, in the case of any certificateholder that has so
notified the Securities Administrator in writing in accordance with the Pooling
and Servicing Agreement, by wire transfer in immediately available funds to the
account of such certificateholder at a bank or other depository institution
having appropriate wire transfer facilities; provided, however, that the final
distribution in retirement of the certificates will be made only upon
presentation and surrender of such certificates at the office of the Securities
Administrator or such other address designated in writing by the Securities
Administrator. On each Distribution Date, a holder of a certificate will receive
such holder's Percentage Interest of the amounts required to be distributed with
respect to the applicable class of certificates.

Distributions of Interest. On each Distribution Date, the interest
distributable with respect to the Offered Certificates is the interest which has
accrued thereon at the then applicable related Pass-Through Rate from and
including the preceding Distribution Date (or from the Closing Date in the case
of the first Distribution Date) to and including the day prior to the current
Distribution Date less Prepayment Interest Shortfalls, if any.

All calculations of interest on the Offered Certificates will be made on
the basis of a 360-day year and the actual number of days elapsed in the
applicable Accrual Period.

On each Distribution Date, the Interest Funds for such Distribution Date
are required to be distributed in the following order of priority, until such
Interest Funds have been fully distributed:

    1. to the Class P Certificates, an amount equal to any prepayment charges
        received with respect to the Mortgage Loans or paid by the Servicer or
        the Seller in respect of prepayment charges pursuant to the Pooling
        and Servicing Agreement during the related Prepayment Period;

    2. to each class of the Class A Certificates, the Current Interest and
        any Interest Carry Forward Amount with respect to each such class;
        provided, however, that if Interest Funds are insufficient to make
a

full distribution of the aggregate Current Interest and the aggregate
Interest Carry Forward Amount to the Class A Certificates, Interest Funds will be distributed pro rata among each class of the Class A Certificates based upon the ratio of (x) the Current Interest and Interest Carry Forward Amount for each class of the Class A Certificates to (y) the total amount of Current Interest and any Interest Carry Forward Amount for the Class A Certificates in the aggregate;

   3. to the Class M-1 Certificates, the Current Interest for such class and
any Interest Carry Forward Amount with respect to such class;

   4. to the Class M-2 Certificates, the Current Interest for such class and
any Interest Carry Forward Amount with respect to such class;

   5. to the Class M-3 Certificates, the Current Interest for such class and
any Interest Carry Forward Amount with respect to such class;

<PAGE>

   6. to the Class M-4 Certificates, the Current Interest for such class and
any Interest Carry Forward Amount with respect to such class;

   7. to the Class M-5 Certificates, the Current Interest for such class and
any Interest Carry Forward Amount with respect to such class;

   8. to the Class M-6 Certificates, the Current Interest for such class and
any Interest Carry Forward Amount with respect to such class;

   9. to the Class B-1 Certificates, the Current Interest for such class and
any Interest Carry Forward Amount with respect to such class;

  10. to the Class B-2 Certificates, the Current Interest for such class and
any Interest Carry Forward Amount with respect to such class;

  11. to the Class B-3 Certificates, the Current Interest for such class and
any Interest Carry Forward Amount with respect to such class; and

  12. any remainder to be distributed as described under
"-- Overcollateralization Provisions" below.

On each Distribution Date, subject to the proviso in (2) above, Interest
Funds received on the Group One Mortgage Loans will be deemed to be distributed
to the Class R and Class A-1 Certificates and Interest Funds received on the

Group Two Mortgage Loans will be deemed to be distributed to the Class A-2 Certificates, in each case, until the related Current Interest and Interest Carry Forward Amount of each such class of certificates for such Distribution Date has been paid in full, and thereafter, Interest Funds not required for such
distributions will be available to be applied, if necessary, to the class or classes of certificates that are not related to such group of Mortgage Loans.

Any payments received under the terms of the Class A-1 Cap Contract will
be available to pay the holders of the related classes of the Class A-1 and Class R Certificates amounts in respect of any Floating Rate Certificate Carryover, except Floating Rate Certificate Carryover resulting from the fact that the Pooling and Servicing Agreement does not provide for the reduction of
the Certificate Principal Balance of the Class A Certificates as a result of Realized Losses. Any payments received under the terms of the Class A-2 Cap Contract will be available to pay the holders of the related classes of the Class A-2 Certificates amounts in respect of any Floating Rate Certificate Carryover, except Floating Rate Certificate Carryover resulting from the fact that the Pooling and Servicing Agreement does not provide for the reduction of
the Certificate Principal Balance of the Class A Certificates as a result of Realized Losses. Any payments received under the terms of the Subordinated Certificate Cap Contract will be available to pay the holders of the related classes of the Subordinated Certificates amounts in respect of any Floating Rate
Certificate Carryover. Any amounts received under the terms of the Cap Contracts
on a Distribution Date that are not used to pay such Floating Rate Certificate
Carryover will be distributed to the holder of the Class C Certificates. Payments in respect of such Floating Rate Certificate Carryover shall be paid to
the Class A-1 and Class R Certificates, in respect of the Class A-1 Cap Contract, the Class A-2 Certificates in respect of the Class A-2 Cap Contract and the Subordinated Certificates, in respect of the Subordinated Certificate Cap Contract, in each case pro rata based upon such Floating Rate Certificate Carryover for such Certificates.

Distributions of Principal.  On each Distribution Date, the Principal Distribution Amount for such Distribution Date is required to be distributed in
the following order of priority until the Principal Distribution Amount has been
fully distributed:

        (1) to the Class A Certificates, the Class A Principal Distribution
            Amount will be distributed as follows:

          (a) the Group One Principal Distribution Amount will be distributed
as
              follows: first, to the Class R Certificate until its Certificate
              Principal Balance has been reduced to zero, and second, the
Class
              A-1 Certificates until the Certificate Principal Balance of such
              class has been reduced to zero; and

<PAGE>

        (b) the Group Two Principal Distribution Amount will be distributed
        sequentially to the Class A-2A, Class A-2B and Class A-2C
        Certificates until the Certificate Principal Balance of each such
        class has been reduced to zero; provided, however, that on and
        after the Distribution Date on which the aggregate Certificate
        Principal Balance of the Class M, Class B and Class C Certificates
        have been reduced to zero, any principal distributions allocated to
        the Class A-2A, Class A-2B and Class A-2C Certificates are required
        to be allocated pro rata among such classes of Certificates, based
        on their respective Certificate Principal Balances, until their
        Certificate Principal Balances have been reduced to zero;

     (2) to the Class M-1 Certificates, the Class M-1 Principal Distribution
        Amount;

     (3) to the Class M-2 Certificates, the Class M-2 Principal Distribution
Amount;

     (4) to the Class M-3 Certificates, the Class M-3 Principal Distribution
Amount;

     (5) to the Class M-4 Certificates; the Class M-4 Principal Distribution
Amount;

     (6) to the Class M-5 Certificates; the Class M-5 Principal Distribution
Amount;

     (7) to the Class M-6 Certificates; the Class M-6 Principal Distribution
        Amount;

     (8) to the Class B-1 Certificates, the Class B-1 Principal Distribution
        Amount;

     (9) to the Class B-2 Certificates, the Class B-2 Principal Distribution
        Amount;

    (10) to the Class B-3 Certificates, the Class B-3 Principal Distribution
        Amount; and

(11) any remainder to be distributed as described under
        "-- Overcollateralization Provisions" below.

OVERCOLLATERALIZATION PROVISIONS


        If on any Distribution Date, after giving effect to any Extra Principal
Distribution Amount, the aggregate Certificate Principal Balance of the Offered
Certificates exceeds the aggregate Stated Principal Balance of the Mortgage
Loans, the Certificate Principal Balance of the Subordinated Certificates will
be reduced, in inverse order of seniority (beginning with the Class B-3
Certificates) by an amount equal to such excess.


        If the Certificate Principal Balance of a class of Subordinated
Certificates is reduced, that class thereafter will be entitled to distributions
of interest and principal only with respect to its Certificate Principal Balance
as so reduced. On subsequent Distribution Dates, however, as described below,
Interest Funds and Principal Funds not otherwise required to be distributed with
respect to principal of and interest on the certificates will be applied to
reduce Unpaid Realized Loss Amounts previously allocated to such certificates in
order of seniority.


        On each Distribution Date, Interest Funds and Principal Funds not
otherwise required to be distributed with respect to principal of and interest
on the certificates as described above under "-- Distributions" will be required
to be distributed in respect of the following amounts, without duplication,
until fully distributed:

        (1) the Extra Principal Distribution Amount;

        (2) to the Class M-1 Certificates, any Unpaid Realized Loss Amount for
            such class;

        (3) to the Class M-2 Certificates, any Unpaid Realized Loss Amount for
            such class;

        (4) to the Class M-3 Certificates, any Unpaid Realized Loss Amount for
            such class;

        (5) to the Class M-4 Certificates, any Unpaid Realized Loss Amount for
            such class;

        (6) to the Class M-5 Certificates, any Unpaid Realized Loss Amount for
            such class;

        (7) to the Class M-6 Certificates, any Unpaid Realized Loss Amount for
            such class;

                                    S-66

<PAGE>

(8) to the Class B-1 Certificates, any Unpaid Realized Loss Amount for
            such class;

        (9) to the Class B-2 Certificates, any Unpaid Realized Loss Amount for
            such class;

        (10) to the Class B-3 Certificates, any Unpaid Realized Loss Amount
for
such class;

        (11) to the Offered Certificates, on a pro rata basis, the Floating
Rate
Certificate Carryover; and

        (12) to the Class C Certificates or the Residual Certificate, the
remaining amount.

        Any Floating Rate Certificate Carryover will be paid on future
Distribution Dates from and to the extent of funds available for that purpose
as
described in this prospectus supplement. The ratings on the Offered
Certificates
do not address the likelihood of the payment of any Floating Rate Certificate
Carryover.

SUBORDINATION OF THE PAYMENT OF THE SUBORDINATED CERTIFICATES

        The rights of the holders of the Subordinated Certificates to receive
payments with respect to the Mortgage Loans will be subordinated to the
rights
of the holders of the Class A Certificates and the rights of the holders of
each
class of Subordinated Certificates (other than the Class M-1 Certificates) to
receive such payments will be further subordinated to the rights of the class
or
classes of Subordinated Certificates with lower numerical class designations,
in
each case only to the extent described in this prospectus supplement. The
subordination of the Subordinated Certificates to the Class A Certificates
and
the further subordination among the Subordinated Certificates is intended to
provide the certificateholders having higher relative payment priority with
protection against Realized Losses.

CAP CONTRACTS

        On the Closing Date, the Securities Administrator, on behalf of the
Trust
Fund, will be directed to enter into three interest rate cap transactions
with
the Cap Contract Counterparty as evidenced by the Cap Contracts. The Cap
Contracts will be entered into in lieu of negotiating an ISDA Master
Agreement
and confirmation thereunder, and pursuant to the Cap Contracts, an ISDA
Master

Agreement will be deemed to have been executed by the Securities Administrator
and the Cap Contract Counterparty on the date that each Cap Contract was
executed. The Cap Contracts are subject to certain ISDA definitions. On or prior
to the Cap Contract Termination Date, amounts, if any, received by the
Securities Administrator on behalf of the Trustee for the benefit of the Trust
Fund in respect of the applicable Cap Contract will be used to pay Floating Rate
Certificate Carryover on the related classes of the Offered Certificates, except
Floating Rate Certificate Carryover resulting from the fact that the Pooling and
Servicing Agreement does not provide for the reduction of the Certificate
Principal Balance of the Class A Certificates as a result of Realized Losses.
Any amounts that are received on the Cap Contracts that are not used to pay such
Floating Rate Certificate Carryover on the Offered Certificates will be
distributed to the holder of the Class C Certificates.

     With respect to any Distribution Date on or prior to the related Cap
Contract Termination Date, the amount, if any, payable by the Cap Contract
Counterparty under the related Cap Contract will equal the product of (i) the
excess of (x) the minimum of the related Upper Collar as shown under the heading
"Upper Collar" in the related One-Month LIBOR Cap Table appearing below and
One-Month LIBOR (as determined by the Cap Contract Counterparty) over (y) the
rate with respect to such Distribution Date as shown under the heading "Lower
Collar" in the related One-Month LIBOR Cap Table appearing below, (ii) an amount
equal to the lesser of (x) the related Cap Contract Notional Balance for such
Distribution Date and (y) the Certificate Principal Balance of (A) in the case
of the Class A-1 Cap Contract, the Class A-1 Certificates, (B) in the case of
the Class A-2 Cap Contract, the Class A-2 Certificates or (C) in the case of the
Subordinated Certificate Cap Contract, the Subordinated Certificates and (iii)
the actual number of days in such Accrual Period, divided by 360.

<PAGE>

     The Class A-1 Cap Contract Notional Balances will be as shown in the
following table:

                    CLASS A-1 ONE-MONTH LIBOR CAP TABLE

<Table>
<Caption>

| PERIOD | BEGINNING ACCRUAL | ENDING ACCRUAL | NOTIONAL BALANCE($) | LOWER COLLAR (%) | UPPER COLLAR (%) |
| ------ | --------- | -------- | ----------- | ------------ | ------------ |
| <S> | <C> | <C> | <C> | <C> | <C> |
| 1... | 12/28/05 | 01/25/06 | 663,543,000 | 6.802 | 9.260 |
| 2... | 01/25/06 | 02/25/06 | 658,107,425 | 6.120 | 9.260 |

<Table>

| Period | Beginning Accrual | Ending Accrual | Notional Balance ($) | Lower Collar (%) | Upper Collar (%) |
|---|---|---|---|---|---|
| 3... | 02/25/06 | 03/25/06 | 650,830,022 | 6.802 | 9.260 |
| 4... | 03/25/06 | 04/25/06 | 641,715,845 | 6.120 | 9.260 |
| 5... | 04/25/06 | 05/25/06 | 630,766,744 | 6.333 | 9.260 |
| 6... | 05/25/06 | 06/25/06 | 618,009,572 | 6.121 | 9.260 |
| 7... | 06/25/06 | 07/25/06 | 603,469,708 | 6.333 | 9.260 |
| 8... | 07/25/06 | 08/25/06 | 587,198,436 | 6.121 | 9.260 |
| 9... | 08/25/06 | 09/25/06 | 569,245,461 | 6.121 | 9.260 |
| 10.. | 09/25/06 | 10/25/06 | 549,953,536 | 6.333 | 9.260 |
| 11.. | 10/25/06 | 11/25/06 | 529,386,173 | 6.124 | 9.260 |
| 12.. | 11/25/06 | 12/25/06 | 509,401,456 | 6.337 | 9.260 |
| 13.. | 12/25/06 | 01/25/07 | 489,982,490 | 6.125 | 9.260 |
| 14.. | 01/25/07 | 02/25/07 | 471,113,065 | 6.125 | 9.260 |
| 15.. | 02/25/07 | 03/25/07 | 452,777,437 | 6.808 | 9.260 |
| 16.. | 03/25/07 | 04/25/07 | 434,960,320 | 6.126 | 9.260 |
| 17.. | 04/25/07 | 05/25/07 | 417,646,867 | 6.340 | 9.260 |
| 18.. | 05/25/07 | 06/25/07 | 400,822,724 | 6.128 | 9.260 |
| 19.. | 06/25/07 | 07/25/07 | 384,473,826 | 6.341 | 9.260 |
| 20.. | 07/25/07 | 08/25/07 | 368,584,330 | 6.129 | 9.260 |
| 21.. | 08/25/07 | 09/25/07 | 353,143,470 | 6.129 | 9.260 |
| 22.. | 09/25/07 | 10/25/07 | 326,365,353 | 6.343 | 9.260 |
| 23.. | 10/25/07 | 11/25/07 | 301,025,275 | 7.850 | 9.260 |
| 24.. | 11/25/07 | 12/25/07 | 277,093,330 | 8.108 | 9.260 |
| 25.. | 12/25/07 | 01/25/08 | 254,440,275 | 7.827 | 9.260 |
| 26.. | 01/25/08 | 02/25/08 | 232,994,092 | 7.815 | 9.260 |
| 27.. | 02/25/08 | 03/25/08 | 219,533,744 | 8.364 | 9.260 |
| 28.. | 03/25/08 | 04/25/08 | 206,521,428 | 7.804 | 9.260 |
| 29.. | 04/25/08 | 05/25/08 | 193,941,839 | 8.639 | 9.260 |
| 30.. | 05/25/08 | 06/25/08 | 181,789,535 | 8.345 | 9.260 |
| 31.. | 06/25/08 | 07/25/08 | 170,040,305 | 8.623 | 9.260 |
| 32.. | 07/25/08 | 08/25/08 | 158,680,413 | 8.330 | 9.260 |
| 33.. | 08/25/08 | 09/25/08 | 147,696,596 | 8.322 | 9.260 |
| 34.. | 09/25/08 | 10/25/08 | 137,076,053 | 8.599 | 9.260 |

</Table>

With respect to any Distribution Date, if One-Month LIBOR (as determined
by the Cap Contract Counterparty and subject to a cap equal to 9.260%) exceeds
the Lower Collar, the Trust Fund will receive payments pursuant to the Class A-1
Cap Contract.

<PAGE>

The Class A-2 Cap Contract Notional Balances will be as shown in the following table:

CLASS A-2 ONE-MONTH LIBOR CAP TABLE

<Table>
<Caption>

| PERIOD | BEGINNING ACCRUAL | ENDING ACCRUAL | NOTIONAL BALANCE($) | LOWER COLLAR (%) | UPPER COLLAR (%) |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| 1... | 12/28/05 | 01/25/06 | 868,297,000 | 6.379 | 9.920 |

```
2...      01/25/06    02/25/06    861,353,365    5.740          9.920
3...      02/25/06    03/25/06    851,933,522    6.379          9.920
4...      03/25/06    04/25/06    840,042,697    5.740          9.920
5...      04/25/06    05/25/06    825,680,322    5.943          9.920
6...      05/25/06    06/25/06    808,881,629    5.744          9.920
7...      06/25/06    07/25/06    789,678,284    5.943          9.920
8...      07/25/06    08/25/06    768,139,114    5.744          9.920
9...      08/25/06    09/25/06    744,330,445    5.744          9.920
10..      09/25/06    10/25/06    718,468,468    5.943          9.920
11..      10/25/06    11/25/06    690,647,280    5.751          9.920
12..      11/25/06    12/25/06    663,633,800    5.950          9.920
13..      12/25/06    01/25/07    637,404,069    5.751          9.920
14..      01/25/07    02/25/07    611,935,263    5.751          9.920
15..      02/25/07    03/25/07    587,205,221    6.391          9.920
16..      03/25/07    04/25/07    563,192,429    5.751          9.920
17..      04/25/07    05/25/07    539,876,004    5.955          9.920
18..      05/25/07    06/25/07    517,235,808    5.756          9.920
19..      06/25/07    07/25/07    495,252,011    5.956          9.920
20..      07/25/07    08/25/07    473,905,506    5.757          9.920
21..      08/25/07    09/25/07    453,177,740    5.757          9.920
22..      09/25/07    10/25/07    415,477,167    5.957          9.920
23..      10/25/07    11/25/07    379,866,518    7.865          9.920
24..      11/25/07    12/25/07    346,257,409    8.129          9.920
25..      12/25/07    01/25/08    314,507,708    7.855          9.920
26..      01/25/08    02/25/08    284,513,468    7.849          9.920
27..      02/25/08    03/25/08    266,403,785    8.404          9.920
28..      03/25/08    04/25/08    248,921,816    7.845          9.920
29..      04/25/08    05/25/08    232,045,618    8.832          9.920
30..      05/25/08    06/25/08    215,759,425    8.536          9.920
31..      06/25/08    07/25/08    200,037,047    8.825          9.920
32..      07/25/08    08/25/08    184,858,790    8.530          9.920
33..      08/25/08    09/25/08    170,205,654    8.526          9.920
34..      09/25/08    10/25/08    156,059,303    8.814          9.920
35..      10/25/08    11/25/08    142,402,047    9.686          9.920
36..      11/25/08    12/25/08    129,226,982    9.920          9.920
37..      12/25/08    01/25/09    116,506,784    9.676          9.920
38..      01/25/09    02/25/09    116,506,784    9.670          9.920
39..      02/25/09    03/25/09    116,506,784    9.920          9.920
40..      03/25/09    04/25/09    116,506,784    9.659          9.920
</Table>
```

     With respect to any Distribution Date, if One-Month LIBOR (as
determined
by the Cap Contract Counterparty and subject to a cap equal to 9.920%)
exceeds
the Lower Collar, the Trust Fund will receive payments pursuant to the Class
A-2
Cap Contract.

<PAGE>

     The Subordinated Certificate Cap Contract Notional Balances will be as
shown in the following table:

          SUBORDINATED CERTIFICATE ONE-MONTH LIBOR CAP TABLE

<Table>
<Caption>

| PERIOD | BEGINNING ACCRUAL | ENDING ACCRUAL | NOTIONAL BALANCE($) | LOWER COLLAR (%) | UPPER COLLAR (%) |
|--------|-------------------|----------------|---------------------|------------------|------------------|
| <S> | <C> | <C> | <C> | <C> | <C> |
| 1... | 12/28/05 | 01/25/06 | 342,917,000 | 6.021 | 8.730 |
| 2... | 01/25/06 | 02/25/06 | 342,917,000 | 5.364 | 8.730 |
| 3... | 02/25/06 | 03/25/06 | 342,917,000 | 6.021 | 8.730 |
| 4... | 03/25/06 | 04/25/06 | 342,917,000 | 5.364 | 8.730 |
| 5... | 04/25/06 | 05/25/06 | 342,917,000 | 5.570 | 8.730 |
| 6... | 05/25/06 | 06/25/06 | 342,917,000 | 5.366 | 8.730 |
| 7... | 06/25/06 | 07/25/06 | 342,917,000 | 5.570 | 8.730 |
| 8... | 07/25/06 | 08/25/06 | 342,917,000 | 5.366 | 8.730 |
| 9... | 08/25/06 | 09/25/06 | 342,917,000 | 5.366 | 8.730 |
| 10.. | 09/25/06 | 10/25/06 | 342,917,000 | 5.571 | 8.730 |
| 11.. | 10/25/06 | 11/25/06 | 342,917,000 | 5.371 | 8.730 |
| 12.. | 11/25/06 | 12/25/06 | 342,917,000 | 5.576 | 8.730 |
| 13.. | 12/25/06 | 01/25/07 | 342,917,000 | 5.372 | 8.730 |
| 14.. | 01/25/07 | 02/25/07 | 342,917,000 | 5.372 | 8.730 |
| 15.. | 02/25/07 | 03/25/07 | 342,917,000 | 6.030 | 8.730 |
| 16.. | 03/25/07 | 04/25/07 | 342,917,000 | 5.372 | 8.730 |
| 17.. | 04/25/07 | 05/25/07 | 342,917,000 | 5.581 | 8.730 |
| 18.. | 05/25/07 | 06/25/07 | 342,917,000 | 5.376 | 8.730 |
| 19.. | 06/25/07 | 07/25/07 | 342,917,000 | 5.581 | 8.730 |
| 20.. | 07/25/07 | 08/25/07 | 342,917,000 | 5.377 | 8.730 |
| 21.. | 08/25/07 | 09/25/07 | 342,917,000 | 5.377 | 8.730 |
| 22.. | 09/25/07 | 10/25/07 | 342,917,000 | 5.583 | 8.730 |
| 23.. | 10/25/07 | 11/25/07 | 342,917,000 | 7.317 | 8.730 |
| 24.. | 11/25/07 | 12/25/07 | 342,917,000 | 7.579 | 8.730 |
| 25.. | 12/25/07 | 01/25/08 | 342,917,000 | 7.301 | 8.730 |
| 26.. | 01/25/08 | 02/25/08 | 342,917,000 | 7.293 | 8.730 |
| 27.. | 02/25/08 | 03/25/08 | 342,917,000 | 7.845 | 8.730 |
| 28.. | 03/25/08 | 04/25/08 | 342,917,000 | 7.286 | 8.730 |
| 29.. | 04/25/08 | 05/25/08 | 342,917,000 | 8.207 | 8.730 |
| 30.. | 05/25/08 | 06/25/08 | 342,917,000 | 7.912 | 8.730 |
| 31.. | 06/25/08 | 07/25/08 | 342,917,000 | 8.196 | 8.730 |
| 32.. | 07/25/08 | 08/25/08 | 342,917,000 | 7.902 | 8.730 |
| 33.. | 08/25/08 | 09/25/08 | 342,917,000 | 7.896 | 8.730 |
| 34.. | 09/25/08 | 10/25/08 | 342,917,000 | 8.180 | 8.730 |

</Table>

With respect to any Distribution Date, if One-Month LIBOR (as determined
by the Cap Contract Counterparty and subject to a cap equal to 8.730%) exceeds
the Lower Collar, the Trust Fund will receive payments pursuant to the
Subordinated Certificates Cap Contract.

Each Cap Contract is scheduled to remain in effect until the applicable
Cap Contract Termination Date and will be subject to early termination only in
limited circumstances. Such circumstances include certain insolvency or
bankruptcy events in relation to the Cap Contract Counterparty or the Trust
Fund, the failure by the Cap Contract Counterparty (after a grace period of
three Local Business Days, as defined in the related Cap Contract, after
notice

of such failure is received by the Cap Contract Counterparty) to make a payment
due under the related Cap Contract, the failure by the Cap Contract Counterparty
or the Securities Administrator (after a cure period of 20 days after notice of
such failure is received) to perform any other agreement made by it under the
related Cap Contract, the termination of the Trust Fund and the related Cap
Contract becoming illegal or subject to certain kinds of taxation.

<PAGE>

        The Offered Certificates do not represent an obligation of the Cap
Contract Counterparty. Holders of the Offered Certificates will not have any
right to proceed directly against the Cap Contract Counterparty in respect of
its obligations under any Cap Contract.

CALCULATION OF ONE-MONTH LIBOR

        On each Interest Determination Date, the Securities Administrator will
determine One-Month LIBOR for the related Accrual Period on the basis of (1) the
offered rates for one-month United States dollar deposits, as such rates appear
on Telerate Page 3750, as of 11:00 a.m. (London time) on such Interest
Determination Date or (2) if such rate does not appear on Telerate Page 3750 as
of 11:00 a.m. (London time), the Securities Administrator will determine such
rate on the basis of the offered rates of the Reference Banks for one-month
United States dollar deposits, as such rates appear on the Reuters Screen LIBO
Page, as of 11:00 a.m. (London time) on such Interest Determination Date.

        If One-Month LIBOR is determined under clause (2) above, on each Interest
Determination Date, One-Month LIBOR for the related Accrual Period for the
Offered Certificates will be established by the Securities Administrator as
follows:

        (1) If on such Interest Determination Date two or more Reference Banks
provide such offered quotations, One-Month LIBOR for the related Accrual Period
for the Offered Certificates shall be the arithmetic mean of such offered
quotations (rounded upwards if necessary to the nearest whole multiple of
0.03125%).

        (2) If on such Interest Determination Date fewer than two Reference Banks
provide such offered quotations, One-Month LIBOR for the related Accrual Period
shall be the higher of (x) One-Month LIBOR as determined on the previous
Interest Determination Date and (y) the Reserve Interest Rate.

        The establishment of One-Month LIBOR on each Interest Determination Date
by the Securities Administrator and the Securities Administrator's calculation

of the rate of interest applicable to the Offered Certificates, for the related
Accrual Period for the Offered Certificates shall (in the absence of manifest error) be final and binding.

REPORTS TO CERTIFICATEHOLDERS

On each Distribution Date, the Securities Administrator will make available on its website located at www.etrustee.net to each certificateholder,
the Master Servicer, the Servicer, the Special Servicer, the Depositor, the Trustee and any other interested party a statement, based solely on information
provided by the Servicer, generally setting forth among other information:

(1) the amount of the related distribution to holders of each class of certificates allocable to principal, separately identifying (A) the
aggregate amount of any principal prepayments included therein, (B)
the aggregate amount of all scheduled payments of principal included
therein and (C) any Extra Principal Distribution Amount, in the aggregate and with respect to the Group One Mortgage Loans and Group
Two Mortgage Loans;

(2) the amount of such distribution to holders of each class of certificates allocable to interest;

(3) the Interest Carry Forward Amount for each class of certificates;

(4) the Certificate Principal Balance of each class of certificates after
giving effect to the distribution of principal on such Distribution
Date;

(5) the aggregate outstanding principal balance of each class of certificates for the following Distribution Date;

(6) the amount of the Servicing Fee paid to or retained by the Servicer
and any amounts constituting reimbursement or indemnification of the
Master Servicer, the Servicer, the Securities Administrator or the Trustee;

S-71

<PAGE>

(7) the Pass-Through Rate for each class of certificates for such Distribution Date;

(8) the amount of Advances included in the distribution on such Distribution Date;

(9)  the cumulative amount of (A) Realized Losses and (B) Applied
Realized
             Loss Amounts to date;

        (10) the amount of (A) Realized Losses and (B) Applied Realized Loss
             Amounts with respect to such Distribution Date;

        (11) the number and aggregate principal amounts of Mortgage Loans (A)
             delinquent (exclusive of Mortgage Loans in foreclosure) (1) 31 to
60
             days, (2) 61 to 90 days and (3) 91 or more days, and (B) in
             foreclosure and delinquent (1) 31 to 60 days, (2) 61 to 90 days
and
             (3) 91 or more days, in each case as of the close of business on
the
             last day of the calendar month preceding such Distribution Date,
in
             the aggregate and with respect to the Group One Mortgage Loans and
             Group Two Mortgage Loans;

        (12) with respect to any Mortgage Loan that became an REO Property
during
             the preceding calendar month, the loan number and Stated Principal
             Balance of such Mortgage Loan as of the close of business on the
             Determination Date and the date of acquisition thereof, in the
             aggregate;

        (13) whether a Stepdown Trigger Event has occurred and is in effect;

        (14) the total number and principal balance of any REO Properties as of
             the close of business on the related Determination Date, in the
             aggregate;

        (15) any Floating Rate Certificate Carryover paid and all Floating Rate
             Certificate Carryover remaining on each class of the Offered
             Certificates on such Distribution Date;

        (16) the number and amount of prepayment charges and the amount of late
             payment fees received during the related Prepayment Period in the
             aggregate;

        (17) as of each Distribution Date, the amount, if any, received
pursuant
             to each Cap Contract and the amount thereof to be paid to each
class
             of certificates;

        (18) the number of Mortgage Loans with respect to which (i) a reduction
in
             the Mortgage Rate has occurred or (ii) the related borrower's
             obligation to repay interest on a monthly basis has been suspended
or
             reduced pursuant to the Servicemembers Civil Relief Act or the
             California Military and Veterans Code, as amended; and the amount
of
             interest not required to be paid with respect to any such Mortgage

Loans during the related Due Period as a result of such reductions in

the aggregate and with respect to the Group One Mortgage Loans and Group Two Mortgage Loans; and

(19) the amounts distributed as interest in respect of the portion of each

class of certificates that represents a regular or residual interest

in a REMIC and the amount of distributions on each class of certificates not treated as distributions on a regular or residual interest in a REMIC.

Assistance in using the Securities Administrator's website can be obtained by calling the Securities Administrator's customer service desk at (800) 246-5761. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Securities Administrator shall have the right to change the way statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Securities Administrator shall provide timely and adequate notification to all above parties regarding any such changes.

In addition, within a reasonable period of time after the end of each calendar year, the Securities Administrator will prepare and deliver to each certificateholder of record during the previous calendar year and the NIMS Insurer, upon its written request, a statement containing information necessary to enable

<PAGE>

certificateholders to prepare their tax returns. Such statements will not have been examined and reported upon by an independent public accountant.

ADDITIONAL RIGHTS OF THE CLASS R CERTIFICATEHOLDER

The Class R Certificate will remain outstanding for so long as the Trust Fund shall exist, whether or not such Class R Certificate is receiving current distributions of principal or interest. In addition to distributions of principal and interest distributable as described under "-- Distributions," the holder of the Class R Certificate will be entitled to receive (i) the amounts, if any, remaining in each REMIC on any Distribution Date after distributions of principal and interest on the regular interests and Class R Certificate on such date and (ii) the proceeds of the assets of the Trust Fund, if any, remaining in

each REMIC after distributions in respect of any accrued and unpaid interest on
such regular interests and Class R Certificate, and after distributions in respect of principal have reduced the principal amounts of the regular interests
and Class R Certificate to zero. After the Certificate Principal Balance of the
Class R Certificate is reduced to zero, it is not anticipated that any material
distributions will be made with respect to the Class R Certificate at any time.
See "Material Federal Income Tax Consequences--REMICs--Taxation of Owners of REMIC Residual Certificates" in the prospectus.

RESTRICTIONS ON TRANSFER OF THE CLASS R CERTIFICATE

        The Class R Certificate will be subject to the following restrictions on
transfer, and the Class R Certificate will contain a legend describing such restrictions.

        The REMIC provisions of the Code impose certain taxes on (i) transferors
of residual interests to, or agents that acquire residual interests on behalf
of, disqualified organizations (as defined in the prospectus) and (ii) certain
pass-through entities (as defined in the prospectus) that have disqualified
organizations as beneficial owners. No tax will be imposed on a pass-through
entity (other than an "electing large partnership" as defined in the Code) with
respect to the Class R Certificate to the extent it has received an affidavit
from the owner thereof that such owner is not a disqualified organization or a
nominee for a disqualified organization. The Pooling and Servicing Agreement
will provide that no legal or beneficial interest in the Class R Certificate may
be transferred to or registered in the name of any person unless (i) the
proposed purchaser provides to the Securities Administrator an affidavit to the
effect that, among other items, such transferee is not a disqualified
organization and is not purchasing the Class R Certificate as an agent for a
disqualified organization (i.e., as a broker, nominee, or other middleman
thereof) and (ii) the transferor states in writing to the Securities
Administrator that it has no actual knowledge that such affidavit or letter is
false. Further, such affidavit or letter requires the transferee to affirm that
it (i) historically has paid its debts as they have come due and intends to do
so in the future, (ii) understands that it may incur tax liabilities with
respect to the Class R Certificate in excess of cashflows generated thereby,
(iii) intends to pay taxes associated with holding the Class R Certificate as
such taxes become due, (iv) will not transfer the Class R Certificate to any
person or entity that does not provide a similar affidavit or letter and (v)
will not cause income from the Class R Certificate to be attributable to a
foreign permanent establishment or fixed base (within the meaning of an
applicable income tax treaty) of the transferee or another U.S. taxpayer.

In addition, the Class R Certificate may not be purchased by or transferred to any person that is not a U.S. Person (as defined in the prospectus), unless such person holds such Class R Certificate in connection with the conduct of a trade or business within the United States and furnishes
the transferor and the Securities Administrator with an effective IRS Form W-8ECI (or any successor thereto).

The Pooling and Servicing Agreement will provide that any attempted or purported transfer in violation of these transfer restrictions will be null and
void and will vest no rights in any purported transferee. Any transferor or agent to whom the Securities Administrator provides information as to any applicable tax imposed on such transferor or agent may be required to bear the
cost of computing or providing such information.

<center>S-73</center>

<PAGE>

The Class R Certificate may not be acquired by or transferred to a Plan or
a person acting for, on behalf of or with any assets of any such Plan. See "ERISA Considerations" in this prospectus supplement and in the prospectus.

<center>THE POOLING AND SERVICING AGREEMENT</center>

GENERAL

The certificates will be issued pursuant to the Pooling and Servicing Agreement among the Depositor, the Master Servicer, the Securities Administrator, the Trustee, the Special Servicer and the Servicer. The NIMS Insurer, if any, will be a third party beneficiary of the Pooling and Servicing
Agreement. In addition, the NIMS Insurer will have various rights under the Pooling and Servicing Agreement. The Offered Certificates in certificated form
will be transferable and exchangeable at the office of the Securities Administrator, which will serve as certificate registrar and paying agent. The
Securities Administrator will provide to a prospective or actual certificateholder, upon written request, a copy (without exhibits) of the Pooling and Servicing Agreement. Requests should be addressed to LaSalle Bank National Association, 135 South LaSalle Street, Suite 1625, Chicago, Illinois 60603, Attention: Global Securities and Trust Services Group/FFMLT 2005-FF12.

ASSIGNMENT OF MORTGAGE LOANS

The Mortgage Loans will be assigned to the Trustee, together with all principal and interest received with respect to the Mortgage Loans on and after
the Cut-off Date, other than scheduled payments due on or before that date. The
Securities Administrator, as authenticating agent, will, concurrently with such
assignment, authenticate and deliver the Offered Certificates. Each Mortgage

Loan will be identified in a schedule appearing as an exhibit to the Pooling and
Servicing Agreement which will specify with respect to each Mortgage Loan, among
other things, the original principal balance and the Stated Principal Balance as
of the close of business on the Cut-off Date, the Mortgage Rate, the scheduled
payment and the maturity date of such Mortgage Loan.

As to each Mortgage Loan, the following documents are generally required
to be delivered to the Trustee (or the custodian on its behalf) in accordance
with the Pooling and Servicing Agreement: (1) the related original Mortgage
Note, with any riders thereto, endorsed without recourse to the Trustee or in
blank, (2) the original Mortgage, with any riders thereto, with evidence of
recording indicated (or, if the original recorded Mortgage has not yet been
returned by the recording office, a copy thereof certified to be a true and
complete copy of such Mortgage sent for recording), (3) an original assignment
of the Mortgage to the Trustee or in blank in recordable form (except as
described below), (4) the policies of title insurance issued with respect to
each Mortgage Loan and (5) the originals of any assumption, modification,
extension or guaranty agreements. It is expected that the Mortgages or
assignments of Mortgage with respect to many of the Mortgage Loans will have
been recorded in the name of an agent on behalf of the holder of the related
Mortgage Note. In those cases, no Mortgage assignment in favor of the Trustee
will be required to be prepared, delivered or recorded. Instead, the Servicer
will be required to take all actions as are necessary to cause the Trustee to be
shown as the owner of the related Mortgage Loan on the records of the agent for
purposes of the system of recording transfers of beneficial ownership of
mortgages maintained by the agent. With the exception of assignments relating to
mortgaged properties in certain states, the Depositor does not expect to cause
the assignments to be recorded.

Pursuant to the terms of various sale agreements, the Originator has made
or assigned to the Seller, as of the date of (or as provided in) such agreement,
certain representations and warranties concerning the related Mortgage Loans
that generally include representations and warranties similar to those
summarized in the prospectus under the heading "Description of the
Agreements--Representations and Warranties; Repurchases." These representations
and warranties will be brought forward by each Originator to the Closing Date,
subject to certain exceptions. On the Closing Date, the Seller's rights under
the various sale agreements will be assigned by the Seller to the Depositor and,
in turn, by the Depositor to the Trustee for the benefit of holders of the
Certificates. Within the period of time specified in the various sale agreements

<PAGE>

following its discovery of a breach of any representation or warranty that materially or adversely affects the interests of holders of certificates in a Mortgage Loan, or receipt of notice of such breach, the Originator will be obligated to cure such breach or purchase the affected Mortgage Loan from the Trust Fund for a price equal to the unpaid principal balance thereof plus any costs and damages incurred by the Trust Fund in connection with any violation by
the affected Mortgage Loan of any anti-predatory or anti-abusive lending laws (or, in certain circumstances, to substitute another Mortgage Loan).

Pursuant to the terms of a mortgage loan sale and assignment agreement whereby the Mortgage Loans will be purchased by the Depositor, the Seller will
make to the Depositor (and the Depositor will assign to the Trustee for the benefit of holders of the Certificates) only certain limited representations and
warranties as of the Closing Date intended to address the accuracy of the Mortgage Loan Schedule and the payment and delinquency status of each Mortgage
Loan. In the event of a breach of any such representation or warranty that does
not constitute a breach of any representation or warranty made by an Originator
as described above, the Seller will be obligated to cure such breach or purchase
the affected Mortgage Loans, as described above.

To the extent that any Mortgage Loan as to which a representation or warranty has been breached is not purchased by the Originator or the Seller and
a Realized Loss occurs with respect to that Mortgage Loan, holders of the Offered Certificates may incur a loss.

AMENDMENT

The Pooling and Servicing Agreement may be amended by the Depositor, the
Master Servicer, the Securities Administrator, the Servicer, the Special Servicer and the Trustee with the consent of the NIMS Insurer, without the consent of certificateholders, for any of the purposes set forth under "Description of the Agreements--Amendment" in the prospectus. In addition, the
Pooling and Servicing Agreement may be amended by the Depositor, the Master Servicer, the Servicer, the Securities Administrator, the Special Servicer and
the Trustee and the holders of a 66 2/3% Percentage Interest of each class of certificates affected thereby with the consent of the NIMS Insurer, if any, for
the purpose of adding any provisions to or changing in any manner or eliminating
any of the provisions of the Pooling and Servicing Agreement or of modifying in
any manner the rights of the certificateholders; provided, however, that no such
amendment may

(1) reduce in any manner the amount of, or delay the timing of, payments
        required to be distributed on any certificate without the consent of
        the holder of such certificate;

(2) adversely affect in any material respect the interests of the holders
        of any class of certificates in a manner other than as described in
        clause (1) above, without the consent of the holders of certificates
        of such class evidencing, as to such class, Percentage Interests
        aggregating 66 2/3%; or

(3) reduce the aforesaid percentage of aggregate outstanding principal
        amounts of certificates of each class, the holders of which are
        required to consent to any such amendment, without the consent of the
        holders of all certificates of such class.

OPTIONAL TERMINATION

        Immediately after the Auction Termination Date, the Trustee will be
directed, pursuant to the Pooling and Servicing Agreement, to attempt to
terminate the Trust Fund through a one-time auction process, using procedures
that are mutually acceptable to the Securities Administrator and the Depositor,
and thereby effect the retirement of all of the certificates. Pursuant to such
procedures, the Securities Administrator will attempt to auction the remaining
Trust Fund assets via a solicitation of bids from at least three bidders. Any
such termination will occur only if the highest bid received is at least equal
to the sum of (i) the aggregate outstanding principal balance of the Mortgage
Loans (or if such Mortgage Loan is an REO Property, the fair market value of
such REO Property), plus accrued interest thereon through the Due Date preceding
distribution of the proceeds, (ii) any unreimbursed out-of-pocket amounts owed
to the Trustee, the Securities Administrator, the Master Servicer, the Special
Servicer or the Servicer,

S-75

<PAGE>

whether incurred or otherwise, and all unreimbursed Advances and servicing
advances, (iii) any unreimbursed costs, penalties and/or damages incurred by the
Trust Fund in connection with any violation relating to any of the Mortgage
Loans of any predatory or abusive lending law and (iv) all reasonable fees and
expenses incurred by the Securities Administrator in connection with such
auction. Net proceeds (after reimbursement of amounts due to the Servicer, the
Trustee, the Special Servicer and the Securities Administrator) from the

purchase will be distributed to the certificateholders as provided in the
Pooling and Servicing Agreement. Any such optional termination of the Trust
Fund
will result in an early retirement of the certificates. If a sufficient
purchase
price is not achieved at such auction, the NIMS Insurer may, on any
subsequent
Distribution Date, purchase all of the Mortgage Loans, at a price described
in
the Pooling and Servicing Agreement, which would result in the termination of
the Trust Fund. If the Trust Fund is not terminated as a result of an auction
and the NIMS Insurer fails to exercise its option to purchase all of the
Mortgage Loans, the Servicer may purchase all of the Mortgage Loans, which
would
similarly result in the termination of the Trust Fund.

EVENTS OF DEFAULT

        Events of default will consist of:

        (1) any failure by the Servicer to deposit in the Collection Account or
            the Certificate Account the required amounts or remit to the
            Securities Administrator any payment (including an Advance required
to
            be made under the terms of the Pooling and Servicing Agreement)
which
            continues unremedied for the number of days set forth in the
Pooling
            and Servicing Agreement after written notice of the failure shall
have
            been given to the Servicer, the Securities Administrator, the
Trustee
            and the Depositor by the Securities Administrator or the Depositor,
or
            to the Servicer, the Depositor, the Securities Administrator and
the
            Trustee by the NIMS Insurer or the holders of certificates
evidencing
            greater than 50% of the voting rights evidenced by the
certificates;

        (2) any failure by the Servicer to observe or perform in any material
            respect any other of its covenants or agreements, or any breach of
a
            representation or warranty made by the Servicer in the Pooling and
            Servicing Agreement, which continues unremedied for the number of
days
            set forth in the Pooling and Servicing Agreement after the giving
of
            written notice of the failure to the Servicer, the Securities
            Administrator, the Trustee or the Depositor by the Securities
            Administrator, the Trustee or the Depositor, or to the Servicer,
the
            Depositor, the Securities Administrator and the Trustee by the NIMS
            Insurer or the holders of certificates evidencing greater than 50%
of
            the voting rights evidenced by the certificates; and

(3) insolvency, readjustment of debt, marshaling of assets and liabilities
            or similar proceedings, and certain actions by or on behalf of the
            Servicer indicating its insolvency or inability to pay its
            obligations.

As of any date of determination, (1) holders of the Offered Certificates will be
allocated 98% of all voting rights, allocated among the Offered Certificates in
proportion to their respective outstanding Certificate Principal Balances and
(2) holders of the Class C and Class P Certificates will be allocated all of the
remaining voting rights. Voting rights will be allocated among the certificates
of each class in accordance with their respective Percentage Interests.


RIGHTS UPON EVENT OF DEFAULT

        So long as an event of default under the Pooling and Servicing Agreement
remains unremedied, the Master Servicer may (with the consent of the NIMS
Insurer, if any), or upon the receipt of instructions from the NIMS Insurer or
the holders of certificates having greater than 50% of the voting rights
evidenced by the certificates (with the consent of the NIMS Insurer, if any)
shall, terminate all of the rights and obligations of the Servicer under the
Pooling and Servicing Agreement and in and to the Mortgage Loans, whereupon the
Master Servicer will, within the time period specified in the Pooling and
Servicing Agreement, succeed, or appoint a successor servicer, to all of the
responsibilities and duties of
                                    S-76
<PAGE>

the Servicer under the Pooling and Servicing Agreement, including the obligation
to make Advances. No assurance can be given that termination of the rights and
obligations of the Servicer under the Pooling and Servicing Agreement would not
adversely affect the servicing of the Mortgage Loans serviced by the Servicer,
including the delinquency experience of such Mortgage Loans.

        No certificateholder, solely by virtue of the holder's status as a
certificateholder, will have any right under the Pooling and Servicing Agreement
to institute any proceeding regarding an event of default, unless the holder
previously has given to the Trustee written notice of the continuation of an
event of default and unless the holders of certificates having not less than 25%
of the voting rights evidenced by the certificates have made written request to
the Trustee to institute such proceeding in its own name as trustee thereunder

and have offered to the Trustee reasonable indemnity and the Trustee for 60 days
has neglected or refused to institute any such proceeding.

THE TRUSTEE

     The Trustee will be the trustee under the Pooling and Servicing Agreement
and will be paid a fee in consideration of its services by the Securities
Administrator. The Trustee will be entitled to reimbursement for certain
expenses prior to distributions of any amounts to certificateholders. The office
of the Trustee is located at 388 Greenwich Street, 14th Floor, New York, New
York 10013, Attention: Agency & Trust, or at such other addresses as the Trustee
may designate from time to time.

THE SECURITIES ADMINISTRATOR

     The Securities Administrator will be the securities administrator under
the Pooling and Servicing Agreement. The Securities Administrator will be
entitled to reimbursement for certain expenses prior to distributions of any
amounts to certificateholders. The office of the Securities Administrator is
located at 135 South LaSalle Street, Suite 1625, Chicago, Illinois 60603,
Attention: Global Securities and Trust Services, Ref: First Franklin Mortgage
Loan Trust, Series 2005-FF12, or at such other addresses as the Securities
Administrator may designate from time to time.

     The Securities Administrator will:

     (1) provide administrative services and file reports with regard to the
         certificates;

     (2) provide reports to the certificateholders regarding the Mortgage Loans
         and the certificates; and

     (3) receive payments with respect to the Mortgage Loans from the Servicer
         and, in its capacity as paying agent for the certificates, remit the
         payments to the certificateholders as described herein.

     The Securities Administrator will pay certain administrative expenses of
the trust from amounts on deposit in the Certificate Account. The Securities
Administrator will pay the fees of the Trustee and the Master Servicer pursuant
to a separate agreement. The Securities Administrator will be entitled to a
portion of interest or investment income earned on funds in the Certificate
Account.

<center>YIELD, PREPAYMENT AND MATURITY CONSIDERATIONS</center>

GENERAL

     The weighted average life of and the yield to maturity on each class of

Offered Certificates will be directly related to the rate of payment of
principal (including prepayments) of the Mortgage Loans. The actual rate of
principal prepayments on pools of mortgage loans is influenced by a variety
of
economic, tax, geographic, demographic, social, legal and other factors and
has
fluctuated considerably in recent years. In addition, the rate of principal
prepayments may differ among pools of mortgage loans at any time because of
specific factors relating to the mortgage loans in a particular pool,
including,
among other things, the age of the mortgage loans, the geographic locations
of
the properties securing the mortgage loans, the extent of the mortgagors'
equity
in the related properties, and changes in the mortgagors' housing needs,

<PAGE>

job transfers and employment status, as well as whether the related mortgage
loans are subject to prepayment charges. Any such refinancings will affect
the
rate of principal prepayments on the mortgage pool.

        The timing of changes in the rate of prepayments may significantly
affect
the actual yield to investors who purchase the Offered Certificates at prices
other than par, even if the average rate of principal prepayments is
consistent
with the expectations of investors. In general, the earlier the payment of
principal of the Mortgage Loans the greater the effect on an investor's yield
to
maturity. As a result, the effect on an investor's yield of principal
prepayments occurring at a rate higher (or lower) than the rate anticipated
by
the investor during the period immediately following the issuance of the
Offered
Certificates may not be offset by a subsequent like reduction (or increase)
in
the rate of principal prepayments. Investors must make their own decisions as
to
the appropriate prepayment assumptions to be used in deciding whether to
purchase any of the Offered Certificates. The Depositor does not make any
representations or warranties as to the rate of prepayment or the factors to
be
considered in connection with such determinations.

        The weighted average life of and yield to maturity on each class of
Offered Certificates will also be influenced by the amount of Net Excess
Cashflow generated by the Mortgage Loans and applied in reduction of the
Certificate Principal Balances of such certificates. The level of Net Excess
Cashflow available on any Distribution Date to be applied in reduction of the
Certificate Principal Balances of the Class A, Class M and Class B
Certificates
will be influenced by, among other factors:

(1) the overcollateralization level of the assets at such time (i.e., the

      extent to which interest on the related Mortgage Loans is accruing on

      a higher Stated Principal Balance than the Certificate Principal Balance of the related Class A, Class M and Class B Certificates);

(2) the delinquency and default experience of the related Mortgage Loans;

(3) the level of One-Month LIBOR;

(4) the Mortgage Index for the Adjustable Rate Mortgage Loans; and

(5) the provisions of the Pooling and Servicing Agreement that permit Net

      Excess Cashflow to be distributed to the Class C Certificates or the

      Residual Certificate when required overcollateralization levels have

      been met.

To the extent that greater (or lesser) amounts of Net Excess Cashflow are distributed in reduction of the Certificate Principal Balances of a class of Offered Certificates, the weighted average life thereof can be expected to shorten (or lengthen). No assurance, however, can be given as to the amount of Net Excess Cashflow distributed at any time or in the aggregate. See "Description of the Certificates--Overcollateralization Provisions."

PREPAYMENTS AND YIELDS FOR THE CERTIFICATES

Generally, if purchased at other than par, the yield to maturity on the Offered Certificates will be affected by the rate of the payment of principal of the Mortgage Loans. If the actual rate of payments on the Mortgage Loans is slower than the rate anticipated by an investor who purchases Offered Certificates at a discount, the actual yield to such investor will be lower than such investor's anticipated yield. If the actual rate of payments on the Mortgage Loans is faster than the rate anticipated by an investor who purchases Offered Certificates at a premium, the actual yield to such investor will be lower than such investor's anticipated yield. Because approximately 78.07% of the Mortgage Loans contain prepayment charges, the rate of principal prepayments during the term of such prepayment charges may be less than the rate of principal prepayments for Mortgage Loans which do not contain prepayment charges; however, principal prepayments on the Mortgage Loans could be expected to increase, perhaps materially, at or near the time of the expiration of the terms of such prepayment charges.

Approximately 10.37% of the Mortgage Loans in the mortgage pool are Fixed

Rate Mortgage Loans. In general, if prevailing interest rates fall
significantly
below the interest rates on fixed rate

<PAGE>

mortgage loans, fixed rate mortgage loans are likely to be subject to higher
prepayment rates than if prevailing rates remain at or above the interest
rates
on fixed rate mortgage loans. Conversely, if prevailing interest rates rise
appreciably above the interest rates on fixed rate mortgage loans, fixed rate
mortgage loans are likely to experience a lower prepayment rate than if
prevailing rates remain at or below the interest rates on fixed rate mortgage
loans.

        Approximately 89.63% of the Mortgage Loans in the mortgage pool are
Adjustable Rate Mortgage Loans. As is the case with conventional fixed rate
mortgage loans, adjustable rate mortgage loans may be subject to a greater
rate
of principal prepayments in a declining interest rate environment. For
example,
if prevailing interest rates fall significantly, adjustable rate mortgage
loans
could be subject to higher prepayment rates than if prevailing interest rates
remain constant because the availability of fixed rate mortgage loans at
lower
interest rates may encourage mortgagors to refinance their adjustable rate
mortgage loans to a lower fixed interest rate. In addition, depending on
prevailing interest rates, adjustable rate mortgage loans could experience
higher prepayment rates at or near the time of any interest rate adjustment.
Nevertheless, no assurance can be given as to the level of prepayment that
the
Mortgage Loans will experience.

        Although the Mortgage Rates on the Adjustable Rate Mortgage Loans are
subject to adjustment, such Mortgage Rates adjust less frequently than the
Pass-Through Rate on the Offered Certificates and adjust by reference to the
Mortgage Index. Changes in One-Month LIBOR may not correlate with changes in
the
Mortgage Index and also may not correlate with prevailing interest rates. It
is
possible that an increased level of One-Month LIBOR could occur
simultaneously
with a lower level of prevailing interest rates which would be expected to
result in faster prepayments, thereby reducing the weighted average life of
the
Offered Certificates. The Mortgage Rate applicable to substantially all of
the
Adjustable Rate Mortgage Loans and any Adjustment Date will be based on the
Mortgage Index value most recently announced generally as of a date 45 days
prior to such Adjustment Date. Thus, if the Mortgage Index value with respect
to
an Adjustable Rate Mortgage Loan rises, the lag in time before the
corresponding
Mortgage Rate increases will, all other things being equal, slow the upward
adjustment of the related Available Funds Cap. Moreover, the Fixed Rate
Mortgage

Loans have Mortgage Rates which will not adjust and the presence of the Fixed
Rate Mortgage Loans in the mortgage pool will make the related Available
Funds
Cap less likely to adjust either upward or downward. See "The Mortgage Pool."

     The calculation of the Pass-Through Rate on each class of the Offered
Certificates is based upon the value of an index (One-Month LIBOR) which is
different from the value of the index applicable to substantially all of the
Adjustable Rate Mortgage Loans (Six-Month LIBOR) as described under "The
Mortgage Pool--General." In addition, the Fixed Rate Mortgage Loans have
Mortgage Rates that are not dependent upon any index. The Class A-1 and Class
R
Certificates are subject to the Class A-1 Available Funds Cap, which limits
the
pass through rate on the Class A-1 and Class R Certificates to a per annum
rate
equal to the product of (i) 12, (ii) the quotient of (x) the total scheduled
interest on the Group One Mortgage Loans based on the Net Mortgage Rates in
effect on the related Due Date, divided by (y) the aggregate Stated Principal
Balance of the Group One Mortgage Loans as of the first day of the related
Accrual Period and (iii) a fraction, the numerator of which is 30, and the
denominator of which is the actual number of days in the related Accrual
Period.
The Class A-2 Certificates are subject to the Class A-2 Available Funds Cap,
which limits the pass through rate on the Class A-2 Certificates to a per
annum
rate equal to the product of (i) 12, (ii) the quotient of (x) the total
scheduled interest on the Group Two Mortgage Loans based on the Net Mortgage
Rates in effect on the related Due Date, divided by (y) the aggregate Stated
Principal Balance of the Group Two Mortgage Loans as of the first day of the
related Accrual Period and (iii) a fraction, the numerator of which is 30,
and
the denominator of which is the actual number of days in the related Accrual
Period. The Subordinated Certificates are subject to the Subordinated
Certificate Available Funds Cap, which limits the pass through rate on the
Subordinated Certificates to a per annum rate equal to the weighted average
of
the Class A-1 Available Funds Cap and the Class A-2 Available Funds Cap
(weighted in proportion to the results of subtracting from the aggregate
Stated
Principal Balance of each Mortgage Group, the current Certificate Principal
Balance of the related Class A Certificates).

                                   S-79

<PAGE>

     Furthermore, even if One-Month LIBOR and Six-Month LIBOR were at the
same
level, various factors may cause an Available Funds Cap to limit the amount
of
interest that would otherwise accrue on a related class of Offered
Certificates.
In particular, the Pass-Through Rate on each class of Offered Certificates
adjusts monthly, while the interest rates on the Adjustable Rate Mortgage
Loans
adjust less frequently and the interest rates on the Fixed Rate Mortgage
Loans

remain constant, with the result that the operation of an Available Funds Cap may limit increases in the Pass-Through Rates for extended periods in a rising interest rate environment. In addition, the Adjustable Rate Mortgage Loans are subject to periodic (i.e., semi-annual) adjustment caps, minimum and maximum rate caps, and the weighted average margin is subject to change based upon prepayment experience, which also may result in an Available Funds Cap limiting increases in the Pass-Through Rate for the related classes of Offered Certificates. Consequently, the interest that becomes due on the Mortgage Loans (net of the Servicing Fee and the Securities Administrator Fee) with respect to any Distribution Date may not equal the amount of interest that would accrue at One-Month LIBOR plus the margin on each class of Offered Certificates. Furthermore, if an Available Funds Cap determines the Pass-Through Rate for a class of Offered Certificates for a Distribution Date, the market value of such class of Offered Certificates may be temporarily or permanently reduced. Although the Pooling and Servicing Agreement provides a mechanism to pay, on a subordinated basis, any Floating Rate Certificate Carryover, there is no assurance that funds will be available to pay such amount. The ratings assigned to the Offered Certificates do not address the likelihood of the payment of any such amount.

The extent to which the yield to maturity on the Offered Certificates may vary from the anticipated yield will depend upon the degree to which they are purchased at a discount or premium and, correspondingly, the degree to which the timing of payments thereon is sensitive to prepayments, liquidations and purchases of the Mortgage Loans. In particular, in the case of the Offered Certificates purchased at a discount, an investor should consider the risk that a slower than anticipated rate of principal payments, liquidations and purchases of the Mortgage Loans could result in an actual yield to such investor that is lower than the anticipated yield and, in the case of the Offered Certificates purchased at a premium, the risk that a faster than anticipated rate of principal payments, liquidations and purchases of such Mortgage Loans could result in an actual yield to such investor that is lower than the anticipated yield.

The Last Scheduled Distribution Date for each class of Offered Certificates is set forth in the chart appearing on page S-4. The actual final Distribution Date with respect to each class of Offered Certificates could occur significantly earlier than its Last Scheduled Distribution Date because:

(1) prepayments are likely to occur and such prepayments will be applied
      to the payment of the Certificate Principal Balances thereof;

(2) excess interest to the extent available will be applied as an
      accelerated payment of principal on the Offered Certificates as
      described herein; and

(3) the Securities Administrator will be directed in the Pooling and
      Servicing Agreement to conduct a one-time auction for the purchase of
      all the Mortgage Loans in the mortgage pool when the Stated Principal
      Balance of the Mortgage Loans and REO Properties at the time of
      purchase is less than or equal to 10% of the aggregate Stated
      Principal Balance of the Mortgage Loans as of the Cut-off Date; and if
      such auction fails to achieve the sufficient purchase price, the NIMS
      Insurer, if any, or the Servicer, to the extent any NIMS Insurer does
      not exercise its purchase option, may purchase all of the Mortgage
      Loans.

Prepayments on mortgage loans are commonly measured relative to a prepayment model or standard. The prepayment models used in this prospectus supplement are based on an assumed rate of prepayment each month of the then unpaid principal balance of a pool of mortgage loans similar to the Fixed Rate Mortgage Loans or Adjustable Rate Mortgage Loans, as applicable. For the Fixed Rate Mortgage Loans, the prepayment model used in this prospectus supplement is HEP. For the Adjustable Rate Mortgage Loans, the prepayment model used in this prospectus supplement is PPC.

<PAGE>

As used in the following tables "0% of the prepayment model" assumes no prepayments on the Mortgage Loans; "80% of the prepayment model" assumes the Mortgage Loans will prepay at rates equal to 80% of the related prepayment model; "100% of the prepayment model" assumes the Mortgage Loans will prepay at rates equal to 100% of the related prepayment model; "150% of the prepayment model" assumes the Mortgage Loans will prepay at rates equal to 150% of the related prepayment model; and "200% of the prepayment model" assumes the Mortgage Loans will prepay at rates equal to 200% of the related prepayment model.

There is no assurance, however, that prepayments on the Mortgage Loans will conform to any level of the prepayment model, and no representation is made that the Mortgage Loans will prepay at the prepayment rates shown or any other prepayment rate. The rate of principal payments on pools of mortgage loans is

influenced by a variety of economic, geographic, social and other factors,
including the level of interest rates. Other factors affecting prepayment of
mortgage loans include changes in obligors' housing needs, job transfers,
employment status, the solicitation of mortgagors to refinance their mortgage
loans and the existence of prepayment charges. In the case of mortgage loans
in
general, if prevailing interest rates fall significantly below the interest
rates on the mortgage loans, the mortgage loans are likely to be subject to
higher prepayment rates than if prevailing interest rates remain at or above
the
rates borne by the mortgage loans. Conversely, if prevailing interest rates
rise
above the interest rates on the mortgage loans, the rate of prepayment would
be
expected to decrease.

     The weighted average lives of the Offered Certificates set forth on the
following tables are determined by (1) multiplying the amount of each assumed
principal distribution by the number of years from the date of issuance of
the
certificates to the related Distribution Date, (2) summing the results and
(3)
dividing the sum by the total principal distribution on the Offered
Certificates.

     The following tables have been prepared on the basis of the Modeling
Assumptions, including the assumption that the mortgage loans have the
approximate characteristics described below:

### GROUP ONE FIXED RATE MORTGAGE LOANS

<Table>
<Caption>

| REMAINING AMORTIZATION TERM (LESS CURRENT IO TERM) BALANCE($) (MONTHS) | ORIGINAL INTEREST-ONLY MORTGAGE TERM RATE(%) (MONTHS) | REMAINING INTEREST-NET ONLY MORTGAGE TERM RATE(%) (MONTHS) | ORIGINAL MONTHS TO ORIGINAL TERM PREPAYMENT TERM CHARGE (MONTHS) EXPIRATION | REMAINING TERM (MONTHS) | ORIGINAL AMORTIZATION TERM (LESS IO TERM) (MONTHS) |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | <C> | | |
| 59,925.10 | 8.375 | 7.875 | 180 | 178 | 360 |
| 358 | 0 | 0 | 0 | | |
| 67,415.68 | 8.375 | 7.875 | 180 | 178 | 360 |
| 358 | 0 | 0 | 24 | | |
| 219,672.44 | 7.500 | 7.000 | 180 | 178 | 360 |
| 358 | 0 | 0 | 36 | | |
| 4,795,096.47 | 7.044 | 6.544 | 180 | 178 | 180 |
| 178 | 0 | 0 | 0 | | |
| 166,301.25 | 8.252 | 7.752 | 180 | 178 | 180 |
| 178 | 0 | 0 | 12 | | |

```
 1,083,903.54   7.115      6.615       180         178          180
178            0           0           24
 3,464,408.61   6.784      6.284       180         178          180
178            0           0           36
   381,400.00   7.924      7.424       180         178          120
120           60          58           0
   251,000.00   7.750      7.250       180         178          120
120           60          58           24
   137,295.06   8.250      7.750       240         238          240
238            0           0           0
   123,650.37   7.500      7.000       240         238          240
238            0           0           24
40,425,721.77   7.439      6.939       360         358          360
358            0           0           0
 2,881,388.73   7.976      7.476       360         358          360
358            0           0           12
30,721,548.04   7.151      6.651       360         358          360
358            0           0           24
44,334,265.19   7.264      6.764       360         358          360
358            0           0           36
 5,362,235.76   7.588      7.088       360         358          300
300           60          58           0
 3,605,862.73   7.581      7.081       360         358          300
300           60          58           24
 4,511,999.18   7.349      6.849       360         358          300
300           60          58           36
</Table>
```

<PAGE>

GROUP TWO FIXED RATE MORTGAGE LOANS

```
<Table>
<Caption>
                                                        ORIGINAL
REMAINING
                                                     AMORTIZATION
AMORTIZATION   ORIGINAL    REMAINING    ORIGINAL
                                                        TERM
TERM      INTEREST-   INTEREST-   MONTHS TO   REMAINING    (LESS IO
(LESS IO     ONLY         ONLY       PREPAYMENT
CURRENT    MORTGAGE     MORTGAGE      TERM       TERM        TERM)
TERM)       TERM        TERM         CHARGE
BALANCE($)   RATE(%)     RATE(%)     (MONTHS)    (MONTHS)    (MONTHS)
(MONTHS)    (MONTHS)    (MONTHS)    EXPIRATION
-------------  --------    --------    --------   ---------   ------------  --
----------   ---------   ---------   ----------
<S>          <C>         <C>         <C>        <C>         <C>
<C>          <C>         <C>         <C>
   263,693.06   7.750      7.250       180         178          300
300           60          58           36
   357,544.25   6.125      5.625       180         178          180
178            0           0           0
   198,149.37   5.375      4.875       180         178          180
178            0           0           24
```

```
    53,712.06   9.000      8.500       180        178         180
178             0          0           36
   756,000.00   6.884      6.384       180        178         120
120             60         58          24
 8,729,083.92   7.336      6.836       360        358         360
358             0          0           0
   639,236.13   7.767      7.267       360        357         360
357             0          0           12
10,637,196.82   6.678      6.178       360        358         360
358             0          0           24
24,900,852.82   6.680      6.180       360        358         360
358             0          0           36
 4,963,579.41   7.168      6.668       360        358         300
300             60         58          0
   709,000.00   8.706      8.206       360        358         300
300             60         58          12
 4,308,659.26   7.284      6.784       360        358         300
300             60         58          24
 4,672,063.57   6.878      6.378       360        358         300
300             60         58          36
```
</Table>

<PAGE>

GROUP ONE ADJUSTABLE RATE MORTGAGE LOANS

<Table>
<Caption>

| CURRENT BALANCE($) | NET MORTGAGE RATE(%) | MORTGAGE RATE(%) | ORIGINAL TERM (MONTHS) | REMAINING TERM (MONTHS) | ORIGINAL AMORTIZATION TERM (LESS IO CURRENT TERM) (MONTHS) | REMAINING AMORTIZATION TERM (LESS IO TERM) (MONTHS) | ORIGINAL INTEREST ONLY TERM (MONTHS) | REMAINING INTEREST ONLY TERM (MONTHS) |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 439,832.24 | 6.389 | 5.889 | 360 | 358 | 300 | 300 | 60 | 58 |
| 553,989.35 | 7.020 | 6.520 | 360 | 358 | 360 | 358 | 0 | 0 |
| 286,650.71 | 7.250 | 6.750 | 360 | 358 | 360 | 358 | 0 | 0 |
| 43,475,438.85 | 7.410 | 6.910 | 360 | 358 | 360 | 358 | 0 | 0 |
| 11,874,627.81 | 7.478 | 6.978 | 360 | 358 | 360 | 358 | 0 | 0 |
| 157,022,789.20 | 7.218 | 6.718 | 360 | 358 | 360 | 358 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 29,046,233.93 | 7.022 | 6.522 | 360 | 358 | 360 | 358 | 0 | 0 |
| 32,086,965.82 | 7.284 | 6.784 | 360 | 358 | 300 | 300 | 60 | 58 |
| 18,252,537.08 | 7.227 | 6.727 | 360 | 358 | 300 | 300 | 60 | 58 |
| 185,549,190.90 | 6.865 | 6.365 | 360 | 358 | 300 | 300 | 60 | 58 |
| 46,789,615.05 | 6.712 | 6.212 | 360 | 358 | 300 | 300 | 60 | 58 |
| 33,407,873.19 | 7.345 | 6.845 | 360 | 358 | 360 | 358 | 0 | 0 |
| 735,362.55 | 6.940 | 6.440 | 360 | 358 | 360 | 358 | 0 | 0 |
| 942,274.16 | 7.308 | 6.808 | 360 | 358 | 360 | 358 | 0 | 0 |
| 30,867,768.82 | 7.004 | 6.504 | 360 | 358 | 360 | 358 | 0 | 0 |
| 32,933,475.82 | 7.090 | 6.590 | 360 | 358 | 300 | 300 | 60 | 58 |
| 2,195,975.00 | 6.930 | 6.430 | 360 | 358 | 300 | 300 | 60 | 58 |
| 1,656,706.50 | 6.700 | 6.200 | 360 | 358 | 300 | 300 | 60 | 58 |
| 52,476,476.23 | 6.606 | 6.106 | 360 | 358 | 300 | 300 | 60 | 58 |
| 1,537,944.43 | 6.858 | 6.358 | 360 | 358 | 360 | 358 | 0 | 0 |
| 549,722.18 | 7.003 | 6.503 | 360 | 358 | 360 | 358 | 0 | 0 |
| 1,996,120.14 | 6.681 | 6.181 | 360 | 358 | 360 | 358 | 0 | 0 |
| 4,127,348.38 | 6.790 | 6.290 | 360 | 358 | 360 | 358 | 0 | 0 |
| 3,025,043.02 | 6.772 | 6.272 | 360 | 358 | 300 | 300 | 60 | 58 |
| 131,999.16 | 6.750 | 6.250 | 360 | 356 | 300 | 300 | 60 | 56 |
| 3,356,224.05 | 6.613 | 6.113 | 360 | 358 | 300 | 300 | 60 | 58 |
| 13,330,484.62 | 6.564 | 6.064 | 360 | 358 | 300 | 300 | 60 | 58 |

<Caption>

ORIGINAL

NUMBER OF                          MONTHS
                    INITIAL             TO                                              RATE
MONTHS UNTIL                                                                            CHANGE
                    RATE                                                  CHANGE
NEXT RATE                       PREPAYMENT
      GROSS         CHANGE      PERIODIC    MAXIMUM     MINIMUM     FREQUENCY
ADJUSTMENT                      CHARGE
      MARGIN(%)     CAP(%)      CAP(%)      RATE(%)     RATE(%)     (MONTHS)
DATE                INDEX       EXPIRATION

```
     ---------  ---------  --------  --------  ----------  ---------  -
------------------  ---------- ----------
<C>  <C>       <C>       <C>       <C>       <C>        <C>
<C>            <C>       <C>
        5.326     1.000     1.000     12.389    6.389             6
 4   6M LIBOR      36
        5.846     2.000     1.000     13.020    7.020             6
10   6M LIBOR       0
        5.500     2.000     1.000     13.250    7.250             6
10   6M LIBOR      12
        5.872     3.000     1.000     13.410    7.410             6
22   6M LIBOR       0
        5.757     3.000     1.000     13.478    7.478             6
22   6M LIBOR      12
        5.847     3.000     1.000     13.218    7.218             6
22   6M LIBOR      24
        5.979     3.000     1.000     13.022    7.022             6
22   6M LIBOR      36
        5.489     3.000     1.000     13.284    7.284             6
22   6M LIBOR       0
        5.421     3.000     1.000     13.227    7.227             6
22   6M LIBOR      12
        5.394     3.000     1.000     12.865    6.865             6
22   6M LIBOR      24
        5.553     3.000     1.000     12.712    6.712             6
22   6M LIBOR      36
        6.008     3.000     1.000     13.345    7.345             6
34   6M LIBOR       0
        5.773     3.000     1.000     12.940    6.940             6
34   6M LIBOR      12
        5.383     3.000     1.000     13.308    7.308             6
34   6M LIBOR      24
        5.731     3.000     1.000     13.004    7.004             6
34   6M LIBOR      36
        5.575     3.000     1.000     13.090    7.090             6
34   6M LIBOR       0
        5.435     3.000     1.000     12.930    6.930             6
34   6M LIBOR      12
        5.210     3.000     1.000     12.700    6.700             6
34   6M LIBOR      24
        5.318     3.000     1.000     12.606    6.606             6
34   6M LIBOR      36
        5.626     3.000     1.000     12.858    6.858             6
58   6M LIBOR       0
        5.379     3.000     1.000     13.003    7.003             6
58   6M LIBOR      12
        5.406     3.000     1.000     12.681    6.681             6
58   6M LIBOR      24
        5.362     3.000     1.000     12.790    6.790             6
58   6M LIBOR      36
        5.272     3.000     1.000     12.772    6.772             6
58   6M LIBOR       0
        5.000     3.000     1.000     12.750    6.750             6
56   6M LIBOR      12
        5.088     3.000     1.000     12.613    6.613             6
58   6M LIBOR      24
```

5.159    3.000    1.000    12.564    6.564    6
58  6M LIBOR    36
</Table>

S-83

<PAGE>

GROUP TWO ADJUSTABLE RATE MORTGAGE LOANS
<Table>
<Caption>

| | CURRENT BALANCE($) | MORTGAGE RATE(%) | NET MORTGAGE RATE(%) | ORIGINAL AMORTIZATION TERM (MONTHS) | REMAINING AMORTIZATION TERM (MONTHS) | ORIGINAL INTEREST ONLY TERM (MONTHS) | REMAINING INTEREST ONLY TERM (MONTHS) | ORIGINAL TERM (MONTHS) | REMAINING TERM (MONTHS) |
|---|---|---|---|---|---|---|---|---|---|
| <C> <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| | 2,224,632.00 | 6.434 | 5.934 | 360 | 358 | 300 | 300 | 60 | 58 |
| | 971,999.51 | 6.335 | 5.835 | 360 | 358 | 300 | 300 | 60 | 58 |
| | 861,199.83 | 5.635 | 5.135 | 360 | 358 | 300 | 300 | 60 | 58 |
| | 1,511,217.52 | 6.430 | 5.930 | 360 | 358 | 360 | 358 | 0 | 0 |
| | 139,739.97 | 6.375 | 5.875 | 360 | 358 | 360 | 358 | 0 | 0 |
| | 24,886,246.59 | 7.121 | 6.621 | 360 | 358 | 360 | 358 | 0 | 0 |
| | 12,104,756.31 | 7.137 | 6.637 | 360 | 358 | 360 | 358 | 0 | 0 |
| | 86,537,547.86 | 6.817 | 6.317 | 360 | 358 | 360 | 358 | 0 | 0 |
| | 7,328,524.53 | 6.751 | 6.251 | 360 | 358 | 360 | 358 | 0 | 0 |
| | 101,052,401.64 | 7.002 | 6.502 | 360 | 358 | 300 | 300 | 60 | 58 |
| | 89,344,306.45 | 6.904 | 6.404 | 360 | 358 | 300 | 300 | 60 | 58 |
| | 446,479,235.83 | 6.523 | 6.023 | 360 | 358 | 300 | 300 | 60 | 58 |
| | 49,443,610.70 | 6.415 | 5.915 | 360 | 358 | 300 | 300 | 60 | 58 |
| | 28,055,767.53 | 6.881 | 6.381 | 360 | 358 | 360 | 358 | 0 | 0 |
| | 493,245.07 | 6.744 | 6.244 | 360 | 358 | 360 | 358 | 0 | 0 |
| | 713,126.02 | 6.785 | 6.285 | 360 | 358 | 360 | 358 | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| 15,278,912.06 | 6.538 | 6.038 | 360 | 358 |
| 360 | 358 | 0 | 0 | |
| 56,284,946.03 | 6.747 | 6.247 | 360 | 358 |
| 300 | 300 | 60 | 58 | |
| 4,338,849.63 | 6.689 | 6.189 | 360 | 358 |
| 300 | 300 | 60 | 58 | |
| 1,565,797.52 | 6.493 | 5.993 | 360 | 358 |
| 300 | 300 | 60 | 58 | |
| 82,471,106.45 | 6.337 | 5.837 | 360 | 358 |
| 300 | 300 | 60 | 58 | |
| 325,504.21 | 5.763 | 5.263 | 360 | 358 |
| 360 | 358 | 0 | 0 | |
| 2,718,631.45 | 5.966 | 5.466 | 360 | 358 |
| 360 | 358 | 0 | 0 | |
| 4,485,260.49 | 6.424 | 5.924 | 360 | 358 |
| 360 | 358 | 0 | 0 | |
| 4,429,048.61 | 6.137 | 5.637 | 360 | 358 |
| 300 | 300 | 60 | 58 | |
| 370,400.00 | 6.500 | 6.000 | 360 | 358 |
| 300 | 300 | 60 | 58 | |
| 11,391,547.05 | 6.559 | 6.059 | 360 | 358 |
| 300 | 300 | 60 | 58 | |
| 16,919,536.16 | 6.397 | 5.897 | 360 | 358 |
| 300 | 300 | 60 | 58 | |

<Caption>

ORIGINAL

| NUMBER OF MONTHS UNTIL NEXT RATE ADJUSTMENT DATE | GROSS MARGIN(%) | INITIAL RATE CHANGE CAP(%) | MONTHS TO PREPAYMENT PERIODIC CAP(%) | MAXIMUM RATE(%) | MINIMUM RATE(%) | RATE CHANGE FREQUENCY (MONTHS) | INDEX | CHARGE EXPIRATION |
|---|---|---|---|---|---|---|---|---|
| | --------- | --------- | -------- | -------- | ---------- | --------- | - ---------------- | ---------- ---------- |
| <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| | 5.124 | 1.000 | 1.000 | 12.434 | 6.434 | 6 | | |
| 4 | | | | | | | 6M LIBOR | 0 |
| | 5.050 | 1.000 | 1.000 | 12.335 | 6.335 | 6 | | |
| 4 | | | | | | | 6M LIBOR | 24 |
| | 5.038 | 1.000 | 1.000 | 11.635 | 5.635 | 6 | | |
| 4 | | | | | | | 6M LIBOR | 36 |
| | 5.555 | 2.000 | 1.000 | 12.430 | 6.430 | 6 | | |
| 10 | | | | | | | 6M LIBOR | 0 |
| | 5.375 | 2.000 | 1.000 | 12.375 | 6.375 | 6 | | |
| 10 | | | | | | | 6M LIBOR | 12 |
| | 5.783 | 3.000 | 1.000 | 13.121 | 7.121 | 6 | | |
| 22 | | | | | | | 6M LIBOR | 0 |
| | 5.660 | 3.000 | 1.000 | 13.137 | 7.137 | 6 | | |
| 22 | | | | | | | 6M LIBOR | 12 |

|        |          |    | 5.628 | 3.000 | 1.000 | 12.818 | 6.818 | 6 |
| 22 | 6M LIBOR | 24 |       |       |       |        |       |   |
|        |          |    | 5.822 | 3.000 | 1.000 | 12.751 | 6.751 | 6 |
| 22 | 6M LIBOR | 36 |       |       |       |        |       |   |
|        |          |    | 5.272 | 3.000 | 1.000 | 13.002 | 7.002 | 6 |
| 22 | 6M LIBOR | 0  |       |       |       |        |       |   |
|        |          |    | 5.261 | 3.000 | 1.000 | 12.904 | 6.904 | 6 |
| 22 | 6M LIBOR | 12 |       |       |       |        |       |   |
|        |          |    | 5.233 | 3.000 | 1.000 | 12.523 | 6.523 | 6 |
| 22 | 6M LIBOR | 24 |       |       |       |        |       |   |
|        |          |    | 5.376 | 3.000 | 1.000 | 12.415 | 6.415 | 6 |
| 22 | 6M LIBOR | 36 |       |       |       |        |       |   |
|        |          |    | 5.680 | 3.000 | 1.000 | 12.881 | 6.881 | 6 |
| 34 | 6M LIBOR | 0  |       |       |       |        |       |   |
|        |          |    | 5.434 | 3.000 | 1.000 | 12.744 | 6.744 | 6 |
| 34 | 6M LIBOR | 12 |       |       |       |        |       |   |
|        |          |    | 5.444 | 3.000 | 1.000 | 12.785 | 6.785 | 6 |
| 34 | 6M LIBOR | 24 |       |       |       |        |       |   |
|        |          |    | 5.500 | 3.000 | 1.000 | 12.538 | 6.538 | 6 |
| 34 | 6M LIBOR | 36 |       |       |       |        |       |   |
|        |          |    | 5.442 | 3.000 | 1.000 | 12.747 | 6.747 | 6 |
| 34 | 6M LIBOR | 0  |       |       |       |        |       |   |
|        |          |    | 5.256 | 3.000 | 1.000 | 12.689 | 6.689 | 6 |
| 34 | 6M LIBOR | 12 |       |       |       |        |       |   |
|        |          |    | 5.119 | 3.000 | 1.000 | 12.493 | 6.493 | 6 |
| 34 | 6M LIBOR | 24 |       |       |       |        |       |   |
|        |          |    | 5.212 | 3.000 | 1.000 | 12.337 | 6.337 | 6 |
| 34 | 6M LIBOR | 36 |       |       |       |        |       |   |
|        |          |    | 5.055 | 3.000 | 1.000 | 11.763 | 5.763 | 6 |
| 58 | 6M LIBOR | 0  |       |       |       |        |       |   |
|        |          |    | 5.052 | 3.000 | 1.000 | 11.966 | 5.966 | 6 |
| 58 | 6M LIBOR | 24 |       |       |       |        |       |   |
|        |          |    | 5.224 | 3.000 | 1.000 | 12.424 | 6.424 | 6 |
| 58 | 6M LIBOR | 36 |       |       |       |        |       |   |
|        |          |    | 5.017 | 3.000 | 1.000 | 12.137 | 6.137 | 6 |
| 58 | 6M LIBOR | 0  |       |       |       |        |       |   |
|        |          |    | 5.000 | 3.000 | 1.000 | 12.500 | 6.500 | 6 |
| 58 | 6M LIBOR | 12 |       |       |       |        |       |   |
|        |          |    | 5.129 | 3.000 | 1.000 | 12.559 | 6.559 | 6 |
| 58 | 6M LIBOR | 24 |       |       |       |        |       |   |
|        |          |    | 5.121 | 3.000 | 1.000 | 12.397 | 6.397 | 6 |
| 58 | 6M LIBOR | 36 |       |       |       |        |       |   |

</Table>

<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT MODEL SET FORTH BELOW

<Table>
<Caption>
                                                    CLASS A-1
CLASS A-2A
                            --------------------------------   ----
----------------------------

| DISTRIBUTION DATE | 0% | 80% | 100% | 150% | 200% | 0% | 80% | 100% | 150% | 200% |
|---|---|---|---|---|---|---|---|---|---|---|
| ----------------- | ----- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial............................. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2006................... | 99 | 79 | 74 | 61 | 47 | 99 | 58 | 48 | 21 | 0 |
| December 25, 2007................... | 99 | 49 | 38 | 14 | 0 | 99 | 0 | 0 | 0 | 0 |
| December 25, 2008................... | 98 | 28 | 16 | 0 | 0 | 98 | 0 | 0 | 0 | 0 |
| December 25, 2009................... | 97 | 24 | 16 | 0 | 0 | 98 | 0 | 0 | 0 | 0 |
| December 25, 2010................... | 97 | 18 | 12 | 0 | 0 | 97 | 0 | 0 | 0 | 0 |
| December 25, 2011................... | 95 | 14 | 9 | 0 | 0 | 95 | 0 | 0 | 0 | 0 |
| December 25, 2012................... | 94 | 10 | 6 | 0 | 0 | 92 | 0 | 0 | 0 | 0 |
| December 25, 2013................... | 92 | 8 | 5 | 0 | 0 | 89 | 0 | 0 | 0 | 0 |
| December 25, 2014................... | 90 | 6 | 3 | 0 | 0 | 85 | 0 | 0 | 0 | 0 |
| December 25, 2015................... | 88 | 5 | 3 | 0 | 0 | 82 | 0 | 0 | 0 | 0 |
| December 25, 2016................... | 86 | 4 | 2 | 0 | 0 | 78 | 0 | 0 | 0 | 0 |
| December 25, 2017................... | 84 | 3 | 2 | 0 | 0 | 73 | 0 | 0 | 0 | 0 |
| December 25, 2018................... | 81 | 2 | 1 | 0 | 0 | 68 | 0 | 0 | 0 | 0 |
| December 25, 2019................... | 78 | 2 | * | 0 | 0 | 63 | 0 | 0 | 0 | 0 |
| December 25, 2020................... | 75 | 2 | 0 | 0 | 0 | 57 | 0 | 0 | 0 | 0 |
| December 25, 2021................... | 72 | 1 | 0 | 0 | 0 | 50 | 0 | 0 | 0 | 0 |
| December 25, 2022................... | 68 | * | 0 | 0 | 0 | 43 | 0 | 0 | 0 | 0 |
| December 25, 2023................... | 64 | 0 | 0 | 0 | 0 | 35 | 0 | 0 | 0 | 0 |
| December 25, 2024................... | 60 | 0 | 0 | 0 | 0 | 26 | 0 | 0 | 0 | 0 |
| December 25, 2025................... | 55 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 |
| December 25, 2026................... | 50 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 |
| December 25, 2027................... | 44 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| December 25, 2028................... | 38 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| December 25, 2029................... | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| December 25, 2030................... | 28 | 0 | 0 | 0 | 0 |
| 0    0    0    0    0 | | | | | |
| December 25, 2031................... | 23 | 0 | 0 | 0 | 0 |
| 0    0    0    0    0 | | | | | |
| December 25, 2032................... | 18 | 0 | 0 | 0 | 0 |
| 0    0    0    0    0 | | | | | |
| December 25, 2033................... | 12 | 0 | 0 | 0 | 0 |
| 0    0    0    0    0 | | | | | |
| December 25, 2034................... | 6 | 0 | 0 | 0 | 0 |
| 0    0    0    0    0 | | | | | |
| December 25, 2035................... | 0 | 0 | 0 | 0 | 0 |
| 0    0    0    0    0 | | | | | |
| Weighted Average Life in Years..... | 19.79 | 3.11 | 2.44 | 1.29 | 1.02 |
| 15.00   1.17   1.00   0.74   0.60 | | | | | |

\</Table>

---------------

* Less than 0.5% but greater than 0.0%.

S-85

\<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT MODEL SET FORTH BELOW

\<Table>
\<Caption>

| | CLASS A-2B | | | | | CLASS A-2C | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DISTRIBUTION DATE | 0% | 80% | 100% | 150% | 200% | 0% | 80% | 100% | 150% | 200% |
| Initial............................ | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2006.................. | 100 | 100 | 100 | 100 | 92 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2007.................. | 100 | 96 | 72 | 17 | 0 | 100 | 100 | 100 | 100 | 0 |
| December 25, 2008.................. | 100 | 50 | 23 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| December 25, 2009.................. | 100 | 41 | 23 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| December 25, 2010.................. | 100 | 28 | 16 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| December 25, 2011.................. | 100 | 19 | 8 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| December 25, 2012.................. | 100 | 12 | 3 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| December 25, 2013.................. | 100 | 7 | * | 0 | 0 | 100 | 100 | 100 | 0 | 0 |

```
December 25, 2014...................    100      3      0      0      0
100    100     61      0      0
December 25, 2015...................    100      1      0      0      0
100    100     34      0      0
December 25, 2016...................    100      0      0      0      0
100     80     16      0      0
December 25, 2017...................    100      0      0      0      0
100     54      4      0      0
December 25, 2018...................    100      0      0      0      0
100     35      0      0      0
December 25, 2019...................    100      0      0      0      0
100     21      0      0      0
December 25, 2020...................    100      0      0      0      0
100     11      0      0      0
December 25, 2021...................    100      0      0      0      0
100      0      0      0      0
December 25, 2022...................    100      0      0      0      0
100      0      0      0      0
December 25, 2023...................    100      0      0      0      0
100      0      0      0      0
December 25, 2024...................    100      0      0      0      0
100      0      0      0      0
December 25, 2025...................    100      0      0      0      0
100      0      0      0      0
December 25, 2026...................    100      0      0      0      0
100      0      0      0      0
December 25, 2027...................     93      0      0      0      0
100      0      0      0      0
December 25, 2028...................     79      0      0      0      0
100      0      0      0      0
December 25, 2029...................     67      0      0      0      0
100      0      0      0      0
December 25, 2030...................     58      0      0      0      0
100      0      0      0      0
December 25, 2031...................     47      0      0      0      0
100      0      0      0      0
December 25, 2032...................     36      0      0      0      0
100      0      0      0      0
December 25, 2033...................     23      0      0      0      0
100      0      0      0      0
December 25, 2034...................      8      0      0      0      0
100      0      0      0      0
December 25, 2035...................      0      0      0      0      0
0      0      0      0      0
Weighted Average Life in Years.....  25.64   4.12   3.07   1.75   1.40
29.73   12.56   9.65   2.35   1.83
</Table>
```

------------

* Less than 0.5% but greater than 0.0%.

<PAGE>

             PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
        AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT MODEL SET FORTH BELOW

```
<Table>
<Caption>
```

|                     | CLASS M-1 | | | | | CLASS M-2 | | | | |
|---------------------|------|-----|------|------|------|------|-----|------|------|------|
| DISTRIBUTION DATE   | 0%   | 80% | 100% | 150% | 200% | 0%   | 80% | 100% | 150% | 200% |
| Initial.............................. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2006................. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2007................. | 100 | 100 | 100 | 100 | 0 | 100 | 100 | 100 | 100 | 0 |
| December 25, 2008................. | 100 | 100 | 100 | 0 | 0 | 100 | 100 | 100 | 7 | 0 |
| December 25, 2009................. | 100 | 63 | 77 | 0 | 0 | 100 | 63 | 45 | 7 | 0 |
| December 25, 2010................. | 100 | 47 | 30 | 0 | 0 | 100 | 47 | 30 | 7 | 0 |
| December 25, 2011................. | 100 | 34 | 20 | 0 | 0 | 100 | 34 | 20 | 7 | 0 |
| December 25, 2012................. | 100 | 25 | 14 | 0 | 0 | 100 | 25 | 14 | 7 | 0 |
| December 25, 2013................. | 100 | 19 | 10 | 0 | 0 | 100 | 19 | 10 | 7 | 0 |
| December 25, 2014................. | 100 | 14 | 7 | 0 | 0 | 100 | 14 | 7 | 1 | 0 |
| December 25, 2015................. | 100 | 10 | 5 | 0 | 0 | 100 | 10 | 5 | 0 | 0 |
| December 25, 2016................. | 100 | 8 | 3 | 0 | 0 | 100 | 8 | 3 | 0 | 0 |
| December 25, 2017................. | 100 | 6 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 |
| December 25, 2018................. | 100 | 4 | 0 | 0 | 0 | 100 | 4 | 0 | 0 | 0 |
| December 25, 2019................. | 100 | 3 | 0 | 0 | 0 | 100 | 2 | 0 | 0 | 0 |
| December 25, 2020................. | 100 | * | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2021................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2022................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2023................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2024................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2025................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2026................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |

<table>

| DISTRIBUTION DATE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| December 25, 2027.................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2028.................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2029.................. | 93 | 0 | 0 | 0 | 0 | 93 | 0 | 0 | 0 | 0 |
| December 25, 2030.................. | 81 | 0 | 0 | 0 | 0 | 81 | 0 | 0 | 0 | 0 |
| December 25, 2031.................. | 67 | 0 | 0 | 0 | 0 | 67 | 0 | 0 | 0 | 0 |
| December 25, 2032.................. | 52 | 0 | 0 | 0 | 0 | 52 | 0 | 0 | 0 | 0 |
| December 25, 2033.................. | 35 | 0 | 0 | 0 | 0 | 35 | 0 | 0 | 0 | 0 |
| December 25, 2034.................. | 17 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 0 | 0 |
| December 25, 2035.................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years..... | 26.98 | 5.84 | 5.15 | 2.62 | 1.89 | 26.98 | 5.80 | 4.97 | 3.30 | 1.97 |

</table>

------------

* Less than 0.5% but greater than 0.0%.

S-87

<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT MODEL SET FORTH BELOW

<Table>
<Caption>

| DISTRIBUTION DATE | CLASS M-3 | | | | | CLASS M-4 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 80% | 100% | 150% | 200% | 0% | 80% | 100% | 150% | 200% |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial............................ | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2006.................. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2007.................. | 100 | 100 | 100 | 100 | 65 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2008.................. | 100 | 100 | 100 | 100 | 0 | 100 | 100 | 100 | 100 | 0 |
| December 25, 2009.................. | 100 | 63 | 45 | 100 | 0 | 100 | 63 | 45 | 100 | 0 |
| December 25, 2010.................. | 100 | 47 | 30 | 100 | 0 | 100 | 47 | 30 | 59 | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| December 25, 2011................... | 100 | 34 | 20 | 72 | 0 | 100 | 34 | 20 | 5 | 0 |
| December 25, 2012................... | 100 | 25 | 14 | 31 | 0 | 100 | 25 | 14 | 0 | 0 |
| December 25, 2013................... | 100 | 19 | 10 | 5 | 0 | 100 | 19 | 10 | 0 | 0 |
| December 25, 2014................... | 100 | 14 | 7 | 0 | 0 | 100 | 14 | 7 | 0 | 0 |
| December 25, 2015................... | 100 | 10 | 5 | 0 | 0 | 100 | 10 | 5 | 0 | 0 |
| December 25, 2016................... | 100 | 8 | 0 | 0 | 0 | 100 | 8 | 0 | 0 | 0 |
| December 25, 2017................... | 100 | 6 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 |
| December 25, 2018................... | 100 | 4 | 0 | 0 | 0 | 100 | 2 | 0 | 0 | 0 |
| December 25, 2019................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2020................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2021................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2022................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2023................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2024................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2025................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2026................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2027................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2028................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2029................... | 93 | 0 | 0 | 0 | 0 | 93 | 0 | 0 | 0 | 0 |
| December 25, 2030................... | 81 | 0 | 0 | 0 | 0 | 81 | 0 | 0 | 0 | 0 |
| December 25, 2031................... | 67 | 0 | 0 | 0 | 0 | 67 | 0 | 0 | 0 | 0 |
| December 25, 2032................... | 52 | 0 | 0 | 0 | 0 | 52 | 0 | 0 | 0 | 0 |
| December 25, 2033................... | 35 | 0 | 0 | 0 | 0 | 35 | 0 | 0 | 0 | 0 |
| December 25, 2034................... | 17 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 0 | 0 |
| December 25, 2035................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years..... | 26.98 | 5.77 | 4.87 | 6.65 | 2.05 | 26.98 | 5.74 | 4.80 | 5.17 | 2.11 |

</Table>

<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT MODEL SET FORTH BELOW

<Table>
<Caption>

CLASS M-6 / CLASS M-5

| DISTRIBUTION DATE | CLASS M-5 0% | CLASS M-5 80% | CLASS M-5 100% | CLASS M-5 150% | CLASS M-5 200% | 0% | CLASS M-6 80% | CLASS M-6 100% | CLASS M-6 150% | CLASS M-6 200% |
|---|---|---|---|---|---|---|---|---|---|---|
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2006 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2007 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2008 | 100 | 100 | 100 | 100 | 0 | 100 | 100 | 100 | 100 | 0 |
| December 25, 2009 | 100 | 63 | 45 | 100 | 0 | 100 | 63 | 45 | 73 | 0 |
| December 25, 2010 | 100 | 47 | 30 | 9 | 0 | 100 | 47 | 30 | 9 | 0 |
| December 25, 2011 | 100 | 34 | 20 | 3 | 0 | 100 | 34 | 20 | 0 | 0 |
| December 25, 2012 | 100 | 25 | 14 | 0 | 0 | 100 | 25 | 14 | 0 | 0 |
| December 25, 2013 | 100 | 19 | 10 | 0 | 0 | 100 | 19 | 10 | 0 | 0 |
| December 25, 2014 | 100 | 14 | 7 | 0 | 0 | 100 | 14 | 7 | 0 | 0 |
| December 25, 2015 | 100 | 10 | 1 | 0 | 0 | 100 | 10 | 0 | 0 | 0 |
| December 25, 2016 | 100 | 8 | 0 | 0 | 0 | 100 | 8 | 0 | 0 | 0 |
| December 25, 2017 | 100 | 6 | 0 | 0 | 0 | 100 | 3 | 0 | 0 | 0 |
| December 25, 2018 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2019 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2020 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2021 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2022 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2023 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2024 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2025 | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| December 25, 2026.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2027.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2028.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2029.................... | 93 | 0 | 0 | 0 | 0 | 93 | 0 | 0 | 0 | 0 |
| December 25, 2030.................... | 81 | 0 | 0 | 0 | 0 | 81 | 0 | 0 | 0 | 0 |
| December 25, 2031.................... | 67 | 0 | 0 | 0 | 0 | 67 | 0 | 0 | 0 | 0 |
| December 25, 2032.................... | 52 | 0 | 0 | 0 | 0 | 52 | 0 | 0 | 0 | 0 |
| December 25, 2033.................... | 35 | 0 | 0 | 0 | 0 | 35 | 0 | 0 | 0 | 0 |
| December 25, 2034.................... | 17 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 0 | 0 |
| December 25, 2035.................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years..... | 26.98 | 5.71 | 4.75 | 4.60 | 2.26 | 26.97 | 5.68 | 4.70 | 4.26 | 2.42 |

</Table>

<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT MODEL SET FORTH BELOW

<Table>
<Caption>

| | CLASS B-1 | | | | | CLASS B-2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DISTRIBUTION DATE | 0% | 80% | 100% | 150% | 200% | 0% | 80% | 100% | 150% | 200% |
| | ----- | ---- | ---- | ---- | ---- | ----- | ---- | ---- | ---- | ---- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial.................. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2006........ | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2007........ | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| December 25, 2008........ | 100 | 100 | 100 | 100 | 0 | 100 | 100 | 100 | 100 | 0 |
| December 25, 2009........ | 100 | 63 | 45 | 16 | 0 | 100 | 63 | 45 | 16 | 0 |
| December 25, 2010........ | 100 | 47 | 30 | 9 | 0 | 100 | 47 | 30 | 8 | 0 |
| December 25, 2011........ | 100 | 34 | 20 | 0 | 0 | 100 | 34 | 20 | 0 | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| December 25, 2012........ | 100 | 25 | 14 | 0 | 0 | 100 | 25 | 14 | 0 | 0 |
| December 25, 2013........ | 100 | 19 | 10 | 0 | 0 | 100 | 19 | 10 | 0 | 0 |
| December 25, 2014........ | 100 | 14 | 3 | 0 | 0 | 100 | 14 | 0 | 0 | 0 |
| December 25, 2015........ | 100 | 10 | 0 | 0 | 0 | 100 | 10 | 0 | 0 | 0 |
| December 25, 2016........ | 100 | 8 | 0 | 0 | 0 | 100 | * | 0 | 0 | 0 |
| December 25, 2017........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2018........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2019........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2020........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2021........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2022........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2023........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2024........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2025........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2026........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2027........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2028........ | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| December 25, 2029........ | 93 | 0 | 0 | 0 | 0 | 93 | 0 | 0 | 0 | 0 |
| December 25, 2030........ | 81 | 0 | 0 | 0 | 0 | 81 | 0 | 0 | 0 | 0 |
| December 25, 2031........ | 67 | 0 | 0 | 0 | 0 | 67 | 0 | 0 | 0 | 0 |
| December 25, 2032........ | 52 | 0 | 0 | 0 | 0 | 52 | 0 | 0 | 0 | 0 |
| December 25, 2033........ | 35 | 0 | 0 | 0 | 0 | 35 | 0 | 0 | 0 | 0 |
| December 25, 2034........ | 17 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 0 | 0 |
| December 25, 2035........ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years................... | 26.97 | 5.64 | 4.64 | 4.01 | 2.61 | 26.96 | 5.58 | 4.60 | 3.83 | 2.82 |

</Table>

------------

* Less than 0.5% but greater than 0.0%.

<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT MODEL SET FORTH BELOW

<Table>
<Caption>

CLASS B-3

| DISTRIBUTION DATE | 0% | 80% | 100% | 150% | 200% |
|---|---|---|---|---|---|
| Initial............................................... | 100 | 100 | 100 | 100 | 100 |
| December 25, 2006..................................... | 100 | 100 | 100 | 100 | 100 |
| December 25, 2007..................................... | 100 | 100 | 100 | 100 | 100 |
| December 25, 2008..................................... | 100 | 100 | 100 | 100 | 50 |
| December 25, 2009..................................... | 100 | 63 | 45 | 16 | 50 |
| December 25, 2010..................................... | 100 | 47 | 30 | 0 | 50 |
| December 25, 2011..................................... | 100 | 34 | 20 | 0 | 8 |
| December 25, 2012..................................... | 100 | 25 | 14 | 0 | 0 |
| December 25, 2013..................................... | 100 | 19 | 3 | 0 | 0 |
| December 25, 2014..................................... | 100 | 14 | 0 | 0 | 0 |
| December 25, 2015..................................... | 100 | 7 | 0 | 0 | 0 |
| December 25, 2016..................................... | 100 | 0 | 0 | 0 | 0 |
| December 25, 2017..................................... | 100 | 0 | 0 | 0 | 0 |
| December 25, 2018..................................... | 100 | 0 | 0 | 0 | 0 |
| December 25, 2019..................................... | 100 | 0 | 0 | 0 | 0 |
| December 25, 2020..................................... | 100 | 0 | 0 | 0 | 0 |
| December 25, 2021..................................... | 100 | 0 | 0 | 0 | 0 |
| December 25, 2022..................................... | 100 | 0 | 0 | 0 | 0 |
| December 25, 2023..................................... | 100 | 0 | 0 | 0 | 0 |

```
<Table>
December 25, 2024........................................   100      0
  0      0      0
December 25, 2025........................................   100      0
  0      0      0
December 25, 2026........................................   100      0
  0      0      0
December 25, 2027........................................   100      0
  0      0      0
December 25, 2028........................................   100      0
  0      0      0
December 25, 2029........................................    93      0
  0      0      0
December 25, 2030........................................    81      0
  0      0      0
December 25, 2031........................................    67      0
  0      0      0
December 25, 2032........................................    52      0
  0      0      0
December 25, 2033........................................    35      0
  0      0      0
December 25, 2034........................................    17      0
  0      0      0
December 25, 2035........................................     0      0
  0      0      0
Weighted Average Life in Years........................... 26.96   5.53
 4.53   3.70   4.31
</Table>
```

```
<PAGE>
```

HYPOTHETICAL AVAILABLE FUNDS CAP TABLE

        Based upon the Modeling Assumptions and assuming further that the Fixed
Rate Mortgage Loans prepay at a constant rate of 20% HEP and the Adjustable
Rate
Mortgage Loans prepay at a constant rate of 100% PPC, the following table
indicates the related Available Funds Cap under such an assumed hypothetical
scenario. It is highly unlikely, however, that prepayments on the Fixed Rate
Mortgage Loans will occur at a constant rate of 20% HEP or prepayments on the
Adjustable Rate Mortgage Loans will occur at a constant rate of 100% PPC or
at
any other constant rate. There is no assurance, therefore, of whether or to
what
extent the actual weighted average Net Mortgage Rate of the Mortgage Loans on
any Distribution Date will conform to the corresponding rate set forth for
such
Distribution Date in the following table.

```
<Table>
<Caption>
                                             SUBORDINATED
SUBORDINATED
          CLASS A-1    CLASS A-2    CERTIFICATE    CLASS A-1    CLASS A-2
CERTIFICATE
          AVAILABLE    AVAILABLE    AVAILABLE      AVAILABLE    AVAILABLE
AVAILABLE
```

| FUNDS DISTRIBUTION DATE | FUNDS CAP(%) (1)(3) | FUNDS CAP(%) (1)(4) | FUNDS CAP(%) (1)(5) | FUNDS CAP(%) (2)(3) | FUNDS CAP(%) (2)(4) | CAP(%) (2)(5) |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| 1/25/2006.. | 7.042 | 6.599 | 6.791 | 7.042 | 6.599 | 6.791 |
| 2/25/2006.. | 6.360 | 5.960 | 6.134 | 9.500 | 10.140 | 9.500 |
| 3/25/2006.. | 7.042 | 6.599 | 6.791 | 9.500 | 10.140 | 9.500 |
| 4/25/2006.. | 6.360 | 5.960 | 6.134 | 9.500 | 10.140 | 9.500 |
| 5/25/2006.. | 6.573 | 6.163 | 6.340 | 9.500 | 10.140 | 9.500 |
| 6/25/2006.. | 6.361 | 5.964 | 6.136 | 9.500 | 10.140 | 9.500 |
| 7/25/2006.. | 6.573 | 6.163 | 6.340 | 9.500 | 10.140 | 9.500 |
| 8/25/2006.. | 6.361 | 5.964 | 6.136 | 9.500 | 10.140 | 9.500 |
| 9/25/2006.. | 6.361 | 5.964 | 6.136 | 9.500 | 10.140 | 9.500 |
| 10/25/2006.. | 6.573 | 6.163 | 6.341 | 9.500 | 10.140 | 9.500 |
| 11/25/2006.. | 6.364 | 5.971 | 6.141 | 9.500 | 10.140 | 9.500 |
| 12/25/2006.. | 6.577 | 6.170 | 6.346 | 9.500 | 10.140 | 9.500 |
| 1/25/2007.. | 6.365 | 5.971 | 6.142 | 9.500 | 10.140 | 9.500 |
| 2/25/2007.. | 6.365 | 5.971 | 6.142 | 9.500 | 10.140 | 9.500 |
| 3/25/2007.. | 7.048 | 6.611 | 6.800 | 9.500 | 10.140 | 9.500 |
| 4/25/2007.. | 6.366 | 5.971 | 6.142 | 9.500 | 10.140 | 9.500 |
| 5/25/2007.. | 6.580 | 6.175 | 6.351 | 9.500 | 10.140 | 9.500 |
| 6/25/2007.. | 6.368 | 5.976 | 6.146 | 9.500 | 10.140 | 9.500 |
| 7/25/2007.. | 6.581 | 6.176 | 6.351 | 9.500 | 10.140 | 9.500 |
| 8/25/2007.. | 6.369 | 5.977 | 6.147 | 9.500 | 10.140 | 9.500 |
| 9/25/2007.. | 6.369 | 5.977 | 6.147 | 9.500 | 10.140 | 9.500 |
| 10/25/2007.. | 6.583 | 6.177 | 6.353 | 9.500 | 10.140 | 9.500 |
| 11/25/2007.. | 8.079 | 8.073 | 8.075 | 9.500 | 10.140 | 9.500 |

| | | | | | |
|---|---|---|---|---|---|
| 12/25/2007.. | 8.336 | 8.337 | 8.337 | 9.500 | 10.140 9.500 |
| 1/25/2008.. | 8.055 | 8.063 | 8.060 | 9.500 | 10.140 9.500 |
| 2/25/2008.. | 8.043 | 8.058 | 8.051 | 9.500 | 10.140 9.500 |
| 3/25/2008.. | 8.592 | 8.611 | 8.603 | 9.500 | 10.140 9.500 |
| 4/25/2008.. | 8.033 | 8.053 | 8.044 | 9.500 | 10.140 9.500 |
| 5/25/2008.. | 8.418 | 8.523 | 8.477 | 9.500 | 10.140 9.500 |
| 6/25/2008.. | 8.141 | 8.245 | 8.200 | 9.500 | 10.140 9.500 |
| 7/25/2008.. | 8.406 | 8.517 | 8.469 | 9.500 | 10.140 9.500 |
| 8/25/2008.. | 8.129 | 8.240 | 8.192 | 9.500 | 10.140 9.500 |

</Table>

<PAGE>

<Table>
<Caption>

| SUBORDINATED CERTIFICATE AVAILABLE FUNDS DISTRIBUTION DATE | CLASS A-1 AVAILABLE FUNDS CAP(%) (1)(3) | CLASS A-2 AVAILABLE FUNDS CAP(%) (1)(4) | SUBORDINATED CERTIFICATE AVAILABLE FUNDS CAP(%) (1)(5) | CLASS A-1 AVAILABLE FUNDS CAP(%) (2)(3) | CLASS A-2 AVAILABLE FUNDS CAP(%) (2)(4) | SUBORDINATED CERTIFICATE AVAILABLE FUNDS CAP(%) (2)(5) |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| 9/25/2008.. | 8.123 | 8.237 | 8.188 | 9.500 | 10.140 | 9.500 |
| 10/25/2008.. | 8.387 | 8.509 | 8.456 | 9.500 | 10.140 | 9.500 |
| 11/25/2008.. | 8.589 | 8.707 | 8.656 | 9.566 | 10.140 | 9.759 |
| 12/25/2008.. | 8.867 | 8.993 | 8.939 | 9.873 | 10.231 | 10.076 |
| 1/25/2009.. | 8.573 | 8.700 | 8.645 | 9.542 | 10.140 | 9.742 |
| 2/25/2009.. | 8.564 | 8.696 | 8.639 | 9.530 | 10.140 | 9.734 |
| 3/25/2009.. | 9.473 | 9.624 | 9.558 | 10.537 | 10.944 | 10.768 |
| 4/25/2009.. | 8.548 | 8.688 | 8.627 | 9.505 | 10.140 | 9.717 |

| | | | | | |
|---|---|---|---|---|---|
| 5/25/2009.. | 8.869 | 9.045 | 8.968 | 10.514 | 11.068 |
| 10.828 | | | | | |
| 6/25/2009.. | 8.574 | 8.749 | 8.673 | 10.159 | 10.704 |
| 10.468 | | | | | |
| 7/25/2009.. | 8.851 | 9.036 | 8.956 | 10.481 | 11.054 |
| 10.805 | | | | | |
| 8/25/2009.. | 8.556 | 8.741 | 8.661 | 10.128 | 10.690 |
| 10.446 | | | | | |
| 9/25/2009.. | 8.548 | 8.737 | 8.655 | 10.112 | 10.683 |
| 10.435 | | | | | |
| 10/25/2009.. | 8.823 | 9.023 | 8.937 | 10.432 | 11.031 |
| 10.771 | | | | | |
| 11/25/2009.. | 8.530 | 8.728 | 8.642 | 10.231 | 10.823 |
| 10.566 | | | | | |
| 12/25/2009.. | 8.805 | 9.015 | 8.923 | 10.555 | 11.176 |
| 10.906 | | | | | |
| 1/25/2010.. | 8.511 | 8.719 | 8.629 | 10.197 | 10.807 |
| 10.543 | | | | | |
| 2/25/2010.. | 8.502 | 8.715 | 8.623 | 10.180 | 10.799 |
| 10.531 | | | | | |
| 3/25/2010.. | 9.403 | 9.644 | 9.539 | 11.252 | 11.947 |
| 11.646 | | | | | |
| 4/25/2010.. | 8.484 | 8.706 | 8.610 | 10.146 | 10.783 |
| 10.507 | | | | | |
| 5/25/2010.. | 8.757 | 8.991 | 8.890 | 10.618 | 11.292 |
| 11.000 | | | | | |
| 6/25/2010.. | 8.465 | 8.697 | 8.596 | 10.257 | 10.919 |
| 10.633 | | | | | |
| 7/25/2010.. | 8.737 | 8.982 | 8.876 | 10.580 | 11.274 |
| 10.974 | | | | | |
| 8/25/2010.. | 8.446 | 8.687 | 8.583 | 10.221 | 10.902 |
| 10.607 | | | | | |
| 9/25/2010.. | 8.437 | 8.682 | 8.576 | 10.202 | 10.892 |
| 10.594 | | | | | |
| 10/25/2010.. | 8.708 | 8.967 | 8.855 | 10.523 | 11.246 |
| 10.933 | | | | | |
| 11/25/2010.. | 8.495 | 8.770 | 8.651 | 10.242 | 10.972 |
| 10.656 | | | | | |
| 12/25/2010.. | 8.767 | 9.057 | 8.932 | 10.563 | 11.327 |
| 10.997 | | | | | |
| 1/25/2011.. | 8.474 | 8.759 | 8.636 | 10.203 | 10.952 |
| 10.629 | | | | | |
| 2/25/2011.. | 8.464 | 8.754 | 8.629 | 10.184 | 10.942 |
| 10.615 | | | | | |
| 3/25/2011.. | 9.359 | 9.686 | 9.545 | 11.253 | 12.104 |
| 11.737 | | | | | |
| 4/25/2011.. | 8.443 | 8.743 | 8.614 | 10.144 | 10.922 |
| 10.587 | | | | | |
| 5/25/2011.. | 8.719 | 9.041 | 8.902 | 10.488 | 11.309 |
| 10.956 | | | | | |
| 6/25/2011.. | 8.427 | 8.743 | 8.607 | 10.129 | 10.934 |
| 10.588 | | | | | |
| 7/25/2011.. | 8.697 | 9.029 | 8.886 | 10.446 | 11.287 |
| 10.926 | | | | | |
| 8/25/2011.. | 8.406 | 8.732 | 8.592 | 10.089 | 10.912 |
| 10.559 | | | | | |

```
9/25/2011..    8.395      8.726      8.584       10.069      10.901
10.545
10/25/2011..   8.664      9.010      8.862       10.383      11.253
10.881
11/25/2011..   8.373      8.713      8.568       10.052      10.911
10.544
12/25/2011..   8.641      8.998      8.846       10.365      11.263
10.880
1/25/2012..    8.352      8.701      8.552       10.010      10.888
10.514
</Table>
```

`<PAGE>`

```
<Table>
<Caption>
                               SUBORDINATED
SUBORDINATED
                CLASS A-1   CLASS A-2   CERTIFICATE   CLASS A-1   CLASS A-2
CERTIFICATE
                AVAILABLE   AVAILABLE   AVAILABLE     AVAILABLE   AVAILABLE
AVAILABLE
                 FUNDS       FUNDS       FUNDS         FUNDS       FUNDS
FUNDS
DISTRIBUTION    CAP(%)      CAP(%)       CAP(%)       CAP(%)      CAP(%)
CAP(%)
   DATE          (1)(3)      (1)(4)       (1)(5)       (2)(3)      (2)(4)
(2)(5)
------------   ---------   ---------   ------------   ---------   ---------
------------
<S>            <C>         <C>         <C>            <C>         <C>
<C>
2/25/2012..      ***         ***          ***          ***         ***
***
</Table>
```

---------------

(1) Assumes no losses, 10% optional termination, 20% HEP for the Fixed Rate
    Mortgage Loans and 100% PPC for the Adjustable Rate Mortgage Loans, and
    One-Month LIBOR and Six-Month LIBOR remain constant at 4.3803% and
4.6295%,
    respectively.

(2) Assumes no losses, 10% optional termination, 20% HEP for the Fixed Rate
    Mortgage Loans and 100% PPC for the Adjustable Rate Mortgage Loans, and
    One-Month LIBOR and Six-Month LIBOR are 4.3803% and 4.6295%, respectively,
    for the first Distribution Date and both increase to 20.000% for each
    Distribution Date thereafter. The values indicated include proceeds from
the
    related Cap Contract, although such proceeds are excluded from the
    calculation of the related Available Funds Cap.

(3) Available Funds Cap for the Class A-1 Certificates is a per annum rate
equal
    to the product of (i) 12, (ii) the quotient of (x) the total scheduled

interest based on the Group One Mortgage Loans at their Net Mortgage Rates
in effect on the related due date, and (y) the aggregate principal balance
of the Group One Mortgage Loans as of the first day of the applicable
accrual period and (iii) 30 and divided by the actual number of days in the
related accrual period.

(4) Available Funds Cap for the Class A-2 Certificates is a per annum rate equal
to the product of (i) 12, (ii) the quotient of (x) the total scheduled
interest based on the Group Two Mortgage Loans at their Net Mortgage Rates
in effect on the related due date, and (y) the aggregate principal balance
of the Group Two Mortgage Loans as of the first day of the applicable
accrual period and (iii) 30 and divided by the actual number of days in the
related accrual period.

(5) Available Funds Cap for the Subordinated Certificates is a per annum rate
equal to the weighted average (weighted in proportion to the results of
subtracting from the aggregate principal balance of each loan group the
current principal balance of the related Class A Certificates) of the Class
A-1 Available Funds Cap and the Class A-2 Available Funds Cap.

ADDITIONAL INFORMATION

        The Depositor has filed additional yield tables and other computational
materials with respect to the certificates with the Securities and Exchange
Commission in a report on Form 8-K. Those tables and materials were prepared by
the underwriter for prospective investors who made requests for that additional
information. Those tables and assumptions may be based on assumptions that
differ from the Modeling Assumptions. Accordingly, those tables and other
materials may not be relevant to or appropriate for investors other than those
specifically requesting them.

                        FEDERAL INCOME TAX CONSEQUENCES

        For federal income tax purposes, the Trust Fund will include one or more
segregated asset pools, with respect to which elections will be made to treat
each as a separate REMIC. The Trust Fund will also include (x) a grantor trust
which will hold the Class C Certificates, the Cap Contract Account and the
rights to payments under the Cap Contracts and certain obligations with respect
to excess interest payments described below and (y) a grantor trust that will
hold the rights to prepayment charges. The assets of the lowest-tier REMIC will
consist of the Mortgage Loans and all other property in the Trust Fund except

for (i) interests issued by any of the REMICs, (ii) prepayment charges received
with respect to the Mortgage Loans, (iii) the Cap Contracts and the Cap Contract
Account and (iv) the interests in the grantor trusts described above. Each class
of the Offered Certificates (other than the Class R Certificate) will represent
the beneficial ownership of the corresponding regular interest of the
highest-tier REMIC. The Class R Certificate will represent the beneficial
ownership of the residual interest in each of the REMICs.

<PAGE>

     For federal income tax purposes, each of the interests in the highest-tier
REMIC that corresponds to an Offered Certificate will be subject to an interest
rate cap equal to the Net WAC Cap. In addition to representing the beneficial
ownership of the corresponding interest of the highest-tier REMIC, each of the
Offered Certificates will also represent the beneficial ownership of any excess
of the interest distributable on such class over the interest that would have
accrued on the corresponding class of interest had each of the Offered
Certificates been subject to a cap equal to the Net WAC Cap (such excess,
"excess interest payments"). The rights to excess interest payments associated
with the Offered Certificates will not, for federal income tax purposes, be
treated as interests in a REMIC.

     Upon the issuance of the Offered Certificates, Dechert LLP will deliver
its opinion to the effect that, assuming compliance with the Pooling and
Servicing Agreement, and the accuracy of certain representations made in the
Pooling and Servicing Agreement and the transfer agreements with respect to the
Mortgage Loans and certain representations made by the Seller, for federal
income tax purposes, each of the REMICs will qualify as a REMIC within the
meaning of Section 860D of the Code and the grantor trusts will qualify as such
under subpart E, Part I of Subchapter J of the Code.

     Holders of Subordinated Certificates may be required to accrue income
currently even though their distributions may be reduced due to defaults and
delinquencies on the related Mortgage Loans. See "Material Federal Income Tax
Consequences" in the prospectus.

     The current backup withholding rate is 28%. The rate is subject to
adjustment after 2010.

TAXATION OF THE BASIS RISK ARRANGEMENTS

     General.  Each holder of an Offered Certificate will be treated for
federal income tax purposes as having entered into, on the date it purchases
its

Offered Certificate, one or more notional principal contracts whereby it has the
right to receive payments with respect to excess interest payments.

In general, the holders of the Offered Certificates must allocate the price they pay for their certificates between their interest in the highest-tier REMIC and their rights to receive excess interest payments based on their relative fair market values. To the extent rights to receive such payments are determined to have a value on the Closing Date that is greater than zero, a portion of such purchase price will be allocable to such rights, and such portion will be treated as a cap premium paid by the holders of the Offered Certificates. A holder of an Offered Certificate will be required to amortize the cap premium under one of the methods set forth in the Swap Regulations. Prospective purchasers of the Offered Certificates should consult their own tax advisors regarding the appropriate method of amortizing any cap premium.

Under the Swap Regulations (i) all taxpayers must recognize periodic payments with respect to a notional principal contract under the accrual method of accounting, and (ii) any periodic payments received in connection with the right to receive excess interest payments must be netted against payments, if any, deemed made as a result of the cap premiums described above over the recipient's taxable year, rather than accounted for on a gross basis. Net income or deduction with respect to net payments under a notional principal contract for a taxable year should, and under recently proposed regulations would, constitute ordinary income or ordinary deduction. The proposed regulations referred to in the preceding sentence are proposed to be effective thirty days after they are published as final regulations. It is not known whether the proposed regulations will be adopted as final regulations or, if so, whether they will be adopted in their current form. The IRS could contend the amount of net income or deduction is capital gain or loss, but such treatment is unlikely, at least in the absence of further regulations. Individuals may be limited in their ability to deduct any such net deduction and should consult their tax advisors prior to investing in the Offered Certificates.

Termination Payments.  Any amount of proceeds from the sale, redemption or retirement of an Offered Certificate that is considered to be allocated to the selling beneficial owner's rights to receive excess interest payments in connection with the sale or exchange of an Offered Certificate would be considered under the Swap Regulations a "termination payment". A holder of an Offered Certificate will

<PAGE>

have gain or loss from such a termination of the right to receive excess interest payments equal to (i) any termination payment it received or is deemed

to have received minus (ii) the unamortized portion of any cap premium paid (or
deemed paid) by the beneficial owner upon entering into or acquiring its right
to receive excess interest payments.

Gain or loss realized upon the termination of a right to receive excess
interest payments generally will be treated as capital gain or loss. Moreover,
in the case of a bank or thrift institution, Section 582(c) of the Code would
likely not apply to treat such gain or loss, or a portion thereof, as
ordinary.

Investors are urged to consult their own tax advisors regarding the
appropriate tax treatment of the right to receive excess interest payments.

Application of the Straddle Rules.  The Offered Certificates, representing
beneficial ownership of the corresponding regular interest and the right to
receive excess interest payments, may constitute positions in a straddle, in
which case, the straddle rules of Section 1092 of the Code would apply. If the
straddle rules apply, a selling beneficial owner's capital gain or loss with
respect to such corresponding regular interest would be short-term because the
holding period would be tolled under the straddle rules. Similarly, capital gain
or loss realized in connection with the termination of the right to receive
excess interest payments would be short-term. If the holder of an Offered
Certificate incurred or continued indebtedness to acquire or hold such Offered
Certificate, the holder would generally be required to capitalize a portion of
the interest paid on such indebtedness until termination of the right to receive
excess interest payments.

ORIGINAL ISSUE DISCOUNT AND AMORTIZABLE BOND PREMIUM

The REMIC regular interests represented by the Offered Certificates (other
than the Class R Certificate) may be, treated as being issued with original
issue discount. For purposes of determining the amount and rate of accrual of
original issue discount and market discount, the Depositor intends to assume
that there will be prepayments on the Mortgage Loans at a rate equal to 100% of
the applicable prepayment model, as described above. No representation is made
as to whether the Mortgage Loans will prepay at that rate or any other rate. See
"Yield, Prepayment and Maturity Considerations" in this prospectus supplement
and "Material Federal Income Tax Consequences" in the prospectus.

The REMIC regular interests represented by the other classes of the
Offered Certificates (other than the Class R Certificate) may be treated as
being issued at a premium. If this occurs, the holders of the Offered
Certificates may elect under Section 171 of the Code to amortize that premium
under the constant yield method and to treat that amortizable premium as an

offset to interest income on such regular interests. This election, however, applies to all the certificateholder's debt instruments held during or after the
first taxable year in which the election is first made, may be revoked only with
the consent of the IRS, and should only be made after consulting with a tax advisor.

    If the method for computing original issue discount described in the prospectus results in a negative amount for any period with respect to a certificateholder, such certificateholder will be permitted to offset such excess amounts only against the respective future income, if any, from the REMIC
regular interest represented by such certificate. Although the tax treatment is
uncertain, a certificateholder may be permitted to deduct a loss to the extent
that such holder's respective remaining basis in the REMIC regular interest represented by such certificate exceeds the maximum amount of future payments to
which such holder is entitled with respect to its REMIC regular interest, assuming no further principal prepayments on the Mortgage Loans are received. Although the matter is not free from doubt, any such loss might be treated as a
capital loss.

SPECIAL TAX ATTRIBUTES OF THE OFFERED CERTIFICATES

    As is described more fully under "Material Federal Income Tax Consequences" in the prospectus, the Offered Certificates, other than any portion of an Offered Certificate representing a right to receive excess interest payments, will be treated as assets described in Section 7701(a)(19)(C)
of the Code in

<PAGE>

the same proportion that the assets of the Trust Fund, exclusive of the rights
to the Cap Contract Account, rights to receive payments under the Cap Contracts,
and rights to receive prepayment charges with respect to the Mortgage Loans, would be so treated; provided, however, that if at least 95% of the assets of the Trust Fund, exclusive of the rights to the Cap Contract Account, rights to
receive payments under the Cap Contracts, and rights to receive prepayment charges with respect to the Mortgage Loans, are assets described in Section 7701(a)(19)(C)(i)-(x) of the Code, the Offered Certificates, other than any portion of an Offered Certificate representing a right to receive excess interest payments, will be treated in their entirety as assets described in Section 7701(a)(19)(C) of the Code.

    The Offered Certificates, other than any portion of an Offered Certificate
representing a right to receive excess interest payments, will be treated as "real estate assets" under Section 856(c)(5)(B) of the Code in the same

proportion that the assets of the Trust Fund, exclusive of the rights to the Cap
Contract Account, rights to receive payments under the Cap Contracts, and rights
to receive prepayment charges with respect to the Mortgage Loans, would be so
treated; provided, however, that if at least 95% of the assets of the Trust
Fund, exclusive of the rights to the Cap Contract Account, rights to receive
payments under the Cap Contracts, and rights to receive prepayment charges with
respect to the Mortgage Loans, are "real estate assets" within the meaning of
Section 856(c)(5)(B) of the Code, then the Offered Certificates, other than any
portion of an Offered Certificate representing a right to receive excess
interest payments, will be treated in their entirety as "real estate assets"
under Section 856(c)(5)(B) of the Code. Interest on the Offered Certificates,
other than excess interest payments, will be treated as "interest on obligations
secured by mortgages on real property" within the meaning of Section
856(c)(3)(B) of the Code in the same proportion that income of the Trust Fund,
exclusive of income from the Cap Contracts, income from the Cap Contract Account
and income from prepayment charges with respect to the Mortgage Loans, is income
described in Section 856(c)(3)(B) of the Code; provided, however, that if at
least 95% of the assets of the Trust Fund, exclusive of the rights to the Cap
Contract Account, rights to receive payments under the Cap Contracts, and rights
to receive prepayment charges with respect to the Mortgage Loans, are "real
estate assets" within the meaning of Section 856(c)(5)(B) of the Code, then all
interest on the Offered Certificates, other than excess interest payments, will
be treated as "interest on obligations secured by mortgages on real property"
within the meaning of Section 856(c)(3)(B) of the Code.

        The portion of any Offered Certificate representing a right to receive
excess interest payments will not be treated as a "real estate asset" under
Section 856(c)(5)(B) of the Code or as a qualifying asset under Section
860G(a)(3) or Section 7701(a)(19)(C) of the Code and income with respect to such
portion will not be treated as "interest on obligations secured by mortgages on
real property" within the meaning of Section 856(c)(3)(B) of the Code.

PROHIBITED TRANSACTIONS TAX AND OTHER TAXES

        The Code imposes a tax on REMICs equal to 100% of the net income derived
from "prohibited transactions." In general, subject to specified exceptions, a
prohibited transaction means the disposition of a Mortgage Loan, the receipt of
income from a source other than a Mortgage Loan or other permitted investments,
the receipt of compensation for services, or gain from the disposition of an
asset purchased with the payments on the Mortgage Loans for temporary investment

pending distribution on the certificates. It is not anticipated that the Trust
Fund will engage in any prohibited transactions in which it would recognize a
material amount of net income.

In addition, contributions to a trust fund that elects to be treated as a
REMIC made after the day on which the trust fund issues all of its interests
could result in the imposition of a tax on the trust fund equal to 100% of the
value of the contributed property. The Trust Fund will not accept contributions
that would subject it to such tax.

In addition, a trust fund that elects to be treated as a REMIC may be
subject to federal income tax at the highest corporate rate on "net income from
foreclosure property," determined by reference to the rules applicable to real
estate investment trusts. "Net income from foreclosure property" generally

<PAGE>

means income derived from foreclosure property, including gain from the sale of
a foreclosure property, other than qualifying rents and other income or gain
that would be qualifying income for a real estate investment trust. It is not
anticipated that the Trust Fund will recognize net income from foreclosure
property subject to federal income tax.

Where the above-referenced prohibited transactions tax, tax on
contributions to a trust fund, tax on net income from foreclosure property or
state or local income or franchise tax that may be imposed on a REMIC arises out
of a breach of the Servicer's or the Securities Administrator's obligations, as
the case may be, under the Pooling and Servicing Agreement and in respect of
compliance with then applicable law, such tax will be borne by the Servicer or
the Securities Administrator in either case out of its own funds. In the event
that either the Servicer or the Securities Administrator, as the case may be,
fails to pay or is not required to pay any such tax as provided above, such tax
will be paid by the Trust Fund first with amounts that might otherwise be
distributable to the holders of certificates in the manner provided in the
Pooling and Servicing Agreement. It is not anticipated that any material state
or local income or franchise tax will be imposed on the Trust Fund.

For further information regarding the federal income tax consequences of
investing in the Offered Certificates, see "Material Federal Income Tax
Consequences--REMICs" in the prospectus.

CLASS R CERTIFICATE

The holder of the Class R Certificate must include the taxable income or
loss of the REMICs in determining its federal taxable income. The Class R
Certificate will remain outstanding for federal income tax purposes until there
are no certificates of any other class outstanding. Prospective investors are
cautioned that the Class R Certificateholder's REMIC taxable income and the tax
liability thereon may exceed, and may substantially exceed, cash distributions
to such holder during certain periods, in which event, the holder thereof must
have sufficient alternative sources of funds to pay such tax liability.
Furthermore, it is anticipated that all or a substantial portion of the taxable
income of the REMICs includable by the holder of the Class R Certificate will be
treated as "excess inclusion" income, resulting in (i) the inability of such
holder to use net operating losses to offset such income from the REMICs, (ii)
the treatment of such income as "unrelated business taxable income" to certain
holders who are otherwise tax-exempt and (iii) the treatment of such income as
subject to 30% withholding tax to certain non-U.S. investors, with no exemption
or treaty reduction.

     The Class R Certificate will be considered to represent "noneconomic
residual interests," with the result that transfers thereof would be disregarded
for federal income tax purposes if any significant purpose of the transfer was
to impede the assessment or collection of tax. All transfers of the Class R
Certificate will be subject to certain restrictions intended to reduce the
possibility of any such transfer being disregarded. Such restrictions include
requirements that (i) the transferor represent that it has conducted an
investigation of the transferee and made certain findings regarding whether the
transferee has historically paid its debts when they become due, (ii) the
proposed transferee make certain representations regarding its understanding
that as the holder of a Class R Certificate the transferee may incur tax
liabilities in excess of the cashflow from the Class R Certificate and its
intention to pay the taxes associated with holding the Class R Certificate as
they become due and (iii) the proposed transferee agree that it will not
transfer the Class R Certificate to any person unless that person agrees to
comply with the same restrictions on future transfers. See "Description of the
Certificates--Restrictions on Transfer of the Class R Certificate" in this
prospectus supplement and "Material Federal Income Tax Consequences--Tax-
Related Restrictions on Transfers of REMIC Residual Certificates" in the
prospectus.

     An individual, trust or estate that holds the Class R Certificate (whether
such Class R Certificate is held directly or indirectly through certain

pass-through entities) also may have additional gross income with respect to, but may be subject to limitations on the deductibility of, Servicing Fees on the
Mortgage Loans and other administrative expenses of the Trust Fund in computing
such holder's regular tax liability, and may not be able to deduct such fees or
expenses to any extent in computing such holder's alternative minimum tax liability. In addition, some portion of a purchaser's basis, if any, in the Class R Certificate

<PAGE>

may not be recovered until termination of the Trust Fund. Furthermore, the federal income tax consequences of any consideration paid to a transferee on a
transfer of the Class R Certificate are unclear. Recently issued regulations require an acquiror or transferee of a noneconomic residual interest to recognize as income any fee received to induce such person to become a holder of
such interest over a period reasonably related to the period during which the applicable REMIC is expected to generate taxable income or net loss in a manner
that reasonably reflects the after-tax costs and benefits (without regard to such fee) of holding such interest. The regulations provide two safe harbor methods that satisfy this requirement. Under one method, the fee is recognized
in accordance with the method of accounting, and over the same period, that the
taxpayer uses for financial reporting purposes, provided that the fee is included in income for financial reporting purposes over a period that is not shorter than the period during which the applicable REMIC is expected to generate taxable income. Under a second method, the fee is recognized ratably over the anticipated weighted average life of the applicable REMIC (as determined under applicable Treasury regulations) remaining as of the date of acquisition of the noneconomic residual interest. The IRS may provide additional
safe harbor methods in future guidance. Once a taxpayer adopts a particular method of accounting for such fees, the taxpayer generally may not change to a
different method without consent of the IRS. Under the regulations, if any portion of such a fee has not been recognized in full by the time the holder of
a noneconomic residual interest disposes of such interest, then the holder must
include the unrecognized portion in income at that time. The regulations also provide that such a fee shall be treated as income from sources within the United States. Any transferee receiving consideration with respect to the Class
R Certificate should consult its tax advisors.

    Due to the special tax treatment of residual interests, the effective after-tax return of the Class R Certificate may be significantly lower than would be the case if the Class R Certificate were taxed as a debt instrument, or
may be negative.

For further information regarding the federal income tax consequences of investing in the Offered Certificates, see "Material Federal Income Tax Consequences" in the prospectus.

## TAX RETURN DISCLOSURE REQUIREMENTS

Taxpayers are required to report certain information on IRS Form 8886 if they participate in a "reportable transaction." Holders should consult their tax advisors as to the need to file a Form 8886 (disclosing certain potential tax shelters) with their federal income tax returns.

## STATE TAXES

The Depositor makes no representations regarding the tax consequences of purchase, ownership or disposition of the Offered Certificates under the tax laws of any state. Investors considering an investment in the Offered Certificates should consult their own tax advisors regarding such tax consequences.

All investors should consult their own tax advisors regarding the federal, state, local or foreign income tax consequences of the purchase, ownership and disposition of the Offered Certificates.

## ERISA CONSIDERATIONS

Section 406 of ERISA prohibits "parties in interest" with respect to a Plan subject to ERISA and Section 4975 of the Code prohibits "disqualified persons" with respect to a Plan subject thereto from engaging in certain transactions involving such Plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes certain excise taxes and other penalties on prohibited transactions involving Plans subject to that Section. ERISA authorizes the imposition of civil penalties for prohibited transactions involving Plans subject to Title I of ERISA in certain circumstances. Any Plan fiduciary proposing to cause a Plan to acquire the Offered Certificates should consult with its counsel with respect to the potential consequences under ERISA and the Code of the Plan's acquisition and holding of the Offered Certificates. The Class R Certificate may not be

<PAGE>

purchased by a Plan; therefore, references in the following discussion to the Offered Certificates do not apply, in general, to the Class R Certificate. See

"ERISA Considerations" in the prospectus.

     Certain employee benefit plans, including governmental plans and certain
church plans, are not subject to ERISA. Accordingly, assets of such plans may be
invested in the Offered Certificates without regard to the ERISA Considerations
described herein and in the Prospectus, subject to any provisions under any
federal, state, local, non-U.S. or other laws or regulations that are
substantively similar to Title I of ERISA or Section 4975 of the Code ("Similar
Law").

     Except as noted above, investments by Plans are subject to ERISA's general
fiduciary requirements, including the requirement of investment prudence and
diversification and the requirement that a Plan's investments be made in
accordance with the documents governing the Plan. A fiduciary deciding whether
to invest the assets of a Plan in the Offered Certificates should consider,
among other factors, the extreme sensitivity of the investments to the rate of
principal payments (including prepayments) on the Mortgage Loans.

     The U.S. Department of Labor has granted the Exemption from certain of the
prohibited transaction rules of ERISA and the related excise tax provisions of
Section 4975 of the Code with respect to the initial purchase, the holding, the
servicing and the subsequent resale by Plans of certificates in pass-through
trusts that consist of receivables, loans and other obligations that meet the
conditions and requirements of the Exemption.

     Among the general conditions that must be satisfied for the Exemption to
apply are the following:

     (1) the acquisition of the certificates by a Plan is on terms (including
         the price for the certificates) that are at least as favorable to the
         Plan as they would be in an arm's-length transaction with an unrelated
         party;

     (2) the rights and interests evidenced by the certificates acquired by the
         Plan are not subordinated to the rights and interests evidenced by
         other certificates of the Trust Fund, other than in the case of
         Designated Transactions;

     (3) the certificates acquired by the Plan have received a rating at the
         time of such acquisition that is one of the three (or in the case of
         Designated Transactions, four) highest generic rating categories of

Fitch, Moody's or S&P;

(4) the Trustee must not be an affiliate of any other member of the
Restricted Group other than an underwriter;

(5) the sum of all payments made to and retained by the underwriter in
connection with the distribution of the certificates represents not
more than reasonable compensation for underwriting the
certificates;
the sum of all payments made to and retained by the Seller for the
assignment of the Mortgage Loans to the Trust Fund represents not
more
than the fair market value of such Mortgage Loans; the sum of all
payments made to and retained by the Servicer and any other
servicer
represents not more than reasonable compensation for such person's
services under the agreement in which the loans are pooled and
reimbursements of such person's reasonable expenses in connection
therewith; and

(6) the Plan investing in the certificates is an "accredited investor"
as
defined in Rule 501(a)(1) of Regulation D of the Securities and
Exchange Commission under the Securities Act of 1933, as amended.

The Trust Fund must also meet the following requirements:

(1) the corpus of the Trust Fund must consist solely of assets of the
type
that have been included in other investment pools;

<PAGE>

(2) certificates in such other investment pools must have been rated in
one of the three (or in the case of Designated Transactions, four)
highest rating categories of Fitch, Moody's or S&P for at least one
year prior to the Plan's acquisition of certificates; and

(3) certificates evidencing interests in such other investment pools
must
have been purchased by investors other than Plans for at least one
year prior to any Plan's acquisition of certificates.

Moreover, the Exemption provides relief from certain self-
dealing/conflict
of interest prohibited transactions that may occur when a Plan fiduciary
causes
a Plan (other than a Plan sponsored by a member of the Restricted Group) to
acquire certificates in a trust and the fiduciary (or its affiliate) is an
obligor on the receivables held in the trust, provided that, among other
requirements:

(1) in the case of an acquisition in connection with the initial
issuance
of certificates, at least fifty percent (50%) of each class of
certificates in which Plans have invested is acquired by persons

independent of the Restricted Group and at least fifty percent (50%)

of the aggregate interest in the trust is acquired by persons independent of the Restricted Group;

(2) such fiduciary (or its affiliate) is an obligor with respect to five

percent (5%) or less of the fair market value of the obligations contained in the trust;

(3) the Plan's investment in certificates of any class does not exceed twenty-five percent (25%) of all of the certificates of that class outstanding at the time of the acquisition; and

(4) immediately after the acquisition, no more than twenty-five percent (25%) of the assets of any Plan with respect to which such person is a

fiduciary are invested in certificates representing an interest in one

or more trusts containing assets sold or serviced by the same entity.

Further, additional conditions under the Exemption are applicable to eligible swaps or cap contracts. These conditions are discussed in "ERISA Considerations" in the prospectus.

Except as described below, it is expected that the Exemption will apply to
the acquisition and holding of the Offered Certificates by Plans and that all conditions of the Exemption other than those within the control of the investors
will be met. In addition, as of the date hereof, there is no single mortgagor that is the obligor on five percent (5%) or more of the Mortgage Loans included
in the Trust Fund by aggregate unamortized principal balance of the assets of the Trust Fund.

Because the characteristics of the Class R Certificate may not meet the requirements of the Exemption or any other issued exemption under ERISA, a Plan
may have engaged in a prohibited transaction or incur excise taxes or civil penalties if it purchases and holds the Class R Certificate. Consequently, transfers of the Class R Certificate will not be registered by the Securities Administrator unless the Securities Administrator receives a representation from
the transferee of the Class R Certificate, acceptable to and in form and substance satisfactory to the Securities Administrator, that the transferee is
not a Plan, and is not directly or indirectly acquiring the Class R Certificate
for, on behalf of or with any assets of any such Plan. Any purported transfer of
the Class R Certificate or any interest therein in violation of such representation shall be void and of no effect, and the next preceding permitted
beneficial owner will be treated as the beneficial owner of the Class R

Certificate. The Securities Administrator shall be entitled, but not obligated,
to recover from any holder of the Class R Certificate that was in fact a Plan
and that held such Certificate in violation of such representation all payments
made on such Class R Certificate at and after the time it commenced such
holding. Any such payments so recovered shall be paid and delivered to such last
preceding beneficial owner.

Prospective Plan investors should consult with their legal advisors
concerning the impact of ERISA and the Code, the applicability of the Exemption
and PTE (described in the prospectus), and the potential consequences in their
specific circumstances, prior to making an investment in the Offered
Certificates. Moreover, each Plan fiduciary should determine whether under the
general fiduciary standards of ERISA, an investment in the Offered Certificates
is appropriate for the Plan, taking into account the overall investment policy
of the Plan and the composition of the Plan's investment portfolio.

<PAGE>

## LEGAL INVESTMENT

The Offered Certificates will not constitute "mortgage related securities"
under SMMEA. The appropriate characterization of the Offered Certificates under
various legal investment restrictions, and thus the ability of investors subject
to those restrictions to purchase Offered Certificates, may be subject to
significant interpretive uncertainties. All investors whose investment authority
is subject to legal restrictions should consult their own legal advisors to
determine whether, and to what extent, the Offered Certificates will constitute
legal investments for them.

No representations are made as to the proper characterization of the
Offered Certificates for legal investment or financial institution regulatory
purposes, or other purposes, or as to the ability of particular investors to
purchase the Offered Certificates under applicable legal investment
restrictions. The uncertainties described above (and any unfavorable future
determinations concerning legal investment or financial institution regulatory
characteristics of the Offered Certificates) may adversely affect the liquidity
of the Offered Certificates. See "Legal Investment" in the prospectus.

## USE OF PROCEEDS

Substantially all of the net proceeds to be received from the sale of the
Offered Certificates will be applied by the Depositor to the purchase price of
the Mortgage Loans.

## METHOD OF DISTRIBUTION

Subject to the terms and conditions of the underwriting agreement dated
February 28, 2003 and the terms agreement dated December 21, 2005, each between
the Depositor and Merrill Lynch, as underwriter, the Offered Certificates are
being purchased from the Depositor by Merrill Lynch.

The Depositor has been advised that the underwriter proposes initially to
offer the Offered Certificates set forth below to the public at the offering
prices set forth below. The Depositor has been advised that the underwriter
proposes initially to offer the Offered Certificates set forth below to certain
dealers at such offering prices less a selling concession not to exceed the
percentage of the certificate denomination set forth below, and that the
underwriter may allow and such dealers may reallow a reallowance discount not to
exceed the percentage of the certificate denomination set forth below:

```
<Table>
<Caption>
```

| CLASS OF CERTIFICATES | PRICE TO PUBLIC | UNDERWRITING DISCOUNT | SELLING REALLOWANCE | REALLOWANCE DISCOUNT |
|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` |
| A-1........................................ | 100.000000% | 0.156250% | 0.093750% | 0.046875% |
| A-2A....................................... | 100.000000% | 0.156250% | 0.093750% | 0.046875% |
| A-2B....................................... | 100.000000% | 0.218750% | 0.131250% | 0.065625% |
| A-2C....................................... | 100.000000% | 0.250000% | 0.150000% | 0.075000% |
| M-1........................................ | 100.000000% | 0.343750% | 0.206250% | 0.103125% |
| M-2........................................ | 100.000000% | 0.468750% | 0.281250% | 0.140625% |
| M-3........................................ | 100.000000% | 0.500000% | 0.300000% | 0.150000% |
| M-4........................................ | 100.000000% | 0.562500% | 0.337500% | 0.168750% |
| M-5........................................ | 100.000000% | 0.625000% | 0.375000% | 0.187500% |
| M-6........................................ | 100.000000% | 0.812500% | 0.487500% | 0.243750% |

```
B-1........................................    100.000000%    0.875000%
0.525000%    0.262500%
B-2........................................     98.318100%    0.906250%
0.543750%    0.271875%
B-3........................................     94.726800%    0.968750%
0.581250%    0.290625%
R..........................................    100.000000%    0.000000%
0.000000%    0.000000%
</Table>
```

After the initial public offering, the public offering price, selling
concessions and reallowance discounts may be changed.

<PAGE>

The Depositor has been advised by the underwriter that it intends to
make
a market in the Offered Certificates, but that the underwriter has no
obligation
to do so. There can be no assurance that a secondary market for the Offered
Certificates, or any particular class of Offered Certificates, will develop
or,
if it does develop, that it will continue or that such market will provide
sufficient liquidity to certificateholders.

Until the distribution of the Offered Certificates is completed, rules
of
the Securities and Exchange Commission may limit the ability of the
underwriter
and some selling group members to bid for and purchase the Offered
Certificates.
As an exception to these rules, the underwriter is permitted to engage in
transactions that stabilize the price of the Offered Certificates. These
transactions consist of bids or purchases for the purpose of pegging, fixing
or
maintaining the price of the Offered Certificates.

In general, purchases of a security for the purpose of stabilization or
to
reduce a short position could cause the price of the security to be higher
than
it might be in the absence of such purchases.

Neither the Depositor nor the underwriter makes any representation or
prediction as to the direction or magnitude of any effect that the
transactions
described above may have on the prices of the Offered Certificates. In
addition,
neither the Depositor nor the underwriter makes any representation that the
underwriter will engage in such transactions or that such transactions, once
commenced, will not be discontinued without notice.

The Depositor has agreed to indemnify the underwriter against, or make
contributions to the underwriter with respect to, certain liabilities,
including
liabilities under the Securities Act of 1933, as amended.

The underwriter has agreed to reimburse the Depositor for certain expenses
incurred in connection with the issuance of the certificates.

Merrill Lynch is an affiliate of the Depositor, the Seller and the Servicer.

## LEGAL MATTERS

Certain legal matters will be passed upon for the Depositor and for the underwriter by Dechert LLP, New York, New York.

<PAGE>

## RATINGS

It is a condition of the issuance of the Offered Certificates that they be
assigned the ratings designated below by Moody's and S&P. The designation "NR"
means that the applicable rating agency will not rate the certificates of that
class.

<Table>
<Caption>

| CLASS OF CERTIFICATES | MOODY'S | S&P |
|---------------------|---------|------|
| <S> | <C> | <C> |
| A-1........................................................... | Aaa | AAA |
| A-2A.......................................................... | Aaa | AAA |
| A-2B.......................................................... | Aaa | AAA |
| A-2C.......................................................... | Aaa | AAA |
| M-1........................................................... | Aa1 | AA+ |
| M-2........................................................... | Aa2 | AA+ |
| M-3........................................................... | Aa3 | AA |
| M-4........................................................... | A1 | AA- |
| M-5........................................................... | A2 | A+ |
| M-6........................................................... | A3 | A |
| B-1........................................................... | Baa1 | A- |
| B-2........................................................... | Baa2 | BBB+ |
| B-3........................................................... | Baa3 | BBB |
| R............................................................. | NR | AAA |

</Table>

The security ratings assigned to the Offered Certificates should be
evaluated independently from similar ratings on other types of securities. A
security rating is not a recommendation to buy, sell or hold securities and may
be subject to revision or withdrawal at any time by the Rating Agencies. The
ratings on the Offered Certificates do not, however, constitute statements
regarding the likelihood or frequency of prepayments on the Mortgage Loans, the
payment of the Floating Rate Certificate Carryover or the anticipated yields in

light of prepayments.

Moody's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which such certificateholders are entitled. Moody's ratings opinions address the structural and legal issues associated with the Offered Certificates, including
the nature of the underlying mortgage loans. Moody's ratings on pass-through certificates do not represent any assessment of the likelihood that principal prepayments may differ from those originally anticipated nor do they address the
possibility that, as a result of principal prepayments, certificateholders may
receive a lower than anticipated yield.

S&P's ratings on mortgage pass-through certificates address the likelihood
of receipt by certificateholders of payments required under the operative agreements. S&P's ratings take into consideration the credit quality of the mortgage pool including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream of the mortgage pool is adequate to make payments required under the certificates, S&P's ratings on mortgage pass-through certificates do not, however, constitute a statement regarding the frequency of prepayments on the mortgage loans or address the likelihood of receipt of Floating Rate Certificate
Carryover. S&P's ratings do not address the possibility that investors may suffer a lower than anticipated yield.

The Depositor has not requested a rating of the Offered Certificates by any rating agency other than Moody's and S&P. However, there can be no assurance
as to whether any other rating agency will rate the Offered Certificates or, if
it does, what ratings would be assigned by such other rating agency. The ratings
assigned by any such other rating agency to the Offered Certificates could be lower than the respective ratings assigned by the Rating Agencies.

<PAGE>

GLOSSARY OF DEFINED TERMS

| 1/29 LIBOR LOANS | means Mortgage Loans which bear interest at a |
| | fixed rate for a period of approximately one year after origination and thereafter have semi-annual interest rate and payment adjustments in substantially the same manner as |
| | Six-Month LIBOR Loans. |
| 2/28 LIBOR LOANS | means Mortgage Loans which bear interest at a |
| | fixed rate for a period of approximately two years after origination and thereafter have |

|                                    | semi-annual interest rate and payment adjustments in substantially the same manner as |
|                                    | Six-Month LIBOR Loans. |
| 3/27 LIBOR LOANS | means Mortgage Loans which bear interest at a |
|                                    | fixed rate for a period of approximately three |
|                                    | years after origination and thereafter have semi-annual interest rate and payment adjustments in substantially the same manner as |
|                                    | Six-Month LIBOR Loans. |
| 5/25 LIBOR LOANS | means Mortgage Loans which bear interest at a |
|                                    | fixed rate for a period of approximately five |
|                                    | years after origination and thereafter have semi-annual interest rate and payment adjustments in substantially the same manner as |
|                                    | Six-Month LIBOR Loans. |
| ACCOUNTS | means one or more accounts maintained by the Securities Administrator, the Master Servicer |
|                                    | or the Servicer pursuant to the Pooling and Servicing Agreement. |
| ACCRUAL PERIOD | means, with respect to the Offered Certificates |
|                                    | and a Distribution Date, the period from and including the preceding Distribution Date (or |
|                                    | from the Closing Date in the case of the first |
|                                    | Distribution Date) to and including the day prior to such Distribution Date. |
| ADJUSTABLE RATE MORTGAGE LOAN | means a Mortgage Loan in the Trust Fund with an |
|                                    | adjustable interest rate. |
| ADJUSTMENT DATE | means, with respect to an Adjustable Rate Mortgage Loan, generally the first day of the |
|                                    | month or months specified in the related mortgage note. |
| ADVANCE | means, with respect to a Servicer Remittance Date, an advance of the Servicer's own funds, or funds in the related Collection Account that |
|                                    | are not required to be distributed on the related Distribution Date, in an amount |

generally equal to the aggregate of payments
of
principal and interest on the Mortgage Loans
(adjusted to the applicable Net Mortgage
Rate)
that were due on the related Due Date and
delinquent on the related Servicer
Remittance
Date (other than the principal portion of
any
Balloon Amount), together with an amount
equivalent to principal and interest
(adjusted
to the Net Mortgage Rate) deemed due on each
Mortgage Loan as to which there is REO
Property, such latter amount to be
calculated
after taking into account any rental income.

APPLIED REALIZED LOSS AMOUNT          means, with respect to any class of
Subordinated Certificates and as to any
Distribution Date, the sum of the Realized
Losses with respect to Mortgage Loans which
have been applied in reduction of the
Certificate Principal Balance of such class.

AUCTION TERMINATION DATE              means the first Distribution Date on which
the
aggregate Stated Principal Balance of the
Mortgage Loans and REO Properties is

S-105

<PAGE>

less than or equal to 10% of the aggregate
Stated Principal Balance of the Mortgage
Loans
as of the Cut-off Date.

AVAILABLE FUNDS CAP                   means any of the Class A-1 Available Funds
Cap,
the Class A-2 Available Funds Cap or the
Subordinated Certificate Available Funds Cap.

BALLOON AMOUNT                        means the balloon payment of the remaining
outstanding principal balance of a mortgage
loan.

BALLOON LOAN                          means a mortgage loan having an original
term
to stated maturity of approximately 15 years
and providing for level monthly payments
generally based on a 30 year amortization
schedule with a payment of a Balloon Amount
due
on such mortgage loan at its stated maturity.

BOOK-ENTRY CERTIFICATES                means the Offered Certificates other than
any
                                       Definitive Certificates.

BUSINESS DAY                           means any day other than (i) a Saturday or
                                       Sunday or (ii) a day on which banking
                                       institutions in the State of California,
State
                                       of Illinois, State of Oregon or the City of
New
                                       York, New York are authorized or obligated
by
                                       law or executive order to be closed.

CAP CONTRACT                           means any of the Class A-1 Cap Contract,
Class
                                       A-2 Cap Contract or Subordinated Certificate
                                       Cap Contract.

CAP CONTRACT ACCOUNT                   means the separate account into which
payments
                                       received on the Cap Contracts will be
                                       deposited.

CAP CONTRACT COUNTERPARTY              means The Royal Bank of Scotland plc, with
whom
                                       the Securities Administrator, on behalf of
the
                                       Trust Fund, entered into each of the Cap
                                       Contracts.

CAP CONTRACT NOTIONAL BALANCE          means any of the Class A-1 Cap Contract
                                       Notional Balance, Class A-2 Cap Contract
                                       Notional Balance or Subordinated Certificate
                                       Cap Contract Notional Balance.

CAP CONTRACT TERMINATION DATE          means any of the Class A-1 Cap Contract
                                       Termination Date, Class A-2 Cap Contract
                                       Termination Date or Subordinated Certificate
                                       Cap Contract Termination Date.

CERTIFICATE ACCOUNT                    means the one or more accounts established
by
                                       the Securities Administrator, for the
benefit
                                       of the certificateholders, into which the
                                       Securities Administrator is required to
deposit
                                       or cause to be deposited certain payments
                                       received from the Servicer as described
herein.

CERTIFICATE OWNERS                     means persons acquiring beneficial ownership
                                       interests in the Offered Certificates.

CERTIFICATE PRINCIPAL BALANCE          means, with respect to any class of Offered
                                       Certificate and as of any Distribution Date,

the outstanding principal balance of such
class
on the date of the initial issuance of the
certificates as reduced, but not below zero,
by
(i) all amounts distributed on previous
Distribution Dates on such class on account
of
principal; and (ii) such class's share of
any
Applied Realized Loss Amounts for previous
Distribution Dates. Notwithstanding the
foregoing, on any Distribution Date relating
to
a Due Period in which a Subsequent Recovery
has
been received by the

<PAGE>

Servicer, the Certificate Principal Balance
of
any class of Subordinated Certificates then
outstanding for which any Applied Realized
Loss
Amount has been allocated will be increased,
in
order of seniority, by an amount equal to
the
lesser of (I) the Unpaid Realized Loss
Amount
for such class of certificates and (II) the
total of any Subsequent Recovery distributed
on
such date to the certificateholders (reduced
by
the amount of the increase in the
Certificate
Principal Balance of any more senior class
of
certificates pursuant to this sentence on
such
Distribution Date).

CLASS A CERTIFICATES                    means the Class A-1, Class A-2 and Class R
                                        Certificates.

CLASS A PRINCIPAL DISTRIBUTION
AMOUNT                                  means (1) with respect to any Distribution
Date
                                        prior to the related Stepdown Date or as to
                                        which a Stepdown Trigger Event exists, 100%
of
                                        the Principal Distribution Amount for such
                                        Distribution Date and (2) with respect to
any

Distribution Date on or after the Stepdown Date and as to which a Stepdown Trigger Event does not exist, the excess of (A) the Certificate Principal Balance of the Class A Certificates immediately prior to such Distribution Date over (B) the lesser of (1) approximately 55.90% of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period and (2) the excess of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period over approximately $9,825,788; provided, however, that in no event will the Class A Principal Distribution Amount with respect to any Distribution Date exceed the aggregate Certificate Principal Balance of the Class A Certificates.

CLASS A-1 AVAILABLE FUNDS CAP means, with respect to a Distribution Date, the per annum rate equal to the product of (i) 12, (ii) the quotient of (x) the total scheduled interest on the Group One Mortgage Loans based on the Net Mortgage Rates in effect on the related Due Date, divided by (y) the aggregate Stated Principal Balance of the Group One Mortgage Loans as of the first day of the related Accrual Period and (iii) a fraction, the numerator of which is 30, and the denominator of which is the actual number of days in the related Accrual Period.

CLASS A-1 CAP CONTRACT means an amended confirmation and agreement between the Securities Administrator, on behalf of the Trust Fund, and the Cap Contract Counterparty for the benefit of the Class A-1 and Class R Certificates.

CLASS A-1 CAP CONTRACT NOTIONAL BALANCE means the notional balance of the Class A-1 Cap Contract set forth in the table beginning on page S-68.

CLASS A-1 CAP CONTRACT

```
TERMINATION
DATE                            means the Distribution Date after the
                                Distribution Date in October 2008.

CLASS A-1 LOWER COLLAR          means, with respect to each Distribution
Date,
                                the applicable per annum rate set forth
under
                                the heading "Lower Collar" in the Class A-1
                                One-Month LIBOR Cap Table beginning on page
                                S-68.

CLASS A-1 MAXIMUM RATE CAP      means, with respect to a Distribution Date,
the
                                per annum rate, adjusted to reflect the
length
                                of the related Accrual Period, equal

                                     S-107
<PAGE>

                                to the weighted average of the maximum
lifetime
                                Net Mortgage Rates on the Adjustable Rate
                                Mortgage Loans in Group One and the Net
                                Mortgage Rates on the Fixed Rate Mortgage
Loans
                                in Group One. The Class A-1 Maximum Rate Cap
                                shall relate to the Class A-1 and Class R
                                Certificates.

CLASS A-1 UPPER COLLAR          means, with respect to each Distribution
Date
                                with respect to which payments are received
on
                                the Class A-1 Cap Contract, a rate equal to
the
                                lesser of One-Month LIBOR and 9.260% per
annum.

CLASS A-2 AVAILABLE FUNDS CAP   means, with respect to a Distribution Date,
the
                                per annum rate equal to the product of (i)
12,
                                (ii) the quotient of (x) the total scheduled
                                interest on the Group Two Mortgage Loans
based
                                on the Net Mortgage Rates in effect on the
                                related Due Date, divided by (y) the
aggregate
                                Stated Principal Balance of the Group Two
                                Mortgage Loans as of the first day of the
                                related Accrual Period and (iii) a fraction,
                                the numerator of which is 30, and the
                                denominator of which is the actual number of
                                days in the related Accrual Period.
```

| | |
|---|---|
| CLASS A-2 CAP CONTRACT | means an amended confirmation and agreement between the Securities Administrator, on behalf |
| | of the Trust Fund, and the Cap Contract Counterparty for the benefit of the Class A-2 |
| | Certificates. |
| CLASS A-2 CAP CONTRACT NOTIONAL BALANCE | means the notional balance of the Class A-2 Cap |
| | Contract set forth in the table beginning on page S-69. |
| CLASS A-2 CAP CONTRACT TERMINATION DATE | means the Distribution Date after the Distribution Date in April 2009. |
| CLASS A-2 CERTIFICATES | means the Class A-2A, Class A-2B and Class A-2C |
| | Certificates. |
| CLASS A-2 LOWER COLLAR | means, with respect to each Distribution Date, |
| | the applicable per annum rate set forth under |
| | the heading "Lower Collar" in the Class A-2 One-Month LIBOR Cap Table beginning on page S-69. |
| CLASS A-2 MAXIMUM RATE CAP | means, with respect to a Distribution Date, the |
| | per annum rate, adjusted to reflect the length |
| | of the related Accrual Period, equal to the weighted average of the maximum lifetime Net Mortgage Rates on the Adjustable Rate Mortgage |
| | Loans in Group Two and the Net Mortgage Rates |
| | on the Fixed Rate Mortgage Loans in Group Two. |
| | The Class A-2 Maximum Rate Cap shall relate to |
| | the Class A-2 Certificates. |
| CLASS A-2 UPPER COLLAR | means, with respect to each Distribution Date |
| | with respect to which payments are received on |
| | the Class A-2 Cap Contract, a rate equal to the |
| | lesser of One-Month LIBOR and 9.920% per annum. |

CLASS B CERTIFICATES          means the Class B-1, Class B-2 and Class B-3
                              Certificates.

CLASS B-1 PRINCIPAL
DISTRIBUTION
AMOUNT                        means, with respect to any Distribution Date
on
                              or after the Stepdown Date, 100% of the
                              Principal Distribution Amount if the

aggregate
                              Certificate Principal Balance of the Class A
                              and Class M Certificates has been reduced to
                              zero and a Stepdown Trigger Event exists, or,
                              as long as a Stepdown Trigger Event does not
                              exist, the excess of (1) the sum of (A) the
                              Certificate

                                   S-108
<PAGE>
                              Principal Balance of the Class A
Certificates
                              (after taking into account distributions of
the
                              Class A Principal Distribution Amount to the
                              Class A Certificates for such Distribution
                              Date), (B) the Certificate Principal Balance
of
                              the Class M-1 Certificates (after taking
into
                              account distributions of the Class M-1
                              Principal Distribution Amount to the Class
M-1
                              Certificates for such Distribution Date),
(C)
                              the Certificate Principal Balance of the
Class
                              M-2 Certificates (after taking into account
                              distributions of the Class M-2 Principal
                              Distribution Amount to the Class M-2
                              Certificates for such Distribution Date),
(D)
                              the Certificate Principal Balance of the
Class
                              M-3 Certificates (after taking into account
                              distributions of the Class M-3 Principal
                              Distribution Amount to the Class M-3
                              Certificates for such Distribution Date),
(E)
                              the Certificate Principal Balance of the
Class
                              M-4 Certificates (after taking into account
                              distributions of the Class M-4 Principal
                              Distribution Amount to the Class M-4
                              Certificates for such Distribution Date),
(F)

the Certificate Principal Balance of the Class

M-5 Certificates (after taking into account distributions of the Class M-5 Principal Distribution Amount to the Class M-5 Certificates for such Distribution Date),

(G)                                              the Certificate Principal Balance of the Class

M-6 Certificates (after taking into account distributions of the Class M-6 Principal Distribution Amount to the Class M-6 Certificates for such Distribution Date) and (H) the Certificate Principal Balance of the Class B-1 Certificates immediately prior to such Distribution Date over (2) the lesser of

(A) approximately 86.60% of the aggregate Stated Principal Balance of the Mortgage Loans

as of the end of the immediately preceding Due

Period and (B) the excess of the aggregate Stated Principal Balance of the Mortgage Loans

as of the end of the immediately preceding Due

Period over approximately $9,825,788. Notwithstanding the above, (1) on any Distribution Date prior to the Stepdown Date on

which the aggregate Certificate Principal Balance of the Class A and Class M Certificates

has been reduced to zero, the Class B-1 Principal Distribution Amount will equal the lesser of (A) the outstanding Certificate Principal Balance of the Class B-1 Certificates

and (B) 100% of the Principal Distribution Amount remaining after any distributions on the

Class A and Class M Certificates and (2) in no

event will the Class B-1 Principal Distribution

Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the

Class B-1 Certificates.

CLASS B-2 PRINCIPAL
DISTRIBUTION
AMOUNT                                           means, with respect to any Distribution Date on

or after the Stepdown Date, 100% of the

Principal Distribution Amount if the aggregate Certificate Principal Balance of the Class A, Class M and Class B-1 Certificates has been reduced to zero and a Stepdown Trigger Event exists, or, as long as a Stepdown Trigger Event does not exist, the excess of (1) the sum of (A) the Certificate Principal Balance of the Class A Certificates (after taking into account distributions of the Class A Principal Distribution Amount to the Class A Certificates for such Distribution Date), (B) the Certificate Principal Balance of the

<PAGE>

Class M-1 Certificates (after taking into account distributions of the Class M-1 Principal Distribution Amount to the Class M-1 Certificates for such Distribution Date), (C) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account distributions of the Class M-2 Principal Distribution Amount to the Class M-2 Certificates for such Distribution Date), (D) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account distributions of the Class M-3 Principal Distribution Amount to the Class M-3 Certificates for such Distribution Date), (E) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account distributions of the Class M-4 Principal Distribution Amount to the Class M-4 Certificates for such Distribution Date), (F) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account distributions of the Class M-5 Principal Distribution Amount to the Class M-5 Certificates for such Distribution Date), (G) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account

distributions of the Class M-6 Principal Distribution Amount to the Class M-6 Certificates for such Distribution Date),

(H) the Certificate Principal Balance of the Class B-1 Certificates (after taking into account distributions of the Class B-1 Principal Distribution Amount to the Class B-1 Certificates for such Distribution Date) and (I) the Certificate Principal Balance of the Class B-2 Certificates immediately prior to such Distribution Date over (2) the lesser of (A) approximately 88.80% of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period and (B) the excess of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period over approximately $9,825,788. Notwithstanding the above, (1) on any Distribution Date prior to the Stepdown Date on which the aggregate Certificate Principal Balance of the Class A, Class M and Class B-1 Certificates has been reduced to zero, the Class B-2 Principal Distribution Amount will equal the lesser of (A) the outstanding Certificate Principal Balance of the Class B-2 Certificates and (B) 100% of the Principal Distribution Amount remaining after any distributions on the Class A, Class M and Class B-1 Certificates and (2) in no event will the Class B-2 Principal Distribution Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the Class B-2 Certificates.

CLASS B-3 PRINCIPAL DISTRIBUTION AMOUNT means, with respect to any Distribution Date on or after the Stepdown Date, 100% of the Principal Distribution Amount if the aggregate Certificate Principal Balance of the Class A,

Class M, Class B-1 and Class B-2 Certificates

has been reduced to zero and a Stepdown Trigger Event exists, or, as long as a Stepdown Trigger Event does not exist, the excess of (1) the sum of (A) the Certificate Principal Balance of the Class A Certificates (after taking into account distributions of the Class A Principal Distribution Amount to the Class A Certifi

<PAGE>

cates for such Distribution Date), (B) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account distributions of the Class M-1 Principal Distribution Amount to the Class M-1 Certificates for such Distribution Date), (C) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account distributions of the Class M-2 Principal Distribution Amount to the Class M-2 Certificates for such Distribution Date), (D) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account distributions of the Class M-3 Principal Distribution Amount to the Class M-3 Certificates for such Distribution Date), (E) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account distributions of the Class M-4 Principal Distribution Amount to the Class M-4 Certificates for such Distribution Date), (F) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account distributions of the Class M-5 Principal Distribution Amount to the Class M-5 Certificates for such Distribution Date), (G) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account

distributions of the Class M-6 Principal Distribution Amount to the Class M-6 Certificates for such Distribution Date),

(H) the Certificate Principal Balance of the Class B-1 Certificates (after taking into account distributions of the Class B-1 Principal Distribution Amount to the Class B-1 Certificates for such Distribution Date),

(I) the Certificate Principal Balance of the Class B-2 Certificates (after taking into account distributions of the Class B-2 Principal Distribution Amount to the Class B-2 Certificates for such Distribution Date) and (J) the Certificate Principal Balance of the Class B-3 Certificates immediately prior to such Distribution Date over (2) the lesser of (A) approximately 90.80% of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period and (B) the excess of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period over approximately $9,825,788. Notwithstanding the above, (1) on any Distribution Date prior to the Stepdown Date on which the aggregate Certificate Principal Balance of the Class A, Class M, Class B-1 and Class B-2 Certificates has been reduced to zero, the Class B-3 Principal Distribution Amount will equal the lesser of (A) the outstanding Certificate Principal Balance of the Class B-3 Certificates and (B) 100% of the Principal Distribution Amount remaining after any distributions on the Class A, Class M, Class B-1 and Class B-2 Certificates and (2) in no event will the Class B-3 Principal Distribution Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the Class B-3 Certificates.

CLASS M CERTIFICATES      means the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5 and Class M-6

Certificates.

CLASS M-1 PRINCIPAL
DISTRIBUTION
AMOUNT                          means, with respect to any Distribution Date
on
                                or after the Stepdown Date, 100% of the
                                Principal Distribution Amount if the
aggregate
                                Certificate Principal Balance of the Class A

<PAGE>
                                Certificates has been reduced to zero and a
                                Stepdown Trigger Event exists, or, as long
as a
                                Stepdown Trigger Event does not exist, the
                                excess of (1) the sum of (A) the aggregate
                                Certificate Principal Balance of the Class A
                                Certificates (after taking into account
                                distributions of the Class A Principal
                                Distribution Amount to the Class A
Certificates
                                for such Distribution Date) and (B) the
                                Certificate Principal Balance of the Class
M-1
                                Certificates immediately prior to such
                                Distribution Date over (2) the lesser of (A)
                                approximately 63.20% of the aggregate Stated
                                Principal Balance of the Mortgage Loans as
of
                                the end of the immediately preceding Due
Period
                                and (B) the excess of the aggregate Stated
                                Principal Balance of the Mortgage Loans as
of
                                the end of the immediately preceding Due
Period
                                over approximately $9,825,788.
Notwithstanding
                                the above, (1) on any Distribution Date
prior
                                to the Stepdown Date on which the aggregate
                                Certificate Principal Balance of the Class A
                                Certificates has been reduced to zero, the
                                Class M-1 Principal Distribution Amount will
                                equal the lesser of (A) the outstanding
                                Certificate Principal Balance of the Class
M-1
                                Certificates and (B) 100% of the Principal
                                Distribution Amount remaining after any
                                distributions on the Class A Certificates
and
                                (2) in no event will the Class M-1 Principal
                                Distribution Amount with respect to any
                                Distribution Date exceed the Certificate

Principal Balance of the Class M-1
Certificates.

CLASS M-2 PRINCIPAL
DISTRIBUTION
AMOUNT                          means, with respect to any Distribution Date
on
                                or after the Stepdown Date, 100% of the
                                Principal Distribution Amount if the
                                Certificate Principal Balance of each class
of
                                Class A and Class M-1 Certificates has been
                                reduced to zero and a Stepdown Trigger Event
                                exists, or, as long as a Stepdown Trigger
Event
                                does not exist, the excess of (1) the sum of
                                (A) the aggregate Certificate Principal
Balance
                                of the Class A Certificates (after taking
into
                                account distributions of the Class A
Principal
                                Distribution Amount to the Class A
Certificates
                                for such Distribution Date), (B) the
                                Certificate Principal Balance of the Class
M-1
                                Certificates (after taking into account
                                distributions of the Class M-1 Principal
                                Distribution Amount to the Class M-1
                                Certificates for such Distribution Date) and
                                (C) the Certificate Principal Balance of the
                                Class M-2 Certificates immediately prior to
                                such Distribution Date over (2) the lesser
of
                                (A) approximately 69.80% of the aggregate
                                Stated Principal Balance of the Mortgage
Loans
                                as of the end of the immediately preceding
Due
                                Period and (B) the excess of the aggregate
                                Stated Principal Balance of the Mortgage
Loans
                                as of the end of the immediately preceding
Due
                                Period over approximately $9,825,788.
                                Notwithstanding the above, (1) on any
                                Distribution Date prior to the Stepdown Date
on
                                which the aggregate Certificate Principal
                                Balance of the Class A Certificates and the
                                Class M-1 Certificates has been reduced to
                                zero, the Class M-2 Principal Distribution
                                Amount will equal the lesser of (A) the
                                outstanding Certificate Principal Balance of
                                the Class M-2 Certificates and (B) 100% of
the

Principal Distribution Amount remaining after any distributions on the Class A and Class M-1

<PAGE>

Class Certificates and (2) in no event will the respect M-2 Principal Distribution Amount with Certificate to any Distribution Date exceed the Principal Balance of the Class M-2 Certificates.

CLASS M-3 PRINCIPAL DISTRIBUTION AMOUNT          means, with respect to any Distribution Date on or after the Stepdown Date, 100% of the Principal Distribution Amount if the Certificate Principal Balance of each class of Class A, Class M-1 and Class M-2 Certificates has been reduced to zero and a Stepdown Trigger Event exists, or, as long as a Stepdown Trigger Event does not exist, the excess of (1) the sum of (A) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account distributions of the Class A Principal Distribution Amount to the Class A Certificates for such Distribution Date), (B) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account distributions of the Class M-1 Principal Distribution Amount to the Class M-1 Certificates for such Distribution Date), (C) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account distributions of the Class M-2 Principal Distribution Amount to the Class M-2 Certificates for such Distribution Date) and (D) the Certificate Principal Balance of the Class M-3 Certificates immediately prior to

such Distribution Date over (2) the lesser
of

(A) approximately 74.20% of the aggregate
Stated Principal Balance of the Mortgage
Loans

as of the end of the immediately preceding
Due

Period and (B) the excess of the aggregate
Stated Principal Balance of the Mortgage
Loans

as of the end of the immediately preceding
Due

Period over approximately $9,825,788.
Notwithstanding the above, (1) on any
Distribution Date prior to the Stepdown Date
on

which the aggregate Certificate Principal
Balance of the Class A, Class M-1 and Class
M-2

Certificates has been reduced to zero, the
Class M-3 Principal Distribution Amount will
equal the lesser of (A) the outstanding
Certificate Principal Balance of the Class
M-3

Certificates and (B) 100% of the Principal
Distribution Amount remaining after any
distributions on the Class A, Class M-1 and
Class M-2 Certificates and (2) in no event
will

the Class M-3 Principal Distribution Amount
with respect to any Distribution Date exceed
the Certificate Principal Balance of the
Class

M-3 Certificates.

CLASS M-4 PRINCIPAL
DISTRIBUTION
AMOUNT                          means, with respect to any Distribution Date
on

or after the Stepdown Date, 100% of the
Principal Distribution Amount if the
Certificate Principal Balance of each class
of

Class A, Class M-1, Class M-2 and Class M-3
Certificates has been reduced to zero and a
Stepdown Trigger Event exists, or, as long
as a

Stepdown Trigger Event does not exist, the
excess of (1) the sum of (A) the aggregate
Certificate Principal Balance of the Class A
Certificates (after taking into account
distributions of the Class A Principal
Distribution Amount to the Class A
Certificates

for such Distribution Date), (B) the
Certificate Principal Balance of the Class
M-1

Certificates (after taking into account distributions of the Class M-1 Principal Distribution Amount to the Class M-1 Certificates for such

<PAGE>

Distribution Date), (C) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account distributions of the Class M-2 Principal Distribution Amount to the Class M-2 Certificates for such Distribution Date), (D) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account distributions of the Class M-3 Principal Distribution Amount to the Class M-3 Certificates for such Distribution Date) and (E) the Certificate Principal Balance of the Class M-4 Certificates immediately prior to such Distribution Date over (2) the lesser of (A) approximately 77.50% of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period and (B) the excess of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period over approximately $9,825,788. Notwithstanding the above, (1) on any Distribution Date prior to the Stepdown Date on which the aggregate Certificate Principal Balance of the Class A, Class M-1, Class M-2 and Class M-3 Certificates has been reduced to zero, the Class M-4 Principal Distribution Amount will equal the lesser of (A) the outstanding Certificate Principal Balance of the Class M-4 Certificates and (B) 100% of the Principal Distribution Amount remaining after any distributions on the Class A, Class M-1, Class M-2 and Class M-3 Certificates and (2) in no event will the Class M-4 Principal

Distribution Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the Class M-4 Certificates.

CLASS M-5 PRINCIPAL DISTRIBUTION AMOUNT means, with respect to any Distribution Date on or after the Stepdown Date, 100% of the Principal Distribution Amount if the Certificate Principal Balance of each class of Class A, Class M-1, Class M-2, Class M-3 and Class M-4 Certificates has been reduced to zero and a Stepdown Trigger Event exists, or, as long as a Stepdown Trigger Event does not exist, the excess of (1) the sum of (A) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account distributions of the Class A Principal Distribution Amount to the Class A Certificates for such Distribution Date), (B) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account distributions of the Class M-1 Principal Distribution Amount to the Class M-1 Certificates for such Distribution Date), (C) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account distributions of the Class M-2 Principal Distribution Amount to the Class M-2 Certificates for such Distribution Date), (D) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account distributions of the Class M-3 Principal Distribution Amount to the Class M-3 Certificates for such Distribution Date), (E) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account distributions of the Class M-4 Principal Distribution Amount to the Class M-4 Certificates for such Distribution Date) and (F) the Certificate Principal Balance of the Class M-5 Certificates immediately prior to such Distribution Date over

<PAGE>

                              (2) the lesser of (A) approximately 80.80%
of
                         the aggregate Stated Principal Balance of
the
                         Mortgage Loans as of the end of the
immediately
                         preceding Due Period and (B) the excess of
the
                         aggregate Stated Principal Balance of the
                         Mortgage Loans as of the end of the
immediately
                         preceding Due Period over approximately
                         $9,825,788. Notwithstanding the above, (1)
on
                         any Distribution Date prior to the Stepdown
                         Date on which the aggregate Certificate
                         Principal Balance of the Class A, Class M-1,
                         Class M-2, Class M-3 and Class M-4
Certificates
                         has been reduced to zero, the Class M-5
                         Principal Distribution Amount will equal the
                         lesser of (A) the outstanding Certificate
                         Principal Balance of the Class M-5
Certificates
                         and (B) 100% of the Principal Distribution
                         Amount remaining after any distributions on
the
                         Class A, Class M-1, Class M-2, Class M-3 and
                         Class M-4 Certificates and (2) in no event
will
                         the Class M-5 Principal Distribution Amount
                         with respect to any Distribution Date exceed
                         the Certificate Principal Balance of the
Class
                         M-5 Certificates.

CLASS M-6 PRINCIPAL
DISTRIBUTION
AMOUNT                   means, with respect to any Distribution Date
on
                         or after the Stepdown Date, 100% of the
                         Principal Distribution Amount if the
                         Certificate Principal Balance of each class
of
                         Class A, Class M-1, Class M-2, Class M-3,
Class
                         M-4 and Class M-5 Certificates has been
reduced
                         to zero and a Stepdown Trigger Event exists,
                         or, as long as a Stepdown Trigger Event does
                         not exist, the excess of (1) the sum of (A)
the

aggregate Certificate Principal Balance of the Class A Certificates (after taking into account distributions of the Class A Principal Distribution Amount to the Class A Certificates for such Distribution Date), (B) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account distributions of the Class M-1 Principal Distribution Amount to the Class M-1 Certificates for such Distribution Date), (C) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account distributions of the Class M-2 Principal Distribution Amount to the Class M-2 Certificates for such Distribution Date), (D) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account distributions of the Class M-3 Principal Distribution Amount to the Class M-3 Certificates for such Distribution Date), (E) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account distributions of the Class M-4 Principal Distribution Amount to the Class M-4 Certificates for such Distribution Date), (F) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account distributions of the Class M-5 Principal Distribution Amount to the Class M-5 Certificates for such Distribution Date) and (F) the Certificate Principal Balance of the Class M-6 Certificates immediately prior to such Distribution Date over (2) the lesser of (A) approximately 83.60% of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period and (B) the excess of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period over approximately $9,825,788.

Notwithstanding the above,

<PAGE>

(1) on any Distribution Date prior to the Stepdown Date on which the aggregate Certificate Principal Balance of the Class A, Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Certificates has been reduced to zero, the Class M-6 Principal Distribution Amount will equal the lesser of (A) the outstanding Certificate Principal Balance of the Class M-6 Certificates and (B) 100% of the Principal Distribution Amount remaining after any distributions on the Class A, Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Certificates and (2) in no event will the Class M-6 Principal Distribution Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the Class M-6 Certificates.

| | |
|---|---|
| CLEARSTREAM LUXEMBOURG | means Clearstream Banking, societe anonyme. |
| CLOSING DATE | means on or about December 28, 2005. |
| CODE | means the Internal Revenue Code of 1986, as amended. |
| COLLATERAL VALUE | means, with respect to a Mortgage Loan the proceeds of which were used to purchase the related mortgaged property, the lesser of (x) the appraised value of such mortgaged property based on an appraisal made for the originator by an independent fee appraiser at the time of the origination of the related Mortgage Loan and (y) the sales price of such mortgaged property at such time of origination and means, with respect to a Mortgage Loan the proceeds of which were used to refinance an existing Mortgage Loan, the appraised value of the mortgaged property based upon the appraisal obtained at the time of refinancing. |

COLLECTION ACCOUNT                        means the one or more accounts established by the Servicer, for the benefit of the certificateholders, into which the Servicer is required to deposit or cause to be deposited certain payments described in the Pooling and Servicing Agreement.

COMPENSATING INTEREST                     means, for any Distribution Date, the amount of the Servicing Fee otherwise payable to the Servicer for the related month, which the Servicer is obligated to deposit into the Collection Account for distribution to certificateholders on that Distribution Date, in an amount up to the amount of any shortfall in interest payments resulting from prepayments in full received during the period from the first day of the related Prepayment Period through the last day of the month preceding such Distribution Date with respect to Mortgage Loans serviced by the Servicer; provided that any such deposit in reduction of the Servicing Fee otherwise payable to the Servicer with respect to that Distribution Date will be limited to the product of (1) one-twelfth of 0.25% per annum and (2) the aggregate Stated Principal Balance of the Mortgage Loans on the related Distribution Date.

CPR OR CONSTANT PREPAYMENT
RATE                                      means a prepayment assumption which represents a constant assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans for the life of such mortgage loans. For example, 30% CPR assumes a constant prepayment rate of 30% per annum.

S-116

<PAGE>

CREDIT SCORES                             means statistical credit scores obtained by many mortgage lenders in connection with a loan

application.

CURRENT INTEREST                means, with respect to each class of the
                                Offered Certificates and each Distribution
                                Date, the interest accrued at the applicable
                                Pass-Through Rate for the applicable Accrual
                                Period on the Certificate Principal Balance
of
                                such class as of such Distribution Date plus
                                any amount previously distributed with
respect
                                to Current Interest or Interest Carry
Forward
                                Amounts for such class that is recovered as
a
                                voidable preference by a trustee in
bankruptcy
                                less any Prepayment Interest Shortfalls
                                allocated to such class on such Distribution
                                Date.

CUT-OFF DATE                    means December 1, 2005.

DEFINITIVE CERTIFICATE          means a physical certificate representing an
                                Offered Certificate.

DEPOSITOR                       means Merrill Lynch Mortgage Investors, Inc.

DESIGNATED TRANSACTION          means a transaction in which the assets
                                underlying the certificates consist of
                                single-family residential, multi-family
                                residential, home equity, manufactured
housing
                                and/or commercial mortgage obligations that
are
                                secured by single-family residential,
                                multi-family residential, commercial real
                                property or leasehold interests therein.

DETERMINATION DATE              means, with respect to a Distribution Date,
the
                                15th day of the month of such Distribution
                                Date(or, if not a Business Day, the
immediately
                                preceding Business Day).

DISTRIBUTION DATE               means the 25th day of each month beginning
in
                                January 2006, or if such day is not a
Business
                                Day, the first Business Day thereafter.

DTC                             means The Depository Trust Company.

DUE DATE                        means a scheduled monthly payment date for
any
                                Mortgage Loan.

DUE PERIOD                          means, with respect to any Distribution Date,
                                    the period beginning on the second day of
the
                                    calendar month preceding the calendar month
in
                                    which such Distribution Date occurs and
ending
                                    on the first day in the month in which such
                                    Distribution Date occurs.

ERISA                               means the Employee Retirement Income
Security
                                    Act of 1974, as amended.

EUROCLEAR                           means the Euroclear System.

EUROCLEAR OPERATOR                  means Euroclear Bank S.A./N.V., a bank
                                    incorporated under the laws of the Kingdom
of
                                    Belgium.

EUROPEAN DEPOSITARIES               means Citibank, N.A., as depositary for
                                    Clearstream Luxembourg and JPMorgan Chase
Bank,
                                    as depositary for Euroclear, collectively.

EXEMPTION                           means PTE 90-29 (Exemption Application No.
                                    D-8012, 55 Fed. Reg. 21459 (1990)), as
amended,
                                    granted by the U.S. Department of Labor to
                                    Merrill Lynch and its affiliates, or any
                                    substantially similar administrative
exemption
                                    granted by the U.S. Department of Labor to
an
                                    underwriter as amended.

                              S-117

<PAGE>

EXTRA PRINCIPAL DISTRIBUTION
AMOUNT                               means, with respect to any Distribution Date,
                                    (1) prior to the Stepdown Date, the excess
of
                                    (A) the sum of (x) the aggregate Certificate
                                    Principal Balance of the Offered
Certificates
                                    immediately preceding such Distribution Date
                                    reduced by the Principal Funds with respect
to
                                    such Distribution Date and (y) approximately
                                    $90,397,251 over (B) the aggregate Stated
                                    Principal Balance of the Mortgage Loans as
of
                                    such Distribution Date and (2) on and after
the

Stepdown Date, (A) the sum of (x) the aggregate Certificate Principal Balance of the Offered Certificates and (y) the greater of (a) 9.20% of the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the immediately preceding Due Period and (b) $9,825,788 less (B) the aggregate Stated Principal Balance of the Mortgage Loans; provided, however, that if on any Distribution Date a Stepdown Trigger Event is in effect, the Extra Principal Distribution Amount will not be reduced to the applicable percentage of then-current Stated Principal Balance of the Mortgage Loans (and will remain fixed at the applicable percentage of the Stated Principal Balance of the Mortgage Loans as of the Due Date immediately prior to the Stepdown Trigger Event) until the next Distribution Date on which the Stepdown Trigger Event is not in effect.

FANNIE MAE    means the Federal National Mortgage Association or any successor.

FINANCIAL INTERMEDIARY    means a bank, brokerage firm, thrift institution or other financial intermediary.

FITCH    means Fitch, Inc. or any successor.

FIXED RATE MORTGAGE LOAN    means a Mortgage Loan in the Trust Fund with a fixed interest rate.

FLOATING RATE CERTIFICATE CARRYOVER    means, with respect to a Distribution Date, in the event that the Pass-Through Rate for a class of Offered Certificates is based upon the related Available Funds Cap, the excess of (1) the amount of interest that such class would have been entitled to receive on such Distribution Date had the Pass-Through Rate for that class not been calculated based on the related Available Funds Cap, up to but not exceeding the greater of (a) the related Maximum Rate Cap or (b) the sum of (i) the

related Available Funds Cap and (ii) the
product of (A) a fraction, the numerator of
which is 360 and the denominator of which is
the actual number of days in the related
Accrual Period and (B) the quotient obtained
by

dividing (I) an amount equal to the proceeds,
if any, payable under the related Cap

Contract

with respect to such Distribution Date by

(II)

the aggregate Certificate Principal Balance

of

each of the Classes of Certificates to which
such Cap Contract relates for such

Distribution

Date over (2) the amount of interest such

class

was entitled to receive on such Distribution
Date based on the related Available Funds

Cap

together with (A) the unpaid portion of any
such excess from prior Distribution Dates

(and

interest accrued thereon at the then

applicable

Pass-Through Rate for such class, without
giving effect to the related Available Funds
Cap) and

S-118

<PAGE>

(B) any amount previously distributed with
respect to Floating Rate Certificate

Carryover

for such class that is recovered as a

voidable

preference by a trustee in bankruptcy.

FREDDIE MAC                    means the Federal Home Loan Mortgage
                               Corporation.

GROSS MARGIN                   means a fixed percentage amount specified in
                               the related mortgage note.

GROUP ONE                      means the portion of the mortgage pool
                               identified as "Group One" in this prospectus
                               supplement.

GROUP ONE PRINCIPAL
DISTRIBUTION
AMOUNT                         means, as of any Distribution Date, the
amount

equal to the lesser of (i) the aggregate
Certificate Principal Balance of the Class

A-1

and Class R Certificates and (ii) the product of (x) the Group One Principal Distribution Percentage and (y) the Class A Principal Distribution Amount; provided, however, that with respect to any Distribution Date on which the Class A-1 and Class R Certificates are outstanding and the Certificate Principal Balances of the Class A-2 Certificates have been reduced to zero, the Group One Principal Distribution Amount will equal the Class A Principal Distribution Amount.

GROUP ONE PRINCIPAL DISTRIBUTION PERCENTAGE    means, with respect to any Distribution Date, a fraction expressed as a percentage, the numerator of which is the amount of Principal Funds received with respect to Mortgage Loans in Group One, and the denominator of which is the amount of Principal Funds received from all of the Mortgage Loans in the mortgage pool.

GROUP TWO    means the portion of the mortgage pool identified as "Group Two" in this prospectus supplement.

GROUP TWO PRINCIPAL DISTRIBUTION AMOUNT    means, as of any Distribution Date, the amount equal to the lesser of (i) the aggregate Certificate Principal Balance of the Class A-2 Certificates and (ii) the product of (x) the Group Two Principal Distribution Percentage and (y) the Class A Principal Distribution Amount; provided, however, that with respect to any Distribution Date on which the Class A-2 Certificates are outstanding and the Certificate Principal Balances of the Class A-1 and Class R Certificates have been reduced to zero, the Group Two Principal Distribution Amount will equal the Class A Principal Distribution Amount.

GROUP TWO PRINCIPAL
DISTRIBUTION
PERCENTAGE                              means, with respect to any Distribution Date, a

fraction expressed as a percentage, the numerator of which is the amount of Principal

Funds received with respect to Mortgage Loans in Group Two, and the denominator of which is

the amount of Principal Funds received from all

of the Mortgage Loans in the mortgage pool.

HEP OR HOME EQUITY PREPAYMENT           means a prepayment model which uses a prepayment assumption which represents an assumed rate of prepayment each month relative

to the then outstanding principal balance of a

pool of mortgage loans for the life of such mortgage loans. 20% HEP, which represents 100%

of the prepayment model for the Fixed Rate Mortgage Loans, assumes prepayment rates of 2.0% per annum of the then outstanding principal balance of the related Mortgage Loans

in the first month of the life of such Mortgage

<PAGE>

Loans and an additional 2.0% per annum in each

month thereafter up to and including the tenth

month. Beginning in the eleventh month and in

each month thereafter during the life of such

Mortgage Loans, 20% HEP assumes a constant prepayment rate of 20% per annum.

INDIRECT PARTICIPANTS                   means Participants and organizations which have

indirect access to the DTC system, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly.

INTEREST CARRY FORWARD AMOUNT           means, with respect to each class of the Offered Certificates and each Distribution

Date, the sum of (1) the excess of (A)
Current
Interest for such class with respect to
prior
Distribution Dates (excluding any Floating
Rate
Certificate Carryover for such class, if
applicable) over (B) the amount actually
distributed to such class with respect to
Current Interest and Interest Carry Forward
Amount on such prior Distribution Dates and
(2)
interest on such excess (to the extent
permitted by applicable law) at the
applicable
Pass-Through Rate for the related Accrual
Period.

INTEREST DETERMINATION DATE        means each date that is the second LIBOR
                                   Business Day preceding the commencement of
each
                                   Accrual Period for the Offered Certificates.

INTEREST FUNDS                      means, with respect to any Distribution Date,
                                   the sum, without duplication, of (1) all
                                   scheduled interest due during the related
Due
                                   Period that is received before the related
                                   Servicer Remittance Date or advanced on or
                                   before the related Servicer Remittance Date
                                   less the Servicing Fee, (2) all Advances
                                   relating to interest, (3) all Compensating
                                   Interest, (4) liquidation proceeds collected
                                   during the related Prepayment Period (to the
                                   extent such liquidation proceeds relate to
                                   interest), (5) proceeds of any Mortgage Loan
                                   purchased by the Depositor or any transferor
                                   under the Pooling and Servicing Agreement
                                   during the related Prepayment Period for
                                   document defects, breach of a representation
or
                                   warranty, realization upon default or
optional
                                   termination (to the extent such proceeds
relate
                                   to interest) and (6) prepayment charges
                                   received with respect to the related
Mortgage
                                   Loans, less all non-recoverable Advances
                                   relating to interest and certain
                                   indemnification amounts and expenses
reimbursed
                                   to the Trustee, the Master Servicer, the
                                   Securities Administrator and the Servicer.

INTEREST-ONLY MORTGAGE LOAN        means a Mortgage Loan that provides for
monthly

payments of interest at the Mortgage Rate, but

no payments of principal for the first five years after its origination.

IRS                             means the Internal Revenue Service.

LAST SCHEDULED DISTRIBUTION
DATE                            means, for each class of Offered Certificates,

the latest maturity date for any Mortgage Loan

plus one year.

LIBOR BUSINESS DAY              means a day on which banks are open for dealing

in foreign currency and exchange in London and

New York City.

S-120

<PAGE>

LOAN-TO-VALUE RATIO OR LTV      means, for any Mortgage Loan, (1) the original

principal balance of such Mortgage Loan divided

by (2) the Collateral Value of the related mortgaged property.

LOWER COLLAR                    means, with respect to each Distribution Date

and each of the Cap Contracts, the applicable

per annum rate set forth under the heading "Lower Collar" in the Class A-1 One-Month LIBOR

Cap Table, the Class A-2 One-Month LIBOR Cap Table or the Subordinated Certificate One-Month

LIBOR Cap Table.

MASTER SERVICER                 means LaSalle Bank National Association.

MASTER SERVICING FEE            means the fee to be paid by the Securities Administrator pursuant to a separate agreement.

In addition, the Master Servicer shall be entitled to a portion of investment income earned on amounts in the Certificate Account and shall be entitled to receive from the Trust

Fund reimbursement for certain indemnification

amounts and expenses incurred in connection with its duties as Master Servicer.

MAXIMUM MORTGAGE RATE                  means the rate which the Mortgage Rate on
the
                                       related Adjustable Rate Mortgage Loan will
                                       never exceed.

MAXIMUM RATE CAP                       means any of the Class A-1 Maximum Rate Cap,
                                       the Class A-2 Maximum Rate Cap or the
                                       Subordinated Certificate Maximum Rate Cap.

MERRILL LYNCH                          means Merrill Lynch, Pierce, Fenner & Smith
                                       Incorporated.

MINIMUM MORTGAGE RATE                  means the rate which the Mortgage Rate on
the
                                       related Adjustable Rate Mortgage Loan will
                                       never be less than.

MODELING ASSUMPTIONS                   means the following assumptions:

                                       -   the assumed Adjustable Rate Mortgage
Loans
                                           and the assumed Fixed Rate Mortgage
Loans
                                           prepay at the indicated percentage of
the
                                           related prepayment model;

                                       -   distributions on the Certificates are
                                           received, in cash, on the 25th day of
each
                                           month, commencing in January 2006, in
                                           accordance with the payment priorities
                                           defined in this prospectus supplement;

                                       -   no defaults or delinquencies in, or
                                           modifications, waivers or amendments
                                           respecting, the payment by the
mortgagors
                                           of principal and interest on the assumed
                                           Mortgage Loans occur;

                                       -   Scheduled Payments are assumed to be
                                           received on the first day of each month
                                           commencing in January 2006, and
prepayments
                                           represent payment in full of individual
                                           assumed Mortgage Loans and are assumed
to
                                           be received on the last day of each
month,
                                           commencing on December 31, 2005, and
                                           include 30 days' interest thereon;

                                       -   the level of One-Month LIBOR remains
                                           constant at 4.3803% and the level of
                                           Six-Month LIBOR remains constant at
                                           4.6295%;

- the Certificate Principal Balance of the Class R Certificate is zero;

- the Closing Date for the certificates is December 28, 2005;

S-121

<PAGE>

- the Mortgage Rate for each assumed Adjustable Rate Mortgage Loan is adjusted

on its next Mortgage Rate Adjustment Date

(and on any subsequent Mortgage Rate Adjustment Dates, if necessary) to equal the sum of (a) the assumed level of the Mortgage Index and (b) the respective Gross

Margin (such sum being subject to the applicable periodic adjustment caps and floors);

- none of the Trustee, the NIMS Insurer or the Servicer exercises its option to terminate the Trust Fund as described in this prospectus supplement under "The Pooling and Servicing Agreement-- Optional

Termination"; and

- the initial overcollateralization amount is

approximately $90,400,627, the targeted overcollateralization amount is approximately $90,397,251, and the minimum

required overcollateralization amount is approximately $9,825,788.

MOODY'S                         means Moody's Investors Service, Inc. or any successor.

MORTGAGE GROUP                  means any of Group One or Group Two.

MORTGAGE INDEX                  means the index applicable to any Adjustable Rate Mortgage Loan which is Six-Month LIBOR with respect to all Adjustable Rate Mortgage Loans.

MORTGAGE LOANS                  means the mortgage loans included in the Trust

Fund as of the Closing Date.

MORTGAGE LOAN SCHEDULE          means the schedule of Mortgage Loans appearing

|  |  |
|---|---|
|  | as an exhibit to the Pooling and Servicing Agreement from time to time. |
| MORTGAGE RATE | means the per annum interest rate borne by a Mortgage Loan. |
| NCHLS | means National City Home Loan Services, Inc. |
| NET EXCESS CASHFLOW | means Interest Funds and Principal Funds not otherwise required to be distributed with respect to principal of and interest on the Offered Certificates and not otherwise required to be distributed to the Class P Certificates. |
| NET MORTGAGE RATE | means, with respect to any Mortgage Loan, the Mortgage Rate with respect to such Mortgage Loan less the Servicing Fee Rate. |
| NET WAC CAP | means, with respect to the Class A-1 and Class R Certificates, the Class A-1 Available Funds Cap; with respect to the Class A-2 Certificates, the Class A-2 Available Funds Cap; and with respect to the Subordinated Certificates, the Subordinated Certificate Available Funds Cap. |
| NIMS INSURER | means any one or more insurance companies that may issue a financial guaranty insurance policy covering net interest margin securities issued by a separate trust and secured by all or a portion of the Class C and Class P Certificates issued by the Trust Fund. |
| OFFERED CERTIFICATES | means the Class A-1, Class A-2A, Class A-2B, Class A-2C, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class R Certificates. |
| ONE-MONTH LIBOR | means the London interbank offered rate for one-month United States dollar deposits. |

<PAGE>

| | |
|---|---|
| ORIGINAL LOAN-TO-VALUE RATIO | means, for any Mortgage Loan, (1) the principal balance of such Mortgage Loan at the date of |

|                          |                                                                                                                          |
|--------------------------|--------------------------------------------------------------------------------------------------------------------------|
|                          | origination, divided by (2) the Collateral Value of the related mortgaged property.                                      |
| ORIGINATOR               | means First Franklin, a division of National City Bank of Indiana, or its affiliate First Franklin Financial Corporation. |
| PARTICIPANTS utilize     | means participating organizations that                                                                                   |
|                          | the services of DTC, including securities brokers and dealers, banks and trust                                           |
| companies                |                                                                                                                          |
|                          | and clearing corporations and certain other organizations.                                                               |
| PASS-THROUGH MARGIN      | means for each class of Offered Certificates, for any Distribution Date on or before the Auction Termination Date: Class A-1, 0.240%; A-2A, 0.090%; A-2B, 0.260%; A-2C, 0.330%; |
| Class                    |                                                                                                                          |
|                          | M-1, 0.450%; Class M-2, 0.470%; Class M-3, 0.500%; Class M-4, 0.630%; Class M-5,                                          |
| 0.670%;                  |                                                                                                                          |
|                          | Class M-6, 0.740%; Class B-1, 1.650%; Class B-2, 1.750%; Class B-3, 1.750%; and Class R, 0.240%; and for any Distribution Date after |
| the                      |                                                                                                                          |
|                          | Auction Termination Date: Class A-1, 0.480%; A-2A, 0.180%; A-2B, 0.520%; A-2C, 0.660%;                                    |
| Class                    |                                                                                                                          |
|                          | M-1, 0.675%; Class M-2, 0.705%; Class M-3, 0.750%; Class M-4, 0.945%; Class M-5,                                          |
| 1.005%;                  |                                                                                                                          |
|                          | Class M-6, 1.110%; Class B-1, 2.475%; Class B-2, 2.625%; Class B-3, 2.625%; and Class R, 0.480%.                          |
| PASS-THROUGH RATE Certificates | means, with respect to the Offered                                                                                  |
|                          | on any Distribution Date, the lesser of (1) One-Month LIBOR plus the Pass-Through Margin for such Offered Certificates and (2) the related Available Funds Cap. |
| PERCENTAGE INTEREST      | means, with respect to any certificate, the percentage derived by dividing the                                           |
| denomination             |                                                                                                                          |
|                          | of such certificate by the aggregate denominations of all certificates of the applicable class. |
| PERIODIC RATE CAP Mortgage | means the maximum amount by which the                                                                                  |
|                          | Rate on any Adjustable Rate Mortgage Loan                                                                                 |
| may                      |                                                                                                                          |
|                          | increase or decrease on an Adjustment Date.                                                                              |

| | |
|---|---|
| PLAN | means an employee benefit plan or |
| arrangement | |
| | subject to Title I of ERISA, a plan subject |
| to | |
| | Section 4975 of the Code or a plan subject |
| to | |
| | any provisions under any federal, state, |
| local, | |
| | non-U.S. or other laws or regulations that |
| are | |
| | substantively similar to the foregoing |
| | provisions of ERISA or the Code. |
| | |
| POOLING AND SERVICING | |
| AGREEMENT | means the Pooling and Servicing Agreement, |
| | dated as of December 1, 2005, among the |
| | Depositor, the Securities Administrator, the |
| | Master Servicer, the Servicer, the Special |
| | Servicer and the Trustee. |
| | |
| PPC OR PREPAYMENT CONSTANT | means a prepayment model which uses a |
| | prepayment assumption which represents an |
| | assumed rate of prepayment each month |
| relative | |
| | to the then outstanding principal balance of |
| a | |
| | pool of mortgage loans for the life of such |
| | mortgage loans. 100% PPC, which represents |
| 100% | |
| | of the prepayment model for the Adjustable |
| Rate | |
| | Mortgage Loans, assumes prepayment rates at |
| a | |
| | constant prepayment rate of 2% per annum in |
| | month 1, increasing linearly (rounded to the |
| | nearest hundredth) to a constant prepayment |
| | rate of 30% per annum in month 12 and |
| remaining | |
| | constant at a constant prepayment rate of |
| 30% | |
| | per |

S-123

<PAGE>

| | |
|---|---|
| | annum from month 12 up to and including |
| month | |
| | 22, then remaining constant at a constant |
| | prepayment rate of 50% per annum from month |
| 23 | |
| | up to and including month 27 and then |
| remaining | |
| | constant at a constant prepayment rate of |
| 35% | |
| | per annum from month 28 and thereafter. |

PREPAYMENT INTEREST EXCESSES    means, with respect to any Servicer
Remittance

                                Date, for each Mortgage Loan that was the
                                subject of a Principal Prepayment in full
                                during the portion of the related Prepayment
                                Period occurring between the first day of
the
                                calendar month in which such Servicer
                                Remittance Date occurs and the last day of
the
                                related Prepayment Period, an amount equal
to
                                interest (to the extent received) at the
                                applicable Net Mortgage Rate on the amount
of
                                such Principal Prepayment for the number of
                                days commencing on the first day of the
                                calendar month in which such Servicer
                                Remittance Date occurs and ending on the
date
                                on which such Principal Prepayment is so
                                applied.

PREPAYMENT INTEREST SHORTFALL   means a shortfall in interest distributions
                                resulting from principal prepayments to
                                certificateholders in excess of Compensating
                                Interest.

PREPAYMENT PERIOD                means, with respect to any Distribution Date,
                                the period beginning on the 15th day of the
                                month preceding the month in which such
                                Distribution Date occurs (or, in the case of
                                the first Distribution Date, beginning on
the
                                Cut-off Date) and ending on the 14th day of
the
                                month in which such Distribution Date occurs.

PRINCIPAL DISTRIBUTION AMOUNT   means, with respect to each Distribution
Date,
                                the sum of (1) the Principal Funds for such
                                Distribution Date and (2) any Extra
Principal
                                Distribution Amount for such Distribution
Date.

PRINCIPAL FUNDS                  means, with respect to any Distribution Date,
                                the sum, without duplication, of (1) the
                                scheduled principal due during the related
Due
                                Period and received before the related
Servicer
                                Remittance Date or advanced on or before the
                                related Servicer Remittance Date, (2)
                                prepayments of principal collected in the
                                related Prepayment Period, (3) the Stated
                                Principal Balance of each Mortgage Loan that

was purchased by the Depositor or the
Servicer
                                      during the related Prepayment Period or, in
the
                                      case of a purchase in connection with an
                                      optional termination, on the Business Day
prior
                                      to such Distribution Date, (4) the amount,
if
                                      any, by which the aggregate unpaid principal
                                      balance of any replacement Mortgage Loans is
                                      less than the aggregate unpaid principal
                                      balance of any Mortgage Loans delivered by
the
                                      Seller in connection with a substitution of
a
                                      Mortgage Loan, (5) all liquidation proceeds
                                      collected during the related Prepayment
Period
                                      (to the extent such liquidation proceeds
                                      related to principal), (6) all Subsequent
                                      Recoveries received during the related Due
                                      Period and (7) all other collections and
                                      recoveries in respect of principal during
the
                                      related Prepayment Period less all
                                      non-recoverable Advances relating to
principal
                                      and all non-recoverable servicing advances
                                      reimbursed during the related Prepayment
Period
                                      and certain indemnification amounts and

                                          S-124
<PAGE>

                                      expenses reimbursable to the Trustee, the
                                      Master Servicer, the Securities
Administrator,
                                      the Special Servicer and the Servicer.

PRINCIPAL PREPAYMENT                  means any mortgagor payment of principal
(other
                                      than payment of a Balloon Amount) or other
                                      recovery of principal on a Mortgage Loan
that
                                      is recognized as having been received or
                                      recovered in advance of its Due Date and
                                      applied to reduce the Stated Principal
Balance
                                      of the Mortgage Loan in accordance with the
                                      terms of the mortgage note.

PTE                                   means a Prohibited Transaction Exemption
                                      granted by the U.S. Department of Labor.

RATING AGENCY                         means either of Moody's or S&P.

REALIZED LOSS                           means the excess of the Stated Principal
                                        Balance of a defaulted Mortgage Loan plus
                                        accrued interest over the net liquidation
                                        proceeds of a defaulted Mortgage Loan that
are
                                        allocated to principal.

RECORD DATE                             means, for a Distribution Date, the last
                                        Business Day of the month preceding the
month
                                        of such Distribution Date.

REFERENCE BANKS                         means leading banks selected by the
Securities
                                        Administrator and engaged in transactions in
                                        Eurodollar deposits in the international
                                        Eurocurrency market (1) with an established
                                        place of business in London, (2) whose
                                        quotations appear on the Reuters Screen LIBO
                                        Page on the Interest Determination Date in
                                        question, (3) which have been designated as
                                        such by the Servicer and (4) not controlling,
                                        controlled by, or under common control with,
                                        the Depositor, the Securities Administrator,
                                        the Trustee, the Master Servicer, the
Servicer,
                                        the Seller or any successor servicer.

RELEVANT DEPOSITARY                     means Citibank, N.A., as depositary for
                                        Clearstream Luxembourg, and JPMorgan Chase
                                        Bank, as depositary for Euroclear,
                                        individually.

REO PROPERTY                            means mortgaged property which has been
                                        acquired by the Servicer through foreclosure
or
                                        deed-in-lieu of foreclosure in connection
with
                                        a defaulted mortgage loan.

RESERVE INTEREST RATE                   means the rate per annum that the Trustee
                                        determines to be either (1) the arithmetic
mean
                                        (rounded upwards if necessary to the nearest
                                        whole multiple of 0.03125%) of the one-month
                                        United States dollar lending rates which New
                                        York City banks selected by the Trustee are
                                        quoting on the relevant Interest
Determination
                                        Date to the principal London offices of
leading
                                        banks in the London interbank market or (2)
in
                                        the event that the Trustee can determine no
                                        such arithmetic mean, the lowest one-month
                                        United States dollar lending rate which New

York City banks selected by the Trustee are quoting on such Interest Determination Date to

leading European banks.

RESIDUAL CERTIFICATE          means the Class R Certificate.

RESTRICTED GROUP              means the underwriter, the Trustee, the Securities Administrator, the Servicer, any obligor with respect to Mortgage Loans included

in the Trust Fund constituting more than five

percent

<PAGE>

(5%) of the aggregate unamortized principal balance of the assets in the Trust Fund or any

affiliate of such parties.

REUTERS SCREEN LIBO PAGE      means the display designated as page "LIBO" on

the Reuters Monitor Money Rates Service (or such other page as may replace the LIBO page on

that service for the purpose of displaying London interbank offered rates of major banks).

RULES                        means the rules, regulations and procedures creating and affecting DTC and its operations.

S&P                          means Standard and Poor's, a division of The McGraw-Hill Companies, Inc. or any successor.

SCHEDULED PAYMENTS           means scheduled monthly payments made by mortgagors on the Mortgage Loans.

SECURITIES ADMINISTRATOR     means LaSalle Bank National Association.

SECURITIES ADMINISTRATOR FEE means a portion of investment income earned on

amounts on deposit in the Certificate Account.

In addition, the Securities Administrator shall

be entitled to receive from the Trust Fund reimbursement for certain indemnification amounts and expenses incurred in connection with its duties as Securities Administrator.

SELLER                       means Merrill Lynch Mortgage Lending, Inc.

**SENIOR ENHANCEMENT PERCENTAGE** means, with respect to a Distribution Date, the quotient of (x) the excess of (1) the aggregate Stated Principal Balance of the Mortgage Loans over (2) the Certificate Principal Balance of the most senior class of Certificates outstanding as of such Distribution Date, prior to giving effect to distributions to be made on such Distribution Date, and (y) the Stated Principal Balances of the Mortgage Loans. As used herein, the Certificate Principal Balance of the most senior class of Certificates will equal the aggregate Certificate Principal Balance of the Class A Certificates as of such date of calculation.

**SERVICER** means National City Home Loan Services, Inc.

**SERVICER REMITTANCE DATE** means the 18th day (or if such day is not a Business Day, the next succeeding Business Day) of the month in which the related Distribution Date occurs.

**SERVICING FEE** means a monthly fee paid to the Servicer from interest collected with respect to each Mortgage Loan serviced by it (as well as from any liquidation proceeds from a liquidated Mortgage Loan that are applied to accrued and unpaid interest) generally equal to the product of (a) one-twelfth of the Servicing Fee Rate and (b) the Stated Principal Balance of such Mortgage Loan. The Servicer is also entitled to receive, as additional servicing compensation, all Prepayment Interest Excesses, insufficient funds charges, assumption fees, late charges, modification fees, extension fees and other similar charges (other than prepayment charges), all investment income earned on amounts on deposit in the Collection Account.

SERVICING FEE RATE                means 0.50% per annum.

<PAGE>

SIX-MONTH LIBOR                   the average of the London interbank offered
                                  rates for six-month U.S. dollar deposits in
the
                                  London market, as set forth in The Wall
Street
                                  Journal, or, if such rate ceases to be
                                  published in The Wall Street Journal or
becomes
                                  unavailable for any reason, then based upon
a
                                  new index selected by the Servicer, as
holder
                                  of the related mortgage note, based on
                                  comparable information, in each case as most
                                  recently announced as of a date 45 days
prior
                                  to such Adjustment Date.

SIX-MONTH LIBOR LOANS             means Adjustable Rate Mortgage Loans having
a
                                  Mortgage Rate which is generally subject to
                                  semi-annual adjustment on the first day of
the
                                  months specified in the related mortgage
note
                                  to equal the sum, rounded to the nearest
                                  0.125%, of (1) the Mortgage Index and (2)
the
                                  Gross Margin.

SMMEA                             means the Secondary Mortgage Market
Enhancement
                                  Act of 1984, as amended.

SPECIAL SERVICER                  means Wilshire Credit Corporation.

STATED PRINCIPAL BALANCE          means, with respect to a Mortgage Loan and
any
                                  Distribution Date, the amount equal to the
                                  outstanding principal balance as of the Cut-
off
                                  Date, after giving effect to Scheduled
Payments
                                  due on or before that date, reduced by (1)
the
                                  principal portion of all Scheduled Payments
due
                                  on or before the Due Date in the Due Period
                                  immediately preceding such Distribution Date,
                                  whether or not received, and (2) all amounts
                                  allocable to unscheduled principal payments
                                  received on or before the last day of the

Prepayment Period immediately preceding such
Distribution Date.

STEPDOWN DATE                          means the later to occur of (1) the
                                       Distribution Date in January 2009 or (2) the
                                       first Distribution Date on which the
                                       Certificate Principal Balance of the Class A
                                       Certificates (after giving effect to
                                       distributions of the Principal Funds amount
for
                                       such Distribution Date) is less than or
equal
                                       to 55.90% of the aggregate Stated Principal
                                       Balances of the Mortgage Loans.

STEPDOWN REQUIRED LOSS
PERCENTAGE                             means, for any Distribution Date, the
                                       applicable percentage for such Distribution
                                       Date set forth in the following table:

<Table>
<Caption>
                                                    DISTRIBUTION DATE OCCURRING IN
STEPDOWN REQUIRED LOSS PERCENTAGE                   ------------------------------
---------------------------------
<S>                                                 <C>
<C>
                                                    January 2009-December 2009
2.85% with respect to January

2009, plus an additional 1/12th

of 1.40% for each month

thereafter
                                                    January 2010-December 2010
4.25% with respect to January

2010, plus an additional 1/12th

of 0.50% for each month

thereafter
                                                    January 2011-December 2011
4.75% with respect to January

2011, plus an additional 1/12th

of 0.25% for each month

thereafter
                                                    January 2012 and thereafter
5.00%
</Table>

<PAGE>

STEPDOWN TRIGGER EVENT     means the situation that exists with respect to any Distribution Date on or after the Stepdown Date, if (a) the quotient of (1) the Stated Principal Balance of all Mortgage Loans 60 or more days delinquent, measured on a rolling three-month basis (including Mortgage Loans in foreclosure, REO Properties and Mortgage Loans with respect to which the applicable mortgagor is in bankruptcy) and (2) the Stated Principal Balance of all the Mortgage Loans as of the preceding Servicer Remittance Date, equals or exceeds the product of (i) 35.00% and (ii) the Senior Enhancement Percentage or (b) the quotient (expressed as a percentage) of (1) the aggregate Realized Losses incurred from the Cut-off Date through the last day of the calendar month preceding such Distribution Date and (2) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date exceeds the Stepdown Required Loss Percentage.

SUBORDINATED CERTIFICATES     means the Class M and Class B Certificates.

SUBORDINATED CERTIFICATE AVAILABLE FUNDS CAP     means a rate equal to the weighted average (weighted in proportion to the results of subtracting the current principal balance of the related Class A Certificates from the aggregate principal balance of each mortgage group) of the Class A-1 Available Funds Cap and the Class A-2 Available Funds Cap.

SUBORDINATED CERTIFICATE CAP CONTRACT     means an amended confirmation and agreement between the Securities Administrator, on behalf of the Trust Fund, and the Cap Contract Counterparty for the benefit of the Subordinated Certificates.

SUBORDINATED CERTIFICATE CAP
CONTRACT
NOTIONAL BALANCE                    means the notional balance of the Cap
Contract
                                    set forth in the table beginning on page S-
70.

SUBORDINATED CERTIFICATE CAP
CONTRACT
TERMINATION DATE                    means the Distribution Date after the
                                    Distribution Date in October 2008.

SUBORDINATED CERTIFICATE LOWER
COLLAR                              means, with respect to each Distribution
Date,
                                    the applicable per annum rate set forth
under
                                    the heading "Lower Collar" in the
Subordinated
                                    Certificate One-Month LIBOR Cap Table
beginning
                                    on page S-70.

SUBORDINATED CERTIFICATE
MAXIMUM
RATE CAP                            means, with respect to a Distribution Date,
the
                                    per annum rate equal to the weighted average
                                    (weighted in proportion to the results of
                                    subtracting from the aggregate Stated
Principal
                                    Balance of each Mortgage Group, the current
                                    Certificate Principal Balance of the related
                                    Class A Certificates) of the Class A-1
Maximum
                                    Rate Cap and the Class A-2 Maximum Rate Cap.
                                    The Subordinated Certificate Maximum Rate
Cap
                                    shall relate only to the Subordinated
                                    Certificates.

SUBORDINATED CERTIFICATE UPPER
COLLAR                              means, with respect to each Distribution
Date
                                    with respect to which payments are received
on
                                    the Subordinated Certificate Cap Contract, a
                                    rate equal to the lesser of One-Month LIBOR
and
                                    8.730% per annum.

SUBSEQUENT RECOVERY                 means any amount (net of amounts to be
                                    reimbursed to the Servicer related to such
                                    Mortgage Loan) received on a Mortgage Loan
                                    subsequent to such Mortgage Loan being
                                    determined to be a liquidated Mortgage Loan.

<PAGE>

SWAP REGULATIONS             means the final regulations issued by the
IRS
                             relating to notional principal contracts
under
                             Section 446 of the Code.

TERMS AND CONDITIONS         means the Terms and Conditions Governing Use
of
                             Euroclear, the related Operating Procedures
of
                             the Euroclear System and applicable Belgian
                             law.

TRUST FUND                   means the trust fund created by the Pooling
and
                             Servicing Agreement.

TRUSTEE                      means Citibank, N.A.

UNPAID REALIZED LOSS AMOUNT  means, with respect to any class of the
                             Subordinated Certificates and as to any
                             Distribution Date, the excess of (1) Applied
                             Realized Loss Amounts with respect to such
                             class over (2) the sum of (x) all
distributions
                             in reduction of the Unpaid Applied Realized
                             Loss Amounts on all previous Distribution
Dates
                             and (y) all increases in the Certificate
                             Principal Balance of such class pursuant to
the
                             last sentence of the definition of
"Certificate
                             Principal Balance." Any amounts distributed
to
                             a class of Subordinated Certificates in
respect
                             of any Unpaid Realized Loss Amount will not
be
                             applied to reduce the Certificate Principal
                             Balance of such class.

UPPER COLLAR                 means any of the Class A-1 Upper Collar,
Class
                             A-2 Upper Collar or Subordinated Certificate
                             Upper Collar.

S-129

<PAGE>

ANNEX 1

GLOBAL CLEARANCE, SETTLEMENT AND TAX DOCUMENTATION PROCEDURES

Except in limited circumstances, the globally offered First Franklin
Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-
FF12
known as "Global Securities," will be available only in book-entry form.
Investors in the Global Securities may hold such Global Securities through
any
of DTC, Clearstream Luxembourg or Euroclear. The Global Securities will be
tradeable as home market instruments in both the European and U.S. domestic
markets. Initial settlement and all secondary trades will settle in same-day
funds.

Secondary market trading between investors holding Global Securities
through Clearstream Luxembourg and Euroclear will be conducted in the
ordinary
way in accordance with their normal rules and operating procedures and in
accordance with conventional Eurobond practice (i.e., seven calendar day
settlement).

Secondary market trading between investors holding Global Securities
through DTC will be conducted according to the rules and procedures
applicable
to U.S. corporate debt obligations and prior mortgage pass-through
certificate
issues.

Secondary cross-market trading between Clearstream Luxembourg or
Euroclear
and DTC Participants holding certificates will be effected on a
delivery-against-payment basis through the respective European Depositaries
of
Clearstream Luxembourg and Euroclear (in such capacity) and as DTC
Participants.

Beneficial owners of Global Securities that are non-U.S. Persons (as
described below) will be subject to U.S. withholding taxes unless such
holders
meet certain requirements and deliver appropriate U.S. tax documents to the
securities clearing organizations or their participants.

INITIAL SETTLEMENT

All Global Securities will be held in book-entry form by DTC in the
name
of Cede & Co. as nominee of DTC. Investors' interests in the Global
Securities
will be represented through financial institutions acting on their behalf as
direct and indirect Participants in DTC. As a result, Clearstream Luxembourg
and
Euroclear will hold positions on behalf of their Participants through their
respective European Depositaries, which in turn will hold such positions in
accounts as DTC Participants.

Investors electing to hold their Global Securities through DTC will
follow
the settlement practices applicable to prior mortgage pass-through
certificate
issues. Investors' securities custody accounts will be credited with their

holdings against payment in same-day funds on the settlement date.

Investors electing to hold their Global Securities through Clearstream Luxembourg or Euroclear accounts will follow the settlement procedures applicable to conventional Eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period.

Global Securities will be credited to the securities custody accounts on
the settlement date against payment in same-day funds.

SECONDARY MARKET TRADING

Since the purchaser determines the place of delivery, it is important to
establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value
date.

Trading Between DTC Participants.  Secondary market trading between DTC Participants will be settled using the procedures applicable to prior mortgage
pass-through certificate issues in same-day funds.

A-1

<PAGE>

Trading Between Clearstream Luxembourg and/or Euroclear Participants.  Secondary market trading between Clearstream Luxembourg Participants or Euroclear Participants will be settled using the procedures applicable to conventional Eurobonds in same-day funds.

Trading Between DTC Seller and Clearstream Luxembourg or Euroclear Purchaser.  When Global Securities are to be transferred from the account of a
DTC Participant to the account of a Clearstream Luxembourg Participant or a Euroclear Participant, the purchaser will send instructions to Clearstream Luxembourg or Euroclear through a Clearstream Luxembourg Participant or Euroclear Participant at least one business day prior to settlement. Clearstream
Luxembourg or Euroclear will instruct the Relevant Depositary to receive the Global Securities against payment. Payment will include interest accrued on the
Global Securities from and including the last coupon payment date to and excluding the settlement date, on the basis of either the actual number of days
in such accrual period and a year assumed to consist of 360 days or a 360-day year of twelve 30-day months, as applicable to the related class of Global Securities. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month.
Payment will then be made by the Relevant Depositary of the DTC Participant's account against delivery of the Global Securities. After settlement has been completed, the Global Securities will be credited to the respective clearing system and by the clearing system, in accordance with its usual procedures, to

the Clearstream Luxembourg Participant's or Euroclear Participant's account. The
securities credit will appear the next day (European time) and the cash debt
will be back-valued to, and the interest on the Global Securities will accrue
from, the value date (which would be the preceding day when settlement occurred
in New York). If settlement is not completed on the intended value date (i.e.,
the trade fails), the Clearstream Luxembourg or Euroclear cash debt will be
valued instead as of the actual settlement date.

Clearstream Luxembourg Participants and Euroclear Participants will need
to make available to the respective clearing systems the funds necessary to
process same-day funds settlement. The most direct means of doing so is to
pre-position funds for settlement, either from cash on hand or existing lines of
credit, as they would for any settlement occurring within Clearstream Luxembourg
or Euroclear. Under this approach, they may take on credit exposure to
Clearstream Luxembourg or Euroclear until the Global Securities are credited to
their accounts one day later.

As an alternative, if Clearstream Luxembourg or Euroclear has extended a
line of credit to them, Clearstream Luxembourg Participants or Euroclear
Participants can elect not to pre-position funds and allow that credit line to
be drawn upon the finance settlement. Under this procedure, Clearstream
Luxembourg Participants or Euroclear Participants purchasing Global Securities
would incur overdraft charges for one day, assuming they cleared the overdraft
when the Global Securities were credited to their accounts. However, interest on
the Global Securities would accrue from the value date. Therefore, in many cases
the investment income on the Global Securities earned during that one-day period
may substantially reduce or offset the amount of such overdraft charges,
although this result will depend on each Clearstream Luxembourg Participant's or
Euroclear Participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC
Participants can employ their usual procedures for sending Global Securities to
the Relevant Depositary for the benefit of Clearstream Luxembourg Participants
or Euroclear Participants. The sale proceeds will be available to the DTC seller
on the settlement date. Thus, to the DTC Participants a cross-market transaction
will settle no differently than a trade between two DTC Participants.

Trading Between Clearstream Luxembourg or Euroclear Seller and DTC

Purchaser.  Due to time zone differences in their favor, Clearstream
Luxembourg
Participants and Euroclear Participants may employ their customary procedures
for transactions in which Global Securities are to be transferred by the
respective clearing system, through the Relevant Depositary, to a DTC
Participant. The seller will send instructions to Clearstream Luxembourg or
Euroclear through a Clearstream Luxembourg Participant or Euroclear
Participant
at least one business day prior to settlement. In these cases, Clearstream
Luxembourg or Euroclear will instruct the Relevant Depositary, as appropriate,
to deliver the Global Securities to the DTC Participant's account against
payment. Payment will include interest accrued on the

<PAGE>

Global Securities from and including the last coupon payment date to and
excluding the settlement date on the basis of either the actual number of
days
in such accrual period and a year assumed to consist of 360 days or a 360-day
year of twelve 30-day months, as applicable to the related class of Global
Securities. For transactions settling on the 31st of the month, payment will
include interest accrued to and excluding the first day of the following
month.
The payment will then be reflected in the account of the Clearstream
Luxembourg
Participant or Euroclear Participant the following day, and receipt of the
cash
proceeds in the Clearstream Luxembourg Participant's or Euroclear
Participant's
account would be back-valued to the value date (which would be the preceding
day, when settlement occurred in New York). Should the Clearstream Luxembourg
Participant or Euroclear Participant have a line of credit with its
respective
clearing system and elect to be in debt in anticipation of receipt of the
sale
proceeds in its account, the back-valuation will extinguish any overdraft
incurred over that one-day period. If settlement is not completed on the
intended value date (i.e., the trade fails), receipt of the cash proceeds in
the
Clearstream Luxembourg Participant's or Euroclear Participant's account would
instead be valued as of the actual settlement date.

        Finally, day traders that use Clearstream Luxembourg or Euroclear and
that
purchase Global Securities from DTC Participants for delivery to Clearstream
Luxembourg Participants or Euroclear Participants should note that these
trades
would automatically fail on the sale side unless affirmative action were
taken.
At least three techniques should be readily available to eliminate this
potential problem:

        (1) borrowing through Clearstream Luxembourg or Euroclear for one day
(until the purchase side of the day trade is reflected in their Clearstream
Luxembourg or Euroclear accounts) in accordance with the clearing system's
customary procedures;

(2) borrowing the Global Securities in the U.S. from a DTC Participant no
later than one day prior to settlement, which would give the Global Securities
sufficient time to be reflected in their Clearstream Luxembourg or Euroclear
account in order to settle the sale side of the trade; or

(3) staggering the value dates for the buy and sell sides of the trade so
that the value date for the purchase from the DTC Participant is at least one
day prior to the value date for the sale to the Clearstream Luxembourg
Participant or Euroclear Participant.

CERTAIN U.S. FEDERAL INCOME TAX DOCUMENTATION REQUIREMENTS

A beneficial owner of Global Securities that is a non-U.S. Person will be
subject to the 30% U.S. withholding tax that generally applies to payments of
interest (including original issue discount) on registered debt issued by U.S.
Persons, unless (1) each clearing system, bank or other financial institution
that holds customers' securities in the ordinary course of its trade or
business
in the chain of intermediaries between such beneficial owner and the U.S.
entity
required to withhold tax complies with applicable certification requirements
and
(2) such beneficial owner takes one of the following steps to obtain an
exemption or reduced tax rate:

Exemption for non-U.S. Persons (Form W-8BEN). Beneficial owners of
Global
Securities that are non-U.S. Persons and are neither "10-percent
shareholders"
of the issuer within the meaning of Code Section 871(h)(3)(B) nor controlled
foreign corporations related to the issuer within the meaning of Code Section
881(c)(3)(C) can obtain a complete exemption from the withholding tax by
filing
a signed Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for
United States Tax Withholding). Further, non-U.S. Persons that are beneficial
owners residing in a country that has a tax treaty with the United States and
are eligible for benefits under that treaty can obtain an exemption or
reduced
tax rate (depending on the treaty terms) by filing a properly completed Form
W-8BEN claiming eligibility for treaty benefits. If the information shown on
Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of such
change. If the owner of Global Securities is a partnership or other type of
pass-through entity that is not treated for U.S. withholding tax purposes as
the
beneficial owner of the income with respect to such Global Securities, the
owner
generally must receive the statement described in the previous sentence from
the
owner's partners or other beneficial owners of the income with respect to the

A-3

<PAGE>

Global Securities and may be required to provide such statements, and certain additional information, to the person through whom the owner holds the Global Securities.

     Exemption for non-U.S. Persons with Effectively Connected Income (Form W-8ECI).  A non-U.S. Person, including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an exemption from the withholding tax by filing Form W-8ECI (Certificate of Foreign Person's
Claim for Exemption from Withholding on Income Effectively Connected with the Conduct of a Trade or Business in the United States).

     The term "U.S. Person" means

     (1) a citizen or resident of the United States,

     (2) a corporation or partnership organized in or under the laws of the United States, any state thereof or the District of Columbia (unless, in the case of a partnership, Treasury regulations provide otherwise), including an entity treated as a corporation or partnership for federal income tax purposes,

     (3) an estate the income of which is includable in gross income for United
States tax purposes, regardless of its source, or

     (4) a trust if a court within the United States is able to exercise primary supervision of the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust. Notwithstanding the preceding sentence, to the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as United States persons prior to such date, that elect to continue to
be treated as United States persons will also be U.S. Persons.

     This summary does not deal with all aspects of U.S. federal income tax withholding that may be relevant to foreign holders of the Global Securities. Investors are advised to consult their own tax advisors for specific tax advice
concerning their holding and disposing of the Global Securities.

                                    A-4

<PAGE>

PROSPECTUS

                         ASSET BACKED CERTIFICATES

                            ASSET BACKED NOTES
                            (ISSUABLE IN SERIES)

                    MERRILL LYNCH MORTGAGE INVESTORS, INC.
                                  DEPOSITOR
                         ----------------------
CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE 1 OF THIS PROSPECTUS.

The securities of each series will not represent an obligation of or interest in
the depositor, an obligation of or interest in the depositor, Merrill Lynch,
Pierce, Fenner & Smith Incorporated, any master servicer or any of their
respective affiliates, except to the limited extent described herein and in the
related prospectus supplement.

This prospectus may be used to offer and sell the securities only if accompanied
by a prospectus supplement.

THE SECURITIES

        Merrill Lynch Mortgage Investors, Inc., as depositor, will sell the
securities, which may be in the form of asset backed certificates or asset
backed notes. Each issue of securities will have its own series designation and
will evidence either:

        -   ownership interests in certain assets in a trust fund or

        -   debt obligations secured by certain assets in a trust fund.

        -   Each series of securities will consist of one or more classes. Each
            class of securities will represent the entitlement to a specified
            portion of future interest payments and a specified portion of
future
            principal payments on the assets in the related trust fund. In each
            case, the specified portion may equal from 0% to 100%. A series may
            include one or more classes of securities that are senior in right
of
            payment to one or more other classes. One or more classes of
securities
            may be entitled to receive distributions of principal, interest or
both
            prior to one or more other classes, or before or after certain
            specified events have occurred. The related prospectus supplement
will
            specify each of these features.

THE TRUST FUND AND ITS ASSETS

        As specified in the related prospectus supplement, each trust fund will
consist primarily of assets from one of the following categories:

        -   one or more segregated pools of various types of mortgage loans (or
            participation interests in mortgage loans) and/or closed-end and/or
            revolving home equity loans (or certain balances of these loans), in
            each case secured by first and/or junior liens on one- to five-
family
            residential properties, or security interests in shares issued by
            cooperative housing corporations, including mixed residential and
            commercial structures;

        -   manufactured housing installment contracts and installment loan

agreements secured by senior or junior liens on manufactured homes
and/or by mortgages on real estate on which the manufactured homes are
located;

- home improvement installment sales contracts or installment loan
  agreements originated by a home improvement contractor and secured by a
  mortgage on the related mortgaged property that is junior to other
  liens on the mortgaged property; and

- mortgage pass-through certificates or mortgage-backed securities
  evidencing interests in mortgage loans or secured thereby or certain
  direct obligations of the United States, agencies thereof or agencies
  created thereby. Each trust fund may be subject to early termination in
  certain circumstances.

MARKET FOR THE SECURITIES

     No market will exist for the securities of any series before they are
issued. In addition, even after the securities of a series have been issued and
sold, there can be no assurance that a resale market will develop.

OFFERS OF THE SECURITIES

     Offers of the securities are made through Merrill Lynch, Pierce, Fenner &
Smith Incorporated and the other underwriters listed in the related prospectus
supplement.

     Neither the Securities and Exchange Commission nor any state securities
commission has approved these securities or determined that this prospectus is
accurate or complete. Any representation to the contrary is a criminal
offense.

                         ----------------------

                            MERRILL LYNCH & CO.
                         ----------------------

              The date of this Prospectus is August 26, 2005.
<PAGE>

                 IMPORTANT NOTICE ABOUT INFORMATION IN THIS PROSPECTUS
                     AND EACH ACCOMPANYING PROSPECTUS SUPPLEMENT

Information about each series of securities is contained in the following
documents:

- this prospectus, which provides general information, some of which may not
  apply to a particular series; and

- the accompanying prospectus supplement for a particular series, which

describes the specific terms of the securities of that series. If the
prospectus supplement contains information about a particular series that
differs from the information contained in this prospectus, you should rely
on
the information in the prospectus supplement.

You should rely only on the information contained in this prospectus
and
the accompanying prospectus supplement. We have not authorized anyone to
provide
you with information that is different from that contained in this prospectus
and the accompanying prospectus supplement. The information in this
prospectus
is accurate only as of the date of this prospectus.

Each prospectus supplement generally will include the following
information with respect to the related series of securities:

- the principal amount, interest rate and authorized denominations of
  each class of securities;

- information concerning the mortgage loans, home improvement
contracts
  and/or securities in the related trust fund;

- information concerning the seller or sellers of the mortgage loans,
  home improvement contracts and/or securities and information
concerning
  any servicer;

- the terms of any credit enhancement with respect to particular
classes
  of the securities;

- information concerning other trust fund assets, including any
reserve
  fund;

- the final scheduled distribution date for each class of securities;

- the method for calculating the amount of principal to be paid to
each
  class of securities, and the timing and order of priority of
principal
  payments;

- information about any REMIC or FASIT tax elections for some or all
of
  the trust fund assets; and

- particulars of the plan of distribution for the securities.

If you require additional information, the mailing address of our
principal executive offices is Merrill Lynch Mortgage Investors, Inc., 250
Vesey
Street, World Financial Center-North Tower, 10th Floor, New York, New York
10281-1310, Attention: Secretary, and our telephone number is (212) 449-0357.

For other means of acquiring additional information about us or a series of securities, see "Incorporation of Certain Information by Reference" on page 124 of this prospectus.

<PAGE>

TABLE OF CONTENTS

PROSPECTUS

<Table>
<S>                              <C>
Risk Factors........................    1
Description of the Trust Funds......    7
    Assets..........................    7
    Mortgage Loans..................    7
    Loan-to-Value Ratio............    8
    Mortgage Loan Information in
        Prospectus Supplements.......    8
    MBS.............................   10
    Government Securities..........   12
    Pre-Funding Account............   12
    Accounts.......................   12
    Credit Support.................   12
    Cash Flow Agreements...........   13
Use of Proceeds.....................   13
Yield Considerations................   13
    General........................   13
    Pass-Through Rate and
        Interest Rate...............   13
    Timing of Payment of
        Interest....................   13
    Payments of Principal;
        Prepayments.................   14
    Prepayments--Maturity and
        Weighted Average Life........   15
    Other Factors Affecting
        Weighted Average Life........   16
The Depositor.......................   17
Description of the Securities.......   18
    General........................   18
    Categories of Classes of
        Securities...................   19
    Distributions..................   22
    Available Distribution
        Amount.......................   22
    Distributions of Interest on
        the Securities...............   23
    Distributions of Principal of
        the Securities...............   24
    Components......................   24
    Allocation of Losses and
        Shortfalls...................   25
    Advances in Respect of
        Delinquencies...............   25

Reports to Securityholders.....        26
Termination....................        28
Book-Entry Registration and
    Definitive Securities........        28
Recombinable Securities.............        31
General.......................        31
Exchanges.....................        32
Procedures and Exchange
    Proportions...................        34
Description of the Agreements.......        35
Agreements Applicable to a
    Series.......................        35
Assignment of Assets;
    Repurchases..................        36
Representations and Warranties;
    Repurchases..................        38
Collection Account and Related
    Accounts.....................        39
Collection and Other Servicing
    Procedures...................        43
Sub-Servicers..................        43
Realization upon Defaulted
    Whole Loans..................        44
Primary Mortgage Insurance
    Policies.....................        45
Hazard Insurance Policies......        46
Fidelity Bonds and Errors and
    Omissions Insurance..........        47
Due-on-Sale Provisions.........        48
Retained Interest; Servicing
    Compensation and Payment of
    Expenses.....................        48
Evidence as to Compliance......        48
Certain Matters Regarding a
    Master Servicer and the
    Depositor....................        49
Events of Default under the
    Agreement....................        50
Rights upon Event of Default
    under the Agreement..........        51
Amendment......................        52
The Trustee....................        52
Duties of the Trustee..........        52
Certain Matters Regarding the
    Trustee......................        53
Resignation and Removal of the
    Trustee......................        53
Certain Terms of the
    Indenture....................        54
Description of Credit Support.......        56
General.......................        56
Subordinate Securities.........        57
Cross-Support Provisions.......        57
Insurance or Guarantees........        57
</Table>

iii

<PAGE>
<Table>
<S>                                        <C>

          Letter of Credit...............   57
          Insurance Policies and Surety
            Bonds........................   57
          Reserve Funds..................   58
          Credit Support with Respect to
            MBS..........................   58
Certain Legal Aspects of Mortgage
  Loans.............................   58
          General........................   58
          Types of Mortgage
            Instruments..................   59
          Interest in Real Property......   59
          Cooperative Loans..............   59
          Foreclosure....................   60
          Junior Mortgages...............   64
          Anti-Deficiency Legislation and
            Other Limitations on
            Lenders......................   64
          Environmental Legislation......   65
          Due-on-Sale Clauses............   66
          Subordinate Financing..........   66
          Applicability of Usury Laws....   66
          Alternative Mortgage
            Instruments..................   67
          Servicemembers Civil Relief
            Act...........................   68
          Forfeitures in Drug and RICO
            Proceedings..................   68
          The Contracts..................   68
Material Federal Income Tax
  Consequences......................   71
          General........................   72
          Grantor Trust Funds............   72
          New Withholding Regulations....   80
          REMICs..........................   80
          Tax-Related Restrictions on
            Transfers of REMIC Residual
            Certificates.................   96
          Tax Characterization of a Trust
            Fund as a Partnership........   99
          Tax Treatment of Certificates
            as Debt for Tax Purposes.....  105
          FASIT Securities...............  108
Taxation of Classes of Recombinable
  Securities........................  111
          General........................  111
          Tax Status.....................  112
          Tax Accounting for Recombinable
            Securities...................  112
          Exchanges of Recombinable
            Securities...................  113
          Tax Treatment of Foreign
            Investors....................  113
          Backup Withholding.............  113

        Reporting and Administrative
          Matters......................   114
State Tax Considerations............   114
ERISA Considerations................   114
        General.......................   114
        Prohibited Transactions........   114
        Availability of Underwriter's
          Exemption for Certificates...   115
        Review by Plan Fiduciaries.....   120
Legal Investment....................   121
Plan of Distribution................   123
Legal Matters.......................   124
Financial Information...............   124
Incorporation of Certain Information
  by Reference......................   124
Ratings.............................   125
Index of Defined Terms..............   126
&lt;/Table&gt;

                                        iv
&lt;PAGE&gt;

                        RISK FACTORS

You should consider the following information carefully, since it identifies
certain significant sources of risk associated with an investment in the
securities.

THERE IS A RISK THAT THE SECURITIES WILL HAVE LIMITED LIQUIDITY.

At the time a series of securities is issued, there will not be a secondary
market for them. Merrill Lynch, Pierce, Fenner & Smith Incorporated currently
expects to make a secondary market in the offered securities, but it is not
required to. We cannot assure you that a secondary market for the securities
of
any series will develop or, if it does develop, that it will provide holders
of
those securities with liquidity of investment or will continue while those
securities remain outstanding.

THERE IS A RISK ASSOCIATED WITH LIMITED ASSETS THAT THOSE ASSETS WILL NOT BE
SUFFICIENT TO PAY THE SECURITIES IN FULL.

-  The securities will not represent an interest in or obligation of the
   depositor, the master servicer or any of their affiliates.

-  The only obligations with respect to the securities or the assets securing
   them will be the obligations (if any) of any "warranting party" (as
further
   described in this prospectus) pursuant to certain limited representations
and
   warranties made with respect to the mortgage loans, the master servicer's
and
   any sub-servicer's servicing obligations under the related agreements
   (including the limited obligation to make certain advances in the event of
   delinquencies on the mortgage loans, but only to the extent they deem such

advances recoverable) and, if described in the related prospectus
supplement,
  certain limited obligations of the master servicer in connection with an
  agreement to purchase or act as remarketing agent with respect to a
  convertible adjustable-rate mortgage loan (as more fully described in this
  prospectus) upon conversion to a fixed rate or a different index.

- Since certain representations and warranties with respect to the mortgage
  assets may have been made and/or assigned in connection with transfers of
the
  mortgage assets prior to the closing date, the rights of the trustee and
the
  securityholders with respect to such representations or warranties will be
  limited to their rights as an assignee thereof.

- Unless otherwise specified in the related prospectus supplement, none of
the
  depositor, the master servicer or any affiliate thereof will have any
  obligation with respect to representations or warranties made by any other
  entity.

- Unless otherwise specified in the related prospectus supplement, neither
the
  securities nor the underlying assets will be guaranteed or insured by any
  governmental agency or instrumentality, or by the depositor, the master
  servicer, any sub-servicer or any of their affiliates.

- Proceeds of the assets included in the related trust fund for each series
of
  securities (including the assets and any form of credit enhancement) will
be
  the sole source of payments on the securities, and there will be no
recourse
  to the depositor or any other entity in the event that these proceeds are
  insufficient or otherwise unavailable to make all payments provided for
under
  the securities.

- Unless otherwise specified in the related prospectus supplement, a series
of
  securities will not have any claim against or security interest in the
trust
  funds for any other series. If the related trust fund is insufficient to
make
  payments on these securities, no other assets will be available for
payment
  of the deficiency. Additionally, certain amounts remaining in certain
funds
  or accounts, including the collection account and any accounts maintained
as
  credit support, may be withdrawn under certain conditions, as described in
  the related prospectus supplement. In the event of such withdrawal, such
  amounts will not be available for future payment of principal of or
interest
  on the securities.

- If provided in the prospectus supplement for a series of securities

consisting of one or more classes of subordinate securities, on any
distribution date in respect of which losses or shortfalls in collections on
the assets have been incurred, the amount of such losses or shortfalls will
be borne first by one or more classes of the subordinate securities, and,
thereafter, by the remaining classes of securi-

<PAGE>

ties in the priority and manner and subject to the limitations specified in
that prospectus supplement.

We refer you to "Description of the Trust Funds" for further information.

THERE IS A RISK THAT PREPAYMENTS ON THE ASSETS IN A TRUST FUND WILL ADVERSELY
AFFECT THE AVERAGE LIFE AND YIELDS OF THE RELATED SECURITIES.

- Prepayments (including those caused by defaults) on the assets in any trust
  fund generally will result in a faster rate of principal payments on one or
  more classes of the related securities than if payments on these assets were
  made as scheduled. Thus, the prepayment experience on the assets may affect
  the average life of each class of related securities. The rate of principal
  payments on pools of mortgage loans varies between pools and from time to
  time is influenced by a variety of economic, demographic, geographic, social,
  tax, legal and other factors. We can't assure you as to the rate of
  prepayment on the assets in any trust fund or that the rate of payments will
  conform to any model we describe here or in any prospectus supplement. If
  prevailing interest rates fall significantly below the applicable mortgage
  interest rates, principal prepayments are likely to be higher than if
  prevailing rates remain at or above the rates borne by the mortgage loans
  underlying or comprising the mortgage assets in any trust fund. As a result,
  the actual maturity of any class of securities evidencing an interest in a
  trust fund containing mortgage assets could occur significantly earlier than
  expected.

- A series of securities may include one or more classes of securities with
  priorities of payment and, as a result, yields on other classes of
  securities, including classes of offered securities, of such series may be
  more sensitive to prepayments on assets. A series of securities may include
  one or more classes offered at a significant premium or discount. Yields on
  these classes of securities will be sensitive, and in some cases extremely
  sensitive, to prepayments on mortgage assets and, where the amount of
  interest payable with respect to a class is disproportionately high, as

compared to the amount of principal, as with certain classes of stripped
interest securities, a holder might, in some prepayment scenarios, fail to
recoup its original investment. A series of securities may include one or
more classes of securities, including classes of offered securities, that
provide for distribution of principal thereof from amounts attributable to
interest accrued but not currently distributable on one or more classes of
accrual securities and, as a result, yields on such securities will be
sensitive to (a) the provisions of such accrual securities relating to the
timing of distributions of interest thereon and (b) if such accrual
securities accrue interest at a variable or adjustable pass-through rate
or
    interest rate, changes in such rate.

We refer you to "Yield Considerations" in the prospectus and, if applicable,
in
the related prospectus supplement for further information.

THERE IS A RISK THAT DEFAULTS BY OBLIGORS OR DECLINES IN THE VALUES OF
MORTGAGED
PROPERTIES WILL RESULT IN LOSSES TO INVESTORS.

-  An investment in securities such as the securities which generally
represent
   interests in mortgage loans may be affected by, among other things, a
decline
   in real estate values and changes in the mortgagors' financial condition.
No
   assurance can be given that values of the mortgaged properties have
remained
   or will remain at their levels on the dates of origination of the related
   mortgage loans. If the relevant residential real estate market should
   experience an overall decline in property values such that the outstanding
   balances of the related mortgage loans, and any secondary financing on the
   mortgaged properties, become equal to or greater than the value of the
   mortgaged properties, the actual rates of delinquencies, foreclosures and
   losses could be higher than those now generally experienced in the
mortgage
   lending industry in that market. In addition, in the case of mortgage
loans
   that are subject to negative amortization, due to the addition to
principal
   balance of deferred interest, the principal balances of such mortgage
loans
   could be increased to an amount equal to or in excess of the value of the
   underlying mortgaged properties, thereby increasing the likelihood of
   default.

-  To the extent that these losses are not covered by the applicable credit
   support, if any, holders

                                      2
<PAGE>

    of securities of the series evidencing interests in the related mortgage
    loans will bear all risk of loss resulting from default by mortgagors and
    will have to look primarily to the value of the mortgaged properties for
    recovery of the outstanding principal and unpaid interest on the defaulted

mortgage loans. Certain of the types of mortgage loans may involve additional
    uncertainties not present in traditional types of loans.

-   For example, certain of the mortgage loans provide for escalating or variable
    payments by the mortgagor under the mortgage loan, as to which the mortgagor
    is generally qualified on the basis of the initial payment amount. In some
    cases the mortgagor's income may not be sufficient to enable it to continue
    to make its loan payments as such payments increase and thus the likelihood
    of default will increase.

-   In addition to the foregoing, certain geographic regions of the United States
    from time to time will experience weaker regional economic conditions and
    housing markets, and will thus experience higher rates of loss and
    delinquency than the mortgage loans generally will experience. The mortgage
    loans underlying certain series of securities may be concentrated in these
    regions, and this concentration may present risk considerations in addition
    to those generally present for similar mortgage-backed securities without
    this concentration.

-   Further, the rate of default on mortgage loans that are refinance or limited
    documentation mortgage loans, and on mortgage loans with high loan-to-value
    ratios, may be higher than for other types of mortgage loans. Additionally, a
    decline in the value of the mortgaged properties will increase the risk of
    loss particularly with respect to any related junior mortgage loans.

We refer you to "--There is a risk that there will be reduced or no proceeds
available when junior lien mortgage loans are liquidated" in this prospectus for
further information.

-   In addition, a prospectus supplement may specify that the loan-to-value
    ratios for the mortgage loans in the related trust will exceed 100%. The
    related mortgaged properties will thus be highly unlikely to provide adequate
    security for these mortgage loans. To the extent specified in that prospectus
    supplement, the assessment of the credit history of a borrower and that
    borrower's capacity to make payments on the related mortgage loan will have
    been the primary considerations in underwriting the mortgage loans included
    in that trust. The evaluation of the adequacy of the loan-to-value ratio, if
    so specified in the related prospectus supplement, will have been given less

consideration, and in certain cases no consideration, in underwriting those
   mortgage loans.

THERE IS A RISK THAT THERE WILL BE REDUCED OR NO PROCEEDS AVAILABLE WHEN JUNIOR
LIEN MORTGAGE LOANS ARE LIQUIDATED.

- Certain mortgage loans may be secured by junior liens and the related first
   and other senior liens, if any, may not be included in the mortgage pool.

- The primary risk to holders of mortgage loans secured by junior liens is the
   possibility that adequate funds will not be received in connection with a
   foreclosure of the related senior lien to satisfy fully both the senior lien
   and the mortgage loan. If a holder of the senior lien forecloses on a
   mortgaged property, the proceeds of the foreclosure or similar sale will be
   applied first to the payment of court costs and fees in connection with the
   foreclosure, second to real estate taxes, third in satisfaction of all
   principal, interest, prepayment or acceleration penalties, if any, and any
   other sums due and owing to the holder of the senior lien. The claims of the
   holder of the senior lien will be satisfied in full out of proceeds of the
   liquidation of the mortgage loan, if these proceeds are sufficient, before
   the trust fund as holder of the junior lien receives any payments in respect
   of the mortgage loan.

- If the master servicer were to foreclose on any mortgage loan, it would do so
   subject to any related senior lien. In order for the debt related to the
   mortgage loan to be paid in full at such sale, a bidder at the foreclosure
   sale of that mortgage loan would have to bid an amount sufficient to pay off
   all sums due under the mortgage loan and the senior lien or purchase the
   mortgaged property subject to the senior lien. In the event that such
   proceeds from a foreclosure or similar sale of the related

                                       3
<PAGE>

   mortgaged property were insufficient to satisfy both loans in the aggregate,
   the trust fund, as the holder of the junior lien, and, accordingly, holders
   of the certificates, would bear the risk of delay in distributions while a
   deficiency judgment against the borrower was being obtained and the risk of
   loss if the deficiency judgment were not realized upon. Moreover, deficiency
   judgments may not be available in certain jurisdictions. In addition, a
   junior mortgagee may not foreclose on the property securing a junior mortgage

unless it forecloses subject to the senior mortgage.

We refer you to "Certain Legal Aspects of the Mortgage Loans--Junior Mortgages"
in this prospectus for further information.

THERE IS A RISK THAT ANY APPLICABLE CREDIT SUPPORT WILL NOT COVER ALL LOSSES.

- The prospectus supplement for a series of certificates will describe any
  credit support in the related trust fund, which may include letters of
  credit, insurance policies, guarantees, reserve funds or other types of
  credit support, or combinations of these. Any credit support will be subject
  to the conditions and limitations described here and in the related
  prospectus supplement. Moreover, this credit support may not cover all
  potential losses or risks; for example, credit support may or may not cover
  fraud or negligence by a borrower or other parties.

- A series of securities may include one or more classes of subordinate
  securities (which may include offered securities), if we provide for that in
  the related prospectus supplement. Although subordination is designed to
  reduce the risk to holders of senior securities of delinquent distributions
  or ultimate losses, the amount of subordination will be limited and may
  decline under certain circumstances. In addition, if principal payments on
  one or more classes of securities of a series are made in a specified order
  of priority, any limits with respect to the aggregate amount of claims under
  any related credit support may be exhausted before the principal of the lower
  priority classes of securities of this series has been repaid. As a result,
  the impact of significant losses and shortfalls on the assets may fall
  primarily upon those classes of securities having a lower priority of
  payment. Moreover, if a form of credit support covers more than one series of
  securities (we refer to this as a "covered trust"), holders of securities
  evidencing an interest in a covered trust will be subject to the risk that
  this credit support will be exhausted by the claims of other covered trusts.

- The amount of any applicable credit support supporting one or more classes of
  offered securities, including the subordination of one or more classes of
  securities, will be determined on the basis of criteria established by each
  rating agency rating such classes of securities based on an assumed level of
  defaults, delinquencies, other losses or other factors. We can't assure you,
  however, that the loss experience on the related assets will not exceed these
  assumed levels.

- Regardless of the form of credit enhancement, the amount of coverage will be
  limited in amount and in most cases will be subject to periodic reduction in
  accordance with a schedule or formula. The master servicer will generally be
  permitted to reduce, terminate or substitute all or a portion of the credit
  enhancement for any series of securities, if the applicable rating agency
  indicates that the then-current rating of those securities will not be
  adversely affected.

- The rating agency rating a series of securities may lower its rating
  following the initial issuance of the securities if the obligations of any
  applicable credit support provider have been downgraded, or as a result of
  losses on the related assets substantially in excess of the levels
  contemplated by that rating agency when it performed its initial rating
  analysis. None of the depositor, the master servicer or any of their
  affiliates will have any obligation to replace or supplement any credit
  support or to take any other action to maintain any rating of any series of
  securities.

We refer you to "--There are risks in relying on the limited nature of ratings",
"Description of the Securities" and "Description of Credit Support" for further
information.

<PAGE>

THERE IS A RISK TO HOLDERS OF SUBORDINATE SECURITIES THAT LOSSES WILL HAVE A
GREATER IMPACT ON THEM.

- The rights of subordinate securityholders to receive distributions to which
  they would otherwise be entitled with respect to the assets will be
  subordinate to the rights of the master servicer (to the extent that the
  master servicer is paid its servicing fee, including any unpaid servicing
  fees with respect to one or more prior due periods, and is reimbursed for
  certain unreimbursed advances and unreimbursed liquidation expenses) and the
  senior securityholders to the extent described in the related prospectus
  supplement. As a result of the foregoing, investors must be prepared to bear
  the risk that they may be subject to delays in payment and may not recover
  their initial investments in the subordinate securities.

We refer you to "Description of the Securities--General" and "--Allocation of
Losses and Shortfalls" in this prospectus for further information.

- The yields on the subordinate securities may be extremely sensitive to the
  loss experience of the assets and the timing of any such losses. If the
  actual rate and amount of losses experienced by the assets exceed the rate
  and amount of such losses assumed by an investor, the yields to maturity on

the subordinate securities may be lower than you anticipated.

THERE IS A RISK THAT OBLIGORS ON BALLOON LOANS WILL NOT BE ABLE TO MAKE BALLOON
PAYMENTS.

Some of the mortgage loans as of the cut-off date may not be fully amortizing over their terms to maturity (we call these "balloon loans") and, thus, will require substantial principal payments (i.e., balloon payments) at their stated
maturity. Mortgage loans with balloon payments involve a greater degree of risk
because the ability of a mortgagor to make a balloon payment typically will depend upon its ability either to timely refinance the loan or to timely sell the related mortgaged property. The ability of a mortgagor to accomplish either
of these goals will be affected by a number of factors, including the level of
available mortgage interest rates at the time of sale or refinancing, the mortgagor's equity in the related mortgaged property, the financial condition of
the mortgagor, the value of the mortgaged property, tax laws, prevailing general
economic conditions and the availability of credit for single family or multifamily real properties generally.

THERE IS A POSSIBILITY, IF THE RELATED PROSPECTUS SUPPLEMENT PROVIDES FOR IT, THAT UPON AN OPTIONAL TERMINATION OF A TRUST FUND, THE PROCEEDS MAY BE LESS THAN
THE OUTSTANDING PRINCIPAL AMOUNT OF THE SECURITIES PLUS ACCRUED INTEREST.

- If specified in the related prospectus supplement, a series of securities may
  be subject to optional early termination through the repurchase of the assets
  in the related trust fund by the party specified therein, under the circumstances and in the manner set forth therein. If provided in the related
  prospectus supplement, upon the reduction of the security balance of a specified class or classes of securities to a specified percentage or amount,
  the party specified therein will solicit bids for the purchase of all assets
  of the trust fund, or of a sufficient portion of such assets to retire such
  class or classes or purchase such class or classes at a price set forth in
  the related prospectus supplement, in each case, under the circumstances and
  in the manner set forth therein.

- In either such case, if the related prospectus supplement provides for it,
  the proceeds available for distribution to securityholders may be less than
  the outstanding principal balance of their securities plus accrued interest.
  If this happens, these securityholders could incur a loss on their investment.

THERE ARE RISKS RELATING TO CERTAIN FEDERAL INCOME TAX CONSIDERATIONS
REGARDING
REMIC RESIDUAL CERTIFICATES.

- Holders of REMIC residual certificates must report on their federal income
  tax returns as ordinary income their pro rata share of the taxable income
of
  the REMIC, regardless of the amount or timing of their receipt of cash
  payments, as described in "Material Federal Income Tax Consequences--
REMICs."
  Under certain circumstances, holders of offered securities that are REMIC
  residual certificates may have taxable income and tax liabilities arising
  from such investment during a taxable year in excess of the cash received
  during such period. Individual holders of REMIC residual

<PAGE>

  certificates may be limited in their ability to deduct servicing fees and
  other expenses of the REMIC.

- In addition, REMIC residual certificates are subject to certain
restrictions
  on transfer. Because of the special tax treatment of REMIC residual
  certificates, the taxable income arising in a given year on a REMIC
residual
  certificate will not be equal to the taxable income associated with
  investment in a corporate bond or stripped instrument having similar cash
  flow characteristics and pre-tax yield. Therefore, the after-tax yield on
the
  REMIC residual certificate may be significantly less than that of a
corporate
  bond or stripped instrument having similar cash flow characteristics.
  Additionally, prospective purchasers of a REMIC residual certificate
should
  be aware that treasury regulations provide that REMIC residual interests
may
  not be marked to market.

We refer you to "Material Federal Income Tax Consequences--REMICs" in this
prospectus for further information.

THERE ARE RISKS IN RELYING ON THE LIMITED NATURE OF RATINGS.

        Any rating assigned by a rating agency to a class of securities will
reflect that rating agency's assessment solely of the likelihood that holders
of
securities of that class will receive payments to which those securityholders
are entitled under the related agreement. This rating will not be an
assessment
of the likelihood that principal prepayments (including those caused by
defaults) on the related mortgage assets will be made, the degree to which
the
rate of such prepayments might differ from what you originally anticipated or
the likelihood of early optional termination of the series of securities.
This

rating will not address the possibility that prepayment at higher or lower rates
than you anticipated may cause you to experience a yield lower than you
anticipated or that an investor purchasing a security at a significant premium
might fail to recoup its initial investment under certain prepayment scenarios.
Each prospectus supplement will identify any payment to which holders of offered
securities of the related series are entitled that is not covered by the
applicable rating.

We refer you to "Ratings" in this prospectus for further information.

<PAGE>

## DESCRIPTION OF THE TRUST FUNDS

ASSETS

The primary assets of each Trust Fund (the "Assets") will include:

      (i)      one- to five-family mortgage loans or participation interests in
              mortgage loans (or certain balances thereof) (collectively, the
              "Mortgage Loans"), including without limitation, Home Equity
              Loans, Home Improvement Contracts and Manufactured Housing
              Contracts,

      (ii)     pass-through certificates or other mortgage-backed securities
              (such as debt obligations or participation interests or
              certificates) evidencing interests in or secured by one or more
              Mortgage Loans or other similar participations, certificates or
              securities ("MBS") or

    (iii)    direct obligations of the United States, agencies thereof or
              agencies created thereby which are:

           (a)    interest-bearing securities,

           (b)    non-interest-bearing securities,

           (c)    originally interest-bearing securities from which coupons
                  representing the right to payment of interest have been
                  removed, or

           (d)    interest-bearing securities from which the right to payment
                  of principal has been removed (the "Government Securities").

     As used herein, "Mortgage Loans" refers to both whole Mortgage Loans (or
certain balances thereof) and Mortgage Loans underlying MBS. Mortgage Loans that
secure, or interests in which are evidenced by, MBS are herein sometimes

referred to as "Underlying Mortgage Loans." Mortgage Loans (or certain balances
thereof) that are not Underlying Mortgage Loans are sometimes referred to as
"Whole Loans." Any pass-through certificates or other asset-backed certificates
in which an MBS evidences an interest or which secure an MBS are sometimes
referred to herein also as MBS or as "Underlying MBS." Mortgage Loans and MBS
are sometimes referred to herein as "Mortgage Assets." The Mortgage Assets will
not be guaranteed or insured by Merrill Lynch Mortgage Investors, Inc. (the
"Depositor") or any of its affiliates or, unless otherwise provided in the
Prospectus Supplement, by any governmental agency or instrumentality or by any
other person. Each Asset will be selected by the Depositor for inclusion in a
Trust Fund from among those purchased, either directly or indirectly, from a
prior holder thereof (an "Asset Seller"), which may be an affiliate of the
Depositor and, with respect to Assets, which prior holder may or may not be the
originator of such Mortgage Loan or the issuer of such MBS.

Unless otherwise specified in the related Prospectus Supplement, the
Securities will be entitled to payment only from the assets of the related Trust
Fund and will not be entitled to payments in respect of the assets of any other
trust fund established by the Depositor. If specified in the related Prospectus
Supplement, the assets of a Trust Fund will consist of certificates representing
beneficial ownership interests in, or indebtedness of, another trust fund that
contains the Assets.

MORTGAGE LOANS

General

Unless otherwise specified in the related Prospectus Supplement, each
Mortgage Loan will be secured by:

    (i)     a lien on a Mortgaged Property consisting of a one- to
         five-family residential property (a "Single Family Property" and
         the related Mortgage Loan a "Single Family Mortgage Loan") or

<PAGE>

    (ii)    a security interest in shares issued by private cooperative
         housing corporations ("Cooperatives"). If so specified in the
         related Prospectus Supplement, a Mortgaged Property may include
         some commercial use.

Mortgaged Properties will be located, unless otherwise specified in the
related Prospectus Supplement, in any one of the fifty states, the District of

Columbia, the Commonwealth of Puerto Rico or any U.S. possession. To the extent
specified in the related Prospectus Supplement, the Mortgage Loans will be secured by first and/or junior mortgages or deeds of trust or other similar security instruments creating a first or junior lien on Mortgaged Property. The
Mortgaged Properties may include apartments owned by Cooperatives and leasehold
interests in properties, the title to which is held by third party lessors. Unless otherwise specified in the Prospectus Supplement, the term of any such leasehold shall exceed the term of the related mortgage note by at least five years. Each Mortgage Loan will have been originated by a person (the "Originator") other than the Depositor. The related Prospectus Supplement will
indicate if any Originator is an affiliate of the Depositor. The Mortgage Loans
will be evidenced by promissory notes (the "Mortgage Notes") secured by mortgages, deeds of trust or other security instruments (the "Mortgages") creating a lien on the Mortgaged Properties. If specified in the related Prospectus Supplement, certain of the Mortgage Loans (by principal balance) in a
Trust Fund will be, as of the related Cut-off Date, 30 days or more past their
most recent contractually scheduled payment date.

        Participation interests in a Mortgage Loan or a loan pool will be purchased by the Depositor, or an affiliate, pursuant to a participation agreement (a "Participation Agreement"). The interest acquired by the Depositor
under the Participation Agreement will be evidenced by a participation certificate (a "Participation Certificate"). The trustee will be the holder of a
Participation Certificate. Unless otherwise specified in the related Prospectus
Supplement, the trustee will not be in possession of or be assignee of record with respect to the Mortgage Loans represented by any Participation Certificate.

LOAN-TO-VALUE RATIO

        The "Loan-to-Value Ratio" of a Mortgage Loan at any given time is the ratio (expressed as a percentage) of the then outstanding principal balance of
the Mortgage Loan plus the principal balance of any senior mortgage loan to the
Value of the related Mortgaged Property. If specified in the related Prospectus
Supplement, the Loan-to-Value Ratio of certain Mortgage Loans may exceed 100%. The "Value" of a Mortgaged Property, other than with respect to Refinance Loans,
is generally the lesser of:

        (a)    the appraised value determined in an appraisal obtained by the
               originator at origination of such loan and

        (b)    the sales price for such property.

"Refinance Loans" are loans made to refinance existing loans. Unless otherwise
set forth in the related Prospectus Supplement, the Value of the Mortgaged
Property securing a Refinance Loan is the appraised value thereof determined in
an appraisal obtained at the time of origination of the Refinance Loan. The
Value of a Mortgaged Property as of the date of initial issuance of the related
series of Certificates may be less than the value at origination and will
fluctuate from time to time based upon changes in economic conditions and the
real estate market.

MORTGAGE LOAN INFORMATION IN PROSPECTUS SUPPLEMENTS

        Each Prospectus Supplement will contain information, as of the dates
specified in such Prospectus Supplement and to the extent then applicable and
specifically known to the Depositor, with respect to the Mortgage Loans,
including:

        (i)      the aggregate outstanding principal balance and the largest,
                 smallest and average outstanding principal balance of the
                 Mortgage Loans as of the applicable Cut-off Date,

        (ii)     the type of property securing the Mortgage Loans,

<PAGE>

        (iii)    the weighted average (by principal balance) of the original
and
                 remaining terms to maturity of the Mortgage Loans,

        (iv)     the earliest and latest origination date and maturity date of
the
                 Mortgage Loans,

        (v)      the range of the Loan-to-Value Ratios at origination of the
                 Mortgage Loans,

        (vi)     the Mortgage Rates or range of Mortgage Rates and the weighted
                 average Mortgage Rate borne by the Mortgage Loans,

        (vii)    the state or states in which most of the Mortgaged Properties
are
                 located,

        (viii)   information with respect to the prepayment provisions, if any,
of
                 the Mortgage Loans,

        (ix)     with respect to Mortgage Loans with adjustable Mortgage Rates
                 ("ARM Loans"), the index, the frequency of the adjustment
dates,
                 the range of margins added to the index, and the maximum
Mortgage
                 Rate or monthly payment variation at the time of any
adjustment

thereof and over the life of the ARM Loan, and

          (x)          information regarding the payment characteristics of the
Mortgage
                    Loans, including without limitation balloon payment and other
                    amortization provisions

If specific information respecting the Mortgage Loans is not known to the
Depositor at the time Securities are initially offered, more general
information
of the nature described above will be provided in the Prospectus Supplement,
and
specific information will be set forth in a report which will be available to
purchasers of the related Securities at or before the initial issuance
thereof
and will be filed as part of a Current Report on Form 8-K with the Securities
and Exchange Commission within fifteen days after such initial issuance.

          The related Prospectus Supplement may specify whether the Mortgage
Loans
include closed-end and/or revolving home equity loans or certain balances
thereof ("Home Equity Loans"), which may be secured by Mortgages that are
junior
to other liens on the related Mortgaged Property and/or home improvement
installment sales contracts or installment loan agreements (the "Home
Improvement Contracts") originated by a home improvement contractor and
secured
by a Mortgage on the related Mortgaged Property that is junior to other liens
on
the Mortgaged Property. Except as otherwise described in the related
Prospectus
Supplement, the home improvements purchased with the Home Improvement
Contracts
will generally be replacement windows, house siding, roofs, swimming pools,
satellite dishes, kitchen and bathroom remodeling goods and solar heating
panels. The related Prospectus Supplement will specify whether the Home
Improvement Contracts are partially insured under Title I of the National
Housing Act and, if so, the limitations on such insurance.

          If specified in the related Prospectus Supplement, new draws by
borrowers
under the revolving Home Equity Loans will, during a specified period of time,
automatically become part of the Trust Fund for a series. As a result, the
aggregate balance of the revolving Home Equity Loans will fluctuate from day
to
day as new draws by borrowers are added to the Trust Fund and principal
collections are applied to purchase such balances. Such amounts will usually
differ each day, as more specifically described in the related Prospectus
Supplement.

          The related Prospectus Supplement may specify whether the Mortgage
Loans
consist, in whole or in part, of conventional manufactured housing
installment
sales contracts and installment loan agreements, originated by a manufactured
housing dealer in the ordinary course of business (collectively,
"Manufactured

Housing Contracts"). Such Manufactured Housing Contracts will be secured by manufactured homes, located in any of the fifty states or the District of Columbia, or by mortgages on the real estate on which the manufactured homes are
located.

The manufactured homes securing the Manufactured Housing Contracts will consist of manufactured homes within the meaning of 42 United States Code, Section 5402(6), or manufactured homes meeting those other standards as shall be
described in the related prospectus supplement. Section 5402(6) defines a "manufactured home" as "a structure, transportable in one or more sections, which, in the

<PAGE>

traveling mode, is eight body feet or more in width or forty body feet or more
in length, or, when erected on site, is three hundred twenty or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required
utilities, and includes the plumbing, heating, air conditioning and electrical
systems contained therein; except that the term shall include any structure which meets all the requirements of [this] paragraph except the size requirements and with respect to which the manufacturer voluntarily files a certification required by the Secretary of Housing and Urban Development and complies with the standards established under [this] chapter."

Manufactured homes, and home improvements, unlike mortgaged properties, generally depreciate in value. Consequently, at any time after origination it is
possible, especially in the case of contracts with high loan-to-value ratios at
origination, that the market value of a manufactured home or home improvement may be lower than the principal amount outstanding under the related contract.

If specified in the related Prospectus Supplement, principal collections
received on the Mortgage Loans may be applied to purchase additional Mortgage Loans which will become part of the Trust Fund for a series. Such additions may
be made to the extent that such additions could be made in connection with a Trust Fund with respect to which a REMIC election has been made. The related Prospectus Supplement will set forth the characteristics that such additional Mortgage Loans will be required to meet. Such characteristics will be specified
in terms of the categories described in the second preceding paragraph.

Payment provisions of the mortgage loans

Unless otherwise specified in the related Prospectus Supplement, all of the Mortgage Loans will:

(i)      have individual principal balances at origination of not less
than
                $25,000,

        (ii)     have original terms to maturity of not more than 40 years, and

        (iii)    provide for payments of principal, interest or both, on due
dates
                that occur monthly, quarterly or semi-annually or at such other
                interval as is specified in the related Prospectus Supplement.

Each Mortgage Loan may provide for no accrual of interest or for accrual of
interest thereon at an interest rate (a "Mortgage Rate") that is fixed over
its
term or that adjusts from time to time, or that may be converted from an
adjustable to a fixed Mortgage Rate or a different adjustable Mortgage Rate,
or
from a fixed to an adjustable Mortgage Rate, from time to time pursuant to an
election or as otherwise specified on the related Mortgage Note, in each case
as
described in the related Prospectus Supplement. Each Mortgage Loan may
provide
for scheduled payments to maturity or payments that adjust from time to time
to
accommodate changes in the Mortgage Rate or to reflect the occurrence of
certain
events or that adjust on the basis of other methodologies, and may provide
for
negative amortization or accelerated amortization, in each case as described
in
the related Prospectus Supplement. Each Mortgage Loan may be fully amortizing
or
require a balloon payment due on its stated maturity date, in each case as
described in the related Prospectus Supplement.

MBS

        Any MBS will have been issued pursuant to a pooling and servicing
agreement, a participation agreement, a trust agreement, an indenture or
similar
agreement (an "MBS Agreement"). A seller (the "MBS Issuer") and/or servicer
(the
"MBS Servicer") of the underlying Mortgage Loans (or Underlying MBS) will
have
entered into the MBS Agreement with a trustee or a custodian under the MBS
Agreement (the "MBS Trustee"), if any, or with the original purchaser of the
interest in the underlying Mortgage Loans or MBS evidenced by the MBS.

        Distributions of any principal or interest, as applicable, will be made
on
MBS on the dates specified in the related Prospectus Supplement. The MBS may
be
issued in one or more classes with characteristics

                                        10

<PAGE>

similar to the classes of Securities described in this Prospectus. Any principal
or interest distributions will be made on the MBS by the MBS Trustee or the MBS
Servicer. The MBS Issuer or the MBS Servicer or another person specified in the
related Prospectus Supplement may have the right or obligation to repurchase or
substitute assets underlying the MBS after a certain date or under other
circumstances specified in the related Prospectus Supplement.

        Enhancement in the form of reserve funds, subordination or other forms of
credit support similar to that described for the Securities under "Description
of Credit Support" may be provided with respect to the MBS. The type,
characteristics and amount of such credit support, if any, will be a function of
certain characteristics of the Underlying Mortgage Loans or Underlying MBS
evidenced by or securing such MBS and other factors and generally will have been
established for the MBS on the basis of requirements of either any Rating Agency
that may have assigned a rating to the MBS or the initial purchasers of the MBS.

        The Prospectus Supplement for a series of Securities evidencing interests
in Mortgage Assets that include MBS will specify, to the extent available to the
Depositor:

        (i)     the aggregate approximate initial and outstanding principal
                amount or notional amount, as applicable, and type of the MBS to
                be included in the Trust Fund,

        (ii)    the original and remaining term to stated maturity of the MBS, if
                applicable,

        (iii)   whether such MBS is entitled only to interest payments, only to
                principal payments or to both,

        (iv)    the pass-through or bond rate of the MBS or formula for
                determining such rates, if any,

        (v)     the applicable payment provisions for the MBS, including, but not
                limited to, any priorities, payment schedules and subordination
                features,

        (vi)    the MBS Issuer, MBS Servicer and MBS Trustee, as applicable,

        (vii)   certain characteristics of the credit support, if any, such as
                subordination, reserve funds, insurance policies, letters of

credit or guarantees relating to the related Underlying
Mortgage
                        Loans, the Underlying MBS or directly to such MBS,

        (viii)    the terms on which the related Underlying Mortgage Loans or
                  Underlying MBS for such MBS or the MBS may, or are required to,
                  be purchased prior to their maturity,

        (ix)      the terms on which Mortgage Loans or Underlying MBS may be
                  substituted for those originally underlying the MBS,

        (x)       the servicing fees payable under the MBS Agreement,

        (xi)      the type of information in respect of the Underlying Mortgage
                  Loans described under "--Mortgage Loans--Mortgage Loan
                  Information in Prospectus Supplements" above, and the type of
                  information in respect of the Underlying MBS described in this
                  paragraph,

        (xi)      the trust fund evidenced or secured by the MBS, and

        (xiii)    whether Depository Trust Company or the Participants Trust
                  Company.

Each MBS will be either:

        (i)       a security exempted from the registration requirements of the
                  Securities Act,

        (ii)      a security that has been previously registered under the
                  Securities Act or

        (iii)     a security that is eligible for sale under Rule 144(k) under
the
                  Securities Act.

In the case of clause (iii), such security will be acquired in a secondary
market transaction not from the issuer thereof or an affiliate of such issuer.

                                      11
<PAGE>

GOVERNMENT SECURITIES

        The Prospectus Supplement for a series of Securities evidencing
interests
in Assets of a Trust Fund that include Government Securities will specify, to
the extent available,

        (i)       the aggregate approximate initial and outstanding principal
                  amounts or notional amounts, as applicable, and types of the
                  Government Securities to be included in the Trust Fund,

        (ii)      the original and remaining terms to stated maturity of the
                  Government Securities,

(iii)      whether such Government Securities are entitled only to
interest
                   payments, only to principal payments or to both,

        (iv)       the interest rates of the Government Securities or the formula
to
                   determine such rates, if any,

        (v)        the applicable payment provisions for the Government Securities
                   and

        (vi)       to what extent, if any, the obligation evidenced thereby is
                   backed by the full faith and credit of the United States.

PRE-FUNDING ACCOUNT

        To the extent provided in a Prospectus Supplement, the Depositor will
be
obligated (subject only to the availability thereof) to sell at a
predetermined
price, and the Trust Fund for the related series of Securities will be
obligated
to purchase (subject to the satisfaction of certain conditions described in
the
applicable Agreement), additional Assets (the "Subsequent Assets") from time
to
time (as frequently as daily) within the number of months specified in the
related Prospectus Supplement after the issuance of such series of Securities
having an aggregate principal balance approximately equal to the amount on
deposit in the Pre-Funding Account (the "Pre-Funded Amount") for such series
on
date of such issuance.

ACCOUNTS

        Each Trust Fund will include one or more accounts established and
maintained on behalf of the Securityholders into which the person or persons
designated in the related Prospectus Supplement will, to the extent described
herein and in such Prospectus Supplement deposit all payments and collections
received or advanced with respect to the Assets and other assets in the Trust
Fund. Such an account may be maintained as an interest bearing or a non-
interest
bearing account, and funds held therein may be held as cash or invested in
certain short-term, investment grade obligations, in each case as described
in
the related Prospectus Supplement. See "Description of the Agreement--
Collection
Account and Related Accounts."

CREDIT SUPPORT

        If so provided in the related Prospectus Supplement, partial or full
protection against certain defaults and losses on the Assets in the related
Trust Fund may be provided to one or more classes of Securities in the
related
series in the form of subordination of one or more other classes of
Securities

in such series and/or by one or more other types of credit support, such as a letter of credit, insurance policy, guarantee, reserve fund or other type of credit support consistent with the foregoing, or a combination thereof (any such coverage with respect to the Securities of any series, "Credit Support"). The amount and types of coverage, the identification of the entity providing the coverage (if applicable) and related information with respect to each type of Credit Support, if any, will be described in the Prospectus Supplement for a series of Securities. See "Risk Factors--Credit Support Limitations" and "Description of Credit Support."

<PAGE>

CASH FLOW AGREEMENTS

       If so provided in the related Prospectus Supplement, the Trust Fund may include guaranteed investment contracts pursuant to which moneys held in the funds and accounts established for the related series will be invested at a specified rate. The Trust Fund may also include one or more of the following agreements: interest rate exchange agreements, interest rate cap or floor agreements, currency exchange agreements, other swaps and derivative instruments or other agreements consistent with the foregoing. The principal terms of any such agreement (any such agreement, a "Cash Flow Agreement"), including, without limitation, provisions relating to the timing, manner and amount of payments thereunder and provisions relating to the termination thereof, will be described in the Prospectus Supplement for the related series. In addition, the related Prospectus Supplement will provide certain information with respect to the obligor under any such Cash Flow Agreement.

USE OF PROCEEDS

       The net proceeds to be received from the sale of the Securities will be applied by the Depositor to the purchase of Assets, or the payment of the financing incurred in such purchase, and to pay for certain expenses incurred in connection with such purchase of Assets and sale of Securities. The Depositor expects to sell the Securities from time to time, but the timing and amount of offerings of Securities will depend on a number of factors, including the volume of Assets acquired by the Depositor, prevailing interest rates, availability of funds and general market conditions.

YIELD CONSIDERATIONS

GENERAL

       The yield on any Offered Security will depend on the price paid by the Securityholder, the Pass-Through Rate or interest rate of the Security, the receipt and timing of receipt of distributions on the Security and the weighted

average life of the Assets in the related Trust Fund (which may be affected by
prepayments, defaults, liquidations or repurchases). See "Risk Factors."

PASS-THROUGH RATE AND INTEREST RATE

        Securities of any class within a series may have fixed, variable or
adjustable Pass-Through Rates or interest rates, which may or may not be based
upon the interest rates borne by the Assets in the related Trust Fund. The
Prospectus Supplement with respect to any series of Securities will specify the
Pass-Through Rate or interest rate for each class of such Securities or, in the
case of a variable or adjustable Pass-Through Rate or interest rate, the method
of determining the Pass-Through Rate or interest rate; the effect, if any, of
the prepayment of any Asset on the Pass-Through Rate or interest rate of one or
more classes of Securities; and whether the distributions of interest on the
Securities of any class will be dependent, in whole or in part, on the
performance of any obligor under a Cash Flow Agreement.

        If so specified in the related Prospectus Supplement, the effective yield
to maturity to each holder of Securities entitled to payments of interest will
be below that otherwise produced by the applicable Pass-Through Rate or interest
rate and purchase price of such Security because, while interest may accrue on
each Asset during a certain period, the distribution of such interest will be
made on a day which may be several days, weeks or months following the period of
accrual.

TIMING OF PAYMENT OF INTEREST

        Each payment of interest on the Securities (or addition to the Security
Balance of a class of Accrual Securities) on a Distribution Date will include
interest accrued during the Interest Accrual Period for such Distribution Date.
As indicated above under "--Pass-Through Rate and Interest Rate," if the
Interest Accrual Period ends on a date other than the day before a Distribution
Date for the related series,

<PAGE>

the yield realized by the holders of such Securities may be lower than the yield
that would result if the Interest Accrual Period ended on such day before the
Distribution Date.

PAYMENTS OF PRINCIPAL; PREPAYMENTS

The yield to maturity on the Securities will be affected by the rate of principal payments on the Assets (including principal prepayments on Mortgage Loans resulting from both voluntary prepayments by the borrowers and involuntary liquidations). The rate at which principal prepayments occur on the Mortgage Loans will be affected by a variety of factors, including, without limitation, the terms of the Mortgage Loans, the level of prevailing interest rates, the availability of mortgage credit and economic, demographic, geographic, tax, legal and other factors. In general, however, if prevailing interest rates fall significantly below the Mortgage Rates on the Mortgage Loans comprising or underlying the Assets in a particular Trust Fund, such Mortgage Loans are likely to be the subject of higher principal prepayments than if prevailing rates remain at or above the rates borne by such Mortgage Loans. In this regard, it should be noted that certain Assets may consist of Mortgage Loans with different Mortgage Rates and the stated pass-through or pay-through interest rate of certain MBS may be a number of percentage points higher or lower than certain of the Underlying Mortgage Loans. The rate of principal payments on some or all of the classes of Securities of a series will correspond to the rate of principal payments on the Assets in the related Trust Fund. Mortgage Loans with a prepayment premium provision, to the extent enforceable, generally would be expected to experience a lower rate of principal prepayments than otherwise identical Mortgage Loans without such provisions or with lower Prepayment Premiums.

If the purchaser of a Security offered at a discount calculates its anticipated yield to maturity based on an assumed rate of distributions of principal that is faster than that actually experienced on the Assets, the actual yield to maturity will be lower than that so calculated. Conversely, if the purchaser of a Security offered at a premium calculates its anticipated yield to maturity based on an assumed rate of distributions of principal that is slower than that actually experienced on the Assets, the actual yield to maturity will be lower than that so calculated. In either case, if so provided in the Prospectus Supplement for a series of Securities, the effect on yield on one or more classes of the Securities of such series of prepayments of the Assets in the related Trust Fund may be mitigated or exacerbated by any provisions for sequential or selective distribution of principal to such classes.

Unless otherwise specified in the related Prospectus Supplement, when a full prepayment is made on a Mortgage Loan, the obligor is charged interest on the principal amount of the Mortgage Loan so prepaid for the number of days in the month actually elapsed up to the date of the prepayment. Unless otherwise specified in the related Prospectus Supplement, the effect of prepayments in full will be to reduce the amount of interest paid in the following month to

holders of Securities entitled to payments of interest because interest on the
principal amount of any Mortgage Loan so prepaid will be paid only to the date
of prepayment rather than for a full month. Unless otherwise specified in the
related Prospectus Supplement, a partial prepayment of principal is applied so
as to reduce the outstanding principal balance of the related Mortgage Loan as
of the Due Date in the month in which such partial prepayment is received.

        The timing of changes in the rate of principal payments on the Assets may
significantly affect an investor's actual yield to maturity, even if the average
rate of distributions of principal is consistent with an investor's expectation.
In general, the earlier a principal payment is received on the Mortgage Assets
and distributed on a Security, the greater the effect on such investor's yield
to maturity. The effect on an investor's yield of principal payments occurring
at a rate higher (or lower) than the rate anticipated by the investor during a
given period may not be offset by a subsequent like decrease (or increase) in
the rate of principal payments.

        The Securityholder will bear the risk of being able to reinvest principal
received in respect of a Security at a yield at least equal to the yield on such
Security.

<PAGE>

PREPAYMENTS--MATURITY AND WEIGHTED AVERAGE LIFE

        The rates at which principal payments are received on the Assets included
in or comprising a Trust Fund and the rate at which payments are made from any
Credit Support or Cash Flow Agreement for the related series of Securities may
affect the ultimate maturity and the weighted average life of each class of such
series. Prepayments on the Mortgage Loans comprising or underlying the Assets in
a particular Trust Fund will generally accelerate the rate at which principal is
paid on some or all of the classes of the Securities of the related series.

        If so provided in the Prospectus Supplement for a series of Securities,
one or more classes of Securities may have a final scheduled Distribution Date,

which is the date on or prior to which the Security Balance thereof is scheduled
to be reduced to zero, calculated on the basis of the assumptions applicable to
such series set forth therein.

Weighted average life refers to the average amount of time that will
elapse from the date of issue of a security until each dollar of principal of
such security will be repaid to the investor. The weighted average life of a
class of Securities of a series will be influenced by the rate at which
principal on the Mortgage Loans comprising or underlying the Assets is paid to
such class, which may be in the form of scheduled amortization or prepayments
(for this purpose, the term "prepayment" includes prepayments, in whole or in
part, and liquidations due to default).

In addition, the weighted average life of the Securities may be affected
by the varying maturities of the Mortgage Loans comprising or underlying the
Assets in a Trust Fund. If any Mortgage Loans comprising or underlying the
Assets in a particular Trust Fund have actual terms to maturity less than those
assumed in calculating final scheduled Distribution Dates for the classes of
Securities of the related series, one or more classes of such Securities may be
fully paid prior to their respective final scheduled Distribution Dates, even in
the absence of prepayments. Accordingly, the prepayment experience of the Assets
will, to some extent, be a function of the mix of Mortgage Rates and maturities
of the Mortgage Loans comprising or underlying such Assets. See "Description of
the Trust Funds."

Prepayments on loans are also commonly measured relative to a prepayment
standard or model, such as the Constant Prepayment Rate ("CPR") prepayment model
or the Standard Prepayment Assumption ("SPA") prepayment model, each as
described below. CPR represents a constant assumed rate of prepayment each month
relative to the then outstanding principal balance of a pool of loans for the
life of such loans. SPA represents an assumed rate of prepayment each month
relative to the then outstanding principal balance of a pool of loans. A
prepayment assumption of 100% of SPA assumes prepayment rates of 0.2% per annum
of the then outstanding principal balance of such loans in the first month of
the life of the loans and an additional 0.2% per annum in each month thereafter
until the thirtieth month. Beginning in the thirtieth month and in each month
thereafter during the life of the loans, 100% of SPA assumes a constant
prepayment rate of 6% per annum each month.

Neither CPR nor SPA nor any other prepayment model or assumption purports

to be a historical description of prepayment experience or a prediction of the
anticipated rate of prepayment of any pool of loans, including the Mortgage
Loans underlying or comprising the Assets.

The Prospectus Supplement with respect to each series of Securities may
contain tables, if applicable, setting forth the projected weighted average
life
of each class of Offered Securities of such series and the percentage of the
initial Security Balance of each such class that would be outstanding on
specified Distribution Dates based on the assumptions stated in such
Prospectus
Supplement, including assumptions that prepayments on the Mortgage Loans
comprising or underlying the related Assets are made at rates corresponding
to
various percentages of CPR, SPA or such other standard specified in such
Prospectus Supplement. Such tables and assumptions are intended to illustrate
the sensitivity of the weighted average life of the Securities to various
prepayment rates and will not be intended to predict or to provide
information
that will enable investors to predict the actual weighted average life of the
Securities. It is unlikely that prepayment of any Mortgage Loans comprising
or
underlying the Assets for

<center>15</center>

<PAGE>

any series will conform to any particular level of CPR, SPA or any other rate
specified in the related Prospectus Supplement.

OTHER FACTORS AFFECTING WEIGHTED AVERAGE LIFE

Type of Mortgage Asset

If so specified in the related Prospectus Supplement, a number of
Mortgage
Loans may have balloon payments due at maturity, and because the ability of a
mortgagor to make a balloon payment typically will depend upon its ability
either to refinance the loan or to sell the related Mortgaged Property, there
is
a risk that a number of Mortgage Loans having balloon payments may default at
maturity. In the case of defaults, recovery of proceeds may be delayed by,
among
other things, bankruptcy of the mortgagor or adverse conditions in the market
where the property is located. In order to minimize losses on defaulted
Mortgage
Loans, the servicer may, to the extent and under the circumstances set forth
in
the related Prospectus Supplement, be permitted to modify Mortgage Loans that
are in default or as to which a payment default is imminent. Any defaulted
balloon payment or modification that extends the maturity of a Mortgage Loan
will tend to extend the weighted average life of the Securities, thereby
lengthening the period of time elapsed from the date of issuance of a
Security
until it is retired.

With respect to certain Mortgage Loans, including ARM Loans, the Mortgage
Rate at origination may be below the rate that would result if the index and
margin relating thereto were applied at origination. Under the applicable
underwriting standards, the mortgagor under each Mortgage Loan generally will be
qualified on the basis of the Mortgage Rate in effect at origination. The
repayment of any such Mortgage Loan may thus be dependent on the ability of the
mortgagor or obligor to make larger level monthly payments following the
adjustment of the Mortgage Rate. In addition, certain Mortgage Loans may be
subject to temporary buydown plans ("Buydown Mortgage Loans") pursuant to which
the monthly payments made by the mortgagor during the early years of the
Mortgage Loan will be less than the scheduled monthly payments thereon (the
"Buydown Period"). The periodic increase in the amount paid by the mortgagor of
a Buydown Mortgage Loan during or at the end of the applicable Buydown Period
may create a greater financial burden for the mortgagor, who might not have
otherwise qualified for a mortgage, and may accordingly increase the risk of
default with respect to the related Mortgage Loan.

    The Mortgage Rates on certain ARM Loans subject to negative amortization
generally adjust monthly and their amortization schedules adjust less
frequently. During a period of rising interest rates as well as immediately
after origination (initial Mortgage Rates are generally lower than the sum of
the applicable index at origination and the related margin over such index at
which interest accrues), the amount of interest accruing on the principal
balance of such Mortgage Loans may exceed the amount of the minimum scheduled
monthly payment thereon. As a result, a portion of the accrued interest on
negatively amortizing Mortgage Loans may be added to the principal balance
thereof and will bear interest at the applicable Mortgage Rate. The addition of
any such deferred interest to the principal balance of any related class or
classes of Securities will lengthen the weighted average life thereof and may
adversely affect yield to holders thereof, depending upon the price at which
such Securities were purchased. In addition, with respect to certain ARM Loans
subject to negative amortization, during a period of declining interest rates,
it might be expected that each minimum scheduled monthly payment on such a
Mortgage Loan would exceed the amount of scheduled principal and accrued
interest on the principal balance thereof, and since such excess will be applied
to reduce the principal balance of the related class or classes of Securities,
the weighted average life of such Securities will be reduced and may adversely
affect yield to holders thereof, depending upon the price at which such
Securities were purchased.

Defaults

    The rate of defaults on the Mortgage Loans will also affect the rate,
timing and amount of principal payments on the Assets and thus the yield on the
Securities. In general, defaults on mortgage loans are expected to occur with
greater frequency in their early years. The rate of default on Mortgage Loans

which are refinance or limited documentation mortgage loans, and on Mortgage
Loans with high Loan-to-

<PAGE>

Value Ratios, may be higher than for other types of Mortgage Loans.
Furthermore,
the rate and timing of prepayments, defaults and liquidations on the Mortgage
Loans will be affected by the general economic condition of the region of the
country in which the related Mortgage Properties are located. The risk of
delinquencies and loss is greater and prepayments are less likely in regions
where a weak or deteriorating economy exists, as may be evidenced by, among
other factors, increasing unemployment or falling property values.

Foreclosures

        The number of foreclosures or repossessions and the principal amount of
the Mortgage Loans comprising or underlying the Assets that are foreclosed or
repossessed in relation to the number and principal amount of Mortgage Loans
that are repaid in accordance with their terms will affect the weighted
average
life of the Mortgage Loans comprising or underlying the Assets and that of
the
related series of Securities.

Refinancing

        At the request of a mortgagor, the Master Servicer or a Sub-Servicer
may
allow the refinancing of a Mortgage Loan in any Trust Fund by accepting
prepayments thereon and permitting a new loan secured by a mortgage on the
same
property. In the event of such a refinancing, the new loan would not be
included
in the related Trust Fund and, therefore, such refinancing would have the
same
effect as a prepayment in full of the related Mortgage Loan. A Sub-Servicer
or
the Master Servicer may, from time to time, implement programs designed to
encourage refinancing. Such programs may include, without limitation,
modifications of existing loans, general or targeted solicitations, the
offering
of pre-approved applications, reduced origination fees or closing costs, or
other financial incentives. In addition, Sub-Servicers may encourage the
refinancing of Mortgage Loans, including defaulted Mortgage Loans, that would
permit creditworthy borrowers to assume the outstanding indebtedness of such
Mortgage Loans.

Due-on-Sale Clauses

        Acceleration of mortgage payments as a result of certain transfers of
underlying Mortgaged Property is another factor affecting prepayment rates
that
may not be reflected in the prepayment standards or models used in the
relevant

Prospectus Supplement. A number of the Mortgage Loans comprising or underlying
the Assets may include "due-on-sale" clauses that allow the holder of the
Mortgage Loans to demand payment in full of the remaining principal balance of
the Mortgage Loans upon sale, transfer or conveyance of the related Mortgaged
Property. With respect to any Whole Loans, unless otherwise provided in the
related Prospectus Supplement, the Master Servicer will generally enforce any
due-on-sale clause to the extent it has knowledge of the conveyance or proposed
conveyance of the underlying Mortgaged Property and it is entitled to do so
under applicable law; provided, however, that the Master Servicer will not take
any action in relation to the enforcement of any due-on-sale provision which
would adversely affect or jeopardize coverage under any applicable insurance
policy. See "Certain Legal Aspects of Mortgage Loans--Due-on-Sale Clauses" and
"Description of the Agreements--Due-on-Sale Provisions."

THE DEPOSITOR

     Merrill Lynch Mortgage Investors, Inc., the Depositor, is a direct
wholly-owned subsidiary of Merrill Lynch Mortgage Capital Inc. and was
incorporated in the State of Delaware on June 13, 1986. The principal executive
offices of the Depositor are located at 250 Vesey Street, World Financial
Center, North Tower, 10th Floor, New York, New York 10218-1310. Its telephone
number is (212) 449-0357.

     The Depositor's principal business is to acquire, hold and/or sell or
otherwise dispose of cash flow assets, usually in connection with the
securitization of that asset. The Depositor does not have, nor is it expected in
the future to have, any significant assets.

                                       17

<PAGE>

                          DESCRIPTION OF THE SECURITIES

GENERAL

     The certificates of each series (including any class of certificates not
offered hereby) (collectively, the "Certificates") will represent the entire
beneficial ownership interest in the Trust Fund created pursuant to the related
Agreement. If a series of Securities includes Notes, such Notes will represent
indebtedness of the related Trust Fund and will be issued and secured pursuant
to an indenture (an "Indenture"). Each series of Securities will consist of one
or more classes of Securities that may:

          (i)     provide for the accrual of interest thereon based on fixed,
                  variable or adjustable rates;

(ii)     be senior (collectively, "Senior Securities") or subordinate
                 (collectively, "Subordinate Securities") to one or more other
                 classes of Securities in respect of certain distributions on
the
                 Securities;

        (iii)    be entitled to principal distributions, with
disproportionately
                 low, nominal or no interest distributions (collectively,
                 "Stripped Principal Securities");

        (iv)     be entitled to interest distributions, with disproportionately
                 low, nominal or no principal distributions (collectively,
                 "Stripped Interest Securities");

        (v)      provide for distributions of accrued interest thereon
commencing
                 only following the occurrence of certain events, such as the
                 retirement of one or more other classes of Securities of such
                 series (collectively, "Accrual Securities");

        (vi)     provide for payments of principal as described in the related
                 Prospectus Supplement, from all or only a portion of the Assets
in
                 such Trust Fund, to the extent of available funds, in each case
as
                 described in the related Prospectus Supplement; and/or

        (vii)    provide for distributions based on a combination of two or more
                 components thereof with one or more of the characteristics
                 described in this paragraph including a Stripped Principal
                 Security component and a Stripped Interest Security component.

        If so specified in the related Prospectus Supplement, a Trust Fund may
include additional Mortgage Loans (or certain balances thereof) that will be
transferred to the Trust from time to time and/or, in the case of revolving
Home
Equity loans or certain balances thereof, any additional balances advanced to
the borrowers under the revolving Home Equity loans during certain periods.
If
so specified in the related Prospectus Supplement, distributions on one or
more
classes of a series of Securities may be limited to collections from a
designated portion of the Whole Loans in the related Mortgage Pool (each such
portion of Whole Loans, a "Mortgage Loan Group"). Any such classes may
include
classes of Offered Securities.

        Each class of Offered Securities of a series will be issued in minimum
denominations corresponding to the Security Balances or, in case of Stripped
Interest Securities, notional amounts or percentage interests specified in
the
related Prospectus Supplement. The transfer of any Offered Securities may be
registered and such Securities may be exchanged without the payment of any
service charge payable in connection with such registration of transfer or
exchange, but the Depositor or the Trustee or any agent thereof may require

payment of a sum sufficient to cover any tax or other governmental charge. One
or more classes of Securities of a series may be issued in definitive form
("Definitive Securities") or in book-entry form ("Book-Entry Securities"), as
provided in the related Prospectus Supplement. See "Risk Factors--Book-Entry
Registration" and "Description of the Securities--Book-Entry Registration and
Definitive Securities." Definitive Securities will be exchangeable for other
Securities of the same class and series of a like aggregate Security Balance,
notional amount or percentage interest but of different authorized
denominations. See "Risk Factors--Limited Liquidity" and "--Limited Assets."

<PAGE>

CATEGORIES OF CLASSES OF SECURITIES

        The Securities of any series may be comprised of one or more classes.
Such
classes, in general, fall into different categories. The following chart
identifies and generally defines certain of the more typical categories. The
Prospectus Supplement for a series of Securities may identify the classes
which
comprise such series by reference to the following categories or another
category specified in the related Prospectus Supplement.

<Table>
<Caption>
CATEGORIES OF CLASSES                        DEFINITION
---------------------                        ----------
<S>                                          <C>
                                             PRINCIPAL TYPES

"Accretion Directed"........................ A class that receives
principal payments from the
                                             accreted interest from
specified Accrual Classes. An
                                             Accretion Directed Class also
may receive principal
                                             payments from principal paid
on the Mortgage Loans for
                                             the related series.

"Component Securities"...................... A class consisting of
"Components." The Components of
                                             a class of Component
Securities may have different
                                             principal and/or interest
payment characteristics but
                                             together constitute a single
class and do not
                                             represent severable interests.
Each Component of a
                                             class of Component Securities
may be identified as
                                             falling into one or more of
the categories in this
                                             chart.

"Lockout Class" (sometimes also referred to
  as a "NAS Class")........................... A class that is designed to
receive no principal
                                               payments or a
disproportionately small portion of
                                               principal payments from the
first Distribution Date
                                               until a Distribution Date
specified in the related
                                               Prospectus Supplement.

"Notional Amount Class"...................... A class having no principal
balance and bearing
                                               interest on the related
notional amount. The notional
                                               amount is used for purposes of
the determination of
                                               interest distributions.

"Planned Amortization Class" (also sometimes
  referred to as a "PAC").................... A class that is designed to
receive principal payments
                                               using a pre-determined
principal balance schedule
                                               derived by assuming two
constant prepayment rates for
                                               the underlying Mortgage Loans.
These two rates are the
                                               endpoints for the "structuring
range" for the Planned
                                               Amortization Class. The
Planned Amortization Classes
                                               in any series of Securities
may be subdivided into
                                               different categories (e.g.,
Planned Amortization Class
                                               I ("PAC I") Planned
Amortization Class II ("PAC II")
                                               and so forth) derived using
different structuring
                                               ranges.

</Table>

19

<PAGE>

<Table>
<Caption>
CATEGORIES OF CLASSES                          DEFINITION
---------------------                          ----------
<S>                                            <C>
"Scheduled Amortization Class"............... A class that is designed to
receive principal payments
                                               using a pre-determined
principal balance schedule but

is not designated as a Planned Amortization Class or Targeted Amortization Class. The schedule is derived by assuming either two constant prepayment rates or a single constant prepayment rate for the underlying Mortgage Loans. In the former case, the two rates are the endpoints for the "structuring rate" for the Scheduled Amortization Class and such range generally is narrower than that for a Planned Amortization Class. Typically, the Support Class for the applicable series of Securities generally will represent a smaller percentage of the Scheduled Amortization Class than a Support Class generally would represent in relation to a Planned Amortization Class or a Targeted Amortization Class.

"Senior Securities"........................... A class that is entitled to receive payments of principal and interest on each Distribution Date prior to the classes of Subordinate Securities.

"Senior Support Securities".................. A class of Senior Securities that bears certain losses allocated to one or more classes of Senior Securities after the classes of Subordinate Securities are no longer outstanding.

"Sequential Pay Class"....................... Classes that are entitled to receive principal payments in a prescribed sequence, that do not have predetermined principal balance schedules and that, in most cases, are entitled to receive payments of principal continuously from the first Distribution Date on which they receive principal until they are retired. A single class that is entitled to receive

after other classes in                           principal payments before or
may be identified as a                            the same series of Securities
                                                  Sequential Pay class.

"Strip Class"..............................       A class that is entitled to
receive a constant                                proportion, or "strip," of the
                                                  the underlying Mortgage Loans.
principal payments on

"Mezzanine Securities".......................     A class that is entitled to
receive payments of                               principal and interest on each
                                                  the Senior Securities have
Distribution Date after                           principal and interest
                                                  distributions of principal and
received their full                               of Subordinate Securities.

entitlements and prior to any

interest on the classes

"Subordinate Securities".....................     A class that is entitled to
receive payments of                               principal and interest on each
                                                  after the Senior Securities
Distribution Date only                            Securities with higher
                                                  any have received their full
and classes of Subordinate                        entitlements.

priority of distributions, if

principal and interest

"Super Senior Securities"....................     A class of Senior Securities
that will not bear its                            share of certain losses after
                                                  Securities are no longer
the class of Subordinate                          one or more other specified
                                                  Securities are outstanding.
outstanding for so long as

classes of Senior

</Table>

                                  20
<PAGE>

<Table>
<Caption>
CATEGORIES OF CLASSES                             DEFINITION
---------------------                             ----------
<S>                                               <C>
"Support Class" (also sometimes referred to

as a "Companion Class").....................  A class that is entitled to
receive principal payments

on any Distribution Date only

if scheduled payments

have been made on specified

Planned Amortization

Classes, Targeted Amortization

Classes and/or

Scheduled Amortization  Classes.

Targeted Amortization Class" (also sometimes
  referred to as a "TAC").....................  A class that is designed to
receive principal payments

using a pre-determined

principal balance schedule

derived by assuming a single

constant prepayment rate

for the underlying Mortgage

Loans.

INTEREST TYPES

"Component Securities".......................  A class consisting of
"Components." The components of

a class of Component

Securities may have different

principal and/or interest

payment characteristics but

together constitute a single

class and do not

represent severable interests.

Each Component of a

class of Component Securities

may be identified as

falling into one or more of

the categories in this

chart.

"Fixed Rate Class"...........................  A class with an interest rate
that is fixed throughout

the life of the class.

"Floating Rate Class"........................  A class with an interest rate
that resets periodically

based upon a designated index

and that varies directly

with changes in such index.

"Inverse Floating Rate Class"................  A class with an interest rate
that resets periodically

based upon a designated index

and that varies

inversely with changes in such

index and with changes

in the interest rate payable

on the related Floating

Rate Class.

"Variable Rate Class"........................ A class with an interest rate
that resets periodically
                                               and is calculated by reference
to the rate or rates of
                                               interest applicable to the
Mortgage Loans.

"Interest-Only Class"........................ A class that is entitled to
receive some or all of the
                                               interest payments made on the
Mortgage Loans and
                                               little or no principal.
Interest-Only Classes have
                                               either a nominal principal
balance or a notional
                                               amount. A nominal principal
balance represents actual
                                               principal that will be paid on
the class. It is
                                               referred to as nominal since
it is extremely small
                                               compared to other classes. A
notional amount is the
                                               amount used as a reference to
calculate the amount of
                                               interest due on an Interest-
Only Class that is not
                                               entitled to any distributions
in respect of principal.
</Table>

21

<PAGE>

<Table>
<Caption>
CATEGORIES OF CLASSES                          DEFINITION
---------------------                          ----------
<S>                                            <C>
"Principal-Only Class"........................ A class that does not bear
interest and is entitled to
                                               receive only distributions in
respect of principal.

"Accrual Class"............................... A class that accretes the
amount of accrued interest
                                               otherwise distributable on
such class, which amount
                                               will be added as principal to
the principal balance of
                                               such class on each applicable
Distribution Date. Such
                                               accretion may continue until
some specified event has
                                               occurred or until such Accrual
Class is retired.

"Step-up Class"............................... A class that bears interest at
one or more higher, or

"stepped-up" Pass-Through
Rates or interest rates for

a period of time specified in
the related Prospectus

Supplement before resetting to
a lower Pass-Through

Rate or interest rate that
will remain fixed

thereafter.

</Table>

DISTRIBUTIONS

        Distributions on the Securities of each series will be made by or on
behalf of the Trustee on each Distribution Date as specified in the related
Prospectus Supplement from the Available Distribution Amount for such series
and
such Distribution Date. Except as otherwise specified in the related
Prospectus
Supplement, distributions (other than the final distribution) will be made to
the persons in whose names the Securities are registered at the close of
business on the last business day of the month preceding the month in which
the
Distribution Date occurs (the "Record Date"), and the amount of each
distribution will be determined as of the close of business on the date
specified in the related Prospectus Supplement (the "Determination Date").
All
distributions with respect to each class of Securities on each Distribution
Date
will be allocated pro rata among the outstanding Securities in such class or
by
random selection, as described in the related Prospectus Supplement or
otherwise
established by the related Trustee. Payments will be made either by wire
transfer in immediately available funds to the account of a Securityholder at
a
bank or other entity having appropriate facilities therefor, if such
Securityholder has so notified the Trustee or other person required to make
such
payments no later than the date specified in the related Prospectus
Supplement
(and, if so provided in the related Prospectus Supplement, holds Securities
in
the requisite amount specified therein), or by check mailed to the address of
the person entitled thereto as it appears on the Security Register; provided,
however, that the final distribution in retirement of the Securities (whether
Definitive Securities or Book-Entry Securities) will be made only upon
presentation and surrender of the Securities at the location specified in the
notice to Securityholders of such final distribution.

AVAILABLE DISTRIBUTION AMOUNT

        All distributions on the Securities of each series on each Distribution
Date will be made from the Available Distribution Amount described below, in

accordance with the terms described in the related Prospectus Supplement. Unless
provided otherwise in the related Prospectus Supplement, the "Available Distribution Amount" for each Distribution Date equals the sum of the following amounts:

    (i)    the total amount of all cash on deposit in the related Collection
Account as of the corresponding Determination Date, exclusive of:

    (a)    all scheduled payments of principal and interest collected
but due on a date subsequent to the related Due Period (unless the related Prospectus Supplement provides otherwise, a "Due Period" with respect to any Distribution
Date will commence on the second day of the month in which
the immediately preceding Distribution Date occurs, or the
day after the Cut-off Date in the case of the first

<PAGE>

    Due Period, and will end on the first day of the month of the related Distribution Date),

    (b)    unless the related Prospectus Supplement provides otherwise,
all prepayments, together with related payments of the interest thereon and related Prepayment Premiums, Liquidation Proceeds, Insurance Proceeds and other unscheduled recoveries received subsequent to the related Due Period, and

    (c)    all amounts in the Collection Account that are due or reimbursable to the Depositor, the Trustee, an Asset Seller,
a Sub-Servicer, the Master Servicer or any other entity as
specified in the related Prospectus Supplement or that are
payable in respect of certain expenses of the related Trust
Fund;

    (ii)    if the related Prospectus Supplement so provides, interest or investment income on amounts on deposit in the Collection Account,
including any net amounts paid under any Cash Flow Agreements;

    (iii)    all advances made by a Master Servicer or any other entity as specified in the related Prospectus Supplement with respect to such Distribution Date;

>           (iv)    if and to the extent the related Prospectus Supplement so
>                   provides, amounts paid by a Master Servicer or any other entity
> as
>                   specified in the related Prospectus Supplement with respect to
>                   interest shortfalls resulting from prepayments during the
> related
>                   Prepayment Period; and
>
>           (v)     unless the related Prospectus Supplement provides otherwise, to
>                   the extent not on deposit in the related Collection Account as
> of
>                   the corresponding Determination Date, any amounts collected
> under,
>                   from or in respect of any Credit Support with respect to such
>                   Distribution Date.

        As described below, the entire Available Distribution Amount will be
distributed among the related Securities (including any Securities not
offered
hereby) on each Distribution Date, and accordingly will be released from the
Trust Fund and will not be available for any future distributions.

DISTRIBUTIONS OF INTEREST ON THE SECURITIES

        Each class of Securities (other than classes of Stripped Principal
Securities that have no Pass-Through Rate or interest rate) may have a
different
Pass-Through Rate or interest rate, which will be a fixed, variable or
adjustable rate at which interest will accrue on such class or a component
thereof (the "Pass-Through Rate" in the case of Certificates). The related
Prospectus Supplement will specify the Pass-Through Rate or interest rate for
each class or component or, in the case of a variable or adjustable Pass-
Through
Rate or interest rate, the method for determining the Pass-Through Rate or
interest rate. Unless otherwise specified in the related Prospectus
Supplement,
interest on the Securities will be calculated on the basis of a 360-day year
consisting of twelve 30-day months.

        Distributions of interest in respect of the Securities of any class
will
be made on each Distribution Date (other than any class of Accrual Securities,
which will be entitled to distributions of accrued interest commencing only
on
the Distribution Date, or under the circumstances, specified in the related
Prospectus Supplement, and any class of Stripped Principal Securities that
are
not entitled to any distributions of interest) based on the Accrued Security
Interest for such class and such Distribution Date, subject to the
sufficiency
of the portion of the Available Distribution Amount allocable to such class
on
such Distribution Date. Prior to the time interest is distributable on any
class
of Accrual Securities, the amount of Accrued Security Interest otherwise
distributable on such class will be added to the Security Balance thereof on

each Distribution Date. With respect to each class of Securities and each
Distribution Date (other than certain classes of Stripped Interest
Securities),
"Accrued Security Interest" will be equal to interest accrued for a specified
period on the outstanding Security Balance thereof immediately prior to the
Distribution Date, at the applicable Pass-Through Rate or interest rate,
reduced
as described below.

<PAGE>

Unless otherwise provided in the Prospectus Supplement, Accrued Security
Interest on Stripped Interest Securities will be equal to interest accrued
for a
specified period on the outstanding notional amount thereof immediately prior
to
each Distribution Date, at the applicable Pass-Through Rate or interest rate,
reduced as described below. The method of determining the notional amount for
any class of Stripped Interest Securities will be described in the related
Prospectus Supplement. Reference to notional amount is solely for convenience
in
certain calculations and does not represent the right to receive any
distributions of principal.

        Unless otherwise provided in the related Prospectus Supplement, the
Accrued Security Interest on a series of Securities will be reduced in the
event
of prepayment interest shortfalls, which are shortfalls in collections of
interest for a full accrual period resulting from prepayments prior to the
due
date in such accrual period on the Mortgage Loans comprising or underlying
the
Assets in the Trust Fund for such series. The particular manner in which such
shortfalls are to be allocated among some or all of the classes of Securities
of
that series will be specified in the related Prospectus Supplement. The
related
Prospectus Supplement will also describe the extent to which the amount of
Accrued Certificate Interest that is otherwise distributable on (or, in the
case
of Accrual Securities, that may otherwise be added to the Security Balance
of) a
class of Offered Securities may be reduced as a result of any other
contingencies, including delinquencies, losses and deferred interest on or in
respect of the Mortgage Loans comprising or underlying the Assets in the
related
Trust Fund. Unless otherwise provided in the related Prospectus Supplement,
any
reduction in the amount of Accrued Security Interest otherwise distributable
on
a class of Securities by reason of the allocation to such class of a portion
of
any deferred interest on the Mortgage Loans comprising or underlying the
Assets
in the related Trust Fund will result in a corresponding increase in the

Security Balance of such class. See "Risk Factors--Average Life of Securities;
Prepayments; Yields" and "Yield Considerations."

## DISTRIBUTIONS OF PRINCIPAL OF THE SECURITIES

   The Securities of each series, other than certain classes of Stripped Interest Securities, will have a "Security Balance" which, at any time, will equal the then maximum amount that the holder will be entitled to receive in respect of principal out of the future cash flow on the Assets and other assets
included in the related Trust Fund. The outstanding Security Balance of a Security will be reduced to the extent of distributions of principal thereon from time to time and, if and to the extent so provided in the related Prospectus Supplement, by the amount of losses incurred in respect of the related Assets, may be increased in respect of deferred interest on the related
Mortgage Loans to the extent provided in the related Prospectus Supplement and,
in the case of Accrual Securities prior to the Distribution Date on which distributions of interest are required to commence, will be increased by any related Accrued Security Interest. Unless otherwise provided in the related Prospectus Supplement, the initial aggregate Security Balance of all classes of
Securities of a series will not be greater than the outstanding aggregate principal balance of the related Assets as of the applicable Cut-off Date. The
initial aggregate Security Balance of a series and each class thereof will be specified in the related Prospectus Supplement. Unless otherwise provided in the
related Prospectus Supplement, distributions of principal will be made on each
Distribution Date to the class or classes of Securities entitled thereto in accordance with the provisions described in such Prospectus Supplement until the
Security Balance of such class has been reduced to zero. Stripped Interest Securities with no Security Balance are not entitled to any distributions of principal.

## COMPONENTS

   To the extent specified in the related Prospectus Supplement, distribution
on a class of Securities may be based on a combination of two or more different
components as described under "--General" above. To such extent, the descriptions set forth under "--Distributions of Interests on the Securities" and "--Distributions of Principal of the Securities" above also relate to components of such a class of Securities. In such case, reference in such sections to Security Balance and Pass-Through Rate or interest rate refer to the
principal balance, if any, of any such component and the Pass-Through Rate or interest rate, if any, on any such component, respectively.

24

<PAGE>

ALLOCATION OF LOSSES AND SHORTFALLS

        If so provided in the Prospectus Supplement for a series of Securities
consisting of one or more classes of Subordinate Securities, on any
Distribution
Date in respect of which losses or shortfalls in collections on the Assets
have
been incurred, the amount of such losses or shortfalls will be borne first by
a
class of Subordinate Securities in the priority and manner and subject to the
limitations specified in such Prospectus Supplement. See "Description of
Credit
Support" for a description of the types of protection that may be included in
a
Trust Fund against losses and shortfalls on Assets comprising such Trust Fund.

ADVANCES IN RESPECT OF DELINQUENCIES

        With respect to any series of Securities evidencing an interest in a
Trust
Fund, unless otherwise provided in the related Prospectus Supplement, the
Master
Servicer or another entity described therein will be required as part of its
servicing responsibilities to advance on or before each Distribution Date its
own funds or funds held in the Collection Account that are not included in
the
Available Distribution Amount for such Distribution Date, in an amount equal
to
the aggregate of payments of principal (other than any balloon payments) and
interest (net of related servicing fees and Retained Interest) that were due
on
the Whole Loans in such Trust Fund during the related Due Period and were
delinquent on the related Determination Date, subject to the Master
Servicer's
(or another entity's) good faith determination that such advances will be
reimbursable from Related Proceeds (as defined below). In the case of a
series
of Securities that includes one or more classes of Subordinate Securities and
if
so provided in the related Prospectus Supplement, the Master Servicer's (or
another entity's) advance obligation may be limited only to the portion of
such
delinquencies necessary to make the required distributions on one or more
classes of Senior Securities and/or may be subject to the Master Servicer's
(or
another entity's) good faith determination that such advances will be
reimbursable not only from Related Proceeds but also from collections on
other
Assets otherwise distributable on one or more classes of such Subordinate
Securities. See "Description of Credit Support."

        Advances are intended to maintain a regular flow of scheduled interest
and
principal payments to holders of the class or classes of Certificates
entitled
thereto, rather than to guarantee or insure against losses. Unless otherwise

provided in the related Prospectus Supplement, advances of the Master Servicer's
(or another entity's) funds will be reimbursable only out of related recoveries
on the Mortgage Loans (including amounts received under any form of Credit
Support) respecting which such advances were made (as to any Mortgage Loan,
"Related Proceeds") and, if so provided in the Prospectus Supplement, out of any
amounts otherwise distributable on one or more classes of Subordinate Securities
of such series; provided, however, that any such advance will be reimbursable
from any amounts in the Collection Account prior to any distributions being made
on the Securities to the extent that the Master Servicer (or such other entity)
shall determine in good faith that such advance (a "Nonrecoverable Advance") is
not ultimately recoverable from Related Proceeds or, if applicable, from
collections on other Assets otherwise distributable on such Subordinate
Securities. If advances have been made by the Master Servicer from excess funds
in the Collection Account, the Master Servicer is required to replace such funds
in the Collection Account on any future Distribution Date to the extent that
funds in the Collection Account on such Distribution Date are less than payments
required to be made to Securityholders on such date. If so specified in the
related Prospectus Supplement, the obligations of the Master Servicer (or
another entity) to make advances may be secured by a cash advance reserve fund,
a surety bond, a letter of credit or another form of limited guaranty. If
applicable, information regarding the characteristics of, and the identity of
any obligor on, any such surety bond, will be set forth in the related
Prospectus Supplement.

        If and to the extent so provided in the related Prospectus Supplement, the
Master Servicer (or another entity) will be entitled to receive interest at the
rate specified therein on its outstanding advances and will be entitled to pay
itself such interest periodically from general collections on the Assets prior
to any payment to Securityholders or as otherwise provided in the related
Agreement and described in such Prospectus Supplement.

<PAGE>

        The Prospectus Supplement for any series of Securities evidencing an
interest in a Trust Fund that includes MBS will describe any corresponding
advancing obligation of any person in connection with such MBS.

REPORTS TO SECURITYHOLDERS

        Unless otherwise provided in the Prospectus Supplement, with each
distribution to holders of any class of Securities of a series, the Master

Servicer or the Trustee, as provided in the related Prospectus Supplement, will
forward or cause to be forwarded to each such holder, to the Depositor and to
such other parties as may be specified in the related Agreement, a statement
setting forth, in each case to the extent applicable and available:

     (i)       the amount of such distribution to holders of Securities of such

                  class applied to reduce the Security Balance thereof;

     (ii)      the amount of such distribution to holders of Securities of such

                  class allocable to Accrued Security Interest;

     (iii)     the amount of such distribution allocable to Prepayment
                  Premiums;

     (iv)      the amount of related servicing compensation received by a
                  Master Servicer (and, if payable directly out of the related
                  Trust Fund, by any Sub-Servicer) and such other customary
                  information as any such Master Servicer or the Trustee deems
                  necessary or desirable, or that a Securityholder reasonably
                  requests, to enable Securityholders to prepare their tax
                  returns;

     (v)       the aggregate amount of advances included in such distribution,
                  and the aggregate amount of unreimbursed advances at the close of

                  business on such Distribution Date;

     (vi)      the aggregate principal balance of the Assets at the close of
                  business on such Distribution Date;

     (vii)     the number and aggregate principal balance of Whole Loans in
                  respect of which:

           (a)   one scheduled payment is delinquent,

           (b)   two scheduled payments are delinquent,

           (c)   three or more scheduled payments are delinquent, and

           (d)   foreclosure proceedings have been commenced;

     (viii)    with respect to any Whole Loan liquidated during the related Due
                  Period, the portion of such liquidation proceeds payable or
                  reimbursable to the Master Servicer (or any other entity) in
                  respect of such Mortgage Loan, and the amount of any loss to
                  Securityholders;

     (ix)      with respect to each REO Property relating to a Whole Loan and
                  included in the Trust Fund as of the end of the related Due
                  Period, the loan number of the related Mortgage Loan and the
                  date of acquisition;

(x)     with respect to each REO Property relating to a Whole Loan and
        included in the Trust Fund as of the end of the related Due
        Period:

        (a)   the book value,

        (b)   the principal balance of the related Mortgage Loan
              immediately following such Distribution Date (calculated
as
              if such Mortgage Loan were still outstanding taking into
              account certain limited modifications to the terms
thereof
              specified in the Agreement),

        (c)   the aggregate amount of unreimbursed servicing expenses
              and unreimbursed advances in respect thereof, and

26

<PAGE>

        (d)   if applicable, the aggregate amount of interest accrued
              and payable on related servicing expenses and related
              advances;

(xi)    with respect to any such REO Property sold during the related
        Due Period:

        (a)   the aggregate amount of sale proceeds,

        (b)   the portion of such sales proceeds payable or
reimbursable
              to the Master Servicer in respect of such REO Property
or
              the related Mortgage Loan; and

        (c)   the amount of any loss to Securityholders in respect of
              the related Mortgage Loan;

(xii)   the aggregate Security Balance or notional amount, as the
case
        may be, of each class of Securities (including any class of
        Securities not offered hereby) at the close of business on
such
        Distribution Date, separately identifying any reduction in
such
        Security Balance due to the allocation of any loss and
increase
        in the Security Balance of a class of Accrual Securities in
the
        event that Accrued Security Interest has been added to such
        balance;

(xiii)  the aggregate amount of principal prepayments made during the
        related Due Period;

(xiv)   the amount deposited in the reserve fund, if any, on such
        Distribution Date;

(xv)     the amount remaining in the reserve fund, if any, as of the
close
             of business on such Distribution Date;

    (xvi)    the aggregate unpaid Accrued Security Interest, if any, on
each
             class of Securities at the close of business on such
             Distribution Date;

    (xvii)   in the case of Securities with a variable Pass-Through Rate
or
             interest rate, the Pass-Through Rate or interest rate
applicable
             to such Distribution Date, and, if available, the immediately
             succeeding Distribution Date, as calculated in accordance
with
             the method specified in the related Prospectus Supplement;

    (xviii)  in the case of Securities with an adjustable Pass-Through
Rate
             or interest rate, for statements to be distributed in any
month
             in which an adjustment date occurs, the adjustable Pass-
Through
             Rate or interest rate applicable to such Distribution Date,
if
             available, and the immediately succeeding Distribution Date
as
             calculated in accordance with the method specified in the
             related Prospectus Supplement;

    (xix)    as to any series which includes Credit Support, the amount of
             coverage of each instrument of Credit Support included
therein
             as of the close of business on such Distribution Date; and

    (xx)     the aggregate amount of payments by the obligors of default
             interest, late charges and assumption and modification fees
             collected during the related Due Period.

    In the case of information furnished pursuant to subclauses (i)-(iv)
above, the amounts shall be expressed as a dollar amount per minimum
denomination of Securities or for such other specified portion thereof. In
addition, in the case of information furnished pursuant to subclauses (i),
(ii),
(xii), (xvi) and (xvii) above, such amounts shall also be provided with
respect
to each component, if any, of a class of Securities. The Master Servicer or
the
Trustee, as specified in the related Prospectus Supplement, will forward or
cause to be forwarded to each holder, to the Depositor and to such other
parties
as may be specified in the Agreement, a copy of any statements or reports
received by the Master Servicer or the Trustee, as applicable, with respect
to
any MBS. The Prospectus Supplement for each series of Offered Securities will

describe any additional information to be included in reports to the holders
of
such Securities.

    Within a reasonable period of time after the end of each calendar year,
the Master Servicer or the Trustee, as provided in the related Prospectus
Supplement, shall furnish to each person who at any time

<PAGE>

during the calendar year was a holder of a Security a statement containing
the
information set forth in subclauses (i)-(iv) above, aggregated for such
calendar
year or the applicable portion thereof during which such person was a
Securityholder. Such obligation of the Master Servicer or the Trustee shall
be
deemed to have been satisfied to the extent that substantially comparable
information shall be provided by the Master Servicer or the Trustee pursuant
to
any requirements of the Code as are from time to time in force. See
"Description
of the Securities--Registration and Definitive Securities."

TERMINATION

    The obligations created by the related Agreement for each series of
Certificates will terminate upon the payment to Certificateholders of that
series of all amounts held in the Collection Account or by the Master
Servicer,
if any, or the Trustee and required to be paid to them pursuant to such
Agreement following the earlier of (i) the final payment or other liquidation
of
the last Asset subject thereto or the disposition of all property acquired
upon
foreclosure of any Whole Loan subject thereto and (ii) the purchase of all of
the assets of the Trust Fund by the party entitled to effect such termination,
under the circumstances and in the manner set forth in the related Prospectus
Supplement. In no event, however, will the trust created by the Agreement
continue beyond the date specified in the related Prospectus Supplement.
Written
notice of termination of the Agreement will be given to each Securityholder,
and
the final distribution will be made only upon presentation and surrender of
the
Securities at the location to be specified in the notice of termination.

    If so specified in the related Prospectus Supplement, a series of
Securities may be subject to optional early termination through the
repurchase
of the assets in the related Trust Fund by the party specified therein, under
the circumstances and in the manner set forth therein. If so provided in the
related Prospectus Supplement, upon the reduction of the Security Balance of
a
specified class or classes of Securities by a specified percentage or amount,

the party specified therein will solicit bids for the purchase of all assets of
the Trust Fund, or of a sufficient portion of such assets to retire such class
or classes or purchase such class or classes at a price set forth in the related
Prospectus Supplement, in each case, under the circumstances and in the manner
set forth therein.

BOOK-ENTRY REGISTRATION AND DEFINITIVE SECURITIES

        If so provided in the related Prospectus Supplement, one or more classes
of the Offered Securities of any series will be issued as Book-Entry Securities,
and each such class will be represented by one or more single Securities
registered in the name of a nominee for the depository, The Depository Trust
Company ("DTC").

        DTC is a limited-purpose trust company organized under the laws of the
State of New York, a member of the Federal Reserve System, a "clearing
corporation" within the meaning of the Uniform Commercial Code ("UCC") and a
"clearing agency" registered pursuant to the provisions of Section 17A of the
Securities Exchange Act of 1934, as amended. DTC was created to hold securities
for its participating organizations ("Participants") and facilitate the
clearance and settlement of securities transactions between Participants through
electronic book-entry changes in their accounts, thereby eliminating the need
for physical movement of certificates. Participants include Merrill Lynch,
Pierce, Fenner & Smith Incorporated, securities brokers and dealers, banks,
trust companies and clearing corporations and may include certain other
organizations. Indirect access to the DTC system also is available to others
such as banks, brokers, dealers and trust companies that clear through or
maintain a custodial relationship with a Participant, either directly or
indirectly ("Indirect Participants").

        Unless otherwise provided in the related Prospectus Supplement, investors
that are not Participants or Indirect Participants but desire to purchase, sell
or otherwise transfer ownership of, or other interests in, Book-Entry Securities
may do so only through Participants and Indirect Participants. In addition, such
investors ("Security Owners") will receive all distributions on the Book-Entry
Securities through DTC and its Participants. Under a book-entry format, Security
Owners will receive payments after the related Distribution Date because, while
payments are required to be forwarded to Cede & Co., as nominee for

<PAGE>

DTC ("Cede"), on each such date, DTC will forward such payments to its Participants which thereafter will be required to forward them to Indirect Participants or Security Owners. Unless otherwise provided in the related Prospectus Supplement, the only "Securityholder" (as such term is used in the Agreement) will be Cede, as nominee of DTC, and the Security Owners will not be recognized by the Trustee as Securityholders under the Agreement. Security Owners will be permitted to exercise the rights of Securityholders under the related Agreement, Trust Agreement or Indenture, as applicable, only indirectly through the Participants who in turn will exercise their rights through DTC.

        Under the rules, regulations and procedures creating and affecting DTC and its operations, DTC is required to make book-entry transfers among Participants on whose behalf it acts with respect to the Book-Entry Securities and is required to receive and transmit distributions of principal of and interest on the Book-Entry Securities. Participants and Indirect Participants with which Security Owners have accounts with respect to the Book-Entry Securities similarly are required to make book-entry transfers and receive and transmit such payments on behalf of their respective Security Owners.

        Because DTC can act only on behalf of Participants, who in turn act on behalf of Indirect Participants and certain banks, the ability of a Security Owner to pledge its interest in the Book-Entry Securities to persons or entities that do not participate in the DTC system, or otherwise take actions in respect of its interest in the Book-Entry Securities, may be limited due to the lack of a physical certificate evidencing such interest.

        DTC has advised the Depositor that it will take any action permitted to be taken by a Securityholder under an Agreement only at the direction of one or more Participants to whose account with DTC interests in the Book-Entry Securities are credited.

        Cedelbank ("CEDEL") is incorporated under the laws of Luxembourg as a professional depository. CEDEL holds securities for its participating organizations ("CEDEL Participants") and facilitates the clearance and settlement of securities transactions between CEDEL Participants through electronic book-entry changes in accounts of CEDEL Participants, thereby eliminating the need for physical movement of certificates. Transactions may be settled in CEDEL in any of 28 currencies, including United States dollars. CEDEL provides to its CEDEL Participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. CEDEL interfaces with domestic markets in several countries. As a professional depository, CEDEL is subject to regulation by the Luxembourg Monetary Institute. CEDEL Participants are

recognized financial institutions around the world, including underwriters,
securities brokers and dealers, banks, trust companies, clearing corporations
and certain other organizations and may include the Underwriters. Indirect
access to CEDEL is also available to others, such as banks, brokers, dealers
and
trust companies that clear through or maintain a custodial relationship with
a
CEDEL Participant, either directly or indirectly.

     The Euroclear System was created in 1968 to hold securities for
participants of the Euroclear System ("Euroclear Participants") and to clear
and
settle transactions between Euroclear Participants through simultaneous
electronic book-entry delivery against payment, thereby eliminating the need
for
physical movement of certificates and any risk from lack of simultaneous
transfers of securities and cash. Transactions may now be settled in
Euroclear
in any of 32 currencies, including United States dollars. The Euroclear
System
includes various other services, including securities lending and borrowing,
and
interfaces with domestic markets in several countries generally similar to
the
arrangements for cross-market transfers with DTC. The Euroclear System is
operated by JPMorgan Chase Bank, Brussels, Belgium office (the "Euroclear
Operator" or "Euroclear"), under contract with Euroclear Clearance System,
S.C.,
a Belgian cooperative corporation (the "Euroclear Cooperative"). All
operations
are conducted by the Euroclear Operator, and all Euroclear securities
clearance
accounts and Euroclear cash accounts are accounts with the Euroclear Operator,
not the Euroclear Cooperative. The Euroclear Cooperative establishes policy
for
the Euroclear System on behalf of Euroclear Participants. Euroclear
Participants
include banks (including central banks), securities brokers and dealers and
other professional financial intermediaries and may

<PAGE>

include the Underwriters. Indirect access to the Euroclear System is also
available to other firms that clear through or maintain a custodial
relationship
with a Euroclear Participant, either directly or indirectly.

     The Euroclear Operator is the Belgian branch of a New York banking
corporation which is a member bank of the Federal Reserve System. As such, it
is
regulated and examined by the Board of Governors of the Federal Reserve
System
and the New York State Banking Department, as well as the Belgian Banking
Commission.

     Securities clearance accounts and cash accounts with the Euroclear

Operator are governed by the Terms and Conditions Governing Use of Euroclear and
the related Operating Procedures of the Euroclear System and applicable Belgian
law (collectively, the "Terms and Conditions"). The Terms and Conditions govern
transfers of securities and cash within the Euroclear System, withdrawal of
securities and cash from the Euroclear System, and receipts of payments with
respect to securities in the Euroclear System. All securities in the Euroclear
System are held on a fungible basis without attribution of specific certificates
to specific securities clearance accounts. The Euroclear Operator acts under the
Terms and Conditions only on behalf of Euroclear Participants and has no record
of or relationship with persons holding through Euroclear Participants.

Distributions with respect to Securities held through CEDEL or Euroclear
will be credited to the cash accounts of CEDEL Participants or Euroclear
Participants in accordance with the relevant system's rules and procedures, to
the extent received by its Depositary. Such distributions will be subject to tax
reporting and may be subject to withholding in accordance with relevant United
States tax laws and regulations. See "Material Federal Income Tax Consequences"
in this Prospectus and "Global Clearance, Settlement and Tax Documentation
Procedures" in Annex I to the related Prospectus Supplement. CEDEL or the
Euroclear Operator, as the case may be, will take any other action permitted to
be taken by a Security under the Indenture, Trust Agreement or Pooling and
Servicing Agreement, as applicable, on behalf of a CEDEL Participant or
Euroclear Participant only in accordance with its relevant rules and procedures
and subject to its Depositary's ability to effect such actions on its behalf
through DTC.

Cede, as nominee for DTC, will hold the Securities. CEDEL and Euroclear
will hold omnibus positions in the Securities on behalf of the CEDEL
Participants and the Euroclear Participants, respectively, through customers'
securities accounts in CEDEL's and Euroclear's names on the books of their
respective depositaries (collectively, the "Depositaries"), which in turn will
hold such positions in customers' securities accounts in the Depositaries' names
on the books of DTC.

Transfers between DTC's participating organizations (the "Participants")
will occur in accordance with DTC rules. Transfers between CEDEL Participants
and Euroclear Participants will occur in the ordinary way in accordance with
their applicable rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly

through DTC, on the one hand, and directly or indirectly through CEDEL
Participants or Euroclear Participants, on the other, will be effected in DTC
in
accordance with DTC rules on behalf of the relevant European international
clearing system by its Depositary; however, such cross-market transactions
will
require delivery of instructions to the relevant European international
clearing
system by the counterparty in such system in accordance with its rules and
procedures and within its established deadlines (European time). The relevant
European international clearing system will, if the transaction meets its
settlement requirements, deliver instructions to its Depositary to take
action
to effect final settlement on its behalf by delivering or receiving
securities
in DTC, and making or receiving payment in accordance with normal procedures
for
same-day funds settlement applicable to DTC. CEDEL Participants and Euroclear
Participants may not deliver instructions directly to the Depositaries.

    Because of time zone differences, credits of securities in CEDEL or
Euroclear as a result of a transaction with a Participant will be made during
the subsequent securities settlement processing, dated the business day
following the DTC settlement date, and such credits or any transactions in
such
securities settled during such processing will be reported to the relevant
CEDEL
Participant or Euroclear Participant on such business day. Cash received in
CEDEL or Euroclear as a result of sales of securities by or

                                  30

<PAGE>

through a CEDEL Participant or a Euroclear Participant to a Participant will
be
received with value on the DTC settlement date but will be available in the
relevant CEDEL or Euroclear cash account only as of the business day
following
settlement in DTC.

    Although DTC, CEDEL and Euroclear have agreed to the foregoing
procedures
in order to facilitate transfers of Securities among participants of DTC,
CEDEL
and Euroclear, they are under no obligation to perform or continue to perform
such procedures and such procedures may be discontinued at any time.

    In the event that any of DTC, CEDEL or Euroclear should discontinue its
services, the Administrator would seek an alternative depository (if
available)
or cause the issuance of Definitive Securities to the owners thereof or their
nominees in the manner described in the Prospectus under "Description of the
Securities--Book Entry Registration and Definitive Securities".

    Unless otherwise specified in the related Prospectus Supplement,
Securities initially issued in book-entry form will be issued in fully
registered certificated form to Security Owners or their nominees (the

"Definitive Securities"), rather than to DTC or its nominee only if (i) the
Depositor advises the Trustee in writing that DTC is no longer willing or
able
to properly discharge its responsibilities as depository with respect to the
Securities and the Depositor is unable to locate a qualified successor or
(ii)
the Depositor, at its option, elects to terminate the book-entry system
through
DTC.

        Upon the occurrence of either of the events described in the
immediately
preceding paragraph, DTC is required to notify all Participants of the
availability through DTC of Definitive Securities for the Security Owners.
Upon
surrender by DTC of the certificate or certificates representing the Book-
Entry
Securities, together with instructions for reregistration, the Trustee will
issue (or cause to be issued) to the Security Owners identified in such
instructions the Definitive Securities to which they are entitled, and
thereafter the Trustee will recognize the holders of such Definitive
Securities
as Securityholders under the Agreement.

                          RECOMBINABLE SECURITIES

GENERAL

        If provided in the related prospectus supplement, one or more classes
of
offered securities will be recombinable securities. In each series that
includes
recombinable securities, all of the classes of recombinable securities listed
on
the cover page of the related prospectus supplement will be issued. Holders
of
one or more of the specified classes of recombinable securities will be
entitled, upon notice and payment to the trustee of a fee, to exchange all or
a
portion of such securities for proportionate interests in one or more of the
other specified classes of recombinable securities.

        The classes of recombinable securities that are exchangeable for one
another will be referred to as being "related" to one another, and related
classes of recombinable securities will be referred to as "Combinations." The
Combinations for the recombinable securities in a series, if any, will be
described in the prospectus supplement for that series.

        The classes that are to be the basis for any such exchange will be
deposited in a separate trust fund (the "Recombinable Securities Trust Fund")
established pursuant to a trust agreement between a trustee and the depositor.
The trustee of the trust fund which issues the securities described in the
related prospectus supplement may also serve as the trustee of the
Recombinable
Securities Trust Fund. The Recombinable Securities Trust Fund initially will
issue classes of recombinable securities that are identical in all respects
to

the classes of securities deposited in such trust fund. At any time after the
issuance of the recombinable securities, including immediately after such
issuance, the classes of recombinable securities or any portion thereof may
be
exchanged for other related classes of recombinable securities that are part
of
the same Combination, as specified in the related prospectus supplement.
Simultaneously with such exchange, the Recombinable Securities Trust Fund
will
cancel the relevant portion or portions of the class or classes of
recombinable
securities that are being exchanged and will issue the corresponding

<PAGE>

portion or portions of the class or classes of other related recombinable
securities into which such class or classes of securities are exchangeable.
Any
recombinable security received in an exchange may be subject to an unlimited
amount of exchanges thereafter. Each recombinable security issued by a
Recombinable Securities Trust Fund will represent a beneficial ownership
interest in the class or classes of securities deposited in such trust fund.

        In general, the descriptions in this prospectus of classes of
securities
of a series also apply to the classes of recombinable securities of that
series,
except where the context requires otherwise. For example, the classes of
recombinable securities of a series are entitled to receive distributions of
principal and/or interest, are issued in book-entry form or as physical
securities to securityholders in certain minimum denominations, may be
provided
with various forms of credit enhancement, and are subject to yield and
prepayment considerations, in the same manner and to the same extent as are
the
other classes of securities of such series. Similarly, the discussions under
"ERISA Considerations" and "Legal Investment" apply to recombinable
securities
as well as securities.

EXCHANGES

        The ability of a holder to exchange recombinable securities for other
recombinable securities within a Combination will be subject to three
constraints, as follows:

        -  The aggregate principal balance of the recombinable securities
received
           in the exchange, immediately thereafter, must equal that of the
           recombinable securities surrendered for such exchange immediately
prior
           to the exchange (for this purpose, the principal balance of any
           interest only class will always equal $0).

        -  The aggregate amount of annual interest (the "Annual Interest
Amount")

payable with respect to the recombinable securities received in the
exchange must equal that of the recombinable securities surrendered
for
exchange.

- Such classes must be exchanged in the applicable proportions, if any,
  shown in the related prospectus supplement, which, as described
below,
  are based at all times on the original principal balance (or
original
  notional principal balances, if applicable) of such classes.

Within any particular series, more than one type of Combination may
exist.
For example, a class of recombinable securities with a certificate rate that
adjusts based on an index and a class of recombinable securities with a
certificate rate that adjusts inversely based on an index may be exchangeable
for a class of recombinable securities with a fixed certificate rate. Under
another Combination, a class of recombinable securities that is a principal
only
class and a class of recombinable securities that is an interest only class
may
be exchanged for a class of recombinable securities that is entitled to
distributions of both principal and interest. Further, a class of
recombinable
securities that accretes all of its interest for a period (such accreted
interest being added to the principal of such class) and a class of
recombinable
securities that is entitled to principal payments from such accretions may be
exchanged for a class of recombinable securities that is entitled to payments
of
interest continuously from the first distribution date until the principal
balance thereof has been reduced to zero. Under another Combination, a class
of
recombinable securities that is entitled to principal payments in accordance
with a schedule or a planned amortization class and a class of recombinable
securities that is entitled to principal payments on any distribution date
only
if scheduled payments have been made on the planned amortization class may be
exchanged for a class of recombinable securities that is entitled to
principal
payments continuously from the first distribution date on which it receives
principal until the principal balance thereof has been reduced to zero and
that
also receives a coupon. The foregoing examples describe only some of the
types
of Combinations that are possible.

Set forth below are additional examples that illustrate in simple
mathematical terms how certain Combinations might operate. The first example
illustrates a Combination of a floating rate recombinable

<PAGE>

security and an inverse floating rate recombinable security which are

exchangeable for a single class of recombinable securities with a fixed interest
rate:

<Table>
<Caption>

| CLASS | ORIGINAL PRINCIPAL AMOUNT | INTEREST RATES | MAX RATE | MIN RATE | CLASS | MAXIMUM ORIGINAL PRINCIPAL AMOUNT | ORIGINAL INTEREST RATES |
| ----- | ---------- | -------------- | -------- | -------- | ----- | -------- | -------- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| RS-1 | $10,000,000 | LIBOR* + 0.55% | 8.50% | 0.55% | RS-3 | $20,000,000 | 4.25% |
| RS-2 | $10,000,000 | 7.95% - LIBOR | 7.95% | 0.00% | | | |

</Table>

---------------

* For purposes of this example, LIBOR shall be equal to 1.375% per annum.

        The following example illustrates a Combination in which recombinable
securities of a principal only class and recombinable securities of an interest
only class are exchanged for recombinable securities of a class that are
entitled to distributions of principal and interest:

<Table>
<Caption>

| CLASS | ORIGINAL PRINCIPAL AMOUNT | INTEREST RATES | CLASS | MAXIMUM ORIGINAL PRINCIPAL AMOUNT | INTEREST RATES |
| ----- | ---------------- | -------------- | ----- | ---------------- | ---------- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| RS-IO* | $10,000,000 | 10% | RS-3 | $10,000,000 | 10% |
| | (notional) | | | | |
| RS-PO** | $10,000,000 | 0% | | | |

</Table>

---------------

 * Class RS-IO is an interest only certificate and will receive no principal
   payments.

** Class RS-PO is a principal only certificate and will receive no interest
   payments.

        In some series, a Combination may include a number of classes of
recombinable securities that may be exchanged for one another and that will

enable a holder of one of the classes of recombinable securities to exchange it
for another class of recombinable securities with a higher or lower certificate
rate. Such a Combination would require the creation of additional classes of
recombinable securities that pay down on a pro rata basis. The following table
illustrates various Combinations for a single class of recombinable securities
having a principal balance of $40,000,000 and a certificate rate of 8.50% per annum.

| CLASS | ORIGINAL PRINCIPAL AMOUNT | INTEREST RATES | CLASS | MAXIMUM ORIGINAL PRINCIPAL AMOUNT | INTEREST RATES |
|-------|---------------------------|----------------|-------|-----------------------------------|----------------|
| RS-4 | $40,000,000 | 8.50% | RS-5 | $15,000,000 | 6.50% |
| RS-6 | $25,000,000 | 9.00% | | | |
| RS-7* | $ 2,187,500 (notional) | 8.00% | | | |
| RS-4 | $40,000,000 | 8.50% | RS-8 | $23,000,000 | 9.50% |
| RS-9 | $12,500,000 | 9.72% | | | |
| RS-10** | $ 4,500,000 | 0.00% | | | |

---------------

  * Class RS-7 is an interest only certificate and will receive no principal
    payments.

** Class RS-10 is a principal only certificate and will receive no interest
    payments.

     The foregoing table shows the maximum amount of each other class of
recombinable securities that can be created from the related Class RS-4
recombinable security. Such Combinations could not exist concurrently in their
maximum amounts, as any Combination is limited to the amount of principal and
interest distributable on the related recombinable security to be exchanged. One
method of calculating the maximum amount that can be created in a specific
Combination is to determine the Annual Interest Amount applicable to the
recombinable security to be exchanged, and divide such interest amount by the
coupon of the desired recombinable security. The resulting principal balance can
in no case be greater than the principal balance of recombinable securities to
be exchanged. Using the first Combination in the foregoing table, if the holder
of the Class RS-4 recombinable security desires to create the Class RS-5 and
Class RS-6 recombinable securities, the holder would also have to create an

interest only recombinable

<PAGE>

security, Class RS-7. Since the Annual Interest Amount of the Class RS-4
recombinable security is equal to $3,400,000 and the Annual Interest Amount
for
the Class RS-5 recombinable security and the Class RS-6 recombinable security
is
equal to $975,000 and $2,250,000, respectively, the holder of the Class RS-4
recombinable security would have to create the Class RS-7 interest only
certificate to receive the remaining $175,000 of interest. The notional
amount
of the Class RS-7 recombinable securities would be calculated by dividing the
Annual Interest Amount ($175,000) by the certificate rate applicable thereto
(8.00%) to determine the notional amount ($2,187,500).

     Similarly, if the holder of the Class RS-4 recombinable security
desires
to create the Class RS-8 and Class RS-9 recombinable securities, the holder
of
the Class RS-4 recombinable security would have to create a principal only
recombinable security, Class RS-10, in order to ensure that the principal
amount
of the Class RS-4 recombinable security ($40,000,000) was maintained after
the
exchange and that the Annual Interest Amount applicable to the Class RS-4
recombinable security ($3,400,000) was completely utilized. The sum of the
principal amount of the Class RS-8 recombinable security ($23,500,000) and
the
principal amount of the Class RS-9 recombinable security ($12,500,000) is
equal
to $35,500,000. The sum of the Annual Interest Amount applicable to the Class
RS-8 recombinable security ($2,185,000) and the Annual Interest Amount
applicable to the Class RS-9 recombinable security ($1,215,000) is equal to
$3,400,000. Since the total amount of Annual Interest applicable to the Class
RS-4 recombinable security has been utilized, the Class RS-10 recombinable
security would not be entitled to interest, but would be required to have a
principal balance of $4,500,000.

     The foregoing examples highlight various Combinations of recombinable
securities which differ in interest characteristics (i.e., interest only
classes, principal only classes and classes which are entitled to
distributions
of principal and interest). In certain series, a securityholder may also be
able
to exchange its recombinable securities for other recombinable securities
that
have different principal payment characteristics. For example, an exchange of
two or more classes of recombinable securities for a single class of
recombinable securities may result in a recombinable security with the
aggregate
principal payment characteristics of the classes of recombinable securities
for
which it was exchanged. In addition, in certain series, recombinable
securities

may be exchangeable for other recombinable securities with different credit
characteristics. For example, a class that is senior in priority of payment
may
be combined with a subordinated class, to create a new class with the
aggregate
credit characteristics of the two classes that were combined.

     At any given time, a number of factors will limit a securityholder's
ability to exchange recombinable securities for other recombinable securities.
A
securityholder must, at the time of the proposed exchange, own the class or
classes which are permitted to be exchanged in the proportions necessary to
effect the desired exchange. A securityholder that does not own such class or
classes or the necessary amounts of such class or classes may not be able to
obtain the desired class or classes of recombinable securities. The
securityholder of a class of recombinable securities may be unable or
unwilling
to sell such securities or the sale of such recombinable securities may be
subject to certain transfer restrictions imposed by the structure of the
transaction or applicable law, such as the Employee Retirement Income
Security
Act of 1974, as amended ("ERISA"). In addition, the amount and timing of
principal payments to the securityholders will, over time, diminish the
amounts
available for a desired exchange.

PROCEDURES AND EXCHANGE PROPORTIONS

     To effect an exchange, a securityholder must notify the trustee or
follow
other procedures as described in the related prospectus supplement. The
securityholder must give such notice in writing or by telefax not later than
five business days before the proposed exchange date (which date, subject to
the
trustee's approval, can be any business day other than the first or last
business day of the month) or as otherwise specified in the related
prospectus
supplement. The notice must include the outstanding principal (or notional
principal) amount of the securities to be exchanged and the securities to be
received, and the proposed exchange date. Promptly after the securityholder
has
given the required notice, the trustee will provide instructions for
delivering
the securities and the payment of the administrative fee to the trustee by

                                   34
<PAGE>

wire transfer. A securityholder's notice becomes irrevocable on the second
business day before the proposed exchange date or as otherwise specified in
the
related prospectus supplement.

     An exchanging securityholder will pay an administrative fee to the
trustee
in connection with each exchange as specified in the related prospectus
supplement. In the case of recombinable securities issued in book-entry form,

any exchanges will be subject to the rules, regulations and procedures
applicable to DTC's book-entry securities.

Where exchange proportions are shown in the related prospectus
supplement
for classes of recombinable securities, the Issuer will follow the convention
of
basing such proportions on the original, rather than on the outstanding,
principal or notional principal amounts of such classes. If such classes
receive
principal payments pro rata with each other, the exchange proportions also
will
apply to their outstanding principal amounts. If such classes do not receive
principal payments pro rata with each other, an investor can calculate
current
exchange proportions for such classes, based on their outstanding principal
amounts, by (1) multiplying the exchange proportion shown in the related
prospectus supplement for each such class by its current Class Factor (as
defined below) and (2) dividing each resulting percentage by the sum of such
percentages. The trustee will include the Class Factor for each class of
outstanding recombinable securities having a principal amount in the
statements
it furnishes to securityholders in connection with each distribution date.
The
current Class Factor also will be available to securityholders from the
depositor or the trustee upon request as specified in the related prospectus
supplement. The "Class Factor" for any month will be a truncated seven-digit
decimal which, when multiplied by the original principal amount of that class,
will equal its remaining principal amount, after giving effect to any payment
of
(or addition to) principal to be made on the distribution date in the
following
month. A Class Factor for each interest only class having a notional
principal
amount will be included in the statements the trustee furnishes to
securityholders in connection with each distribution date and also will be
available to securityholders from the depositor or the trustee upon request
as
specified in the related prospectus supplement. Such a Class Factor will
reflect
the remaining notional principal amount of the interest only class in an
analogous manner.

The first payment on a recombinable security received in an exchange
transaction will be made on the distribution date in the month following the
month of the exchange or as specified in the related prospectus supplement.
Such
payment will be made to the securityholder of record as of the applicable
record
date.

DESCRIPTION OF THE AGREEMENTS

AGREEMENTS APPLICABLE TO A SERIES

REMIC Certificates, Grantor Trust Certificates. Certificates that are

REMIC Certificates, Grantor Trust Certificates or indebtedness for tax purposes
will be issued, and the related Trust Fund will be created, pursuant to a
pooling and servicing agreement (a "Pooling and Servicing Agreement") among the
Depositor, the Master Servicer and the Trustee. The Assets of such Trust Fund
will be transferred to the Trust Fund and thereafter serviced in accordance with
the terms of the Pooling and Servicing Agreement. In the context of the
conveyance and servicing of the related Assets, the Pooling and Servicing
Agreement or the Trust Agreement, as applicable, may be referred to herein as
the "Agreement". If specified in the related Prospectus Supplement, certificates
that are REMIC Certificates, Grantor Trust Certificates or indebtedness for tax
purposes will be issued, and the related Trust Fund will be created, pursuant to
a Trust Agreement (a "Trust Agreement") between the Depositor and the Trustee.
Unless otherwise described in the related Prospectus Supplement, the Assets of
such Trust Fund will be serviced by one or more Master Servicers or servicers
pursuant to one or more servicing agreements between the Trustee and the Master
Servicer or servicer, as applicable (each, a "Servicing Agreement"), each of
which may also be referred to herein as the "Agreement". If the Assets of the
Trust Fund for such a series consists only of Government Securities or MBS, such
Assets will be conveyed to the Trust Fund and administered

<PAGE>

pursuant to a Trust Agreement between the Depositor and the Trustee, which may
also be referred to herein as the "Agreement".

        Certificates That Are Partnership Interests for Tax Purposes and
Notes.  Certificates that are partnership interests for tax purposes will be
issued, and the related Trust Fund will be created, pursuant to a Trust
Agreement between the Depositor and the Trustee. The Assets of the related Trust
Fund will be transferred to the Trust Fund and thereafter serviced in accordance
with a servicing agreement (a "Servicing Agreement") among the Depositor, the
Servicer and the Trustee. In the context of the conveyance and servicing of the
related Assets, a Servicing Agreement may be referred to herein as the
"Agreement".

        A series of Notes issued by a Trust Fund will be issued pursuant to the
indenture (the "Indenture") between the related Trust Fund and an indenture
trustee (the "Indenture Trustee") named in the related Prospectus Supplement.

        Notwithstanding the foregoing, if the Assets of a Trust Fund consist only
of MBS or Government Securities, such Assets will be conveyed to the Trust Fund

and administered in accordance with the terms of the Trust Agreement, which in
such context may be referred to herein as the Agreement.

General. Any Master Servicer and the Trustee with respect to any series of
Securities will be named in the related Prospectus Supplement. In any series of
Securities for which there are multiple Master Servicers, there may also be
multiple Mortgage Loan Groups, each corresponding to a particular Master
Servicer; and, if the related Prospectus Supplement so specifies, the servicing
obligations of each such Master Servicer will be limited to the Whole Loans in
such corresponding Mortgage Loan Group. In lieu of appointing a Master Servicer,
a servicer may be appointed pursuant to the Agreement for any Trust Fund. Such
servicer will service all or a significant number of Whole Loans directly
without a Sub-Servicer. Unless otherwise specified in the related Prospectus
Supplement, the obligations of any such servicer shall be commensurate with
those of the Master Servicer described herein. References in this Prospectus to
Master Servicer and its rights and obligations, unless otherwise specified in
the related Prospectus Supplement, shall be deemed to also be references to any
servicer servicing Whole Loans directly. A manager or administrator may be
appointed pursuant to the Trust Agreement for any Trust Fund to administer such
Trust Fund. The provisions of each Agreement will vary depending upon the nature
of the Securities to be issued thereunder and the nature of the related Trust
Fund. Forms of a Pooling and Servicing Agreement, a Sale and Servicing Agreement
and a Trust Agreement have been filed as exhibits to the Registration Statement
of which this Prospectus is a part.

The following summaries describe certain provisions that may appear in
each Agreement. The Prospectus Supplement for a series of Securities will
describe any provision of the Agreement relating to such series that materially
differs from the description thereof contained in this Prospectus. The summaries
do not purport to be complete and are subject to, and are qualified in their
entirety by reference to, all of the provisions of the Agreement for each Trust
Fund and the description of such provisions in the related Prospectus
Supplement. As used herein with respect to any series, the term "Security"
refers to all of the Securities of that series, whether or not offered hereby
and by the related Prospectus Supplement, unless the context otherwise requires.
The Depositor will provide a copy of the Agreement (without exhibits) relating
to any series of Securities without charge upon written request of a holder of a

Security of such series addressed to Merrill Lynch Mortgage Investors, Inc.,
250
Vesey Street, World Financial Center, North Tower, 10th Floor, New York, New
York 10281-1310. Attention: Jack Ross.

ASSIGNMENT OF ASSETS; REPURCHASES

        At the time of issuance of any series of Securities, the Depositor will
assign (or cause to be assigned) to the designated Trustee the Assets to be
included in the related Trust Fund, together with all principal and interest
to
be received on or with respect to such Assets after the Cut-off Date, other
than
principal and interest due on or before the Cut-off Date and other than any
Retained Interest. The Trustee will, concurrently with such assignment,
deliver
the Securities to the Depositor in exchange for the Assets and the other
assets
comprising the Trust Fund for such series. Each Asset will be identified in a
schedule

<PAGE>

appearing as an exhibit to the related Agreement. Unless otherwise provided
in
the related Prospectus Supplement, such schedule will include detailed
information (i) in respect of each Whole Loan included in the related Trust
Fund, including without limitation, the address of the related Mortgaged
Property and type of such property, the Mortgage Rate and, if applicable, the
applicable index, margin, adjustment date and any rate cap information, the
original and remaining term to maturity, the original and outstanding
principal
balance and balloon payment, if any, the Value and Loan-to-Value Ratio as of
the
date indicated and payment and prepayment provisions, if applicable; and (ii)
in
respect of each MBS included in the related Trust Fund, including without
limitation, the MBS Issuer, MBS Servicer and MBS Trustee, the pass-through or
bond rate or formula for determining such rate, the issue date and original
and
remaining term to maturity, if applicable, the original and outstanding
principal amount and payment provisions, if applicable.

        With respect to each Whole Loan, except as otherwise specified in the
related Prospectus Supplement, the Depositor will deliver or cause to be
delivered to the Trustee (or to the custodian hereinafter referred to)
certain
loan documents, which unless otherwise specified in the related Prospectus
Supplement will include the original Mortgage Note endorsed, without recourse,
in blank or to the order of the Trustee, the original Mortgage (or a
certified
copy thereof) with evidence of recording indicated thereon and an assignment
of
the Mortgage to the Trustee in recordable form. Notwithstanding the foregoing,
a
Trust Fund may include Mortgage Loans where the original Mortgage Note is not

delivered to the Trustee if the Depositor delivers to the Trustee or the
custodian a copy or a duplicate original of the Mortgage Note, together with
an
affidavit certifying that the original thereof has been lost or destroyed.
With
respect to such Mortgage Loans, the Trustee (or its nominee) may not be able
to
enforce the Mortgage Note against the related borrower. Unless otherwise
specified in the related Prospectus Supplement, the Asset Seller will be
required to agree to repurchase, or substitute for, each such Mortgage Loan
that
is subsequently in default if the enforcement thereof or of the related
Mortgage
is materially adversely affected by the absence of the original Mortgage Note.
Unless otherwise provided in the related Prospectus Supplement, the related
Agreement will require the Depositor or another party specified therein to
promptly cause each such assignment of Mortgage to be recorded in the
appropriate public office for real property records, except in the State of
California or in other states where, in the opinion of counsel acceptable to
the
Trustee, such recording is not required to protect the Trustee's interest in
the
related Whole Loan against the claim of any subsequent transferee or any
successor to or creditor of the Depositor, the Master Servicer, the relevant
Asset Seller or any other prior holder of the Whole Loan.

        The Trustee (or a custodian) will review such Whole Loan documents
within
a specified period of days after receipt thereof, and the Trustee (or a
custodian) will hold such documents in trust for the benefit of the
Certificateholders. Unless otherwise specified in the related Prospectus
Supplement, if any such document is found to be missing or defective in any
material respect, the Trustee (or such custodian) shall immediately notify
the
Master Servicer and the Depositor, and the Master Servicer shall immediately
notify the relevant Asset Seller. If the Asset Seller cannot cure the
omission
or defect within a specified number of days after receipt of such notice,
then
unless otherwise specified in the related Prospectus Supplement, the Asset
Seller will be obligated, within a specified number of days of receipt of
such
notice, to repurchase the related Whole Loan from the Trustee at the Purchase
Price or substitute for such Mortgage Loan. There can be no assurance that an
Asset Seller will fulfill this repurchase or substitution obligation, and
neither the Master Servicer nor the Depositor will be obligated to repurchase
or
substitute for such Mortgage Loan if the Asset Seller defaults on its
obligation. Unless otherwise specified in the related Prospectus Supplement,
this repurchase or substitution obligation constitutes the sole remedy
available
to the Certificateholders or the Trustee for omission of, or a material
defect
in, a constituent document. To the extent specified in the related Prospectus
Supplement, in lieu of curing any omission or defect in the Asset or
repurchasing or substituting for such Asset, the Asset Seller may agree to
cover

any losses suffered by the Trust Fund as a result of such breach or defect.

Notwithstanding the preceding two paragraphs, unless otherwise specified
in the related Prospectus Supplement, the documents with respect to Home Equity
Loans, Home Improvement Contracts and Manufactured Housing Contracts will not be
delivered to the Trustee (or a custodian), but will be

<PAGE>

retained by the Master Servicer, which may also be the Asset Seller. In
addition, assignments of the related Mortgages to the Trustee will not be
recorded, unless otherwise provided in the related Prospectus Supplement.

With respect to each Government Security or MBS in certificated form, the
Depositor will deliver or cause to be delivered to the Trustee (or the
custodian) the original certificate or other definitive evidence of such
Government Security or MBS, as applicable, together with bond power or other
instruments, certifications or documents required to transfer fully such
Government Security or MBS, as applicable, to the Trustee for the benefit of the
Certificateholders. With respect to each Government Security or MBS in
uncertificated or book-entry form or held through a "clearing corporation"
within the meaning of the UCC, the Depositor and the Trustee will cause such
Government Security or MBS to be registered directly or on the books of such
clearing corporation or of one or more securities intermediaries in the name of
the Trustee for the benefit of the Securityholders. Unless otherwise provided in
the related Prospectus Supplement, the related Agreement will require that
either the Depositor or the Trustee promptly cause any MBS and Government
Securities in certificated form not registered in the name of the Trustee to be
re-registered, with the applicable persons, in the name of the Trustee.

REPRESENTATIONS AND WARRANTIES; REPURCHASES

Unless otherwise provided in the related Prospectus Supplement the
Depositor will, with respect to each Whole Loan, assign certain representations
and warranties, as of a specified date (the person making such representations
and warranties, the "Warranting Party") covering, by way of example, the
following types of matters:

    (i)    the accuracy of the information set forth for such Whole Loan on
the schedule of Assets appearing as an exhibit to the related
Agreement;

    (ii)    the existence of title insurance insuring the lien priority of
the
Whole Loan;

(iii)   the authority of the Warranting Party to sell the Whole Loan;

(iv)    the payment status of the Whole Loan;

(v)     in the case of a Whole Loan, the existence of customary provisions
        in the related Mortgage Note and Mortgage to permit realization
        against the Mortgaged Property of the benefit of the security of
        the Mortgage; and

(vi)    the existence of hazard and extended perils insurance coverage on
        the Mortgaged Property.

Any Warranting Party shall be an Asset Seller or an affiliate thereof or
such other person acceptable to the Depositor and shall be identified in the
related Prospectus Supplement.

Representations and warranties made in respect of a Whole Loan may have
been made as of a date prior to the applicable Cut-off Date. A substantial
period of time may have elapsed between such date and the date of initial
issuance of the related series of Certificates evidencing an interest in such
Whole Loan. Unless otherwise specified in the related Prospectus Supplement, in
the event of a breach of any such representation or warranty, the Warranting
Party will be obligated to reimburse the Trust Fund for losses caused by any
such breach or either cure such breach or repurchase or replace the affected
Whole Loan as described below. Since the representations and warranties may not
address events that may occur following the date as of which they were made, the
Warranting Party will have a reimbursement, cure, repurchase or substitution
obligation in connection with a breach of such a representation and warranty
only if the relevant event that causes such breach occurs prior to such date.
Such party would have no such obligations if the relevant event that causes such
breach occurs after such date.

Unless otherwise provided in the related Prospectus Supplement, each
Agreement will provide that the Master Servicer and/or Trustee will be required
to notify promptly the relevant Warranting Party of any breach of any
representation or warranty made by it in respect of a Whole Loan that materially
and adversely affects the value of such Whole Loan or the interests therein of
the Securityholders. If such

<PAGE>

Warranting Party cannot cure such breach within a specified period following the
date on which such party was notified of such breach, then such Warranting Party
will be obligated to repurchase such Whole Loan from the Trustee within a

specified period from the date on which the Warranting Party was notified of
such breach, at the Purchase Price therefor. As to any Whole Loan, unless
otherwise specified in the related Prospectus Supplement, the "Purchase
Price"
is equal to the sum of the unpaid principal balance thereof, plus unpaid
accrued
interest thereon at the Mortgage Rate from the date as to which interest was
last paid to the due date in the Due Period in which the relevant purchase is
to
occur, plus certain servicing expenses that are reimbursable to the Master
Servicer. If so provided in the Prospectus Supplement for a series, a
Warranting
Party, rather than repurchase a Whole Loan as to which a breach has occurred,
will have the option, within a specified period after initial issuance of
such
series of Certificates, to cause the removal of such Whole Loan from the
Trust
Fund and substitute in its place one or more other Whole Loans in accordance
with the standards described in the related Prospectus Supplement. If so
provided in the Prospectus Supplement for a series, a Warranting Party,
rather
than repurchase or substitute a Whole Loan as to which a breach has occurred,
will have the option to reimburse the Trust Fund or the Securityholders for
any
losses caused by such breach. Unless otherwise specified in the related
Prospectus Supplement, this reimbursement, repurchase or substitution
obligation
will constitute the sole remedy available to holders of Securities or the
Trustee for a breach of representation by a Warranting Party.

        Neither the Depositor (except to the extent that it is the Warranting
Party) nor the Master Servicer will be obligated to purchase or substitute
for a
Whole Loan if a Warranting Party defaults on its obligation to do so, and no
assurance can be given that Warranting Parties will carry out such
obligations
with respect to Whole Loans.

        Unless otherwise provided in the related Prospectus Supplement the
Warranting Party will, with respect to a Trust Fund that includes Government
Securities or MBS, make or assign certain representations or warranties, as
of a
specified date, with respect to such Government Securities or MBS, covering
the
accuracy of the information set forth therefor on the schedule of Assets
appearing as an exhibit to the related Agreement and covering the authority
of
the Warranting Party to sell such Assets. The related Prospectus Supplement
will
describe the remedies for a breach thereof.

        A Master Servicer will make certain representations and warranties
regarding its authority to enter into, and its ability to perform its
obligations under, the related Agreement. A breach of any such representation
of
the Master Servicer which materially and adversely affects the interests of
the

Certificateholders and which continues unremedied for the number of days
specified in the Agreement after the giving of written notice of such breach
to
the Master Servicer by the Trustee or the Depositor, or to the Master
Servicer,
the Depositor and the Trustee by the holders of Certificates evidencing not
less
than 25% of the Voting Rights (unless otherwise specified in the related
Prospectus Supplement), will constitute an Event of Default under such
Pooling
and Servicing Agreement. See "Events of Default" and "Rights Upon Event of
Default".

COLLECTION ACCOUNT AND RELATED ACCOUNTS

General

        The Master Servicer and/or the Trustee will, as to each Trust Fund,
establish and maintain or cause to be established and maintained one or more
separate accounts for the collection of payments on the related Assets
(collectively, the "Collection Account"), which must be either

        (i)     an account or accounts the deposits in which are insured by the
                Federal Deposit Insurance Corporation ("FDIC") (to the limits
                established by the FDIC) and, if so specified in the related
                Prospectus Supplement, the uninsured deposits in which are
otherwise
                secured such that the Trustee have a claim with respect to the
funds
                in the Collection Account or a perfected first priority security
                interest against any collateral securing such funds that is
superior
                to the claims of any other depositors or general creditors of the
                institution with which the Collection Account is maintained or

                                      39
<PAGE>

        (ii)    otherwise maintained with a bank or trust company, and in a
manner,
                satisfactory to the Rating Agency or Agencies rating any class
of
                Securities of such series.

        The collateral eligible to secure amounts in the Collection Account is
limited to United States government securities and other investment grade
obligations specified in the Agreement ("Permitted Investments"). A
Collection
Account may be maintained as an interest bearing or a non-interest bearing
account and the funds held therein may be invested pending each succeeding
Distribution Date in certain short-term Permitted Investments. Unless
otherwise
provided in the related Prospectus Supplement, any interest or other income
earned on funds in the Collection Account will be paid to a Master Servicer
or
its designee as additional servicing compensation. The Collection Account may
be

maintained with an institution that is an affiliate of the Master Servicer, if
applicable, provided that such institution meets the standards imposed by the
Rating Agency or Agencies. If permitted by the Rating Agency or Agencies and so
specified in the related Prospectus Supplement, a Collection Account may contain
funds relating to more than one series of mortgage pass-through certificates and
may contain other funds respecting payments on mortgage loans belonging to the
Master Servicer or serviced or master serviced by it on behalf of others.

Deposits

     A Master Servicer or the Trustee will deposit or cause to be deposited in
the Collection Account for one or more Trust Funds on a daily basis, unless
otherwise provided in the related Agreement, the following payments and
collections received, or advances made, by the Master Servicer or the Trustee or
on its behalf subsequent to the Cut-off Date (other than payments due on or
before the Cut-off Date, and exclusive of any amounts representing a Retained
Interest):

     (i)     all payments on account of principal, including principal
             prepayments, on the Assets;

     (ii)    all payments on account of interest on the Assets, including any
             default interest collected, in each case net of any portion
             thereof retained by a Master Servicer or a Sub-Servicer as its
             servicing compensation and net of any Retained Interest;

     (iii)   all proceeds of the hazard insurance policies to be maintained in
             respect of each Mortgaged Property securing a Whole Loan in the
             Trust Fund (to the extent such proceeds are not applied to the
             restoration of the property or released to the mortgagor in
             accordance with the normal servicing procedures of a Master
             Servicer or the related Sub-Servicer, subject to the terms and
             conditions of the related Mortgage and Mortgage Note)
             (collectively, "Insurance Proceeds") and all other amounts
             received and retained in connection with the liquidation of
             defaulted Mortgage Loans in the Trust Fund, by foreclosure or
             otherwise ("Liquidation Proceeds"), together with the net
             proceeds on a monthly basis with respect to any Mortgaged
             Properties acquired for the benefit of Securityholders by
             foreclosure or by deed in lieu of foreclosure or otherwise;

     (iv)    any amounts paid under any instrument or drawn from any fund that
             constitutes Credit Support for the related series of Securities as
             described under "Description of Credit Support";

(v)       any advances made as described under "Description of the
                  Securities--Advances in Respect of Delinquencies";

        (vi)      any amounts paid under any Cash Flow Agreement, as described
under
                  "Description of the Trust Funds--Cash Flow Agreements";

        (vii)     all proceeds of any Asset or, with respect to a Whole Loan,
                  property acquired in respect thereof purchased by the
Depositor,
                  any Asset Seller or any other specified person as described
under
                  "Assignment of Assets; Repurchases" and "Representations and
                  Warranties; Repurchases," all proceeds of any defaulted
Mortgage
                  Loan purchased as described under "Realization Upon Defaulted
                  Whole Loans," and all proceeds of any Asset

                                      40
<PAGE>

                  purchased as described under "Description of the
                  Securities--Termination" (also, "Liquidation Proceeds");

        (viii)    any amounts paid by a Master Servicer to cover certain
interest
                  shortfalls arising out of the prepayment of Whole Loans in the
                  Trust Fund as described under "Description of the
                  Agreements--Retained Interest; Servicing Compensation and
Payment
                  of Expenses";

        (ix)      to the extent that any such item does not constitute additional
                  servicing compensation to a Master Servicer, any payments on
                  account of modification or assumption fees, late payment
charges
                  or prepayment premiums on the Mortgage Assets;

        (x)       all payments required to be deposited in the Collection Account
                  with respect to any deductible clause in any blanket insurance
                  policy described under "Hazard Insurance Policies";

        (xi)      any amount required to be deposited by a Master Servicer or the
                  Trustee in connection with losses realized on investments for
the
                  benefit of the Master Servicer or the Trustee, as the case may
be,
                  of funds held in the Collection Account; and

        (xii)     any other amounts required to be deposited in the Collection
                  Account as provided in the related Agreement and described in
the
                  related Prospectus Supplement.

Withdrawals

A Master Servicer or the Trustee may, from time to time, unless otherwise
specified in the related Prospectus Supplement or the related Agreement, make
withdrawals from the Collection Account for each Trust Fund for any of the
following purposes:

    (i)      to make distributions to the Securityholders on each Distribution
Date;

    (ii)      to reimburse a Master Servicer for unreimbursed amounts advanced
as described under "Description of the Securities--Advances in
Respect of Delinquencies," such reimbursement to be made out of
amounts received which were identified and applied by the Master
Servicer as late collections of interest (net of related
servicing fees and Retained Interest) on and principal of the
particular Whole Loans with respect to which the advances were
made or out of amounts drawn under any form of Credit Support
with respect to such Whole Loans;

    (iii)      to reimburse a Master Servicer for unpaid servicing fees earned
and certain unreimbursed servicing expenses incurred with
respect to Whole Loans and properties acquired in respect
thereof, such reimbursement to be made out of amounts that
represent Liquidation Proceeds and Insurance Proceeds collected
on the particular Whole Loans and properties, and net income
collected on the particular properties, with respect to which
such fees were earned or such expenses were incurred or out of
amounts drawn under any form of Credit Support with respect to
such Whole Loans and properties;

    (iv)      to reimburse a Master Servicer for any advances described in
clause (ii) above and any servicing expenses described in clause
(iii) above which, in the Master Servicer's good faith judgment,
will not be recoverable from the amounts described in clauses
(ii) and (iii), respectively, such reimbursement to be made from
amounts collected on other Assets or, if and to the extent so
provided by the related Agreement and described in the related
Prospectus Supplement, just from that portion of amounts
collected on other Assets that is otherwise distributable on one
or more classes of Subordinate Securities, if any remain
outstanding, and otherwise any outstanding class of Securities,
of the related series;

<PAGE>

       (v)        if and to the extent described in the related Prospectus Supplement, to pay a Master Servicer interest accrued on the advances described in clause (ii) above and the servicing expenses described in clause (iii) above while such remain outstanding and unreimbursed;

       (vi)       to reimburse a Master Servicer, the Depositor, or any of their respective directors, officers, employees and agents, as the case

                      may be, for certain expenses, costs and liabilities incurred thereby, as and to the extent described under "Certain Matters Regarding a Master Servicer and the Depositor";

       (vii)     if and to the extent described in the related Prospectus Supplement, to pay (or to transfer to a separate account for purposes of escrowing for the payment of) the Trustee's fees;

       (viii)    to reimburse the Trustee or any of its directors, officers, employees and agents, as the case may be, for certain expenses,

                      costs and liabilities incurred thereby, as and to the extent described under "Certain Matters Regarding the Trustee";

       (ix)       unless otherwise provided in the related Prospectus Supplement, to pay a Master Servicer, as additional servicing compensation, interest and investment income earned in respect of amounts held

                      in the Collection Account;

       (x)        to pay the person entitled thereto any amounts deposited in the

                      Collection Account that were identified and applied by the Master

                      Servicer as recoveries of Retained Interest;

       (xi)       to pay for costs reasonably incurred in connection with the proper management and maintenance of any Mortgaged Property acquired for the benefit of Securityholders by foreclosure or by

                      deed in lieu of foreclosure or otherwise, such payments to be made out of income received on such property;

       (xii)     if one or more elections have been made to treat the Trust Fund

                      or designated portions thereof as a REMIC, to pay any federal, state or local taxes imposed on the Trust Fund or its assets or

                      transactions, as and to the extent described under "Material Federal Income Tax Consequences--REMICs--Prohibited Transactions

                      Tax and Other Taxes";

       (xiii)    to pay for the cost of an independent appraiser or other expert

in real estate matters retained to determine a fair sale price
for a defaulted Whole Loan or a property acquired in respect or
thereof in connection with the liquidation of such Whole Loan
property;

(xiv)    to pay for the cost of various opinions of counsel obtained
pursuant to the related Agreement for the benefit of
Securityholders;

(xv)    to pay for the costs of recording the related Agreement if such
recordation materially and beneficially affects the interests of
Securityholders, provided that such payment shall not constitute
a waiver with respect to the obligation of the Warranting Party
to remedy any breach of representation or warranty under the
Agreement;

(xvi)    to pay the person entitled thereto any amounts deposited in the
Collection Account in error, including amounts received on any
Asset after its removal from the Trust Fund whether by reason of
purchase or substitution as contemplated by "Assignment of
Assets; Repurchase" and "Representations and Warranties;
Repurchases" or otherwise;

(xvii)    to make any other withdrawals permitted by the related
Agreement; and

(xviii)    to clear and terminate the Collection Account at the termination
of the Trust Fund.

Other Collection Accounts

    Notwithstanding the foregoing, if so specified in the related Prospectus
Supplement, the Agreement for any series of Securities may provide for the
establishment and maintenance of a separate collection account into which the
Master Servicer or any related Sub-Servicer will deposit on a daily basis the
amounts described under "--Deposits" above for one or more series of
Securities.
Any amounts on deposit

<PAGE>

in any such collection account will be withdrawn therefrom and deposited into
the appropriate Collection Account by a time specified in the related Prospectus
Supplement. To the extent specified in the related Prospectus Supplement, any

amounts which could be withdrawn from the Collection Account as described under
"--Withdrawals" above, may also be withdrawn from any such collection account. The Prospectus Supplement will set forth any restrictions with respect to any such collection account, including investment restrictions and any restrictions
with respect to financial institutions with which any such collection account may be maintained.

COLLECTION AND OTHER SERVICING PROCEDURES

     The Master Servicer, directly or through Sub-Servicers, is required to make reasonable efforts to collect all scheduled payments under the Whole Loans
and will follow or cause to be followed such collection procedures as it would
follow with respect to mortgage loans that are comparable to the Whole Loans and
held for its own account, provided such procedures are consistent with:

     (i)    the terms of the related Agreement and any related hazard insurance
            policy or instrument of Credit Support, if any, included in the
            related Trust Fund described herein or under "Description of Credit
            Support,"

     (ii)   applicable law and

     (iii)  the general servicing standard specified in the related Prospectus
            Supplement or, if no such standard is so specified, its normal
            servicing practices (in either case, the "Servicing Standard").

In connection therewith, the Master Servicer will be permitted in its discretion
to waive any late payment charge or penalty interest in respect of a late payment on a Whole Loan.

     Each Master Servicer will also be required to perform other customary functions of a servicer of comparable loans, including maintaining hazard insurance policies as described herein and in any related Prospectus Supplement,
and filing and settling claims thereunder; maintaining escrow or impoundment accounts of mortgagors for payment of taxes, insurance and other items required
to be paid by any mortgagor pursuant to a Whole Loan; processing assumptions or
substitutions in those cases where the Master Servicer has determined not to enforce any applicable due-on-sale clause; attempting to cure delinquencies; supervising foreclosures or repossessions; inspecting and managing Mortgaged Properties under certain circumstances; and maintaining accounting records relating to the Whole Loans. Unless otherwise specified in the related Prospectus Supplement, the Master Servicer will be responsible for filing and settling claims in respect of particular Whole Loans under any applicable instrument of Credit Support. See "Description of Credit Support."

The Master Servicer may agree to modify, waive or amend any term of any Whole Loan in a manner consistent with the Servicing Standard so long as the modification, waiver or amendment will not affect the amount or timing of any scheduled payments of principal or interest on the Whole Loan or, in its judgment, materially impair the security for the Whole Loan or reduce the likelihood of timely payment of amounts due thereon. The Master Servicer also may agree to any modification, waiver or amendment that would so affect or impair the payments on, or the security for, a Whole Loan if, unless otherwise
provided in the related Prospectus Supplement, in its judgment, a material default on the Whole Loan has occurred or a payment default is imminent, and in
its judgment, such modification, waiver or amendment is reasonably likely to produce a greater recovery with respect to the Whole Loan on a present value basis than would liquidation. The Master Servicer is required to notify the Trustee in the event of any modification, waiver or amendment of any Whole Loan.

SUB-SERVICERS

A Master Servicer may delegate its servicing obligations in respect of the
Whole Loans to third-party servicers (each, a "Sub-Servicer"), but such Master
Servicer will remain obligated under the related Agreement. Each sub-servicing
agreement between a Master Servicer and a Sub-Servicer (a "Sub-

<PAGE>

Servicing Agreement") must be consistent with the terms of the related Agreement
and must provide that, if for any reason the Master Servicer for the related series of Securities is no longer acting in such capacity, the Trustee or any successor Master Servicer may assume the Master Servicer's rights and obligations under such Sub-Servicing Agreement.

Unless otherwise provided in the related Prospectus Supplement, the Master
Servicer will be solely liable for all fees owed by it to any Sub-Servicer, irrespective of whether the Master Servicer's compensation pursuant to the related Agreement is sufficient to pay such fees. However, a Sub-Servicer may be
entitled to a Retained Interest in certain Whole Loans. Each Sub-Servicer will
be reimbursed by the Master Servicer for certain expenditures which it makes, generally to the same extent the Master Servicer would be reimbursed under an Agreement. See "Retained Interest; Servicing Compensation and Payment of Expenses."

REALIZATION UPON DEFAULTED WHOLE LOANS

Unless otherwise provided in the related Prospectus Supplement, the Master
Servicer is required to monitor any Whole Loan which is in default, initiate corrective action in cooperation with the mortgagor or obligor if cure is

likely, inspect the Mortgaged Property and take such other actions as are consistent with the Servicing Standard. A significant period of time may elapse
before the Master Servicer is able to assess the success of such corrective action or the need for additional initiatives.

Any Agreement relating to a Trust Fund that includes Whole Loans may grant
to the Master Servicer and/or the holder or holders of certain classes of Securities a right of first refusal to purchase from the Trust Fund at a predetermined purchase price any such Whole Loan as to which a specified number
of scheduled payments thereunder are delinquent. Any such right granted to the
holder of an Offered Security will be described in the related Prospectus Supplement. The related Prospectus Supplement will also describe any such right
granted to any person if the predetermined purchase price is less than the Purchase Price described under "Representations and Warranties; Repurchases."

If so specified in the related Prospectus Supplement, the Master Servicer
may offer to sell any defaulted Whole Loan described in the preceding paragraph
and not otherwise purchased by any person having a right of first refusal with
respect thereto, if and when the Master Servicer determines, consistent with the
Servicing Standard, that such a sale would produce a greater recovery on a present value basis than would liquidation through foreclosure, repossession or
similar proceedings. The related Agreement will provide that any such offering
be made in a commercially reasonable manner for a specified period and that the
Master Servicer accept the highest cash bid received from any person (including
itself, an affiliate of the Master Servicer or any Securityholder) that constitutes a fair price for such defaulted Whole Loan. In the absence of any bid determined in accordance with the related Agreement to be fair, the Master
Servicer shall proceed with respect to such defaulted Mortgage Loan as described
below. Any bid in an amount at least equal to the Purchase Price described under
"Representations and Warranties; Repurchases" will in all cases be deemed fair.

The Master Servicer, on behalf of the Trustee, may at any time institute
foreclosure proceedings, exercise any power of sale contained in any mortgage, obtain a deed in lieu of foreclosure, or otherwise acquire title to a Mortgaged
Property securing a Whole Loan by operation of law or otherwise, if such action
is consistent with the Servicing Standard and a default on such Whole Loan has

occurred or, in the Master Servicer's judgment, is imminent.

Unless otherwise provided in the related Prospectus Supplement, if title
to any Mortgaged Property is acquired by a Trust Fund as to which a REMIC
election has been made, the Master Servicer, on behalf of the Trust Fund, will
be required to sell the Mortgaged Property within three years of acquisition,
unless the Internal Revenue Service grants an extension of time to sell such
property, or unless the Trustee receives an opinion of independent counsel to
the effect that the holding of the property by the Trust Fund subsequent to
three years after its acquisition will not result in the imposition of a tax on
the Trust Fund or cause the Trust Fund to fail to qualify as a REMIC under the
Code at any time that any Security is outstanding. Subject to the foregoing, the
Master Servicer will be required to solicit bids for any

<PAGE>

Mortgaged Property so acquired in such a manner as will be reasonably likely to
realize a fair price for such property and accept the first (and, if multiple
bids are contemporaneously received, the highest) cash bid received from any
person that constitutes a fair price.

The limitations imposed by the related Agreement and the REMIC provisions
of the Code (if a REMIC election has been made with respect to the related Trust
Fund) on the ownership and management of any Mortgaged Property acquired on
behalf of the Trust Fund may result in the recovery of an amount less than the
amount that would otherwise be recovered. See "Certain Legal Aspects of Mortgage
Loans--Foreclosure."

If recovery on a defaulted Whole Loan under any related instrument of
Credit Support is not available, the Master Servicer nevertheless will be
obligated to follow or cause to be followed such normal practices and procedures
as it deems necessary or advisable to realize upon the defaulted Whole Loan. If
the proceeds of any liquidation of the property securing the defaulted Whole
Loan are less than the outstanding principal balance of the defaulted Whole Loan
plus interest accrued thereon at the Mortgage Rate, as applicable, plus the
aggregate amount of expenses incurred by the Master Servicer in connection with
such proceedings and which are reimbursable under the Agreement, the Trust Fund
will realize a loss in the amount of such difference. The Master Servicer will
be entitled to withdraw or cause to be withdrawn from the Collection Account out

of the Liquidation Proceeds recovered on any defaulted Whole Loan, prior to the
distribution of such Liquidation Proceeds to Securityholders, amounts
representing its normal servicing compensation on the Whole Loan, unreimbursed
servicing expenses incurred with respect to the Whole Loan and any unreimbursed
advances of delinquent payments made with respect to the Whole Loan.

If any property securing a defaulted Whole Loan is damaged, the Master
Servicer is not required to expend its own funds to restore the damaged property
unless it determines (i) that such restoration will increase the proceeds to
Securityholders on liquidation of the Whole Loan after reimbursement of the
Master Servicer for its expenses and (ii) that such expenses will be recoverable
by it from related Insurance Proceeds or Liquidation Proceeds.

As servicer of the Whole Loans, a Master Servicer, on behalf of itself,
the Trustee and the Securityholders, will present claims to the obligor under
each instrument of Credit Support, and will take such reasonable steps as are
necessary to receive payment or to permit recovery thereunder with respect to
defaulted Whole Loans.

If a Master Servicer or its designee recovers payments under any
instrument of Credit Support with respect to any defaulted Whole Loan, the
Master Servicer will be entitled to withdraw or cause to be withdrawn from the
Collection Account out of such proceeds, prior to distribution thereof to
Certificateholders, amounts representing its normal servicing compensation on
such Whole Loan, unreimbursed servicing expenses incurred with respect to the
Whole Loan and any unreimbursed advances of delinquent payments made with
respect to the Whole Loan. See "Hazard Insurance Policies" and "Description of
Credit Support."

PRIMARY MORTGAGE INSURANCE POLICIES

The Master Servicer will maintain or cause to be maintained, as the case
may be and as permitted by law, in full force and effect, to the extent
specified in the prospectus supplement, a primary mortgage insurance policy
(each, a "Primary Mortgage Insurance Policy") with regard to each Whole Loan for
which that coverage is required. Unless required by law, the Master Servicer
will not cancel or refuse to renew any Primary Mortgage Insurance Policy in
effect at the time of the initial issuance of a series of securities that is
required to be kept in force under the applicable Agreement unless the
replacement Primary Mortgage Insurance Policy for the cancelled or nonrenewed
policy is maintained with an insurer whose claims-paying ability is sufficient
to maintain the current rating of the classes of securities of that series that
have been rated.

<PAGE>

Although the terms and conditions of primary mortgage insurance vary, the
amount of a claim for benefits under a Primary Mortgage Insurance Policy
covering a mortgage loan will consist of the insured percentage of the unpaid
principal amount of the covered loan and accrued and unpaid interest on the
Whole Loan and reimbursement of certain expenses, less:

- all rents or other payments collected or received by the insured (other
  than the proceeds of hazard insurance) that are derived from or in any
  way related to the property;

- hazard insurance proceeds in excess of the amount required to restore
  the property and which have not been applied to the payment of the Whole
  Loan;

- amounts expended but not approved by the insurer of the related primary
  mortgage insurance policy;

- claim payments previously made by the insurer; and

- unpaid premiums.

Primary Mortgage Insurance Policies reimburse certain losses sustained by
reason of default in payments by borrowers. Primary Mortgage Insurance Policies
will not insure against, and exclude from coverage, losses sustained by reason
of a default arising from or involving certain matters, including:

- fraud or negligence in origination or servicing of the Whole Loans,
  including misrepresentation by the originator, mortgagor (or obligor) or
  other persons involved in the origination of the Whole Loan;

- failure to construct the property subject to the Whole Loan in
  accordance with specified plans;

- physical damage to the property; and

- the related Master Servicer not being approved as a Master Servicer by
  the insurer.

Evidence of each Primary Mortgage Insurance Policy will be provided to the
Trustee simultaneously with the transfer to the Trustee of the Whole Loan. The
Master Servicer, on behalf of itself, the Trustee and the securityholders, is
required to present claims to the insurer under any Primary Mortgage Insurance
Policy and to take reasonable steps that are necessary to permit recovery

thereunder with respect to defaulted Whole Loans. Amounts collected by the
Master Servicer on behalf of itself, the Trustee and the securityholders
shall
be deposited in the related Collection Account for distribution as set forth
above.

HAZARD INSURANCE POLICIES

    Unless otherwise specified in the related Prospectus Supplement, each
Agreement for a Trust Fund comprised of Whole Loans will require the Master
Servicer to cause the mortgagor on each Whole Loan to maintain a hazard
insurance policy providing for such coverage as is required under the related
mortgage or, if any mortgage permits the holder thereof to dictate to the
mortgagor the insurance coverage to be maintained on the related Mortgaged
Property, then such coverage as is consistent with the Servicing Standard.
Unless otherwise specified in the related Prospectus Supplement, such
coverage
will be in general in an amount equal to the lesser of the principal balance
owing on such Whole Loan and the amount necessary to fully compensate for any
damage or loss to the improvements on the Mortgaged Property on a replacement
cost basis, but in either case not less than the amount necessary to avoid
the
application of any co-insurance clause contained in the hazard insurance
policy.
The ability of the Master Servicer to assure that hazard insurance proceeds
are
appropriately applied may be dependent upon its being named as an additional
insured under any hazard insurance policy and under any other insurance
policy
referred to below, or upon the extent to which information in this regard is
furnished by mortgagors. All amounts collected by the Master Servicer under
any
such policy (except for amounts to be applied to the restoration or repair of
the Mortgaged Property or released to the mortgagor in accordance with the
Master Servicer's normal servicing procedures, subject to the terms and
conditions of the related mortgage and Mortgage Note) will be deposited in
the
Collection Account. The Agreement will provide that the

<PAGE>

Master Servicer may satisfy its obligation to cause each mortgagor to
maintain
such a hazard insurance policy by the Master Servicer's maintaining a blanket
policy insuring against hazard losses on the Whole Loans. If such blanket
policy
contains a deductible clause, the Master Servicer will be required to deposit
in
the Collection Account all sums that would have been deposited therein but
for
such clause.

    In general, the standard form of fire and extended coverage policy
covers
physical damage to or destruction of the improvements on the property by fire,
lightning, explosion, smoke, windstorm and hail, and riot, strike and civil

commotion, subject to the conditions and exclusions specified in each policy.
Although the policies relating to the Whole Loans will be underwritten by
different insurers under different state laws in accordance with different
applicable state forms, and therefore will not contain identical terms and
conditions, the basic terms thereof are dictated by respective state laws,
and
most such policies typically do not cover any physical damage resulting from
war, revolution, governmental actions, floods and other water-related causes,
earth movement (including earthquakes, landslides and mudflows), wet or dry
rot,
vermin, domestic animals and certain other kinds of uninsured risks.

        The hazard insurance policies covering the Mortgaged Properties
securing
the Whole Loans will typically contain a co-insurance clause that in effect
requires the insured at all times to carry insurance of a specified
percentage
(generally 80% to 90%) of the full replacement value of the improvements on
the
property in order to recover the full amount of any partial loss. If the
insured's coverage falls below this specified percentage, such clause
generally
provides that the insurer's liability in the event of partial loss does not
exceed the lesser of (i) the replacement cost of the improvements less
physical
depreciation and (ii) such proportion of the loss as the amount of insurance
carried bears to the specified percentage of the full replacement cost of
such
improvements.

        Each Agreement for a Trust Fund comprised of Whole Loans will require
the
Master Servicer to cause the mortgagor on each Whole Loan to maintain all
such
other insurance coverage with respect to the related Mortgaged Property as is
consistent with the terms of the related mortgage and the Servicing Standard,
which insurance may typically include flood insurance (if the related
Mortgaged
Property was located at the time of origination in a federally designated
flood
area).

        Any cost incurred by the Master Servicer in maintaining any such
insurance
policy will be added to the amount owing under the Mortgage Loan where the
terms
of the Mortgage Loan so permit; provided, however, that the addition of such
cost will not be taken into account for purposes of calculating the
distribution
to be made to Certificateholders. Such costs may be recovered by the Master
Servicer or Sub-Servicer, as the case may be, from the Collection Account,
with
interest thereon, as provided by the Agreement.

        Under the terms of the Whole Loans, mortgagors will generally be
required

to present claims to insurers under hazard insurance policies maintained on the
related Mortgaged Properties. The Master Servicer, on behalf of the Trustee and
Certificateholders, is obligated to present or cause to be presented claims
under any blanket insurance policy insuring against hazard losses on Mortgaged
Properties securing the Whole Loans. However, the ability of the Master Servicer
to present or cause to be presented such claims is dependent upon the extent to
which information in this regard is furnished to the Master Servicer by
mortgagors.

FIDELITY BONDS AND ERRORS AND OMISSIONS INSURANCE

        Unless otherwise specified in the related Prospectus Supplement, each
Agreement will require that the Master Servicer obtain and maintain in effect a
fidelity bond or similar form of insurance coverage (which may provide blanket
coverage) or any combination thereof insuring against loss occasioned by fraud,
theft or other intentional misconduct of the officers, employees and agents of
the Master Servicer. The related Agreement will allow the Master Servicer to
self-insure against loss occasioned by the errors and omissions of the officers,
employees and agents of the Master Servicer so long as certain criteria set
forth in the Agreement are met.

<PAGE>

DUE-ON-SALE PROVISIONS

        The Whole Loans may contain clauses requiring the consent of the mortgagee
to any sale or other transfer of the related Mortgaged Property, or due-on-sale
clauses entitling the mortgagee to accelerate payment of the Whole Loan upon any
sale, transfer or conveyance of the related Mortgaged Property. Unless otherwise
provided in the related Prospectus Supplement, the Master Servicer will
generally enforce any due-on-sale clause to the extent it has knowledge of the
conveyance or proposed conveyance of the underlying Mortgaged Property and it is
entitled to do so under applicable law; provided, however, that the Master
Servicer will not take any action in relation to the enforcement of any
due-on-sale provision which would adversely affect or jeopardize coverage under
any applicable insurance policy. Unless otherwise specified in the related
Prospectus Supplement, any fee collected by or on behalf of the Master Servicer
for entering into an assumption agreement will be retained by or on behalf of

the Master Servicer as additional servicing compensation.

RETAINED INTEREST; SERVICING COMPENSATION AND PAYMENT OF EXPENSES

     The Prospectus Supplement for a series of Certificates will specify
whether there will be any Retained Interest in the Assets, and, if so, the
initial owner thereof. If so, the Retained Interest will be established on a
loan-by-loan basis and will be specified on an exhibit to the related
Agreement.
A "Retained Interest" in an Asset represents a specified portion of the
interest
payable thereon. The Retained Interest will be deducted from mortgagor
payments
as received and will not be part of the related Trust Fund.

     Unless otherwise specified in the related Prospectus Supplement, the
Master Servicer's and a Sub-Servicer's primary servicing compensation with
respect to a series of Securities will come from the periodic payment to it
of a
portion of the interest payment on each Asset. Since any Retained Interest
and a
Master Servicer's primary compensation are percentages of the principal
balance
of each Asset, such amounts will decrease in accordance with the amortization
of
the Assets. The Prospectus Supplement with respect to a series of Securities
evidencing interests in a Trust Fund that includes Whole Loans may provide
that,
as additional compensation, the Master Servicer or the Sub-Servicers may
retain
all or a portion of assumption fees, modification fees, late payment charges
or
Prepayment Premiums collected from mortgagors and any interest or other
income
which may be earned on funds held in the Collection Account or any account
established by a Sub-Servicer pursuant to the Agreement.

     The Master Servicer may, to the extent provided in the related
Prospectus
Supplement, pay from its servicing compensation certain expenses incurred in
connection with its servicing and managing of the Assets, including, without
limitation, payment of the fees and disbursements of the Trustee and
independent
accountants, payment of expenses incurred in connection with distributions
and
reports to Securityholders, and payment of any other expenses described in
the
related Prospectus Supplement. Certain other expenses, including certain
expenses relating to defaults and liquidations on the Whole Loans and, to the
extent so provided in the related Prospectus Supplement, interest thereon at
the
rate specified therein may be borne by the Trust Fund.

     If and to the extent provided in the related Prospectus Supplement, the
Master Servicer may be required to apply a portion of the servicing
compensation
otherwise payable to it in respect of any Due Period to certain interest

shortfalls resulting from the voluntary prepayment of any Whole Loans in the related Trust Fund during such period prior to their respective due dates therein.

EVIDENCE AS TO COMPLIANCE

Each Agreement relating to Assets which include Whole Loans will provide
that on or before a specified date in each year, beginning with the first such
date at least six months after the related Cut-off Date, a firm of independent
public accountants will furnish a statement to the Trustee to the effect that,
on the basis of the examination by such firm conducted substantially in
compliance with either the Uniform Single Attestation Program for Mortgage
Bankers, the Audit Program for mortgages serviced for Freddie Mac or such other
audit or attestation program used by the Master Servicer, the servicing by or

48

<PAGE>

on behalf of the Master Servicer of mortgage loans under agreements
substantially similar to each other (including the related Agreement) was
conducted in compliance with the terms of such agreements or such program except
for any significant exceptions or errors in records that, in the opinion of the
firm, either the Audit Program for mortgages serviced for Freddie Mac, or
paragraph 4 of the Uniform Single Attestation Program for Mortgage Bankers, or
such other audit or attestation program requires it to report. In rendering its
statement such firm may rely, as to matters relating to the direct servicing of
mortgage loans by Sub-Servicers, upon comparable statements for examinations
conducted substantially in compliance with the Uniform Single Attestation
Program for Mortgage Bankers or the Audit Program for mortgages serviced for
Freddie Mac or such other audit or attestation program used by such Sub-
Servicer
(rendered within one year of such statement) of firms of independent public
accountants with respect to the related Sub-Servicer.

Each such Agreement will also provide for delivery to the Trustee, on or
before a specified date in each year, of an annual statement signed by two
officers of the Master Servicer to the effect that the Master Servicer has
fulfilled its obligations under the Agreement throughout the preceding calendar
year or other specified twelve-month period.

Unless otherwise provided in the related Prospectus Supplement, copies of
such annual accountants' statement and such statements of officers will be
obtainable by Securityholders without charge upon written request to the Master
Servicer at the address set forth in the related Prospectus Supplement.

CERTAIN MATTERS REGARDING A MASTER SERVICER AND THE DEPOSITOR

        The Master Servicer, if any, or a servicer for substantially all the
Whole
Loans under each Agreement will be named in the related Prospectus Supplement.
The entity serving as Master Servicer (or as such servicer) may be an
affiliate
of the Depositor and may have other normal business relationships with the
Depositor or the Depositor's affiliates. Reference herein to the Master
Servicer
shall be deemed to be to the servicer of substantially all of the Whole Loans.

        Unless otherwise specified in the related Prospectus Supplement, the
related Agreement will provide that the Master Servicer may resign from its
obligations and duties thereunder only upon a determination that its duties
under the Agreement are no longer permissible under applicable law or are in
material conflict by reason of applicable law with any other activities
carried
on by it, the other activities of the Master Servicer so causing such a
conflict
being of a type and nature carried on by the Master Servicer at the date of
the
Agreement. No such resignation will become effective until the Trustee or a
successor servicer has assumed the Master Servicer's obligations and duties
under the Agreement.

        Unless otherwise specified in the related Prospectus Supplement, each
Agreement will further provide that neither any Master Servicer, the
Depositor
nor any director, officer, employee, or agent of a Master Servicer or the
Depositor will be under any liability to the related Trust Fund or
Securityholders for any action taken, or for refraining from the taking of
any
action, in good faith pursuant to the Agreement; provided, however, that
neither
a Master Servicer, the Depositor nor any such person will be protected
against
any breach of a representation, warranty or covenant made in such Agreement,
or
against any liability specifically imposed thereby, or against any liability
which would otherwise be imposed by reason of willful misfeasance, bad faith
or
gross negligence in the performance of obligations or duties thereunder or by
reason of reckless disregard of obligations and duties thereunder.

        Unless otherwise specified in the related Prospectus Supplement, each
Agreement will further provide that any Master Servicer, the Depositor and
any
director, officer, employee or agent of a Master Servicer or the Depositor
will
be entitled to indemnification by the related Trust Fund and will be held
harmless against any loss, liability or expense incurred in connection with
any
legal action relating to the Agreement or the Securities; provided, however,
that such indemnification will not extend to any loss, liability or expense:

(i)     specifically imposed by such Agreement or otherwise incidental
to
                the performance of obligations and duties thereunder, including,
                in the case of a Master Servicer, the

<PAGE>

                prosecution of an enforcement action in respect of any specific
                Whole Loan or Whole Loans (except as any such loss, liability
or
                expense shall be otherwise reimbursable pursuant to such
                Agreement);

        (ii)    incurred in connection with any breach of a representation,
                warranty or covenant made in such Agreement;

        (iii)   incurred by reason of misfeasance, bad faith or gross
negligence
                in the performance of obligations or duties thereunder, or by
                reason of reckless disregard of such obligations or duties;

        (iv)    incurred in connection with any violation of any state or
federal
                securities law; or

        (v)     imposed by any taxing authority if such loss, liability or
expense
                is not specifically reimbursable pursuant to the terms of the
                related Agreement.

        In addition, each Agreement will provide that neither any Master
Servicer
nor the Depositor will be under any obligation to appear in, prosecute or
defend
any legal action which is not incidental to its respective responsibilities
under the Agreement and which in its opinion may involve it in any expense or
liability. Any such Master Servicer or the Depositor may, however, in its
discretion undertake any such action which it may deem necessary or desirable
with respect to the Agreement and the rights and duties of the parties
thereto
and the interests of the Securityholders thereunder. In such event, the legal
expenses and costs of such action and any liability resulting therefrom will
be
expenses, costs and liabilities of the Securityholders, and the Master
Servicer
or the Depositor, as the case may be, will be entitled to be reimbursed
therefor
and to charge the Collection Account.

        Any person into which the Master Servicer or the Depositor may be
merged
or consolidated, or any person resulting from any merger or consolidation to
which the Master Servicer or the Depositor is a party, or any person
succeeding
to the business of the Master Servicer or the Depositor, will be the
successor

of the Master Servicer or the Depositor, as the case may be, under the related
Agreement.

EVENTS OF DEFAULT UNDER THE AGREEMENT

Unless otherwise provided in the related Prospectus Supplement, Events of
Default under the related Agreement will include:

(i)     any failure by the Master Servicer to distribute or cause to be
        distributed to Securityholders, or to remit to the Trustee or
        Indenture Trustee, as applicable, for distribution to
        Securityholders, any required payment that continues after a grace
        period, if any;

(ii)    any failure by the Master Servicer duly to observe or perform in
        any material respect any of its other covenants or obligations
        under the Agreement which continues unremedied for thirty days (or
        such other period specified in the related Prospectus Supplement)
        after written notice of such failure has been given to the Master
        Servicer by the Trustee or the Depositor, or to the Master
        Servicer, the Depositor and the Trustee by the holders of
        Securities evidencing not less than 25% of the Voting Rights;

(iii)   any breach of a representation or warranty made by the Master
        Servicer under the Agreement which materially and adversely
        affects the interests of Securityholders and which continues
        unremedied for thirty days (or such longer period specified in the
        related Prospectus Supplement) after written notice of such breach
        has been given to the Master Servicer by the Trustee or the
        Depositor, or to the Master Servicer, the Depositor and the
        Trustee by the holders of Securities evidencing not less than 25%
        of the Voting Rights; and

(iv)    certain events of insolvency, readjustment of debt, marshalling of
        assets and liabilities or similar proceedings and certain actions
        by or on behalf of the Master Servicer indicating its insolvency or
        inability to pay its obligations.

                                       50
<PAGE>

Material variations to the foregoing Events of Default (other than to shorten
cure periods or eliminate notice requirements) will be specified in the related

Prospectus Supplement. Unless otherwise specified in the related Prospectus
Supplement, the Trustee shall, not later than the later of 60 days after the
occurrence of any event which constitutes or, with notice or lapse of time or
both, would constitute an Event of Default and five days after certain
officers
of the Trustee become aware of the occurrence of such an event, transmit by
mail
to the Depositor and all Securityholders of the applicable series notice of
such
occurrence, unless such default shall have been cured or waived.

        The manner of determining the "Voting Rights" of a Security or class or
classes of Securities will be specified in the related Prospectus Supplement.

RIGHTS UPON EVENT OF DEFAULT UNDER THE AGREEMENT

        So long as an Event of Default under an Agreement remains unremedied,
the
Depositor or the Trustee may, and at the direction of holders of Securities
evidencing not less than 51% (or such other percentage specified in the
related
Prospectus Supplement) of the Voting Rights, the Trustee shall, terminate all
of
the rights and obligations of the Master Servicer under the Agreement and in
and
to the Mortgage Loans (other than as a Securityholder or as the owner of any
Retained Interest), whereupon the Trustee will succeed to all of the
responsibilities, duties and liabilities of the Master Servicer under the
Agreement (except that if the Trustee is prohibited by law from obligating
itself to make advances regarding delinquent Mortgage Loans, or if the
related
Prospectus Supplement so specifies, then the Trustee will not be obligated to
make such advances) and will be entitled to similar compensation arrangements.
Unless otherwise specified in the related Prospectus Supplement, in the event
that the Trustee is unwilling or unable so to act, it may or, at the written
request of the holders of Securities entitled to at least 51% (or such other
percentage specified in the related Prospectus Supplement) of the Voting
Rights,
it shall appoint, or petition a court of competent jurisdiction for the
appointment of, a loan servicing institution acceptable to the Rating Agency
with a net worth at the time of such appointment of at least $15,000,000 (or
such other amount specified in the related Prospectus Supplement) to act as
successor to the Master Servicer under the Agreement. Pending such
appointment,
the Trustee is obligated to act in such capacity. The Trustee and any such
successor may agree upon the servicing compensation to be paid, which in no
event may be greater than the compensation payable to the Master Servicer
under
the Agreement.

        Unless otherwise described in the related Prospectus Supplement, the
holders of Securities representing at least 66% (or such other percentage
specified in the related Prospectus Supplement) of the Voting Rights
allocated
to the respective classes of Securities affected by any Event of Default will
be
entitled to waive such Event of Default; provided, however, that an Event of

Default involving a failure to distribute a required payment to
Securityholders
described in clause (i) under "Events of Default" may be waived only by all
of
the Securityholders. Upon any such waiver of an Event of Default, such Event
of
Default shall cease to exist and shall be deemed to have been remedied for
every
purpose under the Agreement.

     No Securityholder will have the right under any Agreement to institute
any
proceeding with respect thereto unless such holder previously has given to
the
Trustee written notice of default and unless the holders of Securities
evidencing not less than 25% (or such other percentage specified in the
related
Prospectus Supplement) of the Voting Rights have made written request upon
the
Trustee to institute such proceeding in its own name as Trustee thereunder
and
have offered to the Trustee reasonable indemnity, and the Trustee for sixty
days
(or such other number of days specified in the related Prospectus Supplement)
has neglected or refused to institute any such proceeding. The Trustee,
however,
is under no obligation to exercise any of the trusts or powers vested in it
by
any Agreement or to make any investigation of matters arising thereunder or
to
institute, conduct or defend any litigation thereunder or in relation thereto
at
the request, order or direction of any of the holders of Securities covered
by
such Agreement, unless such Securityholders have offered to the Trustee
reasonable security or indemnity against the costs, expenses and liabilities
which may be incurred therein or thereby.

<PAGE>

AMENDMENT

     Each Agreement may be amended by the parties thereto, without the
consent
of any of the holders of Securities covered by the Agreement:

     (i)    to cure any ambiguity or correct any mistake,

     (ii)    to correct, modify or supplement any provision therein which
may
             be inconsistent with any other provision therein or with the
             related Prospectus Supplement,

     (iii)    to make any other provisions with respect to matters or
questions

arising under the Agreement which are not materially inconsistent
with the provisions thereof,

    (iv)    to modify, alter, amend, add to or rescind any of the terms or provisions contained in the Agreement, or

    (v)    to comply with any requirements imposed by the Code; provided, however, that, in the case of clauses (iii) and (iv), such amendment will not, as evidenced by an opinion of counsel to such
affect, adversely affect in any material respect the interests of
any Securityholder; provided, further, however, that such amendment
will be deemed to not adversely affect in any material respect the
interest of any Securityholder if the Person requesting such amendment obtains a letter from each applicable Rating Agency stating that such amendment will not result in a reduction or withdrawal of its rating of any class of the related Security.

    Unless otherwise specified in the related Prospectus Supplement, each Agreement may also be amended by the Depositor, the Master Servicer, if any, and
the Trustee, with the consent of the holders of Securities affected thereby evidencing not less than 51% (or such other percentage specified in the related
Prospectus Supplement) of the Voting Rights, for any purpose; provided, however,
that unless otherwise specified in the related Prospectus Supplement, no such amendment may:

    (i)    reduce in any manner the amount of, or delay the timing of, payments received or advanced on Mortgage Loans which are required
to be distributed on any Security without the consent of the holder
of such Security or

    (ii)    reduce the consent percentages described in this paragraph without
the consent of the holders of all Securities covered by such Agreement then outstanding.

    However, with respect to any series of Securities as to which a REMIC election is to be made, the Trustee will not consent to any amendment of the Agreement unless it shall first have received an opinion of counsel to the effect that such amendment will not result in the imposition of a tax on the related Trust Fund or cause the related Trust Fund to fail to qualify as a REMIC
at any time that the related Securities are outstanding.

THE TRUSTEE

    The Trustee under each Agreement or Trust Agreement will be named in the

related Prospectus Supplement. The commercial bank, national banking
association, banking corporation or trust company serving as Trustee may have
a
banking relationship with the Depositor and its affiliates and with any
Master
Servicer and its affiliates.

DUTIES OF THE TRUSTEE

        The Trustee will make no representations as to the validity or
sufficiency
of any Agreement or Trust Agreement, the Securities or any Asset or related
document and is not accountable for the use or application by or on behalf of
any Master Servicer of any funds paid to the Master Servicer or its designee
in
respect of the Securities or the Assets, or deposited into or withdrawn from
the
Collection Account or any other account by or on behalf of the Master
Servicer.
If no Event of Default has occurred and is continuing, the Trustee is
required
to perform only those duties specifically required under the related
Agreement
or Trust Agreement, as applicable. However, upon receipt of the various
certificates, reports or

                                      52
<PAGE>

other instruments required to be furnished to it, the Trustee is required to
examine such documents and to determine whether they conform to the
requirements
of the Agreement or Trust Agreement, as applicable.

CERTAIN MATTERS REGARDING THE TRUSTEE

        Unless otherwise specified in the related Prospectus Supplement, the
Trustee and any director, officer, employee or agent of the Trustee shall be
entitled to indemnification out of the Collection Account for any loss,
liability or expense (including costs and expenses of litigation, and of
investigation, counsel fees, damages, judgments and amounts paid in
settlement)
incurred in connection with the Trustee's:

        (i)    enforcing its rights and remedies and protecting the interests of
               the Securityholders during the continuance of an Event of Default,

        (ii)   defending or prosecuting any legal action in respect of the
related
               Agreement or series of Securities,

        (iii)  being the mortgagee of record with respect to the Mortgage
Loans
               in a Trust Fund and the owner of record with respect to any
               Mortgaged Property acquired in respect thereof for the benefit
of
               Securityholders, or

(iv)    acting or refraining from acting in good faith at the direction
of
                the holders of the related series of Securities entitled to not
                less than 25% (or such other percentage as is specified in the
                related Agreement with respect to any particular matter) of the
                Voting Rights for such series; provided, however, that such
                indemnification will not extend to any loss, liability or
expense
                that constitutes a specific liability of the Trustee pursuant to
                the related Agreement, or to any loss, liability or expense
                incurred by reason of willful misfeasance, bad faith or
negligence
                on the part of the Trustee in the performance of its obligations
                and duties thereunder, or by reason of its reckless disregard of
                such obligations or duties, or as may arise from a breach of any
                representation, warranty or covenant of the Trustee made therein.


RESIGNATION AND REMOVAL OF THE TRUSTEE

        The Trustee may at any time resign from its obligations and duties
under
an Agreement by giving written notice thereof to the Depositor, the Master
Servicer, if any, and all Securityholders. Upon receiving such notice of
resignation, the Depositor is required promptly to appoint a successor
trustee
acceptable to the Master Servicer, if any. If no successor trustee shall have
been so appointed and have accepted appointment within 30 days after the
giving
of such notice of resignation, the resigning Trustee may petition any court
of
competent jurisdiction for the appointment of a successor trustee.

        If at any time the Trustee shall cease to be eligible to continue as
such
under the related Agreement, or if at any time the Trustee shall become
incapable of acting, or shall be adjudged bankrupt or insolvent, or a
receiver
of the Trustee or of its property shall be appointed, or any public officer
shall take charge or control of the Trustee or of its property or affairs for
the purpose of rehabilitation, conservation or liquidation, or if a change in
the financial condition of the Trustee has adversely affected or will
adversely
affect the rating on any class of the Securities, then the Depositor may
remove
the Trustee and appoint a successor trustee acceptable to the Master Servicer,
if any. Holders of the Securities of any series entitled to at least 51% (or
such other percentage specified in the related Prospectus Supplement) of the
Voting Rights for such series may at any time remove the Trustee without
cause
and appoint a successor trustee.

        Any resignation or removal of the Trustee and appointment of a
successor
trustee shall not become effective until acceptance of appointment by the
successor trustee.

<PAGE>

CERTAIN TERMS OF THE INDENTURE

     Events of Default. Unless otherwise specified in the related Prospectus
Supplement, Events of Default under the Indenture for each series of Notes
include:

          (i)    default for thirty (30) days (or such other number of days
                 specified in such Prospectus Supplement) or more in the payment
of
                 any principal of or interest on any Note of such series;

          (ii)   failure to perform any other covenant of the Depositor or the
                 Trust Fund in the Indenture which continues for a period of
sixty
                 (60) days (or such other number of days specified in such
                 Prospectus Supplement) after notice thereof is given in
accordance
                 with the procedures described in the related Prospectus
                 Supplement;

          (iii)  any representation or warranty made by the Depositor or the
Trust
                 Fund in the Indenture or in any certificate or other writing
                 delivered pursuant thereto or in connection therewith with
respect
                 to or affecting such series having been incorrect in a material
                 respect as of the time made, and such breach is not cured
within
                 sixty (60) days (or such other number of days specified in such
                 Prospectus Supplement) after notice thereof is given in
accordance
                 with the procedures described in the related Prospectus
                 Supplement;

          (iv)   certain events of bankruptcy, insolvency, receivership or
                 liquidation of the Depositor or the Trust Fund; or

          (v)    any other Event of Default provided with respect to Notes of
that
                 series.

     If an Event of Default with respect to the Notes of any series at the
time
outstanding occurs and is continuing, either the Indenture Trustee or the
holders of a majority of the then aggregate outstanding amount of the Notes
of
such series may declare the principal amount (or, if the Notes of that series
are Accrual Securities, such portion of the principal amount as may be
specified
in the terms of that series, as provided in the related Prospectus
Supplement)
of all the Notes of such series to be due and payable immediately. Such
declaration may, under certain circumstances, be rescinded and annulled by
the

holders of a majority in aggregate outstanding amount of the Notes of such series.

If, following an Event of Default with respect to any series of Notes, the Notes of such series have been declared to be due and payable, the Indenture Trustee may, in its discretion, notwithstanding such acceleration, elect to maintain possession of the collateral securing the Notes of such series and to continue to apply distributions on such collateral as if there had been no declaration of acceleration if such collateral continues to provide sufficient funds for the payment of principal of and interest on the Notes of such series as they would have become due if there had not been such a declaration. In addition, the Indenture Trustee may not sell or otherwise liquidate the collateral securing the Notes of a series following an Event of Default, other than a default in the payment of any principal or interest on any Note of such series for thirty (30) days or more, unless:

(a) the holders of 100% (or such other percentage specified in the related Prospectus Supplement) of the then aggregate outstanding amount of the Notes of such series consent to such sale,

(b) the proceeds of such sale or liquidation are sufficient to pay in full the principal of and accrued interest, due and unpaid, on the outstanding Notes of such series at the date of such sale or

(c) the Indenture Trustee determines that such collateral would not be sufficient on an ongoing basis to make all payments on such Notes as such payments would have become due if such Notes had not been declared due and payable, and the Indenture Trustee obtains the consent of the holders of 66% (or such other percentage specified in the related Prospectus Supplement) of the then aggregate outstanding amount of the Notes of such series.

54

<PAGE>

In the event that the Indenture Trustee liquidates the collateral in connection with an Event of Default involving a default for thirty (30) days (or such other number of days specified in the related Prospectus Supplement) or more in the payment of principal of or interest on the Notes of a series, the Indenture provides that the Indenture Trustee will have a prior lien on the proceeds of any such liquidation for unpaid fees and expenses. As a result, upon the occurrence of such an Event of Default, the amount available for distribution to the Noteholders would be less than would otherwise be the case.

However, the Indenture Trustee may not institute a proceeding for the enforcement of its lien except in connection with a proceeding for the enforcement of the lien of the Indenture for the benefit of the Noteholders after the occurrence of such an Event of Default.

Unless otherwise specified in the related Prospectus Supplement, in the event the principal of the Notes of a series is declared due and payable, as described above, the holders of any such Notes issued at a discount from par may be entitled to receive no more than an amount equal to the unpaid principal amount thereof less the amount of such discount which is unamortized.

Subject to the provisions of the Indenture relating to the duties of the Indenture Trustee, in case an Event of Default shall occur and be continuing with respect to a series of Notes, the Indenture Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders of Notes of such series, unless such holders offered to the Indenture Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which might be incurred by it in complying with such request or direction. Subject to such provisions for indemnification and certain limitations contained in the Indenture, the holders of a majority of the then aggregate outstanding amount of the Notes of such series shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Indenture Trustee or exercising any trust or power conferred on the Indenture Trustee with respect to the Notes of such series, and the holders of a majority of the then aggregate outstanding amount of the Notes of such series may, in certain cases, waive any default with respect thereto, except a default in the payment of principal or interest or a default in respect of a covenant or provision of the Indenture that cannot be modified without the waiver or consent of all the holders of the outstanding Notes of such series affected thereby.

Discharge of the Indenture. The Indenture will be discharged with respect to a series of Notes (except with respect to certain continuing rights specified in the Indenture) upon the delivery to the Indenture Trustee for cancellation of all the Notes of such series or, with certain limitations, upon deposit with the Indenture Trustee of funds sufficient for the payment in full of all of the Notes of such series.

In addition to such discharge with certain limitations, the Indenture will provide that, if so specified with respect to the Notes of any series, the

related Trust Fund will be discharged from any and all obligations in respect of
the Notes of such series (except for certain obligations relating to temporary
Notes and exchange of Notes, to register the transfer of or exchange Notes of
such series, to replace stolen, lost or mutilated Notes of such series, to
maintain paying agencies and to hold monies for payment in trust) upon the
deposit with the Indenture Trustee, in trust, of money and/or direct obligations
of or obligations guaranteed by the United States of America which through the
payment of interest and principal in respect thereof in accordance with their
terms will provide money in an amount sufficient to pay the principal of and
each installment of interest on the Notes of such series on the maturity date
for such Notes and any installment of interest on such Notes in accordance with
the terms of the Indenture and the Notes of such series. In the event of any
such defeasance and discharge of Notes of such series, holders of Notes of such
series would be able to look only to such money and/or direct obligations for
payment of principal and interest, if any, on their Notes until maturity.

        Indenture Trustee's Annual Report. The Indenture Trustee for each series
of Notes will be required to mail each year to all related Noteholders a brief
report relating to its eligibility and qualification to continue as Indenture
Trustee under the related Indenture, any amounts advanced by it under the
Indenture, the amount, interest rate and maturity date of certain indebtedness
owing by such Trust to the applicable Indenture Trustee in its individual
capacity, the property and funds physically held by such

<PAGE>

Indenture Trustee as such and any action taken by it that materially affects
such Notes and that has not been previously reported.

        The Indenture Trustee. The Indenture Trustee for a series of Notes will be
specified in the related Prospectus Supplement. The Indenture Trustee for any
series may resign at any time, in which event the Depositor will be obligated to
appoint a successor trustee for such series. The Depositor may also remove any
such Indenture Trustee if such Indenture Trustee ceases to be eligible to
continue as such under the related Indenture or if such Indenture Trustee
becomes insolvent. In such circumstances the Depositor will be obligated to
appoint a successor trustee for the applicable series of Notes. Any resignation
or removal of the Indenture Trustee and appointment of a successor trustee for
any series of Notes does not become effective until acceptance of the
appointment by the successor trustee for such series.

The bank or trust company serving as Indenture Trustee may have a banking
relationship with the Depositor or any of its affiliates or the Master Servicer
or any of its affiliates.

## DESCRIPTION OF CREDIT SUPPORT

GENERAL

For any series of Securities Credit Support may be provided with respect
to one or more classes thereof or the related Assets. Credit Support may be in
the form of the subordination of one or more classes of Securities, letters of
credit, insurance policies, guarantees, the establishment of one or more reserve
funds or another method of Credit Support described in the related Prospectus
Supplement, or any combination of the foregoing. If so provided in the related
Prospectus Supplement, any form of Credit Support may be structured so as to be
drawn upon by more than one series to the extent described therein.

Unless otherwise provided in the related Prospectus Supplement for a
series of Securities the Credit Support will not provide protection against all
risks of loss and will not guarantee repayment of the entire Security Balance of
the Securities and interest thereon. If losses or shortfalls occur that exceed
the amount covered by Credit Support or that are not covered by Credit Support,
Securityholders will bear their allocable share of deficiencies. Moreover, if a
form of Credit Support covers more than one series of Securities (each, a
"Covered Trust"), holders of Securities evidencing interests in any of such
Covered Trusts will be subject to the risk that such Credit Support will be
exhausted by the claims of other Covered Trusts prior to such Covered Trust
receiving any of its intended share of such coverage.

If Credit Support is provided with respect to one or more classes of
Securities of a series, or the related Assets, the related Prospectus Supplement
will include a description of:

(a)    the nature and amount of coverage under such Credit Support,

(b)    any conditions to payment thereunder not otherwise described
herein,

(c)    the conditions (if any) under which the amount of coverage under
       such Credit Support may be reduced and under which such Credit
       Support may be terminated or replaced, and

(d)    the material provisions relating to such Credit Support.

Additionally, the related Prospectus Supplement will set forth
certain information with respect to the obligor under any
instrument
of Credit Support, including

    (i)    a brief description of its principal business activities,

    (ii)    its principal place of business, place of incorporation
and
    the jurisdiction under which it is chartered or licensed
to
    do business,

    (iii)    if applicable, the identity of regulatory agencies that
exercise primary jurisdiction over the conduct of its
business and

<PAGE>

    (iv)    its total assets, and its stockholders' or policyholders'
surplus, if applicable, as of the date specified in the
Prospectus Supplement.

See "Risk Factors--Credit Support Limitations--Risk That Credit Support Will
Not
Cover All Losses."

SUBORDINATE SECURITIES

If so specified in the related Prospectus Supplement, one or more
classes
of Securities of a series may be Subordinate Securities. To the extent
specified
in the related Prospectus Supplement, the rights of the holders of
Subordinate
Securities to receive distributions of principal and interest from the
Collection Account on any Distribution Date will be subordinated to such
rights
of the holders of Senior Securities. If so provided in the related Prospectus
Supplement, the subordination of a class may apply only in the event of (or
may
be limited to) certain types of losses or shortfalls. The related Prospectus
Supplement will set forth information concerning the amount of subordination
of
a class or classes of Subordinate Securities in a series, the circumstances
in
which such subordination will be applicable and the manner, if any, in which
the
amount of subordination will be effected.

CROSS-SUPPORT PROVISIONS

If the Assets for a series are divided into separate groups, each
supporting a separate class or classes of Securities of a series, credit
support

may be provided by cross-support provisions requiring that distributions be made
on Senior Securities evidencing interests in one group of Assets prior to
distributions on Subordinate Securities evidencing interests in a different
group of Assets within the Trust Fund. The Prospectus Supplement for a series
that includes a cross-support provision will describe the manner and conditions
for applying such provisions.

INSURANCE OR GUARANTEES

     If so provided in the Prospectus Supplement for a series of Securities,
the Whole Loans in the related Trust Fund will be covered for various default
risks by insurance policies or guarantees.

LETTER OF CREDIT

     If so provided in the Prospectus Supplement for a series of Securities,
deficiencies in amounts otherwise payable on such Securities or certain classes
thereof will be covered by one or more letters of credit, issued by a bank or
financial institution specified in such Prospectus Supplement (the "L/C Bank").
Under a letter of credit, the L/C Bank will be obligated to honor draws
thereunder in an aggregate fixed dollar amount, net of unreimbursed payments
thereunder, generally equal to a percentage specified in the related Prospectus
Supplement of the aggregate principal balance of the Assets on the related
Cut-off Date or of the initial aggregate Security Balance of one or more classes
of Securities. If so specified in the related Prospectus Supplement, the letter
of credit may permit draws in the event of only certain types of losses and
shortfalls. The amount available under the letter of credit will, in all cases,
be reduced to the extent of the unreimbursed payments thereunder and may
otherwise be reduced as described in the related Prospectus Supplement. The
obligations of the L/C Bank under the letter of credit for each series of
Securities will expire at the earlier of the date specified in the related
Prospectus Supplement or the termination of the Trust Fund.

INSURANCE POLICIES AND SURETY BONDS

     If so provided in the Prospectus Supplement for a series of Securities,
deficiencies in amounts otherwise payable on such Securities or certain classes
thereof will be covered by insurance policies and/or surety bonds provided by
one or more insurance companies or sureties. Such instruments may cover, with
respect to one or more classes of Securities of the related series, timely
distributions of interest and/or full distributions of principal on the basis of
a schedule of principal distributions set forth in or determined in the manner
specified in the related Prospectus Supplement.

<PAGE>

RESERVE FUNDS

        If so provided in the Prospectus Supplement for a series of Securities,
deficiencies in amounts otherwise payable on such Securities or certain
classes
thereof will be covered by one or more reserve funds in which cash, a letter
of
credit, Permitted Investments, a demand note or a combination thereof will be
deposited, in the amounts so specified in such Prospectus Supplement. The
reserve funds for a series may also be funded over time by depositing therein
a
specified amount of the distributions received on the related Assets as
specified in the related Prospectus Supplement.

        Amounts on deposit in any reserve fund for a series, together with the
reinvestment income thereon, if any, will be applied for the purposes, in the
manner, and to the extent specified in the related Prospectus Supplement. A
reserve fund may be provided to increase the likelihood of timely
distributions
of principal of and interest on the Certificates. If so specified in the
related
Prospectus Supplement, reserve funds may be established to provide limited
protection against only certain types of losses and shortfalls. Following
each
Distribution Date, amounts in a reserve fund in excess of any amount required
to
be maintained therein may be released from the reserve fund under the
conditions
and to the extent specified in the related Prospectus Supplement and will not
be
available for further application to the Securities.

        Moneys deposited in any Reserve Funds will be invested in Permitted
Investments, except as otherwise specified in the related Prospectus
Supplement.
Unless otherwise specified in the related Prospectus Supplement, any
reinvestment income or other gain from such investments will be credited to
the
related Reserve Fund for such series, and any loss resulting from such
investments will be charged to such Reserve Fund. However, such income may be
payable to any related Master Servicer or another service provider as
additional
compensation. The Reserve Fund, if any, for a series will not be a part of
the
Trust Fund unless otherwise specified in the related Prospectus Supplement.

        Additional information concerning any Reserve Fund will be set forth in
the related Prospectus Supplement, including the initial balance of such
Reserve
Fund, the balance required to be maintained in the Reserve Fund, the manner
in
which such required balance will decrease over time, the manner of funding
such
Reserve Fund, the purposes for which funds in the Reserve Fund may be applied
to
make distributions to Securityholders and use of investment earnings from the

Reserve Fund, if any.

CREDIT SUPPORT WITH RESPECT TO MBS

If so provided in the Prospectus Supplement for a series of Securities,
the MBS in the related Trust Fund and/or the Mortgage Loans underlying such
MBS
may be covered by one or more of the types of Credit Support described herein.
The related Prospectus Supplement will specify as to each such form of Credit
Support the information indicated above with respect thereto, to the extent
such
information is material and available.

CERTAIN LEGAL ASPECTS OF MORTGAGE LOANS

The following discussion contains summaries, which are general in
nature,
of certain state law legal aspects of loans secured by single-family or
multi-family residential properties. Because such legal aspects are governed
primarily by the applicable laws of the state in which the related Mortgaged
Property is located (which laws may differ substantially), the summaries do
not
purport to be complete nor to reflect the laws of any particular state, nor
to
encompass the laws of all states in which the security for the Mortgage Loans
is
situated. The summaries are qualified in their entirety by reference to the
applicable federal and state laws governing the Mortgage Loans. See
"Description
of the Trust Funds--Assets."

GENERAL

All of the Mortgage Loans are loans evidenced by a note or bond and
secured by instruments granting a security interest in real property which
may
be mortgages, deeds of trust, security deeds or deeds to secure debt,
depending
upon the prevailing practice and law in the state in which the Mortgaged
Property is located. Mortgages, deeds of trust and deeds to secure debt are
herein collectively referred to

<PAGE>

as "mortgages." Any of the foregoing types of mortgages will create a lien
upon,
or grant a title interest in, the subject property, the priority of which
will
depend on the terms of the particular security instrument, as well as
separate,
recorded, contractual arrangements with others holding interests in the
mortgaged property, the knowledge of the parties to such instrument as well
as
the order of recordation of the instrument in the appropriate public
recording
office. However, recording does not generally establish priority over

governmental claims for real estate taxes and assessments and other charges
imposed under governmental police powers.

TYPES OF MORTGAGE INSTRUMENTS

        A mortgage either creates a lien against or constitutes a conveyance of
real property between two parties--a mortgagor (the borrower and usually the
owner of the subject property) and a mortgagee (the lender). In contrast, a
deed
of trust is a three-party instrument, among a trustor (the equivalent of a
mortgagor), a trustee to whom the mortgaged property is conveyed, and a
beneficiary (the lender) for whose benefit the conveyance is made. As used in
this Prospectus, unless the context otherwise requires, "mortgagor" includes
the
trustor under a deed of trust and a grantor under a security deed or a deed
to
secure debt. Under a deed of trust, the mortgagor grants the property,
irrevocably until the debt is paid, in trust, generally with a power of sale
as
security for the indebtedness evidenced by the related note. A deed to secure
debt typically has two parties. By executing a deed to secure debt, the
grantor
conveys title to, as opposed to merely creating a lien upon, the subject
property to the grantee until such time as the underlying debt is repaid,
generally with a power of sale as security for the indebtedness evidenced by
the
related mortgage note. In case the mortgagor under a mortgage is a land trust,
there would be an additional party because legal title to the property is
held
by a land trustee under a land trust agreement for the benefit of the
mortgagor.
At origination of a mortgage loan involving a land trust, the mortgagor
executes
a separate undertaking to make payments on the mortgage note. The mortgagee's
authority under a mortgage, the trustee's authority under a deed of trust and
the grantee's authority under a deed to secure debt are governed by the
express
provisions of the mortgage, the law of the state in which the real property
is
located, certain federal laws (including, without limitation, the Service
Members Civil Relief Act) and, in some cases, in deed of trust transactions,
the
directions of the beneficiary.

INTEREST IN REAL PROPERTY

        The real property covered by a mortgage, deed of trust, security deed
or
deed to secure debt is most often the fee estate in land and improvements.
However, such an instrument may encumber other interests in real property
such
as a tenant's interest in a lease of land or improvements, or both, and the
leasehold estate created by such lease. An instrument covering an interest in
real property other than the fee estate requires special provisions in the
instrument creating such interest or in the mortgage, deed of trust, security
deed or deed to secure debt, to protect the mortgagee against termination of
such interest before the mortgage, deed of trust, security deed or deed to

secure debt is paid. Unless otherwise specified in the Prospectus Supplement,
the Depositor or the Asset Seller will make certain representations and
warranties in the Agreement with respect to any Mortgage Loans that are
secured
by an interest in a leasehold estate. Such representations and warranties, if
applicable, will be set forth in the Prospectus Supplement.

COOPERATIVE LOANS

        If specified in the Prospectus Supplement relating to a series of
Offered
Securities, the Mortgage Loans may also consist of cooperative apartment
loans
("Cooperative Loans") secured by security interests in shares issued by a
cooperative housing corporation (a "Cooperative") and in the related
proprietary
leases or occupancy agreements granting exclusive rights to occupy specific
dwelling units in the Cooperatives' buildings. The security agreement will
create a lien upon, or grant a title interest in, the property which it
covers,
the priority of which will depend on the terms of the particular security
agreement as well as the order of recordation of the agreement in the
appropriate recording office. Such a

<PAGE>

lien or title interest is not prior to the lien for real estate taxes and
assessments and other charges imposed under governmental police powers.

        Each Cooperative owns in fee or has a leasehold interest in all the
real
property and owns in fee or leases the building and all separate dwelling
units
therein. The Cooperative is directly responsible for property management and,
in
most cases, payment of real estate taxes, other governmental impositions and
hazard and liability insurance. If there is a blanket mortgage or mortgages
on
the Cooperative apartment building or underlying land, as is generally the
case,
or an underlying lease of the land, as is the case in some instances, the
Cooperative, as property mortgagor, or lessee, as the case may be, is also
responsible for meeting these mortgage or rental obligations. A blanket
mortgage
is ordinarily incurred by the Cooperative in connection with either the
construction or purchase of the Cooperative's apartment building or obtaining
of
capital by the Cooperative. The interest of the occupant under proprietary
leases or occupancy agreements as to which that Cooperative is the landlord
are
generally subordinate to the interest of the holder of a blanket mortgage and
to
the interest of the holder of a land lease. If the Cooperative is unable to
meet
the payment obligations (i) arising under a blanket mortgage, the mortgagee
holding a blanket mortgage could foreclose on that mortgage and terminate all

subordinate proprietary leases and occupancy agreements or (ii) arising under
its land lease, the holder of the landlord's interest under the land lease
could
terminate it and all subordinate proprietary leases and occupancy agreements.
Also, a blanket mortgage on a Cooperative may provide financing in the form
of a
mortgage that does not fully amortize, with a significant portion of
principal
being due in one final payment at maturity. The inability of the Cooperative
to
refinance a mortgage and its consequent inability to make such final payment
could lead to foreclosure by the mortgagee. Similarly, a land lease has an
expiration date and the inability of the Cooperative to extend its term or,
in
the alternative, to purchase the land could lead to termination of the
Cooperative's interest in the property and termination of all proprietary
leases
and occupancy agreement. In either event, a foreclosure by the holder of a
blanket mortgage or the termination of the underlying lease could eliminate
or
significantly diminish the value of any collateral held by the lender that
financed the purchase by an individual tenant stockholder of Cooperative
shares
or, in the case of the Mortgage Loans, the collateral securing the
Cooperative
Loans.

    The Cooperative is owned by tenant-stockholders who, through ownership
of
stock or shares in the corporation, receive proprietary lease or occupancy
agreements which confer exclusive rights to occupy specific units. Generally,
a
tenant-stockholder of a Cooperative must make a monthly payment to the
Cooperative representing such tenant-stockholder's pro rata share of the
Cooperative's payments for its blanket mortgage, real property taxes,
maintenance expenses and other capital or ordinary expenses. An ownership
interest in a Cooperative and accompanying occupancy rights are financed
through
a cooperative share loan evidenced by a promissory note and secured by an
assignment of and a security interest in the occupancy agreement or
proprietary
lease and a security interest in the related cooperative shares. The lender
generally takes possession of the share certificate and a counterpart of the
proprietary lease or occupancy agreement and a financing statement covering
the
proprietary lease or occupancy agreement and the cooperative shares is filed
in
the appropriate state and local offices to perfect the lender's interest in
its
collateral. Subject to the limitations discussed below, upon default of the
tenant-stockholder, the lender may sue for judgment on the promissory note,
dispose of the collateral at a public or private sale or otherwise proceed
against the collateral or tenant-stockholder as an individual as provided in
the
security agreement covering the assignment of the proprietary lease or
occupancy

agreement and the pledge of cooperative shares. See "Foreclosure--
Cooperatives"
below.

FORECLOSURE

General

     Foreclosure is a legal procedure that allows the mortgagee to recover
its
mortgage debt by enforcing its rights and available legal remedies under the
mortgage. If the mortgagor defaults in payment or performance of its
obligations
under the note or mortgage, the mortgagee has the right to institute
foreclosure
proceedings to sell the mortgaged property at public auction to satisfy the
indebtedness.

<PAGE>

     Foreclosure procedures with respect to the enforcement of a mortgage
vary
from state to state. Two primary methods of foreclosing a mortgage are
judicial
foreclosure and non-judicial foreclosure pursuant to a power of sale granted
in
the mortgage instrument. There are several other foreclosure procedures
available in some states that are either infrequently used or available only
in
certain limited circumstances, such as strict foreclosure.

Judicial Foreclosure

     A judicial foreclosure proceeding is conducted in a court having
jurisdiction over the mortgaged property. Generally, the action is initiated
by
the service of legal pleadings upon all parties having an interest of record
in
the real property. Delays in completion of the foreclosure may occasionally
result from difficulties in locating defendants. When the lender's right to
foreclose is contested, the legal proceedings can be time-consuming. Upon
successful completion of a judicial foreclosure proceeding, the court
generally
issues a judgment of foreclosure and appoints a referee or other officer to
conduct a public sale of the mortgaged property, the proceeds of which are
used
to satisfy the judgment. Such sales are made in accordance with procedures
that
vary from state to state.

Equitable Limitations on Enforceability of Certain Provisions

     United States courts have traditionally imposed general equitable
principles to limit the remedies available to a mortgagee in connection with
foreclosure. These equitable principles are generally designed to relieve the
mortgagor from the legal effect of mortgage defaults, to the extent that such

effect is perceived as harsh or unfair. Relying on such principles, a court may
alter the specific terms of a loan to the extent it considers necessary to
prevent or remedy an injustice, undue oppression or overreaching, or may require
the lender to undertake affirmative and expensive actions to determine the cause
of the mortgagor's default and the likelihood that the mortgagor will be able to
reinstate the loan. In some cases, courts have substituted their judgment for
the lender's and have required that lenders reinstate loans or recast payment
schedules in order to accommodate mortgagors who are suffering from a temporary
financial disability. In other cases, courts have limited the right of the
lender to foreclose if the default under the mortgage is not monetary, e.g., the
mortgagor failed to maintain the mortgaged property adequately or the mortgagor
executed a junior mortgage on the mortgaged property. The exercise by the court
of its equity powers will depend on the individual circumstances of each case
presented to it. Finally, some courts have been faced with the issue of whether
federal or state constitutional provisions reflecting due process concerns for
adequate notice require that a mortgagor receive notice in addition to
statutorily-prescribed minimum notice. For the most part, these cases have
upheld the reasonableness of the notice provisions or have found that a public
sale under a mortgage providing for a power of sale does not involve sufficient
state action to afford constitutional protections to the mortgagor.

Non-Judicial Foreclosure/Power of Sale

        Foreclosure of a deed of trust is generally accomplished by a non-judicial
trustee's sale pursuant to the power of sale granted in the deed of trust. A
power of sale is typically granted in a deed of trust. It may also be contained
in any other type of mortgage instrument. A power of sale allows a non-judicial
public sale to be conducted generally following a request from the
beneficiary/lender to the trustee to sell the property upon any default by the
mortgagor under the terms of the mortgage note or the mortgage instrument and
after notice of sale is given in accordance with the terms of the mortgage
instrument, as well as applicable state law. In some states, prior to such sale,
the trustee under a deed of trust must record a notice of default and notice of
sale and send a copy to the mortgagor and to any other party who has recorded a
request for a copy of a notice of default and notice of sale. In addition, in
some states the trustee must provide notice to any other party having an
interest of record in the real property, including junior lienholders. A notice

of sale must be posted in a public place and, in most states, published for a
specified period of time in one or more newspapers. The mortgagor or junior
lienholder may then have the right, during a reinstatement period required in
some states, to cure the default by paying the entire actual amount in
arrears
(without acceleration) plus the expenses incurred in enforcing the obligation.
In other

<PAGE>

states, the mortgagor or the junior lienholder is not provided a period to
reinstate the loan, but has only the right to pay off the entire debt to
prevent
the foreclosure sale. Generally, the procedure for public sale, the parties
entitled to notice, the method of giving notice and the applicable time
periods
are governed by state law and vary among the states. Foreclosure of a deed to
secure debt is also generally accomplished by a non-judicial sale similar to
that required by a deed of trust, except that the lender or its agent, rather
than a trustee, is typically empowered to perform the sale in accordance with
the terms of the deed to secure debt and applicable law.

Public Sale

        A third party may be unwilling to purchase a mortgaged property at a
public sale because of the difficulty in determining the value of such
property
at the time of sale, due to, among other things, redemption rights which may
exist and the possibility of physical deterioration of the property during
the
foreclosure proceedings. For these reasons, it is common for the lender to
purchase the mortgaged property for an amount equal to or less than the
underlying debt and accrued and unpaid interest plus the expenses of
foreclosure. Generally, state law controls the amount of foreclosure costs
and
expenses which may be recovered by a lender. Thereafter, subject to the
mortgagor's right in some states to remain in possession during a redemption
period, if applicable, the lender will become the owner of the property and
have
both the benefits and burdens of ownership of the mortgaged property. For
example, the lender will become obligated to pay taxes, obtain casualty
insurance and to make such repairs at its own expense as are necessary to
render
the property suitable for sale. The lender will commonly obtain the services
of
a real estate broker and pay the broker's commission in connection with the
sale
of the property. Depending upon market conditions, the ultimate proceeds of
the
sale of the property may not equal the lender's investment in the property.
Moreover, a lender commonly incurs substantial legal fees and court costs in
acquiring a mortgaged property through contested foreclosure and/or
bankruptcy
proceedings. Generally, state law controls the amount of foreclosure expenses
and costs, including attorneys' fees, that may be recovered by a lender.

A junior mortgagee may not foreclose on the property securing the junior
mortgage unless it forecloses subject to senior mortgages and any other prior
liens, in which case it may be obliged to make payments on the senior mortgages
to avoid their foreclosure. In addition, in the event that the foreclosure of a
junior mortgage triggers the enforcement of a "due-on-sale" clause contained in
a senior mortgage, the junior mortgagee may be required to pay the full amount
of the senior mortgage to avoid its foreclosure. Accordingly, with respect to
those Mortgage Loans, if any, that are junior mortgage loans, if the lender
purchases the property the lender's title will be subject to all senior
mortgages, prior liens and certain governmental liens.

The proceeds received by the referee or trustee from the sale are applied
first to the costs, fees and expenses of sale and then in satisfaction of the
indebtedness secured by the mortgage under which the sale was conducted. Any
proceeds remaining after satisfaction of senior mortgage debt are generally
payable to the holders of junior mortgages and other liens and claims in order
of their priority, whether or not the mortgagor is in default. Any additional
proceeds are generally payable to the mortgagor. The payment of the proceeds to
the holders of junior mortgages may occur in the foreclosure action of the
senior mortgage or a subsequent ancillary proceeding or may require the
institution of separate legal proceedings by such holders.

Rights of Redemption

The purposes of a foreclosure action are to enable the mortgagee to
realize upon its security and to bar the mortgagor, and all persons who have an
interest in the property which is subordinate to the mortgage being foreclosed,
from exercise of their "equity of redemption." The doctrine of equity of
redemption provides that, until the property covered by a mortgage has been sold
in accordance with a properly conducted foreclosure and foreclosure sale, those
having an interest which is subordinate to that of the foreclosing mortgagee
have an equity of redemption and may redeem the property by paying the entire
debt with interest. In addition, in some states, when a foreclosure action has
been commenced, the

<PAGE>

redeeming party must pay certain costs of such action. Those having an equity of
redemption must generally be made parties and joined in the foreclosure
proceeding in order for their equity of redemption to be cut off and
terminated.

The equity of redemption is a common-law (non-statutory) right which exists prior to completion of the foreclosure, is not waivable by the mortgagor, must be exercised prior to foreclosure sale and should be distinguished from the post-sale statutory rights of redemption. In some states, after sale pursuant to a deed of trust or foreclosure of a mortgage, the mortgagor and foreclosed junior lienors are given a statutory period in which to redeem the property from the foreclosure sale. In some states, statutory redemption may occur only upon payment of the foreclosure sale price. In other states, redemption may be authorized if the former mortgagor pays only a portion of the sums due. The effect of a statutory right of redemption is to diminish the ability of the lender to sell the foreclosed property. The exercise of a right of redemption would defeat the title of any purchaser from a foreclosure sale or sale under a deed of trust. Consequently, the practical effect of the redemption right is to force the lender to maintain the property and pay the expenses of ownership until the redemption period has expired. In some states, a post-sale statutory right of redemption may exist following a judicial foreclosure, but not following a trustee's sale under a deed of trust.

Under the REMIC Provisions currently in effect, property acquired by foreclosure generally must not be held for more than three years. Unless otherwise provided in the related Prospectus Supplement, with respect to a series of Securities for which an election is made to qualify the Trust Fund or a part thereof as a REMIC, the Agreement will permit foreclosed property to be held for more than three years if the Internal Revenue Service grants an extension of time within which to sell such property or independent counsel renders an opinion to the effect that holding such property for such additional period is permissible under the REMIC Provisions.

Cooperative Loans

The cooperative shares owned by the tenant-stockholder and pledged to the lender are, in almost all cases, subject to restrictions on transfer as set forth in the Cooperative's Certificate of Incorporation and By-laws, as well as the proprietary lease or occupancy agreement, and may be cancelled by the Cooperative for failure by the tenant-stockholder to pay rent or other obligations or charges owed by such tenant-stockholder, including mechanics' liens against the Cooperative apartment building incurred by such tenant-stockholder. The proprietary lease or occupancy agreement generally permits the Cooperative to terminate such lease or agreement in the event an obligor fails to make payments or defaults in the performance of covenants required thereunder. Typically, the lender and the Cooperative enter into a recognition agreement which establishes the rights and obligations of both parties in the event of a default by the tenant-stockholder. Under the

proprietary lease or occupancy agreement such a default will usually constitute
a default under the security agreement between the lender and the tenant-stockholder.

The recognition agreement generally provides that, in the event that the
tenant-stockholder has defaulted under the proprietary lease or occupancy
agreement, the Cooperative will take no action to terminate such lease or
agreement until the lender has been provided with an opportunity to cure the
default. The recognition agreement typically provides that if the proprietary
lease or occupancy agreement is terminated, the Cooperative will recognize the
lender's lien against proceeds from the sale of the Cooperative apartment,
subject, however, to the Cooperative's right to sums due under such proprietary
lease or occupancy agreement. The total amount owed to the Cooperative by the
tenant-stockholder, which the lender generally cannot restrict and does not
monitor, could reduce the value of the collateral below the outstanding
principal balance of the Cooperative Loan and accrued and unpaid interest
thereon. Recognition agreements also provide that in the event of a foreclosure
on a Cooperative Loan, the lender must obtain the approval or consent of the
Cooperative as required by the proprietary lease before transferring the
cooperative shares or assigning the proprietary lease. Generally, the lender is
not limited in any rights it may have to dispossess the tenant-stockholders.

<PAGE>

In some states, foreclosure on the cooperative shares is accomplished by a
sale in accordance with the provisions of Article 9 of the UCC and the security
agreement relating to those shares. Article 9 of the UCC requires that a sale be
conducted in a "commercially reasonable" manner. Whether a foreclosure sale has
been conducted in a "commercially reasonable" manner will depend on the facts in
each case. In determining commercial reasonableness, a court will look to the
notice given the debtor and the method, manner, time, place and terms of the
foreclosure. Generally, a sale conducted according to the usual practice of
banks selling similar collateral will be considered reasonably conducted.

Article 9 of the UCC provides that the proceeds of the sale will be
applied first to pay the costs and expenses of the sale and then to satisfy the
indebtedness secured by the lender's security interest. The recognition
agreement, however, generally provides that the lender's right to reimbursement
is subject to the right of the Cooperatives to receive sums due under the
proprietary lease or occupancy agreement. If there are proceeds remaining, the
lender must account to the tenant-stockholder for the surplus. Conversely, if a

portion of the indebtedness remains unpaid, the tenant-stockholder is generally
responsible for the deficiency.

In the case of foreclosure on a building which was converted from a rental
building to a building owned by a Cooperative under a non-eviction plan, some
states require that a purchaser at a foreclosure sale take the property subject
to rent control and rent stabilization laws which apply to certain tenants who
elected to remain in the building when it was so converted.

JUNIOR MORTGAGES

Some of the Mortgage Loans may be secured by junior mortgages or deeds of
trust, which are subordinate to first or other senior mortgages or deeds of
trust held by other lenders. The rights of the Trust Fund as the holder of a
junior deed of trust or a junior mortgage are subordinate in lien and in payment
to those of the holder of the senior mortgage or deed of trust, including the
prior rights of the senior mortgagee or beneficiary to receive and apply hazard
insurance and condemnation proceeds and, upon default of the mortgagor, to cause
a foreclosure on the property. Upon completion of the foreclosure proceedings by
the holder of the senior mortgage or the sale pursuant to the deed of trust, the
junior mortgagee's or junior beneficiary's lien will be extinguished unless the
junior lienholder satisfies the defaulted senior loan or asserts its subordinate
interest in a property in foreclosure proceedings. See "--Foreclosure" herein.

Furthermore, because the terms of the junior mortgage or deed of trust are
subordinate to the terms of the first mortgage or deed of trust, in the event of
a conflict between the terms of the first mortgage or deed of trust and the
junior mortgage or deed of trust, the terms of the first mortgage or deed of
trust will generally govern. Upon a failure of the mortgagor or trustor to
perform any of its obligations, the senior mortgagee or beneficiary, subject to
the terms of the senior mortgage or deed of trust, may have the right to perform
the obligation itself. Generally, all sums so expended by the mortgagee or
beneficiary become part of the indebtedness secured by the mortgage or deed of
trust. To the extent a first mortgagee expends such sums, such sums will
generally have priority over all sums due under the junior mortgage.

ANTI-DEFICIENCY LEGISLATION AND OTHER LIMITATIONS ON LENDERS

Statutes in some states limit the right of a beneficiary under a deed of

trust or a mortgagee under a mortgage to obtain a deficiency judgment against
the mortgagor following foreclosure or sale under a deed of trust. A
deficiency
judgment would be a personal judgment against the former mortgagor equal to
the
difference between the net amount realized upon the public sale of the real
property and the amount due to the lender. Some states require the lender to
exhaust the security afforded under a mortgage by foreclosure in an attempt
to
satisfy the full debt before bringing a personal action against the mortgagor.
In certain other states, the lender has the option of bringing a personal
action
against the mortgagor on the debt without first exhausting such security;
however, in some of these states, the lender, following judgment on such
personal action, may be deemed to have elected a remedy and may be precluded
from exercising remedies with respect to the security. In some cases, a
lender
will be precluded from exercising

<PAGE>

any additional rights under the note or mortgage if it has taken any prior
enforcement action. Consequently, the practical effect of the election
requirement, in those states permitting such election, is that lenders will
usually proceed against the security first rather than bringing a personal
action against the mortgagor. Finally, other statutory provisions limit any
deficiency judgment against the former mortgagor following a judicial sale to
the excess of the outstanding debt over the fair market value of the property
at
the time of the public sale. The purpose of these statutes is generally to
prevent a lender from obtaining a large deficiency judgment against the
former
mortgagor as a result of low or no bids at the judicial sale.

     In addition to laws limiting or prohibiting deficiency judgments,
numerous
other federal and state statutory provisions, including the federal
bankruptcy
laws and state laws affording relief to debtors, may interfere with or affect
the ability of the secured mortgage lender to realize upon collateral or
enforce
a deficiency judgment. For example, with respect to federal bankruptcy law, a
court with federal bankruptcy jurisdiction may permit a debtor through his or
her Chapter 11 or Chapter 13 rehabilitative plan to cure a monetary default
in
respect of a mortgage loan on a debtor's residence by paying arrearages
within a
reasonable time period and reinstating the original mortgage loan payment
schedule even though the lender accelerated the mortgage loan and final
judgment
of foreclosure had been entered in state court (provided no sale of the
residence had yet occurred) prior to the filing of the debtor's petition.
Some
courts with federal bankruptcy jurisdiction have approved plans, based on the
particular facts of the reorganization case, that effected the curing of a
mortgage loan default by paying arrearages over a number of years.

Courts with federal bankruptcy jurisdiction have also indicated that the
terms of a mortgage loan secured by property of the debtor may be modified.
These courts have allowed modifications that include reducing the amount of each
monthly payment, changing the rate of interest, altering the repayment schedule,
forgiving all or a portion of the debt and reducing the lender's security
interest to the value of the residence, thus leaving the lender a general
unsecured creditor for the difference between the value of the residence and the
outstanding balance of the loan. Generally, however, the terms of a mortgage
loan secured only by a mortgage on real property that is the debtor's principal
residence may not be modified pursuant to a plan confirmed pursuant to Chapter
11 or Chapter 13 except with respect to mortgage payment arrearages, which may
be cured within a reasonable time period.

Certain tax liens arising under the Internal Revenue Code of 1986, as
amended, may in certain circumstances provide priority over the lien of a
mortgage or deed of trust. In addition, substantive requirements are imposed
upon mortgage lenders in connection with the origination and the servicing of
mortgage loans by numerous federal and some state consumer protection laws.
These laws include the federal Truth-in-Lending Act, Real Estate Settlement
Procedures Act, Equal Credit Opportunity Act, Fair Credit Billing Act, Fair
Credit Reporting Act and related statutes. These federal laws impose specific
statutory liabilities upon lenders who originate mortgage loans and who fail to
comply with the provisions of the law. In some cases this liability may affect
assignees of the mortgage loans.

Generally, Article 9 of the UCC governs foreclosure on cooperative shares
and the related proprietary lease or occupancy agreement. Some courts have
interpreted section 9-504 of the UCC to prohibit a deficiency award unless the
creditor establishes that the sale of the collateral (which, in the case of a
Cooperative Loan, would be the shares of the Cooperative and the related
proprietary lease or occupancy agreement) was conducted in a commercially
reasonable manner.

ENVIRONMENTAL LEGISLATION

Certain states impose a statutory lien for associated costs on property
that is the subject of a cleanup action by the state on account of hazardous
wastes or hazardous substances released or disposed of on the property. Such a
lien will generally have priority over all subsequent liens on the property and,
in certain of these states, will have priority over prior recorded liens
including the lien of a mortgage. In addition, under federal environmental
legislation and under state law in a number of states, a secured party that
takes a deed in lieu of foreclosure or acquires a mortgaged property at a

foreclosure sale or becomes involved in the operation or management of a property so as to be deemed an "owner" or "operator" of

<PAGE>

the property may be liable for the costs of cleaning up a contaminated site. Although such costs could be substantial, it is unclear whether they would be imposed on a lender (such as a Trust Fund) secured by residential real property.
In the event that title to a Mortgaged Property securing a Mortgage Loan in a Trust Fund was acquired by the Trust Fund and cleanup costs were incurred in respect of the Mortgaged Property, the holders of the related series of Securities might realize a loss if such costs were required to be paid by the Trust Fund.

DUE-ON-SALE CLAUSES

        Unless the related Prospectus Supplement indicates otherwise, the Mortgage
Loans will contain due-on-sale clauses. These clauses generally provide that the
lender may accelerate the maturity of the loan if the mortgagor sells, transfers
or conveys the related Mortgaged Property. The enforceability of due-on-sale
clauses has been the subject of legislation or litigation in many states and, in
some cases, the enforceability of these clauses was limited or denied. However,
with respect to certain loans the Garn-St Germain Depository Institutions Act of
1982 preempts state constitutional, statutory and case law that prohibits the
enforcement of due-on-sale clauses and permits lenders to enforce these clauses
in accordance with their terms, subject to certain limited exceptions.
Due-on-sale clauses contained in mortgage loans originated by federal savings
and loan associations or federal savings banks are fully enforceable pursuant to
regulations of the United States Federal Home Loan Bank Board, as succeeded by
the Office of Thrift Supervision, which preempt state law restrictions on the
enforcement of such clauses. Similarly, "due-on-sale" clauses in mortgage loans
made by national banks and federal credit unions are now fully enforceable
pursuant to preemptive regulations of the Comptroller of the Currency and the
National Credit Union Administration, respectively.

        The Garn-St Germain Act also sets forth nine specific instances in which a
mortgage lender covered by the act (including federal savings and loan
associations and federal savings banks) may not exercise a "due-on-sale" clause,
notwithstanding the fact that a transfer of the property may have occurred.
These include intra-family transfers, certain transfers by operation of law,
leases of fewer than three years and the creation of a junior encumbrance.
Regulations promulgated under the Garn-St Germain Act also prohibit the

imposition of a prepayment penalty upon the acceleration of a loan pursuant to a
due-on-sale clause. The inability to enforce a "due-on-sale" clause may result
in a mortgage that bears an interest rate below the current market rate being
assumed by a new home buyer rather than being paid off, which may affect the
average life of the Mortgage Loans and the number of Mortgage Loans which may
extend to maturity.

SUBORDINATE FINANCING

    Where a mortgagor encumbers mortgaged property with one or more junior
liens, the senior lender is subjected to additional risk. First, the mortgagor
may have difficulty servicing and repaying multiple loans. In addition, if the
junior loan permits recourse to the mortgagor (as junior loans often do) and the
senior loan does not, a mortgagor may be more likely to repay sums due on the
junior loan than those on the senior loan. Second, acts of the senior lender
that prejudice the junior lender or impair the junior lender's security may
create a superior equity in favor of the junior lender. For example, if the
mortgagor and the senior lender agree to an increase in the principal amount of
or the interest rate payable on the senior loan, the senior lender may lose its
priority to the extent any existing junior lender is harmed or the mortgagor is
additionally burdened. Third, if the mortgagor defaults on the senior loan
and/or any junior loan or loans, the existence of junior loans and actions taken
by junior lenders can impair the security available to the senior lender and can
interfere with or delay the taking of action by the senior lender. Moreover, the
bankruptcy of a junior lender may operate to stay foreclosure or similar
proceedings by the senior lender.

APPLICABILITY OF USURY LAWS

    Title V of the Depository Institutions Deregulation and Monetary Control
Act of 1980, enacted in March 1980 ("Title V"), provides that state usury
limitations shall not apply to certain types of residential

<PAGE>

first mortgage loans originated by certain lenders after March 31, 1980. A
similar federal statute was in effect with respect to mortgage loans made during
the first three months of 1980. The Office of Thrift Supervision is authorized
to issue rules and regulations and to publish interpretations governing
implementation of Title V. The statute authorized any state to reimpose interest

rate limits by adopting, before April 1, 1983, a law or constitutional provision
that expressly rejects application of the federal law. In addition, even where
Title V is not so rejected, any state is authorized by the law to adopt a
provision limiting discount points or other charges on mortgage loans covered by
Title V. Certain states have taken action to reimpose interest rate limits
and/or to limit discount points or other charges.

The Depositor believes that a court interpreting Title V would hold that
residential first mortgage loans that are originated on or after January 1, 1980
are subject to federal preemption. Therefore, in a state that has not taken the
requisite action to reject application of Title V or to adopt a provision
limiting discount points or other charges prior to origination of such mortgage
loans, any such limitation under such state's usury law would not apply to such
mortgage loans.

In any state in which application of Title V has been expressly rejected
or a provision limiting discount points or other charges is adopted, no mortgage
loan originated after the date of such state action will be eligible for
inclusion in a Trust Fund unless (i) such mortgage loan provides for such
interest rate, discount points and charges as are permitted in such state or
(ii) such mortgage loan provides that the terms thereof shall be construed in
accordance with the laws of another state under which such interest rate,
discount points and charges would not be usurious and the mortgagor's counsel
has rendered an opinion that such choice of law provision would be given
effect.

Statutes differ in their provisions as to the consequences of a usurious
loan. One group of statutes requires the lender to forfeit the interest due
above the applicable limit or impose a specified penalty. Under this statutory
scheme, the mortgagor may cancel the recorded mortgage or deed of trust upon
paying its debt with lawful interest, and the lender may foreclose, but only for
the debt plus lawful interest. A second group of statutes is more severe. A
violation of this type of usury law results in the invalidation of the
transaction, thereby permitting the mortgagor to cancel the recorded mortgage or
deed of trust without any payment or prohibiting the lender from foreclosing.

ALTERNATIVE MORTGAGE INSTRUMENTS

Alternative mortgage instruments, including adjustable rate mortgage loans
and early ownership mortgage loans, originated by non-federally chartered
lenders have historically been subject to a variety of restrictions. Such
restrictions differed from state to state, resulting in difficulties in

determining whether a particular alternative mortgage instrument originated
by a
state-chartered lender was in compliance with applicable law. These
difficulties
were alleviated substantially as a result of the enactment of Title VIII of
the
Garn-St Germain Act ("Title VIII"). Title VIII provides that, notwithstanding
any state law to the contrary, state-chartered banks may originate
alternative
mortgage instruments in accordance with regulations promulgated by the
Comptroller of the Currency with respect to origination of alternative
mortgage
instruments by national banks; state-chartered credit unions may originate
alternative mortgage instruments in accordance with regulations promulgated
by
the National Credit Union Administration with respect to origination of
alternative mortgage instruments by federal credit unions; and all other non-
federally chartered housing creditors, including state-chartered savings and
loan associations, state-chartered savings banks and mutual savings banks and
mortgage banking companies, may originate alternative mortgage instruments in
accordance with the regulations promulgated by the Federal Home Loan Bank
Board,
predecessor to the Office of Thrift Supervision, with respect to origination
of
alternative mortgage instruments by federal savings and loan associations.
Title
VIII provides that any state may reject applicability of the provisions of
Title
VIII by adopting, prior to October 15, 1985, a law or constitutional
provision
expressly rejecting the applicability of such provisions. Certain states have
taken such action.

<PAGE>


SERVICEMEMBERS CIVIL RELIEF ACT

        The Servicemembers Civil Relief Act was recently signed into law,
revising
the Soldiers' and Sailors' Civil Relief Act of 1940 (the "Relief Act"). Under
the terms of the Relief Act, a mortgagor who enters military service after
the
origination of such mortgagor's Mortgage Loan (including a mortgagor who was
in
reserve status and is called to active duty after origination of the Mortgage
Loan), may not be charged interest (including fees and charges) above an
annual
rate of 6% (and all interest in excess of 6% shall be forgiven) during the
period of such mortgagor's active duty status, unless a court orders
otherwise
upon application of the lender. The Relief Act applies to mortgagors who are
members of all branches of the military (including draftees and reservists in
military service called to active duty). Because the Relief Act applies to
mortgagors who enter military service (including reservists who are called to
active duty) after origination of the related Mortgage Loan, no information
can

be provided as to the number of loans that may be affected by the Relief Act.
Application of the Relief Act would adversely affect, for an indeterminate
period of time, the ability of any servicer to collect full amounts of
interest
on certain of the Mortgage Loans. Any shortfalls in interest collections
resulting from the application of the Relief Act would result in a reduction
of
the amounts distributable to the holders of the related series of
Certificates,
and would not be covered by advances or, unless otherwise specified in the
related Prospectus Supplement, any form of Credit Support provided in
connection
with such Certificates. In addition, the Relief Act imposes limitations that
would impair the ability of the servicer to foreclose on an affected Mortgage
Loan during the mortgagor's period of active duty status, and, under certain
circumstances, during an additional three month period thereafter. Thus, in
the
event that such a Mortgage Loan goes into default, there may be delays and
losses occasioned thereby.

FORFEITURES IN DRUG AND RICO PROCEEDINGS

        Federal law provides that property purchased or improved with assets
derived from criminal activity or otherwise tainted, or used in the
commission
of certain offenses, can be seized and ordered forfeited to the United States
of
America. The offenses which can trigger such a seizure and forfeiture include,
among others, violations of the Racketeer Influenced and Corrupt
Organizations
Act, the Bank Secrecy Act, the anti-money laundering laws and regulations,
including the USA Patriot Act of 2001 and the regulations issued pursuant to
that Act, as well as the narcotic drug laws. In many instances, the United
States may seize the property even before a conviction occurs.

        In the event of a forfeiture proceeding, a lender may be able to avoid
forfeiture of its interest in the property by proving that (1) its mortgage
was
executed and recorded before the commission of the illegal conduct from which
the assets used to purchase or improve the property were derived or before
the
commission of any other crime upon which the forfeiture is based, or (2) the
lender, at the time of the execution of the mortgage, "did not know or was
reasonably without cause to believe that the property was subject to
forfeiture." However, there is no assurance that such a defense will be
successful.

THE CONTRACTS

        General.  The manufactured housing contracts and home improvement
contracts, other than those that are unsecured or are secured by mortgages on
real estate generally, are "chattel paper" or constitute "purchase money
security interests" each as defined in the UCC. Pursuant to the UCC, the sale
of
chattel paper is treated in a manner similar to perfection of a security
interest in chattel paper. Under the related agreement, the Depositor or the
seller will transfer physical possession of the contracts to the trustee or a

designated custodian or may retain possession of the contracts as custodian for
the trustee. In addition, the Depositor will make an appropriate filing of a
UCC-1 financing statement in the appropriate states to, among other things, give
notice of the trust fund's ownership of the contracts. The contracts will not be
stamped or otherwise marked to reflect their assignment from the Depositor or
the trustee unless the related prospectus supplement states that they will be so
stamped. With respect to each transaction, a decision will be made as to whether
or not the contracts will be stamped or otherwise marked to reflect their
assignment from the Depositor to the trustee, based upon, among other things,
the practices and procedures of the related originator and servicer and after
consultation with the applicable rating agency or

<PAGE>

rating agencies. Therefore, if the contracts are not stamped or otherwise marked
to reflect their assignment from the Depositor to the trustee and through
negligence, fraud or otherwise, a subsequent purchaser were able to take
physical possession of the contracts without notice of the assignment, the trust
fund's interest in the contracts could be defeated.

        Security Interests in Home Improvements.  The contracts that are secured
by home improvements grant to the originator of those contracts a purchase money
security interest in the home improvements to secure all or part of the purchase
price of the home improvements and related services. A financing statement
generally is not required to be filed to perfect a purchase money security
interest in consumer goods. The purchase money security interests are
assignable. In general, a purchase money security interest grants to the holder
a security interest that has priority over a conflicting security interest in
the same collateral and the proceeds of that collateral. However, to the extent
that the collateral subject to a purchase money security interest becomes a
fixture, in order for the related purchase money security interest to take
priority over a conflicting interest in the fixture, the holder's interest in
that home improvement must generally be perfected by a timely fixture filing. In
general, a security interest does not exist under the UCC in ordinary building
material incorporated into an improvement on land. Home improvement contracts
that finance lumber, bricks, other types of ordinary building materials or other
goods that are deemed to lose that characterization upon incorporation of those
materials into the related property, will not be secured by a purchase money
security interest in the home improvement being financed.

Enforcement of Security Interest in Home Improvements. So long as the home improvement is not governed by real estate law, a creditor can repossess a home improvement securing a contract by voluntary surrender, by "self-help" repossession that is "peaceful"--i.e., without breach of the peace--or, in the absence of voluntary surrender and the ability to repossess without breach of the peace, by judicial process. The holder of a contract must give the debtor a number of days' notice, which varies from 10 to 30 days depending on the state, prior to commencement of any repossession. The UCC and consumer protection laws in most states place restrictions on repossession sales, including requiring prior notice to the debtor and commercial reasonableness in effecting a repossession sale. The law in most states also requires that the debtor be given notice of any sale prior to resale of the unit that the debtor may redeem at or before the resale.

Under the laws of most states, a creditor is entitled to obtain a deficiency judgment from a debtor for any deficiency on repossession and resale of the property securing the debtor's mortgage loan. However, some states impose prohibitions or limitations on deficiency judgments, and in many cases the defaulting borrower would have no assets with which to pay a judgment. Other statutory provisions, including federal and state bankruptcy and insolvency laws and general equitable principles, may limit or delay the ability of a lender to repossess and resell collateral or enforce a deficiency judgment.

Security Interests in the Manufactured Homes. The manufactured homes securing the manufactured housing contracts may be located in all 50 states and the District of Columbia. Security interests in manufactured homes may be perfected either by notation of the secured party's lien on the certificate of title or by delivery of the required documents and payment of a fee to the state motor vehicle authority, depending on state law. The security interests of the related trustee in the manufactured homes will not be noted on the certificates of title or by delivery of the required documents and payment of fees to the applicable state motor vehicle authorities unless the related prospectus supplement so states. With respect to each transaction, a decision will be made as to whether or not the security interests of the related trustee in the manufactured homes will be noted on the certificates of title and the required documents and fees will be delivered to the applicable state motor vehicle authorities based upon, among other things, the practices and procedures of the related originator and servicer and after consultation with the applicable

rating agency or rating agencies. In some nontitle states, perfection pursuant
to the provisions of the UCC is required. As manufactured homes have become
large and often have been attached to their sites without any apparent intention
to move them, courts in many states have held that manufactured homes, under
particular circumstances, may become governed by real estate title and recording
laws. As a result, a security interest in a manufactured home could be rendered
subordinate to the interests of other

<PAGE>

parties claiming an interest in the manufactured home under applicable state
real estate law. In order to perfect a security interest in a manufactured home
under real estate laws, the secured party must file either a "fixture filing"
under the provisions of the UCC or a real estate mortgage under the real estate
laws of the state where the home is located. These filings must be made in the
real estate records office of the county where the manufactured home is located.
If so specified in the related prospectus supplement, the manufactured housing
contracts may contain provisions prohibiting the borrower from permanently
attaching the manufactured home to its site. So long as the borrower does not
violate this agreement, a security interest in the manufactured home will be
governed by the certificate of title laws or the UCC, and the notation of the
security interest on the certificate of title or the filing of a UCC financing
statement will be effective to maintain the priority of the security interest in
the manufactured home. If, however, a manufactured home is permanently attached
to its site, the related lender may be required to perfect a security interest
in the manufactured home under applicable real estate laws.

        In the event that the owner of a manufactured home moves it to a state
other than the state in which the manufactured home initially is registered,
under the laws of most states the perfected security interest in the
manufactured home would continue for four months after that relocation and,
after expiration of the four months, only if and after the owner re-registers
the manufactured home in that state. If the owner were to relocate a
manufactured home to another state and not re-register a security interest in
that state, the security interest in the manufactured home would cease to be
perfected. A majority of states generally require surrender of a certificate of
title to re-register a manufactured home; accordingly, the secured party must
surrender possession if it holds the certificate of title to that manufactured
home or, in the case of manufactured homes registered in states which provide
for notation of lien on the certificate of title, notice of surrender would be

given to the secured party noted on the certificate of title. In states that do
not require a certificate of title for registration of a manufactured home,
re-registration could defeat perfection of the security interest.

Under the laws of most states, liens for repairs performed on a
manufactured home and liens for personal property taxes take priority over a
perfected security interest in the manufactured home.

Consumer Protection Laws.  The so-called "Holder-in-Due Course" rule of
the FTC is intended to defeat the ability of the transferor of a consumer credit
contract who is the seller of goods which gave rise to the transaction, and
particular, related lenders and assignees, to transfer that contract free of
notice of claims by the contract debtor. The effect of this rule is to subject
the assignee of a contract of this type to all claims and defenses that the
debtor under the contract could assert against the seller of goods. Liability
under this rule is limited to amounts paid under a contract; however, the
obligor also may be able to assert the rule to set off remaining amounts due as
a defense against a claim brought by the trustee against that obligor. Numerous
other federal and state consumer protection laws impose requirements applicable
to the origination and lending pursuant to the contracts, including the Truth in
Lending Act, the Federal Trade Commission Act, the Fair Credit Billing Act, the
Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Fair Debt
Collection Practices Act and the Uniform Consumer Credit Code. In the case of
some of these laws, the failure to comply with their provisions may affect the
enforceability of the related contract.

Applicability of Usury Laws.  Title V provides that state usury
limitations shall not apply to any contract that is secured by a first lien on
particular kinds of consumer goods, unless it is covered by any of the following
conditions. The contracts would be covered if they satisfy conditions governing,
among other things, the terms of any prepayments, late charges and deferral fees
and requiring a 30-day notice period prior to instituting any action leading to
repossession of the related unit.

Title V authorized any state to reimpose limitations on interest rates and
finance charges by adopting before April 1, 1983 a law or constitutional
provision which expressly rejects application of the federal law. Fifteen states
adopted a similar law prior to the April 1, 1983 deadline. In addition, even
where Title V was not rejected, any state is authorized by the law to adopt a
provision limiting discount points or other charges on Mortgage Loans covered by

Title V.

    Installment Contracts.  The Mortgage Loans may also consist of installment
contracts. Under an installment contract the property seller, as lender under
the contract, retains legal title to the property and

<PAGE>

enters into an agreement with the purchaser, as borrower under the contract,
for
the payment of the purchase price, plus interest, over the term of that
contract. Only after full performance by the borrower of the contract is the
lender obligated to convey title to the property to the purchaser. As with
mortgage or deed of trust financing, during the effective period of the
installment contract, the borrower is generally responsible for maintaining
the
property in good condition and for paying real estate taxes, assessments and
hazard insurance premiums associated with the property.

    The method of enforcing the rights of the lender under an installment
contract varies on a state-by-state basis depending upon the extent to which
state courts are willing, or able pursuant to state statute, to enforce the
contract strictly according to its terms. The terms of installment contracts
generally provide that upon a default by the borrower, the borrower loses his
or
her right to occupy the property, the entire indebtedness is accelerated, and
the buyer's equitable interest in the property is forfeited. The lender in
that
type of situation does not have to foreclose in order to obtain title to the
property, although in some cases a quiet title action is in order if the
borrower has filed the installment contract in local land records and an
ejectment action may be necessary to recover possession. In a few states,
particularly in cases of borrower default during the early years of an
installment contract, the courts will permit ejectment of the buyer and a
forfeiture of his or her interest in the property. However, most state
legislatures have enacted provisions by analogy to mortgage law protecting
borrowers under installment contracts from the harsh consequences of
forfeiture.
Under those statutes, a judicial or nonjudicial foreclosure may be required,
the
lender may be required to give notice of default and the borrower may be
granted
some grace period during which the installment contract may be reinstated
upon
full payment of the default amount and the borrower may have a post-
foreclosure
statutory redemption right. In other states, courts in equity may permit a
borrower with significant investment in the property under an installment
contract for the sale of real estate to share in the proceeds of sale of the
property after the indebtedness is repaid or may otherwise refuse to enforce
the
forfeiture clause. Nevertheless generally speaking, the lender's procedures
for
obtaining possession and clear title under an installment contract in a given

state are simpler and less time-consuming and costly than are the procedures for
foreclosing and obtaining clear title to a property that is encumbered by one or
more liens.

## MATERIAL FEDERAL INCOME TAX CONSEQUENCES

The following summary of the anticipated material federal income tax
consequences of the purchase, ownership and disposition of Offered Certificates
represents the opinion of Dechert LLP or Thacher Proffitt & Wood, counsel to the
Depositor, as of the date of this Prospectus. This summary is based on the
Internal Revenue Code of 1986, as amended (the "Code"), laws, regulations,
including the REMIC regulations promulgated by the Treasury Department (the
"REMIC Regulations"), rulings and decisions now in effect or (with respect to
regulations) proposed, all of which are subject to change either prospectively
or retroactively. This summary does not address the federal income tax
consequences of an investment in Securities applicable to all categories of
investors, some of which (for example, banks and insurance companies) may be
subject to special rules. Prospective investors should consult their tax
advisors regarding the federal, state, local and any other tax consequences to
them of the purchase, ownership and disposition of Securities.

The term "U.S. Person" means a citizen or resident of the United States, a
corporation, partnership or other entity created or organized in or under the
laws of the United States or any state thereof or the District of Columbia
(other than a partnership that is not treated as a United States person under
any applicable Treasury regulations), an estate whose income is subject to U.S.
federal income tax regardless of its source, or a trust if a court within the
United States is able to exercise primary supervision of the administration of
the trust and one or more United States persons have the authority to control
all substantial decisions of the trust. Notwithstanding the preceding sentence,
to the extent provided in regulations, certain trusts in existence on August 20,
1996 and treated as United States persons prior to such date that elect to
continue to be treated as United States persons shall be considered U.S. Persons
as well.

<PAGE>

GENERAL

The federal income tax consequences to Securityholders will vary depending
on whether an election is made to treat the Trust Fund relating to a particular
series of Securities as a REMIC under the Code. The Prospectus Supplement for

each series of Securities will specify whether a REMIC election will be made.

GRANTOR TRUST FUNDS

     If the related Prospectus Supplement indicates that the Trust Fund will be
treated as a grantor trust, then Dechert LLP or Thacher Proffitt & Wood will
deliver its opinion that the Trust Fund will not be classified as an association
taxable as a corporation and that each such Trust Fund will be classified as a
grantor trust under subpart E, Part I of subchapter J of the Code. In this case,
owners of Certificates will be treated for federal income tax purposes as owners
of a portion of the Trust Fund's assets as described below.

     1.     Single Class of Grantor Trust Certificates

     Characterization.  The Trust Fund may be created with one class of Grantor
Trust Certificates. In this case, each Grantor Trust Certificateholder will be
treated as the owner of a pro rata undivided interest in the interest and
principal portions of the Trust Fund represented by the Grantor Trust
Certificates and will be considered the equitable owner of a pro rata undivided
interest in each of the Mortgage Assets in the Pool. Any amounts received by a
Grantor Trust Certificateholder in lieu of amounts due with respect to any
Mortgage Asset because of a default or delinquency in payment will be treated
for federal income tax purposes as having the same character as the payments
they replace.

     Each Grantor Trust Certificateholder will be required to report on its
federal income tax return in accordance with such Grantor Trust
Certificateholder's method of accounting its pro rata share of the entire income
from the Mortgage Loans in the Trust Fund represented by Grantor Trust
Certificates, including interest, original issue discount ("OID"), if any,
prepayment fees, assumption fees, any gain recognized upon an assumption and
late payment charges received by the Master Servicer. Under Code Sections 162 or
212 each Grantor Trust Certificateholder will be entitled to deduct its pro rata
share of servicing fees, prepayment fees, assumption fees, any loss recognized
upon an assumption and late payment charges retained by the Master Servicer,
provided that such amounts are reasonable compensation for services rendered to
the Trust Fund. Grantor Trust Certificateholders that are individuals, estates
or trusts will be entitled to deduct their share of expenses as itemized
deductions only to the extent such expenses plus all other Code Section 212
expenses exceed two percent of its adjusted gross income. In addition, the
amount of itemized deductions otherwise allowable for the taxable year for an
individual whose adjusted gross income exceeds the applicable amount (which

amount will be adjusted for inflation) will be reduced by the lesser of (i) 3%
of the excess of adjusted gross income over the applicable amount and (ii) 80%
of the amount of itemized deductions otherwise allowable for such taxable year.
This reduction is currently scheduled to be phased-out over a five-year period
beginning in 2006. A Grantor Trust Certificateholder using the cash method of accounting must take into account its pro rata share of income and deductions as
and when collected by or paid to the Master Servicer. A Grantor Trust Certificateholder using an accrual method of accounting must take into account
its pro rata share of income and deductions as they become due or are paid to the Master Servicer, whichever is earlier. If the servicing fees paid to the Master Servicer are deemed to exceed reasonable servicing compensation, the amount of such excess could be considered as an ownership interest retained by
the Master Servicer (or any person to whom the Master Servicer assigned for value all or a portion of the servicing fees) in a portion of the interest payments on the Mortgage Assets. The Mortgage Assets would then be subject to the "coupon stripping" rules of the Code discussed below.

<PAGE>

        Unless otherwise specified in the related Prospectus Supplement, as to each series of Certificates evidencing an interest in a Trust Fund comprised of
Mortgage Loans, Dechert LLP or Thacher Proffitt & Wood will have advised the Depositor that:

        (i)     a Grantor Trust Certificate owned by a "domestic building and loan
                association" within the meaning of Code Section 7701(a)(19)
                representing principal and interest payments on Mortgage Assets
                will be considered to represent "loans . . . secured by an interest
                in real property which is . . . residential property" within the
                meaning of Code Section 7701(a)(19)(C)(v), to the extent that the
                Mortgage Assets represented by that Grantor Trust Certificate are
                of a type described in such Code section;

        (ii)    a Grantor Trust Certificate owned by a real estate investment
                trust representing an interest in Mortgage Assets will be
                considered to represent "real estate assets" within the meaning of
                Code Section 856(c)(4)(A), and interest income on the Mortgage
                Assets will be considered "interest on obligations secured by
                mortgages on real property" within the meaning of Code Section
                856(c)(3)(B), to the extent that the Mortgage Assets represented
                by that Grantor Trust Certificate are of a type described in such

Code section;

(iii)    a Grantor Trust Certificate owned by a REMIC will represent
         "obligation[s] . . . which [are] principally secured by an
         interest in real property" within the meaning of Code Section
         860G(a)(3); and

(iv)     a Grantor Trust Certificate representing interests in
obligations
         secured by manufactured housing treated as a single-family
         residence under Section 25(e)(10) of the Code will be
considered
         interests in "qualified mortgages" as defined in Section
         860G(a)(3) of the Code.

The Small Business Job Protection Act of 1996, as part of the repeal of
the bad debt reserve method for thrift institutions, repealed the application
of
Code Section 593(d) to any taxable year beginning after December 31, 1995.

Stripped Bonds and Coupons.  Certain Trust Funds may consist of
Government
Securities which constitute "stripped bonds" or "stripped coupons" as those
terms are defined in Code Section 1286, and, as a result, such assets would
be
subject to the stripped bond provisions of the Code. Under these rules, such
Government Securities are treated as having OID based on the purchase price
and
the stated redemption price at maturity of each Security. As such, Grantor
Trust
Certificateholders would be required to include in income their pro rata
share
of the OID on each Government Security recognized in any given year on an
economic accrual basis even if the Grantor Trust Certificateholder is a cash
method taxpayer. Accordingly, the sum of the income includible to the Grantor
Trust Certificateholder in any taxable year may exceed amounts actually
received
during such year.

Buydown Loans.  The assets constituting certain Trust Funds may include
Buydown Loans. The characterization of any investment in Buydown Loans will
depend upon the precise terms of the related buydown agreement, but to the
extent that such Buydown Loans are secured in part by a bank account or other
personal property, they may not be treated in their entirety as assets
described
in the foregoing sections of the Code. There are no directly applicable
precedents with respect to the federal income tax treatment or the
characterization of investments in Buydown Loans. Accordingly, Grantor Trust
Certificateholders should consult their own tax advisors with respect to the
characterization of investments in Grantor Trust Certificates representing an
interest in a Trust Fund that includes Buydown Loans.

Premium.  The price paid for a Grantor Trust Certificate by a holder
will
be allocated to such holder's undivided interest in each Mortgage Asset based
on
each Mortgage Asset's relative fair market value, so that such holder's

undivided interest in each Mortgage Asset will have its own tax basis. A Grantor
Trust Certificateholder that acquires an interest in Mortgage Assets at a
premium may elect to amortize such premium under a constant interest method,
provided that the underlying mortgage loans with respect to such Mortgage Assets
were originated after September 27, 1985. Premium allocable to mortgage loans
originated on or before September 27, 1985 should be allocated among the
principal payments on such mortgage loans and allowed as an ordinary deduction
as principal payments are made.

<PAGE>

Amortizable bond premium will be treated as an offset to interest income on such
Grantor Trust Certificate. The basis for such Grantor Trust Certificate will be
reduced to the extent that amortizable premium is applied to offset interest
payments. It is not clear whether a reasonable prepayment assumption should be
used in computing amortization of premium allowable under Code Section 171. A
Certificateholder that makes this election for a Certificate that is acquired at
a premium will be deemed to have made an election to amortize bond premium with
respect to all debt instruments having amortizable bond premium that such
Certificateholder acquires during the year of the election or thereafter.

        If a premium is not subject to amortization using a reasonable prepayment
assumption, the holder of a Grantor Trust Certificate acquired at a premium
should recognize a loss if a Mortgage Loan (or an underlying mortgage loan with
respect to a Mortgage Asset) prepays in full, equal to the difference between
the portion of the prepaid principal amount of such Mortgage Loan (or underlying
mortgage loan) that is allocable to the Certificate and the portion of the
adjusted basis of the Certificate that is allocable to such Mortgage Loan (or
underlying mortgage loan). If a reasonable prepayment assumption is used to
amortize such premium, it appears that such a loss would be available, if at
all, only if prepayments have occurred at a rate faster than the reasonable
assumed prepayment rate. It is not clear whether any other adjustments would be
required to reflect differences between an assumed prepayment rate and the
actual rate of prepayments.

        On December 30, 1997 the IRS issued final regulations (the "Amortizable
Bond Premium Regulations") dealing with amortizable bond premium. These
regulations specifically do not apply to prepayable debt instruments subject to
Code Section 1272(a)(6) such as the Certificates. Absent further guidance from
the IRS, the Trustee intends to account for amortizable bond premium in the
manner described above. Prospective Certificateholders should consult their tax

advisors regarding the possible application of the amortizable Bond Premium Regulations.

Original Issue Discount. The IRS has stated in published rulings that, in circumstances similar to those described herein, the special rules of the Code relating to original issue discount ("OID")(currently Code Sections 1271 through 1273 and 1275) and Treasury regulations issued on January 27, 1994, as amended on June 11, 1996, under such Sections (the "OID Regulations"), will be applicable to a Grantor Trust Certificateholder's interest in those Mortgage Assets meeting the conditions necessary for these Sections to apply. Rules regarding periodic inclusion of OID income are applicable to mortgages of corporations originated after May 27, 1969, mortgages of noncorporate mortgagors (other than individuals) originated after July 1, 1982, and mortgages of individuals originated after March 2, 1984. Such OID could arise by the financing of points or other charges by the originator of the mortgages in an amount greater than a statutory de minimis exception to the extent that the points are not currently deductible under applicable Code provisions or are not for services provided by the lender. OID generally must be reported as ordinary gross income as it accrues under a constant interest method. See "--Multiple Classes of Grantor Trust Certificates--Accrual of Original Issue Discount" below.

Market Discount. A Grantor Trust Certificateholder that acquires an undivided interest in Mortgage Assets may be subject to the market discount rules of Code Sections 1276 through 1278 to the extent an undivided interest in a Mortgage Asset is considered to have been purchased at a "market discount." Generally, the amount of market discount is equal to the excess of the portion of the principal amount of such Mortgage Asset allocable to such holder's undivided interest over such holder's tax basis in such interest. Market discount with respect to a Grantor Trust Certificate will be considered to be zero if the amount allocable to the Grantor Trust Certificate is less than 0.25% of the Grantor Trust Certificate's stated redemption price at maturity multiplied by the weighted average maturity remaining after the date of purchase. Treasury regulations implementing the market discount rules have not yet been issued; therefore, investors should consult their own tax advisors regarding the application of these rules and the advisability of making any of the elections allowed under Code Sections 1276 through 1278.

The Code provides that any principal payment (whether a scheduled payment or a prepayment) or any gain on disposition of a market discount bond acquired by the taxpayer after October 22, 1986 shall be treated as ordinary income to the extent that it does not exceed the accrued market discount at the time

<PAGE>

of such payment. The amount of accrued market discount for purposes of
determining the tax treatment of subsequent principal payments or
dispositions
of the market discount bond is to be reduced by the amount so treated as
ordinary income.

   The Code also grants the Treasury Department authority to issue
regulations providing for the computation of accrued market discount on debt
instruments, the principal of which is payable in more than one installment.
While the Treasury Department has not yet issued regulations, rules described
in
the relevant legislative history will apply. Under those rules, the holder of
a
market discount bond may elect to accrue market discount either on the basis
of
a constant interest rate or according to one of the following methods. If a
Grantor Trust Certificate is issued with OID, the amount of market discount
that
accrues during any accrual period would be equal to the product of:

      (i)   the total remaining market discount and

      (ii)   a fraction, the numerator of which is the OID accruing during
the
             period and the denominator of which is the total remaining OID
at
             the beginning of the accrual period.

   For Grantor Trust Certificates issued without OID, the amount of market
discount that accrues during a period is equal to the product of:

      (i)   the total remaining market discount and

      (ii)   a fraction, the numerator of which is the amount of stated
interest
             paid during the accrual period and the denominator of which is
the
             total amount of stated interest remaining to be paid at the
             beginning of the accrual period.

   For purposes of calculating market discount under any of the above
methods
in the case of instruments (such as the Grantor Trust Certificates) that
provide
for payments that may be accelerated by reason of prepayments of other
obligations securing such instruments, the same prepayment assumption
applicable
to calculating the accrual of OID will apply. Because the regulations
described
above have not been issued, it is impossible to predict what effect those
regulations might have on the tax treatment of a Grantor Trust Certificate
purchased at a discount or premium in the secondary market.

   A holder who acquired a Grantor Trust Certificate at a market discount

also may be required to defer a portion of its interest deductions for the
taxable year attributable to any indebtedness incurred or continued to
purchase
or carry such Grantor Trust Certificate purchased with market discount. For
these purposes, the de minimis rule referred to above applies. Any such
deferred
interest expense would not exceed the market discount that accrues during
such
taxable year and is, in general, allowed as a deduction not later than the
year
in which such market discount is includible in income. If such holder elects
to
include market discount in income currently as it accrues on all market
discount
instruments acquired by such holder in that taxable year or thereafter, the
interest deferral rule described above will not apply.

    Election to Treat All Interest as OID.  The OID Regulations permit a
Certificateholder to elect to accrue all interest, discount (including de
minimis market or original issue discount) and premium in income as interest,
based on a constant yield method for Certificates acquired on or after April
4,
1994. If such an election were to be made with respect to a Grantor Trust
Certificate with market discount, the Certificateholder would be deemed to
have
made an election to include in income currently market discount with respect
to
all other debt instruments having market discount that such Certificateholder
acquires during the year of the election or thereafter. Similarly, a
Certificateholder that makes this election for a Certificate that is acquired
at
a premium will be deemed to have made an election to amortize bond premium
with
respect to all debt instruments having amortizable bond premium that such
Certificateholder owns or acquires. See "--Premium" herein. The election to
accrue interest, discount and premium on a constant yield method with respect
to
a Certificate is irrevocable.

    2.    Multiple Classes of Grantor Trust Certificates

    a.    Stripped Bonds and Stripped Coupons

<PAGE>

    Pursuant to Code Section 1286, the separation of ownership of the right
to
receive some or all of the interest payments on an obligation from ownership
of
the right to receive some or all of the principal payments results in the
creation of "stripped bonds" with respect to principal payments and "stripped
coupons" with respect to interest payments. For purposes of Code Sections
1271
through 1288, Code Section 1286 treats a stripped bond or a stripped coupon
as
an obligation issued on the date that such stripped interest is created. If a

Trust Fund is created with two classes of Grantor Trust Certificates, one class
of Grantor Trust Certificates may represent the right to principal and interest,
or principal only, on all or a portion of the Mortgage Assets (the "Stripped Bond Certificates"), while the second class of Grantor Trust Certificates may represent the right to some or all of the interest on such portion (the "Stripped Coupon Certificates").

Servicing fees in excess of reasonable servicing fees ("excess servicing") will be treated under the stripped bond rules. If the excess servicing fee is less than 100 basis points (i.e., 1% interest on the Mortgage Asset principal balance) or the Certificates are initially sold with a de minimis discount (assuming no prepayment assumption is required), any non-de minimis discount arising from a subsequent transfer of the Certificates should be treated as market discount. The IRS appears to require that reasonable servicing fees be calculated on a Mortgage Asset by Mortgage Asset basis, which could result in some Mortgage Assets being treated as having more than 100 basis points of interest stripped off.

Although not entirely clear, a Stripped Bond Certificate generally should be treated as an in interest in Mortgage Assets issued on the day such Certificate is purchased for purposes of calculating any OID. Generally, if the discount on a Mortgage Asset is larger than a de minimis amount (as calculated for purposes of the OID rules) a purchaser of such a Certificate will be required to accrue the discount under the OID rules of the Code. See "--Single Class of Grantor Trust Certificates--Original Issue Discount" herein. However, a purchaser of a Stripped Bond Certificate will be required to account for any discount on the Mortgage Assets as market discount rather than OID if either:

(i)   the amount of OID with respect to the Mortgage Assets is treated as
      zero under the OID de minimis rule when the Certificate was stripped
      or

(ii)  no more than 100 basis points (including any amount of servicing
      fees in excess of reasonable servicing fees) is stripped off of the
      Trust Fund's Mortgage Assets.

Pursuant to Revenue Procedure 91-49, issued on August 8, 1991, purchasers of Stripped Bond Certificates using an inconsistent method of accounting must change their method of accounting and request the consent of the IRS to the change in their accounting method on a statement attached to their first timely tax return filed after August 8, 1991.

The precise tax treatment of Stripped Coupon Certificates is substantially

uncertain. The Code could be read literally to require that OID computations be
made for each payment from each Mortgage Asset. However, based on the recent IRS
guidance, it appears that all payments from a Mortgage Asset underlying a
Stripped Coupon Certificate should be treated as a single installment obligation
subject to the OID rules of the Code, in which case, all payments from such
Mortgage Asset would be included in the Mortgage Asset's stated redemption price
at maturity for purposes of calculating income on such certificate under the OID
rules of the Code.

It is unclear under what circumstances, if any, the prepayment of Mortgage
Assets will give rise to a loss to the holder of a Stripped Bond Certificate
purchased at a premium or a Stripped Coupon Certificate. If such Certificate is
treated as a single instrument (rather than an interest in discrete mortgage
loans) and the effect of prepayments is taken into account in computing yield
with respect to such Grantor Trust Certificate, it appears that no loss will be
available as a result of any particular prepayment unless prepayments occur at a
rate faster than the assumed prepayment rate. However, if such Certificate is
treated as an interest in discrete Mortgage Assets, or if no prepayment
assumption is used, then when a Mortgage Asset is prepaid, the holder of such
Certificate should be able to recognize a loss equal to the portion of the
adjusted issue price of such Certificate that is allocable to such Mortgage
Asset.

<PAGE>

Holders of Stripped Bond Certificates and Stripped Coupon Certificates are
urged to consult with their own tax advisors regarding the proper treatment of
these Certificates for federal income tax purposes.

Treatment of Certain Owners.  Several Code sections provide beneficial
treatment to certain taxpayers that invest in Mortgage Assets of the type that
make up the Trust Fund. With respect to these Code sections, no specific legal
authority exists regarding whether the character of the Grantor Trust
Certificates, for federal income tax purposes, will be the same as that of the
underlying Mortgage Assets. While Code Section 1286 treats a stripped obligation
as a separate obligation for purposes of the Code provisions addressing OID, it
is not clear whether such characterization would apply with regard to these
other Code sections. Although the issue is not free from doubt, based on policy
considerations, each class of Grantor Trust Certificates, unless otherwise

specified in the related Prospectus Supplement, should be considered to
represent "real estate assets" within the meaning of Code Section
856(c)(4)(A)
and "loans . . . secured by, an interest in real property which is . . .
residential real property" within the meaning of Code Section
7701(a)(19)(C)(v),
and interest income attributable to Grantor Trust Certificates should be
considered to represent "interest on obligations secured by mortgages on real
property" within the meaning of Code Section 856(c)(3)(B), provided that in
each
case the underlying Mortgage Assets and interest on such Mortgage Assets
qualify
for such treatment. Prospective purchasers to which such characterization of
an
investment in Certificates is material should consult their own tax advisors
regarding the characterization of the Grantor Trust Certificates and the
income
therefrom. Grantor Trust Certificates will be "obligation[s] . . . which
[are]
principally secured, directly or indirectly, by an interest in real property"
within the meaning of Code Section 860G(a)(3).

        b.      Grantor Trust Certificates Representing Interests in Loans other
than ARM Loans

        The OID rules of Code Sections 1271 through 1275 will be applicable to
a
Certificateholder's interest in those Mortgage Assets as to which the
conditions
for the application of those sections are met. Rules regarding periodic
inclusion of OID in income are applicable to mortgages of corporations
originated after May 27, 1969, mortgages of noncorporate mortgagors (other
than
individuals) originated after July 1, 1982, and mortgages of individuals
originated after March 2, 1984. Under the OID Regulations, such OID could
arise
by the charging of points by the originator of the mortgage in an amount
greater
than the statutory de minimis exception, including a payment of points that
is
currently deductible by the borrower under applicable Code provisions, or
under
certain circumstances, by the presence of "teaser" rates on the Mortgage
Assets.
OID on each Grantor Trust Certificate must be included in the owner's
ordinary
income for federal income tax purposes as it accrues, in accordance with a
constant interest method that takes into account the compounding of interest,
in
advance of receipt of the cash attributable to such income. The amount of OID
required to be included in an owner's income in any taxable year with respect
to
a Grantor Trust Certificate representing an interest in Mortgage Assets other
than Mortgage Assets with interest rates that adjust periodically (ARM Loans)
likely will be computed as described below under "--Accrual of Original Issue
Discount." The following discussion is based in part on the OID Regulations
and

in part on the provisions of the Tax Reform Act of 1986 (the "1986 Act"). The
OID Regulations generally are effective for debt instruments issued on or
after
April 4, 1994, but may be relied upon as authority with respect to debt
instruments, such as the Grantor Trust Certificates, issued after December 21,
1992. Alternatively, proposed Treasury regulations issued December 21, 1992
may
be treated as authority for debt instruments issued after December 21, 1992
and
prior to April 4, 1994, and proposed Treasury regulations issued in 1986 and
1991 may be treated as authority for instruments issued before December 21,
1992. In applying these dates, the issue date of the Mortgage Assets should
be
used, or, in the case of Stripped Bond Certificates or Stripped Coupon
Certificates, the date such Certificates are acquired. The holder of a
Certificate should be aware, however, that neither the proposed OID
Regulations
nor the OID Regulations adequately address certain issues relevant to
prepayable
securities.

     Under the Code, the Mortgage Assets underlying the Grantor Trust
Certificate will be treated as having been issued on the date they were
originated with an amount of OID equal to the excess of such Mortgage Asset's
stated redemption price at maturity over its issue price. The issue price of
a
Mortgage Asset is generally the amount lent to the mortgagee, which may be
adjusted to take into account certain loan origination fees. The stated
redemption price at maturity of a Mortgage Asset is the sum of all

<PAGE>

payments to be made on such Mortgage Asset other than payments that are
treated
as qualified stated interest payments. The accrual of this OID, as described
below under "--Accrual of Original Issue Discount," will, unless otherwise
specified in the related Prospectus Supplement, utilize the original yield to
maturity of the Grantor Trust Certificate calculated based on a reasonable
assumed prepayment rate for the mortgage loans underlying the Grantor Trust
Certificates (the "Prepayment Assumption"), and will take into account events
that occur during the calculation period. The Prepayment Assumption will be
determined in the manner prescribed by regulations that have not yet been
issued. The legislative history of the 1986 Act (the "Legislative History")
provides, however, that the regulations will require that the Prepayment
Assumption be the prepayment assumption that is used in determining the
offering
price of such Certificate. No representation is made that any Certificate
will
prepay at the Prepayment Assumption or at any other rate. The prepayment
assumption contained in the Code literally only applies to debt instruments
collateralized by other debt instruments that are subject to prepayment
rather
than direct ownership interests in such debt instruments, such as the
Certificates represent. However, no other legal authority provides guidance
with

regard to the proper method for accruing OID on obligations that are subject to
prepayment, and, until further guidance is issued, the Master Servicer intends
to calculate and report OID under the method described below.

        Accrual of Original Issue Discount.  Generally, the owner of a Grantor
Trust Certificate must include in gross income the sum of the "daily portions,"
as defined below, of the OID on such Grantor Trust Certificate for each day on
which it owns such Certificate, including the date of purchase but excluding the
date of disposition. In the case of an original owner, the daily portions of OID
with respect to each component generally will be determined as set forth under
the OID Regulations. A calculation will be made by the Master Servicer or such
other entity specified in the related Prospectus Supplement of the portion of
OID that accrues during each successive monthly accrual period (or shorter
period from the date of original issue) that ends on the day in the calendar
year corresponding to each of the Distribution Dates on the Grantor Trust
Certificates (or the day prior to each such date). This will be done, in the
case of each full month accrual period, by:

        (i)    adding

                (a)    the present value at the end of the accrual period
(determined
                       by using as a discount factor the original yield to maturity
of
                       the respective component under the Prepayment Assumption) of
                       all remaining payments to be received under the Prepayment
                       Assumption on the respective component and

                (b)    any payments included in the state redemption price at
maturity
                       received during such accrual period, and

        (ii)   subtracting from that total the "adjusted issue price" of the
               respective component at the beginning of such accrual period.

        The adjusted issue price of a Grantor Trust Certificate at the beginning
of the first accrual period is its issue price; the adjusted issue price of a
Grantor Trust Certificate at the beginning of a subsequent accrual period is the
adjusted issue price at the beginning of the immediately preceding accrual
period plus the amount of OID allocable to that accrual period reduced by the
amount of any payment other than a payment of qualified stated interest made at
the end of or during that accrual period. The OID accruing during such accrual
period will then be divided by the number of days in the period to determine the
daily portion of OID for each day in the period. With respect to an initial

accrual period shorter than a full monthly accrual period, the daily portions of
OID must be determined according to an appropriate allocation under any reasonable method.

OID generally must be reported as ordinary gross income as it accrues under a constant interest method that takes into account the compounding of interest as it accrues rather than when received. However, the amount of OID includible in the income of a holder of an obligation is reduced when the obligation is acquired after its initial issuance at a price greater than the sum of the original issue price and the previously accrued OID, less prior payments of principal. Accordingly, if such Mortgage Assets

<PAGE>

acquired by a Certificateholder are purchased at a price equal to the then unpaid principal amount of such Mortgage Asset, no OID attributable to the difference between the issue price and the original principal amount of such Mortgage Asset (i.e. points) will be includible by such holder. Other OID on the
Mortgage Assets (e.g., that arising from a "teaser" rate) would still need to be
accrued.

c.     Grantor Trust Certificates Representing Interests in ARM Loans

The OID Regulations do not address the treatment of instruments, such as
the Grantor Trust Certificates, which represent interests in ARM Loans. Additionally, the IRS has not issued guidance under the Code's coupon stripping
rules with respect to such instruments. In the absence of any authority, the Master Servicer will report OID on Grantor Trust Certificates attributable to ARM Loans ("Stripped ARM Obligations") to holders in a manner it believes is consistent with the rules described above under the heading "--Grantor Trust Certificates Representing Interests in Loans Other Than ARM Loans" and with the
OID Regulations. In general, application of these rules may require inclusion of
income on a Stripped ARM Obligation in advance of the receipt of cash attributable to such income. Further, the addition of interest deferred by reason of negative amortization ("Deferred Interest") to the principal balance
of an ARM Loan may require the inclusion of such amount in the income of the Grantor Trust Certificateholder when such amount accrues. Furthermore, the addition of Deferred Interest to the Grantor Trust Certificate's principal balance will result in additional income (including possibly OID income) to the
Grantor Trust Certificateholder over the remaining life of such Grantor Trust Certificates.

Because the treatment of Stripped ARM Obligations is uncertain, investors
are urged to consult their tax advisors regarding how income will be includible
with respect to such Certificates.

3.    Sale or Exchange of a Grantor Trust Certificate

Sale or exchange of a Grantor Trust Certificate prior to its maturity will
result in gain or loss equal to the difference, if any, between the amount
received and the owner's adjusted basis in the Grantor Trust Certificate. Such
adjusted basis generally will equal the seller's purchase price for the Grantor
Trust Certificate, increased by the OID included in the seller's gross income
with respect to the Grantor Trust Certificate, and reduced by principal payments
on the Grantor Trust Certificate previously received by the seller. Such gain or
loss will be capital gain or loss to an owner for which a Grantor Trust
Certificate is a "capital asset" within the meaning of Code Section 1221, and
will be long-term or short-term depending on whether the Grantor Trust
Certificate has been owned for the long-term capital gain holding period
(generally more than one year). Long-term capital gains of non-corporate
taxpayers are subject to reduced maximum rates while short-term capital gains
are taxable at ordinary rates. The use of capital losses is subject to
limitations.

Prospective investors should consult their own tax advisors concerning the
treatment of capital gains.

Grantor Trust Certificates will be "evidences of indebtedness" within the
meaning of Code Section 582(c)(1), so that gain or loss recognized from the sale
of a Grantor Trust Certificate by a bank or a thrift institution to which such
section applies will be treated as ordinary income or loss.

4.    Non-U.S. Persons

Generally, to the extent that a Grantor Trust Certificate evidences
ownership in underlying Mortgage Assets that were issued on or before July 18,
1984, interest or OID paid by the person required to withhold tax under Code
Section 1441 or 1442 to (i) an owner that is not a U.S. Person or (ii) a Grantor
Trust Certificateholder holding on behalf of an owner that is not a U.S. Person
will be subject to federal income tax, collected by withholding, at a rate of
30% or such lower rate as may be provided for interest by an applicable tax
treaty. Accrued OID recognized by the owner on the sale or exchange of such a
Grantor Trust Certificate also will be subject to federal income tax at the same
rate. Generally, such payments would not be subject to withholding to the extent
that a Grantor Trust Certificate evidences ownership in Mortgage Assets issued
after July 18, 1984, by natural persons if such Grantor Trust Certificateholder
complies with certain identification requirements (including delivery of a

statement,

<PAGE>

signed by the Grantor Trust Certificateholder under penalties of perjury,
certifying that such Grantor Trust Certificateholder is not a U.S. Person and
providing the name and address of such Grantor Trust Certificateholder).
Additional restrictions apply to Mortgage Assets where the mortgagor is not a
natural person in order to qualify for the exemption from withholding.

    5.      Information Reporting and Backup Withholding

    The Master Servicer will furnish or make available, within a reasonable
time after the end of each calendar year, to each person who was a
Certificateholder at any time during such year, such information as may be
deemed necessary or desirable to assist Certificateholders in preparing their
federal income tax returns, or to enable holders to make such information
available to beneficial owners or financial intermediaries that hold such
Certificates as nominees on behalf of beneficial owners. If a holder,
beneficial
owner, financial intermediary or other recipient of a payment on behalf of a
beneficial owner fails to supply a certified taxpayer identification number
or
if the Secretary of the Treasury determines that such person has not reported
all interest and dividend income required to be shown on its federal income
tax
return, backup withholding may be required with respect to any payments. Any
amounts deducted and withheld on account of backup withholding from a
distribution to a recipient would be allowed as a credit against such
recipient's federal income tax liability. The backup withholding rate is
currently 28%. This rate is scheduled to adjust for tax years after 2010.

NEW WITHHOLDING REGULATIONS

    On January 1, 2001 new regulations (the "New Regulations") became
effective (subject to certain transition rules) which make certain
modifications
to the withholding, backup withholding and information reporting rules
described
above. The New Regulations attempt to unify certification requirements and
modify reliance standards. Prospective investors are urged to consult their
own
tax advisors regarding the New Regulations.

REMICS

    The Trust Fund relating to a series of Certificates may elect to be
treated as a REMIC. Qualification as a REMIC requires ongoing compliance with
certain conditions. Although a REMIC is not generally subject to federal
income
tax (see, however "--Taxation of Owners of REMIC Residual Certificates" and
"--Prohibited Transactions Tax and Other Taxes" below), if a Trust Fund with
respect to which a REMIC election is made fails to comply with one or more of
the ongoing requirements of the Code for REMIC status during any taxable year,
including the implementation of restrictions on the purchase and transfer of
the

residual interests in a REMIC as described below under "Taxation of Owners of REMIC Residual Certificates," the Code provides that a Trust Fund will not be treated as a REMIC for such year and thereafter. In that event, such entity may
be taxable as a separate corporation, and the related Certificates (the "REMIC
Certificates") may not be accorded the status or given the tax treatment described below. While the Code authorizes the Treasury Department to issue regulations providing relief in the event of an inadvertent termination of the
status of a trust fund as a REMIC, no such regulations have been issued. Any such relief, moreover, may be accompanied by sanctions, such as the imposition
of a corporate tax on all or a portion of the REMIC's income for the period in
which the requirements for such status are not satisfied. With respect to each
Trust Fund that elects REMIC status, Dechert LLP or Thacher Proffitt & Wood will
deliver its opinion generally to the effect that, under then existing law and assuming compliance with all provisions of the related Pooling and Servicing Agreement, such Trust Fund will qualify as a REMIC, and the related Certificates
will be considered to be regular interests ("REMIC Regular Certificates") or a
sole class of residual interests ("REMIC Residual Certificates") in the REMIC. The related Prospectus Supplement for each series of Certificates will indicate
whether the Trust Fund will make a REMIC election and whether a class of Certificates will be treated as a regular or residual interest in the REMIC.

        In general, with respect to each series of Certificates for which a REMIC
election is made, (i) such Certificates held by a thrift institution taxed as a
"domestic building and loan association" will

                                   80
<PAGE>

constitute assets described in Code Section 7701(a)(19)(C); (ii) such Certificates held by a real estate investment trust will constitute "real estate
assets" within the meaning of Code Section 856(c)(4)(A); and (iii) interest on
such Certificates held by a real estate investment trust will be considered "interest on obligations secured by mortgages on real property" within the meaning of Code Section 856(c)(3)(B). If less than 95% of the REMIC's assets are
assets qualifying under any of the foregoing Code sections, the Certificates will be qualifying assets only to the extent that the REMIC's assets are qualifying assets. In addition, payments on Mortgage Assets held pending distribution on the REMIC Certificates will be considered to be real estate assets for purposes of Code Section 856(c). The Small Business Job Protection Act of 1996, as part of the repeal of the bad debt reserve method for thrift institutions, repealed the application of Code Section 593(d) to any taxable year beginning after December 31, 1995.

In some instances the Mortgage Assets may not be treated entirely as assets described in the foregoing sections. See, in this regard, the discussion of Buydown Loans contained in "--Single Class of Grantor Trust Certificates" above. REMIC Certificates held by a real estate investment trust will not constitute "Government Securities" within the meaning of Code Section 856(c)(4)(A), and REMIC Certificates held by a regulated investment company will not constitute "Government Securities" within the meaning of Code Section 851(b)(3)(A)(ii). REMIC Certificates held by certain financial institutions will constitute "evidences of indebtedness" within the meaning of Code Section 582(c)(1).

A "qualified mortgage" for REMIC purposes is any obligation (including certificates of participation in such an obligation) that is principally secured by an interest in real property and that is transferred to the REMIC within a prescribed time period in exchange for regular or residual interests in the REMIC. The REMIC Regulations provide that obligations secured by manufactured housing that qualify as "single-family residences" within the meaning of Code Section 25(e)(10) may be treated as "qualified mortgages" of a REMIC. Under Code Section 25(e)(10), the term "single-family residence" includes any manufactured home which has a minimum of 400 square feet of living space, a minimum width in excess of 102 inches and which is of a kind customarily used at a fixed location.

Tiered REMIC Structures.  For certain series of Certificates, two separate elections may be made to treat designated portions of the related Trust Fund as REMICs (respectively, the "Subsidiary REMIC" and the "Master REMIC") for federal income tax purposes. Upon the issuance of any such series of Certificates, Dechert LLP or Thacher Proffitt & Wood, counsel to the Depositor, will deliver its opinion generally to the effect that, assuming compliance with all provisions of the related Agreement, the Master REMIC as well as any Subsidiary REMIC will each qualify as a REMIC, and the REMIC Certificates issued by the Master REMIC and the Subsidiary REMIC, respectively, will be considered to evidence ownership of REMIC Regular Certificates or REMIC Residual Certificates in the related REMIC within the meaning of the REMIC provisions.

Only REMIC Certificates, other than the residual interest in the Subsidiary REMIC, issued by the Master REMIC will be offered hereunder. The Subsidiary REMIC and the Master REMIC will be treated as one REMIC solely for purposes of determining whether the REMIC Certificates will be (i) "real estate assets" within the meaning of Code Section 856(c)(4)(A); (ii) "loans secured by an interest in real property" under Code Section 7701(a)(19)(C); and (iii)

whether the income on such Certificates is interest described in Code Section
856(c)(3)(B).

    1.    Taxation of Owners of REMIC Regular Certificates

    General.  Except as otherwise stated in this discussion, REMIC Regular
Certificates will be treated for federal income tax purposes as debt
instruments
issued by the REMIC and not as ownership interests in the REMIC or its assets.
Moreover, holders of REMIC Regular Certificates that otherwise report income
under a cash method of accounting will be required to report income with
respect
to REMIC Regular Certificates under an accrual method.

    Original Issue Discount and Premium.  The REMIC Regular Certificates
may
be issued with OID. Generally, such OID, if any, will equal the difference
between the "stated redemption price at maturity" of a REMIC Regular
Certificate
and its "issue price." Holders of any class of Certificates issued with

<PAGE>

OID will be required to include such OID in gross income for federal income
tax
purposes as it accrues, in accordance with a constant interest method based
on
the compounding of interest as it accrues rather than in accordance with
receipt
of the interest payments. The following discussion is based in part on the
OID
Regulations and in part on the provisions of the 1986 Act. Holders of REMIC
Regular Certificates (the "REMIC Regular Certificateholders") should be aware,
however, that the OID Regulations do not adequately address certain issues
relevant to prepayable securities, such as the REMIC Regular Certificates.

    Rules governing OID are set forth in Code Sections 1271 through 1273
and
1275. These rules require that the amount and rate of accrual of OID be
calculated based on the Prepayment Assumption and the anticipated
reinvestment
rate, if any, relating to the REMIC Regular Certificates and prescribe a
method
for adjusting the amount and rate of accrual of such discount where the
actual
prepayment rate differs from the Prepayment Assumption. Under the Code, the
Prepayment Assumption must be determined in the manner prescribed by
regulations, which regulations have not yet been issued. The Legislative
History
provides, however, that Congress intended the regulations to require that the
Prepayment Assumption be the prepayment assumption that is used in
determining
the initial offering price of such REMIC Regular Certificates. The Prospectus
Supplement for each series of REMIC Regular Certificates will specify the
Prepayment Assumption to be used for the purpose of determining the amount
and

rate of accrual of OID. No representation is made that the REMIC Regular
Certificates will prepay at the Prepayment Assumption or at any other rate.

In general, each REMIC Regular Certificate will be treated as a single
installment obligation issued with an amount of OID equal to the excess of
its
"stated redemption price at maturity" over its "issue price." The issue price
of
a REMIC Regular Certificate is the first price at which a substantial amount
of
REMIC Regular Certificates of that class are first sold to the public
(excluding
bond houses, brokers, underwriters or wholesalers). If less than a
substantial
amount of a particular class of REMIC Regular Certificates is sold for cash
on
or prior to the date of their initial issuance (the "Closing Date"), the
issue
price for such class will be treated as the fair market value of such class
on
the Closing Date. The issue price of a REMIC Regular Certificate also
includes
the amount paid by an initial Certificateholder for accrued interest that
relates to a period prior to the issue date of the REMIC Regular Certificate.
The stated redemption price at maturity of a REMIC Regular Certificate
includes
the original principal amount of the REMIC Regular Certificate, but generally
will not include distributions of interest if such distributions constitute
"qualified stated interest." Qualified stated interest generally means
interest
payable at a single fixed rate or qualified variable rate (as described
below)
provided that such interest payments are unconditionally payable at intervals
of
one year or less during the entire term of the REMIC Regular Certificate.
Interest is payable at a single fixed rate only if the rate appropriately
takes
into account the length of the interval between payments. Distributions of
interest on REMIC Regular Certificates with respect to which Deferred
Interest
will accrue will not constitute qualified stated interest payments, and the
stated redemption price at maturity of such REMIC Regular Certificates
includes
all distributions of interest as well as principal thereon.

Where the interval between the issue date and the first Distribution
Date
on a REMIC Regular Certificate is longer than the interval between subsequent
Distribution Dates, the greater of any original issue discount (disregarding
the
rate in the first period) and any interest foregone during the first period
is
treated as the amount by which the stated redemption price at maturity of the
Certificate exceeds its issue price for purposes of the de minimis rule
described below. The OID Regulations suggest that all interest on a long
first
period REMIC Regular Certificate that is issued with non-de minimis OID, as

determined under the foregoing rule, will be treated as OID. Where the
interval
between the issue date and the first Distribution Date on a REMIC Regular
Certificate is shorter than the interval between subsequent Distribution
Dates,
interest due on the first Distribution Date in excess of the amount that
accrued
during the first period would be added to the Certificate's stated redemption
price at maturity. REMIC Regular Certificateholders should consult their own
tax
advisors to determine the issue price and stated redemption price at maturity
of
a REMIC Regular Certificate.

<PAGE>

        Under the de minimis rule, OID on a REMIC Regular Certificate will be
considered to be zero if such OID is less than 0.25% of the stated redemption
price at maturity of the REMIC Regular Certificate multiplied by the weighted
average maturity of the REMIC Regular Certificate. For this purpose, the
weighted average maturity of the REMIC Regular Certificate is computed as the
sum of the amounts determined by multiplying the number of full years (i.e.,
rounding down partial years) from the issue date until each distribution in
reduction of stated redemption price at maturity is scheduled to be made by a
fraction, the numerator of which is the amount of each distribution included
in
the stated redemption price at maturity of the REMIC Regular Certificate and
the
denominator of which is the stated redemption price at maturity of the REMIC
Regular Certificate. Although currently unclear, it appears that the schedule
of
such distributions should be determined in accordance with the Prepayment
Assumption. The Prepayment Assumption with respect to a series of REMIC
Regular
Certificates will be set forth in the related Prospectus Supplement. Holders
generally must report de minimis OID pro rata as principal payments are
received, and such income will be capital gain if the REMIC Regular
Certificate
is held as a capital asset. However, accrual method holders may elect to
accrue
all de minimis OID as well as market discount under a constant interest
method.

        The Prospectus Supplement with respect to a Trust Fund may provide for
certain REMIC Regular Certificates to be issued at prices significantly
exceeding their principal amounts or based on notional principal balances
(the
"Super-Premium Certificates"). The income tax treatment of such REMIC Regular
Certificates is not entirely certain. For information reporting purposes, the
Trust Fund intends to take the position that the stated redemption price at
maturity of such REMIC Regular Certificates is the sum of all payments to be
made on such REMIC Regular Certificates determined under the Prepayment
Assumption, with the result that such REMIC Regular Certificates would be
issued
with OID. The calculation of income in this manner could result in negative

original issue discount (which delays future accruals of OID rather than being
immediately deductible) when prepayments on the Mortgage Assets exceed those
estimated under the Prepayment Assumption. The IRS might contend, however, that
certain proposed contingent payment rules contained in regulations issued on
December 15, 1994, with respect to OID, should apply to such Certificates.
Although such rules are not applicable to instruments governed by Code Section
1272(a)(6), they represent the only guidance regarding the current views of the
IRS with respect to contingent payment instruments. In the alternative, the IRS
could assert that the stated redemption price at maturity of such REMIC Regular
Certificates should be limited to their principal amount (subject to the
discussion below under "--Accrued Interest Certificates"), so that such REMIC
Regular Certificates would be considered for federal income tax purposes to be
issued at a premium. If such a position were to prevail, the rules described
below under "--Taxation of Owners of REMIC Regular Certificates--Premium" would
apply. It is unclear when a loss may be claimed for any unrecovered basis for a
Super-Premium Certificate. It is possible that a holder of a Super-Premium
Certificate may only claim a loss when its remaining basis exceeds the maximum
amount of future payments, assuming no further prepayments or when the final
payment is received with respect to such Super-Premium Certificate.

        Under the REMIC Regulations, if the issue price of a REMIC Regular
Certificate (other than a REMIC Regular Certificate based on a notional amount)
does not exceed 125% of its actual principal amount, the interest rate is not
considered disproportionately high. Accordingly, such REMIC Regular Certificate
generally should not be treated as a Super-Premium Certificate and the rules
described below under "--Taxation of Owners of REMIC Regular
Certificates--Premium" should apply. However, it is possible that holders of
REMIC Regular Certificates issued at a premium, even if the premium is less than
25% of such Certificate's actual principal balance, will be required to amortize
the premium under an original issue discount method or contingent interest
method even though no election under Code Section 171 is made to amortize such
premium.

        Generally, a REMIC Regular Certificateholder must include in gross income
the "daily portions," as determined below, of the OID that accrues on a REMIC
Regular Certificate for each day a Certificateholder holds the REMIC Regular
Certificate, including the purchase date but excluding the disposition date. In
the case of an original holder of a REMIC Regular Certificate, a calculation
will be

<PAGE>

made of the portion of the OID that accrues during each successive period ("an
accrual period") that ends on the day in the calendar year corresponding to a
Distribution Date (or if Distribution Dates are on the first day or first
business day of the immediately preceding month, interest may be treated as
payable on the last day of the immediately preceding month) and begins on the
day after the end of the immediately preceding accrual period (or on the issue
date in the case of the first accrual period). This will be done, in the case of
each full accrual period, by:

      (i)   adding

          (a)   the present value at the end of the accrual period (determined
             by using as a discount factor the original yield to maturity of
             the REMIC Regular Certificates as calculated under the
             Prepayment Assumption) of all remaining payments to be received
             on the REMIC Regular Certificates under the Prepayment
             Assumption, and

          (b)   any payments included in the stated redemption price at
             maturity received during such accrual period, and

     (ii)   subtracting from that total the adjusted issue price of the REMIC
        Regular Certificates at the beginning of such accrual period.

The adjusted issue price of a REMIC Regular Certificate at the beginning of the
first accrual period is its issue price; the adjusted issue price of a REMIC
Regular Certificate at the beginning of a subsequent accrual period is the
adjusted issue price at the beginning of the immediately preceding accrual
period plus the amount of OID allocable to that accrual period and reduced by
the amount of any payment other than a payment of qualified stated interest made
at the end of or during that accrual period. The OID accrued during an accrual
period will then be divided by the number of days in the period to determine the
daily portion of OID for each day in the accrual period. The calculation of OID
under the method described above will cause the accrual of OID to either
increase or decrease (but never below zero) in a given accrual period to reflect
the fact that prepayments are occurring faster or slower than under the
Prepayment Assumption. With respect to an initial accrual period shorter than a
full accrual period, the daily portions of OID may be determined according to an
appropriate allocation under any reasonable method.

A subsequent purchaser of a REMIC Regular Certificate issued with OID
who
purchases the REMIC Regular Certificate at a cost less than the remaining
stated
redemption price at maturity will also be required to include in gross income
the sum of the daily portions of OID on that REMIC Regular Certificate. In
computing the daily portions of OID for such a purchaser (as well as an
initial
purchaser that purchases at a price higher than the adjusted issue price but
less than the stated redemption price at maturity), however, the daily
portion
is reduced by the amount that would be the daily portion for such day
(computed
in accordance with the rules set forth above) multiplied by a fraction, the
numerator of which is the amount, if any, by which the price paid by such
holder
for that REMIC Regular Certificate exceeds the following amount:

        (a)     the sum of the issue price plus the aggregate amount of OID that
                would have been includible in the gross income of an original
REMIC
                Regular Certificateholder (who purchased the REMIC Regular
                Certificate at its issue price), less

        (b)     any prior payments included in the stated redemption price at
                maturity, and the denominator of which is the sum of the daily
                portions for that REMIC Regular Certificate for all days
beginning
                on the date after the purchase date and ending on the maturity
date
                computed under the Prepayment Assumption. A holder who pays an
                acquisition premium instead may elect to accrue OID by treating
the
                purchase as a purchase at original issue.

        Variable Rate REMIC Regular Certificates.  REMIC Regular Certificates
may
provide for interest based on a variable rate. Interest based on a variable
rate
will constitute qualified stated interest and not contingent interest if,
generally,

        (i)     such interest is unconditionally payable at least annually,

                                    84
<PAGE>
        (ii)    the issue price of the debt instrument does not exceed the
total
                noncontingent principal payments, and

        (iii)   interest is based on a "qualified floating rate," an "objective
                rate," a combination of a single fixed rate and one or more
                "qualified floating rates," one "qualified inverse floating
rate,"

or a combination of "qualified floating rates" that do not operate
in a manner that significantly accelerates or defers interest payments on such REMIC Regular Certificate.

The amount of OID with respect to a REMIC Regular Certificate bearing a variable rate of interest will accrue in the manner described above under "--Original Issue Discount and Premium" by assuming generally that the index used for the variable rate will remain fixed throughout the term of the Certificate. Appropriate adjustments are made for the actual variable rate.

Although unclear at present, the Depositor intends to treat interest on a REMIC Regular Certificate that is a weighted average of the net interest rates on Mortgage Loans as qualified stated interest. In such case, the weighted average rate used to compute the initial pass-through rate on the REMIC Regular Certificates will be deemed to be the index in effect through the life of the REMIC Regular Certificates. It is possible, however, that the IRS may treat some or all of the interest on REMIC Regular Certificates with a weighted average rate as taxable under the rules relating to obligations providing for contingent payments. Such treatment may effect the timing of income accruals on such REMIC Regular Certificates.

Election to Treat All Interest as OID. The OID Regulations permit a Certificateholder to elect to accrue all interest, discount (including de minimis market or original issue discount) and premium in income as interest, based on a constant yield method. If such an election were to be made with respect to a REMIC Regular Certificate with market discount, the Certificateholder would be deemed to have made an election to include in income currently market discount with respect to all other debt instruments having market discount that such Certificateholder acquires during the year of the election and thereafter. Similarly, a Certificateholder that makes this election for a Certificate that is acquired at a premium will be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that such Certificateholder owns or acquires. See "--Taxation of Owners of REMIC Regular Certificates--Premium" herein. The election to accrue interest, discount and premium on a constant yield method with respect to a Certificate is irrevocable.

Market Discount. A purchaser of a REMIC Regular Certificate may also be subject to the market discount provisions of Code Sections 1276 through 1278. Under these provisions and the OID Regulations, "market discount" equals the excess, if any, of

(i)    the REMIC Regular Certificate's stated principal amount or, in the case of a REMIC Regular Certificate with OID, the adjusted issue price (determined for this purpose as if the purchaser had

purchased such REMIC Regular Certificate from an original
holder)

over

(ii)   the price for such REMIC Regular Certificate paid by the
purchaser.

A Certificateholder that purchases a REMIC Regular Certificate at a
market
discount will recognize income upon receipt of each distribution representing
amounts included in such certificate's stated redemption price at maturity.
In
particular, under Code Section 1276 such a holder generally will be required
to
allocate each such distribution first to accrued market discount not
previously
included in income, and to recognize ordinary income to that extent. A
Certificateholder may elect to include market discount in income currently as
it
accrues rather than including it on a deferred basis in accordance with the
foregoing. If made, such election will apply to all market discount bonds
acquired by such Certificateholder on or after the first day of the first
taxable year to which such election applies.

Market discount with respect to a REMIC Regular Certificate will be
considered to be zero if the amount allocable to the REMIC Regular
Certificate
is less than 0.25% of such REMIC Regular Certificate's stated redemption
price
at maturity multiplied by such REMIC Regular Certificate's weighted average
maturity remaining after the date of purchase. If market discount on a REMIC
Regular

<PAGE>

Certificate is considered to be zero under this rule, the actual amount of
market discount must be allocated to the remaining principal payments on the
REMIC Regular Certificate, and gain equal to such allocated amount will be
recognized when the corresponding principal payment is made. Treasury
regulations implementing the market discount rules have not yet been issued;
therefore, investors should consult their own tax advisors regarding the
application of these rules and the advisability of making any of the
elections
allowed under Code Sections 1276 through 1278.

The Code provides that any principal payment (whether a scheduled
payment
or a prepayment) or any gain on disposition of a market discount bond
acquired
by the taxpayer after October 22, 1986, shall be treated as ordinary income
to
the extent that it does not exceed the accrued market discount at the time of
such payment. The amount of accrued market discount for purposes of
determining
the tax treatment of subsequent principal payments or dispositions of the
market

discount bond is to be reduced by the amount so treated as ordinary income.

The Code also grants authority to the Treasury Department to issue regulations providing for the computation of accrued market discount on debt instruments, the principal of which is payable in more than one installment. Until such time as regulations are issued by the Treasury, rules described in the Legislative History will apply. Under those rules, the holder of a market discount bond may elect to accrue market discount either on the basis of a constant interest method rate or according to one of the following methods. For REMIC Regular Certificates issued with OID, the amount of market discount that accrues during a period is equal to the product of:

    (i)   the total remaining market discount and

    (ii)  a fraction, the numerator of which is the OID accruing during the
         period and the denominator of which is the total remaining OID at
         the beginning of the period.

For REMIC Regular Certificates issued without OID, the amount of market discount that accrues during a period is equal to the product of:

    (a)   the total remaining market discount and

    (b)   a fraction, the numerator of which is the amount of stated interest
         paid during the accrual period and the denominator of which is the
         total amount of stated interest remaining to be paid at the
         beginning of the period.

For purposes of calculating market discount under any of the above methods in the case of instruments (such as the REMIC Regular Certificates) that provide for payments that may be accelerated by reason of prepayments of other obligations securing such instruments, the same Prepayment Assumption applicable to calculating the accrual of OID will apply.

A holder who acquired a REMIC Regular Certificate at a market discount also may be required to defer a portion of its interest deductions for the taxable year attributable to any indebtedness incurred or continued to purchase or carry such Certificate purchased with market discount. For these purposes, the de minimis rule referred to above applies. Any such deferred interest expense would not exceed the market discount that accrues during such taxable year and is, in general, allowed as a deduction not later than the year in which such market discount is includible in income. If such holder elects to include market discount in income currently as it accrues on all market discount instruments acquired by such holder in that taxable year or thereafter, the interest deferral rule described above will not apply.

Premium.  A purchaser of a REMIC Regular Certificate that purchases the REMIC Regular Certificate at a cost (not including accrued qualified stated interest) greater than its remaining stated redemption price at maturity will be
considered to have purchased the REMIC Regular Certificate at a premium and may
elect to amortize such premium under a constant yield method. A Certificateholder that makes this election for a Certificate that is acquired at
a premium will be deemed to have made an election to amortize bond premium with
respect to all debt instruments having amortizable bond premium that such Certificateholder acquires during the year of the election or thereafter. It is
not clear whether the Prepayment Assumption would be taken into account in determining the life of the REMIC Regular

<PAGE>

Certificate for this purpose. However, the Legislative History states that the
same rules that apply to accrual of market discount (which rules require use of
a Prepayment Assumption in accruing market discount with respect to REMIC Regular Certificates without regard to whether such Certificates have OID) will
also apply in amortizing bond premium under Code Section 171. The Code provides
that amortizable bond premium will be allocated among the interest payments on
such REMIC Regular Certificates and will be applied as an offset against such interest payment. On December 30, 1997, the IRS issued final regulations (the "Amortizable Bond Premium Regulations") dealing with amortizable bond premium. These regulations specifically do not apply to prepayable debt instruments subject to Code Section 1272(a)(6). Absent further guidance from the IRS the Trust intends to account for amortizable bond premium in the manner described above. Certificateholders should consult their tax advisors regarding the possibility of making an election to amortize any such bond premium.

        Deferred Interest.  Certain classes of REMIC Regular Certificates may provide for the accrual of Deferred Interest with respect to one or more ARM Loans. Any Deferred Interest that accrues with respect to a class of REMIC Regular Certificates will constitute income to the holders of such Certificates
prior to the time distributions of cash with respect to such Deferred Interest
are made. It is unclear, under the OID Regulations, whether any of the interest
on such Certificates will constitute qualified stated interest or whether all or
a portion of the interest payable on such Certificates must be included in the
stated redemption price at maturity of the Certificates and accounted for as OID
(which could accelerate such inclusion). Interest on REMIC Regular Certificates

must in any event be accounted for under an accrual method by the holders of
such Certificates and, therefore, applying the latter analysis may result
only
in a slight difference in the timing of the inclusion in income of interest
on
such REMIC Regular Certificates.

Effects of Defaults and Delinquencies. Certain series of Certificates
may
contain one or more classes of Subordinated Certificates, and in the event
there
are defaults or delinquencies on the Mortgage Assets, amounts that would
otherwise be distributed on the Subordinated Certificates may instead be
distributed on the Senior Certificates. Subordinated Certificateholders
nevertheless will be required to report income with respect to such
Certificates
under an accrual method without giving effect to delays and reductions in
distributions on such Subordinated Certificates attributable to defaults and
delinquencies on the Mortgage Assets, except to the extent that it can be
established that such amounts are uncollectible. As a result, the amount of
income reported by a Subordinated Certificateholder in any period could
significantly exceed the amount of cash distributed to such holder in that
period. The holder will eventually be allowed a loss (or will be allowed to
report a lesser amount of income) to the extent that the aggregate amount of
distributions on the Subordinated Certificate is reduced as a result of
defaults
and delinquencies on the Mortgage Assets. Timing and characterization of such
losses is discussed in "--Taxation of Owners of REMIC Regular
Certificates--Treatment of Realized Losses" below.

Sale, Exchange or Redemption. If a REMIC Regular Certificate is sold,
exchanged, redeemed or retired, the seller will recognize gain or loss equal
to
the difference between the amount realized on the sale, exchange, redemption,
or
retirement and the seller's adjusted basis in the REMIC Regular Certificate.
Such adjusted basis generally will equal the cost of the REMIC Regular
Certificate to the seller, increased by any OID and market discount included
in
the seller's gross income with respect to the REMIC Regular Certificate, and
reduced (but not below zero) by payments included in the stated redemption
price
at maturity previously received by the seller and by any amortized premium.
Similarly, a holder who receives a payment that is part of the stated
redemption
price at maturity of a REMIC Regular Certificate will recognize gain equal to
the excess, if any, of the amount of the payment over the holder's adjusted
basis in the REMIC Regular Certificate. A REMIC Regular Certificateholder who
receives a final payment that is less than the holder's adjusted basis in the
REMIC Regular Certificate will generally recognize a loss. Except as provided
in
the following paragraph and as provided under "--Market Discount" above, any
such gain or loss will be capital gain or loss, provided that the REMIC
Regular
Certificate is held as a "capital asset" (generally, property held for
investment) within the meaning of Code Section 1221. Such gain or loss
generally

will be long-term capital gain or loss if the Note were held for more than one
year. Long-term capital gains of non-corporate taxpayers are subject to

<PAGE>

reduced maximum rates while short-term capital gains are taxable at ordinary
rates. The use of capital losses is subject to limitations. Prospective
investors should consult their own tax advisors concerning the treatment of
capital gains.

     Gain from the sale or other disposition of a REMIC Regular Certificate
that might otherwise be capital gain will be treated as ordinary income to
the
extent that such gain does not exceed the excess, if any, of (i) the amount
that
would have been includible in such holder's income with respect to the REMIC
Regular Certificate had income accrued thereon at a rate equal to 110% of the
AFR as defined in Code Section 1274(d) determined as of the date of purchase
of
such REMIC Regular Certificate, over (ii) the amount actually includible in
such
holder's income.

     The Certificates will be "evidences of indebtedness" within the meaning
of
Code Section 582(c)(1), so that gain or loss recognized from the sale of a
REMIC
Regular Certificate by a bank or a thrift institution to which such section
applies will be ordinary income or loss.

     The REMIC Regular Certificate information reports will include a
statement
of the adjusted issue price of the REMIC Regular Certificate at the beginning
of
each accrual period. In addition, the reports will include information
necessary
to compute the accrual of any market discount that may arise upon secondary
trading of REMIC Regular Certificates. Because exact computation of the
accrual
of market discount on a constant yield method would require information
relating
to the holder's purchase price which the REMIC may not have, it appears that
the
information reports will only require information pertaining to the
appropriate
proportionate method of accruing market discount.

     Accrued Interest Certificates.  Certain of the REMIC Regular
Certificates
("Payment Lag Certificates") may provide for payments of interest based on a
period that corresponds to the interval between Distribution Dates but that
ends
prior to each such Distribution Date. The period between the Closing Date for
Payment Lag Certificates and their first Distribution Date may or may not
exceed

such interval. Purchasers of Payment Lag Certificates for which the period
between the Closing Date and the first Distribution Date does not exceed such
interval could pay upon purchase of the REMIC Regular Certificates accrued
interest in excess of the accrued interest that would be paid if the interest
paid on the Distribution Date were interest accrued from Distribution Date to
Distribution Date. If a portion of the initial purchase price of a REMIC
Regular
Certificate is allocable to interest that has accrued prior to the issue date
("pre-issuance accrued interest") and the REMIC Regular Certificate provides
for
a payment of stated interest on the first payment date (and the first payment
date is within one year of the issue date) that equals or exceeds the amount
of
the pre-issuance accrued interest, then the REMIC Regular Certificates' issue
price may be computed by subtracting from the issue price the amount of
pre-issuance accrued interest, rather than as an amount payable on the REMIC
Regular Certificate. However, it is unclear under this method how the OID
Regulations treat interest on Payment Lag Certificates. Therefore, in the
case
of a Payment Lag Certificate, the Trust Fund intends to include accrued
interest
in the issue price and report interest payments made on the first
Distribution
Date as interest to the extent such payments represent interest for the
number
of days that the Certificateholder has held such Payment Lag Certificate
during
the first accrual period.

        Investors should consult their own tax advisors concerning the
treatment
for federal income tax purposes of Payment Lag Certificates.

        Non-Interest Expenses of the REMIC.  Under temporary Treasury
regulations,
if the REMIC is considered to be a "single-class REMIC," a portion of the
REMIC's servicing, administrative and other non-interest expenses will be
allocated as a separate item to those REMIC Regular Certificateholders that
are
"pass-through interest holders." Certificateholders that are pass-through
interest holders should consult their own tax advisors about the impact of
these
rules on an investment in the REMIC Regular Certificates. See "Taxation of
Owners of REMIC Residual Certificates--Pass-Through Non-Interest Expenses of
the
REMIC" below.

        Treatment of Realized Losses.  Although not entirely clear, it appears
that holders of REMIC Regular Certificates that are corporations should in
general be allowed to deduct as an ordinary loss any

                                88

<PAGE>

loss sustained during the taxable year on account of any such Certificates
becoming wholly or partially worthless, and that, in general, holders of
Certificates that are not corporations should be allowed to deduct as a

short-term capital loss any loss sustained during the taxable year on account of
any such Certificates becoming wholly worthless. Although the matter is not
entirely clear, non-corporate holders of Certificates may be allowed a bad debt
deduction at such time that the principal balance of any such Certificate is
reduced to reflect realized losses resulting from any liquidated Mortgage
Assets. The Internal Revenue Service, however, could take the position that
non-corporate holders will be allowed a bad debt deduction to reflect realized
losses only after all Mortgage Assets remaining in the related Trust Fund have
been liquidated or the Certificates of the related series have been otherwise
retired. Potential investors and holders of the Certificates are urged to
consult their own tax advisors regarding the appropriate timing, amount and
character of any loss sustained with respect to such Certificates, including any
loss resulting from the failure to recover previously accrued interest or
discount income. Special loss rules are applicable to banks and thrift
institutions, including rules regarding reserves for bad debts. Such taxpayers
are advised to consult their tax advisors regarding the treatment of losses on
Certificates.

        Non-U.S. Persons.  Generally, payments of interest (including any payment
with respect to accrued OID) on the REMIC Regular Certificates to a REMIC
Regular Certificateholder who is not a U.S. Person and is not engaged in a trade
or business within the United States will not be subject to federal withholding
tax if (i) such REMIC Regular Certificateholder does not actually or
constructively own 10 percent or more of the combined voting power of all
classes of equity in the Issuer; (ii) such REMIC Regular Certificateholder is
not a controlled foreign corporation (within the meaning of Code Section 957)
related to the Issuer; and (iii) such REMIC Regular Certificateholder complies
with certain identification requirements (including delivery of a statement,
signed by the REMIC Regular Certificateholder under penalties of perjury,
certifying that such REMIC Regular Certificateholder is a foreign person and
providing the name and address of such REMIC Regular Certificateholder). If a
REMIC Regular Certificateholder is not exempt from withholding, distributions of
interest to such holder, including distributions in respect of accrued OID, may
be subject to a 30% withholding tax, subject to reduction under any applicable
tax treaty.

        Further, a REMIC Regular Certificate will not be included in the estate of
a non-resident alien individual and will not be subject to United States estate
taxes; provided that the REMIC Regular Certificate is not held in connection
with the conduct of a United States trade or business. However,

Certificateholders who are non-resident alien individuals should consult their
tax advisors concerning this question.

REMIC Regular Certificateholders who are not U.S. Persons and persons
related to such holders should not acquire any REMIC Residual Certificates, and
holders of REMIC Residual Certificates (the "REMIC Residual Certificateholder")
and persons related to REMIC Residual Certificateholders should not acquire any
REMIC Regular Certificates without consulting their tax advisors as to the
possible adverse tax consequences of doing so.

Information Reporting and Backup Withholding.  The Master Servicer will
furnish or make available, within a reasonable time after the end of each
calendar year, to each person who was a REMIC Regular Certificateholder at any
time during such year, such information as may be deemed necessary or desirable
to assist REMIC Regular Certificateholders in preparing their federal income tax
returns, or to enable holders to make such information available to beneficial
owners or financial intermediaries that hold such REMIC Regular Certificates on
behalf of beneficial owners. If a holder, beneficial owner, financial
intermediary or other recipient of a payment on behalf of a beneficial owner
fails to supply a certified taxpayer identification number or if the Secretary
of the Treasury determines that such person has not reported all interest and
dividend income required to be shown on its federal income tax return, backup
withholding may be required with respect to any payments. Any amounts deducted
and withheld from a distribution to a recipient on account of backup withholding
would be allowed as a credit against such recipient's federal income tax
liability.

<PAGE>

New Withholding Regulations.  On January 1, 2001 the New Regulations
became effective (subject to certain transition rules) which make certain
modifications to the withholding, backup withholding and information reporting
rules described above. The New Regulations attempt to unify certification
requirements and modify reliance standards. Prospective investors are urged to
consult their own tax advisors regarding the New Regulations.

2.      Taxation of Owners of REMIC Residual Certificates

Allocation of the Income of the REMIC to the REMIC Residual
Certificates.  The REMIC will not be subject to federal income tax except with
respect to income from prohibited transactions and certain other transactions.

See "--Prohibited Transactions Tax and Other Taxes" below. Instead, each original holder of a REMIC Residual Certificate will report on its federal income tax return, as ordinary income, its share of the taxable income of the REMIC for each day during the taxable year on which such holder owns any REMIC Residual Certificates. The taxable income of the REMIC for each day will be determined by allocating the taxable income of the REMIC for each calendar quarter ratably to each day in the quarter. Such a holder's share of the taxable income of the REMIC for each day will be based on the portion of the outstanding REMIC Residual Certificates that such holder owns on that day. The taxable income of the REMIC will be determined under an accrual method and will be taxable to the holders of REMIC Residual Certificates without regard to the timing or amounts of cash distributions by the REMIC. Ordinary income derived from REMIC Residual Certificates will be "portfolio income" for purposes of the taxation of taxpayers subject to the limitations on the deductibility of "passive losses." As residual interests, the REMIC Residual Certificates will be subject to tax rules, described below, that differ from those that would apply if the REMIC Residual Certificates were treated for federal income tax purposes as direct ownership interests in the Certificates or as debt instruments issued by the REMIC.

    A REMIC Residual Certificateholder may be required to include taxable income from the REMIC Residual Certificate in excess of the cash distributed. For example, a structure where principal distributions are made serially on regular interests (that is, a fast-pay, slow-pay structure) may generate such a mismatching of income and cash distributions (that is, "phantom income"). This mismatching may be caused by the use of certain required tax accounting methods by the REMIC, variations in the prepayment rate of the underlying Mortgage Assets and certain other factors. Depending upon the structure of a particular transaction, the aforementioned factors may significantly reduce the after-tax yield of a REMIC Residual Certificate to a REMIC Residual Certificateholder. Investors should consult their own tax advisors concerning the federal income tax treatment of a REMIC Residual Certificate and the impact of such tax treatment on the after-tax yield of a REMIC Residual Certificate.

    A subsequent REMIC Residual Certificateholder also will report on its federal income tax return amounts representing a daily share of the taxable income of the REMIC for each day that such REMIC Residual Certificateholder owns such REMIC Residual Certificate. Those daily amounts generally would equal the amounts that would have been reported for the same days by an original REMIC Residual Certificateholder, as described above. The Legislative History indicates that certain adjustments may be appropriate to reduce (or increase)

the income of a subsequent holder of a REMIC Residual Certificate that purchased
such REMIC Residual Certificate at a price greater than (or less than) the
adjusted basis such REMIC Residual Certificate would have in the hands of an
original REMIC Residual Certificateholder. See "--Sale or Exchange of REMIC
Residual Certificates" below. It is not clear, however, whether such adjustments
will in fact be permitted or required and, if so, how they would be made. The
REMIC Regulations do not provide for any such adjustments.

     Taxable Income of the REMIC Attributable to Residual Interests.  The
taxable income of the REMIC will reflect a netting of (i) the income from the
Mortgage Assets and the REMIC's other assets and (ii) the deductions allowed to
the REMIC for interest and OID on the REMIC Regular Certificates and, except as
described above under "--Taxation of Owners of REMIC Regular Certificates--Non-

90
<PAGE>

Interest Expenses of the REMIC," other expenses. REMIC taxable income is
generally determined in the same manner as the taxable income of an individual
using the accrual method of accounting, except that:

     (i)    the limitations on deductibility of investment interest expense and

            expenses for the production of income do not apply,

     (ii)   all bad loans will be deductible as business bad debts, and

     (iii)  the income will apply.

     The REMIC's gross income includes interest, original issue discount
income, and market discount income, if any, on the Mortgage Loans, reduced by
amortization of any premium on the Mortgage Loans, plus income on reinvestment
of cash flows and reserve assets, plus any cancellation of indebtedness income
upon allocation of realized losses to the REMIC Regular Certificates. Note that
the timing of cancellation of indebtedness income recognized by REMIC Residual
Certificateholders resulting from defaults and delinquencies on Mortgage Assets
may differ from the time of the actual loss on the Mortgage Asset. The REMIC's
deductions include interest and original issue discount expense on the REMIC
Regular Certificates, servicing fees on the Mortgage Loans, other administrative
expenses of the REMIC and realized losses on the Mortgage Loans. The requirement
that REMIC Residual Certificateholders report their pro rata share of taxable
income or net loss of the REMIC will continue until there are no Certificates of

any class of the related series outstanding.

For purposes of determining its taxable income, the REMIC will have an initial aggregate tax basis in its assets equal to the sum of the issue prices of the REMIC Regular Certificates and the REMIC Residual Certificates (or, if a class of Certificates is not sold initially, its fair market value). Such aggregate basis will be allocated among the Mortgage Assets and other assets of the REMIC in proportion to their respective fair market value. A Mortgage Asset will be deemed to have been acquired with discount or premium to the extent that the REMIC's basis therein is less than or greater than its principal balance, respectively. Any such discount (whether market discount or OID) will be includible in the income of the REMIC as it accrues, in advance of receipt of the cash attributable to such income, under a method similar to the method described above for accruing OID on the REMIC Regular Certificates. The REMIC expects to elect under Code Section 171 to amortize any premium on the Mortgage Assets. Premium on any Mortgage Asset to which such election applies would be amortized under a constant yield method. It is not clear whether the yield of a Mortgage Asset would be calculated for this purpose based on scheduled payments or taking account of the Prepayment Assumption. Additionally, such an election would not apply to the yield with respect to any underlying mortgage loan originated on or before September 27, 1985. Instead, premium with respect to such a mortgage loan would be allocated among the principal payments thereon and would be deductible by the REMIC as those payments become due.

The REMIC will be allowed a deduction for interest and OID on the REMIC Regular Certificates. The amount and method of accrual of OID will be calculated for this purpose in the same manner as described above with respect to REMIC Regular Certificates except that the 0.25% per annum de minimis rule and adjustments for subsequent holders described therein will not apply.

A REMIC Residual Certificateholder will not be permitted to amortize the cost of the REMIC Residual Certificate as an offset to its share of the REMIC's taxable income. However, REMIC taxable income will not include cash received by the REMIC that represents a recovery of the REMIC's basis in its assets, and, as described above, the issue price of the REMIC Residual Certificates will be added to the issue price of the REMIC Regular Certificates in determining the REMIC's initial basis in its assets. See "--Sale or Exchange of REMIC Residual Certificates" below. For a discussion of possible adjustments to income of a subsequent holder of a REMIC Residual Certificate to reflect any difference between the actual cost of such REMIC Residual Certificate to such holder and

the adjusted basis such REMIC Residual Certificate would have in the hands of an
original REMIC Residual Certificateholder, see "--Allocation of the Income of the REMIC to the REMIC Residual Certificates" above.

     Net Losses of the REMIC.  The REMIC will have a net loss for any calendar
quarter in which its deductions exceed its gross income. Such net loss would be
allocated among the REMIC Residual

<PAGE>

Certificateholders in the same manner as the REMIC's taxable income. The net
loss allocable to any REMIC Residual Certificate will not be deductible by the
holder to the extent that such net loss exceeds such holder's adjusted basis in
such REMIC Residual Certificate. Any net loss that is not currently deductible
by reason of this limitation may only be used by such REMIC Residual
Certificateholder to offset its share of the REMIC's taxable income in future
periods (but not otherwise). The ability of REMIC Residual Certificateholders
that are individuals or closely held corporations to deduct net losses may be
subject to additional limitations under the Code.

     Mark to Market Rules. A Residual Certificate acquired after January 3,
1995 cannot be marked to market.

     Pass-Through of Non-Interest Expenses of the REMIC.  As a general rule,
all of the fees and expenses of a REMIC will be taken into account by holders of
the REMIC Residual Certificates. In the case of a "single class REMIC," however,
the expenses and a matching amount of additional income will be allocated, under
temporary Treasury regulations, among the REMIC Regular Certificateholders and
the REMIC Residual Certificateholders on a daily basis in proportion to the
relative amounts of income accruing to each Certificateholder on that day. In
general terms, a single class REMIC is one that either (i) would qualify, under
existing Treasury regulations, as a grantor trust if it were not a REMIC
(treating all interests as ownership interests, even if they would be classified
as debt for federal income tax purposes) or (ii) is similar to such a trust and
is structured with the principal purpose of avoiding the single class REMIC
rules. Unless otherwise stated in the related Prospectus Supplement, the
expenses of the REMIC will be allocated to holders of the related REMIC Residual
Certificates in their entirety and not to holders of the related REMIC Regular
Certificates.

     In the case of individuals (or trusts, estates or other persons that

compute their income in the same manner as individuals) who own an interest in a
REMIC Regular Certificate or a REMIC Residual Certificate directly or through a
pass-through interest holder that is required to pass miscellaneous itemized deductions through to its owners or beneficiaries (e.g. a partnership, an S corporation or a grantor trust), such expenses will be deductible under Code Section 67 only to the extent that such expenses, plus other "miscellaneous itemized deductions" of the individual, exceed 2% of such individual's adjusted
gross income. In addition, Code Section 68 provides that the amount of itemized
deductions otherwise allowable for an individual whose adjusted gross income exceeds a certain amount (the "Applicable Amount") will be reduced by the lesser
of (i) 3% of the excess of the individual's adjusted gross income over the Applicable Amount or (ii) 80% of the amount of itemized deductions otherwise allowable for the taxable year. This reduction is currently scheduled to be phased-out over a five-year period beginning in 2006. The amount of additional
taxable income recognized by REMIC Residual Certificateholders who are subject
to the limitations of either Code Section 67 or Code Section 68 may be substantial. Further, holders (other than corporations) subject to the alternative minimum tax may not deduct miscellaneous itemized deductions in determining such holders' alternative minimum taxable income. The REMIC is required to report to each pass-through interest holder and to the

        IRS such holder's allocable share, if any, of the REMIC's non-interest expenses. The term "pass-through interest holder" generally refers to individuals, entities taxed as individuals and certain pass-through entities, but does not include real estate investment trusts. REMIC Residual Certificateholders that are pass-through interest holders should consult their
own tax advisors about the impact of these rules on an investment in the REMIC
Residual Certificates.

        Excess Inclusions.  A portion of the income on a REMIC Residual Certificate (referred to in the Code as an "excess inclusion") for any calendar
quarter will be subject to federal income tax in all events. Thus, for example,
an excess inclusion (i) may not, except as described below, be offset by any unrelated losses, deductions or loss carryovers of a REMIC Residual Certificateholder; (ii) will be treated as "unrelated business taxable income"
within the meaning of Code Section 512 if the REMIC Residual Certificateholder
is subject to tax only on its unrelated business taxable income (see "--Tax-Exempt Investors" below); and (iii) is not eligible for any reduction in
the rate of withholding tax in the case of a REMIC Residual Certificateholder that is a foreign investor. See "--Non-U.S. Persons" below. An

<PAGE>

exception to the excess inclusion rules that applied to thrifts holding certain
residuals was repealed by the Small Business Tax Act of 1996.

Except as discussed in the following paragraph, with respect to any REMIC
Residual Certificateholder, the excess inclusions for any calendar quarter is
the excess, if any, of (i) the income of such REMIC Residual Certificateholder
for that calendar quarter from its REMIC Residual Certificate over (ii) the sum
of the "daily accruals" (as defined below) for all days during the calendar
quarter on which the REMIC Residual Certificateholder holds such REMIC Residual
Certificate. For this purpose, the daily accruals with respect to a REMIC
Residual Certificate are determined by allocating to each day in the calendar
quarter its ratable portion of the product of the "adjusted issue price" (as
defined below) of the REMIC Residual Certificate at the beginning of the
calendar quarter and 120 percent of the "Federal long-term rate" in effect at
the time the REMIC Residual Certificate is issued. For this purpose, the
"adjusted issue price" of a REMIC Residual Certificate at the beginning of any
calendar quarter equals the issue price of the REMIC Residual Certificate,
increased by the amount of daily accruals for all prior quarters, and decreased
(but not below zero) by the aggregate amount of payments made on the REMIC
Residual Certificate before the beginning of such quarter. The "federal
long-term rate" is an average of current yields on Treasury securities with a
remaining term of greater than nine years, computed and published monthly by the
IRS.

In the case of any REMIC Residual Certificates held by a real estate
investment trust, the aggregate excess inclusions with respect to such REMIC
Residual Certificates, reduced (but not below zero) by the real estate
investment trust taxable income (within the meaning of Code Section 857(b)(2),
excluding any net capital gain), will be allocated among the shareholders of
such trust in proportion to the dividends received by such shareholders from
such trust, and any amount so allocated will be treated as an excess inclusion
with respect to a REMIC Residual Certificate as if held directly by such
shareholder. Regulated investment companies, common trust funds and certain
Cooperatives are subject to similar rules.

Fees Paid to Transferee of a REMIC Residual Certificate. The federal
income tax consequences of any consideration paid to a transferee on a transfer
of a REMIC Residual Certificate are unclear. Recently proposed regulations would
require a transferee of a noneconomic residual interest to recognize any fee
received to induce such transferee to become a holder of such interest over a
period reasonably related to the period during which the applicable REMIC is
expected to generate taxable income or net loss in a manner that reasonably
reflects the after-tax costs and benefits (without regard to such fee) of
holding such interest. The proposed regulations provide two safe harbor methods

that would satisfy this requirement. Under one method, the fee is recognized in
accordance with the method of accounting, and over the same period, that the
taxpayer uses for financial reporting purposes, provided that the fee is
included in income for financial reporting purposes over a period that is not
shorter than the period during which the applicable REMIC is expected to
generate taxable income. Under a second method, the fee is recognized ratably
over the anticipated weighted average life of the applicable REMIC (as
determined under applicable Treasury regulations) remaining as of the date of
acquisition of the noneconomic residual interest. The IRS may provide
additional
safe harbor methods in future guidance. Once a taxpayer adopts a particular
method of accounting for such fees, the taxpayer generally may not change to
a
different method without consent of the IRS. Under the proposed regulations,
if
any portion of such a fee has not been recognized in full by the time the
holder
of a noneconomic residual interest disposes of such interest, then the holder
must include the unrecognized portion in income at that time. The proposed
regulations also provide that such a fee shall be treated as income from
sources
within the United States. The regulations are proposed to become effective
for
taxable years ending on or after the date the regulations are adopted as
final
regulations. It is not known whether the proposed regulations will become
adopted as final regulations or, if they are adopted as final regulations,
whether they will be adopted in their current form. Any transferee receiving
consideration with respect to a REMIC Residual Certificate should consult its
tax advisors.

        Payments.  Any distribution made on a REMIC Residual Certificate to a
REMIC Residual Certificateholder will be treated as a non-taxable return of
capital to the extent it does not exceed the

<PAGE>

REMIC Residual Certificateholder's adjusted basis in such REMIC Residual
Certificate. To the extent a distribution exceeds such adjusted basis, it
will
be treated as gain from the sale of the REMIC Residual Certificate.

        Sale or Exchange of REMIC Residual Certificates.  If a REMIC Residual
Certificate is sold or exchanged, the seller will generally recognize gain or
loss equal to the difference between the amount realized on the sale or
exchange
and its adjusted basis in the REMIC Residual Certificate (except that the
recognition of loss may be limited under the "wash sale" rules described
below).
A holder's adjusted basis in a REMIC Residual Certificate generally equals
the
cost of such REMIC Residual Certificate to such REMIC Residual
Certificateholder, increased by the taxable income of the REMIC that was
included in the income of such REMIC Residual Certificateholder with respect
to

such REMIC Residual Certificate, and decreased (but not below zero) by the net
losses that have been allowed as deductions to such REMIC Residual
Certificateholder with respect to such REMIC Residual Certificate and by the
distributions received thereon by such REMIC Residual Certificateholder. In
general, any such gain or loss will be capital gain or loss provided the REMIC
Residual Certificate is held as a capital asset. However, REMIC Residual
Certificates will be "evidences of indebtedness" within the meaning of Code
Section 582(c)(1), so that gain or loss recognized from sale of a REMIC Residual
Certificate by a bank or thrift institution to which such section applies would
be ordinary income or loss.

Except as provided in Treasury regulations yet to be issued, if the seller
of a REMIC Residual Certificate reacquires such REMIC Residual Certificate, or
acquires any other REMIC Residual Certificate, any residual interest in another
REMIC or similar interest in a "taxable mortgage pool" (as defined in Code
Section 7701(i)) during the period beginning six months before, and ending six
months after, the date of such sale, such sale will be subject to the "wash
sale" rules of Code Section 1091. In that event, any loss realized by the REMIC
Residual Certificateholder on the sale will not be deductible, but, instead,
will increase such REMIC Residual Certificateholder's adjusted basis in the
newly acquired asset.

3.      Prohibited Transactions Tax and Other Taxes

The Code imposes a tax on REMICs equal to 100% of the net income derived
from "prohibited transactions" (the "Prohibited Transactions Tax"). In general,
subject to certain specified exceptions, a prohibited transaction means the
disposition of a Mortgage Asset, the receipt of income from a source other than
a Mortgage Asset or certain other permitted investments, the receipt of
compensation for services, or gain from the disposition of an asset purchased
with the payments on the Mortgage Assets for temporary investment pending
distribution on the Certificates. It is not anticipated that the Trust Fund for
any series of Certificates will engage in any prohibited transactions in which
it would recognize a material amount of net income.

In addition, certain contributions to a Trust Fund as to which an election
has been made to treat such Trust Fund as a REMIC made after the day on which
such Trust Fund issues all of its interests could result in the imposition of a
tax on the Trust Fund equal to 100% of the value of the contributed property
(the "Contributions Tax"). No Trust Fund for any series of Certificates will
accept contributions that would subject it to such tax.

In addition, a Trust Fund as to which an election has been made to treat
such Trust Fund as a REMIC may also be subject to federal income tax at the
highest corporate rate on "net income from foreclosure property," determined by
reference to the rules applicable to real estate investment trusts. "Net income
from foreclosure property" generally means income from foreclosure property
other than qualifying income for a real estate investment trust.

Where any Prohibited Transactions Tax, Contributions Tax, tax on net
income from foreclosure property or state or local income or franchise tax that
may be imposed on a REMIC relating to any series of Certificates arises out of
or results from (i) a breach of the related Master Servicer's, Trustee's or
Asset Seller's obligations, as the case may be, under the related Agreement for
such series, such tax will be borne by such Master Servicer, Trustee or Asset
Seller, as the case may be, out of its own funds or

<PAGE>

(ii) the Asset Seller's obligation to repurchase a Mortgage Loan, such tax will
be borne by the Asset Seller. In the event that such Master Servicer, Trustee or
Asset Seller, as the case may be, fails to pay or is not required to pay any
such tax as provided above, such tax will be payable out of the Trust Fund for
such series and will result in a reduction in amounts available to be
distributed to the Certificateholders of such series.

4.    Liquidation and Termination

If the REMIC adopts a plan of complete liquidation, within the meaning of
Code Section 860F(a)(4)(A)(i), which may be accomplished by designating in the
REMIC's final tax return a date on which such adoption is deemed to occur, and
sells all of its assets (other than cash) within a 90-day period beginning on
such date, the REMIC will not be subject to any Prohibited Transaction Tax,
provided that the REMIC credits or distributes in liquidation all of the sale
proceeds plus its cash (other than the amounts retained to meet claims) to
holders of Regular and REMIC Residual Certificates within the 90-day period.

The REMIC will terminate shortly following the retirement of the REMIC
Regular Certificates. If a REMIC Residual Certificateholder's adjusted basis in
the REMIC Residual Certificate exceeds the amount of cash distributed to such
REMIC Residual Certificateholder in final liquidation of its interest, then it
would appear that the REMIC Residual Certificateholder would be entitled to a

loss equal to the amount of such excess. It is unclear whether such a loss, if
allowed, will be a capital loss or an ordinary loss.

> 5.    Administrative Matters

Solely for the purpose of the administrative provisions of the Code, the
REMIC generally will be treated as a partnership and the REMIC Residual
Certificateholders will be treated as the partners. Certain information will be
furnished quarterly to each REMIC Residual Certificateholder who held a REMIC
Residual Certificate on any day in the previous calendar quarter.

Each REMIC Residual Certificateholder is required to treat items on its
return consistently with their treatment on the REMIC's return, unless the REMIC
Residual Certificateholder either files a statement identifying the
inconsistency or establishes that the inconsistency resulted from incorrect
information received from the REMIC. The IRS may assert a deficiency resulting
from a failure to comply with the consistency requirement without instituting an
administrative proceeding at the REMIC level. The REMIC does not intend to
register as a tax shelter pursuant to Code Section 6111 because it is not
anticipated that the REMIC will have a net loss for any of the first five
taxable years of its existence. Any person that holds a REMIC Residual
Certificate as a nominee for another person may be required to furnish the
REMIC, in a manner to be provided in Treasury regulations, with the name and
address of such person and other information.

> 6.    Tax-Exempt Investors

Any REMIC Residual Certificateholder that is a pension fund or other
entity that is subject to federal income taxation only on its "unrelated
business taxable income" within the meaning of Code Section 512 will be subject
to such tax on that portion of the distributions received on a REMIC Residual
Certificate that is considered an excess inclusion. See "--Taxation of Owners of
REMIC Residual Certificates--Excess Inclusions" above.

> 7.    Residual Certificate Payments--Non-U.S. Persons

Amounts paid to REMIC Residual Certificateholders who are not U.S. Persons
are treated as interest for purposes of the 30% (or lower treaty rate) United
States withholding tax. Amounts distributed to holders of REMIC Residual
Certificates should qualify as "portfolio interest," subject to the conditions
described in "--Taxation of Owners of REMIC Regular Certificates--Non U.S.
Persons" above, but only to the extent that the underlying mortgage loans were
originated after July 18, 1984. Furthermore, the rate of withholding on any
income on a REMIC Residual Certificate that is excess inclusion income will not
be subject to reduction under any applicable tax treaties or the "portfolio

interest" exemption. See

<PAGE>

"--Taxation of Owners of REMIC Residual Certificates--Excess Inclusions"
above.
If the portfolio interest exemption is unavailable, such amount will be
subject
to United States withholding tax when paid or otherwise distributed (or when
the
REMIC Residual Certificate is disposed of) under rules similar to those for
withholding upon disposition of debt instruments that have OID. The Code,
however, grants the Treasury Department authority to issue regulations
requiring
that those amounts be taken into account earlier than otherwise provided
where
necessary to prevent avoidance of tax (for example, where the REMIC Residual
Certificates do not have significant value). See "--Taxation of Owners of
REMIC
Residual Certificates--Excess Inclusions" above. If the amounts paid to REMIC
Residual Certificateholders that are not U.S. Persons are effectively
connected
with their conduct of a trade or business within the United States, the 30%
(or
lower treaty rate) withholding will not apply. Instead, the amounts paid to
such
non-U.S. Person will be subject to U.S. federal income taxation at regular
graduated rates. For special restrictions on the transfer of REMIC Residual
Certificates, see "--Tax-Related Restrictions on Transfers of REMIC Residual
Certificates" below.

        REMIC Regular Certificateholders and persons related to such holders
should not acquire any REMIC Residual Certificates, and REMIC Residual
Certificateholders and persons related to REMIC Residual Certificateholders
should not acquire any REMIC Regular Certificates, without consulting their
tax
advisors as to the possible adverse tax consequences of such acquisition.

TAX-RELATED RESTRICTIONS ON TRANSFERS OF REMIC RESIDUAL CERTIFICATES

        Disqualified Organizations. An entity may not qualify as a REMIC unless
there are reasonable arrangements designed to ensure that residual interests
in
such entity are not held by "disqualified organizations" (as defined below).
Further, a tax is imposed on the transfer of a residual interest in a REMIC
to a
"disqualified organization." The amount of the tax equals the product of (i)
an
amount (as determined under the REMIC Regulations) equal to the present value
of
the total anticipated "excess inclusions" with respect to such interest for
periods after the transfer and (ii) the highest marginal federal income tax
rate
applicable to corporations. The tax is imposed on the transferor unless the
transfer is through an agent (including a broker or other middleman) for a

disqualified organization, in which event the tax is imposed on the agent. The
person otherwise liable for the tax shall be relieved of liability for the tax
if the transferee furnished to such person an affidavit that the transferee is
not a disqualified organization and, at the time of the transfer, such person
does not have actual knowledge that the affidavit is false. A "disqualified
organization" means (A) the United States, any State, possession or political
subdivision thereof, any foreign government, any international organization or
any agency or instrumentality of any of the foregoing (provided that such term
does not include an instrumentality if all its activities are subject to tax
and, except for Freddie Mac, a majority of its board of directors is not
selected by any such governmental agency), (B) any organization (other than
certain farmers' Cooperatives) generally exempt from federal income taxes unless
such organization is subject to the tax on "unrelated business taxable income"
and (C) a rural electric or telephone Cooperative.

        A tax is imposed on a "pass-through entity" (as defined below) holding a
residual interest in a REMIC if at any time during the taxable year of the
pass-through entity a disqualified organization is the record holder of an
interest in such entity. The amount of the tax is equal to the product of (A)
the amount of excess inclusions for the taxable year allocable to the interest
held by the disqualified organization and (B) the highest marginal federal
income tax rate applicable to corporations. The pass-through entity otherwise
liable for the tax, for any period during which the disqualified organization is
the record holder of an interest in such entity, will be relieved of liability
for the tax if such record holder furnishes to such entity an affidavit that
such record holder is not a disqualified organization and, for such period, the
pass-through entity does not have actual knowledge that the affidavit is false.
For this purpose, a "pass-through entity" means (i) a regulated investment
company, real estate investment trust or common trust fund, (ii) a partnership,
trust or estate and (iii) certain Cooperatives. Except as may be provided in
Treasury regulations not yet issued, any person holding an interest in a
pass-through entity as a nominee for another will, with respect to such
interest, be treated as a pass-through entity. The tax on pass-through entities
is generally effective for periods after March 31, 1988, except that in the case
of

<PAGE>

regulated investment companies, real estate investment trusts, common trust

funds and publicly-traded partnerships the tax shall apply only to taxable years
of such entities beginning after December 31, 1988. Under the Taxpayer Relief Act of 1997, large partnerships (generally with 250 or more partners) will be taxable on excess inclusion income as if all partners were disqualified organizations.

In order to comply with these rules, the Agreement will provide that no record or beneficial ownership interest in a REMIC Residual Certificate may be
purchased, transferred or sold, directly or indirectly, unless the Master Servicer receives the following: (i) an affidavit from the proposed transferee
to the effect that it is not a disqualified organization and is not acquiring the REMIC Residual Certificate as a nominee or agent for a disqualified organization and (ii) a covenant by the proposed transferee to the effect that
the proposed transferee agrees to be bound by and to abide by the transfer restrictions applicable to the REMIC Residual Certificate.

Noneconomic REMIC Residual Certificates. The REMIC Regulations disregard,
for federal income tax purposes, any transfer of a Noneconomic REMIC Residual Certificate unless no significant purpose of the transfer is to impede the assessment or collection of tax. If a transfer of a Noneconomic REMIC Residual
Certificate is disregarded, the transferor would continue to be treated as the
owner of the REMIC Residual Certificate and would continue to be subject to tax
on its allocable portion of the net income of the REMIC. A Noneconomic REMIC Residual Certificate is any REMIC Residual Certificate (including a REMIC Residual Certificate with a positive value at issuance) unless, at the time of
transfer, taking into account the Prepayment Assumption and any required or permitted clean up calls or required liquidation provided for in the REMIC's organizational documents, (i) the present value of the expected future distributions on the REMIC Residual Certificate at least equals the product of
the present value of the anticipated excess inclusions and the highest corporate
income tax rate in effect for the year in which the transfer occurs and (ii) the
transferor reasonably expects that the transferee will receive distributions from the REMIC at or after the time at which taxes accrue on the anticipated excess inclusions in an amount sufficient to satisfy the accrued taxes. A significant purpose to impede the assessment or collection of tax exists if the
transferor, at the time of the transfer, either knew or should have known that
the transferee would be unwilling or unable to pay taxes due on its share of the
taxable income of the REMIC.

The Treasury Department recently adopted final regulations setting forth

the requirements of a safe harbor under which a transfer of a noneconomic REMIC
Residual Certificate is presumed to be a valid transfer that will be respected
for federal income tax purposes. To be respected under the safe harbor:

     - the transferor must perform a reasonable investigation of the financial
status of the transferee and determine that the transferee has historically paid
its debts when they become due and find no significant evidence to indicate that
the transferee will not continue to pay its debts as they come due (the
"reasonable investigation requirement");

     - the transferor must obtain a representation from the transferee to the
effect that the transferee understands that as the holder of the REMIC Residual
Certificate the transferee may incur tax liabilities in excess of the cash flow
from the REMIC Residual Certificate and that the transferee intends to pay taxes
associated with holding the Residual Certificate as they become due;

     - the transferee must represent that it will not cause income from the
REMIC Residual Certificate to be attributable to a foreign permanent
establishment or fixed base (within the meaning of an applicable income tax
treaty) of the transferee or another U.S. taxpayer (together with the
representation described in the preceding bullet point, the "transferee
representation requirement"); and

     the transfer must satisfy either the "asset test" or the "formula test".

     A transfer satisfies the "asset test" if the following three conditions
are satisfied:

     for financial reporting purposes, the transferee's gross assets exceed
$100 million and its net assets exceed $10 million at the time of the transfer
and at the close of both of the transferee's two preceding

<PAGE>

fiscal years, excluding certain related party obligations and certain assets
held with a principal purpose of satisfying this requirement;

     the transferee is a domestic C corporation (other than a tax-exempt
corporation, regulated investment company, real estate investment trust, REMIC
or Cooperative) that will not hold the REMIC Residual Certificate through a
foreign permanent establishment (an "Eligible C Corporation") and agrees in
writing that any subsequent transfer of the REMIC Residual Certificate will be
to an Eligible C Corporation and will satisfy the asset test and the other
requirements for the subsequent transfer to satisfy the safe harbor; and

a reasonable person would not conclude, based on the facts and circumstances known to the transferor (including any payment made to the transferee), that the taxes associated with the REMIC Residual Certificate will
not be paid.

A transfer satisfies the "formula test" if the transfer is not a direct or
indirect transfer of the REMIC Residual Certificate to a foreign permanent establishment or fixed based (within the meaning of an applicable income tax treaty) of a domestic transferee, and if the present value of the anticipated tax liabilities associated with holding the noneconomic REMIC Residual Certificate does not exceed the sum of:

the present value of any consideration given to the transferee to acquire
the interest;

the present value of the expected future distributions on the interest; and

the present value of the anticipated tax savings associated with holding
the interest as the REMIC generates losses.

For purposes of the computations under the formula test, the transferee generally is assumed to pay tax at the highest rate of tax specified in Code Section 11(b)(1). However, if the transferee has been subject to the alternative
minimum tax under Code Section 55 in the preceding two years and will compute its taxable income in the current year using the alternative minimum tax rate, then the tax rate specified in Code Section 55(b)(1)(B) may be used in lieu of
the highest rate specified in Code Section 11(b)(1). Further, present values generally are computed using a discount rate equal to the federal short-term rate prescribed by Code Section 1274(d) for the month of the transfer and the compounding period used by the transferee. In some situations, satisfaction of
the formula test would require the transferor of a noneconomic REMIC Residual Certificate to pay more consideration to the transferee than would otherwise be
the case.

All transfers of REMIC Residual Certificates will be subject to certain restrictions that are intended to reduce the possibility of any such transfer being disregarded. Such restrictions will include requirements that (i) the transferor represent to the Master Servicer or the Trustee that it has conducted
an investigation of the transferee and made the findings needed to satisfy the
reasonable investigation requirement, (ii) the proposed transferee provides to
the Master Servicer or the Trustee the representations needed to satisfy the transferee representation requirement and (iii) the proposed transferee agrees
that it will not transfer the REMIC Residual Certificate to any person unless

that person agrees to comply with the same restrictions on future transfers. Prior to purchasing a REMIC Residual Certificate, prospective purchasers should
consider the possibility that a purported transfer of such REMIC Residual Certificate by such a purchaser to another purchaser at some future date may be
disregarded in accordance with the foregoing rules, which would result in the retention of tax liability by such purchaser.

Foreign Investors.  The REMIC Regulations provide that the transfer of a
REMIC Residual Certificate that has a "tax avoidance potential" to a "foreign person" will be disregarded for federal income tax purposes. This rule appears
to apply to a transferee who is not a U.S. Person unless such transferee's income in respect of the REMIC Residual Certificate is effectively connected with the conduct of a United Sates trade or business. A REMIC Residual Certificate is deemed to have a tax avoidance potential unless, at the time of
transfer, the transferor reasonably expect that the REMIC will distribute to the
transferee amounts that will equal at least 30 percent of each excess inclusion,
and that such amounts

<PAGE>

will be distributed at or after the time the excess inclusion accrues and not later than the end of the calendar year following the year of accrual. If the non-U.S. Person transfers the REMIC Residual Certificate to a U.S. Person, the
transfer will be disregarded, and the foreign transferor will continue to be treated as the owner, if the transfer has the effect of allowing the transferor
to avoid tax on accrued excess inclusions. The provisions in the REMIC Regulations regarding transfers of REMIC Residual Certificates that have tax avoidance potential to foreign persons are effective for all transfers after June 30, 1992. The Agreement will provide that no record or beneficial ownership
interest in a REMIC Residual Certificate may be transferred, directly or indirectly, to a non-U.S. Person unless such person provides the Trustee with a
duly completed IRS Form W-8ECI.

Any attempted transfer or pledge in violation of the transfer restrictions
shall be absolutely null and void and shall vest no rights in any purported transferee. Investors in REMIC Residual Certificates are advised to consult their own tax advisors with respect to transfers of the REMIC Residual Certificates and, in addition, pass-through entities are advised to consult their own tax advisors with respect to any tax which may be imposed on a pass-through entity.

TAX CHARACTERIZATION OF A TRUST FUND AS A PARTNERSHIP

Dechert LLP or Thacher Proffitt & Wood, special counsel to the Depositor,
will deliver its opinion that a Trust Fund for which a partnership election is
made will not be an association (or publicly traded partnership) taxable as a
corporation for federal income tax purposes. This opinion will be based on the
assumption that the terms of the Trust Agreement and related documents will be
complied with, and on counsel's conclusions that (1) the nature of the income of
the Trust Fund will exempt it from the rule that certain publicly traded
partnerships are taxable as corporations or (2) the issuance of the Certificates
has been structured as a private placement under an IRS safe harbor, so that the
Trust Fund will not be characterized as a publicly traded partnership taxable as
a corporation.

     If the Trust Fund were taxable as a corporation for federal income tax
purposes, the Trust Fund would be subject to corporate income tax on its taxable
income. The Trust Fund's taxable income would include all its income, possibly
reduced by its interest expense on the Notes. Any such corporate income tax
could materially reduce cash available to make payments on the Notes and
distributions on the Certificates, and Certificateholders could be liable for
any such tax that is unpaid by the Trust Fund.

     1.     Tax Consequences to Holders of the Notes

     Treatment of the Notes as Indebtedness.  The Trust Fund will agree, and
the Noteholders will agree by their purchase of Notes, to treat the Notes as
debt for federal income tax purposes. Special counsel to the Depositor will,
except as otherwise provided in the related Prospectus Supplement, advise the
Depositor that the Notes will be classified as debt for federal income tax
purposes. The discussion below assumes this characterization of the Notes is
correct.

     OID, etc.  The discussion below assumes that all payments on the Notes are
denominated in U.S. dollars. Moreover, the discussion assumes that the interest
formula for the Notes meets the requirements for "qualified stated interest"
under the OID regulations, and that any OID on the Notes (i.e., any excess of
the principal amount of the Notes over their issue price) does not exceed a de
minimis amount (i.e., 1/4% of their principal amount multiplied by the number of
full years included in their term), all within the meaning of the OID
regulations. If these conditions are not satisfied with respect to any given
series of Notes, additional tax considerations with respect to such Notes will
be disclosed in the related Prospectus Supplement.

Interest Income on the Notes.  Based on the above assumptions, except as
discussed in the following paragraph, the Notes will not be considered issued
with OID. The stated interest thereon will be taxable to a Noteholder as
ordinary interest income when received or accrued in accordance with such
Noteholder's method of tax accounting. Under the OID regulations, a holder of a
Note issued with a de minimis amount of OID must include such OID in income, on
a pro rata basis, as principal payments are made on the Note. It is believed
that any prepayment premium paid as a result of a mandatory

<PAGE>

redemption will be taxable as contingent interest when it becomes fixed and
unconditionally payable. A purchaser who buys a Note for more or less than its
principal amount will generally be subject, respectively, to the premium
amortization or market discount rules of the Code.

        A holder of a Note that has a fixed maturity date of not more than one
year from the issue date of such Note (a "Short-Term Note") may be subject to
special rules. An accrual basis holder of a Short-Term Note (and certain cash
method holders, including regulated investment companies, as set forth in Code
Section 1281) generally would be required to report interest income as interest
accrues on a straight-line basis over the term of each interest period. Other
cash basis holders of a Short-Term Note would, in general, be required to report
interest income as interest is paid (or, if earlier, upon the taxable
disposition of the Short-Term Note). However, a cash basis holder of a
Short-Term Note reporting interest income as it is paid may be required to defer
a portion of any interest expense otherwise deductible on indebtedness incurred
to purchase or carry the Short-Term Note until the taxable disposition of the
Short-Term Note. A cash basis taxpayer may elect under Code Section 1281 to
accrue interest income on all nongovernment debt obligations with a term of one
year or less, in which case the taxpayer would include interest on the
Short-Term Note in income as it accrues, but would not be subject to the
interest expense deferral rule referred to in the preceding sentence. Certain
special rules apply if a Short-Term Note is purchased for more or less than its
principal amount.

        Sale or Other Disposition.  If a Noteholder sells a Note, the holder will
recognize gain or loss in an amount equal to the difference between the amount
realized on the sale and the holder's adjusted tax basis in the Note.

        The adjusted tax basis of a Note to a particular Noteholder will equal the
holder's cost for the Note, increased by any market discount, acquisition

discount, OID and gain previously included by such Noteholder in income with
respect to the Note and decreased by the amount of bond premium (if any)
previously amortized and by the amount of principal payments previously
received
by such Noteholder with respect to such Note. Any such gain or loss will be
capital gain or loss if the Note was held as a capital asset, except for gain
representing accrued interest and accrued market discount not previously
included in income. Capital losses generally may be used only to offset
capital
gains.

        Such gain or loss generally will be long-term capital gain or loss if
the
Note were held for more than one year. Long-term capital gains of non-
corporate
taxpayers are subject to reduced maximum rates while short-term capital gains
are taxable at ordinary rates. The use of capital losses is subject to
limitations. Prospective investors should consult their own tax advisors
concerning the treatment of capital gains.

        Foreign Holders.  Interest payments made (or accrued) to a Noteholder
who
is a nonresident alien, foreign corporation or other non-United States person
(a
"foreign person") generally will be considered "portfolio interest", and
generally will not be subject to United States federal income tax and
withholding tax, if the interest is not effectively connected with the
conduct
of a trade or business within the United States by the foreign person and the
foreign person (i) is not actually or constructively a "10 percent
shareholder"
of the Trust or the Depositor (including a holder of 10% of the outstanding
Certificates) or a "controlled foreign corporation" with respect to which the
Trust Fund or the Asset Seller is a "related person" within the meaning of
the
Code and (ii) provides the Owner Trustee or other person who is otherwise
required to withhold U.S. tax with respect to the Notes with an appropriate
statement (on Form W-8BEN or a similar form), signed under penalties of
perjury,
certifying that the beneficial owner of the Note is a foreign person and
providing the foreign person's name and address. If a Note is held through a
securities clearing organization or certain other financial institutions, the
organization or institution may provide the relevant signed statement to the
withholding agent; in that case, however, the signed statement must be
accompanied by a Form W-8BEN or substitute form provided by the foreign
person
that owns the Note. If such interest is not portfolio interest, then it will
be
subject to United States federal income and withholding tax at a rate of 30
percent, unless reduced or eliminated pursuant to an applicable tax treaty.

                                      100

<PAGE>

        Any capital gain realized on the sale, redemption, retirement or other
taxable disposition of a Note by a foreign person will be exempt from United
States federal income and withholding tax, provided that (i) such gain is not

effectively connected with the conduct of a trade or business in the United
States by the foreign person and (ii) in the case of an individual foreign
person, the foreign person is not present in the United States for 183 days
or
more in the taxable year.

       Backup Withholding.  Each holder of a Note (other than an exempt holder
such as a corporation, tax-exempt organization, qualified pension and
profit-sharing trust, individual retirement account or nonresident alien who
provides certification as to status as a nonresident) will be required to
provide, under penalties of perjury, a certificate containing the holder's
name,
address, correct federal taxpayer identification number and a statement that
the
holder is not subject to backup withholding. Should a nonexempt Noteholder
fail
to provide the required certification, the Trust Fund will be required to
withhold a portion of the amount otherwise payable to the holder, and remit
the
withheld amount to the IRS as a credit against the holder's federal income
tax
liability. The backup withholding rate is currently 28%. This rate is
scheduled
to adjust for tax years after 2010.

       Possible Alternative Treatments of the Notes.  If, contrary to the
opinion
of special counsel to the Depositor, the IRS successfully asserted that one
or
more of the Notes did not represent debt for federal income tax purposes, the
Notes might be treated as equity interests in the Trust Fund. If so treated,
the
Trust Fund would likely be treated as a publicly traded partnership that
would
not be taxable as a corporation because it would meet certain qualifying
income
tests. Nonetheless, treatment of the Notes as equity interests in such a
publicly traded partnership could have adverse tax consequences to certain
holders. For example, income to certain tax-exempt entities (including
pension
funds) would be "unrelated business taxable income", income to foreign
holders
generally would be subject to U.S. tax and U.S. tax return filing and
withholding requirements, and individual holders might be subject to certain
limitations on their ability to deduct their share of the Trust Fund's
expenses.

     2.    Tax Consequences to Holders of the Certificates

       Treatment of the Trust Fund as a Partnership.  The Depositor will agree,
and the Certificateholders will agree by their purchase of Certificates, to
treat the Trust Fund as a partnership for purposes of federal and state
income
tax, franchise tax and any other tax measured in whole or in part by income,
with the assets of the partnership being the assets held by the Trust Fund,
the
partners of the partnership being the Certificateholders, and the Notes being

debt of the partnership. However, the proper characterization of the arrangement
involving the Trust Fund, the Certificates, the Notes, the Trust Fund and the Master Servicer is not clear because there is no authority on transactions closely comparable to that contemplated herein.

A variety of alternative characterizations are possible. For example, because the Certificates have certain features characteristic of debt, the Certificates might be considered debt of the Trust Fund. Any such characterization would not result in materially adverse tax consequences to Certificateholders as compared to the consequences from treatment of the Certificates as equity in a partnership, described below. The following discussion assumes that the Certificates represent equity interests in a partnership.

Indexed Securities, etc.  The following discussion assumes that all payments on the Certificates are denominated in U.S. dollars, none of the Certificates are Indexed Securities or Strip Certificates, and that a series of
Securities includes a single class of Certificates. If these conditions are not
satisfied with respect to any given series of Certificates, additional tax considerations with respect to such Certificates will be disclosed in the related Prospectus Supplement.

Partnership Taxation.  As a partnership, the Trust Fund will not be subject to federal income tax. Rather, each Certificateholder will be required
to separately take into account such holder's allocated share of income, gains,
losses, deductions and credits of the Trust Fund. The Trust Fund's income will
consist primarily of interest and finance charges earned on the Mortgage Loans
(including appropriate adjustments for market discount, OID and bond premium) and any gain upon collection or disposition of Mortgage

<PAGE>

Loans. The Trust Fund's deductions will consist primarily of interest accruing
with respect to the Notes, servicing and other fees, and losses or deductions upon collection or disposition of Mortgage Loans.

The tax items of a partnership are allocable to the partners in accordance
with the Code, Treasury regulations and the partnership agreement (here, the Trust Agreement and related documents). The Trust Agreement will provide, in general, that the Certificateholders will be allocated taxable income of the Trust Fund for each month equal to the sum of (i) the interest that accrues on
the Certificates in accordance with their terms for such month, including interest accruing at the Pass-Through Rate for such month and interest on amounts previously due on the Certificates but not yet distributed; (ii) any Trust Fund income attributable to discount on the Mortgage Loans that

corresponds to any excess of the principal amount of the Certificates over their
initial issue price; (iii) prepayment premiums payable to the Certificateholders
for such month; and (iv) any other amounts of income payable to the Certificateholders for such month. Such allocation will be reduced by any amortization by the Trust Fund of premium on Mortgage Loans that corresponds to
any excess of the issue price of Certificates over their principal amount. All
remaining taxable income of the Trust Fund will be allocated to the Company. Based on the economic arrangement of the parties, this approach for allocating
Trust Fund income should be permissible under applicable treasury regulations, although no assurance can be given that the IRS would not require a greater amount of income to be allocated to Certificateholders. Moreover, even under the
foregoing method of allocation, Certificateholders may be allocated income equal
to the entire Pass-Through Rate plus the other items described above even though
the Trust Fund might not have sufficient cash to make current cash distributions
of such amount. Thus, cash basis holders will in effect be required to report income from the Certificates on the accrual basis and Certificateholders may become liable for taxes on Trust Fund income even if they have not received cash
from the Trust Fund to pay such taxes. In addition, because tax allocations and
tax reporting will be done on a uniform basis for all Certificateholders but Certificateholders may be purchasing Certificates at different times and at different prices Certificateholders may be required to report on their tax returns taxable income that is greater or less than the amount reported to them
by the Trust Fund.

All of the taxable income allocated to a Certificateholder that is a pension, profit sharing or employee benefit plan or other tax-exempt entity (including an individual retirement account) will constitute "unrelated business
taxable income" generally taxable to such a holder under the Code.

An individual taxpayer's share of expenses of the Trust Fund (including fees to the Master Servicer but not interest expense) would be miscellaneous itemized deductions. Such deductions might be disallowed to the individual in whole or in part and might result in such holder being taxed on an amount of income that exceeds the amount of cash actually distributed to such holder over
the life of the Trust Fund.

The Trust Fund intends to make all tax calculations relating to income and
allocations to Certificateholders on an aggregate basis. If the IRS were to require that such calculations be made separately for each Mortgage Loan, the Trust Fund might be required to incur additional expense but it is believed that
there would not be a material adverse effect on Certificateholders.

Discount and Premium.  It is believed that the Loans were not issued with
OID, and, therefore, the Trust should not have OID income. However, the purchase
price paid by the Trust Fund for the Mortgage Loans may be greater or less than
the remaining principal balance of the Loans at the time of purchase. If so, the
Loan will have been acquired at a premium or discount, as the case may be. (As
indicated above, the Trust Fund will make this calculation on an aggregate
basis, but might be required to recompute it on a Mortgage Loan by Mortgage Loan
basis.)

If the Trust Fund acquires the Mortgage Loans at a market discount or
premium, the Trust Fund will elect to include any such discount in income
currently as it accrues over the life of the Mortgage Loans or to offset any
such premium against interest income on the Mortgage Loans. As indicated above,
a portion of such market discount income or premium deduction may be allocated
to Certificateholders.

<PAGE>

Section 708 Termination.  Under Code Section 708, the Trust Fund will be
deemed to terminate for federal income tax purposes if 50% or more of the
capital and profits interests in the Trust Fund are sold or exchanged within a
12-month period. Pursuant to formal Treasury regulations issued May 8, 1997
under Code Section 708, if such a termination occurs, the Trust Fund (the "old
partnership") would be deemed to contribute its assets to a new partnership (the
"new partnership") in exchange for interests in the new partnership. Such
interests would be deemed distributed to the partners of the old partnership in
liquidation thereof, which would not constitute a sale or exchange.

Disposition of Certificates.  Generally, capital gain or loss will be
recognized on a sale of Certificates in an amount equal to the difference
between the amount realized and the seller's tax basis in the Certificates sold.
A Certificateholder's tax basis in a Certificate will generally equal the
holder's cost increased by the holder's share of Trust Fund income (includible
in income) and decreased by any distributions received with respect to such
Certificate. In addition, both the tax basis in the Certificates and the amount
realized on a sale of a Certificate would include the holder's share of the
Notes and other liabilities of the Trust Fund. A holder acquiring Certificates

at different prices may be required to maintain a single aggregate adjusted tax
basis in such Certificates, and, upon sale or other disposition of some of the
Certificates, allocate a portion of such aggregate tax basis to the Certificates
sold (rather than maintaining a separate tax basis in each Certificate for
purposes of computing gain or loss on a sale of that Certificate).

Any gain on the sale of a Certificate attributable to the holder's share
of unrecognized accrued market discount on the Mortgage Loans would generally be
treated as ordinary income to the holder and would give rise to special tax
reporting requirements. The Trust Fund does not expect to have any other assets
that would give rise to such special reporting requirements. Thus, to avoid
those special reporting requirements, the Trust Fund will elect to include
market discount in income as it accrues.

If a Certificateholder is required to recognize an aggregate amount of
income (not including income attributable to disallowed itemized deductions
described above) over the life of the Certificates that exceeds the aggregate
cash distributions with respect thereto, such excess will generally give rise to
a capital loss upon the retirement of the Certificates.

Allocations Between Transferors and Transferees. In general, the Trust
Fund's taxable income and losses will be determined monthly and the tax items
for a particular calendar month will be apportioned among the Certificateholders
in proportion to the principal amount of Certificates owned by them as of the
close of the last day of such month. As a result, a holder purchasing
Certificates may be allocated tax items (which will affect its tax liability and
tax basis) attributable to periods before the actual transaction.

The use of such a monthly convention may not be permitted by existing
regulations. If a monthly convention is not allowed (or only applies to
transfers of less than all of the partner's interest), taxable income or losses
of the Trust Fund might be reallocated among the Certificateholders. The Trust
Fund's method of allocation between transferors and transferees may be revised
to conform to a method permitted by future regulations.

Section 754 Election. In the event that a Certificateholder sells its
Certificates at a profit (loss), the purchasing Certificateholder will have a
higher (lower) basis in the Certificates than the selling Certificateholder had.
The tax basis of the Trust Fund's assets will not be adjusted to reflect that
higher (or lower) basis unless the Trust Fund were to file an election under
Code Section 754. In order to avoid the administrative complexities that would
be involved in keeping accurate accounting records, as well as potentially
onerous information reporting requirements, the Trust Fund will not make such

election. As a result, Certificateholders might be allocated a greater or lesser
amount of Trust Fund income than would be appropriate based on their own
purchase price for Certificates.

Administrative Matters.  The Trustee is required to keep or have kept
complete and accurate books of the Trust Fund. Such books will be maintained for
financial reporting and tax purposes on an accrual basis and the fiscal year of
the Trust will be the calendar year. The Trustee will file a partnership
information return (IRS Form 1065) with the IRS for each taxable year of the
Trust Fund and will report

<PAGE>

each Certificateholder's allocable share of items of Trust Fund income and
expense to holders and the IRS on Schedule K-1. The Trust Fund will provide the
Schedule K-1 information to nominees that fail to provide the Trust Fund with
the information statement described below and such nominees will be required to
forward such information to the beneficial owners of the Certificates.
Generally, holders must file tax returns that are consistent with the
information return filed by the Trust Fund or be subject to penalties unless the
holder notifies the IRS of all such inconsistencies.

Under Code Section 6031, any person that holds Certificates as a nominee
at any time during a calendar year is required to furnish the Trust Fund with a
statement containing certain information on the nominee, the beneficial owners
and the Certificates so held. Such information includes (i) the name, address
and taxpayer identification number of the nominee and (ii) as to each beneficial
owner (x) the name, address and identification number of such person, (y)
whether such person is a United States person, a tax-exempt entity or a foreign
government, an international organization, or any wholly owned agency or
instrumentality of either of the foregoing, and (z) certain information on
Certificates that were held, bought or sold on behalf of such person throughout
the year. In addition, brokers and financial institutions that hold Certificates
through a nominee are required to furnish directly to the Trust Fund information
as to themselves and their ownership of Certificates. A clearing agency
registered under Section 17A of the Exchange Act is not required to furnish any
such information statement to the Trust Fund. The information referred to above
for any calendar year must be furnished to the Trust Fund on or before the
following January 31. Nominees, brokers and financial institutions that fail to

provide the Trust Fund with the information described above may be subject to
penalties.

The Company will be designated as the tax matters partner in the related
Trust Agreement and, as such, will be responsible for representing the
Certificateholders in any dispute with the IRS. The Code provides for
administrative examination of a partnership as if the partnership were a
separate and distinct taxpayer. Generally, the statute of limitations for
partnership items does not expire before three years after the date on which
the
partnership information return is filed. Any adverse determination following
an
audit of the return of the Trust Fund by the appropriate taxing authorities
could result in an adjustment of the returns of the Certificateholders, and,
under certain circumstances, a Certificateholder may be precluded from
separately litigating a proposed adjustment to the items of the Trust Fund.
An
adjustment could also result in an audit of a Certificateholder's returns and
adjustments of items not related to the income and losses of the Trust Fund.

Tax Consequences to Foreign Certificateholders.  It is not clear
whether
the Trust Fund would be considered to be engaged in a trade or business in
the
United States for purposes of federal withholding taxes with respect to non-
U.S.
Persons because there is no clear authority dealing with that issue under
facts
substantially similar to those described herein. Although it is not expected
that the Trust Fund would be engaged in a trade or business in the United
States
for such purposes, the Trust Fund will withhold as if it were so engaged in
order to protect the Trust Fund from possible adverse consequences of a
failure
to withhold. The Trust Fund expects to withhold on the portion of its taxable
income that is allocable to foreign Certificateholders pursuant to Code
Section
1446, as if such income were effectively connected to a U.S. trade or
business,
at a rate equal to the highest rate of tax specified in Code Section 11(b)(i)
in
the case of foreign holders that are taxable as corporations and equal to the
highest rate of tax specified in Code Section 1 in the case of all other
foreign
holders. Subsequent adoption of Treasury regulations or the issuance of other
administrative pronouncements may require the Trust Fund to change its
withholding procedures. In determining a holder's withholding status, the
Trust
Fund may rely on IRS Form W-8BEN, IRS Form W-9 or the holder's certification
of
nonforeign status signed under penalties of perjury.

Each foreign holder might be required to file a U.S. individual or
corporate income tax return (including, in the case of a corporation, the
branch

profits tax) on its share of the Trust Fund's income. Each foreign holder must
obtain a taxpayer identification number from the IRS and submit that number to
the Trust Fund on Form W-8BEN in order to assure appropriate crediting of the
taxes withheld. A foreign holder generally would be entitled to file with the
IRS a claim for refund with respect to taxes withheld by the Trust Fund taking
the position that no taxes were due because the Trust Fund was not

<PAGE>

engaged in a U.S. trade or business. However, interest payments made (or
accrued) to a Certificateholder who is a foreign person generally will be
considered guaranteed payments to the extent such payments are determined
without regard to the income of the Trust Fund. If these interest payments are
properly characterized as guaranteed payments, then the interest will not be
considered "portfolio interest." As a result, Certificateholders will be subject
to United States federal income tax and withholding tax at a rate of 30 percent,
unless reduced or eliminated pursuant to an applicable treaty. In such case, a
foreign holder would only be enticed to claim a refund for that portion of the
taxes in excess of the taxes that should be withheld with respect to the
guaranteed payments.

    Backup Withholding.  Distributions made on the Certificates and proceeds
from the sale of the Certificates will be subject to backup withholding tax if,
in general, the Certificateholder fails to comply with certain identification
procedures, unless the holder is an exempt recipient under applicable provisions
of the Code.

    New Withholding Regulations.  On January 1, 2001 the New Regulations
became effective (subject to certain transition rules) which make certain
modifications to the withholding, backup withholding and information reporting
rules described above. The New Regulations attempt to unify certification
requirements and modify reliance standards. Prospective investors are urged to
consult their own tax advisors regarding the New Regulations.

TAX TREATMENT OF CERTIFICATES AS DEBT FOR TAX PURPOSES

    1.    Characterization of the Certificates as Indebtedness

    If the related Prospectus Supplement indicates that the Certificates will
be treated as indebtedness for federal income tax purposes, then based on the
application of existing law to the facts as set forth in the Trust Agreement and

other relevant documents and assuming compliance with the terms of the Trust
Agreement as in effect on the date of issuance of the Certificates, Dechert
LLP
or Thacher Proffitt & Wood, special tax counsel to the Depositor ("Tax
Counsel"), will deliver its opinion that the Certificates will be treated as
debt instruments for federal income tax purposes as of such date.

    The Depositor and the Certificateholders will express in the related
Trust
Agreement their intent that, for applicable tax purposes, the Certificates
will
be indebtedness secured by the related Assets. The Depositor and the
Certificateholders, by accepting the Certificates, and each Certificate Owner
by
its acquisition of a beneficial interest in a Certificate, have agreed to
treat
the Certificates as indebtedness for U.S. federal income tax purposes.
However,
because different criteria are used to determine the non-tax accounting
characterization of the transaction, the Depositor may treat this transaction
as
a sale of an interest in the related Assets for financial accounting and
certain
regulatory purposes.

    In general, whether for U.S. federal income tax purposes a transaction
constitutes a sale of property or a loan, the repayment of which is secured
by
property, is a question of fact, the resolution of which is based upon the
economic substance of the transaction rather than its form or the manner in
which it is labeled. While the IRS and the courts have set forth several
factors
to be take into account in determining whether the substance of a transaction
is
a sale of property or a secured loan, the primary factor in making this
determination is whether the transferee has assumed the risk of loss or other
economic burdens relating to the property and has obtained the benefits of
ownership thereof. Tax Counsel will analyze and rely on several factors in
reaching its opinion that the weight of the benefits and burdens of ownership
of
the Mortgage Loans will be retained by the Depositor and not transferred to
the
Certificate Owners.

    In some instances, courts have held that a taxpayer is bound by the
particular form it has chosen for a transaction, even if the substance of the
transaction does not accord with its form. Tax Counsel will advise that the
rationale of those cases will not apply to this transaction, because the form
of
the transaction as reflected in the operative provisions of the documents
either
accords with the characterization of the Certificates as debt or otherwise
makes
the rationale of those cases inapplicable to this situation.

<PAGE>

2.    Taxation of Interest Income of Certificate Owners

Assuming that the Certificate Owners are holders of debt obligations for
U.S. federal tax purposes, the Certificates generally will be taxable in the
following manner. While it is not anticipated that the Certificates will be
issued at a greater than de minimis discount, under the OID Regulations it is
possible that the Certificates could nevertheless be deemed to have been issued
with OID if the interest were not treated as "unconditionally payable" under the
OID Regulations. If such regulations were to apply, all of the taxable income to
be recognized with respect to the Certificates would be includible in income of
Certificate owners as OID, but would not be includible again when the interest
is actually received.

3.    Possible Classification of the Trust Fund as a Partnership or
Association Taxable as a Corporation

Based on application of existing laws to the facts as set forth in the
Trust Agreement and other relevant documents and assuming compliance with the
terms of the Trust Agreement, Tax Counsel will deliver its opinion that the
transaction will not be treated as a partnership or an association taxable as a
corporation. The opinion of Tax Counsel is not binding on the courts or the IRS.
It is possible that the IRS could assert that, for purposes of the Code, the
transaction contemplated by this Prospectus Supplement with respect to the
Certificates constitutes a sale of the Mortgage Loans (or an interest therein)
to the Certificate Owners and that the proper classification of the legal
relationship between the Depositor and the Certificate Owners resulting form
this transaction is that of a partnership (including a publicly traded
partnership treated as a corporation), or an association taxable as a
corporation. Since Tax Counsel will advise that the Certificates will be treated
as indebtedness in the hands of the Certificateholders for U.S. federal income
tax purposes and that the entity constituted by the Trust will not be a publicly
traded partnership treated as a corporation or an association taxable as a
corporation, the Depositor will not attempt to comply with U.S. federal income
tax reporting requirements applicable to partnerships or corporations as such
requirements would apply if the Certificates were treated as indebtedness.

If it were determined that this transaction created an entity classified
as a corporation (including a publicly traded partnership taxable as a
corporation), the Trust Fund would be subject to U.S. federal income tax at
corporate income tax rates on the income it derives form the Mortgage Loans,
which would reduce the amounts available for distribution to the Certificate

Owners. Cash distributions to the Certificate Owners generally would be treated
as dividends for tax purposes to the extent of such corporation's earnings and
profits.

If the transaction were treated as creating a partnership between the
Certificate Owners and the Transferor, the partnership itself would not be
subject to U.S. federal income tax (unless it were to be characterized as a
publicly traded partnership taxable as a corporation); rather, the Depositor and
each Certificate Owner would be taxed individually on their respective
distributive shares of the partnership's income, gain, loss, deductions and
credits. The amount and timing of items of income and deductions of the
Certificate Owner could differ if the Certificates were held to constitute
partnership interests rather than indebtedness.

        4.      Possible Classification as a Taxable Mortgage Pool

        In relevant part, Code Section 7701(i) provides that any entity (or
portion of an entity) that is a "taxable mortgage pool" will be classified as a
taxable corporation and will not be permitted to file a consolidated U.S.
federal income tax return with another corporation. Any entity (or portion of
any entity) will be a taxable mortgage pool if (i) substantially all of its
assets consist of debt instruments, more than 50% of which are real estate
mortgages, (ii) the entity is the obligor under debt obligations with two or
more maturities, and (iii) under the terms of the entity's debt obligations (or
an underlying arrangement), payments on such debt obligations bear a
relationship to the debt instruments held by the entity.

        In the case of a Trust Fund containing Mortgage Assets, assuming that all
of the provisions of the Trust Agreement, as in effect on the date of issuance,
will be complied with, Tax Counsel will deliver its

<PAGE>

opinion that the arrangement created by the Agreement will not be a taxable
mortgage pool under Code Section 7701(i) because only one class of indebtedness
secured by the Mortgage Loans will be issued.

        The opinion of Tax Counsel is not binding on the IRS or the courts. If the
IRS were to contend successfully (or future regulations were to provide) that
the arrangement created by the Trust Agreement is a taxable mortgage pool, such
arrangement would be subject to U.S. federal corporate income tax on its taxable
income generated by ownership of the Mortgage Loans. Such a tax might reduce
amounts available for distributions to Certificate Owners. The amount of such a
tax would depend upon whether distributions to Certificate Owners would be

deductible as interest expense in computing the taxable income of such an arrangement as a taxable mortgage pool.

5.     Foreign Investors

In general, subject to certain exception, interest (including OID) paid on
a Certificate to a nonresident alien individual, foreign corporation or other
non-United States person is not subject to U.S. federal income tax, provided
that such interest is not effectively connected with a trade or business of the
recipient in the United sates and the Certificate Owner provides the required
foreign person information certification.

If the interest of the Certificate Owners were deemed to be partnership
interest, the partnership would be required, on a quarterly basis, to pay
withholding tax equal to the product, for each foreign partner, of such foreign
partner's distributive share of "effectively connected" income of the
partnership multiplied by the highest rate of tax applicable to that foreign
partner. In addition, such foreign partner would be subject to branch profits
tax. Each non-foreign partner would be required to certify to the partnership
that it is not a foreign person. The tax withheld from each foreign partner
would be credited against such foreign partner's U.S. income tax liability.

If the Trust were taxable as a corporation, distributions to foreign
persons, to the extent treated as dividends, would generally be subject to
withholding at the rate of 30%, unless such rate were reduced by an applicable
tax treaty.

6.     Backup Withholding

Certain Certificate Owners may be subject to backup withholding with
respect to interest paid on the Certificates if the Certificate Owners, upon
issuance of the Certificates, fail to supply the Trustee or the Certificate
Owners' brokers with their respective taxpayer identification numbers, furnish
an incorrect taxpayer identification number, fail to report interest, dividends,
or other "reportable payments" (as defined in the Code) properly, or, under
certain circumstances, fail to provide the Trustee of the Certificate Owners'
brokers with certified statements, under penalty of perjury, that they are not
subject to backup withholding. The backup withholding rate is currently 28%.
This rate is scheduled to adjust for tax years after 2010.

The Trustee will be required to report annually to the IRS, and to each
Certificateholder of record, the amount of interest paid (and OID accrued, if
any) on the Certificates (and the amount of interest withheld for U.S. federal
income taxes, if any) for each calendar year, except as to exempt holders
(generally, holders that are corporations, certain tax-exempt organizations or
nonresident aliens who provide certification as to their status as
nonresidents). As long as the only "Certificateholder" of record is Cede, as
nominee for DTC, Certificate Owners and the IRS will receive tax and other

information including the amount of interest paid on the Certificates owned from
Participants and Indirect Participants rather than from the Trustee. (The Trustee, however, will respond to requests for necessary information to enable
Participants, Indirect Participants and certain other persons to complete their
reports.) Each non-exempt Certificate Owner will be required to provide, under
penalty of perjury, a certificate on IRS Form W-9 containing his or her name, address, correct federal taxpayer identification number and a statement that he
or she is not to subject to backup withholding. Should a non-exempt Certificate
Owner fail to provide the required certification, the Participants or Indirect
Participants (or the Paying Agent) will be required to backup withhold from interest (and principal) otherwise payable to the holder, and remit the withheld
amount to the IRS as a credit against the holder's federal income tax liability.

<PAGE>

        7.      New Withholding Regulations

        On January 1, 2001, the New Regulations became effective (subject to certain transition rules) which make certain modifications to the withholding, backup withholding and information reporting rules described above. The New Regulations attempt to unify certification requirements and modify reliance standards. Prospective investors are urged to consult their own tax advisors regarding the New Regulations.

FASIT SECURITIES

        General.  The FASIT provisions of the Code were enacted by the Small Business Job Protection Act of 1996 and create a new elective statutory vehicle
for the issuance of mortgage-backed and asset-backed securities. Definitive guidance cannot be provided with respect to many aspects of the tax treatment of
FASIT Securityholders. Investors also should note that the FASIT discussions contained herein constitutes only a summary of the federal income tax consequences to holders of FASIT Securities. With respect to each series of FASIT Securities, the related Prospectus Supplement will provide a detailed discussion regarding the federal income tax consequences associated with the particular transaction.

        FASIT Securities will be classified as either FASIT regular securities ("FASIT Regular Securities"), which generally will be treated as debt for federal income tax purposes, or FASIT ownership securities ("FASIT Ownership Securities"), which generally are not treated as debt for such purposes, but rather as representing rights and responsibilities with respect to the taxable
income or loss of the related series. The Prospectus Supplement for each series

of Securities will indicate whether one or more FASIT elections will be made for
that series and which Securities of such series will be designated as FASIT Regular Securities, and which, if any, will be designated as FASIT Ownership Securities.

Qualification as a FASIT.  The Trust Fund underlying a series (or one or more designated pools of assets held in the Trust Fund) will qualify under the Code as a FASIT in which the FASIT Regular Securities and the FASIT Ownership Securities will constitute the "regular interests" and the "ownership interests," respectively, if (i) a FASIT election is in effect, (ii) certain tests concerning (A) the composition of the FASIT's assets and (B) the nature of the Securityholders' interest in the FASIT are met on a continuing basis, and (iii) the Trust Fund is not a regulated investment company as defined in Code Section 851(a).

Asset Composition.  In order for a Trust Fund (or one or more designated pools of assets held by a Trust Fund) to be eligible for FASIT status, substantially all of the assets of the Trust Fund (or the designated pool) must consist of "permitted assets" as of the close of the third month beginning after the closing date and at all times thereafter (the "FASIT Qualification Test"). Permitted assets include:

    (i)    cash or cash equivalents,

    (ii)   debt instruments with fixed terms that would qualify as REMIC
           regular interests if issued by a REMIC (generally, instruments
           that provide for interest at a fixed rate, a qualifying variable
           rate, or a qualifying interest-only ("IO") type rate),

    (iii)  foreclosure property,

    (iv)   certain hedging instruments (generally, interest and currency rate
           swaps and credit enhancement contracts) that are reasonably
           required to guarantee or hedge against the FASIT's risks
           associated with being the obligor on FASIT interests,

    (v)    contract rights to acquire assets described in clause (ii) or
           clause (iv) above,

    (vi)   FASIT regular interests, and

    (vii)  REMIC regular interests. Permitted assets do not include any debt
           instruments issued by the holder of the FASIT's ownership interest
           or by any person related to such holder.

<PAGE>

Interests in a FASIT.  In addition to the foregoing asset qualification requirements, the interests in a FASIT also must meet certain requirements. All
of the interests in a FASIT must belong to either of the following: (i) one or
more classes of regular interests or (ii) a single class of ownership interest
that is held by a fully taxable domestic corporation.

A FASIT interest generally qualifies as a regular interest if:

(i)    it is designated as a regular interest,

(ii)   it has a stated maturity no greater than thirty years,

(iii)   it entitles its holder to a specified principal amount,

(iv)   the issue price of the interest does not exceed 125% of its stated
         principal amount,

(v)   the yield to maturity of the interest is less than the applicable
         Treasury rate published by the IRS plus 5%, and

(vi)   if it pays interest, such interest is payable at either

         (a)   fixed rate with respect to the principal amount of the regular
                 interest or

         (b)   a permissible variable rate with respect to such principal
                 amount.

Permissible variable rates for FASIT regular interests are the same as those for
REMIC regular interest (i.e., certain qualified floating rates and weighted average rates). See "Material Federal Income Tax Consequences--REMICs--Taxation
of Owners of REMIC Regular Certificates--Variable Rate REMIC Regulation Certificate."

If a FASIT Regular Security fails to meet one or more of the requirements
set out in clauses (iii), (iv) or (v), but otherwise meets the above requirements, it may still qualify as a type of regular interest known as a "High-Yield Interest." In addition, if a FASIT Regular Security fails to meet the requirements of clause (vi), but the interest payable on the Security consists of a specified portion of the interest payments on permitted assets and
that portion does not vary over the life of the FASIT Regular Security, the FASIT Regular Security also will qualify as a High-Yield Interest. A High-Yield
Interest may be held only by domestic corporations that are fully subject to corporate income tax ("Eligible Corporations"), other FASITs and dealers in

securities who acquire such interests as inventory, rather than for investment.
In addition, holders of High-Yield Interests are subject to limitations on offset of income derived from such interest. See "Material Federal Income Tax Consequences--FASIT Securities--Tax Treatment of FASIT Regular Securities--Treatment of High-Yield Interests."

        Consequences of Disqualification.  If a series of FASIT Securities fails
to comply with one or more of the Code's ongoing requirements for FASIT status
during any taxable year, the Code provides that FASIT status may be lost for that year and thereafter. If FASIT status is lost, the treatment of the former
FASIT and the interests therein for federal income tax purposes is uncertain. The former FASIT might be treated as a grantor trust, as a separate association
taxed as a corporation, or as a partnership. The FASIT Regular Securities could
be treated as debt instruments for federal income tax purposes or as equity interests. Under proposed regulations under the FASIT provisions of the Code, if
a FASIT fails to continue to qualify as a FASIT, (i) its subsequent characterization for federal income tax purposes will be determined under general federal income tax principles, (ii) the holders of the FASIT Ownership
Securities will be treated as exchanging the assets of the FASIT for an amount
equal to their value and will be subject to tax on all gain realized, on an asset-by-asset basis, on such exchange, (iii) the holders of the FASIT Ownership
Securities must recognize cancellation of indebtedness income to the extent that
the adjusted issue price of the FASIT Regular Securities immediately before the
termination exceeds the fair market value of those interests immediately before
the termination, (iv) any continuing interest of the holders of the FASIT Ownership Securities in the Trust Fund following cessation will be characterized
under general federal income tax principles and (v) holders of FASIT Regular Securities will be treated as exchanging their FASIT Regular Securities for interests in the underlying economic arrangement and will recognize gain on such
exchange if their interest in the underlying economic arrangement is not classified

                                109

<PAGE>

as debt or is treated as debt that differs materially in kind or extent from their FASIT Regular Securities. There can be no assurance regarding whether the
proposed regulations will be finalized and the specific provisions that may be
included in the regulations when they are finalized.

Tax Treatment of FASIT Regular Securities.  Payments received by holders
of FASIT Regular Securities generally should be accorded the same tax treatment
under the Code as payments received on other taxable corporate debt instruments
and on REMIC Regular Securities. As in the case of holders of REMIC Regular
Securities, holders of FASIT Regular Securities must report income from such
Securities under an accrual method of accounting, even if they otherwise would
have used the cash receipts and disbursements method. Except in the case of
FASIT Regular Securities issued with original issue discount or acquired with
market discount or premium, interest paid or accrued on a FASIT Regular Security
generally will be treated as ordinary income to the Securityholder and a
principal payment on such Security will be treated as a return of capital to the
extent that the Securityholder's basis is allocable to that payment. FASIT
Regular Securities issued with original issue discount or acquired with market
discount or premium generally will treat interest and principal payments on such
Securities in the same manner described for REMIC Regular Securities. See
"Material Federal Income Tax Consequences--REMICs--Taxation of Owners of REMIC
Regular Certificates" "--Original Issue Discount and Premium" and "--Market
Discount" and "--Premium" above. High-Yield Securities may be held only by fully
taxable domestic corporations, other FASITs, and certain securities dealers.
Holders of High-Yield Securities are subject to limitations on their ability to
use current losses or net operating loss carryforwards or carrybacks to offset
any income derived from those Securities.

     If a FASIT Regular Security is sold or exchanged, the Securityholder
generally will recognize gain or loss upon the sale in the manner described
above for REMIC Regular Securities. See "Material Federal Income Tax
Consequences--REMICs--Taxation of Owners of REMIC Regular Certificates--Sale,
Exchange or Redemption." In addition, if a FASIT Regular Security becomes wholly
or partially worthless as a result of default and delinquencies of the
underlying Assets, the holder of such FASIT Regular Security should be allowed
to deduct the loss sustained (or alternatively be able to report a lesser amount
of income). See "Material Federal Income Tax Consequences--REMICs--Taxation of
Owners of REMIC Regular Certificates", "--Effects of Default and Delinquencies"
and "--Treatment of Realized Losses."

     FASIT Regular Securities held by a REIT will qualify as "real estate
assets" within the meaning of Code Section 856(c)(4)(A), and interest on such
Securities will be considered interest described in Code Section 856(c)(3)(B) to
the same extent that REMIC Securities would be so considered. FASIT Regular

Securities held by a thrift institution taxed as a "domestic building and loan
association" will represent qualifying assets for purposes of the qualification
requirements set forth in Code Section 7701(a)(19) to the same extent that REMIC
Securities would be so considered. See "Material Federal Income Tax
Consequences--REMICs." In addition, FASIT Regular Securities held by a financial
institution to which Code Section 585 applies will be treated as evidences of
indebtedness for purposes of Code Section 582(c)(1). FASIT Securities will not
qualify as "Government Securities" for either REIT or RIC qualification
purposes.

       Treatment of High-Yield Interests.  High-Yield Interests are subject to
special rules regarding the eligibility of holders of such interests, and the
ability of such holders to offset income derived from their FASIT Regular
Security with losses. High-Yield Interests may be held only by Eligible
Corporations, other FASITs and dealers in securities who acquire such interests
as inventory. If a securities dealer (other than an Eligible Corporation)
initially acquires a High-Yield Interest as inventory, but later begins to hold
it for investment, the dealer will be subject to an excise tax equal to the
income from the High-Yield Interest multiplied by the highest corporate income
tax rate. In addition, transfers of High-Yield Interests to disqualified holders
will be disregarded for federal income tax purposes, and the transferor still
will be treated as the holder of the High-Yield Interest.

       The holder of a High-Yield Interest may not use non-FASIT current losses
or net operating loss carryforwards or carrybacks to offset any income derived
from the High-Yield Interest, for either regular

<PAGE>

Federal income tax purposes or for alternative minimum tax purposes. In
addition, the FASIT provisions contain an anti-abuse rule that imposes corporate
income tax on income derived from a FASIT Regular Security that is held by a
pass-through entity (other than another FASIT) that issues debt or equity
securities backed by the FASIT Regular Security and that have the same features
as High-Yield Interests.

       Tax Treatment of FASIT Ownership Securities.  A FASIT Ownership Security
represents the residual equity interest in a FASIT. As such, the holder of a
FASIT Ownership Security determines its taxable income by taking into account
all assets, liabilities and items of income, gain, deduction, loss and credit of
the FASIT. In general, the character of the income to the holder of a FASIT

Ownership Interest will be the same as the character of such income of the FASIT, except that any tax-exempt interest income taken into account by the holder of a FASIT Ownership Interest is treated as ordinary income. In determining that taxable income, the holder of a FASIT Ownership Security must
determine the amount of interest, original issue discount, market discount and
premium recognized with respect to the FASIT's assets and the FASIT Regular Securities issued by the FASIT according to a constant yield methodology and under an accrual method of accounting. In addition, holders of FASIT Ownership
Securities are subject to the same limitations on their ability to use losses to
offset income from their FASIT Ownership Securities as are the holders of High-Yield Interests. See "Material Federal Income Tax Consequences--FASIT Securities--Treatment of High-Yield Interests."

     Rules similar to the wash sale rules applicable to REMIC Residual Securities also apply to FASIT Ownership Securities. Accordingly, losses on dispositions of a FASIT Ownership Security generally will be disallowed where, within six months before or after the disposition, the seller of such FASIT Ownership Security acquires any other FASIT Ownership Security or, in the case
of a FASIT holding mortgage assets, any interest in a Taxable Mortgage Pool that
is economically comparable to a FASIT Ownership Security. In addition, if any security that is sold or contributed to a FASIT by the holder of the related FASIT Ownership Security was required to be marked-to-market under Code Section
475 by such holder, then Code Section 475 will continue to apply to such securities, except that the amount realized under the mark-to-market rules will
be a greater of the security's value under present law or the security's value
after applying special valuation rules contained in the FASIT provisions. Those
special valuation rules generally require that the value of debt instruments that are not traded on an established securities market be determined by calculating the present value of the reasonably expected payments under the instrument using a discount rate of 120% of the applicable Federal rate, compounded semiannually. The holder of a FASIT Ownership Security will be subject to a tax equal to 100% of the net income derived by the FASIT from any
"prohibited transactions." Prohibited transactions include (i) the receipt of income derived from assets that are not permitted assets, (ii) certain dispositions of permitted assets, (iii) the receipt of any income derived from
any loan originated by a FASIT, and (iv) in certain cases, the receipt of income
representing a servicing fee or other compensation. Any series for which a FASIT
election is made generally will be structured in order to avoid application of
the prohibited transaction tax.

     Backup Withholding, Reporting and Tax Administration.  Holders of FASIT

Securities will be subject to backup withholding to the same extent holders of
REMIC Securities would be subject. See "Material Federal Income Tax
Consequences--REMICs--Taxation of Owners of REMIC Regular
Certificates--Information Reporting and Backup Withholding." For purposes of
reporting and tax administration, holders of record of FASIT Securities
generally will be treated in the same manner as holders of REMIC Securities.

TAXATION OF CLASSES OF RECOMBINABLE SECURITIES

GENERAL

        The arrangement pursuant to which the recombinable securities of a
series
are created, sold and administered (an "RS Pool") will be classified as a
grantor trust under subpart E, part I of subchapter J of the Code. The
interests
in the classes of securities that have been exchanged for recombinable
securities

<PAGE>

will be the assets of the RS Pool and the classes of recombinable securities
represent beneficial ownership of these interests in the classes of
securities.

TAX STATUS

        The classes of recombinable securities should be considered to
represent
"real estate assets" within the meaning of Code Section 856(c)(5)(B) and
assets
described in Code Section 7701(a)(19)(C), and original issue discount and
interest accruing on classes of recombinable securities should be considered
to
represent "interest on obligations secured by mortgages on real property"
within
the meaning of Code Section 856(c)(3)(B) in each case to the extent the
securities or income on the securities would be qualifying if held directly
(although the matter is not entirely clear for Strips, defined below). The
classes of recombinable securities will be "qualified mortgages" under Code
Section 860G(a)(3) for a REMIC.

TAX ACCOUNTING FOR RECOMBINABLE SECURITIES

        A class of recombinable securities represents beneficial ownership of
an
interest in one or more classes of securities on deposit in a recombinable
security trust fund, as specified in the related prospectus supplement. If it
represents an interest in more than one class of securities, a purchaser must
allocate its basis in the class of recombinable securities among the
interests
in the classes of securities in accordance with their relative fair market
values as of the time of acquisition. Similarly, on the sale of such
recombinable securities, the holder must allocate the amount received on the

sale among the interests in the classes of securities in accordance with their
relative fair market values as of the time of sale.

The holder of a recombinable security must account separately for each interest in a class of securities (there may be only one such interest). Where the interest represents a pro rata portion of a class of securities that are REMIC regular securities, the holder of the recombinable securities should account for such interest as described under "Material Federal Income Tax Consequences--REMICs--Taxation of Owners of REMIC Regular Certificates" above. Where the interest represents beneficial ownership of a disproportionate part of the principal and interest payments on a class of securities (a "Strip"), the holder is treated as owning, pursuant to Code Section 1286, "stripped bonds" to the extent of its share of principal payments and "stripped coupons" to the extent of its share of interest payments on such class of securities. We intend to treat each Strip as a single debt instrument for purposes of information reporting. The Internal Revenue Service, however, could take a different position. For example, the Internal Revenue Service could contend that a Strip should be treated as a pro rata part of the class of securities to the extent that the Strip represents a pro rata portion thereof, and "stripped bonds" or "stripped coupons" with respect to the remainder. An investor should consult its tax advisor regarding this matter.

A holder of a recombinable security should calculate original issue discount with respect to each Strip and include it in ordinary income as it accrues, which may be before the receipt of cash attributable to such income, in accordance with a constant interest method that takes into account the compounding of interest. The holder should determine its yield to maturity based on its purchase price allocated to the Strip and on a schedule of payments projected using a prepayment assumption, and then make periodic adjustments to take into account actual prepayment experience. With respect to a particular holder, Treasury regulations do not address whether the prepayment assumption used to calculate original issue discount would be determined at the time of purchase of the Strip or would be the original prepayment assumption with respect to the related class of securities. Further, if the related class of securities is subject to redemption as described in the related prospectus supplement, Treasury regulations do not address the extent to which such prepayment assumption should take into account the possibility of the retirement of the Strip concurrently with the redemption of such class of securities. An investor should consult its tax advisor regarding these matters. For purposes of information reporting relating to original issue discount, the original yield to maturity of the Strip, determined as of the date of issuance of the series, will be calculated based on the original prepayment assumption.

If original issue discount accruing with respect to a Strip, computed as
described above, is negative for any period, the holder may be entitled to
offset such amount only against future positive original issue

<PAGE>

discount accruing from such Strip, and income is reported in all cases in this
manner. Although not entirely free from doubt, such a holder may be entitled to
deduct a loss to the extent that its remaining basis would exceed the maximum
amount of future payments to which the holder is entitled with respect to such
Strip, assuming no further prepayments of the Mortgages (or, perhaps, assuming
prepayments at a rate equal to the prepayment assumption). Although the issue is
not free from doubt, all or a portion of such loss may be treated as a capital
loss if the Strip is a capital asset in the hands of the holder.

        A holder realizes gain or loss on the sale of a Strip in an amount equal
to the difference between the amount realized and its adjusted basis in such
Strip. The holder's adjusted basis generally is equal to the holder's allocated
cost of the Strip, increased by income previously included, and reduced (but not
below zero) by distributions previously received. Except as described below, any
gain or loss on such sale generally is capital gain or loss if the holder has
held its interest as a capital asset and is long-term if the interest has been
held for the long-term capital gain holding period (more than one year). Such
gain or loss will be ordinary income or loss (1) for a bank or thrift
institution or (2) if the securities are REMIC regular securities to the extent
income recognized by the holder is less than the income that would have been
recognized if the yield on such interest were 110% of the applicable federal
rate under Code Section 1274(d).

        If a holder exchanges a single class of recombinable securities (an
"Exchanged Class") for several classes of recombinable securities (each, a
"Received Class") and then sells one of the Received Classes, the sale may be
subject the investor to the coupon stripping rules of Code Section 1286. The
holder must allocate its basis in the Exchanged Class between the part of such
class underlying the Received Class that was sold and the part of the Exchanged
Class underlying the Received Classes that was retained, in proportion to their
relative fair market values as of the date of such sale. The holder is treated
as purchasing the interest retained for the amount of basis allocated to such

interest. The holder must calculate original issue discount with respect to the
retained interest as described above.

Although the matter is not free from doubt, a holder that acquires in one
transaction a Combination of classes of recombinable securities that may be
exchanged for a single class of recombinable securities that is identical to a
class of securities that is on deposit in the related recombinable security
trust fund should be treated as owning the relevant class of securities.

EXCHANGES OF RECOMBINABLE SECURITIES

An exchange of an interest in one or more classes of recombinable
securities for an interest in one or more other related classes of recombinable
securities that are part of the same combination, or vice versa, will not be a
taxable exchange. After the exchange, the holder is treated as continuing to own
the interests in the class or classes of recombinable securities that it owned
immediately before the exchange.

TAX TREATMENT OF FOREIGN INVESTORS

A foreign holder of a class of recombinable securities is subject to
taxation in the same manner as foreign holders of REMIC regular securities. Such
manner of taxation is discussed under the heading "Material Federal Income Tax
Consequences--REMICs--Taxation of Owners of REMIC Regular Certificates."

BACKUP WITHHOLDING

A holder of a class of recombinable securities is subject to backup
withholding rules similar to those applicable to REMIC regular securities. Such
manner of taxation is discussed under the heading "Material Federal Income Tax
Consequences--REMICs--Taxation of Owners of REMIC Regular Certificates."

<PAGE>

REPORTING AND ADMINISTRATIVE MATTERS

Reports will be made to the Internal Revenue Service and to holders of
record of the classes of recombinable securities that are not excepted from the
reporting requirements.

DUE TO THE COMPLEXITY OF THE FEDERAL INCOME TAX RULES APPLICABLE TO
SECURITYHOLDERS AND THE CONSIDERABLE UNCERTAINTY THAT EXISTS WITH RESPECT TO
MANY ASPECTS OF THOSE RULES, POTENTIAL INVESTORS SHOULD CONSULT THEIR OWN TAX
ADVISORS REGARDING THE TAX TREATMENT OF THE ACQUISITION, OWNERSHIP, AND

DISPOSITION OF THE SECURITIES.

## STATE TAX CONSIDERATIONS

        In addition to the federal income tax consequences described in
"Material
Federal Income Tax Considerations," potential investors should consider the
state and local income tax consequences of the acquisition, ownership, and
disposition of the Offered Securities. State and local income tax law may
differ
substantially from the corresponding federal law, and this discussion does
not
purport to describe any aspect of the income tax laws of any state or
locality.
Therefore, potential investors should consult their own tax advisors with
respect to the various state and local tax consequences of an investment in
the
Offered Securities.

## ERISA CONSIDERATIONS

GENERAL

        The Employee Retirement Income Security Act of 1974, as amended
("ERISA")
and Section 4975 of the Internal Revenue Code of 1986, as amended (the
"Code"),
impose certain restrictions on employee benefit plans, individual retirement
accounts and annuities, Keogh plans and collective investment funds and
separate
accounts in which those plans, accounts or arrangements are invested
(collectively, "Plans"), and on persons who are parties in interest or
disqualified persons ("Parties In Interest") with respect to such Plans.
Certain
employee benefit plans, such as governmental plans and church plans (if no
election has been made under Code Section 410(d)), are not subject to the
restrictions of ERISA and Code Section 4975, and assets of such plans may be
invested in the Securities without regard to the considerations described
below,
subject to other applicable federal, state and local law ("Similar Law").
However, any such governmental or church plan which is qualified under Code
Section 401(a) and exempt from taxation under Code Section 501(a) is subject
to
the prohibited transaction rules set forth in Code Section 503.

        Investments by Plans are subject to ERISA's general fiduciary
requirements, including the requirement of investment prudence and
diversification and the requirement that a Plan's investments be made in
accordance with the documents governing the Plan.

PROHIBITED TRANSACTIONS

General

        ERISA prohibits Parties in Interest with respect to a Plan from
engaging
in certain transactions involving a Plan and its assets unless a statutory,

regulatory or administrative exemption applies to the transaction. Code Section
4975 imposes certain excise taxes and other sanctions (or, in some cases, a
civil penalty may be assessed pursuant to Section 502 of ERISA) on Parties in
Interest which engage in non-exempt prohibited transactions.

Plan Asset Regulations

    The United States Department of Labor ("Labor") has issued regulations (29
C.F.R. Section 2510.3-101) containing rules for determining what constitutes the
assets of a Plan (the "Plan Asset Regulations"). The Plan Asset Regulations
provide that, as a general rule, the underlying assets and properties

<PAGE>

of corporations, partnerships, trusts and certain other entities in which a Plan
acquires an "equity interest" will be deemed for purposes of ERISA to be assets
of the Plan unless certain exceptions apply.

    Under the terms of the Plan Asset Regulations, the Trust Fund may be
deemed to hold plan assets by reason of a Plan's investment in a Security; such
plan assets would include an undivided interest in the Mortgage Assets and any
other assets held by the Trust Fund. In such an event, the Asset Seller, the
Master Servicer, the Trustee, any insurer of the Assets and other persons, in
providing services with respect to the assets of the Trust Fund, may be Parties
in Interest, subject to the prohibited transaction provisions of Section 406 of
ERISA, Code Section 4975 or Similar Law, with respect to transactions involving
such assets unless such transactions are subject to a statutory, regulatory or
administrative exemption.

    The Plan Asset Regulations contain a de minimis safe-harbor rule that
exempts an entity from being deemed to hold plan assets if the aggregate equity
investment in such entity by Plans is not significant. For this purpose, equity
investment in the entity will be significant if immediately after any
acquisition of any equity interest in the entity, "benefit plan investors" in
the aggregate, own at least 25% of the value of any class of equity interest.
"Benefit plan investors" are defined as Plans as well as employee benefit plans
not subject to Title I of ERISA (e.g., governmental plans). The 25% limitation
must be met with respect to each class of certificates, regardless of the
portion of total equity value represented by such class, on an ongoing basis.

An exception applies if the interest described is treated as indebtedness
under applicable local law and has no substantial equity features. Generally, a
profits interest in a partnership, an undivided ownership interest in property
and a beneficial ownership interest in a trust are deemed to be "equity
interests" under the Plan Asset Regulations. If Notes of a particular series are
deemed to be indebtedness under applicable local law without any substantial
equity features, an investing Plan's assets would include such Notes, but not,
by reason of such purchase, the underlying assets of the Trust Fund.

Labor has issued final regulations under Section 401(c) of ERISA
describing a safe harbor for insurers that issued certain nonguaranteed policies
supported by their general accounts to Plans on or before December 31, 1998, and
under which an insurer would not be considered an ERISA fiduciary with respect
to its general account by virtue of a Plan's investment in such a policy. In
general, to meet the safe harbor, an insurer must (i) disclose certain specified
information to investing Plan fiduciaries initially and on an annual basis, (ii)
allow Plans to terminate or discontinue a policy on 90 days' notice to the
insurer, and to elect, without penalty, either a lump-sum payment or annual
installment payments over a ten-year period, with interest, and (iii) give Plans
written notice of "insurer-initiated amendments" over 60 days before the
amendments take effect.

AVAILABILITY OF UNDERWRITER'S EXEMPTION FOR CERTIFICATES

Labor has granted to Merrill Lynch, Pierce, Fenner & Smith Incorporated
Prohibited Transaction Exemption ("PTE") 90-29, Exemption Application No.
D-8012, 55 Fed. Reg. 21459 (1990), as amended (the "Exemption"), which exempts
from the application of certain of the prohibited transaction rules
transactions
relating to: (1) the acquisition, sale and holding by Plans of certain
certificates representing an undivided interest in certain asset-backed
pass-through trusts, with respect to which Merrill Lynch, Pierce, Fenner & Smith
Incorporated or any of its affiliates is the sole underwriter or the manager or
co-manager of the underwriting syndicate; and (2) the servicing, operation and
management of such asset-backed pass-through trusts, provided that the general
conditions and certain other conditions set forth in the Exemption are
satisfied. With respect to a series of Notes, the related Prospectus Supplement
will discuss whether the Exemption may be applicable to such Notes.

Section II of the Exemption sets forth the following general conditions

which must be satisfied before a transaction involving the acquisition, sale and
holding of the Certificates or a transaction in

<PAGE>

connection with the servicing, operation and management of the Trust may be
eligible for exemptive relief thereunder:

        -    The acquisition of the Certificates by a Plan is on terms
(including
             the price for such Certificates) that are at least as favorable to
the
             Plan as they would be in an arm's-length transaction with an
unrelated
             party;

        -    The rights and interests evidenced by the Certificates acquired by
the
             Plan are not subordinated to the rights and interests evidenced by
             other certificates of the Trust, unless the Certificates are backed
by
             Trust Fund assets which are residential, home equity, multi-family
or
             commercial loans which are described and defined in the Exemption
as
             designated transactions ("Designated Transactions");

        -    The Certificates acquired by the Plan have received a rating at the
             time of such acquisition that is in one of the three (or in the
case
             of a Designated Transaction, four) highest generic rating
categories
             from any of Fitch Inc., Moody's Investors Service, Inc. and
Standard &
             Poor's, a division of The McGraw-Hill Companies, Inc. (each, a
"Rating
             Agency");

        -    The Trustee is not an affiliate of any member of the Restricted
Group
             (consisting of the Underwriter, the Asset Seller, the Master
Servicer,
             any insurer of the Mortgage Assets, any borrower whose obligations
             under one or more Assets constitute more than 5% of the aggregate
             unamortized principal balance of the assets in the Trust Fund, or
any
             of their respective affiliates), other than the Underwriter;

        -    The sum of all payments made to and retained by the Underwriter in
             connection with the distribution or placement of the Certificates
             represents not more than reasonable compensation for underwriting
or
             placing such Certificates; the sum of all payments made to and
             retained by the Asset Seller pursuant to the sale of the Assets to
the

Trust Fund represents not more than the fair market value of such Assets; the sum of all payments made to and retained by the Master Servicer represent not more than reasonable compensation for the Master Servicer's services under the Agreement and reimbursement of the Master Servicer's reasonable expenses in connection therewith; and

- The Plan investing in the Certificates is an "accredited investor" as

   defined in Rule 501(a)(1) of Regulation D of the Securities and Exchange Commission under the Securities Act of 1933 as amended.

The Exemption was amended by PTE 97-34 to extend exemptive relief to Certificates issued in transactions using pre-funding accounts whereby a portion of the loans backing the Certificates are transferred to the Trust Fund within a specified period following the closing date (the "Pre-Funding Period") instead of requiring that all such loans be either identified or transferred on or before the closing date. The relief is available provided that the following conditions are met:

- The ratio of the amount allocated to the pre-funding account to the total principal amount of the certificates being offered must not exceed twenty-five percent (25%);

- All loans transferred after the closing date (referred to as "additional loans") must meet the same terms and conditions for eligibility as the original loans used to create the Trust Fund, which

   terms and conditions have been approved by a Rating Agency;

- The transfer of such additional loans to the Trust Fund during the Pre-Funding Period must not result in the Certificates receiving a lower credit rating from a Rating Agency upon termination of the Pre-Funding Period than the rating that was obtained at the time of the initial issuance of the Certificates by the Trust Fund;

- Solely as a result of the use of pre-funding, the weighted average annual percentage interest rate (the "Average Interest Rate") for all

   of the loans in the Trust Fund at the end of the Pre-Funding Period must not be more than 100 basis points lower than the Average Interest

   Rate for the loans which were transferred to the Trust Fund on the closing date;

<PAGE>

- Either (i) the characteristics of the additional loans must be monitored by an insurer or other credit support provider which is independent of the Asset Seller or (ii) an independent accountant retained by the Asset Seller must provide the Asset Seller with a letter (with copies provided to the Rating Agency, the Underwriter and

the Trustee) stating whether or not the characteristics of the additional loans conform to the characteristics described in the offering documents or the agreement. In preparing such letter, the independent accountant must use the same type of procedures as were applicable to the loans which were transferred as of the closing date;

- The Pre-Funding Period must end no later than three months or 90 days after the closing date or earlier, in certain circumstances, if the amount on deposit in the pre-funding account is reduced below the minimum level specified in the agreement or an event of default occurs under the agreement;

- Amounts transferred to any pre-funding account and/or capitalized interest account used in connection with the pre-funding may be invested only in investments which are permitted by a Rating Agency, and (i) are direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality thereof (provided that such obligations are backed by the full faith and credit of the United States) or (ii) have been rated (or the obligor has been rated) in one of the three highest generic rating categories by a Rating Agency; and

- Certain disclosure requirements must be met.

PTE 2000-58 further amended the Exemption to provide that one subset of Designated Transactions, residential (one-to-four family) and home equity loans and manufactured housing loans, may be less than fully secured, provided that (a) the rights and interests evidenced by Certificates issued in such Designated Transactions are not subordinated to the rights and interests evidenced by securities of the same Trust Fund, (b) such Certificates have received a rating from a Rating Agency at the time of such acquisition that is in one of the two highest generic rating categories, and (c) any loan included in the corpus or assets of the Trust Fund is secured by collateral whose fair market value on the closing date of the Designated Transaction is at least equal to 80% of the sum of (i) the outstanding principal balance due under the loan which is held by the Trust Fund and (ii) the outstanding principal balance(s) of any other loan(s) of higher priority (whether or not held by the Trust Fund) which are secured by the same collateral.

PTE 2000-58 also permits an interest-rate swap to be an asset of a Trust

Fund which issues Certificates acquired by Plans in an initial offering or in
the secondary market and clarifies the requirements regarding yield
supplement
agreements. An interest-rate swap or, if purchased by or on behalf of the
Trust
Fund, an interest-rate cap contract (collectively, a "Swap" or "Swap
Agreement")
is a permitted Trust Fund asset if it (a) is an "eligible Swap," (b) is with
an
"eligible counterparty," (c) is purchased by a "qualified plan investor," (d)
meets certain additional specific conditions which depend on whether the Swap
is
a "ratings dependent Swap" or a "non-ratings dependent Swap" and (e) permits
the
Trust Fund to make termination payments to the Swap (other than currently
scheduled payments) solely from excess spread or amounts otherwise payable to
the Master Servicer or Asset Seller.

        An "eligible Swap" is one which (a) is denominated in U.S. dollars, (b)
pursuant to which the Trust Fund pays or receives, on or immediately prior to
the respective payment or distribution date for the class of Certificates to
which the Swap relates, a fixed rate of interest or a floating rate of
interest
based on a publicly available index (e.g., LIBOR or the U.S. Federal
Reserve's
Cost of Funds Index), with the Trust Fund receiving such payments on at least
a
quarterly basis and obligated to make separate payments no more frequently
than
the counterparty, with all simultaneous payments being netted ("Allowable
Interest Rate"), (c) has a notional amount that does not exceed either: (i)
the
principal balance of the class of Certificates to which the Swap relates; or
(ii) the portion of the principal balance of such class represented by
obligations ("Allowable Notional Amount"), (d) is not leveraged (i.e.,
payments
are based on the applicable notional amount, the day count fractions, the
fixed
or floating rates permitted above, and

                                  117
<PAGE>

the difference between the products thereof, calculated on a one-to-one ratio
and not on a multiplier of such difference) ("Leveraged"), (e) has a final
termination date that is either the earlier of the date on which the Trust
Fund
terminates or the related class of Certificates are fully repaid and (f) does
not incorporate any provision which could cause a unilateral alteration in
the
interest rate requirement described above or the prohibition against
leveraging.

        An "eligible counterparty" means a bank or other financial institution
which has a rating at the date of issuance of the Certificates, which is one
of

the three highest long-term credit rating categories or one of the two highest
short-term credit rating categories, utilized by at least one of the Rating
Agencies rating the Certificates; provided, that if a counterparty is relying on
its short-term rating to establish eligibility hereunder, such counterparty must
either have a long-term rating in one of the three highest long-term rating
categories or not have a long-term rating from the applicable Rating Agency.

A "qualified plan investor" is a Plan where the decision to buy such class
of Certificates is made on behalf of the Plan by an independent fiduciary
qualified to understand the Swap transaction and the effect the Swap would have
on the rating of the Certificates, and such fiduciary either (i) is a "qualified
professional asset manager" under Prohibited Transaction Class Exemption
("PTCE") 84-14, (ii) is an "in-house asset manager" under PTCE 96-23 or (iii)
has total assets (both Plan and non-Plan) under management of at least $100
million at the time the Certificates are acquired by the Plan.

In "rating dependent Swaps" (where the rating of a class of Certificates
is dependent on the terms and conditions of the Swap), the Swap Agreement must
provide that if the credit rating of the counterparty is withdrawn or reduced by
any Rating Agency below a level specified by the Rating Agency, the Master
Servicer must, within the period specified under the Swap Agreement: (a) obtain
a replacement Swap Agreement with an eligible counterparty which is acceptable
to the Rating Agency and the terms of which are substantially the same as the
current Swap Agreement (at which time the earlier Swap Agreement must
terminate); or (b) cause the Swap counterparty to establish any
collateralization or other arrangement satisfactory to the Rating Agency such
that the then current rating by the Rating Agency of the particular class of
Certificates will not be withdrawn or reduced (and the terms of the Swap
Agreement must specifically obligate the counterparty to perform these duties
for any class of Certificates with a term of more than one year). In the event
that the Master Servicer fails to meet these obligations, Plan
certificateholders must be notified in the immediately following periodic report
which is provided to certificateholders but in no event later than the end of
the second month beginning after the date of such failure. Sixty days after the
receipt of such report, the relief provided under the Exemption will
prospectively cease to be applicable to any class of Certificates held by a Plan
which involves such a ratings dependent Swap.

"Non-ratings dependent Swaps" (those where the rating of the Certificates
does not depend on the terms and conditions of the Swap) are subject to the

following conditions. If the credit rating of the counterparty is withdrawn or
reduced below the lowest level permitted above, the Master Servicer will, within
a specified period after such rating withdrawal or reduction: (a) obtain a
replacement Swap Agreement with an eligible counterparty, the terms of which are
substantially the same as the current Swap Agreement (at which time the earlier
Swap Agreement must terminate); (b) cause the counterparty to post collateral
with the Trust Fund in an amount equal to all payments owed by the counterparty
if the Swap transaction were terminated; or (c) terminate the Swap Agreement in
accordance with its terms.

An "eligible yield supplement agreement" is any yield supplement agreement
or similar arrangement (or if purchased by or on behalf of the Trust Fund, an
interest rate cap contract) to supplement the interest rates otherwise payable
on obligations held by the Trust Fund ("EYS Agreement"). If the EYS Agreement
has a notional principal amount and/or is written on an International Swaps and
Derivatives Association, Inc. form, the EYS Agreement may only be held as an
asset of the Trust Fund with respect to Certificates purchased by Plans on or
after April 7, 1998 if it meets the following conditions: (a) it is denominated
in U.S. dollars; (b) it pays an Allowable Interest Rate; (c) it is not
Leveraged; (d) it does not allow any of the three preceding requirements to be

<PAGE>

unilaterally altered without the consent of the Trustee; (e) it is entered into
between the Trust Fund and an eligible counterparty and (f) it has an Allowable
Notional Amount.

If the general conditions of the Exemption are satisfied, the Exemption
may provide an exemption from the restrictions imposed by ERISA and the Code in
connection with the initial acquisition, transfer or holding, and the
acquisition or disposition in the secondary market, of Certificates by a Plan.
However, no exemption is provided from the restrictions of ERISA for the
acquisition or holding of a Certificate on behalf of an "Excluded Plan" by any
person who is a fiduciary with respect to the assets of such Excluded Plan. For
these purposes, an Excluded Plan is a Plan sponsored by any member of the
Restricted Group. Exemptive relief may also be provided for the acquisition,
holding and disposition of Certificates by Plans if the fiduciary or its
affiliate is the obligor with respect to 5% or less of the fair market value of

the loans in the Trust Fund provided that (i) the Plan is not an Excluded
Plan,
(ii) each Plan's investment in each class of Certificates does not exceed 25%
of
the outstanding Certificates in the class, (iii) after the Plan's acquisition
of
the Certificates, no more than 25% of the assets over which the fiduciary has
investment authority are invested in Certificates of a Trust Fund containing
assets which are sold or serviced by the same entity, and (iv) in the case of
initial issuance (but not secondary market transactions), at least 50% of
each
class of Certificates and at least 50% of the aggregate interests in the
Trust
Fund are acquired by persons independent of the Restricted Group.

        In the event that Offered Certificates (other than REMIC residual
Certificates) do not meet the requirements of the Exemption solely because
they
are subordinated Certificates or fail to meet a minimum rating requirement
under
the Exemption, insurance companies may be eligible to purchase Certificates
pursuant to Section III of PTCE 95-60 which permits insurance company general
accounts (as defined in PTCE 95-60) to purchase such Certificates if they
otherwise meet all of the other requirements of the Exemption.

        Before purchasing a Certificate, a fiduciary of a Plan should itself
confirm (a) that the Certificates constitute "certificates" for purposes of
the
Exemption and (b) that the specific and general conditions set forth in the
Exemption and the other requirements set forth in the Exemption would be
satisfied.

Prohibited Transaction Class Exemption 83-1

        Labor has issued an administrative exemption, PTCE 83-1, which under
certain conditions exempts from the application of certain of the prohibited
transaction rules of ERISA and the excise tax provisions of Code Section 4975
transactions involving a Plan in connection with the operation of a "mortgage
pool" and the purchase, sale and holding of Certificates which are "mortgage
pool pass-through certificates." A "mortgage pool" is defined as a fixed
investment pool consisting solely of interest-bearing obligations secured by
first or second mortgages or deeds of trust on single-family residential
property, property acquired in foreclosure and undistributed cash. A
"mortgage
pool pass-through certificate" is defined as a Certificate which represents a
beneficial undivided interest in a mortgage pool which entitles the holder to
pass through payments of principal and interest from the mortgage loans. PTCE
83-1 requires that: (i) the Asset Seller and the Trustee maintain a system of
insurance or other protection for the mortgage loans, the property securing
such
mortgage loans and for indemnifying holders of Certificates against
reductions
in pass-through payments due to defaults in loan payments or property damage
in
an amount at least equal to the greater of (x) 1% of the aggregate principal
balance of the mortgage loans or (y) 1% of the principal balance of the
largest

covered pooled mortgage loans; (ii) the Trustee may not be an affiliate of the
Asset Seller; and (iii) the payments made to, and retained by, the Asset Seller
in connection with the Trust Fund, together with all funds inuring to its
benefit for administering the Trust Fund, represent no more than "adequate
consideration" for selling the mortgage loans, plus reasonable compensation for
services provided to the Trust Fund. In addition, PTCE 83-1 exempts the initial
sale of Certificates to a Plan with respect to which the Asset Seller, the
insurer, the Master Servicer or other servicer or the Trustee is a Party In
Interest if the Plan does not pay more than fair market value for such
Certificates and the rights and interests evidenced by such Certificates are not
subordinated to the rights and interests evidenced by other Certificates of the
same pool.

<PAGE>

        PTCE 83-1 also exempts from the prohibited transaction rules any
transactions in connection with the servicing and operation of the mortgage
pool, provided that any payments made to the Master Servicer in connection with
the servicing of the Trust Fund are made in accordance with a binding agreement,
copies of which must be made available to prospective Plan investors. In the
case of any Plan with respect to which the Asset Seller, the Master Servicer,
the insurer or the Trustee is a fiduciary, PTCE 83-1 will only apply if, in
addition to the other requirements: (i) the initial sale, exchange or transfer
of Certificates is expressly approved by an independent fiduciary who has
authority to manage and control those Plan assets being invested in
Certificates; (ii) the Plan pays no more for the Certificates than would be paid
in an arm's length transaction; (iii) no investment management, advisory or
underwriting fee, sales transfer commission or similar compensation is paid to
the Asset Seller with regard to the sale, exchange or transfer of Certificates
to the Plan; (iv) the total value of the Certificates purchased by such Plan
does not exceed 25% of the amount issued; and (v) at least 50% of the aggregate
amount of Certificates is acquired by persons independent of the Asset Seller,
the Trustee, the Master Servicer and the insurer. Before purchasing Certificates
in reliance on PTCE 83-1, a fiduciary of a Plan should confirm that the Trust
Fund is a "mortgage pool," that the Certificates constitute "mortgage pool
pass-through certificates" and that the conditions set forth in PTCE 83-1 would
be satisfied. In addition to making its own determination as to the availability
of the exemptive relief provided in PTCE 83-1, the fiduciary should consider the
availability of any other prohibited transaction exemptions. The fiduciary

should also consider its general fiduciary obligations under ERISA in determining whether to purchase any Certificates on behalf of a Plan pursuant to
PTCE 83-1.

Investor-Based Exemptions

Even if Securities issued pursuant to an offering are not treated as equity investments for purposes of the Plan Asset Regulations, the acquisition
or holding of such Securities by or on behalf of a Plan could still be considered to give rise to a prohibited transaction if the Issuers, the Depositor, the Indenture Trustee or any of their respective affiliates is or becomes a party in interest or disqualified person with respect to a Plan or related investment vehicle unless such transaction is subject to one or more statutory or administrative exemptions such as: PTCE 90-1, which exempts certain
transactions involving insurance company pooled separate accounts; PTCE 95-60, which exempts certain transactions involving insurance company general accounts;
PTCE 91-38, which exempts certain transactions involving bank collective investment funds; PTCE 84-14, which exempts certain transactions effected on behalf of a Plan by a "qualified professional asset manager;" or PTCE 96-23, which exempts certain transactions effected on behalf of a Plan by certain "in-house" asset managers (collectively, the "Investor-Based Exemptions"). It should be noted, however, that even if the conditions specified in one or more
of the Investor-Based Exemptions are met, the scope of relief provided by such
exemption may not necessarily cover all acts that might be construed as prohibited transactions.

Nevertheless, a Plan generally should not purchase such Securities in reliance on any of the Investor-Based Exemptions if the Issuers, the Depositor,
the Indenture Trustee or any of their respective affiliates: (a) has investment
discretion with respect to the investment of assets of such Plan; (b) has authority or responsibility to give or regularly gives investment advise with respect to assets of such Plan for a fee and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such assets and that such advice will be based on the
particular investment needs of such Plan; or (c) is an employer maintaining or
contributing to such Plan. A party that is described in the preceding sentence
will generally be construed to be a fiduciary under ERISA with respect to the Plan and any such purchase might result in a non-exempt "prohibited transaction"
under ERISA, the Code or Similar Law.

REVIEW BY PLAN FIDUCIARIES

Any Plan fiduciary considering whether to purchase any Securities on behalf of a Plan should consult with its counsel regarding the applicability of

the fiduciary responsibility and prohibited transaction provisions of ERISA, and
the Code and Similar Law to such investment. Among other things, before

<PAGE>

purchasing any Securities, a fiduciary of a Plan subject to the fiduciary
responsibility provisions of ERISA or an employee benefit plan subject to the
prohibited transaction provisions of the Code should make its own determination
as to the availability of the exemptive relief provided in the Exemption, and
also consider the availability of any other prohibited transaction exemptions.
In particular, in connection with a contemplated purchase of Securities
representing a beneficial ownership interest in a pool of single-family
residential first mortgage loans, such Plan fiduciary should consider the
availability of the Exemption or PTCE 83-1 for certain transactions involving
mortgage pool investment trusts.

        Purchasers that are insurance companies should consult with their counsel
with respect to the United States Supreme Court case interpreting the fiduciary
responsibility rules of ERISA, John Hancock Mutual Life Insurance Co. v. Harris
Trust & Savings Bank (decided December 13, 1993). In John Hancock, the Supreme
Court ruled that assets held in an insurance company's general account may be
deemed to be "plan assets" for ERISA purposes under certain circumstances.
Prospective purchasers should determine whether the decision affects their
ability to make purchases of the Securities. In particular, such an insurance
company should consider the exemptive relief granted by Labor for transactions
involving insurance company general accounts in Prohibited Transaction Exemption
95-60 and under Section 401(c) of ERISA.

                              LEGAL INVESTMENT

        Each class of Offered Securities will be rated at the date of issuance in
one of the four highest rating categories by at least one Rating Agency. The
related Prospectus Supplement will specify which classes of the Securities, if
any, will constitute "mortgage related securities" ("SMMEA Securities") for
purposes of the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA").
SMMEA Securities will constitute legal investments for persons, trusts,
corporations, partnerships, associations, business trusts and business entities
(including, but not limited to, state chartered savings banks, commercial banks,
savings and loan associations and insurance companies, as well as trustees and
state government employee retirement systems) created pursuant to or existing
under the laws of the United States or of any state (including the District of
Columbia and Puerto Rico) whose authorized investments are subject to state

regulation to the same extent that, under applicable law, obligations issued by
or guaranteed as to principal and interest by the United States or any agency or
instrumentality thereof constitute legal investments for such entities. Alaska,
Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Kansas,
Maryland, Michigan, Missouri, Nebraska, New Hampshire, New York, North Carolina,
Ohio, South Dakota, Utah, Virginia and West Virginia enacted legislation before
the October 4, 1991 cutoff established by SMMEA for such enactments, limiting to
varying extents the ability of certain entities (in particular, insurance
companies) to invest in mortgage related securities, in most cases by requiring
the affected investors to rely solely upon existing state law, and not SMMEA.
Investors affected by such legislation will be authorized to invest in SMMEA
Certificates only to the extent provided in such legislation. SMMEA provides,
however, that in no event will the enactment of any such legislation affect the
validity of any contractual commitment to purchase, hold or invest in "mortgage
related securities," or require the sale or other disposition of such securities, so long as such contractual commitment was made or such securities
acquired prior to the enactment of such legislation.

        SMMEA also amended the legal investment authority of federally chartered
depository institutions as follows: federal savings and loan associations and
federal savings banks may invest in, sell or otherwise deal with "mortgage
related securities" without limitation as to the percentage of their assets
represented thereby, federal credit unions may invest in such securities, and
national banks may purchase such securities for their own account without regard
to the limitations generally applicable to investment securities set forth in 12
U.S.C. 24 (Seventh), subject in each case to such regulations as the applicable
federal regulatory authority may prescribe. In this connection, federal credit
unions should review the National Credit Union Administration ("NCUA") Letter to
Credit Unions No. 96, as modified by Letter to Credit Unions No. 108, which
includes guidelines to assist federal credit unions in making investment
decisions for mortgage related securities, and the NCUA's regulation "Investment
and Deposit Activities"

                                  121
<PAGE>

(12 C.F.R. Part 703), which sets forth certain restrictions on investment by
federal credit unions in mortgage related securities.

Institutions whose investment activities are subject to legal investment
laws or regulations or review by certain regulatory authorities may be subject
to restrictions on investment in certain classes of Offered Securities. Any
financial institution which is subject to the jurisdiction of the Comptroller of
the Currency, the Board of Governors of the Federal Reserve System, the FDIC,
the Office of Thrift Supervision ("OTS"), the NCUA or other federal or state
agencies with similar authority should review any applicable rules, guidelines
and regulations prior to purchasing any Offered Security. The Federal Financial
Institutions Examination Council, for example, has issued a Supervisory Policy
Statement on Securities Activities effective February 10, 1992 (the "Policy
Statement") setting forth guidelines for and significant restrictions on
investments in "high-risk mortgage securities." The Policy Statement has been
adopted by the Comptroller of the Currency, the Federal Reserve Board, the FDIC,
the OTS and the NCUA (with certain modifications), with respect to the
depository institutions that they regulate. The Policy Statement generally
indicates that a mortgage derivative product will be deemed to be high risk if
it exhibits greater price volatility than a standard fixed rate thirty-year
mortgage security. According to the Policy Statement, prior to purchase, a
depository institution will be required to determine whether a mortgage
derivative product that it is considering acquiring is high-risk, and if so that
the proposed acquisition would reduce the institution's overall interest rate
risk. Reliance on analysis and documentation obtained from a securities dealer
or other outside party without internal analysis by the institution would be
unacceptable. There can be no assurance that any classes of Offered Securities
will not be treated as high-risk under the Policy Statement.

The predecessor to the OTS issued a bulletin, entitled, "Mortgage
Derivative Products and Mortgage Swaps", which is applicable to thrift
institutions regulated by the OTS. The bulletin established guidelines for the
investment by savings institutions in certain "high-risk" mortgage derivative
securities and limitations on the use of such securities by insolvent,
undercapitalized or otherwise "troubled" institutions. According to the
bulletin, such "high-risk" mortgage derivative securities include securities
having certain specified characteristics, which may include certain classes of
Securities. In accordance with Section 402 of the Financial Institutions Reform,
Recovery and Enhancement Act of 1989, the foregoing bulletin will remain in
effect unless and until modified, terminated, set aside or superseded by the
FDIC. Similar policy statements have been issued by regulators having
jurisdiction over the types of depository institutions.

In September 1993 the National Association of Insurance Commissioners
released a draft model investment law (the "Model Law") which sets forth model

investment guidelines for the insurance industry. Institutions subject to insurance regulatory authorities may be subject to restrictions on investment similar to those set forth in the Model Law and other restrictions.

If specified in the related Prospectus Supplement, other classes of Offered Securities offered pursuant to this Prospectus will not constitute "mortgage related securities" under SMMEA. The appropriate characterization of
this Offered Security under various legal investment restrictions, and thus the
ability of investors subject to these restrictions to purchase such Offered Securities, may be subject to significant interpretive uncertainties.

The Depositor will make no representations as to the proper characterization of the Offered Certificates for legal investment or financial
institution regulatory purposes, or as to the ability of particular investors to
purchase any Offered Certificates under applicable legal investment restrictions. The uncertainties described above (and any unfavorable future determinations concerning legal investment or financial institution regulatory
characteristics of the Offered Securities) may adversely affect the liquidity of
the Offered Securities.

The foregoing does not take into consideration the applicability of statutes, rules, regulations, orders, guidelines or agreements generally governing investments made by a particular investor, including, but not limited
to, "prudent investor" provisions, percentage-of-assets limits and provisions which may restrict or prohibit investment in securities which are not "interest
bearing" or "income paying."

<PAGE>

There may be other restrictions on the ability of certain investors, including depository institutions, either to purchase Offered Securities or to
purchase Offered Securities representing more than a specified percentage of the
investor's assets. Accordingly, all investors whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their own
legal advisors in determining whether and to what extent the Offered Securities
of any class constitute legal investments or are subject to investment, capital
or other restrictions.

PLAN OF DISTRIBUTION

The Offered Securities offered hereby and by the Supplements to this

Prospectus will be offered in series. The distribution of the Securities may be
effected from time to time in one or more transactions, including negotiated
transactions, at a fixed public offering price or at varying prices to be
determined at the time of sale or at the time of commitment therefor. If so
specified in the related Prospectus Supplement, the Offered Securities will be
distributed in a firm commitment underwriting, subject to the terms and
conditions of the underwriting agreement, by Merrill Lynch, Pierce, Fenner &
Smith Incorporated ("Merrill Lynch") acting as underwriter with other
underwriters, if any, named therein. Merrill Lynch is an affiliate of the
Depositor. In such event, the Prospectus Supplement may also specify that the
underwriters will not be obligated to pay for any Offered Securities agreed to
be purchased by purchasers pursuant to purchase agreements acceptable to the
Depositor. In connection with the sale of Offered Certificates, underwriters may
receive compensation from the Depositor or from purchasers of Offered
Securities
in the form of discounts, concessions or commissions. The Prospectus
Supplement
will describe any such compensation paid by the Depositor.

    Alternatively, the Prospectus Supplement may specify that Offered
Securities will be distributed by Merrill Lynch and/or any other person or
persons named therein acting as agent or in some cases as principal with
respect
to Offered Securities that it has previously purchased or agreed to purchase.
If
Merrill Lynch or such persons act as agents in the sale of Offered Securities,
they will receive a selling commission with respect to such Offered
Securities,
depending on market conditions, expressed as a percentage of the aggregate
principal balance or notional amount of such Offered Securities as of the
Cut-
off Date. The exact percentage for each series of Securities will be
disclosed
in the related Prospectus Supplement. To the extent that Merrill Lynch or
such
persons elect to purchase Offered Securities as principal, they may realize
losses or profits based upon the difference between its purchase price and
the
sales price. The Prospectus Supplement with respect to any series offered
other
than through underwriters will contain information regarding the nature of
such
offering and any agreements to be entered into between the Depositor and
purchasers of Offered Securities of such series.

    This Prospectus may be used, to the extent required, by Merrill Lynch
or
any other Underwriter in connection with offers and sales related to market
making transactions.

    The Depositor will indemnify Merrill Lynch and any underwriters against
certain civil liabilities, including liabilities under the Securities Act of

1933, or will contribute to payments Merrill Lynch and any underwriters may be
required to make in respect thereof.

In the ordinary course of business, Merrill Lynch and its affiliates may
engage in various securities and financing transactions, including repurchase
agreements to provide interim financing of the Depositor's or Asset Seller's
Assets pending the sale of such Assets or interests therein, including the
Securities.

As to each series of Securities, only those classes rated in an investment
grade rating category by any Rating Agency will be offered hereby. Any
non-investment-grade class may be initially retained by the Depositor or Asset
Seller, and may be sold by the Depositor or Asset Seller at any time.

Upon receipt of a request by an investor who has received an electronic
Prospectus Supplement and Prospectus from the Underwriter or a request by such
investor's representative within the period during which there is an obligation
to deliver a Prospectus Supplement and Prospectus, the Depositor or the

<PAGE>

Underwriter will promptly deliver, or cause to be delivered, without charge, a
paper copy of the Prospectus Supplement and Prospectus.

LEGAL MATTERS

Certain legal matters in connection with the Securities, including certain
federal income tax consequences, will be passed upon for the Depositor by
Dechert LLP, New York, New York or Thacher Proffitt & Wood, New York, New York.
Certain matters with respect to Delaware law will be passed upon for the
Depositor by Richards, Layton & Finger, P.A., Wilmington, Delaware.

FINANCIAL INFORMATION

A new Trust Fund will be formed with respect to each series of Securities
and no Trust Fund will engage in any business activities or have any assets or
obligations prior to the issuance of the related series of Securities.
Accordingly, no financial statements with respect to any Trust Fund will be
included in this Prospectus or in the related Prospectus Supplement.

INCORPORATION OF CERTAIN INFORMATION BY REFERENCE

This Prospectus incorporates by reference all documents and reports filed
on behalf of the Depositor with respect to a Trust Fund pursuant to Section

13(a), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, prior to
the termination of the offering the related Securities. Upon request by any person to whom this prospectus is delivered in connection with the offering of
one or more Classes of Offered Securities, the Depositor will provide or cause
to be provided without charge a copy of any of the documents and/or reports incorporated herein by reference, in each case to the extent the documents or reports relate to such Classes of Offered Securities, other than the exhibits to
such documents (unless those exhibits are specifically incorporated by reference
in such documents). Requests to the Depositor should be directed in writing to:
Merrill Lynch Mortgage Investors, Inc., 250 Vesey Street, World Financial Center-North Tower, 10th Floor, New York, New York 10281-1310, Attention: Secretary, telephone number (212) 449-0357. The Depositor has determined that its financial statements are not material to the offering of any Offered Securities.

        Investors may read and copy the documents and/or reports incorporated herein by reference at the Public Reference Room of the Securities and Exchange
Commission at 450 Fifth Street, N.W., Washington, D.C. 20549. Investors may obtain information on the operation of the Public Reference Room by calling the
SEC at 1-800-SEC-0330. In addition, the SEC maintains a website at http://www.sec.gov containing reports, proxy and information statements and other information regarding issuers, including each Trust Fund, that file electronically with the SEC.

                                124
<PAGE>

                              RATINGS

        It is a condition to the issuance of any class of Offered Securities that
they shall have been rated not lower than investment grade, that is, in one of
the four highest rating categories, by a Rating Agency.

        Ratings on asset backed securities address the likelihood of receipt by securityholders of all distributions on the underlying assets. These ratings address the structural, legal and issuer-related aspects associated with such certificates, the nature of the underlying assets and the credit quality of the
guarantor, if any. Ratings on asset backed securities do not represent any assessment of the likelihood of principal prepayments by borrowers or of the degree by which such prepayments might differ from those originally anticipated.
As a result, securityholders might suffer a lower than anticipated yield, and, in addition, holders of stripped interest certificates in extreme cases might fail to recoup their initial investments.

A security rating is not a recommendation to buy, sell or hold
securities
and may be subject to revision or withdrawal at any time by the assigning
rating
organization. Each security rating should be evaluated independently of any
other security rating.

<PAGE>

INDEX OF DEFINED TERMS

<Table>
<S>                                     <C>

1986 Act...........................  77
Accretion Directed.................  19
Accrual Class......................  22
Accrual Securities.................  18
Accrued Security Interest..........  23
Agreement..........................  35
Allowable Interest Rate............ 117
Allowable Notional Amount.......... 117
Amortizable Bond Premium
  Regulations......................  74
Annual Interest Amount.............  32
Applicable Amount..................  92
ARM Loans..........................   9
Assets.............................   7
Asset Seller.......................   7
Available Distribution Amount......  22
Average Interest Rate.............. 116
Book-Entry Securities..............  18
Buydown Mortgage Loans.............  16
Buydown Period.....................  16
Cash Flow Agreement................  13
Cede...............................  29
CEDEL..............................  29
CEDEL Participants.................  29
Certificates.......................  18
Class Factor.......................  35
Closing Date.......................  82
Code...............................  71
Collection Account.................  39
Combinations.......................  31
Companion Class....................  19
Component..........................  19
Component Securities...............  19
Cooperative Loans..................  59
Cooperatives.......................   8
Contributions Tax..................  94
Covered Trust......................  56
CPR................................  15
Credit Support.....................  12
Deferred Interest..................  79
Definitive Securities..............  18
Depositaries.......................  30
Depositor..........................   7

Designated Transactions.............    116
Determination Date..................     22
DTC.................................     28
Due Period..........................     22
Eligible C Corporation..............     98
Eligible Corporations...............    109
ERISA...............................     34
Euroclear...........................     29
Euroclear Cooperative...............     29
Euroclear Operator..................     29
Euroclear Participants..............     29
Exemption...........................    115
Exchanged Class.....................    113
EYS Agreement.......................    118
FASIT Qualification Test............    108
FASIT Regular Securities............    108
FASIT Ownership Securities..........    108
FDIC................................     39
Fixed Rate Class....................     21
Floating Rate Class.................     21
Government Securities...............      7
Home Equity Loans...................      9
Home Improvement Contracts..........      9
Indenture...........................     18
Indenture Trustee...................     36
Indirect Participants...............     28
Insurance Proceeds..................     40
Interest-Only Class.................     21
Inverse Floating Rate Class.........     21
Investor Based Exemptions...........    120
IO..................................    108
L/C Bank............................     57
Labor...............................    114
Legislative History.................     78
Leveraged...........................    118
Liquidation Proceeds................     40
Loan-to-Value Ratio.................      8
Lockout Class.......................     19
Manufactured Housing Contracts......      9
Master REMIC........................     81
MBS.................................      7
MBS Agreement.......................     10
MBS Issuer..........................     10
MBS Servicer........................     10
MBS Trustee.........................     10
Merrill Lynch.......................    123
Mezzanine Securities................     20
Model Law...........................    122
Mortgage Assets.....................      7
Mortgage Loan Group.................     18
Mortgage Loans......................      7
Mortgage Notes......................      8
Mortgage Rate.......................     10
Mortgages...........................      8
NAS Class...........................     19
NCUA................................    121
New Regulations.....................     80

Nonrecoverable Advance.............. 25
Notional Amount Class............... 19
OID................................. 72
OID Regulations..................... 74
Originator.......................... 8
OTS................................. 122
PAC................................. 19
Participation Agreement............. 8
Participation Certificate........... 8
Participants........................ 28
Parties In Interest................. 114
Pass-Through Rate................... 23
Payment Lag Certificates............ 88
Permitted Investments............... 40
Plan Asset Regulations.............. 114
Planned Amortization Class.......... 19
Plans............................... 114
Policy Statement.................... 122
Pooling and Servicing Agreement..... 35
Pre-Funded Amount................... 12
Pre-Funding Period.................. 116
Prepayment Assumption............... 78
Primary Mortgage Insurance Policy... 45
&lt;/Table&gt;

126

&lt;PAGE&gt;
&lt;Table&gt;
&lt;S&gt;                                  &lt;C&gt;
Principal-Only Class................ 22
Prohibited Transactions Tax......... 94
Purchase Price...................... 39
PTCE................................ 118
PTE................................. 115
Rating Agency....................... 116
Received Class...................... 113
Recombinable Securities Trust
    Fund............................ 31
Record Date......................... 22
Refinance Loans..................... 8
Related Proceeds.................... 25
Relief Act.......................... 68
REMIC Certificates.................. 80
REMIC Regular Certificateholders.... 82
REMIC Regular Certificates.......... 80
REMIC Regulations................... 71
REMIC Residual Certificateholder.... 89
REMIC Residual Certificates......... 80
Retained Interest................... 48
RS Pool............................. 111
Scheduled Amortization Class........ 20
Security............................ 36
Security Balance.................... 24
Security Owners..................... 28
Senior Securities................... 18
Senior Support Securities........... 20
Sequential Pay Class................ 20

```
Servicing Agreement.................    35
Servicing Standard..................    43
Short-Term Note.....................   100
Similar Law.........................   114
Single Family Mortgage Loan.........     7
Single Family Property..............     7
SMMEA...............................   121
SMMEA Securities....................   121
SPA.................................    15
Step-up Class.......................    22
Strip...............................   112
Strip Class.........................    20
Stripped ARM Obligations............    79
Stripped Bond Certificates..........    76
Stripped Coupon Certificates........    76
Stripped Interest Securities........    18
Stripped Principal Securities.......    18
Subordinate Securities..............    18
Subsequent Assets...................    12
Sub-Servicer........................    43
Sub-Servicing Agreement.............    43
Subsidiary REMIC....................    81
Super-Premium Certificates..........    83
Super Senior Securities.............    20
Support Class.......................    21
Swap................................   117
Swap Agreement......................   117
TAC.................................    21
Targeted Amortization Class.........    21
Tax Counsel.........................   105
Terms and Conditions................    30
Title V.............................    66
Title VIII..........................    67
Trust Agreement.....................    35
U.S. Person.........................    71
UCC.................................    28
Underlying MBS......................     7
Underlying Mortgage Loans...........     7
Value...............................     8
Variable Rate Class.................    21
Voting Rights.......................    51
Warranting Party....................    38
Whole Loans.........................     7
```
</Table>

<PAGE>

--------------------------------------------------------------------------
---
--------------------------------------------------------------------------
---

$1,874,757,100 (APPROXIMATE)

FIRST FRANKLIN MORTGAGE LOAN TRUST

MORTGAGE LOAN ASSET-BACKED CERTIFICATES,
SERIES 2005-FF12

MERRILL LYNCH MORTGAGE INVESTORS, INC.
DEPOSITOR

----------------------
PROSPECTUS SUPPLEMENT
----------------------

MERRILL LYNCH & CO.

You should rely on the information contained or incorporated by
reference
in this prospectus supplement and the attached prospectus. We have not
authorized anyone to provide you with different information.

We are not offering these certificates in any state where the offer is
not
permitted.

We represent the accuracy of the information in this prospectus
supplement
and the attached prospectus only as of the dates stated on their respective
covers.

Dealers will be required to deliver a prospectus supplement and
prospectus
when acting as underwriters of these certificates and with respect to their
unsold allotments or subscriptions. In addition, all dealers selling these
certificates will deliver a prospectus supplement and prospectus until ninety
days after the date of this prospectus supplement.

DECEMBER 22, 2005

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
</TEXT>
</DOCUMENT>